FILED
15-0674
11/16/2015 2:17:39 PM
tex-7866695
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

## No. 15-0674
### In the
### Supreme Court of Texas

|  |  |  |
|---|---|---|
| | § | **Original Proceeding** |
| | § | |
| **In re Forum Studio, Inc.** | § | |
| **and Clayco, Inc.,** | § | **From the 160ᵗʰ District Court** |
| *Relators*. | § | |
| | § | |
| | § | |
| | § | **Of Dallas County, Texas** |

### Real Party in Interest's Appendix

Real Party In Interest files this Appendix to their Response to Petition for

Writ of Mandamus .  The Court is requested to consider the following attachments:

Exhibit 1:   Affidavit of Greg C. Noschese ( R.P. Appx. 003-006)

Exhibit 2:   Defendant's Original Answer (R.P. Appx. 007-009)

Exhibit 3:   Defendant's Counterclaim Against Clayco, Inc. (R.P. Appx. 010-191)

Exhibit 4:   Respondents' Objections, Reservation of Rights and, Subject to and Without Waiver of the Same, Their Answering Statement (R.P. Appx. 192-199)

Exhibit 5:   Order Partially Granting and Partially Denying Respondents' Motion to Dismiss on Statutes of Limitations (R.P. Appx. 200-204)

Exhibit 6:   Plaintiffs' Original Petition (R.P. Appx. 205-303)

1

R.P. Appx. 001

Exhibit 7:   Order on Plaintiffs' Application to Stay Arbitration (R.P. Appx. 304)

Exhibit 8:   Order Denying Plaintiffs' Application for Temporary Restraining Order (R.P. Appx. 305)

Exhibit 9:   Defendant Intellicenter Dallas Investment LLP's Motion to Compel Arbitration (R.P. Appx. 306-311)

Exhibit 10:  Defendant Intellicenter Dallas Investments LLP's Response to Plaintiff's Application to Stay Arbitration (R.P. Appx. 312-410)

Exhibit 11:  Texas Board of Architectural Examiners Public Information results regarding Hans Hecker (R.P. Appx. 411)

Exhibit 12:  Texas Board of Architectural Examiners Public Information results regarding Clayco, Inc. (R.P. Appx. 412-413)

2

R.P. Appx. 002

No. 15-0674
In the
Supreme Court of Texas

| | |
|---|---|
| § | **Original Proceeding** |
| § | |
| § | |
| **In re Forum Studio, Inc.** § | |
| **and Clayco, Inc.,** § | **From the 160th District Court** |
| *Relators.* § | |
| § | |
| § | |
| § | **Of Dallas County, Texas** |

**Affidavit of Greg C. Noschese**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned Notary Public, on this day appeared Greg C. Noschese, who is personally known by me, and after first being duly sworn according to law upon his oath, deposed and said:

1. "My name is Greg C. Noschese. I am over eighteen years of age, am of sound mind and am competent to make this affidavit. The facts stated herein are within my personal knowledge and are all true and correct.

2. I am an attorney licensed to practice law in the State of Texas. I am an attorney of record for Intellicenter Dallas Investments LLP, the Real Party in Interest in this proceeding and in the underlying proceeding before Respondent.

R.P. Appx. 003

3. The following documents, which are being presented as Exhibits to the Court in the Appendix to the Response to Petition for Writ of Mandamus, are true and correct copies of the original documents filed in the underlying trial court and arbitration proceedings:

Exhibit 2 - Defendant's Original Answer (Cause No. DC-15-02018);

Exhibit 3 - Defendant's Counterclaim Against Clayco, Inc. (Cause No. DC-15-02018);

Exhibit 4 – Respondents' Objections, Reservation of Rights and, Subject to and Without Waiver of the Same, Their Answering Statement (AAA Case No. 01-14-0001-0249);

Exhibit 5 - Order Partially Granting and Partially Denying Respondents' Motion to Dismiss on Statutes of Limitations (AAA Case No. 01-14-0001-0249);

Exhibit 6 - Plaintiffs' Original Petition (Cause No. DC-15-02018);

Exhibit 7 - Order on Plaintiffs' Application to Stay Arbitration (Cause No. DC-15-02018);

Exhibit 8 - Order Denying Plaintiffs' Application for Temporary Restraining Order (Cause No. DC-15-02018);

Exhibit 9 - Defendant Intellicenter Dallas Investment LLP's Motion to Compel Arbitration (Cause No. DC-15-02018); and

Exhibit 10 - Defendant Intellicenter Dallas Investments LLP's Response to Plaintiff's Application to Stay Arbitration (Cause No. DC-15-02018).

4. The following documents, which are being presented as Exhibits to the Court in the Appendix to the Response to Petition for Writ of Mandamus, are

true and correct print-outs of the information via the Internet obtained from the official website of the Texas Board of Architectural Examiners:

> Exhibit 11 - Texas Board of Architectural Examiners Public Information License Search Results regarding Hans Hecker; and

> Exhibit 12 - Texas Board of Architectural Examiners Public Information License Search Results regarding Clayco, Inc.

Further affiant sayeth not."



Greg C. Noschese

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 16th day of November 2015.



Sharon D. Blackstock
Notary Public in and for the
State of Texas

My Commission Expires:

01-21-19

SHARON D. BLACKSTOCK
My Commission Expires
January 21, 2019

FILED
DALLAS COUNTY
3/2/2015 4:05:16 PM
FELICIA PITRE
DISTRICT CLERK

Candace Tyler

DC-15-02018

| | | |
|---|---|---|
| FORUM STUDIO, INC. and CLAYCO, INC., | § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | OF DALLAS COUNTY, TEXAS |
| INTELLICENTER DALLAS INVESTMENTS LLP, | § § § § | |
| Defendants. | § | 160TH JUDICIAL DISTRICT |

## DEFENDANT'S ORIGINAL ANSWER

Intellicenter Dallas Investments LP (the "Defendant" or "Intellicenter") files its answer to Clacyo's and Forum Studios' Original Petition as follows:

### I.

### General Denial

1.      Intellicenter denies generally each and every, all and singular, the material allegations contained in Plaintiffs' Original Petition for Declaratory Relief and demand strict proof thereof by a preponderance of the evidence.

Rule 54 Denial of Condition Precedent

2.      Intellicenter hereby denies that Defendants have satisfied all conditions precedent entitling them to the relief sought by their petition.

### II.

### Affirmative Defenses

3.      All or part of Plaintiffs' claims are barred by waiver.

4.      All or part of Plaintiffs' claims are barred by estoppel.

5.      All or part of Plaintiffs' claims are barred by Texas Civil Practice and Remedies Code Section 16.069.

6.      All or part of Plaintiffs' claims are barred by first material breach.

**DEFENANT'S ORIGINAL ANSWER - Page 1**

5990124v.1 5554/38

R.P. Appx. 007

7.      All or part of Plaintiffs' claims are barred by fraud.

8.      All or part of Plaintiffs' claims are barred by illegality.

9.      All or part of Plaintiffs' claims are barred by misrepresentation.

WHEREFORE, PREMISES CONSIDERED, Defendant respectfully request that upon trial or hearing of this matter, Plaintiffs take nothing by way of their causes of action, that Defendant go hence with their costs, attorney's fees and all other relief to which they may show themselves justly entitled.

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**


/s/ Greg C. Noschese
Greg C. Noschese, SB No. 00797164
500 North Akard Street, Suite 3800
Dallas, Texas 75201-6659
(214)855-7500 (Telephone)
(214)855-7584 (Facsimile)
Email: gnoschese@munsch.com

**ATTORNEYS FOR DEFENDANT**

5990124v.1 5554/38

R.P. Appx. 008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 2<u>nd</u> day of March, 2015, a true and correct copy of the foregoing instrument was served on the following by Eserve:

Kenneth B. Chaiken
**CHAIKEN & CHAIKEN, PC**
5801 Tennyson Pkwy, Suite 440
Plano, TX  75024
(214)265-0250
(214)265-1537 (fax)
Email:  kchaiken@chaikenlaw.com

R. Thomas Avery
**BLITZ, BARDGETT & DEUTSCH, LC**
120 South Central Avenue, Suite 1650
St. Louis, Missouri  63105
(314)863-1500
(314)863-1877 (Fax)
Email:  rtavery@bbdle.com

/s/ Greg C. Noschese
Greg C. Noschese

FILED
DALLAS COUNTY
3/2/2015 4:05:16 PM
FELICIA PITRE
DISTRICT CLERK

Candace Tyler

DC-15-02018

| | | |
|---|---|---|
| FORUM STUDIO, INC. and CLAYCO, INC., | § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | OF DALLAS COUNTY, TEXAS |
| INTELLICENTER DALLAS INVESTMENTS LLP, | § § § § | |
| Defendants. | § | 160TH JUDICIAL DISTRICT |

## **DEFENDANT'S COUNTERCLAIM AGAINST CLAYCO, INC.**

Intellicenter Dallas Investments LP (the "Defendant" or "Intellicenter") files its Counterclaim against Clacyo, Inc. as follows:

### **I.**

### **Counterclaim Against Clayco**

1.      On or about May 19, 2006, Intellicenter Dallas Investments, LP contracted with Clayco, Inc. ("Clayco") under a Design Build contract ("Design Build Contract") for the design and construction of a 4 story speculative office building consisting of approximately 211,637 square feet located at 3701 Regent Boulevard, Irving Texas ("Project").  A true and correct copy of the Design Build Contract is attached here to as Exhibit "A".

2.      Among other things, the Design Build Contract provided that the Clayco shall be responsible to Intellicenter for acts and omissions of the Clayco's employees, subcontractors and their agents and employees, and other persons, including the project architect, engineers and other design professionals, performing any portion of Clayco's obligations with respect to the design of the Project.  Clayco was also required to cause all architects, engineers and other design professionals performing design work for the Project to maintain Professional Liability Insurance having minimum limits of One Million Dollars ($1,000,000) per claim and in the aggregate (including excess coverage) (claims made basis).   Such Professional Liability

R.P. Appx. 010

Insurance policies were required to (i) **provide coverage for claims arising out of any act, error, or omission with respect to the rendering of or failure to render design, engineering, professional or architectural services** by architects, engineers or other Design Professionals (and their respective officers, directors, employees or agents) who may be employed, engaged or otherwise utilized by Contractor to perform Contractor's design, engineering, architectural and professional duties, obligations and responsibilities under the Contract Documents, (ii) **include Owner**, and its partners members, officers, directors, employees, agents, successors and assigns **as "additional insureds"**, (iii) **be written on an occurrence basis and not on a claims-made basis**, (iv) waive any rights of subrogation against Owner and its partners, members, officers, directors, employees, agents, successors and assigns, and (v) be written by an insurance company or compliance with a current A.M. Best Company rating of A-/IX or better and be admitted to do business in the state where the Land is located. Contract General Conditions 11.1.4 (emphasis added). Clayco was also required to obtain a commercial general liability policy on a similar basis naming Owner as an additional insured and providing coverage on an occurrence basis. Contract 15.1.7.

3. The Design Build Contract Documents included a specification manual which required the elevated floor slabs to be designed for a 100lb live load with Code allowance reductions. Clayco allegedly completed construction on March 6, 2007 as indicated in the architect's certification under the Certificate of Substantial Completion. Throughout the course of the Project, Clayco and its subcontractors, including, without limitation, the design professionals repeatedly represented to Intellicenter that the Project was being built in accordance with the Design Build Contract specifications. Intellicenter relied upon these representations in authorizing payments.

4. In September 2007, six months after Substantial Completion, the architect, Forum Studio Inc. ("FS")., represented to Intellicenter that the Project was built in accordance

R.P. Appx. 011

with the plans and specifications. A true and correct copy of the architect's certificate is attached hereto as Exhibit "B" ("Architect's Certificate"). The Architect's Certificate specifically provided, "[w]e understand that you and the Venture are relying on this letter and that you or the Venture may pursue a claim against us in the event that you or the Venture has any loss or damage as a result of the facts and circumstance that exist at the Project which make any of our certifications incorrect or inaccurate." The unsealed Architect's Certificate was signed by Hans Hecker even though Mr. Hecker is not licensed in Texas as an Architect and the Architect's Certificate provided what it described as "professional opinions" regarding a Texas project. Mr. Hecker also identified himself as a "principal" which under the Texas Occupations Code means he is a Texas architect even though there does not appear to be any record that Mr. Hecker is a registered Texas architect. The Architect's Certificate also purports to offer opinions on the structural aspects of the Project, which Intellicenter now knows were untrue or inaccurate.

5. In late 2013, as Intellicenter was preparing the building for sale, a broker noted some cracking in the exterior tilt panels. After evaluating the cracks, the design, and the building, Intellicenter learned that the cracks, some of which appeared to have been intentionally concealed by repair at the time of initial construction, were the result of inadequate structural design in portions of the perimeter concrete wall panels and a portion of the steel beam to wall panel connections in such a way that some, if not all, failed to meet applicable building code based upon contract specified live load on design drawings. The Architect's Certificate had not disclosed that inadequate structural design in portions of the perimeter concrete wall panels and a portion of the steel beam to wall panel connections in such a way that some, if not all, failed to meet applicable building code based upon contract specified live load on design drawings.

6. Upon its first discovery of the cracks, Intellicenter wrote Clayco and requested that Clayco correct the damage resulting from the deficient design and/or construction and even

requested contractually required insurance information for occurrence based insurance policies. A true and correct copy of the September 16, 2013 letter Intellicenter sent Clayco is attached hereto as Exhibit "C". At Clayco's request, Intellicenter even met with Clayco in person, allowed an inspection, provided data, evaluated information provided by Clayco, though it appeared incomplete and Intellicenter requested even more information. Despite information establishing Clayco's failure to deliver a Project that could support the specified live loads, Clayco refused to take any action to assist with the diagnosis and/or repair of the Project. Clayco also failed to provide Intellicenter with the insurance information required to be furnished under the Contract. Despite the request to repair the deficiency and/or provide insurance information, Clayco has refused to correct the design and construction deficiencies and/or provide the requested insurance information. Because of Clayco's refusal to repair the Project, Intellicenter has sought bids and contracted for the Project to be repaired to correct the defects. Before undertaking the repairs necessitated by Clayco's acts and/or omissions, Intellicenter had not made any repairs to the outside of the Project.

7. On September 5, 2014, Intellicenter initiated a demand for arbitration in accordance with the American Arbitration Association Construction Industry Rules. The parties abated the arbitration to allow Clayco and its design professionals to inspect the property. During the agreed inspection, additional cracks were discovered requiring even more repairs. Clayco continues and refuses to repair the Project despite never disputing the need for the repairs. On February 20, 2015, Plaintiffs commenced this case, and are now asking this court to provide affirmative relief under the Declaratory Judgment Act and also seeking attorney's fees.

8. As a result of Clayco's acts and or omissions detailed above, Intellicenter has suffered actual damages, including, without limitation, repair costs, expert and testing costs, diminution in value and other damages as provided by law.

R.P. Appx. 013

**Breach of Contract**

9.     By the acts and/or omissions described above, Clayco breached the Design Build Contract and has caused Intellicenter damages in the maximum amount of $3.5 million dollars exclusive of attorney's fees.

**Negligent Misrepresentation**

10.     By the acts and/or omissions described above, Clayco and/or its agents, subcontractors or design professionals it is responsible for under the Design Build Contract supplied false information to Intellicenter for the guidance in its business.  Such false information included, without limitation, misstatements of fact, misstatements of opinion and misrepresentation by non-disclosure.  Neither Clayco nor and/or its agents, subcontractors or design professionals it is responsible for under the Design Build Contract exercised reasonable care in obtaining or communicating the information.  Intellicenter justifiably relied upon the information provided and has now suffered pecuniary losses as a proximate result of the negligent misrepresentations for which it now seeks recovery.

**Fraud**

11.     Through the acts and/or omissions detailed above, Clayco made false representations of fact with the intent that Intellicenter rely upon them by either affirmatively misrepresenting facts and or failing to disclose facts when it or its agents, subcontractors or design professionals it is responsible for under the Design Build Contract had a duty to disclose Intellicenter justifiably relied upon said false representations of fact to its detriment because the false representations related to specialized and technical matters and knowledge that were known only to Clayco and its agents, subcontractors or design professionals it is responsible for under the Design Build Contract.  Clayco's false representations and/or the false representations it is responsible for and/or Clayco's nondisclosure and or the nondisclosure it is responsible for caused actual damages and/or injuries to Intellicenter for which Intellicenter now

seeks recovery.

**Exemplary Damages**

12.     As a result of Clayco's fraud and or the fraud it is responsible for, Intellicenter hereby seeks exemplary damages as provided by law.

**Texas Civil Practice & Remedies Code Section 16.069**

13.     While Intellicenter disputes that limitations has run on any of its claims, to the extent Clayco, or any other party claims limitations has run, Intellicenter affirmatively pleads the operation and effect of Section 16.069, in addition to any other tolling provision supported by the above plead facts.

WHEREFORE, PREMISES CONSIDERED, Respondent respectfully request that upon trial or hearing of this matter, Plaintiffs take nothing by way of their causes of action, that Intellicenter have and recover judgment on its counterclaim against Clayco including actual damages including without limitation, repair costs, expert and testing costs, and/or diminution in value, and exemplary damages.  Additionally, Intellicenter requests that upon judgment it go hence with its costs, attorney's fees and all other relief to which it may show herself justly entitled.

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

/s/ Greg C. Noschese
Greg C. Noschese, SB No. 00797164
500 North Akard Street, Suite 3800
Dallas, Texas 75201-6659
(214)855-7500 (Telephone)
(214)855-7584 (Facsimile)
Email: gnoschese@munsch.com

**ATTORNEYS FOR DEFENDANT**

R.P. Appx. 015

## CERTIFICATE OF SERVICE

I hereby certify that on this the 2nd day of March, 2015, a true and correct copy of the foregoing instrument was served on the following by Eserve:

Kenneth B. Chaiken
**CHAIKEN & CHAIKEN, PC**
5801 Tennyson Pkwy, Suite 440
Plano, TX  75024
(214)265-0250
(214)265-1537 (fax)
Email:  kchaiken@chaikenlaw.com

R. Thomas Avery
**BLITZ, BARDGETT & DEUTSCH, LC**
120 South Central Avenue, Suite 1650
St. Louis, Missouri  63105
(314)863-1500
(314)863-1877 (Fax)
Email:  rtavery@bbdle.com

/s/ Greg C. Noschese
Greg C. Noschese

R.P. Appx. 016



# AIA® Document A111™ – 1997

## Standard Form of Agreement Between Owner and Contractor
*where the basis for payment is the COST OF THE WORK PLUS A FEE with a negotiated Guaranteed Maximum Price*

**AGREEMENT** made as of the <u>nineteenth</u> day of <u>May</u> in the year <u>two thousand six</u>
*(In words, indicate day, month and year)*

**BETWEEN** the Owner:
*(Name, address and other information)*

<u>Intellicenter Dallas Investments, LLP</u>
<u>8115 Preston Rd., Suite #700</u>
<u>Dallas, TX 75225</u>
and the Contractor:
*(Name, address and other information)*

<u>Clayco, Inc.</u>
<u>2199 Innerbelt Business Center Drive</u>
<u>St. Louis, Missouri 63114</u>

The Project is:
*(Name and location)*

<u>The design and construction of a 4-story speculative office building, consisting of</u>
<u>approximately 211,637 gross square feet, located at 3701 Regent Blvd., Irving, Texas.</u>

The Architect is:
*(Name, address and other information)*
<u>FS Architecture, PC</u>
<u>c/o Forum Studios, Inc.</u>
<u>2199 Innerbelt Business Center Drive</u>
<u>St. Louis, Missouri 63114</u>

<u>Structural, mechanical, electrical and civil engineering services and the consulting services</u>
<u>of other Design Professionals for the Project will be provided contractually through the</u>
<u>Architect except as follows: Topographic and boundary survey to be provided by Owner.</u>

The Owner and Contractor agree as follows.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

This document is not intended for use in competitive bidding.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by the Associated General Contractors of America.

**AIA Document A111™ – 1997. Copyright** © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)                    (2347931739)

R.P. Appx. 017

## ARTICLE 1 THE CONTRACT DOCUMENTS

The Contract Documents consist of this specifically modified Agreement, the specifically modified AIA Document A201-1997, General Conditions ~~of the Contract (General, Supplementary and other Conditions),~~ ("A201"), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the ~~Contract,~~ "Contract," and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 15. If anything in the other Contract Documents is inconsistent with this Agreement, this Agreement shall govern.

## ARTICLE 2 THE WORK OF THIS CONTRACT

The Contractor shall fully execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others.

## ARTICLE 3 RELATIONSHIP OF THE PARTIES

The Contractor accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect and exercise the Contractor's skill and judgment in furthering the interests of the Owner; to furnish efficient business administration and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Owner's interests. The Owner agrees to furnish and approve, in a timely manner, information required by the Contractor and to make payments to the Contractor in accordance with the requirements of the Contract Documents. The Contractor will enter into a direct contractual relationship with the Architect, engineers, design/build subcontractors and other design professionals (collectively, the "Design Professionals") to provide the design of the Project. The Owner acknowledges and agrees that the Contractor is not a licensed architect or engineer and is not agreeing to perform services which require such a license in the State in which the Project is located. Such services will be performed by licensed architects, engineers and design/build subcontractors under separate agreements. The fees and expenses of all such design professionals shall be included as part of the Cost of the Work. The Contractor shall cause the Architect to prepare and submit, as part of the Cost of the Work, the Construction Documents necessary for the construction of the Project. The contractual obligations of such the Architect, engineers and other design persons or entities are undertaken and performed in the interests of the Contractor. The agreements between the Contractor and the Architect, engineers and other design professionals shall be in writing and these arrangements, including financial arrangements with respect to the Project, shall be promptly and fully disclosed to the Owner upon request. The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, subcontractors and their agents and employees, and other persons, including the Architect, engineers and other Design Professionals, performing any portion of the Contractor's obligations under this Article 3 with respect to the design of the Project. The "Construction Documents" may include drawings, specifications, and other documents and electronic data setting forth the requirements for construction of the Work, and shall (i) be consistent with the intent of the Project as a whole, (ii) provide information for the use of those in the building trades; and (iii) include documents customarily required for regulatory agency approvals. The fees and expenses of all such Design Professionals shall be included as part of the Contract Sum.

## ARTICLE 4 DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

§ 4.1 The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.
*(Insert the date of commencement, if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

February 21, 2006.

If, prior to commencement of the Work, the Owner requires time to file mortgages, mechanic's liens and other security interests, the Owner's time requirement shall be as follows:

**AIA Document A111™ – 1997. Copyright** © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)                                    (2347931739)

2

R.P. Appx. 018

**§ 4.2** The Contract Time shall be measured from the date of commencement.

**§ 4.3** The Contractor shall achieve Substantial Completion of the entire Work not later than ~~days from~~ December 26, 2006, subject to extensions for any delays contemplated in Paragraph 4.1 of this Agreement or Paragraph 8.3.1 of the form the General Conditions (AIA Document No. A201) attached hereto, such completion date ~~of commencement, or~~ being referred to herein as ~~follows:~~ the "**Substantial Completion Date.**"
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. Unless stated elsewhere in the Contract Documents, insert any requirements for earlier Substantial Completion of certain portions of the Work.)*

~~Portion of Work~~                                      ~~Substantial Completion date~~

, subject to adjustments of this Contract Time as provided in the Contract Documents.
*(Insert provisions, if any, for liquidated damages relating to failure to complete on time, or for bonus payments for early completion of the* ~~Work.)~~*Work.)* The initial construction schedule (the "**Project Schedule**") for the Project is attached hereto as **Exhibit "A**

## ARTICLE 5  BASIS FOR PAYMENT
### § 5.1 CONTRACT SUM
**§ 5.1.1** The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum is the Cost of the Work as defined in Article 7 plus the Contractor's Fee.

**§ 5.1.2** The Contractor's Fee is:
*(State a lump sum, percentage of Cost of the Work or other provision for determining the Contractor's Fee, and describe the method of adjustment of the Contractor's Fee for changes in the Work.)*

The "Contractor's Fee" shall be four percent (4%) of the Cost of the Work subject to an increase in the fee of four percent (4%) on all Change Orders, as defined in Paragraph 6.3 herein below, increasing the Cost of the Work, and subject to a decrease in the fee of four percent (4%) on all Change Orders decreasing the Cost of the Work.

### § 5.2 GUARANTEED MAXIMUM PRICE
**§ 5.2.1** The sum of the Cost of the Work and the Contractor's Fee is guaranteed by the Contractor not to exceed ~~($ ),~~ Fourteen Million Three Hundred Fifty-Three Thousand Nine Hundred Seventy-Three and 00/100 Dollars ($14,353,973.00), subject to additions and deductions by Change Order as provided in the Contract Documents. Such maximum sum is referred to in the Contract Documents as the Guaranteed Maximum Price (as the same may be adjusted from time to time by Change Order or otherwise, the "Guaranteed Maximum ~~Price.~~ Price"). Costs which would cause the Guaranteed Maximum Price to be exceeded shall be paid by the Contractor without reimbursement by the Owner. If, upon Final Completion, the GMP exceeds Cost of the Work plus the Contractor's Fee, then the amount of such excess shall be referred to herein as the "savings"; and the savings shall be shared by the Owner and the Contractor as follows: sixty percent (60%) of the savings shall be retained by the Owner; and forty percent (40%) of the savings shall be paid to the Contractor as a fee in addition to the ~~Owner.~~ Contractor's Fee described in Paragraph 5.1.2 above.
*(Insert specific provisions if the Contractor is to participate in any savings.)*

**AIA Document A111™ – 1997. Copyright** © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)                                    (2347931739)

R.P. Appx. 019

§ 5.2.2 The Guaranteed Maximum Price is based on the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:
*(State the numbers or other identification of accepted alternates. If decisions on other alternates are to be made by the Owner subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when the amount expires.)*

See Outline Specification & Drawings (the "**Outline Specs**") attached to this Contract as **Exhibit "B"** (consisting of ____ pages).

§ 5.2.3 Unit prices, if any, are as follows:

| ~~Description~~ | ~~Units~~ | ~~Price ($ 0.00)~~ |
|---|---|---|

See Outline Specs.

§ 5.2.4 Allowances, if any, are as follows
*(Identify and state the amounts of any allowances, and state whether they include labor, materials, or both.)*

| ~~Allowance~~ | ~~Amount ($ 0.00)~~ | ~~Included items~~ |
|---|---|---|

See Outline Specs. If the Contract Documents provide for any allowances, then the parties agree that (i) the GMP shall be reduced by the amount, if any, by which the allowance exceeds the actual cost of the item for which such allowance was made, and (ii) the GMP shall be increased by the amount, if any, by which the actual cost of the item for which such allowance was made exceeds the allowance.

§ 5.2.5 Assumptions, if any, on which the Guaranteed Maximum Price is based are as follows:

Contractor's general conditions as set forth in the Division 1 costs shall not exceed 125% of the amount set forth on the Clayco Control Budget attached as Exhibit "C".

See Outline Specs.

§ 5.2.6 To the extent that the Drawings and Specifications are anticipated to require further development by the Architect, the Contractor has provided in the Guaranteed Maximum Price for such further development consistent with the Contract Documents and reasonably inferable therefrom. Such further development does not include such things as changes in scope, systems, kinds and quality of materials, finishes or equipment, all of which, if required, shall be incorporated by Change Order.

## ARTICLE 6  CHANGES IN THE WORK
§ 6.1 Adjustments to the Guaranteed Maximum Price on account of changes in the Work ~~may~~-shall be determined ~~by any of the methods listed in Section 7.3.3 of AIA Document A201-1997.~~accordance with Paragraph 6.5 below.

§ 6.. § 6.2 ~~In calculating adjustments to subcontracts (except those awarded with the Owner's prior consent on the basis of cost plus a fee), the terms "cost" and "fee" as used in Section 7.3.3.3 of AIA Document A201-1997 and the terms "costs" and "a reasonable allowance for overhead and profit" as used in Section 7.3.6 of AIA Document A201-1997 shall have the meanings assigned to them in AIA Document A201-1997 and shall not be modified by Articles 5, 7 and 8 of this Agreement. Adjustments to subcontracts awarded with the Owner's prior consent on the basis of cost plus a fee shall be calculated in accordance with the terms of those subcontracts.~~

~~§ 6.3~~ § 6.2 In calculating adjustments to the Guaranteed Maximum ~~Price,~~ Price or the impact of any Change Order, the terms "cost" and "costs" as used in the above-referenced provisions of AIA Document A201-1997 shall mean the Cost of the Work as defined in Article 7 of this Agreement and the terms "fee" and "a reasonable allowance for overhead and profit" shall mean the percentage for the Contractor's Fee as ~~defined~~-indicated in Section 5.1.2 of this Agreement.

**AIA Document A111™ – 1997. Copyright** © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A111 - Kof - Intellicenter - Dallas v3 (5-19-06)                    (2347931739)

4

R.P. Appx. 020

§ 6.4 ~~If no specific provision is made in Section 5.1 for adjustment of the Contractor's Fee in the case of changes in the Work, or if the extent of such changes is such, in the aggregate, that application of the adjustment provisions of Section 5.1 will cause substantial inequity to the Owner or Contractor, the Contractor's Fee shall be equitably adjusted on the basis of the Fee established for the original Work, and the Guaranteed Maximum Price shall be adjusted accordingly.~~

§ 6.3 If (a) the Owner requests a change in the Work or (b) the Contractor otherwise is entitled to a Change Order as provided in the Contract Documents, then the Contractor shall have the right to submit to the Owner a written change order request (a "**CO Request**"), which shall set forth such change to the Contract as shall be appropriate. Such CO Request shall be in writing and shall set forth the appropriate changes, if any, to the (i) Cost of the Work, (ii) the Contractor's Fee, (iii) the Guaranteed Maximum Price, (iv) the Contract Sum, (v) the schedule of values, (vi) the Substantial Completion Date, or (vii) any other provisions of the Contract. Each CO Request shall constitute an offer by the Contractor to amend the Contract. If the Owner accepts such offer in writing and without revision, then such offer and acceptance, together, shall constitute a "**Change Order**" which shall operate to amend the Contract. If the Owner accepts such offer subject to revisions not previously agreed to by the Contractor in writing, then such "acceptance" shall constitute a counteroffer by the Owner to the Contractor which the Contractor may either accept in writing or reject. If the Contractor accepts such counteroffer in writing, the same shall constitute a written Change Order. The Contractor shall have no obligation or right to perform any changes in the Work except pursuant to a Change Order made as provided herein.

## ARTICLE 7 COSTS TO BE REIMBURSED
### § 7.1 COST OF THE WORK
The term Cost of the Work shall mean costs necessarily incurred by the Contractor in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior written consent of the Owner. The Cost of the Work shall include only the items set forth in this Article 7.

### § 7.2 LABOR COSTS
§ 7.2.1 Wages of construction workers directly employed by the Contractor to perform the construction of the Work at the site or, with the Owner's approval, at off-site workshops.

§ 7.2.2 Wages or salaries of the Contractor's supervisory and administrative ~~personnel~~ personnel, based upon the time expended on the Project when stationed at the site with the Owner's ~~approval~~ written approval. Time expended on the Project by the Contractor's Project Manager for the Project shall be included as a Cost of the Work, regardless of where the Project Manager is located.
*(If it is intended that the wages or salaries of certain personnel stationed at the Contractor's principal or other offices shall be included in the Cost of the Work, identify in Article 14 the personnel to be included and whether for all or only part of their time, and the rates at which their time will be charged to the Work.)*

§ 7.2.3 Wages and salaries of the Contractor's supervisory or administrative personnel engaged, at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

§ 7.2.4 Costs paid or incurred by the Contractor for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included in the Cost of the Work under Sections 7.2.1 through 7.2.3.

### § 7.3 SUBCONTRACT COSTS
§ 7.3.1 Payments made by the Contractor to Subcontractors (including, without limitation, the Contractor if the Contractor or a division of the Contractor is also a subcontractor but only if approved in writing in advance by Owner) in accordance with the requirements of the subcontracts.

### § 7.4 COSTS OF MATERIALS AND EQUIPMENT INCORPORATED IN THE COMPLETED CONSTRUCTION
§ 7.4.1 Costs, including transportation and storage, of materials and equipment incorporated or to be incorporated in the completed construction.

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)                                    (2347931739)

R.P. Appx. 021

**§ 7.4.2** Costs of materials described in the preceding Section 7.4.1 in excess of those actually installed to allow for reasonable waste and spoilage. Unused excess materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by the Contractor. Any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

## § 7.5 COSTS OF OTHER MATERIALS AND EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS

**§ 7.5.1** Costs, including transportation and storage, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment, and hand tools not customarily owned by construction workers, that are provided by the Contractor at the site and fully consumed in the performance of the Work; and cost (less salvage value) of such items if not fully consumed, whether sold to others or retained by the Contractor. Cost for items previously used by the Contractor shall mean fair market value.

**§ 7.5.2** Rental charges for temporary facilities, machinery, equipment, and hand tools not customarily owned by construction workers that are provided by the Contractor at the site, whether rented from the Contractor or others, and costs of transportation, installation, minor repairs and replacements, dismantling and removal thereof. Rates and quantities of equipment rented <u>from the Contractor</u> shall ~~be subject to~~ <u>not exceed</u> the ~~Owner's prior approval.~~<u>fair market value thereof.</u>

**§ 7.5.3** Costs of removal of debris from the site.

**§ 7.5.4** Costs of document reproductions, facsimile transmissions and long-distance telephone calls, postage and parcel delivery charges, telephone service at the site and reasonable petty cash expenses of the site office.

**§ 7.5.5** That portion of the reasonable expenses of the Contractor's personnel incurred while traveling in discharge of duties connected with the Work.

**§ 7.5.6** Costs of materials and equipment suitably stored off the site at a mutually acceptable location, if approved in advance by the Owner.

## § 7.6 MISCELLANEOUS COSTS

**§ 7.6.1** That portion of insurance ~~and bond premiums~~ that can be directly attributed to this <u>Contract. The parties stipulate and agree that Contractor's cost for providing such insurance is six tenths of one percent (0.75%) of the Cost of the Work, excluding such cost of insurance.</u> ~~Contract.~~

**§ 7.6.2** Sales, <u>consumer,</u> use or similar taxes imposed by a governmental authority that are related to the Work.

**§ 7.6.3** Fees and assessments for the building permit and for other permits, licenses and inspections for which the Contractor is required by the Contract Documents to pay.

**§ 7.6.4** Fees of laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work for which reimbursement is excluded by Section 13.5.3 of AIA Document A201-1997 or other provisions of the Contract Documents, and which do not fall within the scope of Section 7.7.3.

**§ 7.6.5** ~~Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement of the Contract Documents; and payments made in accordance with legal judgments against the Contractor resulting from such suits or claims and payments of settlements made with the Owner's consent. However, such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Contractor's Fee or subject to the Guaranteed Maximum Price. If such royalties, fees and costs are excluded by the last sentence of Section 3.17.1 of AIA Document A201-1997 or other provisions of the Contract Documents, then they shall not be included in the Cost of the Work.~~
**§ 7.6.5** <u>Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents if such royalty and license fees are disclosed to Owner prior to Contractor commencing construction of the Project and Owner approves same in writing.</u>

**§ 7.6.6** Data processing costs related to the Work.

**AIA Document A111™ – 1997. Copyright** © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)                                     (2347931739)

R.P. Appx. 022

**§ 7.6.7** Deposits lost for causes other than the Contractor's negligence or failure to fulfill a specific responsibility to the Owner as set forth in the Contract Documents.

**§ 7.6.8** Legal, mediation and arbitration costs, including attorneys' fees, other than those arising from disputes between the Owner and Contractor, reasonably incurred by the Contractor in the performance of the Work and with the Owner's prior written approval; which approval shall not be unreasonably withheld.

**§ 7.6.9** Expenses incurred in accordance with the Contractor's standard personnel policy for relocation and temporary living allowances of personnel required for the Work, if approved by the Owner.

**§ 7.6.10 Payments by the Contractor into reserves established under the CCIP for the Project for providing Subcontractor insurance. The Contractor represents that the amount of such reserve payments shall not exceed the insurance premiums that reasonably would be incurred for the Project in the absence of the CCIP.**

**§ 7.6.11** Other direct reasonable expenses incurred by the Contractor in connection with the Project to the extent not described in this Section 7.6.

**§ 7.6.12 Design service fees payable to the Architect and any other design professionals engaged by Architect or the Contractor to provide the design for the Project.**

**§ 7.7 OTHER COSTS AND EMERGENCIES**
**§ 7.7.1** Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner.

**§ 7.7.2** Costs due to emergencies incurred in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property, as provided in Section 10.6 of AIA Document A201-1997.

**§ 7.7.3** Costs of repairing or correcting damaged ~~or nonconforming~~ Work executed by the Contractor, Subcontractors or suppliers, provided that such damaged ~~or nonconforming~~ Work was not caused by ~~negligence~~ NEGLIGENCE, intentional misconduct or failure to fulfill a specific responsibility of the Contractor and only to the extent that the cost of repair ~~or correction~~ is not ~~recoverable~~ recovered by the Contractor from insurance, sureties, Subcontractors or suppliers.

**ARTICLE 8   COSTS NOT TO BE REIMBURSED**
**§ 8.1** The Cost of the Work shall not include:

**§ 8.1.1** Salaries and other compensation of the Contractor's personnel stationed at the Contractor's principal office or offices other than the site office, except as specifically provided in Sections 7.2.2 and 7.2.3 or as may be provided in Article 14.

**§ 8.1.2** ~~Expenses~~ Except to the extent provided in Article 7, expenses of the Contractor's principal office and offices other than the site office.

**§ 8.1.3** Overhead and general expenses, except as may be expressly included in Article 7.

**§ 8.1.4** The Contractor's capital expenses, including interest on the Contractor's capital employed for the Work.

**§ 8.1.5** Rental costs of machinery and equipment, except as specifically provided in Section 7.5.2.

**§ 8.1.6** Except as provided in Section 7.7.3 of this Agreement, costs due to the negligence or failure to fulfill a specific responsibility of the Contractor, Subcontractors and suppliers or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable.

**§ 8.1.7** Any cost not specifically and expressly described in Article 7.

**AIA Document A111™ – 1997. Copyright** © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)                                                                                   (2347931739)

R.P. Appx. 023

**§ 8.1.8** Costs, other than costs included in Change Orders approved by the Owner, that would cause the Guaranteed Maximum Price to be exceeded.

**§ 8.1.9** The release, or waiver or bonding, of any liens or claims which may be claimed, threatened or recorded so long as Owner paid Contractor all undisputed amounts under this Contract.

**§ 8.1.10**

Costs recovered by Contractor through insurance or otherwise.

## ARTICLE 9  DISCOUNTS, REBATES AND REFUNDS
**§ 9.1** Cash discounts obtained on payments made by the Contractor shall accrue to the Owner if (1) before making the payment, the Contractor included them in an Application for Payment and received payment therefor from the Owner, or (2) the Owner has deposited funds with the Contractor with which to make payments; otherwise, cash discounts shall accrue to the Contractor. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Contractor shall make provisions so that they can be secured.

**§ 9.2** Amounts that accrue to the Owner in accordance with the provisions of Section 9.1 shall be credited to the Owner as a deduction from the Cost of the Work.

## ARTICLE 10  SUBCONTRACTS AND OTHER AGREEMENTS
**§ 10.1** The Owner hereby agrees that portions of the Work may be subcontracted to the Contractor or any division of the Contractor if agreed to in writing in advance by Owner. Those portions of the Work that the Contractor does not ~~customarily~~ perform with the Contractor's own personnel (or which are not subcontracted to the Contractor or a division thereof as aforesaid) shall be performed under subcontracts or by other appropriate agreements with the Contractor. The Owner may designate specific persons or entities from whom the Contractor shall obtain bids. The Contractor shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work and shall deliver such bids to the ~~Architect.~~ Owner. The Owner shall then determine, with the advice of the ~~Contractor and the Architect,~~ Contractor, which bids will be accepted. The Contractor shall not be required to contract with anyone to whom the Contractor has reasonable objection. For each portion of the Work having an estimated cost in excess of $50,000, Contractor shall endeavor in good faith, using significant efforts, to obtain, and provide to Owner upon request, bids for said portion of the Work from at least 3 qualified subcontractors. If Contractor cannot obtain bids from 3 qualified bidders, Contractor shall inform Owner of this before entering into the relevant Subcontract. Contractor shall not subcontract performance of all or any portion of the Project under the Contract Documents pursuant to any subcontract in excess of $50,000 without first notifying Owner of the intended subcontracting and obtaining Owner's acceptance in writing of the subcontracting and the subcontractor, which acceptance or rejection shall be promptly given. If requested by Owner, Contractor shall furnish Owner a copy of the proposed subcontract for Owner's review of the terms and conditions thereof and shall not execute such subcontract until Owner has accepted such terms. Failure of Contractor to comply with this Section may be deemed to be a material breach of the Contract Documents. Contractor shall not remove any of the following major subcontractors and replace any of such major subcontractors with any other subcontractor without Owner's prior written approval, which shall not be unreasonably withheld or delayed, provided the proposed replacement subcontractor has the experience, financial backing and history of quality construction for projects of the nature and timing of the Project. The major subcontractors that can only be replaced in accordance with the foregoing procedures are as follows: any CSI Division 15 or 16 subcontractor and any subcontractor performing roofing or exterior glass or glazing work. Contractor shall not be relieved of obligations under the Contract Documents by virtue of Owner's approval of any subcontractors.

**§ 10.2** If a specific bidder among those whose bids are delivered by the Contractor to the ~~Architect~~ Owner (1) is recommended to the Owner by the Contractor; (2) is qualified to perform that portion of the Work; and (3) has submitted a bid that conforms to the requirements of the Contract Documents without reservations or exceptions, but the Owner requires that another bid be accepted, then the Contractor may require that a Change Order be issued to adjust the Guaranteed Maximum Price by the difference between the bid of the person or entity recommended to the

**AIA Document A111™ – 1997. Copyright** © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)    (2347931739)

R.P. Appx. 024

Owner by the Contractor and the amount of the subcontract or other agreement actually signed with the person or entity designated by the Owner.

§ 10.3 Subcontracts or other agreements shall conform to the applicable payment provisions of this Agreement, and shall be lump sum contracts and shall not be awarded on the basis of a fixed fee or cost plus a fee without the prior consent of the Owner.

§ 10.4 The Owner shall be invited to all subcontract bid and design review meetings.

§ 10.5 Contractor will, and will cause its subcontractors to, comply with the terms of the Contract Documents applicable to the portion of the Project performed by them. If any portion of the Project that has been subcontracted by Contractor is not prosecuted in accordance with the Contract Documents, on request of Owner the subcontractor shall be replaced and shall not be employed again on the Project.

§ 10.6 Contractor shall include a provision in the contract with each subcontractor authorizing assignment of such contract to Owner in the event of a termination by Owner of the Contract Documents with Contractor.

§ 10.7 As used in the Contract Documents, the term "subcontract" shall also include purchase orders and rental agreements for materials or equipment, and the term "subcontractor" shall also include vendors or suppliers of such material or equipment.

## ARTICLE 11  ACCOUNTING RECORDS
The Contractor shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management under this Contract, and the accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's accountants shall be afforded access to, and shall be permitted to audit and copy, the Contractor's records, books, correspondence, instructions, drawings, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Contract, and the Contractor shall preserve these for a period of three years after final payment, or for such longer period as may be required by law.

## ARTICLE 12  PAYMENTS
### § 12.1 PROGRESS PAYMENTS
§ 12.1.1 Based upon Applications for Payment submitted to the ~~Architect~~ Owner by the ~~Contractor and Certificates for Payment issued by the Architect,~~ Contractor, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

§ 12.1.2 The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

§ 12.1.3 Provided that an Application for Payment is received by the ~~Architect~~ Owner not later than the first (1st) day of a month, the Owner shall make payment to the Contractor not later than the twentieth (20th) day of the same month. If an Application for Payment is received by the ~~Architect~~ Owner after the application date fixed above, payment shall be made by the Owner not later than ~~( )~~ twenty (20) days after the ~~Architect~~ Owner receives the Application for Payment.

§ 12.1.4 With each Application for Payment, the Contractor shall submit (a) payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner ~~or Architect~~ to demonstrate that cash disbursements already made by the Contractor on account of the Cost of the Work equal or exceed (1) progress payments already received by the Contractor; less (2) that portion of those payments attributable to the Contractor's Fee; plus (3) payrolls for the period covered by the present Application for Payment, (b) unconditional lien waivers in such form as Owner may reasonably require for the prior month's payment by Owner to Contractor, executed by Contractor and all first tier subcontractors, mechanics and materialmen on the Project, (c) conditional lien waivers in such form as Owner may reasonably require for ~~Payment.~~ the current month's payment by Owner to Contractor, executed by Contractor and all first tier subcontractors, mechanics and materialmen on the Project, the only condition thereof being the receipt of payment from Owner (or Contractor, in the case of the subcontractors, mechanics and materialmen), (d) an affidavit executed by Owner indicating the names of all

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)  (2347931739)

R.P. Appx. 025

subcontracts and materialmen that have worked on the Project since the date of the last Application for Payment, and (e) within 45 days after the foundation for the Project has been poured, a foundation survey showing the location of the foundation for the Project, along with the boundaries of the Land, the location of any flood plain and all easements and other title exceptions affecting the Land and any set back or other building restrictions as set forth on the most recent Survey.

§ 12.1.5 Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor and approved in writing by Owner in accordance with the Contract Documents. The schedule of values shall allocate the entire Guaranteed Maximum Price and the Contractor's current estimate of the Cost of the Work among the various portions of the Work, except that the Contractor's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the ~~Architect~~ Owner may require. This schedule, unless objected to by the ~~Architect,~~ Owner, shall be used as a basis for reviewing the Contractor's Applications for Payment.

§ 12.1.6 Applications for Payment shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment. The percentage of completion shall be the lesser of (1) the percentage of that portion of the Work which has actually been completed; or (2) the percentage obtained by dividing (a) the expense that has actually been incurred by the Contractor on account of that portion of the Work for which the Contractor has made or intends to make actual payment prior to the next Application for Payment by (b) the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values.

§ 12.1.7 Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

    .1    take that portion of the Guaranteed Maximum Price properly allocable to completed Work as determined by multiplying the percentage of completion of each portion of the Work by the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values. Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Section 7.3.8 of ~~AIA Document A201-1997;~~ the A201;

    .2    add that portion of the Guaranteed Maximum Price properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work, or if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing;

    .3    add the Contractor's Fee, less retainage of ~~( ).The~~ ten percent (10%) of the first 50% of the Cost of the Work (using the Guaranteed Maximum Price as the Cost of the Work for this purpose) and zero percent (0%) retainage thereafter. The Contractor's Fee shall be computed upon the Cost of the Work described in the two preceding Clauses at the rate stated in Section 5.1.2 or, if the Contractor's Fee is stated as a fixed sum in that Subparagraph, shall be an amount that bears the same ratio to that fixed-sum fee as the Cost of the Work in the two preceding Clauses bears to a reasonable estimate of the probable Cost of the Work upon its completion;

    .4    subtract the aggregate of previous payments made by the Owner;

    .5    subtract the shortfall, if any, indicated by the Contractor in the documentation required by Section 12.1.4 to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner's accountants in such documentation; ~~and~~

    .6    subtract amounts, if any, for which the ~~Architect~~ Owner has ~~withheld or nullified~~ not approved a ~~Certificate for~~ Payment as provided in Section 9.5 of AIA Document ~~A201-1997.~~ A201-1997; and.

    .7    Thirty (30) days after Substantial Completion of the Work, any retainage then held by the Owner shall be due and payable to the Contractor provided that such payment may be reduced by the cost of completing any incomplete Work or the disputed amount of any unsettled claims.

§ 12.1.8 Except with the Owner's prior approval, payments to Subcontractors shall be subject to retainage ~~of not less than ( ).~~ as set forth in Section 12.1.7.3 above. The Owner and the Contractor shall agree upon a mutually

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)    (2347931739)

R.P. Appx. 026

acceptable procedure for review and approval of payments and retention for Subcontractors. Thirty days after any Subcontractor fully performs all of its obligations under its Subcontract and the Contractor has approved and the Owner has accepted such work,, upon request of the Contractor, the Owner shall release the full amount of the retainage for such Subcontractor to the Contractor for payment to the Subcontractor, provided that such Subcontractor has provided a final lien release applicable to such payment (as described in Section 12.1.4 above, conditional until payment clears, with an unconditional lien release to follow within 10 days after such payment clears).

§ 12.1.9 In taking action on the Contractor's Applications for Payment, the Architect shall be entitled to rely on the accuracy and completeness of the information furnished by the Contractor and shall not be deemed to represent that the Architect has made a detailed examination, audit or arithmetic verification of the documentation submitted in accordance with Section 12.1.4 or other supporting data; that the Architect has made exhaustive or continuous on-site inspections or that the Architect has made examinations to ascertain how or for what purposes the Contractor has used amounts previously paid on account of the Contract. Such examinations, audits and verifications, if required by the Owner, will be performed by the Owner's accountants acting in the sole interest of the Owner.
§ 12.1.9 As the Project reaches Substantial Completion, Contractor and Owner shall schedule and conduct a joint inspection of the Project and identify in writing all punch list items ("Punch List Items"). Contractor must complete all such Punch List Items prior to Owner making final payment to the Contractor. Owner may continue to retain one hundred ten percent (110%) of the estimated cost of completing the Punch List items until the completion of same. All Punch List Items shall be completed on or before the 45th day after Substantial Completion.
§ 12.1.10 Upon completion of 25%, 50% and 75% of the Work, Contractor shall provide to Owner a project cost report that includes an estimated cost to complete the Project, a listing of modifications and pending Change Orders, and other items reasonably requested by Owner. Upon completion of 25%, 50%, 75% and 100% of the Work, Contractor shall submit to Owner a written reconciliation report evidencing the difference, if any, between (a) the amounts Owner has paid to Contractor under the Schedule of Values plus the portion of the Contractor's Fee paid by Owner and (b) the actual Cost of the Work incurred to the applicable date plus the portion of the Contractor's Fee owed to the applicable date under this Agreement. If such written reconciliation report shows that Owner's payments pursuant to the Schedule of Values plus the Contractor's Fee has resulted in a payment to Contractor in excess of the actual Cost of the Work plus the Contractor's Fee then owed, the overpayment shall be credited to Owner, with the credit being spread over the remaining draws until the excess payments have been fully accounted for by Owner or, if no further draws are to be made, then promptly refunded to Owner.

## § 12.2 FINAL PAYMENT
§ 12.2.1 Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:

    .1    the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Section 12.2.2 of AIA Document A201-1997, and to satisfy other requirements, if any, which extend beyond final payment; andpayment.

    .2    a final Certificate for Payment has been issued by the Architect.
    .2    the other requirements of this Section 12.2 have been fully met.

§ 12.2.2 The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of Contractor has delivered the following to the Owner (but in no event earlier than the Architect's final Certificate for Payment, or as follows:date set forth in Section 12.2.3 hereof):

(i) executed final lien waivers from all first tier Subcontractors and the Contractor (which may be conditioned only upon receipt of Owner's final payment), and (ii) a copy of as-built plans and an as-built survey for the Project, (iii) evidence that all Punch List Items prepared at Substantial Completion of the Work have been completed. The Contractor agrees to obtain final and unconditional lien waivers from all first and second tier Subcontractors (or post an appropriate bond over such lien) and to provide a final unconditional lien waiver from the Contractor within thirty days after receipt of final payment.

§ 12.2.3 The Owner's accountants will review and report in writing on the Contractor's final accounting within 30 days after delivery of the final accounting to the ArchitectOwner by the Contractor. Based upon such Cost of the

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)　　　　　　　　　　　　　　　　　(2347931739)

R.P. Appx. 027

Work as the Owner's accountants report to be substantiated by the Contractor's final accounting, and provided the other conditions of ~~Section~~ Sections 12.2.1 and 12.2.2 have been met, the ~~Architect~~ Owner will, within ~~seven~~ twenty (20) days ~~after receipt of~~ thereafter, either make the ~~written report of the Owner's accountants, either issue~~ final payment, or deliver to the ~~Owner~~ Contractor a ~~final Certificate for Payment with a~~ copy ~~to~~ of the ~~Contractor, or~~ Owner's accountant's report and notify the Contractor ~~and Owner~~ in writing of the ~~Architect's~~ Owner's reasons for withholding ~~a certificate~~ payment as provided in Section 9.5.1 of the AIA Document A201-1997. The time periods stated in this Section 12.2.3 supersede those stated in Section 9.4.1 of the AIA Document A201-1997.

**§ 12.2.4** If the Owner's accountants report the Cost of the Work as substantiated by the Contractor's final accounting to be less than claimed by the Contractor, the Contractor shall be entitled to ~~demand arbitration of the disputed amount without~~ submit such matter as a ~~further decision~~ Claim under Section 4.3 of the ~~Architect.~~ A201. Such ~~demand for arbitration~~ Claim shall be made by the Contractor within 30 days after the Contractor's receipt ~~of a copy~~ of the ~~Architect's final Certificate for Payment;~~ Owner's accountants' report; failure to ~~demand arbitration~~ submit such Claim within this 30-day period shall result in the substantiated amount reported by the Owner's accountants becoming binding on the Contractor. Pending a final resolution ~~by arbitration,~~ of the Claim, the Owner shall pay the Contractor the amount certified in the ~~Architect's final Certificate for Payment.~~ Owner's accountants' report.

~~**§ 12.2.5** If, subsequent to final payment and at the Owner's request, the Contractor incurs costs described in Article 7 and not excluded by Article 8 to correct defective or nonconforming Work, the Owner shall reimburse the Contractor such costs and the Contractor's Fee applicable thereto on the same basis as if such costs had been incurred prior to final payment, but not in excess of the Guaranteed Maximum Price. If the Contractor has participated in savings as provided in Section 5.2, the amount of such savings shall be recalculated and appropriate credit given to the Owner in determining the net amount to be paid by the Owner to the Contractor.~~

## ARTICLE 13 TERMINATION OR SUSPENSION

**§ 13.1** The Contract may be terminated by the Contractor, or by the Owner for convenience, as provided in Article 14 of AIA Document A201-1997. However, the amount to be paid to the Contractor under Section 14.1.3 of AIA Document A201-1997 shall not ~~exceed~~ cause the ~~amount the Contractor would be entitled~~ Guaranteed Maximum Price to ~~receive under Section 13.2 below, except that the Contractor's Fee shall~~ be ~~calculated as if the Work had been fully completed by the Contractor, including a reasonable estimate of the Cost of the Work for Work not actually completed.~~ exceeded..

**§ 13.2** The Contract may be terminated by the Owner for cause as provided in Article 14 of AIA Document A201-1997. The amount, if any, to be paid to the Contractor under Section 14.2.4 of AIA Document A201-1997 shall not cause the Guaranteed Maximum Price to be exceeded, nor shall it exceed an amount calculated as follows:

**§ 13.2.1** Take the Cost of the Work incurred by the Contractor to the date of termination;

**§ 13.2.2** Add the Contractor's Fee computed upon the Cost of the Work to the date of termination at the rate stated in Section 5.1.2 or, if the Contractor's Fee is stated as a fixed sum in that Section, an amount that bears the same ratio to that fixed-sum Fee as the Cost of the Work at the time of termination bears to a reasonable estimate of the probable Cost of the Work upon its completion; and

**§ 13.2.3** Subtract the aggregate of previous payments made by the Owner.

**§ 13.3** The Owner shall also pay the Contractor fair compensation, either by purchase or rental at the election of the Owner, for any equipment owned by the Contractor that the Owner elects to retain and that is not otherwise included in the Cost of the Work under Section 13.2.1. To the extent that the Owner elects to take legal assignment of subcontracts and purchase orders (including rental agreements), the Contractor shall, as a condition of receiving the payments referred to in this Article 13, execute and deliver all such papers and take all such steps, including the legal assignment of such subcontracts and other contractual rights of the Contractor, as the Owner may require for the purpose of fully vesting in the Owner the rights and benefits of the Contractor under such subcontracts or purchase orders.

**§ 13.4** The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201-1997; in such case, the Guaranteed Maximum Price and Contract Time shall be increased as provided in Section 14.3.2 of AIA

**AIA Document A111™ – 1997. Copyright** © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)    (2347931739)

R.P. Appx. 028

Document A201-1997 except that the term "profit" shall be understood to mean the Contractor's Fee as described in Sections Section 5.1.2 and Section 6.4 of this Agreement.

## ARTICLE 14  MISCELLANEOUS PROVISIONS

§ 14.1 Where reference is made in this Agreement to a provision of AIA Document A201-1997 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

§ 14.2 Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

One percent (1%) over the "prime rate" as reported in The Wall Street Journal.

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Contractor's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

§ 14.3 The Owner's representative is:
*(Name, address and other information.)*

Mike Rosamond
8411 Preston Road, Suite 700
Dallas, Texas  75225

With copy of all notices to:
Wayne Angel
8411 Preston Road, Suite 700
Dallas, Texas  75225

§ 14.4 The Contractor's representative is:
*(Name, address and other information.)*

Attn:Tom Sieckhaus
Clayco, Inc.
2199 Innerbelt Business Center Drive
St. Louis, Missouri 63114

At all times during the course of the Project, Contractor shall provide at the job site a qualified, competent and responsible supervisor who shall be satisfactory to Owner. The supervisor shall be Doug Gellner. Any employee of Contractor reasonably deemed by Owner to be objectionable shall be removed from the job site promptly upon Owner request and shall be promptly replaced by Contractor at no extra expense to Owner. Contractor shall nevertheless retain all authority and control over its employees, including responsibility for all costs arising from providing reasonable accommodations for its employees.

§ 14.5 Neither the Owner's nor the Contractor's representative nor the supervisor shall be changed without ten days' written notice to the other party party and only with the other party's approval, which approval may not be unreasonably withheld or delayed.

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)                                    (2347931739)

R.P. Appx. 029

**§ 14.6** Other provisions:

    .1      If there is any conflict among the Contract Documents, then the following priority shall be given to the same: first, the provisions of any Change Orders, Change Directives or other modifications shall govern, with later modifications controlling over earlier modifications, second, this Agreement (A111) shall govern, third, the provisions of the General Conditions (A201), shall govern, fourth, the most recent version of the Drawings approved by Owner and Contractor in writing shall govern, and fifth, the Outline Specs shall govern (provided that as to design matters, the Outline Specs shall govern over A111 or A201).

    .2      The Owner represents that it is the owner of fee simple title to the land on which the Project will be constructed (the "Land")

    .3      The Owner is committed to providing a safe working environment on the jobsite. In endeavoring to achieve a safe workplace, the Owner requires that the Contractor implement a substance abuse policy covering all Contractor, Subcontractor, and Sub-subcontractor employees of any tier throughout the duration of this Project. Contractor agrees that such policy shall be in accordance with the Contractor's corporate substance abuse policy; provided that such policy shall meet or exceed the standards set forth by the St. Louis Construction Industry Substance Abuse Consortium.

**ARTICLE 15   ENUMERATION OF CONTRACT DOCUMENTS**
**§ 15.1** The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:

**§ 15.1.1** The Agreement is this executed 1997 edition of the Standard Form of Agreement Between Owner and Contractor, AIA Document ~~A111–1997.~~A111-1997, as modified herein.

**§ 15.1.2** The General Conditions are the 1997 edition of the General Conditions of the Contract for Construction, AIA Document ~~A201–1997.~~A201-1997, as modified in the form attached to this Agreement.

**§ 15.1.3** The Supplementary and other Conditions of the Contract are those contained in the Project Manual dated , and are as follows:

| ~~Document~~ | ~~Title~~ | ~~Pages~~ |
| --- | --- | --- |

**§ 15.1.4** The Specifications are those contained in the Project Manual dated as in Section 15.1.3, and are as follows:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

See Outline Specs.

| ~~Section~~ | ~~Title~~ | ~~Pages~~ |
| --- | --- | --- |

**§ 15.1.5** The Drawings are as ~~follows, and are dated   unless a different date is shown below:~~follows:
*(Either list the Drawings here or refer to an exhibit attached to this Agreement.)*

See Outline Specs.

| ~~Number~~ | ~~Title~~ | ~~Date~~ |
| --- | --- | --- |

**§ 15.1.6** The Addenda, if any, are as follows:

**AIA Document A111™ – 1997. Copyright** © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)            (2347931739)

R.P. Appx. 030

| ~~Number~~ | ~~Date~~ | ~~Pages~~ |

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 15.

**§ 15.1.7** Other Documents, if any, forming part of the Contract Documents are as follows:
*(List here any additional documents, such as a list of alternates that are intended to form part of the Contract Documents. AIA Document A201-1997 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*

The Clayco Control Budget attached hereto as **Exhibit "C"**. The Clayco Control Budget is not attached for the purpose of (a) establishing a maximum cost of each such item, it being agreed that the Contractor's sole obligation with respect to the Cost of the Work is set forth in Paragraph 5.2.1 herein, or (b) defining the scope of the Work that the Contractor is obligated to provide under this Contract, it being agreed that the Outline Specs and the other Contract Documents (excluding such Control Budget) shall define the Contractor's scope of Work.

**ARTICLE 16  INSURANCE AND BONDS**
*(List required limits of liability for insurance and bonds. AIA Document A201-1997 gives other specific requirements for insurance and bonds.)*

| ~~Type of insurance~~ | ~~Limit of liability ($ 0.00)~~ |

The Contractor will obtain and maintain at all times Builder's Risk insurance for the Project and such insurance shall name the Owner, Owner's equity partner and Owner's construction lender as additional insureds. Current evidence of such insurance shall be furnished to Owner upon request. Contractor will maintain the following insurance coverage: (i) a policy of commercial general liability insurance (occurrence form) as described in paragraph 11.1 of the General Conditions (A201) with coverage limits of not less than $1,000,000 per occurrence and $2,000,000 in the aggregate, (ii) employer's liability coverage with limits of not less than $1,000,000, (iii) worker's compensation with limits of not less than $1,000,000 covering all persons employed by Contractor in the conduct of its operations at the Project (including the all states endorsement and, if applicable, the volunteers endorsement), (iv) automobile liability coverage of not less than $1,000,000, (v) umbrella policy of commercial general liability insurance with limits of not less than $10,000,000. Such insurance policies shall be issued by insurance companies with a rating of not less than A-Class VIII in the latest edition of Best's Insurance Guide. Owner and Prudential Insurance Company of America ("Prudential") shall be a named additional insured party on all such insurance policies, and Contractor shall deliver to Owner certified copies of such insurance policies, together with certificates evidencing the coverage of Owner and Prudential under all such insurance policies and a certified copy of the declarations page to each of the insurance policies, promptly upon issuance or renewal thereof.

Simultaneously with the execution hereof, Contractor shall enter into the Construction Indemnity and Assignment in the form attached hereto as **Exhibit "D"**.

**AIA Document A111™ – 1997. Copyright** © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)                                    (2347931739)

R.P. Appx. 031

This Agreement is entered into as of the day and year first written above and is executed in at least three original copies, of which one is to be delivered to the Contractor, one to the Architect for use in the administration of the Contract, and the remainder to the Owner.

Exhibit "A" – Project Schedule
Exhibit "B" – Outline Specifications & Drawings
Exhibit "C" – Clayco Control Budget
Exhibit "D" – Construction Indemnity and Assignment
Exhibit "E" – Architect's Certificate
Exhibit "F" – Civil Engineer's Certificate
Exhibit "G" – Contractor's Consent and Agreement

## _THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES._

INTELLICENTER DALLAS INVESTMENTS, LLP  CLAYCO, INC.
 By: KDC-HPB Investments Dallas, LP,
  its partner
  By: KDC-HPB Investments Dallas GP, LLC,
  its general partner
   By: Koll Development Company I, L.P., Member
    By: SWV, LLC, Managing General Partner
By:          By: _____

**OWNER** *(Signature)*      **CONTRACTOR** *(Signature)*

           STEVEN R. SIECKHAUS

*(Printed name and title)*    *(Printed name and title)*
           VICE PRESIDENT OF OPERATIONS

**AIA Document A111™ – 1997. Copyright** © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)    (2347931739)

16

R.P. Appx. 032

# ⸙AIA® Document A201™ – 1997

## General Conditions of the Contract for Construction

**for the following PROJECT:**
*(Name and location or address):*

The design and construction of a 4-story speculative office building, consisting of approximately 211,637 gross square feet, located at 3701 Regent Blvd., Irving, Texas.

**THE OWNER:**
*(Name and address):*

Intellicenter Dallas Investments, LLP
8115 Preston Rd., Suite #700
Dallas, TX 75225

**THE ARCHITECT:**
*(Name and address):*

FS Architecture, PC
c/o Forum Studios, Inc.
2199 Innerbelt Business Center Drive
St. Louis, Missouri 63114

This document has important
legal consequences.
Consultation with an attorney
is encouraged with respect to
its completion or modification.

This document has been
approved and endorsed by The
Associated General Contractors
of America

## TABLE OF ARTICLES

1       GENERAL PROVISIONS

2       OWNER

3       CONTRACTOR

4       ADMINISTRATION OF THE CONTRACT

5       SUBCONTRACTORS

6       CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

7       CHANGES IN THE WORK

8       TIME

9       PAYMENTS AND COMPLETION

10      PROTECTION OF PERSONS AND PROPERTY

11      INSURANCE AND BONDS

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                    (986536188)

1

R.P. Appx. 033

12      UNCOVERING AND CORRECTION OF WORK

13      MISCELLANEOUS PROVISIONS

14      TERMINATION OR SUSPENSION OF THE CONTRACT

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                                    (986536188)

2

R.P. Appx. 034

# INDEX
(Numbers and Topics in Bold are Section Headings)

**Acceptance of Nonconforming Work**
9.6.6, 9.9.3, **12.3**
Acceptance of Work
9.6.6, 9.8.2, 9.9.3, 9.10.1, 9.10.3, 12.3
**Access to Work**
**3.16, 6.2.1, 12.1**
Accident Prevention
4.2.3, 10
Acts and Omissions
3.2, 3.3.2, 3.12.8, 3.18, 4.2.3, 4.3.8, 4.4.1, 8.3.1,
9.5.1, 10.2.5, 13.4.2, 13.7, 14.1
Addenda
1.1.1, 3.11
Additional Costs, Claims for
4.3.4, 4.3.5, 4.3.6, 6.1.1, 10.3
Additional Inspections and Testing
9.8.3, 12.2.1, 13.5
Additional Time, Claims for
4.3.4, 4.3.7, 8.3.2
**ADMINISTRATION OF THE CONTRACT**
3.1.3, **4**, 9.4, 9.5
Advertisement or Invitation to Bid
1.1.1
Aesthetic Effect
4.2.13, 4.5.1
**Allowances**
**3.8**
All-risk Insurance
11.4.1.1
**Applications for Payment**
4.2.5, 7.3.8, 9.2, **9.3**, 9.4, 9.5.1, 9.6.3, 9.7.1, 9.8.5,
9.10, 11.1.3, 14.2.4, 14.4.3
Approvals
2.4, 3.1.3, 3.5, 3.10.2, 3.12, 4.2.7, 9.3.2, 13.4.2, 13.5
**Arbitration**
4.3.3, 4.4, 4.5.1, 4.5.2, **4.6**, 8.3.1, 9.7.1, 11.4.9,
11.4.10
**Architect**
**4.1**
Architect, Definition of
4.1.1
Architect, Extent of Authority
2.4, 3.12.7, 4.2, 4.3.6, 4.4, 5.2, 6.3, 7.1.2, 7.3.6, 7.4,
9.2, 9.3.1, 9.4, 9.5, 9.8.3, 9.10.1, 9.10.3, 12.1, 12.2.1,
13.5.1, 13.5.2, 14.2.2, 14.2.4
Architect, Limitations of Authority and
Responsibility
2.1.1, 3.3.3, 3.12.4, 3.12.8, 3.12.10, 4.1.2, 4.2.1,
4.2.2, 4.2.3, 4.2.6, 4.2.7, 4.2.10, 4.2.12, 4.2.13, 4.4,
5.2.1, 7.4, 9.4.2, 9.6.4, 9.6.6
Architect's Additional Services and Expenses
2.4, 11.4.1.1, 12.2.1, 13.5.2, 13.5.3, 14.2.4
**Architect's Administration of the Contract**

3.1.3, **4.2**, 4.3.4, 4.4, 9.4, 9.5
Architect's Approvals
2.4, 3.1.3, 3.5.1, 3.10.2, 4.2.7
Architect's Authority to Reject Work
3.5.1, 4.2.6, 12.1.2, 12.2.1
Architect's Copyright
1.6
Architect's Decisions
4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13, 4.3.4, 4.4.1, 4.4.5,
4.4.6, 4.5, 6.3, 7.3.6, 7.3.8, 8.1.3, 8.3.1, 9.2, 9.4,
9.5.1, 9.8.4, 9.9.1, 13.5.2, 14.2.2, 14.2.4
Architect's Inspections
4.2.2, 4.2.9, 4.3.4, 9.4.2, 9.8.3, 9.9.2, 9.10.1, 13.5
Architect's Instructions
3.2.3, 3.3.1, 4.2.6, 4.2.7, 4.2.8, 7.4.1, 12.1, 13.5.2
Architect's Interpretations
4.2.11, 4.2.12, 4.3.6
Architect's Project Representative
4.2.10
Architect's Relationship with Contractor
1.1.2, 1.6, 3.1.3, 3.2.1, 3.2.2, 3.2.3, 3.3.1, 3.4.2, 3.5.1,
3.7.3, 3.10, 3.11, 3.12, 3.16, 3.18, 4.1.2, 4.1.3, 4.2,
4.3.4, 4.4.1, 4.4.7, 5.2, 6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4,
9.5, 9.7, 9.8, 9.9, 10.2.6, 10.3, 11.3, 11.4.7, 12,
13.4.2, 13.5
Architect's Relationship with Subcontractors
1.1.2, 4.2.3, 4.2.4, 4.2.6, 9.6.3, 9.6.4, 11.4.7
Architect's Representations
9.4.2, 9.5.1, 9.10.1
Architect's Site Visits
4.2.2, 4.2.5, 4.2.9, 4.3.4, 9.4.2, 9.5.1, 9.9.2, 9.10.1,
13.5
Asbestos
10.3.1
Attorneys' Fees
3.18.1, 9.10.2, 10.3.3
Award of Separate Contracts
6.1.1, 6.1.2
**Award of Subcontracts and Other Contracts for**
**Portions of the Work**
**5.2**
**Basic Definitions**
**1.1**
Bidding Requirements
1.1.1, 1.1.7, 5.2.1, 11.5.1
**Boiler and Machinery Insurance**
11.4.2
Bonds, Lien
9.10.2
Bonds, Performance, and Payment
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, 11.5
Building Permit
3.7.1
**Capitalization**
**1.3**
Certificate of Substantial Completion

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)
(986536188)

R.P. Appx. 035

9.8.3, 9.8.4, 9.8.5
**Certificates for Payment**
4.2.5, 4.2.9, 9.3.3, **9.4**, 9.5, 9.6.1, 9.6.6, 9.7.1, 9.10.1,
9.10.3, 13.7, 14.1.1.3, 14.2.4
Certificates of Inspection, Testing or Approval
13.5.4
Certificates of Insurance
9.10.2, 11.1.3
**Change Orders**
1.1.1, 2.4.1, 3.4.2, 3.8.2.3, 3.11.1, 3.12.8, 4.2.8, 4.3.4,
4.3.9, 5.2.3, 7.1, **7.2**, 7.3, 8.3.1, 9.3.1.1, 9.10.3,
11.4.1.2, 11.4.4, 11.4.9, 12.1.2
Change Orders, Definition of
7.2.1
**CHANGES IN THE WORK**
3.11, 4.2.8, **7**, 8.3.1, 9.3.1.1, 11.4.9
Claim, **Definition** of
**4.3.1**
**Claims and Disputes**
3.2.3, **4.3**, 4.4, 4.5, 4.6, 6.1.1, 6.3, 7.3.8, 9.3.3, 9.10.4,
10.3.3
**Claims and Timely Assertion of Claims**
**4.6.5**
**Claims for Additional Cost**
3.2.3, 4.3.4, **4.3.5**, 4.3.6, 6.1.1, 7.3.8, 10.3.2
**Claims for Additional Time**
3.2.3, 4.3.4, **4.3.7**, 6.1.1, 8.3.2, 10.3.2
**Claims for Concealed or Unknown Conditions**
**4.3.4**
Claims for Damages
3.2.3, 3.18, 4.3.10, 6.1.1, 8.3.3, 9.5.1, 9.6.7, 10.3.3,
11.1.1, 11.4.5, 11.4.7, 14.1.3, 14.2.4
Claims Subject to Arbitration
4.4.1, 4.5.1, 4.6.1
**Cleaning Up**
**3.15, 6.3**
**Commencement of Statutory Limitation Period**
**13.7**
Commencement of the Work, Conditions Relating to
2.2.1, 3.2.1, 3.4.1, 3.7.1, 3.10.1, 3.12.6, 4.3.5, 5.2.1,
5.2.3, 6.2.2, 8.1.2, 8.2.2, 8.3.1, 11.1, 11.4.1, 11.4.6,
11.5.1
Commencement of the Work, Definition of
8.1.2
**Communications Facilitating Contract**
**Administration**
3.9.1, **4.2.4**
Completion, Conditions Relating to
1.6.1, 3.4.1, 3.11, 3.15, 4.2.2, 4.2.9, 8.2, 9.4.2, 9.8,
9.9.1, 9.10, 12.2, 13.7, 14.1.2
**COMPLETION, PAYMENTS AND**
**9**
Completion, Substantial
4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, 9.8, 9.9.1, 9.10.3,
9.10.4.2, 12.2, 13.7
Compliance with Laws

1.6.1, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 4.4.8, 4.6.4,
4.6.6, 9.6.4, 10.2.2, 11.1, 11.4, 13.1, 13.4, 13.5.1,
13.5.2, 13.6, 14.1.1, 14.2.1.3
Concealed or Unknown Conditions
4.3.4, 8.3.1, 10.3
Conditions of the Contract
1.1.1, 1.1.7, 6.1.1, 6.1.4
Consent, Written
1.6, 3.4.2, 3.12.8, 3.14.2, 4.1.2, 4.3.4, 4.6.4, 9.3.2,
9.8.5, 9.9.1, 9.10.2, 9.10.3, 11.4.1, 13.2, 13.4.2
**CONSTRUCTION BY OWNER OR BY**
**SEPARATE CONTRACTORS**
1.1.4, **6**
Construction Change Directive, Definition of
7.3.1
**Construction Change Directives**
1.1.1, 3.12.8, 4.2.8, 4.3.9, 7.1, **7.3**, 9.3.1.1
Construction Schedules, Contractor's
1.4.1.2, 3.10, 3.12.1, 3.12.2, 4.3.7.2, 6.1.3
**Contingent Assignment of Subcontracts**
**5.4, 14.2.2.2**
**Continuing Contract Performance**
**4.3.3**
Contract, Definition of
1.1.2
**CONTRACT, TERMINATION OR**
**SUSPENSION OF THE**
5.4.1.1, 11.4.9, **14**
Contract Administration
3.1.3, 4, 9.4, 9.5
Contract Award and Execution, Conditions Relating
to
3.7.1, 3.10, 5.2, 6.1, 11.1.3, 11.4.6, 11.5.1
**Contract Documents, The**
**1.1, 1.2**
Contract Documents, Copies Furnished and Use of
1.6, 2.2.5, 5.3
Contract Documents, Definition of
1.1.1
**Contract Sum**
3.8, 4.3.4, 4.3.5, 4.4.5, 5.2.3, 7.2, 7.3, 7.4, **9.1**, 9.4.2,
9.5.1.4, 9.6.7, 9.7, 10.3.2, 11.4.1, 14.2.4, 14.3.2
Contract Sum, Definition of
9.1
Contract Time
4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1.3, 7.3, 7.4, 8.1.1, 8.2,
8.3.1, 9.5.1, 9.7, 10.3.2, 12.1.1, 14.3.2
Contract Time, Definition of
8.1.1
**CONTRACTOR**
**3**
Contractor, Definition of
3.1, 6.1.2
**Contractor's Construction Schedules**
1.4.1.2, **3.10**, 3.12.1, 3.12.2, 4.3.7.2, 6.1.3
Contractor's Employees

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)          (986536188)

R.P. Appx. 036

3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6, 10.2, 10.3, 11.1.1, 11.4.7, 14.1, 14.2.1.1,

**Contractor's Liability Insurance**
**11.1**

Contractor's Relationship with Separate Contractors and Owner's Forces
3.12.5, 3.14.2, 4.2.4, 6, 11.4.7, 12.1.2, 12.2.4

Contractor's Relationship with Subcontractors
1.2.2, 3.3.2, 3.18.1, 3.18.2, 5, 9.6.2, 9.6.7, 9.10.2, 11.4.1.2, 11.4.7, 11.4.8

Contractor's Relationship with the Architect
1.1.2, 1.6, 3.1.3, 3.2.1, 3.2.2, 3.2.3, 3.3.1, 3.4.2, 3.5.1, 3.7.3, 3.10, 3.11, 3.12, 3.16, 3.18, 4.1.2, 4.1.3, 4.2, 4.3.4, 4.4.1, 4.4.7, 5.2, 6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4, 9.5, 9.7, 9.8, 9.9, 10.2.6, 10.3, 11.3, 11.4.7, 12, 13.4.2, 13.5

Contractor's Representations
1.5.2, 3.5.1, 3.12.6, 6.2.2, 8.2.1, 9.3.3, 9.8.2

Contractor's Responsibility for Those Performing the Work
3.3.2, 3.18, 4.2.3, 4.3.8, 5.3.1, 6.1.3, 6.2, 6.3, 9.5.1, 10

Contractor's Review of Contract Documents
1.5.2, 3.2, 3.7.3

Contractor's Right to Stop the Work
9.7

Contractor's Right to Terminate the Contract
4.3.10, 14.1

Contractor's Submittals
3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3, 7.3.6, 9.2, 9.3, 9.8.2, 9.8.3, 9.9.1, 9.10.2, 9.10.3, 11.1.3, 11.5.2

Contractor's Superintendent
3.9, 10.2.6

Contractor's Supervision and Construction Procedures
1.2.2, 3.3, 3.4, 3.12.10, 4.2.2, 4.2.7, 4.3.3, 6.1.3, 6.2.4, 7.1.3, 7.3.4, 7.3.6, 8.2, 10, 12, 14

Contractual Liability Insurance
11.1.1.8, 11.2, 11.3

Coordination and Correlation
1.2, 1.5.2, 3.3.1, 3.10, 3.12.6, 6.1.3, 6.2.1

Copies Furnished of Drawings and Specifications
1.6, 2.2.5, 3.11

Copyrights
1.6, 3.17

Correction of Work
2.3, 2.4, 3.7.4, 4.2.1, 9.4.2, 9.8.2, 9.8.3, 9.9.1, 12.1.2, 12.2, 13.7.1.3

**Correlation and Intent of the Contract Documents**
**1.2**

Cost, Definition of
7.3.6

Costs
2.4, 3.2.3, 3.7.4, 3.8.2, 3.15.2, 4.3, 5.4.2, 6.1.1, 6.2.3, 7.3.3.3, 7.3.6, 7.3.7, 7.3.8, 9.10.2, 10.3.2, 10.5, 11.3, 11.4, 12.1, 12.2.1, 12.2.4, 13.5, 14

**Cutting and Patching**

6.2.5, **3.14**

Damage to Construction of Owner or Separate Contractors
3.14.2, 6.2.4, 9.2.1.5, 10.2.1.2, 10.2.5, 10.6, 11.1, 11.4, 12.2.4

Damage to the Work
3.14.2, 9.9.1, 10.2.1.2, 10.2.5, 10.6, 11.4, 12.2.4

Damages, Claims for
3.2.3, 3.18, 4.3.10, 6.1.1, 8.3.3, 9.5.1, 9.6.7, 10.3.3, 11.1.1, 11.4.5, 11.4.7, 14.1.3, 14.2.4

Damages for Delay
6.1.1, 8.3.3, 9.5.1.6, 9.7, 10.3.2

Date of Commencement of the Work, Definition of
8.1.2

Date of Substantial Completion, Definition of
8.1.3

Day, Definition of
8.1.4

Decisions of the Architect
4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13, 4.3.4, 4.4.1, 4.4.5, 4.4.6, 4.5, 6.3, 7.3.6, 7.3.8, 8.1.3, 8.3.1, 9.2, 9.4, 9.5.1, 9.8.4, 9.9.1, 13.5.2, 14.2.2, 14.2.4

**Decisions to Withhold Certification**
9.4.1, **9.5**, 9.7, 14.1.1.3

Defective or Nonconforming Work, Acceptance, Rejection and Correction of
2.3, 2.4, 3.5.1, 4.2.6, 6.2.5, 9.5.1, 9.5.2, 9.6.6, 9.8.2, 9.9.3, 9.10.4, 12.2.1, 13.7.1.3

Defective Work, Definition of
3.5.1

Definitions
1.1, 2.1.1, 3.1, 3.5.1, 3.12.1, 3.12.2, 3.12.3, 4.1.1, 4.3.1, 5.1, 6.1.2, 7.2.1, 7.3.1, 7.3.6, 8.1, 9.1, 9.8.1

**Delays and Extensions of Time**
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1, 7.3.1, 7.4.1, **8.3**, 9.5.1, 9.7.1, 10.3.2, 10.6.1, 14.3.2

Disputes
4.1.4, 4.3, 4.4, 4.5, 4.6, 6.3, 7.3.8

**Documents and Samples at the Site**
**3.11**

Drawings, Definition of
1.1.5

Drawings and Specifications, Use and Ownership of
1.1.1, 1.3, 2.2.5, 3.11, 5.3

Effective Date of Insurance
8.2.2, 11.1.2

**Emergencies**
4.3.5, **10.6**, 14.1.1.2

Employees, Contractor's
3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6, 10.2, 10.3, 11.1.1, 11.4.7, 14.1, 14.2.1.1

Equipment, Labor, Materials and
1.1.3, 1.1.6, 3.4, 3.5.1, 3.8.2, 3.8.3, 3.12, 3.13, 3.15.1, 4.2.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6, 9.3.2, 9.3.3, 9.5.1.3, 9.10.2, 10.2.1, 10.2.4, 14.2.1.2

Execution and Progress of the Work

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                    (986536188)

R.P. Appx. 037

1.1.3, 1.2.1, 1.2.2, 2.2.3, 2.2.5, 3.1, 3.3, 3.4, 3.5, 3.7,
3.10, 3.12, 3.14, 4.2.2, 4.2.3, 4.3.3, 6.2.2, 7.1.3, 7.3.4,
8.2, 9.5, 9.9.1, 10.2, 10.3, 12.2, 14.2, 14.3
Extensions of Time
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1, 7.3, 7.4.1,
9.5.1, 9.7.1, 10.3.2, 10.6.1, 14.3.2
**Failure of Payment**
4.3.6, 9.5.1.3, **9.7**, 9.10.2, 14.1.1.3, 14.2.1.2, 13.6
Faulty Work
(*See* Defective or Nonconforming Work)
**Final Completion and Final Payment**
4.2.1, 4.2.9, 4.3.2, 9.8.2, **9.10**, 11.1.2, 11.1.3, 11.4.1,
11.4.5, 12.3.1, 13.7, 14.2.4, 14.4.3
Financial Arrangements, Owner's
2.2.1, 13.2.2, 14.1.1.5
Fire and Extended Coverage Insurance
11.4
**GENERAL PROVISIONS**
**1**
**Governing Law**
**13.1**
Guarantees (*See* Warranty)
Hazardous Materials
10.2.4, **10.3**, 10.5
Identification of Contract Documents
1.5.1
Identification of Subcontractors and Suppliers
5.2.1
**Indemnification**
3.17, **3.18**, 9.10.2, 10.3.3, 10.5, 11.4.1.2, 11.4.7
**Information and Services Required of the Owner**
2.1.2, **2.2**, 3.2.1, 3.12.4, 3.12.10, 4.2.7, 4.3.3, 6.1.3,
6.1.4, 6.2.5, 9.3.2, 9.6.1, 9.6.4, 9.9.2, 9.10.3, 10.3.3,
11.2, 11.4, 13.5.1, 13.5.2, 14.1.1.4, 14.1.4
**Injury or Damage to Person or Property**
**4.3.8, 10.2, 10.6**
Inspections
3.1.3, 3.3.3, 3.7.1, 4.2.2, 4.2.6, 4.2.9, 9.4.2, 9.8.2,
9.8.3, 9.9.2, 9.10.1, 12.2.1, 13.5
Instructions to Bidders
1.1.1
Instructions to the Contractor
3.2.3, 3.3.1, 3.8.1, 4.2.8, 5.2.1, 7, 12, 8.2.2, 13.5.2
Insurance
3.18.1, 6.1.1, 7.3.6, 8.2.1, 9.3.2, 9.8.4, 9.9.1, 9.10.2,
9.10.5, 11
**Insurance, Boiler and Machinery**
**11.4.2**
**Insurance, Contractor's Liability**
**11.1**
Insurance, Effective Date of
8.2.2, 11.1.2
**Insurance, Loss of Use**
**11.4.3**
**Insurance, Owner's Liability**
**11.2**

**Insurance, Project Management Protective**
**Liability**
**11.3**
**Insurance, Property**
10.2.5, **11.4**
Insurance, Stored Materials
9.3.2, 11.4.1.4
**INSURANCE AND BONDS**
**11**
Insurance Companies, Consent to Partial Occupancy
9.9.1, 11.4.1.5
Insurance Companies, Settlement with
11.4.10
Intent of the Contract Documents
1.2.1, 4.2.7, 4.2.12, 4.2.13, 7.4
**Interest**
**13.6**
**Interpretation**
1.2.3, **1.4**, 4.1.1, 4.3.1, 5.1, 6.1.2, 8.1.4
Interpretations, Written
4.2.11, 4.2.12, 4.3.6
Joinder and Consolidation of Claims Required
4.6.4
**Judgment on Final Award**
**4.6.6**
**Labor and Materials, Equipment**
1.1.3, 1.1.6, **3.4**, 3.5.1, 3.8.2, 3.8.3, 3.12, 3.13, 3.15.1,
42.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6, 9.3.2, 9.3.3, 9.5.1.3,
9.10.2, 10.2.1, 10.2.4, 14.2.1.2
Labor Disputes
8.3.1
Laws and Regulations
1.6, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 4.4.8, 4.6,
9.6.4, 9.9.1, 10.2.2, 11.1, 11.4, 13.1, 13.4, 13.5.1,
13.5.2, 13.6, 14
Liens
2.1.2, 4.4.8, 8.2.2, 9.3.3, 9.10
**Limitation on Consolidation or Joinder**
**4.6.4**
Limitations, Statutes of
4.6.3, 12.2.6, 13.7
Limitations of Liability
2.3, 3.2.1, 3.5.1, 3.7.3, 3.12.8, 3.12.10, 3.17, 3.18,
4.2.6, 4.2.7, 4.2.12, 6.2.2, 9.4.2, 9.6.4, 9.6.7, 9.10.4,
10.3.3, 10.2.5, 11.1.2, 11.2.1, 11.4.7, 12.2.5, 13.4.2
Limitations of Time
2.1.2, 2.2, 2.4, 3.2.1, 3.7.3, 3.10, 3.11, 3.12.5, 3.15.1,
4.2.7, 4.3, 4.4, 4.5, 4.6, 5.2, 5.3, 5.4, 6.2.4, 7.3, 7.4,
8.2, 9.2, 9.3.1, 9.3.3, 9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9,
9.10, 11.1.3, 11.4.1.5, 11.4.6, 11.4.10, 12.2, 13.5,
13.7, 14
**Loss of Use Insurance**
**11.4.3**
Material Suppliers
1.6, 3.12.1, 4.2.4, 4.2.6, 5.2.1, 9.3, 9.4.2, 9.6, 9.10.5
Materials, Hazardous
10.2.4, 10.3, 10.5

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American
Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the
maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which
expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                        (986536188)

R.P. Appx. 038

Materials, Labor, Equipment and
1.1.3, 1.1.6, 1.6.1, 3.4, 3.5.1, 3.8.2, 3.8.23, 3.12, 3.13,
3.15.1, 4.2.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6, 9.3.2, 9.3.3,
9.5.1.3, 9.10.2, 10.2.1, 10.2.4, 14.2.1.2
Means, Methods, Techniques, Sequences and
Procedures of Construction
3.3.1, 3.12.10, 4.2.2, 4.2.7, 9.4.2
Mechanic's Lien
4.4.8
**Mediation**
4.4.1, 4.4.5, 4.4.6, 4.4.8, **4.5**, 4.6.1, 4.6.2, 8.3.1, 10.5
**Minor Changes in the Work**
1.1.1, 3.12.8, 4.2.8, 4.3.6, 7.1, **7.4**
MISCELLANEOUS PROVISIONS
13
Modifications, Definition of
1.1.1
Modifications to the Contract
1.1.1, 1.1.2, 3.7.3, 3.11, 4.1.2, 4.2.1, 5.2.3, 7, 8.3.1,
9.7, 10.3.2, 11.4.1
**Mutual Responsibility**
**6.2**
**Nonconforming Work, Acceptance of**
9.6.6, 9.9.3, **12.3**
Nonconforming Work, Rejection and Correction of
2.3, 2.4, 3.5.1, 4.2.6, 6.2.5, 9.5.1, 9.8.2, 9.9.3, 9.10.4,
12.2.1, 13.7.1.3
Notice
2.2.1, 2.3, 2.4, 3.2.3, 3.3.1, 3.7.2, 3.7.4, 3.12.9, 4.3,
4.4.8, 4.6.5, 5.2.1, 8.2.2, 9.7, 9.10, 10.2.2, 11.1.3,
11.4.6, 12.2.2, 12.2.4, 13.3, 13.5.1, 13.5.2, 14.1, 14.2
**Notice, Written**
2.3, 2.4, 3.3.1, 3.9, 3.12.9, 3.12.10, 4.3, 4.4.8, 4.6.5,
5.2.1, 8.2.2, 9.7, 9.10, 10.2.2, 10.3, 11.1.3, 11.4.6,
12.2.2, 12.2.4, **13.3**, 14
Notice of Testing and Inspections
13.5.1, 13.5.2
Notice to Proceed
8.2.2
**Notices, Permits, Fees and**
2.2.2, **3.7**, 3.13, 7.3.6.4, 10.2.2
Observations, Contractor's
1.5.2, 3.2, 3.7.3, 4.3.4
Occupancy
2.2.2, 9.6.6, 9.8, 11.4.1.5
Orders, Written
1.1.1, 2.3, 3.9, 4.3.6, 7, 8.2.2, 11.4.9, 12.1, 12.2,
13.5.2, 14.3.1
**OWNER**
**2**
Owner, Definition of
2.1
**Owner, Information and Services Required of the**
2.1.2, **2.2**, 3.2.1, 3.12.4, 3.12.10, 4.2.7, 4.3.3, 6.1.3,
6.1.4, 6.2.5, 9.3.2, 9.6.1, 9.6.4, 9.9.2, 9.10.3, 10.3.3,
11.2, 11.4, 13.5.1, 13.5.2, 14.1.1.4, 14.1.4
Owner's Authority

1.6, 2.1.1, 2.3, 2.4, 3.4.2, 3.8.1, 3.12.10, 3.14.2, 4.1.2,
4.1.3, 4.2.4, 4.2.9, 4.3.6, 4.4.7, 5.2.1, 5.2.4, 5.4.1,
6.1, 6.3, 7.2.1, 7.3.1, 8.2.2, 8.3.1, 9.3.1, 9.3.2, 9.5.1,
9.9.1, 9.10.2, 10.3.2, 11.1.3, 11.3.1, 11.4.3, 11.4.10,
12.2.2, 12.3.1, 13.2.2, 14.3, 14.4
Owner's Financial Capability
2.2.1, 13.2.2, 14.1.1.5
**Owner's Liability Insurance**
**11.2**
Owner's Loss of Use Insurance
11.4.3
Owner's Relationship with Subcontractors
1.1.2, 5.2, 5.3, 5.4, 9.6.4, 9.10.2, 14.2.2
**Owner's Right to Carry Out the Work**
**2.4, 12.2.4. 14.2.2.2**
**Owner's Right to Clean Up**
**6.3**
**Owner's Right to Perform Construction and to**
**Award Separate Contracts**
**6.1**
**Owner's Right to Stop the Work**
**2.3**
Owner's Right to Suspend the Work
14.3
Owner's Right to Terminate the Contract
14.2
**Ownership and Use of Drawings, Specifications**
**and Other Instruments of Service**
1.1.1, **1.6**, 2.2.5, 3.2.1, 3.11.1, 3.17.1, 4.2.12, 5.3
**Partial Occupancy or Use**
9.6.6, **9.9**, 11.4.1.5
**Patching, Cutting and**
**3.14, 6.2.5**
Patents
3.17
**Payment, Applications for**
4.2.5, 7.3.8, 9.2, **9.3**, 9.4, 9.5.1, 9.6.3, 9.7.1, 9.8.5,
9.10.1, 9.10.3, 9.10.5, 11.1.3, 14.2.4, 14.4.3
**Payment, Certificates for**
4.2.5, 4.2.9, 9.3.3, **9.4**, 9.5, 9.6.1, 9.6.6, 9.7.1, 9.10.1,
9.10.3, 13.7, 14.1.1.3, 14.2.4
**Payment, Failure of**
4.3.6, 9.5.1.3, **9.7**, 9.10.2, 14.1.1.3, 14.2.1.2, 13.6
Payment, Final
4.2.1, 4.2.9, 4.3.2, 9.8.2, 9.10, 11.1.2, 11.1.3, 11.4.1,
11.4.5, 12.3.1, 13.7, 14.2.4, 14.4.3
**Payment Bond, Performance Bond and**
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, **11.5**
Payments, Progress
4.3.3, 9.3, 9.6, 9.8.5, 9.10.3, 13.6, 14.2.3
**PAYMENTS AND COMPLETION**
**9**
Payments to Subcontractors
5.4.2, 9.5.1.3, 9.6.2, 9.6.3, 9.6.4, 9.6.7, 11.4.8,
14.2.1.2
PCB
10.3.1

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                            (986536188)

R.P. Appx. 039

Performance Bond and Payment Bond
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, **11.5**
**Permits, Fees and Notices**
2.2.2, **3.7**, 3.13, 7.3.6.4, 10.2.2
**PERSONS AND PROPERTY, PROTECTION
OF
10**

Polychlorinated Biphenyl
10.3.1
Product Data, Definition of
3.12.2
**Product Data and Samples, Shop Drawings**
3.11, **3.12**, 4.2.7
**Progress and Completion**
4.2.2, 4.3.3, **8.2**, 9.8, 9.9.1, 14.1.4
**Progress Payments**
4.3.3, 9.3, **9.6**, 9.8.5, 9.10.3, 13.6, 14.2.3
Project, Definition of the
1.1.4
**Project Management Protective Liability
Insurance**
**11.3**
Project Manual, Definition of the
1.1.7
Project Manuals
2.2.5
Project Representatives
4.2.10
**Property Insurance**
10.2.5, **11.4**
**PROTECTION OF PERSONS AND PROPERTY
10**
Regulations and Laws
1.6, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 4.4.8, 4.6,
9.6.4, 9.9.1, 10.2.2, 11.1, 11.4, 13.1, 13.4, 13.5.1,
13.5.2, 13.6, 14
Rejection of Work
3.5.1, 4.2.6, 12.2.1
Releases and Waivers of Liens
9.10.2
Representations
1.5.2, 3.5.1, 3.12.6, 6.2.2, 8.2.1, 9.3.3, 9.4.2, 9.5.1,
9.8.2, 9.10.1
Representatives
2.1.1, 3.1.1, 3.9, 4.1.1, 4.2.1, 4.2.10, 5.1.1, 5.1.2,
13.2.1
**Resolution of Claims and Disputes**
**4.4, 4.5, 4.6**
Responsibility for Those Performing the Work
3.3.2, 3.18, 4.2.3, 4.3.8, 5.3.1, 6.1.3, 6.2, 6.3, 9.5.1,
10
Retainage
9.3.1, 9.6.2, 9.8.5, 9.9.1, 9.10.2, 9.10.3
**Review of Contract Documents and Field
Conditions by Contractor**
1.5.2, **3.2**, 3.7.3, 3.12.7, 6.1.3

Review of Contractor's Submittals by Owner and
Architect
3.10.1, 3.10.2, 3.11, 3.12, 4.2, 5.2, 6.1.3, 9.2, 9.8.2
Review of Shop Drawings, Product Data and
Samples by Contractor
3.12
**Rights and Remedies**
1.1.2, 2.3, 2.4, 3.5.1, 3.15.2, 4.2.6, 4.3.4, 4.5, 4.6, 5.3,
5.4, 6.1, 6.3, 7.3.1, 8.3, 9.5.1, 9.7, 10.2.5, 10.3,
12.2.2, 12.2.4, **13.4**, 14
**Royalties, Patents and Copyrights**
**3.17**
Rules and Notices for Arbitration
4.6.2
**Safety of Persons and Property**
**10.2, 10.6**
**Safety Precautions and Programs**
3.3.1, 4.2.2, 4.2.7, 5.3.1, **10.1**, 10.2, 10.6
Samples, Definition of
3.12.3
**Samples, Shop Drawings, Product Data and**
3.11, **3.12**, 4.2.7
**Samples at the Site, Documents and**
**3.11**
**Schedule of Values**
**9.2, 9.3.1**
Schedules,
1.4.1.2, 3.10, 3.Construction12.1, 3.12.2, 4.3.7.2,
6.1.3
Separate Contracts and Contractors
1.1.4, 3.12.5, 3.14.2, 4.2.4, 4.2.7, 4.6.4, 6, 8.3.1,
11.4.7, 12.1.2, 12.2.5
Shop Drawings, Definition of
3.12.1
**Shop Drawings, Product Data and Samples**
3.11, **3.12**, 4.2.7
**Site, Use of**
**3.13, 6.1.1, 6.2.1**
Site Inspections
1.2.2, 3.2.1, 3.3.3, 3.7.1, 4.2, 4.3.4, 9.4.2, 9.10.1, 13.5
Site Visits, Architect's
4.2.2, 4.2.9, 4.3.4, 9.4.2, 9.5.1, 9.9.2, 9.10.1, 13.5
Special Inspections and Testing
4.2.6, 12.2.1, 13.5
Specifications, Definition of the
1.1.6
**Specifications, The**
1.1.1, **1.1.6**, 1.1.7, 1.2.2, 1.6, 3.11, 3.12.10, 3.17
Statute of Limitations
4.6.3, 12.2.6, 13.7
Stopping the Work
2.3, 4.3.6, 9.7, 10.3, 14.1
Stored Materials
6.2.1, 9.3.2, 10.2.1.2, 10.2.4, 11.4.1.4
Subcontractor, Definition of
5.1.1
**SUBCONTRACTORS**

---

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                                (986536188)

8

R.P. Appx. 040

**5**

Subcontractors, Work by
1.2.2, 3.3.2, 3.12.1, 4.2.3, 5.2.3, 5.3, 5.4, 9.3.1.2, 9.6.7

**Subcontractual Relations**
**5.3, 5.4, 9.3.1.2, 9.6, 9.10 10.2.1, 11.4.7, 11.4.8, 14.1, 14.2.1, 14.3.2**

Submittals
1.6, 3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3, 7.3.6, 9.2, 9.3, 9.8, 9.9.1, 9.10.2, 9.10.3, 11.1.3

**Subrogation, Waivers of**
6.1.1, 11.4.5, **11.4.7**

**Substantial Completion**
4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, **9.8**, 9.9.1, 9.10.3, 9.10.4.2, 12.2, 13.7

Substantial Completion, Definition of
9.8.1

Substitution of Subcontractors
5.2.3, 5.2.4

Substitution of Architect
4.1.3

Substitutions of Materials
3.4.2, 3.5.1, 7.3.7

Sub-subcontractor, Definition of
5.1.2

Subsurface Conditions
4.3.4

**Successors and Assigns**
**13.2**

**Superintendent**
**3.9, 10.2.6**

**Supervision and Construction Procedures**
1.2.2, **3.3**, 3.4, 3.12.10, 4.2.2, 4.2.7, 4.3.3, 6.1.3, 6.2.4, 7.1.3, 7.3.6, 8.2, 8.3.1, 9.4.2, 10,  12, 14

Surety
4.4.7, 5.4.1.2, 9.8.5, 9.10.2, 9.10.3, 14.2.2

Surety, Consent of
9.10.2, 9.10.3

Surveys
2.2.3

**Suspension by the Owner for Convenience**
**14.4**

Suspension of the Work
5.4.2, 14.3

Suspension or Termination of the Contract
4.3.6, 5.4.1.1, 11.4.9, 14

Taxes
**3.6, 3.8.2.1, 7.3.6.4**

**Termination by the Contractor**
4.3.10, **14.1**

**Termination by the Owner for Cause**
4.3.10, 5.4.1.1, **14.2**

Termination of the Architect
4.1.3

Termination of the Contractor
14.2.2

**TERMINATION OR SUSPENSION OF THE CONTRACT**
**14**

**Tests and Inspections**
3.1.3, 3.3.3, 4.2.2, 4.2.6, 4.2.9, 9.4.2, 9.8.3, 9.9.2, 9.10.1, 10.3.2, 11.4.1.1, 12.2.1,**13.5**

**TIME**
**8**

**Time, Delays and Extensions of**
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1, 7.3.1, 7.4.1, **8.3**, 9.5.1, 9.7.1, 10.3.2,  10.6.1, 14.3.2

Time Limits
2.1.2, 2.2, 2.4, 3.2.1, 3.7.3, 3.10, 3.11, 3.12.5, 3.15.1, 4.2, 4.3, 4.4, 4.5, 4.6, 5.2, 5.3, 5.4,  6.2.4, 7.3, 7.4, 8.2, 9.2, 9.3.1, 9.3.3, 9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9, 9.10, 11.1.3, 11.4.1.5,  11.4.6, 11.4.10, 12.2, 13.5, 13.7, 14

**Time Limits on Claims**
**4.3.2, 4.3.4, 4.3.8, 4.4, 4.5, 4.6**

Title to Work
9.3.2, 9.3.3

**UNCOVERING AND CORRECTION OF WORK**
**12**

**Uncovering of Work**
**12.1**

Unforeseen Conditions
4.3.4, 8.3.1, 10.3

Unit Prices
4.3.9, 7.3.3.2

Use of Documents
1.1.1, 1.6, 2.2.5, 3.12.6, 5.3

**Use of Site**
**3.13, 6.1.1, 6.2.1**

Values, Schedule of
**9.2, 9.3.1**

Waiver of Claims by the Architect
13.4.2

Waiver of Claims by the Contractor
4.3.10, 9.10.5, 11.4.7, 13.4.2

Waiver of Claims by the Owner
4.3.10, 9.9.3, 9.10.3, 9.10.4, 11.4.3, 11.4.5, 11.4.7, 12.2.2.1, 13.4.2, 14.2.4

**Waiver of Consequential Damages**
**4.3.10, 14.2.4**

Waiver of Liens
9.10.2, 9.10.4

**Waivers of Subrogation**
6.1.1, 11.4.5, **11.4.7**

**Warranty**
**3.5, 4.2.9, 4.3.5.3, 9.3.3, 9.8.4, 9.9.1, 9.10.4, 12.2.2, 13.7.1.3**

Weather Delays
4.3.7.2

Work, Definition of
1.1.3

Written Consent

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                    (986536188)

R.P. Appx. 041

1.6, 3.4.2, 3.12.8, 3.14.2, 4.1.2, 4.3.4, 4.6.4, 9.3.2,
9.8.5, 9.9.1, 9.10.2, 9.10.3, 11.4.1,  13.2, 13.4.2
Written Interpretations
4.2.11, 4.2.12, 4.3.6
**Written Notice**

2.3, 2.4, 3.3.1, 3.9, 3.12.9, 3.12.10, 4.3, 4.4.8, 4.6.5,
5.2.1, 8.2.2, 9.7, 9.10, 10.2.2, 10.3,  11.1.3, 11.4.6,
12.2.2, 12.2.4, **13.3**, 14
Written Orders
1.1.1, 2.3, 3.9, 4.3.6, 7, 8.2.2, 11.4.9, 12.1, 12.2,
13.5.2, 14.3.1

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American
Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the
maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which
expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                         (986536188)

R.P. Appx. 042

# ARTICLE 1 GENERAL PROVISIONS
## § 1.1 BASIC DEFINITIONS
### § 1.1.1 THE CONTRACT DOCUMENTS
The Contract Documents consist of the ~~Agreement between Owner and Contractor (hereinafter the Agreement),~~ Agreement, this specifically modified AIA Document A201-1997, General Conditions ~~of the Contract (General,~~ ~~Supplementary and other Conditions),~~ ("A201"), Drawings, Specifications, Addenda issued prior to execution of the Contract, other documents listed in the Agreement and Modifications issued after execution of the Contract. A Modification is (1) a written amendment to the Contract signed by both parties, or (2) a Change ~~Order, (3) a~~ ~~Construction Change Directive or (4) a written order for a minor change in the Work issued by the Architect.~~ Order. Unless specifically enumerated in the Agreement, the Contract Documents do not include other documents such as bidding requirements (advertisement or invitation to bid, Instructions to Bidders, sample forms, the Contractor's bid or portions of Addenda relating to bidding requirements). References herein to the "Agreement" shall mean and refer to the specifically modified Standard Form of Agreement Between Owner and Contractor, or Owner and Construction Manager, which may be an AIA Document A101, A111 or A121, whichever is applicable.

### § 1.1.2 THE CONTRACT
The Contract Documents form the Contract for Construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification. The Contract Documents shall not be construed to create a contractual relationship of any kind (1) between the Architect and Contractor, (2) between the Owner and a Subcontractor or Sub-subcontractor, (3) between the Owner and Architect or (4) between any persons or entities other than the Owner and Contractor. ~~The Architect shall, however, be entitled to performance and~~ ~~enforcement of obligations under the Contract intended to facilitate performance of the Architect's duties.~~

### § 1.1.3 THE WORK
The term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

### § 1.1.4 THE PROJECT
The Project is the total construction of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Owner or by separate contractors.

### § 1.1.5 THE DRAWINGS
The Drawings are the graphic and pictorial portions of the Contract Documents showing the design, location and dimensions of the Work, generally including plans, elevations, sections, details, schedules and diagrams.

### § 1.1.6 THE SPECIFICATIONS
The Specifications are that portion of the Contract Documents consisting of the written requirements for materials, equipment, systems, standards and workmanship for the Work, and performance of related services.

### § 1.1.7 THE PROJECT MANUAL
The Project Manual is a volume assembled for the Work which may include the bidding requirements, sample forms, Conditions of the Contract and Specifications.

## § 1.2 CORRELATION AND INTENT OF THE CONTRACT DOCUMENTS
§ 1.2.1 The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required only to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results.

§ 1.2.2 Organization of the Specifications into divisions, sections and articles, and arrangement of Drawings shall not control the Contractor in dividing the Work among Subcontractors or in establishing the extent of Work to be performed by any trade.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)          (986536188)

R.P. Appx. 043

**§ 1.2.3** Unless otherwise stated in the Contract Documents, words which have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

### § 1.3 CAPITALIZATION
**§ 1.3.1** Terms capitalized in these General Conditions include those which are (1) specifically defined, (2) the titles of numbered articles or (3) the titles of other documents published by the American Institute of Architects.

### § 1.4 INTERPRETATION
**§ 1.4.1** In the interest of brevity the Contract Documents frequently omit modifying words such as "all" and "any" and articles such as "the" and "an," but the fact that a modifier or an article is absent from one statement and appears in another is not intended to affect the interpretation of either statement.

### § 1.5 EXECUTION OF CONTRACT DOCUMENTS
**§ 1.5.1** The Contract Documents shall be signed by the Owner and Contractor.~~If either the Owner or Contractor or both do not sign all the Contract Documents, the Architect shall identify such unsigned Documents upon request.~~

**§ 1.5.2** Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become generally familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents.

### § 1.6 OWNERSHIP AND USE OF DRAWINGS, SPECIFICATIONS AND OTHER INSTRUMENTS OF SERVICE
~~**§ 1.6.1** The Drawings, Specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service through which the Work to be executed by the Contractor is described. The Contractor may retain one record set. Neither the Contractor nor any Subcontractor, Sub-subcontractor or material or equipment supplier shall own or claim a copyright in the Drawings, Specifications and other documents prepared by the Architect or the Architect's consultants, and unless otherwise indicated the Architect and the Architect's consultants shall be deemed the authors of them and will retain all common law, statutory and other reserved rights, in addition to the copyrights. All copies of Instruments of Service, except the Contractor's record set, shall be returned or suitably accounted for to the Architect, on request, upon completion of the Work. The Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants, and copies thereof furnished to the Contractor, are for use solely with respect to this Project. They are not to be used by the Contractor or any Subcontractor, Sub-subcontractor or material or equipment supplier on other projects or for additions to this Project outside the scope of the Work without the specific written consent of the Owner, Architect and the Architect's consultants. The Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers are authorized to use and reproduce applicable portions of the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants appropriate to and for use in the execution of their Work under the Contract Documents. All copies made under this authorization shall bear the statutory copyright notice, if any, shown on the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants. Submittal or distribution to meet official regulatory requirements or for other purposes in connection with this Project is not to be construed as publication in derogation of the Architect's or Architect's consultants' copyrights or other reserved rights.~~

**§ 1.6.1** The Drawings, Specifications and other documents prepared by the Architect or by any engineer or other design consultant working under the Architect or the Contractor (the "Other Design Consultants") for this Project (the "Design Documents") are instruments of the Architect's and Other Design Consultants' service through which the Work to be executed by the Contractor is described and, unless otherwise provided, the Architect and Other Design Consultants shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright until such time as the Owner has provided full and final payment to the Contractor for all services provided by the Architect and Other Design Consultants under this Agreement. Until final payment has been made by Owner, the Contractor shall cause the Architect and Other Design Consultants to grant in writing, upon execution of this Agreement, to the Owner a full and exclusive license for all copyright rights and privileges held by the Architect and Other Design Consultants with respect to the Design Documents. Such written agreement by the Architect and Other Design Consultants shall also provide that, upon full and final payment for Architect's and the Other Design Consultants' services, all rights reserved for the Architect and the Other Design Consultants with respect to the Design Documents shall pass to the Owner. The Architect and Other Design Consultants shall be permitted to retain copies, including reproducible and electronic copies, of the Design Documents for information and for use in the marketing of the Architect's and Other Design Consultants' services.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06) (986536188)

R.P. Appx. 044

Architect and the Other Design Consultants shall also be permitted to use any standard details from the Design Documents for other projects by the Architect or Other Design Consultants.

Any use of the copyright license or use or distribution of the Design Documents by the Owner, other than for this specific project, shall be at the Owner's sole risk. The Owner waives any right to make claims and waives, to the fullest extent permitted by law, any claim or cause of action against the Architect, the Other Design Consultants, their employees, agents or subconsultants, which may arise out of the Owner's use of this copyright license or its use or distribution of the Design Documents for other than this specific project without the concurrent and associated use of the Architect's or Other Design Consultants' services. The Owner hereby agrees to defend, indemnify and hold harmless the Contractor, Architect and Architect's consultants from any and all claims, damages, liabilities, losses and expenses, including reasonable attorney's fees, arising out of or resulting from the use of the "instruments of service." This does not relieve the Architect or Other Design Consultants from their responsibility to properly design this project for future renovations or expansions to the extent the criteria for such are specifically identified by the Owner and documented in the programming of this project.

The Architect and Other Design Consultants shall deliver to the Owner a complete set of the Design Documents prepared by the Architect, Other Design Consultants or their subconsultants in the form of electronic files within thirty (30) days of the Substantial Completion date or the date of the last Owner-initiated revision, whichever is latest. Architect and the Other Design Consultants shall also maintain an electronic copy of the Design Documents for a period of three (3) years from the date of Substantial Completion of the Project.

## ARTICLE 2   OWNER
### § 2.1 GENERAL
§ 2.1.1 The Owner is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The Owner shall designate in writing a representative who shall have express authority to bind the Owner with respect to all matters requiring the Owner's approval or authorization. Except as otherwise provided in Section 4.2.1, the Architect does not have such authority. The term "Owner" means the Owner or the Owner's authorized representative.

§ 2.1.2 The Owner shall furnish to the Contractor within fifteen days after receipt of a written request, information necessary and relevant for the Contractor to evaluate, give notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property on which the Project is located, usually referred to as the site, and the Owner's interest therein.

### § 2.2 INFORMATION AND SERVICES REQUIRED OF THE OWNER
§ 2.2.1 The Owner shall, at the written request of the Contractor, prior to commencement of the Work and thereafter, furnish to the Contractor reasonable evidence that financial arrangements have been made to fulfill the Owner's obligations under the Contract. Furnishing of such evidence shall be a condition precedent to commencement or continuation of the Work. After such evidence has been furnished, the Owner shall not materially vary such financial arrangements without prior notice to the Contractor.

§ 2.2.2 Except for permits and fees, including those required under Section 3.7.1, which are the responsibility of the Contractor under the Contract Documents, the Owner shall secure and pay for necessary approvals, easements, assessments and charges required for construction, use or occupancy of permanent structures or for permanent changes in existing facilities.

§ 2.2.3 The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the ~~Project,~~ Project (the "**Surveys**"), and a legal description of the site. The Contractor shall be entitled to rely on the accuracy of information furnished by the Owner but shall exercise proper precautions relating to the safe performance of the Work. The Owner shall disclose, to the extent known to the Owner, the results and reports of studies, prior tests, inspections or investigations conducted for the Project (collectively, the "**Project Information**") involving: structural or mechanical systems; chemical, air and water pollution; hazardous materials; geotechnical conditions; Surveys; studies and plans or other environmental, subsurface or concealed conditions. The Owner shall disclose all information known to the Owner regarding the presence of hazardous materials, pollutants or contaminants at the Project's site. The Contractor shall review all such Project Information and shall cause the Architect, the structural engineer and other Design Professionals hired by Contractor and/or Architect to design, and

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                                   (986536188)

R.P. Appx. 045

Contractor shall construct, the Project in accordance with the recommendations and findings set forth in such Project Information.

**§ 2.2.4** Information or services required of the Owner by the Contract Documents shall be furnished by the Owner with reasonable promptness. Any other information or services relevant to the Contractor's performance of the Work under the Owner's control shall be furnished by the Owner after receipt from the Contractor of a written request for such information or services.

**§ 2.2.5** Unless otherwise provided in the Contract Documents, the Contractor will be furnished, free of charge, such copies of Drawings and Project Manuals as are reasonably necessary for execution of the Work.

### § 2.3 OWNER'S RIGHT TO STOP THE WORK
**§ 2.3.1** If the Contractor fails to correct Work which is not in accordance with the requirements of the Contract Documents as required by Section 12.2 or persistently fails to carry out Work in accordance with the Contract Documents, the Owner may issue a written order to the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Contractor or any other person or entity, except to the extent required by Section 6.1.3. No part of the time lost due to any such stop work orders shall be made the subject of a claim for extension of time or for increased costs or damages by Contractor.

### § 2.4 OWNER'S RIGHT TO CARRY OUT THE WORK
**§ 2.4.1** If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within a seven-day period after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may after such seven-day period give the Contractor a second written notice to correct such deficiencies within a three-day period. If the Contractor within such three-day period after receipt of such second notice fails to commence and continue to correct any deficiencies, the Owner may, without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Contractor the reasonable cost of correcting such deficiencies, including Owner's expenses and compensation for the Architect's additional services made necessary by such default, neglect or failure. Such action by the Owner and amounts charged to the Contractor are both subject to prior approval of the Architect. If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor shall pay the difference to the Owner. If the Contractor defaults in the Contractor's obligations to the Owner, the Architect shall grant a license to the Owner to use the drawings, specifications, and other documents and electronic data furnished by the Architect to the Contractor for the completion of the Project.

## ARTICLE 3 CONTRACTOR
### § 3.1 GENERAL
**§ 3.1.1** The Contractor is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Contractor" means the Contractor or the Contractor's authorized representative.

**§ 3.1.2** The Contractor shall perform the Work in accordance with the Contract Documents.

**§ 3.1.3** The Contractor shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the Architect in the Architect's administration of the Contract, or by tests, inspections or approvals required or performed by persons other than the Contractor.

### § 3.2 REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY CONTRACTOR
**§ 3.2.1** Since the Contract Documents are complementary, before starting each portion of the Work, the Contractor shall carefully study and compare the various Drawings and other Contract Documents relative to that portion of the Work, as well as the information furnished by the Owner pursuant to Section 2.2.3, shall take field measurements of any existing conditions related to that portion of the Work and shall observe any conditions at the site affecting it. These obligations are for the purpose of facilitating construction by the Contractor and are not for the purpose of discovering errors, omissions, or inconsistencies in the Contract Documents; however, any errors, inconsistencies or omissions discovered by the Contractor shall be reported promptly to the Architect Owner as a request for information in such form as the Architect Owner may reasonably require.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)    (986536188)

**§ 3.2.2** Any design errors or omissions noted by the Contractor during this review shall be reported promptly to the ~~Architect,~~ Owner, but it is recognized that the Contractor's review is made in the Contractor's capacity as a contractor and not as a licensed design ~~professional unless otherwise specifically provided in the Contract Documents.~~ professional. The Contractor ~~is not required~~ shall cause the Architect and other design professionals to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations, including, without limitation, the Americans with Disabilities Act, but any nonconformity discovered by or ~~made~~ make known to the Contractor shall be promptly reported ~~promptly~~ to ~~the Architect.~~ Owner.

**§ 3.2.3** If the Contractor believes that additional cost or time is involved because of clarifications or instructions issued by the ~~Architect~~ Owner in response to the Contractor's notices or requests for information pursuant to Sections 3.2.1 and 3.2.2, the Contractor shall make Claims as provided in Sections 4.3.6 and 4.3.7. If the Contractor fails to perform the obligations of Sections 3.2.1 and 3.2.2, the Contractor shall pay such costs and damages to the Owner as would have been avoided if the Contractor had performed such obligations. ~~The Contractor shall not be liable to the Owner or Architect for damages resulting from errors, inconsistencies or omissions in the Contract Documents or for differences between field measurements or conditions and the Contract Documents unless the Contractor recognized such error, inconsistency, omission or difference and knowingly failed to report it to the Architect.~~

### § 3.3 SUPERVISION AND CONSTRUCTION PROCEDURES

**§ 3.3.1** The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, the Contractor shall evaluate the jobsite safety thereof and, except as stated below, shall be fully and solely responsible for the jobsite safety of such means, methods, techniques, sequences or procedures. If the Contractor determines that such means, methods, techniques, sequences or procedures may not be safe, the Contractor shall give timely written notice to the Owner and ~~Architect and~~ shall not proceed with that portion of the Work without further written instructions from the ~~Architect.~~ Owner. If the Contractor is then instructed to proceed with the required means, methods, techniques, sequences or procedures without acceptance of changes proposed by the Contractor, the Owner shall be solely responsible for any resulting loss or damage.

**§ 3.3.2** The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors.

**§ 3.3.3** The Contractor shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work.

### § 3.4 LABOR AND MATERIALS

**§ 3.4.1** Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

**§ 3.4.2** The Contractor may make substitutions only with the consent of the Owner, after evaluation by the Architect and in accordance with a Change Order.

**§ 3.4.3** The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Contract. The Contractor shall not permit employment of unfit persons or persons not skilled in tasks assigned to them.

**§ 3.4.4** The Contractor shall inspect all materials, supplies and equipment that are to be incorporated into the Project. In addition, Contractor shall be responsible for construction quality control for all Work. Contractor's quality control program and inspection procedures for the foregoing shall be submitted in writing to Owner for review and approval, in sufficient detail to delineate those items to be inspected and the manner in which they are to be

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)          (986536188)

R.P. Appx. 047

inspected, and shall adequately describe all construction quality control activities contemplated, including provision for adequate documentation of Contractor's performance of such quality control and inspection.

**§ 3.4.5** Contractor shall, during the course of performance of the Project hereunder, without additional compensation, make or cause to be made all inspections required by the Contract Documents. Owner may require at Owner's expense additional inspections. Contractor shall furnish Owner with satisfactory documentation of the results of all inspections. Owner shall be given not less than three (3) working days notice of any inspections to be made by Contractor or Contractor's subcontractors in order that Owner may witness any such inspections.

**§ 3.4.6** Owner and its representatives, and others as may be required by applicable laws, ordinances and regulations, shall have the right at all reasonable times to inspect the Project and all material and equipment for the Project at the job site and at Contractor's and its subcontractors' shops for conformance with the Contract Documents. Contractor shall provide, or cause to be provided access and sufficient, safe and proper facilities for such inspections.

**§ 3.4.7** Neither the failure by Owner to make any inspection under the Contract Documents nor to discover defective workmanship, materials or equipment, nor approval of any Work or payment to Contractor for such Work shall constitute Contractor's satisfaction of its obligations under the Contract Documents, nor shall any such inspections or approvals prejudice the rights of Owner.

## § 3.5 WARRANTY
**§ 3.5.1** The Contractor warrants to the Owner ~~and Architect~~ that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Contractor, improper or insufficient maintenance, improper operation, or normal wear and tear and normal usage. If required by the ~~Architect,~~ Owner, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment. All warranties under this Paragraph shall commence as of the date of Substantial Completion of the Work, and shall continue for a period of one (1) year, except as otherwise noted in the Outline Specs (as such term is defined in the Agreement). **THE CONTRACTOR HEREBY DISCLAIMS ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION, ANY WARRANTIES OF FITNESS FOR ANY PARTICULAR PURPOSE, EXCEPT AS EXPRESSLY WARRANTED HEREIN. THERE ARE NO WARRANTIES BEYOND THE DESCRIPTION ON THE FACE HEREOF.** All subcontractor's and manufacturer's warranties shall be deemed furnished and assigned to the Owner pursuant to this Contract without further action by the Contractor upon Final Payment by the Owner as required under this Contract.

## § 3.6 TAXES
**§ 3.6.1** The Contractor shall pay sales, consumer, use and similar taxes for the Work provided by the Contractor which are legally enacted when bids are received or negotiations concluded, whether or not yet effective or merely scheduled to go into effect.

## § 3.7 PERMITS, FEES AND NOTICES
**§ 3.7.1** Unless otherwise provided in the Contract Documents, the Contractor shall secure and pay for the building permit and other permits and governmental fees, licenses , waivers, consents, approvals and authorizations and make all material registrations, qualifications, designations and filings required and shall secure and pay for all inspections necessary for proper execution and completion of the Work which are customarily secured after execution of the Contract and which are legally required when bids are received or negotiations concluded.

**§ 3.7.2** The Contractor shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities applicable to performance of the Work.

**§ 3.7.3** ~~It is not~~ Contractor shall cause the ~~Contractor's responsibility~~ Architect and other design professionals to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations. However, if the Contractor observes that portions of the Contract Documents are at variance therewith, the Contractor shall promptly notify the ~~Architect and~~ Owner in writing, and necessary changes shall be accomplished by appropriate Modification.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                                 (986536188)

R.P. Appx. 048

**§ 3.7.4** If the Contractor performs Work knowing it to be contrary to laws, statutes, ordinances, building codes, and rules and regulations without such notice to the ~~Architect and~~ Owner, the Contractor shall assume appropriate responsibility for such Work and shall bear the costs attributable to correction.

## § 3.8 ALLOWANCES
**§ 3.8.1** The Contractor shall include in the Contract Sum all allowances stated in the Contract Documents. Items covered by allowances shall be supplied for such amounts and by such persons or entities as the Owner may direct, but the Contractor shall not be required to employ persons or entities to whom the Contractor has reasonable objection.

**§ 3.8.2** Unless otherwise provided in the Contract Documents:
- **.1** allowances shall cover the cost to the Contractor of materials and equipment delivered at the site and all required taxes, less applicable trade discounts;
- **.2** Contractor's costs for unloading and handling at the site, labor, installation costs, ~~overhead, profit~~ Contractor's Fee based on the percentage set forth in Section 5.1.2 of the Agreement and other expenses contemplated for stated allowance amounts shall be included in the Contract Sum but not in the allowances;
- **.3** whenever costs are more than or less than allowances, the Contract Sum shall be adjusted accordingly by Change Order. The amount of the Change Order shall reflect (1) the difference between actual costs and the allowances under Section 3.8.2.1 and (2) changes in Contractor's ~~costs~~ costs, Contractor's Fee based on the percentage set forth in Section 5.1.2 of the Agreement and other expenses under Section 3.8.2.2.

**§ 3.8.3** Materials and equipment under an allowance shall be selected by the Owner in sufficient time to avoid delay in the Work.

## § 3.9 SUPERINTENDENT
**§ 3.9.1** The Contractor shall employ a competent superintendent and necessary assistants who shall be in attendance at the Project site during performance of the Work. The superintendent shall represent the Contractor, and communications given to the superintendent shall be as binding as if given to the Contractor. Important communications (including but not limited to any communication that may affect the items in subparagraphs (i) through (vii) of Section 6.5 of the Agreement) shall be confirmed in writing. Other communications shall be similarly confirmed on written request in each case.

## § 3.10 CONTRACTOR'S CONSTRUCTION SCHEDULES
**§ 3.10.1** The Contractor, promptly after being awarded the Contract, shall prepare and submit for the Owner's ~~and Architect's~~ information a Contractor's construction schedule for the Work. The schedule shall not exceed time limits current under the Contract Documents, shall be revised at appropriate intervals as required by the conditions of the Work and Project, shall be related to the entire Project to the extent required by the Contract Documents, and shall provide for expeditious and practicable execution of the Work.

**§ 3.10.2** The Contractor shall prepare and keep current, for the ~~Architect's~~ Owner's approval, a schedule of submittals which is coordinated with the Contractor's construction schedule and allows the ~~Architect~~ Owner reasonable time to review submittals.

**§ 3.10.3** The Contractor shall perform the Work in general accordance with the most recent schedules submitted to the ~~Owner and Architect.~~ Owner.

## § 3.11 DOCUMENTS AND SAMPLES AT THE SITE
**§ 3.11.1** The Contractor shall maintain at the site for the Owner one record copy of the Drawings, Specifications, Addenda, Change Orders and other Modifications, in good order and marked currently to record field changes and selections made during construction, and one record copy of approved Shop Drawings, Product Data, Samples and similar required submittals. These shall be available to the ~~Architect~~ Owner and shall be delivered ~~to the Architect for submittal~~ to the Owner upon completion of the Work.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06) (986536188)

R.P. Appx. 049

## § 3.12 SHOP DRAWINGS, PRODUCT DATA AND SAMPLES

**§ 3.12.1** Shop Drawings are drawings, diagrams, schedules and other data specially prepared for the Work by the Contractor or a Subcontractor, Sub-subcontractor, manufacturer, supplier or distributor to illustrate some portion of the Work.

**§ 3.12.2** Product Data are illustrations, standard schedules, performance charts, instructions, brochures, diagrams and other information furnished by the Contractor to illustrate materials or equipment for some portion of the Work.

**§ 3.12.3** Samples are physical examples which illustrate materials, equipment or workmanship and establish standards by which the Work will be judged.

**§ 3.12.4** Shop Drawings, Product Data, Samples and similar submittals are not Contract Documents. The purpose of their submittal is to demonstrate for those portions of the Work for which submittals are required by the Contract Documents the way by which the Contractor proposes to conform to the information given and the design concept expressed in the Contract Documents. Review by the ~~Architect~~ Owner is subject to the limitations of ~~Section~~ section 4.2.7. Informational submittals upon which the ~~Architect~~ Owner is not expected to take responsive action may be so identified in the Contract Documents. Submittals ~~which~~ that are not required by the Contract Documents may be returned by the ~~Architect~~ Owner without action.

**§ 3.12.5** The Contractor shall review for compliance with the Contract Documents, ~~approve~~ and ~~submit~~ direct the Owner to review the ~~Architect~~ Shop Drawings, Product Data, Samples and similar submittals required by the Contract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Owner or of separate contractors. ~~Submittals which are not marked as reviewed for compliance with the Contract Documents and approved by the Contractor may be returned by the Architect without action.~~

**§ 3.12.6** By approving and submitting Shop Drawings, Product Data, Samples and similar submittals, the Contractor represents that the Contractor has determined and verified materials, field measurements and field construction criteria related thereto, or will do so, and has checked and coordinated the information contained within such submittals with the requirements of the Work and of the Contract Documents.

**§ 3.12.7** The Contractor shall perform no portion of the Work for which the Contract Documents require submittal and review by the Owner of Shop Drawings, Product Data, Samples or similar submittals until the respective submittal has been approved by the ~~Architect.~~ Owner.

**§ 3.12.8** The Work shall be in accordance with approved submittals except that the Contractor shall not be relieved of responsibility for deviations from requirements of the Contract Documents by the ~~Architect's~~ Owner's approval of Shop Drawings, Product Data, Samples or similar submittals unless the Contractor has specifically informed the ~~Architect~~ Owner in writing of such deviation at the time of submittal and (1) the ~~Architect~~ Owner has given written approval to the specific deviation as a minor change in the Work, or (2) a Change Order ~~or Construction Change Directive~~ has been issued authorizing the deviation. The Contractor shall not be relieved of responsibility for errors or omissions in Shop Drawings, Product Data, Samples or similar submittals by the ~~Architect's~~ Owner's approval thereof.

**§ 3.12.9** The Contractor shall direct specific attention, in writing or on resubmitted Shop Drawings, Product Data, Samples or similar submittals, to revisions other than those requested by the ~~Architect~~ Owner on previous submittals. In the absence of such written notice the ~~Architect's~~ Owner's approval of a resubmission shall not apply to such revisions.

**§ 3.12.10** The Contractor shall not be required to provide professional services which constitute the practice of architecture or engineering unless such services are specifically required by the Contract Documents for a portion of the Work or unless the Contractor needs to provide such services in order to carry out the Contractor's responsibilities for construction means, methods, techniques, sequences and procedures. The Contractor shall not be required to provide professional services in violation of applicable law. If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Owner ~~and the Architect~~ will specify all performance and design criteria that such services must satisfy. The Contractor shall cause such services or certifications to be provided by a properly licensed design professional, whose signature and seal shall appear on all drawings, calculations,

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06) (986536188)

R.P. Appx. 050

specifications, certifications, Shop Drawings and other submittals prepared by such professional. Shop Drawings and other submittals related to the Work designed or certified by such professional, if prepared by others, shall bear such professional's written approval when submitted to the ~~Architect.~~ Owner. The Owner ~~and the Architect~~ shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals, provided the Owner ~~and Architect have~~ has specified to the Contractor all performance and design criteria that such services must satisfy. Pursuant to this Section 3.12.10, the ~~Architect~~ Owner will review, approve or take other appropriate action on submittals only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Contractor shall not be responsible for the adequacy of the performance or design criteria required by the Contract Documents.

## § 3.13 USE OF SITE
§ 3.13.1 The Contractor shall confine operations at the site to areas permitted by law, ordinances, permits and the Contract Documents and shall not unreasonably encumber the site with materials or equipment.

## § 3.14 CUTTING AND PATCHING
§ 3.14.1 The Contractor shall be responsible for cutting, fitting or patching required to complete the Work or to make its parts fit together properly.

§ 3.14.2 The Contractor shall not damage or endanger a portion of the Work or fully or partially completed construction of the Owner or separate contractors by cutting, patching or otherwise altering such construction, or by excavation. The Contractor shall not cut or otherwise alter such construction by the Owner or a separate contractor except with written consent of the Owner and of such separate contractor; such consent shall not be unreasonably withheld. The Contractor shall not unreasonably withhold from the Owner or a separate contractor the Contractor's consent to cutting or otherwise altering the Work.

## § 3.15 CLEANING UP
§ 3.15.1 The Contractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Contract. At completion of the Work, the Contractor shall remove from and about the Project waste materials, rubbish, the Contractor's tools, construction equipment, machinery and surplus materials.

§ 3.15.2 If the Contractor fails to clean up as provided in the Contract Documents, the Owner may do so and the cost thereof shall be charged to the Contractor.

## § 3.16 ACCESS TO WORK
§ 3.16.1 The Contractor shall provide the Owner and Architect access to the Work in preparation and progress wherever located.

## § 3.17 ROYALTIES, PATENTS AND COPYRIGHTS
§ 3.17.1 The Contractor shall pay all royalties and license fees. The Contractor shall defend suits or claims for infringement of copyrights and patent rights and shall hold the Owner ~~and Architect~~ harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Contract Documents or where the copyright violations are contained in Drawings, Specifications or other documents prepared by the ~~Owner or Architect.~~ Owner. However, if the Contractor has reason to believe that the required design, process or product is an infringement of a copyright or a patent, the Contractor shall be responsible for such loss unless such information is promptly furnished to the ~~Architect.~~ Owner.

## § 3.18 INDEMNIFICATION
§ 3.18.1 To the fullest extent permitted by law and to the extent claims, damages, losses or expenses are not covered by (a) Project Management Protective Liability insurance purchased by the Contractor in accordance with Section ~~11.3,~~ 11.3 or (b) builder's risk or property insurance maintained with respect to the Project, the Contractor shall indemnify and hold harmless the Owner, ~~Architect, Architect's consultants, and agents and employees of any of them~~ from and against claims, damages, losses and expenses, including but not limited to reasonable attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the ~~negligent~~ acts or omissions of the Contractor, a Subcontractor,

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)     (986536188)

R.P. Appx. 051

anyone directly or indirectly employed by them or anyone for whose acts they may be liable, ~~regardless~~ but only to the extent that such claim, damage, loss or expense is not caused by breach, or acts of omissions of the Owner. To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, its Subcontractors, and the agents and employees of any of ~~whether or~~ them from and against claims, damages, losses and expenses, including but not limited to reasonable attorneys' fees, arising out of the Project, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property, but only to the extent caused by the Owner's breach of this Contract, or the acts or omissions of the Owner, the Owner's separate contractors (as provided in ~~part~~ subparagraph 6.1.4), anyone directly or indirectly employed by them or anyone for whose acts they may be liable (other than the Contractor and its Subcontractors), and only to the extent that such claim, damage, loss or expense is not caused by ~~a~~ breach, or acts or omissions of the party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 3.18. The obligations of the Contractor and the Owner herein are subject to the provisions of Subparagraphs 4.3.10 and 11.4.7.

§ 3.18.2 In claims against any person or entity indemnified under this Section 3.18 by an employee of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Section 3.18.1 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or a Subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

## ARTICLE 4   ADMINISTRATION OF THE CONTRACT
### § 4.1 ARCHITECT
§ 4.1.1 The Architect is the person lawfully licensed to practice architecture or an entity lawfully practicing architecture identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Architect" means the Architect or the Architect's authorized representative.

§ 4.1.2 Duties, responsibilities and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the ~~Owner, Contractor~~ Owner and ~~Architect.~~ the Contractor. Consent shall not be unreasonably withheld.

§ 4.1.3 If the employment of the Architect is terminated, the ~~Owner~~ Contractor shall employ a new Architect against whom the ~~Contractor~~ Owner has no reasonable objection ~~and~~ whose status under the Contract Documents shall be that of the former Architect.

### § 4.2 ARCHITECT'S ADMINISTRATION OF THE CONTRACT
§ 4.2.1 ~~The Architect will provide administration of the Contract as described in the Contract Documents, and will be an Owner's representative (1) during construction, (2) until final payment is due and (3) with the Owner's concurrence, from time to time during the one-year period for correction of Work described in Section 12.2. The Architect will have authority to act on behalf of the Owner only to the extent provided in the Contract Documents, unless otherwise modified in writing in accordance with other provisions of the Contract.~~
§ 4.2.1 The Contractor shall keep the Owner informed of the progress and quality of the Work. Within thirty (30) calendar days after full execution and delivery of the Contract Documents and before submittal of the first progress payment invoice, and at each construction progress meeting on site, Contractor shall submit to Owner for Owner's reasonable approval (i) a revised Project Schedule (the most recent schedule so approved in writing by Owner becoming the revised Project Schedule for all purposes of the Contract Documents) showing changes from the prior Project Schedule, the sequence in which Contractor proposes to perform the Project, the start and completion dates of all separable portions of the Project in sufficient detail, manpower forecasts (incremental and cumulative percent complete), materials procurement and delivery plans, the anticipated Substantial Completion Date and the anticipated date that Contractor will tender possession of the Project and any other information reasonably specified by Owner pertaining to the construction schedule, along with (ii) a proforma Project Schedule that "looks ahead" two weeks containing the same details as set forth in subpart (i) above. Contractor agrees to adhere to the Project Schedule and attend and participate in scheduled progress and coordination meetings called by Owner. Within thirty (30) calendar days after full execution and delivery of the Contract Documents and before submittal of the first progress payment invoice, and at each construction progress meeting on site, Contractor shall also submit to Owner a revised budget for the Project, in form and content reasonably approved by Owner, including all hard and soft construction costs (the "**Budget**"), along with a construction cost report in form and content reasonably acceptable to Owner. Contractor shall use commercially reasonable efforts to keep the Budget as accurate as possible.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                                     (986536188)

R.P. Appx. 052

Contractor shall provide Owner with monthly reports no later than the tenth (10th) day of each month, which shall, at the minimum, include the most current Project Schedule and a Project Change Order log update (with pricing information).

**§ 4.2.2** In the event Contractor's performance of the Project is not in compliance with the Project Schedule, Owner may, in writing, require the Contractor to submit its plan for schedule recovery, or specify in writing the steps to be taken to achieve compliance with such Project Schedule, and/or exercise any other remedies under the Contract Documents. Contractor shall thereupon take such commercially reasonable steps as may be directed by Owner or otherwise necessary to improve its progress.

**§ 4.2.2** ~~The Architect, as a representative of the Owner, will visit the site at intervals appropriate to the stage of the Contractor's operations (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect will neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents, except as provided in Section 3.3.1.~~

**§ 4.2.3** Contractor acknowledges and agrees Prudential Insurance Company of America ("**Prudential**") shall employ one or more construction consultants or engineers (collectively, the "**Prudential Construction Consultant**") to advise Prudential with respect to the progress of construction and compliance of construction with the construction plans and specifications for the Project, applicable legal requirements and good construction practices. Contractor shall inform the Prudential Construction Consultant of the usual location, date and time of periodic construction meetings for the Project. The Prudential Construction Consultant shall be permitted to attend all such construction meetings. Contractor shall provide the Owner and Prudential Construction Consultant with at least three (3) business days' prior notice of any change in the date, time or location of a periodic construction meeting. Contractor shall permit Owner and the Prudential Construction Consultant to have access to the Project during the period of construction to enable the Owner and Prudential Construction Consultant to examine all aspects of such construction and all matters related thereto. Contractor shall provide Owner and the Prudential Construction Consultant with at least three (3) business days' prior written notice of each of the following trades commencing construction at the Project: mechanical, electrical, plumbing, framing, paving, curtain wall installation and foundations. Contractor shall provide to Owner and the Prudential Construction Consultant reasonable access during normal business hours to all books, records, shop drawings, and engineering and other reports and tests related to the Project as may be requested by Owner or the Prudential Construction Consultant. The Owner and the Prudential Construction Consultant shall have the right to make copies of all such materials. Contractor shall provide to Owner and the Prudential Construction Consultant a reasonable working space and access to telephone and other such facilities as may be reasonably requested by Owner or the Prudential Construction Consultant. Upon execution of this Agreement, Contractor shall deliver to Owner and the Prudential Construction Consultant a list of all current and potential bidders who may perform work at or supply materials to the Project together with a list of all bid packages which were sent to any of such bidders and all bids which were received from such bidders. Such bidding information shall be updated by Contractor on a monthly basis by delivering revised lists to Owner and the Prudential Construction Consultant. The Owner and the Prudential Construction Consultant shall have the right to review any bid packages or any bids received upon request.

**§ 4.2.3** ~~The Architect will not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect will not have control over or charge of and will not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or any other persons or entities performing portions of the Work.~~
**§ 4.2.4** If requested by Owner, Contractor shall furnish it with the names of the subcontractors who have performed or are performing the Work hereunder.

**§ 4.2.4** **§ 4.2.5** Communications Facilitating Contract Administration. ~~Except as otherwise provided in the Contract Documents or when direct communications have been specially authorized, the Owner and Contractor shall endeavor to communicate with each other through the Architect about matters arising out of or relating to the Contract. Communications by and with the Architect's consultants shall be through the Architect.~~ Communications

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06) (986536188)

R.P. Appx. 053

by and with Subcontractors and material suppliers shall be through the Contractor. Communications by and with separate contractors shall be through the Owner.

~~§ 4.2.5 Based on the Architect's evaluations of the Contractor's Applications for Payment, the Architect will review and certify the amounts due the Contractor and will issue Certificates for Payment in such amounts.~~
**§ 4.2.6** Upon request of Owner, Contractor will furnish it with a certificate satisfactory in form to Owner that goods furnished by Contractor in performance of the Contract Documents were produced in full compliance with the requirements of Sections 6, 7, and 12 of the Fair Labor Standards Act of 1938, as amended, and the regulations and orders of the U.S. Department of Labor issued under Section 14 thereof.

**§ ~~4.2.6~~ § 4.2.7** The ~~Architect~~ Owner will have authority to reject Work that does not conform to the Contract Documents. Whenever the ~~Architect~~ Owner considers it necessary or advisable, the ~~Architect~~ Owner will have authority to require inspection or testing of the Work in accordance with Sections 13.5.2 and 13.5.3, whether or not such Work is fabricated, installed or completed. However, neither this authority of the ~~Architect~~ Owner nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the ~~Architect~~ Owner to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees, or other persons or entities performing portions of the Work.

**§ ~~4.2.7~~ § 4.2.8** As set forth in paragraph 3.12 above, the Owner will review submittals such as Shop Drawings, Product Data and Samples. The ~~Architect~~ Owner will review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The ~~Architect's~~ Owner's action will be taken with such reasonable promptness as to cause no delay in the Work or in the activities of the ~~Owner,~~ Contractor or separate contractors, while allowing ~~sufficient~~ time ~~in the Architect's professional judgment~~ to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The ~~Architect's~~ Owner's review of the Contractor's submittals shall not relieve the Contractor of the obligations under Sections 3.3, 3.5 and 3.12. The ~~Architect's~~ Owner's review shall not constitute approval of safety precautions ~~or, unless otherwise specifically stated by the Architect, or~~ of any construction means, methods, techniques, sequences or procedures. The ~~Architect's~~ Owner's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

~~§ 4.2.8 The Architect will prepare Change Orders and Construction Change Directives, and may authorize minor changes in the Work as provided in Section 7.4.~~
**§ 4.2.9** The Owner will submit CO Requests as provided in Section 6.5 of the Agreement.

**§ ~~4.2.9~~ § 4.2.10** The ~~Architect~~ Owner will conduct inspections to determine the date or dates of Substantial Completion and the date of final ~~completion, will receive and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract and assembled by the Contractor, and will issue a final Certificate for Payment upon compliance with the requirements of the Contract Documents.~~ completion.

~~§ 4.2.10 If the Owner and Architect agree, the Architect will provide one or more project representatives to assist in carrying out the Architect's responsibilities at the site. The duties, responsibilities and limitations of authority of such project representatives shall be as set forth in an exhibit to be incorporated in the Contract Documents.~~
**§ 4.2.11** Contractor represents and warrants it is an independent contractor and an employer subject to all applicable unemployment compensation, occupational safety and health, workers' compensation, or similar statutes so as to relieve Owner of any responsibility or liability for treating Contractor's employees as employees of Owner for the purpose of their safety or of keeping records, making reports or paying of any payroll taxes or contribution. Contractor agrees to defend, indemnify and hold Owner harmless and reimburse them for any expense or liability incurred under said statutes in connection with employees of Contractor, including a sum equal to any unemployment benefits paid to those who were Contractor's employees, where such benefit payments are charged to Owner under any merit plan or to Owner reserve accounts pursuant to any statute. Nothing contained in the Contract Documents or any subcontract awarded by Contractor shall create any contractual relationship between any subcontractor and Owner.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)       (986536188)

R.P. Appx. 054

§ 4.2.11 The Architect will interpret and decide matters concerning performance under and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests will be made in writing within any time limits agreed upon or otherwise with reasonable promptness. If no agreement is made concerning the time within which interpretations required of the Architect shall be furnished in compliance with this Section 4.2, then delay shall not be recognized on account of failure by the Architect to furnish such interpretations until 15 days after written request is made for them.

§ 4.2.12 Contractor represents and warrants that it will keep and have available all necessary records and make all payments, reports, collections and deductions and otherwise do any and all things so as to fully comply with all federal, state and local laws, ordinances and regulations as they affect performance of the Contract Documents, so as to fully relieve and protect Owner from any and all responsibility or liability therefore or in regard thereto: (1) the production, purchase and sale, furnishing and delivering, pricing, and use or consumption of materials, supplies and equipment; (2) the hire, tenure or conditions of employment of employees and their hours of work and rates of the payment of their Work, and (3) the keeping of records, making of reports, and the payment, collection and/or deduction of federal, state, commonwealth and local taxes, contributions, pension funds, welfare funds, or similar assessments.

§ 4.2.12 Interpretations and decisions of the Architect will be consistent with the intent of and reasonably inferable from the Contract Documents and will be in writing or in the form of drawings. When making such interpretations and initial decisions, the Architect will endeavor to secure faithful performance by both Owner and Contractor, will not show partiality to either and will not be liable for results of interpretations or decisions so rendered in good faith.

§ 4.2.13 The Architect's decisions on matters relating to aesthetic effect will be final if consistent with the intent expressed in the Contract Documents.

§ 4.2.13 Nothing in the Contract Documents shall be deemed to represent that Contractor, or any of Contractor's employees or agents, are the agents, representatives or employees of Owner. Contractor shall be an independent contractor and shall have responsibility for and control over the details and means for performing the Project. Anything in the Contract Documents that may appear to give Owner the right to direct Contractor as to the details of the performance of the Project or to exercise a measure of control over Contractor shall mean that Contractor shall follow the desires of Owner only as to the intended results of the Project.

## § 4.3 CLAIMS AND DISPUTES

§ 4.3.1 Definition. A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract. Claims must be initiated by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim.

§ 4.3.2 Time Limits on Claims. Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. Claims must be initiated by written notice to the Architect and the other party.

§ 4.3.3 Continuing Contract Performance. Pending final resolution of a Claim except as otherwise agreed in writing or as provided in Section 9.7.1 and Article 14, the Contractor shall proceed diligently with performance of the Contract and the Owner shall continue to make payments in accordance with the Contract Documents.

§ 4.3.4 Claims for Concealed or Unknown Conditions. If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, then notice by the observing party shall be given to the other party promptly before conditions are disturbed and in no event later than 21 days after first observance of the conditions. The Architect will promptly investigate such conditions and, if they differ materially and cause an increase or decrease in the Contractor's cost of, or time required for, performance of any part of the Work, will recommend an equitable adjustment in the Contract Sum or Contract Time, or both. If the Architect determines that the conditions at the site are not materially different from those indicated in the Contract Documents and that no change in the terms of the Contract is justified, the Architect shall so notify the Owner and Contractor in writing, stating the reasons. Claims by either party in opposition to such determination must be made within 21 days after the Architect has given notice of the decision. If

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                    (986536188)

R.P. Appx. 055

the conditions encountered are materially different, the Contract Sum and Contract Time shall be equitably adjusted, but if the Owner and Contractor cannot agree on an adjustment in the Contract Sum or Contract Time, the ~~adjustment~~ matter shall be ~~referred to the Architect for initial determination, subject to further proceedings pursuant to Section 4.4.~~considered a Claim and be resolved in accordance with Sections 4.4-4.6 below.

**§ 4.3.5** Claims for Additional Cost. If the Contractor wishes to make Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the Work. Prior notice is not required for Claims relating to an emergency endangering life or property arising under Section 10.6.

**§ 4.3.6** If the Contractor believes additional cost is involved for reasons including but not limited to (1) a written interpretation from the ~~Architect,~~ Owner, (2) an order by the Owner to stop the Work where the Contractor was not at fault, (3) a written order for a minor change in the Work issued by the ~~Architect,~~ Owner, (4) failure of payment by the Owner, (5) termination of the Contract by the Owner, (6) Owner's suspension or (7) other reasonable grounds, Claim shall be filed in accordance with this Section 4.3.

**§ 4.3.7** Claims for Additional Time
**§ 4.3.7.1** If the Contractor wishes to make Claim for an increase in the Contract Time, written notice as provided herein shall be given. The Contractor's Claim shall include an estimate of cost and of probable effect of delay on progress of the Work. In the case of a continuing delay only one Claim is necessary.

~~**§ 4.3.7.2** If adverse weather conditions are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that weather conditions were abnormal for the period of time, could not have been reasonably anticipated and had an adverse effect on the scheduled construction.~~
**§ 4.3.7.2** Adverse weather conditions or adverse site conditions caused by adverse weather may be the basis for a Claim for additional time to the extent that the days lost during a particular calendar month due to such inclement weather exceeds three (3) days of lost time (in work days) for the calendar month. If adverse weather conditions or adverse site conditions caused by adverse weather are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that either (i) weather conditions had an adverse effect on the scheduled construction, or (ii) weather conditions prevented the type of Work then scheduled, or (iii) adverse site conditions caused by adverse weather prevented the type of Work then scheduled.

**§ 4.3.8** Injury or Damage to Person or Property. If either party to the Contract suffers injury or damage to person or property because of an act or omission of the other party, or of others for whose acts such party is legally responsible, written notice of such injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after discovery. The notice shall provide sufficient detail to enable the other party to investigate the matter.

**§ 4.3.9** If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are materially changed in a proposed Change Order ~~or Construction Change Directive~~ so that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or Contractor, the applicable unit prices shall be equitably adjusted.

**§ 4.3.10** Claims for Consequential Damages. The Contractor and Owner waive Claims against each other for consequential damages arising out of or relating to this Contract. This mutual waiver includes:

    **.1** damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

    **.2** damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work.

This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 14. Nothing contained in this Section 4.3.10 shall be deemed to preclude an award of liquidated direct damages, when applicable, in accordance with the requirements of the Contract Documents.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)   (986536188)

R.P. Appx. 056

## § 4.4 INDEMNITY & RESOLUTION OF CLAIMS AND DISPUTES

**§ 4.4.1** ~~Decision of Architect. Claims, including those alleging an error or omission by the Architect but excluding those arising under Sections 10.3 through 10.5, shall be referred initially to the Architect for decision. An initial decision by the Architect shall be required as a condition precedent to mediation, arbitration or litigation of all Claims between the Contractor and Owner arising prior to the date final payment is due, unless 30 days have passed after the Claim has been referred to the Architect with no decision having been rendered by the Architect. The Architect will not decide disputes between the Contractor and persons or entities other than the Owner.~~

**§ 4.4.1** Contractor agrees to defend, indemnify and hold Owner, the affiliated companies of Owner, and all of their directors, officers, employees, agents and representatives, harmless from and against any claim, demand, cause of action, liability, loss or expense arising:

    **.1** By reason of Contractor's actual or asserted failure to comply with any law, ordinance, regulation, rule or order, or with the Contract Documents. This Section 4.4.1.1 includes, but is not limited to, fines or penalties by government authorities and claims arising from Contractor's actual or asserted failure to pay taxes.

    **.2** From actual or asserted violation or infringement of rights in any patent, copyright, proprietary information, trade secret or other property right caused or alleged to be caused by the use or sale of goods, materials, methods, processes, designs or information, including construction methods, construction equipment and temporary construction facilities, furnished by Contractor or its subcontractors in performance of the Project. Should any goods or services provided by Contractor become, or appear likely to become, the subject of a claim of infringement of a patent, copyright or other property right, Contractor shall, at Owner's option, either procure for Owner the right to continue using such goods or services, replace same with equivalent, non-infringing goods or services, or modify the goods or services so that the use thereof becomes non-infringing, provided that any such modification or replacement is of equal quality and provides equal performance to the infringing goods or services.

    **.3** From actual or alleged contamination, pollution, or public or private nuisance, directly caused by any negligence or intentional misconduct of the Contractor or its subcontractors.

**§ 4.4.2** ~~The Architect will review Claims and within ten days of the receipt of the Claim take one or more of the following actions: (1) request additional supporting data from the claimant or a response with supporting data from the other party, (2) reject the Claim in whole or in part, (3) approve the Claim, (4) suggest a compromise, or (5) advise the parties that the Architect is unable to resolve the Claim if the Architect lacks sufficient information to evaluate the merits of the Claim or if the Architect concludes that, in the Architect's sole discretion, it would be inappropriate for the Architect to resolve the Claim.~~

**§ 4.4.2** Contractor's indemnity obligations in this Subparagraph 4.4 are subject to the provisions of Subparagraphs 4.3.10 and 11.4.7 and Article 10, and shall apply to the extent that the amount to be indemnified was not caused by the negligence or willful misconduct of, or by defects in design furnished by, the party to be indemnified. Contractor's defense and indemnity obligations shall include the duty to reimburse any attorneys' fees and expenses reasonably incurred by Owner for legal action to enforce Contractor's indemnity obligations.

**§ 4.4.3** ~~In evaluating Claims, the Architect may, but shall not be obligated to, consult with or seek information from either party or from persons with special knowledge or expertise who may assist the Architect in rendering a decision. The Architect may request the Owner to authorize retention of such persons at the Owner's expense.~~

**§ 4.4.3** In the event that the indemnity provisions in the Contract Documents are contrary to the law governing the Contract Documents, then the indemnity obligations applicable hereunder shall be construed to be to the fullest extent allowed by applicable law.

**§ 4.4.4** ~~If the Architect requests a party to provide a response to a Claim or to furnish additional supporting data, such party shall respond, within ten days after receipt of such request, and shall either provide a response on the requested supporting data, advise the Architect when the response or supporting data will be furnished or advise the Architect that no supporting data will be furnished. Upon receipt of the response or supporting data, if any, the Architect will either reject or approve the Claim in whole or in part.~~

**§ 4.4.4** With respect to claims by employees of Contractor or its subcontractors, the indemnity obligations created under this Section 4.4 shall not be limited by the fact of, amount, or type of benefits or compensation payable by or for Contractor, its subcontractors or suppliers under any workers' compensation, disability benefits, or other employee benefits acts or regulations, and Contractor waives any limitation of liability or immunity arising from workers' compensation or such other acts or regulations.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                      (986536188)

R.P. Appx. 057

**§ 4.4.5** ~~The Architect will approve or reject Claims by written decision, which shall state the reasons therefor and which shall notify the parties of any change in the Contract Sum or Contract Time or both. The approval or rejection of a Claim by the Architect shall be final and binding on the parties but subject to mediation and arbitration.~~
**§ 4.4.5** Unless Contractor has provided Owner with a bond or other form of security in form and amount reasonably acceptable to Owner, amounts may be retained from payments otherwise due Contractor as shall reasonably be considered necessary to satisfy any mechanics' or materialmen's liens for damages that fall within Contractor's indemnity obligations under this Section 4.4 until such claims suits or liens have been settled and satisfactory evidence to that effect has been furnished to Owner. Notwithstanding anything to the contrary in the foregoing, if the Contractor provides the Owner with a lien bond or other form of security sufficient to cover mechanics' liens filed by the Contractor or any Subcontractor, the Owner shall not withhold payment as set forth in this Section or in Section 9.5.1 herein. The Contractor will diligently pursue the removal of any lien filed by a Subcontractor, and, regardless of whether a lien bond is provided as set forth above, during such time the Owner shall not satisfy or pay off the lien or otherwise settle or compromise the Contractor's claim; provided, however, that promptly after a final, non-appealable judgment is rendered directing that the property be sold to satisfy the lien, and in any event prior to the date of such sale, the Contractor will satisfy the lien and pay the Contractor all amounts owing.

**§ 4.4.6** ~~When a written decision of the Architect states that (1) the decision is final but subject to mediation and arbitration and (2) a demand for arbitration of a Claim covered by such decision must be made within 30 days after the date on which the party making the demand receives the final written decision, then failure to demand arbitration within said 30 days' period shall result in the Architect's decision becoming final and binding upon the Owner and Contractor. If the Architect renders a decision after arbitration proceedings have been initiated, such decision may be entered as evidence, but shall not supersede arbitration proceedings unless the decision is acceptable to all parties concerned.~~
**§ 4.4.6 Notwithstanding any provision in the Contract Documents to the contrary, Owner and Contractor mutually waive any and all claims against the other for special, consequential or punitive damages arising out of or relating to the Contract Documents. This waiver includes but is not limited to damages incurred for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons.**

**§ 4.4.7** Upon receipt of a Claim against the Contractor or at any time thereafter, the ~~Architect or the~~ Owner may, but is not obligated to, notify the surety, if any, of the nature and amount of the Claim. If the Claim relates to a possibility of a Contractor's default, ~~the Architect or~~ the Owner may, but is not obligated to, notify the surety and request the surety's assistance in resolving the controversy.

**§ 4.4.8** If a Claim relates to or is the subject of a mechanic's lien, the party asserting such Claim may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the ~~Claim by the Architect,~~ Claim, by mediation or by arbitration.

### § 4.5 MEDIATION
**§ 4.5.1** Any Claim arising out of or related to the Contract, except ~~Claims relating to aesthetic effect and except~~ those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5 shall, ~~after initial decision by the Architect or 30 days after submission of the Claim to the Architect,~~ be subject to mediation as a condition precedent to ~~arbitration or~~ binding arbitration. Except with the Owner's prior written consent, neither the assertion of a Claim nor the ~~institution~~ prosecution of ~~legal~~ mediation or ~~equitable proceedings by either party.~~ arbitration hereunder shall cause any Work to be halted pending resolution of same.

**§ 4.5.2** The parties shall endeavor to resolve their Claims by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to the Contract and with the American Arbitration Association. The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06) (986536188)

R.P. Appx. 058

**§ 4.5.3** The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

## § 4.6 ARBITRATION

**§ 4.6.1** Any Claim arising out of or related to the Contract, except ~~Claims relating to aesthetic effect and except~~ those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5, ~~shall, after decision by the Architect or 30 days after submission of the Claim to the Architect,~~ shall be subject to binding arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with the provisions of Section 4.5.

**§ 4.6.2** Claims not resolved by mediation shall be decided by binding arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to the Contract and with the American Arbitration ~~Association, and a copy shall be filed with the Architect.~~Association. BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL.

| | |
|---|---|
| Owner Initials | Contractor Initials |

**§ 4.6.3** A demand for arbitration shall be made within ~~the time limits specified in Sections 4.4.6 and 4.6.1 as applicable, and in other cases within~~ a reasonable time after the Claim has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such Claim would be barred by the applicable statute of limitations as determined pursuant to Section 13.7.

**§ 4.6.4** Limitation on Consolidation or Joinder. ~~No arbitration arising out of or relating to the Contract shall include, by consolidation or joinder or in any other manner, the Architect, the Architect's employees or consultants, except by written consent containing specific reference to the Agreement and signed by the Architect, Owner, Contractor and any other person or entity sought to be joined. No arbitration shall include, by consolidation or joinder or in any other manner, parties other than the Owner, Contractor, a separate contractor as described in Article 6 and other persons substantially involved in a common question of fact or law whose presence is required if complete relief is to be accorded in arbitration. No person or entity other than the Owner, Contractor or a separate contractor as described in Article 6 shall be included as an original third party or additional third party to an arbitration whose interest or responsibility is insubstantial. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of a Claim not described therein or with a person or entity not named or described therein.~~ The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to the Agreement shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

**§ 4.6.5** Claims and Timely Assertion of Claims. The party filing a notice of demand for arbitration must assert in the demand all Claims then known to that party on which arbitration is permitted to be demanded.

**§ 4.6.6** Judgment on Final Award. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

## ARTICLE 5 SUBCONTRACTORS
## § 5.1 DEFINITIONS

**§ 5.1.1** A Subcontractor is a person or entity who has a direct contract with the Contractor to perform a portion of the Work at the site. The term "Subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Subcontractor or an authorized representative of the Subcontractor. The term "Subcontractor" does not include a separate contractor or subcontractors of a separate contractor.

**§ 5.1.2** A Sub-subcontractor is a person or entity who has a direct or indirect contract with a Subcontractor to perform a portion of the Work at the site. The term "Sub-subcontractor" is referred to throughout the Contract

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                     (986536188)

R.P. Appx. 059

Documents as if singular in number and means a Sub-subcontractor or an authorized representative of the Sub-subcontractor.

## § 5.2 AWARD OF SUBCONTRACTS AND OTHER CONTRACTS FOR PORTIONS OF THE WORK

§ 5.2.1 Unless otherwise stated in the Contract Documents or the bidding requirements, the Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner ~~through the Architect~~ the names of persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for each principal portion of the ~~Work.~~ Work and will, upon request therefor by Owner, update such list during construction of the Project. The ~~Architect~~ Owner will promptly reply to the Contractor in writing stating whether or not the ~~Owner or the Architect,~~ Owner, after due investigation, has reasonable objection to any such proposed person or entity. Failure of the Owner ~~or Architect~~ to reply promptly shall constitute notice of no reasonable objection. Notwithstanding anything herein to the contrary, the Contractor may subcontract portions of the Work to the Contractor or divisions of the Contractor pursuant to a subcontract agreement, and the subcontract sum thereof shall constitute a Cost of the Work, but only if such subcontract agreement is approved in writing in advance by Owner.

§ 5.2.2 The Contractor shall not contract with a proposed person or entity to whom the Owner ~~or Architect~~ has made reasonable and timely objection. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

§ 5.2.3 If the Owner ~~or Architect~~ has reasonable objection to a person or entity proposed by the Contractor, the Contractor shall propose another to whom the Owner ~~or Architect~~ has no reasonable objection. If the proposed but rejected Subcontractor was reasonably capable of performing the Work, the Contract Sum and Contract Time shall be increased or decreased by the difference, if any, occasioned by such change, and an appropriate Change Order shall be issued before commencement of the substitute Subcontractor's Work. However, no increase in the Contract Sum or Contract Time shall be allowed for such change unless the Contractor has acted promptly and responsively in submitting names as required.

§ 5.2.4 The Contractor shall not change a Subcontractor, person or entity previously selected if the Owner ~~or Architect~~ makes reasonable objection to such substitute.

## § 5.3 SUBCONTRACTUAL RELATIONS

§ 5.3.1 By appropriate agreement, written where legally required for validity, the Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work, which the Contractor, by these Documents, assumes toward the ~~Owner and Architect.~~ Owner. Each subcontract agreement shall preserve and protect the rights of the Owner ~~and Architect~~ under the Contract Documents with respect to the Work to be performed by the Subcontractor so that subcontracting thereof will not prejudice such rights, and shall allow to the Subcontractor, unless specifically provided otherwise in the subcontract agreement, the benefit of all rights, remedies and redress against the Contractor that the Contractor, by the Contract Documents, has against the Owner. Where appropriate, the Contractor shall require each Subcontractor to enter into similar agreements with Sub-subcontractors. The Contractor shall make available to each proposed Subcontractor, prior to the execution of the subcontract agreement, copies of the Contract Documents to which the Subcontractor will be bound, and, upon written request of the Subcontractor, identify to the Subcontractor terms and conditions of the proposed subcontract agreement which may be at variance with the Contract Documents. Subcontractors will similarly make copies of applicable portions of such documents available to their respective proposed Sub-subcontractors.

## § 5.4 CONTINGENT ASSIGNMENT OF SUBCONTRACTS

§ 5.4.1 Each subcontract agreement for a portion of the Work is assigned by the Contractor to the Owner provided that:

.1    assignment is effective only after termination of the Contract by the Owner for cause pursuant to Section 14.2 and only for those subcontract agreements which the Owner accepts by notifying the Subcontractor and Contractor in writing; and

.2    assignment is subject to the prior rights of the surety, if any, obligated under bond relating to the Contract.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                (986536188)

R.P. Appx. 060

§ 5.4.2 Upon such assignment, if the Work has been suspended for more than 30 days, the Subcontractor's compensation shall be equitably adjusted for increases in cost resulting from the suspension.

**ARTICLE 6  CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS**
**§ 6.1 OWNER'S RIGHT TO PERFORM CONSTRUCTION AND TO AWARD SEPARATE CONTRACTS**
§ 6.1.1 The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and to award separate contracts in connection with other portions of the Project or other construction or operations on the site under Conditions of the Contract identical or substantially similar to these including those portions related to insurance and waiver of subrogation. If the Contractor claims that delay or additional cost is involved because of such action by the Owner, the Contractor shall make such Claim as provided in Section 4.3.

§ 6.1.2 When separate contracts are awarded for different portions of the Project or other construction or operations on the site, the term "Contractor" in the Contract Documents in each case shall mean the Contractor who executes each separate Owner-Contractor Agreement.

§ 6.1.3 The Owner shall provide for coordination of the activities of the Owner's own forces and of each separate contractor with the Work of the Contractor, who shall cooperate with them. The Contractor shall participate with other separate contractors and the Owner in reviewing their construction schedules when directed to do so. The Contractor shall make any revisions to the construction schedule deemed necessary after a joint review and mutual agreement. The construction schedules shall then constitute the schedules to be used by the Contractor, separate contractors and the Owner until subsequently revised.

§ 6.1.4 Unless otherwise provided in the Contract Documents, when the Owner performs construction or operations related to the Project with the Owner's own ~~forces,~~ forces or pursuant to separate contracts with other contractors, the Owner shall be deemed to be subject to the same obligations and to have the same rights which apply to the Contractor under the Conditions of the Contract, including, without excluding others, those stated in Article 3, this Article 6 and Articles 10, 11 and 12. Without limiting the generality of the foregoing, if the Owner awards separate contracts with any other contractors for any work at the Project site during the performance of the Work, then the Owner shall cause each and every such other contractor (and their subcontractors of any tier) to name the Contractor as an additional insured on all liability insurance policies maintained by such other contractor (and their subcontractors of any tier) to the extent such policies cover liabilities relating to the Project or other work being performed at the Project site. The Owner shall furnish to the Contractor written evidence that such insurance is in effect and that the Contractor has been named an additional insured as aforesaid upon the first to occur of the award or execution of any such separate contract.

**§ 6.2 MUTUAL RESPONSIBILITY**
§ 6.2.1 The Contractor shall afford the Owner and separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities, and shall connect and coordinate the Contractor's construction and operations with theirs as required by the Contract Documents.

§ 6.2.2 If part of the Contractor's Work depends for proper execution or results upon construction or operations by the Owner or a separate contractor, the Contractor shall, prior to proceeding with that portion of the Work, promptly report to the ~~Architect~~ Owner apparent discrepancies or defects in such other construction that would render it unsuitable for such proper execution and results. Failure of the Contractor so to report shall constitute an acknowledgment that the Owner's or separate contractor's completed or partially completed construction is fit and proper to receive the Contractor's Work, except as to defects not then reasonably discoverable.

§ 6.2.3 The Owner shall be reimbursed by the Contractor for costs incurred by the Owner which are payable to a separate contractor because of delays, improperly timed activities or defective construction of the Contractor. The Owner shall be responsible to the Contractor for costs incurred by the Contractor because of delays, improperly timed activities, damage to the Work or defective construction of a separate contractor.

§ 6.2.4 The Contractor shall promptly remedy damage wrongfully caused by the Contractor to completed or partially completed construction or to property of the Owner or separate contractors as provided in Section 10.2.5.

§ 6.2.5 The Owner and each separate contractor shall have the same responsibilities for cutting and patching as are described for the Contractor in Section 3.14.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                (986536188)

R.P. Appx. 061

## § 6.3 OWNER'S RIGHT TO CLEAN UP
§ 6.3.1 If a dispute arises among the Contractor, separate contractors and the Owner as to the responsibility under their respective contracts for maintaining the premises and surrounding area free from waste materials and rubbish, the Owner may clean up and the ~~Architect will allocate the~~ cost among those ~~responsible.~~responsible shall be equitably allocated.

## ARTICLE 7 CHANGES IN THE WORK
### § 7.1 GENERAL
§ 7.1.1 Changes in the Work may be accomplished after execution of the Contract, and without invalidating the Contract, by Change Order, ~~Construction Change Directive or order for a minor change in the Work,~~ subject to the limitations stated in this Article 7 and elsewhere in the Contract Documents.

~~§ 7.1.2 A Change Order shall be based upon agreement among the Owner, Contractor and Architect; a Construction Change Directive requires agreement by the Owner and Architect and may or may not be agreed to by the Contractor; an order for a minor change in the Work may be issued by the Architect alone.~~
§ 7.1.2 A Change Order shall be based upon agreement between the Owner and the Contractor as provided in Section 6.5 of the Agreement.

§ 7.1.3 Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Contractor shall proceed promptly, unless otherwise provided in the Change ~~Order, Construction Change Directive or order for a minor change in the Work.~~Order.

### § 7.2 CHANGE ORDERS
~~§ 7.2.1 A Change Order is a written instrument prepared by the Architect and signed by the Owner, Contractor and Architect, stating their agreement upon all of the following:~~
> ~~.1 change in the Work;~~
> ~~.2 the amount of the adjustment, if any, in the Contract Sum; and~~
> ~~.3 the extent of the adjustment, if any, in the Contract Time.~~
> § 7.2.1 If the other provisions of the Contract require that a Change Order be issued and the Owner and the Contractor are unable to agree upon the terms thereof as provided in Section 6.5 of the Agreement within ten days of a written demand given by either party to the other party to so agree, then the dispute shall be resolved as provided in Article 4 herein. In any such dispute resolution proceedings the parties agree that the terms of the Change Order set forth in subparagraphs (i)-(vii) of Section 6.5 of the Agreement shall be determined.

§ 7.2.2 ~~Methods~~In any dispute resolution proceeding over a Change Order, the methods used in determining adjustments to the Contract Sum may include those listed in Section ~~7.3.3.~~7.33.

§ 7.2.3 Contractor shall not suspend performance of the Contract Documents during the review and negotiation of any Change Order.

### § 7.3 CONSTRUCTION CHANGE DIRECTIVES
~~§ 7.3.1 A Construction Change Directive is a written order prepared by the Architect and signed by the Owner and Architect, directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or Contract Time, or both. The Owner may by Construction Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly.~~
§ 7.3.1 [Intentionally Omitted].

~~§ 7.3.2 A Construction Change Directive shall be used in the absence of total agreement on the terms of a Change Order.~~
§ 7.3.2 [Intentionally Omitted].

§ 7.3.3 If the ~~Construction~~Change ~~Directive~~Order provides for an adjustment ~~to~~in the Contract Sum, the adjustment ~~shall~~may be based on one of the following methods:

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06) (986536188)

R.P. Appx. 062

.1 mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;

.2 unit prices stated in the Contract Documents or subsequently agreed upon;

.3 cost to be determined in a manner agreed upon by the parties and a ~~mutually acceptable fixed or~~ Contractor Fee based on the percentage ~~fee;~~ set forth in Section 5.1.2 of the Agreement; or

.4 as provided in Section 7.3.6.

**§ 7.3.4** ~~Upon receipt of a Construction Change Directive, the Contractor shall promptly proceed with the change in the Work involved and advise the Architect of the Contractor's agreement or disagreement with the method, if any, provided in the Construction Change Directive for determining the proposed adjustment in the Contract Sum or Contract Time.~~
**§ 7.3.4** [Intentionally Omitted].

**§ 7.3.5** [Intentionally Omitted].
**§ 7.3.5** ~~A Construction Change Directive signed by the Contractor indicates the agreement of the Contractor therewith, including adjustment in Contract Sum and Contract Time or the method for determining them. Such agreement shall be effective immediately and shall be recorded as a Change Order.~~

**§ 7.3.6** ~~If~~ In any dispute between the Contractor ~~does not respond promptly or disagrees with~~ and the Owner over the method for adjustment in the Contract ~~Sum,~~ Sum in connection with any Change Order or in connection with any other adjustment in the Contract Sum to which the Contractor is entitled under the Contract Documents, then the method and the adjustment shall be determined ~~by the Architect~~ on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in case of an increase in the Contract Sum, a ~~reasonable allowance for overhead and profit.~~ Contractor's Fee based on the percentage set forth in Section 5.1.2 of the Agreement. In such case, ~~and also under Section 7.3.3.3,~~ the Contractor shall keep and present, in such form as the ~~Architect~~ Owner may reasonably prescribe, ~~an~~ a reasonably itemized accounting together with appropriate supporting data. Unless otherwise provided in the Contract Documents, costs for the purposes of this Section 7.3.6 shall be limited to the following:

.1 costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance;

.2 costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

.3 rental costs of machinery and equipment, exclusive of hand tools, whether rented from the Contractor or others;

.4 costs of premiums for all bonds and insurance, permit fees, and sales, use or similar taxes related to the Work;~~and~~

.5 additional costs of supervision and field office personnel directly attributable to the ~~change.~~change; and

.6 if the Agreement is an AIA Document A111 or A121, all other costs which would be considered to be Costs of the Work under the Agreement.

**§ 7.3.7** The amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a net decrease in the Contract Sum shall be actual net ~~cost as confirmed by the Architect.~~ cost. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change.

**§ 7.3.8** Pending final determination of the total cost of a ~~Construction~~ Change ~~Directive to the Owner,~~ Order, amounts not in dispute for such changes in the Work shall be included in Applications for Payment accompanied by a Change Order indicating the parties' agreement with part or all of such ~~costs. For any portion of~~ costs and the Owner shall be obligated to pay such ~~cost that remains~~ costs together with a Contractor's Fee based on the percentage set forth in ~~dispute, the Architect will make an interim determination for purposes of monthly certification for payment for those costs. That determination~~ Section 5.1.2 of ~~cost shall adjust the Contract Sum on the same basis as a Change Order, subject~~ Agreement to the ~~right of either party to disagree and assert a claim in accordance with Article 4.~~ Contractor.

**§ 7.3.9** When the Owner and Contractor agree ~~with the determination made by the Architect~~ concerning ~~the~~ any adjustments in any one or more of the Work, the Contract Sum ~~and~~ or the Contract Time, or otherwise reach

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                (986536188)

R.P. Appx. 063

agreement upon the ~~adjustments,~~ adjustments in the items set forth in subparagraphs (i)-(vii) of Section 6.5 of the Agreement, such agreement shall be effective immediately and shall be recorded by preparation and execution of an appropriate Change Order.

## § 7.4 MINOR CHANGES IN THE WORK

**§ 7.4.1** The ~~Architect~~ Owner will have authority to ~~order~~ make minor changes in the Work not involving adjustment in the Contract Sum or extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes shall be effected by written order and shall be binding on the ~~Owner and~~ Contractor. The Contractor shall carry out such written orders promptly.

## ARTICLE 8  TIME
## § 8.1 DEFINITIONS

**§ 8.1.1** Unless otherwise provided, Contract Time is the period of time, including authorized adjustments, allotted in the Contract Documents for Substantial Completion of the Work.

**§ 8.1.2** The date of commencement of the Work is the date established in the Agreement.

**§ 8.1.3** The date of Substantial Completion is the date ~~certified by the Architect~~ when Substantial Completion is actually achieved in accordance with Section 9.8.

**§ 8.1.4** The term "day" as used in the Contract Documents shall mean calendar day unless otherwise specifically defined.

## § 8.2 PROGRESS AND COMPLETION

**§ 8.2.1** Time limits stated in the Contract Documents are of the essence of the Contract. By executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work.

**§ 8.2.2** The Contractor shall not knowingly, except by agreement or instruction of the Owner in writing, prematurely commence operations on the site or elsewhere prior to the effective date of insurance required by Article 11 to be furnished by the Contractor and Owner. The date of commencement of the Work shall not be changed by the effective date of such insurance. Unless the date of commencement is established by the Contract Documents or a notice to proceed given by the Owner, the Contractor shall notify the Owner in writing not less than five days or other agreed period before commencing the Work to permit the timely filing of mortgages, mechanic's liens and other security interests.

**§ 8.2.3** The Contractor shall proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time.

## § 8.3 DELAYS AND EXTENSIONS OF TIME

**§ 8.3.1** ~~If the Contractor is delayed at any time in the commencement or progress of the Work by an act or neglect of the Owner or Architect, or of an employee of either, or of a separate contractor employed by the Owner, or by changes ordered in the Work, or by labor disputes, fire, unusual delay in deliveries, unavoidable casualties or other causes beyond the Contractor's control, or by delay authorized by the Owner pending mediation and arbitration, or by other causes which the Architect determines may justify delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine.~~

**§ 8.3.1** If the Contractor is delayed at any time in the commencement or progress of the Work that adversely affect the sequencing of the Work resulting in a delay in Substantial Completion by (i) an act or neglect of the Owner, or of an employee of Owner, or of a separate contractor employed by the Owner, or (ii) changes ordered in the Work, or (iii) labor disputes, or (iv) fire, or (v) unusual delay in deliveries, or (vi) the imposition after the date of the Agreement of quotas or other restrictions on the ability of the Contractor to obtain material or equipment, or (vii) unavoidable casualties or (viii) other causes not reasonably foreseeable on the date the Work commenced or which are beyond the Contractor's control, or (ix) adverse weather conditions or adverse site conditions as set forth in Section 4.3.7.2, or (x) delays caused by governmental authorities (not caused as a result of fault on the part of the Contractor) or (xi) delay authorized by the Owner pending mediation and arbitration (provided that no such event has been caused by the delay or negligent or other wrongful act or omission of the Contractor or any of its employees or agents), and provided that Contractor has delivered to Owner written notice of the occurrence of such event within ten (10) business days after the occurrence thereof, then the Contract Time shall be extended by

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                              (986536188)

R.P. Appx. 064

Change Order for a reasonable time and the Contract Sum shall be adjusted to the extent reasonably necessary to compensate the Contractor for any increases in the Cost of the Work caused by such delay.

§ 8.3.2 Claims relating to time shall be made in accordance with applicable provisions of Section 4.3.

§ 8.3.3 This Section 8.3 does not preclude recovery of damages for delay by either party under other provisions of the Contract Documents.

## ARTICLE 9  PAYMENTS AND COMPLETION
### § 9.1 CONTRACT SUM
§ 9.1.1 The Contract Sum is stated in the Agreement and, including authorized adjustments, is the total amount payable by the Owner to the Contractor for performance of the Work under the Contract Documents.

### § 9.2 SCHEDULE OF VALUES
§ 9.2.1 Before the first Application for Payment, the Contractor shall submit to the ~~Architect~~ Owner a schedule of values allocated to various portions of the Work, prepared in such form and supported by such data to substantiate its accuracy as the ~~Architect~~ Owner may require. This schedule, unless objected to by the ~~Architect,~~ Owner, shall be used as a basis for reviewing the Contractor's Applications for Payment.

### § 9.3 APPLICATIONS FOR PAYMENT
§ 9.3.1 At least ~~ten~~ twenty days before the date established for each progress payment, the Contractor shall submit to the ~~Architect~~ Owner an itemized Application for Payment for operations completed in accordance with the schedule of values. Such application shall be notarized, if required, and supported by such data substantiating the Contractor's right to payment as the Owner ~~or Architect~~ may reasonably require, such as copies of requisitions from Subcontractors and material suppliers, and reflecting retainage if provided for in the Contract Documents. See the Agreement for additional provisions relating to Applications for Payment.

§ 9.3.1.1 ~~As provided in Section 7.3.8, such applications may include requests for payment on account of changes in the Work which have been properly authorized by Construction Change Directives, or by interim determinations of the Architect, but not yet included in Change Orders.~~[Intentionally Omitted].

§ 9.3.1.2 Such applications may not include requests for payment for portions of the Work for which the Contractor does not intend to pay to a Subcontractor or material supplier, unless such Work has been performed by others whom the Contractor intends to pay.

§ 9.3.2 Unless otherwise provided in the Contract Documents, payments shall be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. If approved in advance by the Owner, payment may similarly be made for materials and equipment suitably stored off the site at a location agreed upon in writing. Payment for materials and equipment stored on or off the site shall be conditioned upon compliance by the Contractor with procedures satisfactory to the Owner to establish the Owner's title to such materials and equipment or otherwise protect the Owner's interest, and shall include the costs of applicable insurance, storage and transportation to the site for such materials and equipment stored off the site.

§ 9.3.3 The Contractor warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment. The Contractor further warrants that upon submittal of an Application for Payment all Work for which ~~Certificates for Payment~~ payments have been ~~previously issued and payments~~ received from the Owner ~~shall, to the best of the Contractor's knowledge, information and belief,~~ shall be free and clear of liens, claims, security interests or encumbrances in favor of the Contractor, Subcontractors, material suppliers, or other persons or entities making a claim by reason of having provided labor, materials and equipment relating to the Work. To the extent permitted by applicable law, good and clear title to all materials furnished by Contractor under the Contract Documents for the Project shall pass to Owner upon incorporation into the Project. Contractor shall ensure that subcontractors from whom Contractor obtains materials do not retain or reserve title to such items, and Contractor shall defend, indemnify and hold Owner harmless from any such claims by Contractor's subcontractors. Notwithstanding the foregoing, the care, custody and control of Contractor's Work incorporated into the Project shall remain with Contractor until such Work has been accepted in writing by Owner and shall thereon pass to Owner unless Owner notifies Contractor in writing that such care, custody and control is assumed by Owner at a earlier date.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                    (986536188)

R.P. Appx. 065

## § 9.4 CERTIFICATES FOR PAYMENT

**§ 9.4.1** The ~~Architect~~ Owner will, within ~~seven~~ twenty days after receipt of the Contractor's Application for Payment, either ~~issue to pay~~ the ~~Owner a Certificate~~ amount of such Application for ~~Payment, with a copy~~ Payment to the Contractor, ~~for such amount as the Architect determines is properly due,~~ or notify the Contractor ~~and Owner~~ in writing of the ~~Architect's~~ Owner's reasons for withholding ~~certification~~ payment in whole or in part as provided in Section 9.5.1.

**§ 9.4.2** ~~The issuance of a Certificate for Payment will constitute a representation by the Architect to the Owner, based on the Architect's evaluation of the Work and the data comprising the Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to correction of minor deviations from the Contract Documents prior to completion and to specific qualifications expressed by the Architect. The issuance of a Certificate for Payment will further constitute a representation that the Contractor is entitled to payment in the amount certified. However, the issuance of a Certificate for Payment will not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) made examination to ascertain how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.~~ [Intentionally Omitted].

## § 9.5 DECISIONS TO WITHHOLD CERTIFICATION

**§ 9.5.1** ~~The Architect may withhold a Certificate for Payment in whole or in part, to~~ If the extent ~~reasonably necessary to protect the Owner, if in the Architect's opinion the representations to the~~ Owner ~~required by Section 9.4.2 cannot be made. If the Architect is unable to certify~~ withholds a payment ~~in the amount~~ of all or any portion of an Application for Payment, then the ~~Application, the Architect~~ Owner will notify the Contractor ~~and Owner~~ as provided in Section 9.4.1. If the Contractor and ~~Architect~~ the Owner cannot agree on a revised amount, the ~~Architect~~ Owner will promptly ~~issue a Certificate for Payment for~~ pay the amount ~~for~~ which ~~the Architect~~ is ~~able to make such representations to the Owner.~~ not in dispute. The ~~Architect~~ Owner may ~~also~~ withhold a ~~Certificate for Payment~~ payment or, because of subsequently discovered evidence, may ~~nullify~~ request a refund of the whole or a part of a ~~Certificate for Payment~~ payment previously ~~issued,~~ made to such extent as may be reasonably necessary ~~in the Architect's opinion~~ to protect the Owner from loss for which the Contractor is responsible, ~~including loss~~ resulting from acts and omissions described in Section 3.3.2, because of:

 .1 defective Work not remedied;

 .2 third party claims filed or reasonable evidence indicating probable filing of such claims against Owner, the Land or the Project or reasonable evidence indicating the probable filing of such claims, unless security acceptable to the Owner is provided by the Contractor to protect Owner against such claims (such security may include, without limitation, Contractor's compliance with its indemnification or bonding obligations under the ~~Contractor;~~ Contract);

 .3 failure of the Contractor to make payments properly to Subcontractors or for labor, materials or equipment;

 .4 reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum;

 .5 damage to the Owner or another contractor;

 .6 reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay; ~~or~~

 .7 persistent failure to carry out the Work in accordance with the Contract Documents; or

 .8 without limiting the generality of the above, any other reason for which Owner is entitled to withhold or deduct payment under the express provisions of the Contract Documents.

**§ 9.5.2** When the above reasons for withholding ~~certification~~ payment are removed, ~~certification~~ payment will be made for amounts previously withheld.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06) (986536188)

R.P. Appx. 066

## § 9.6 PROGRESS PAYMENTS

**§ 9.6.1** After the ~~Architect~~ Owner has ~~issued a Certificate~~ received an Application for ~~Payment,~~ Payment which complies with the requirements of the Contract Documents, the Owner shall make payment in the manner and within the time provided in the Contract ~~Documents, and shall so notify the Architect.~~ Documents.

**§ 9.6.2** The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor on account of such Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to Sub-subcontractors in a similar manner.

**§ 9.6.3** The ~~Architect~~ Owner will, on request, furnish to a Subcontractor, if practicable, information regarding percentages of completion or amounts applied for by the Contractor and action taken thereon by the ~~Architect and~~ Owner on account of portions of the Work done by such Subcontractor.

**§ 9.6.4** ~~Neither~~ Contractor shall use the sums advanced to it pursuant to the Contract documents solely for the purpose of the performance of the Work. The Owner ~~nor Architect~~ shall not have an obligation to pay or to see to the payment of money to a Subcontractor except as may otherwise be required by law.

**§ 9.6.5** Payment to material suppliers shall be treated in a manner similar to that provided in Sections 9.6.2, 9.6.3 and 9.6.4.

**§ 9.6.6** A ~~Certificate for Payment, a~~ progress payment, or partial or entire use or occupancy of the Project by the Owner shall not constitute acceptance of Work not in accordance with the Contract ~~Documents.~~ Documents and shall not relieve Contractor of its obligations under the Contract Documents with respect thereto.

**§ 9.6.7** Unless the Contractor provides the Owner with a payment bond in the full penal sum of the Contract Sum, payments received by the Contractor for Work properly performed by Subcontractors and suppliers shall be held by the Contractor for those Subcontractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor for which payment was made by the Owner. Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Contractor, shall create any fiduciary liability or tort liability on the part of the Contractor for breach of trust or shall entitle any person or entity to an award of punitive damages against the Contractor for breach of the requirements of this provision.

## § 9.7 FAILURE OF PAYMENT

**§ 9.7.1** If the ~~Architect~~ Owner does not ~~issue~~ make a ~~Certificate for~~ Payment, through no fault of the Contractor, within ~~seven~~ twenty days after receipt of the Contractor's Application for Payment, or if the Owner does not pay the Contractor within seven days after the date established in the Contract Documents the amount ~~certified by~~ due to the ~~Architect~~ Contractor hereunder or awarded by arbitration, then the Contractor ~~may, upon seven additional days' written notice to the Owner and Architect,~~ may stop the Work until payment of the amount owing has been received. The Contract Time shall be extended appropriately and the Contract Sum shall be increased by the amount of the Contractor's reasonable costs of shut-down, delay and start-up, plus interest as provided for in the Contract Documents.

## § 9.8 SUBSTANTIAL COMPLETION

**§ 9.8.1** Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use.

**§ 9.8.2** When the Contractor considers that the Work, or a portion thereof which the Owner agrees to accept separately, is substantially complete, the Contractor shall prepare and submit to the ~~Architect~~ Owner a comprehensive list of items to be completed or corrected prior to final payment. Failure to include an item on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents.

**§ 9.8.3** Upon receipt of the Contractor's list, the ~~Architect~~ Owner will make an inspection to determine whether the Work or designated portion thereof is substantially complete. If the ~~Architect's~~ Owner's inspection discloses any

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06) (986536188)

R.P. Appx. 067

item, whether or not included on the Contractor's list, which is not sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work or designated portion thereof for its intended use, the Contractor shall, before issuance of the Certificate of Substantial Completion, complete or correct such item upon notification by the ~~Architect.~~ Owner. In such case, the Contractor shall then submit a request for another inspection by the ~~Architect~~ Owner to determine Substantial Completion.

**§ 9.8.4** When the Work or designated portion thereof is substantially complete, the ~~Architect~~ Owner will prepare a Certificate of Substantial Completion which shall establish the date of Substantial Completion, shall establish responsibilities of the Owner and Contractor for security, maintenance, heat, utilities, damage to the Work and insurance, and shall fix the time within which the Contractor shall finish all items on the list accompanying the Certificate. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion. Upon the Owner providing such Certificate of Substantial Completion, Contractor shall cause (a) the Architect to sign and deliver to Owner and Prudential a certificate in the form of **Exhibit "E"** attached hereto, and (b) the civil engineer for the Project to sign and deliver to Owner and Prudential a certificate in the form of **Exhibit "F"** attached hereto.

**§ 9.8.5** The Certificate of Substantial Completion shall be submitted to the Owner and Contractor for their written acceptance of responsibilities assigned to them in such Certificate. Upon such acceptance and consent of surety, if any, the Owner shall make payment of retainage applying to such Work or designated portion thereof. Such payment shall be adjusted for Work that is incomplete or not in accordance with the requirements of the Contract Documents.

### § 9.9 PARTIAL OCCUPANCY OR USE
**§ 9.9.1** The Owner may occupy or use any completed or partially completed portion of the Work at any stage when such portion is designated by separate agreement with the Contractor, provided such occupancy or use is consented to by the insurer as required under Section 11.4.1.5 and authorized by public authorities having jurisdiction over the Work. Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the Owner and Contractor have accepted in writing the responsibilities assigned to each of them for payments, retainage, if any, security, maintenance, heat, utilities, damage to the Work and insurance, and have agreed in writing concerning the period for correction of the Work and commencement of warranties required by the Contract Documents. When the Contractor considers a portion substantially complete, the Contractor shall prepare and submit a list to the ~~Architect~~ Owner as provided under Section 9.8.2. Consent of the Contractor to partial occupancy or use shall not be unreasonably withheld. The stage of the progress of the Work shall be determined by written agreement between the Owner and ~~Contractor or, if no agreement is reached, by decision of the Architect.~~ Contractor.

**§ 9.9.2** Immediately prior to such partial occupancy or use, the ~~Owner,~~ Owner and the Contractor ~~and Architect~~ shall jointly inspect the area to be occupied or portion of the Work to be used in order to determine and record the condition of the Work.

**§ 9.9.3** Unless otherwise agreed upon, partial occupancy or use of a portion or portions of the Work shall not constitute acceptance of Work not complying with the requirements of the Contract Documents.

### § 9.10 FINAL COMPLETION AND FINAL PAYMENT
**§ 9.10.1** Upon receipt of written notice from Contractor to Owner that all Punch List Items have been completed and that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the ~~Architect~~ Owner will promptly make such inspection and, when ~~the Architect finds~~ the Work ~~acceptable under~~ has been finally completed in accordance with the Contract Documents and the Contract fully performed, the ~~Architect~~ Owner will promptly ~~issue a~~ make final ~~Certificate for Payment stating that to the best~~ payment of ~~the Architect's knowledge, information~~ all amounts due and ~~belief, and on the basis of the Architect's on-site visits and inspections, the Work has been completed in accordance with terms and conditions of the Contract Documents and that the entire balance found~~ owing to ~~be due~~ the Contractor ~~and noted in~~ under the ~~final Certificate is due and payable. The Architect's final Certificate for Payment will constitute a further representation that conditions listed in Section 9.10.2 as precedent to the Contractor's being entitled to final payment have been fulfilled.~~ Contract Documents.

**§ 9.10.2** Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the ~~Architect~~ Owner (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06) (986536188)

R.P. Appx. 068

connected with the Work for which the Owner or the Owner's property might be responsible or encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied, (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner, (3) a written statement that the Contractor knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents, (4) consent of surety, if any, to final ~~payment~~ payment, (5) a certificate stating that to the best of Contractor's knowledge, the Project is in compliance with all applicable laws, statutes, ordinances, rules and regulations with respect to the Project, and that there is no action or proceeding pending or threatened before any court or administrative agency with respect to the validity of the certificates, permits, licenses, waivers, consents, approvals, authorizations, registrations, qualifications, designations, declarations and filings required or compliance with any laws, statutes, ordinances, rules and regulations and Contractor has not received any notice to the contrary, (6) evidence satisfactory to Owner that all utilities necessary or appropriate for the operation of the Project have been installed and are fully operational and are actually operating to the satisfaction of the governmental authorities or utility companies responsible for the operation thereof and that all costs in connection with such installation and operation (including but not limited to impact fees, development fees, tap-on fees and recapture costs) have been paid in full and ~~(5),~~ (7), if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. If a Subcontractor refuses to furnish a release or waiver required by the Owner, the Contractor may furnish a bond satisfactory to the Owner to indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made, the Contractor shall refund to the Owner all money that the Owner may be compelled to pay in discharging such lien, including all costs and reasonable attorneys' fees.

**§ 9.10.3** If, after Substantial Completion of the Work, final completion thereof is materially delayed through no fault of the Contractor or by issuance of Change Orders affecting final completion, ~~and the Architect so confirms,~~ the Owner shall, upon application by the ~~Contractor and certification by the Architect,~~ Contractor, and without terminating the Contract, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance for Work not fully completed or corrected is less than retainage stipulated in the Contract Documents, and if bonds have been furnished, the written consent of surety to payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by the Contractor to the ~~Architect prior to certification of such payment.~~ Owner. Such payment shall be made under terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

**§ 9.10.4** The making of final payment shall constitute a waiver of Claims by the Owner except those arising from:

    .1    liens, Claims, security interests or encumbrances arising out of the Contract and unsettled;
    .2    failure of the Work to comply with the requirements of the Contract Documents; or
    .3    terms of special warranties required by the Contract Documents.

**§ 9.10.5** Acceptance of final payment by the Contractor, a Subcontractor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment.

## ARTICLE 10 PROTECTION OF PERSONS AND PROPERTY
## § 10.1 SAFETY PRECAUTIONS AND PROGRAMS
**§ 10.1.1** The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract.

## § 10.2 SAFETY OF PERSONS AND PROPERTY
**§ 10.2.1** The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to:

    .1    employees on the Work and other persons who may be affected thereby;
    .2    the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of the Contractor or the Contractor's Subcontractors or Sub-subcontractors; and
    .3    other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06) (986536188)

R.P. Appx. 069

Contractor shall comply strictly with local, municipal, provincial, state and national laws, orders, and regulations pertaining to health or safety which are applicable to Contractor or to the Project, including without limitation the Occupational Safety and Health Act of 1970 (84 U.S. Statutes 1590), as amended and any state plans approved thereunder, and regulations thereunder, to the extent applicable, and Contractor warrants the materials, equipment and facilities, whether temporary or permanent, furnished by Contractor in connection with the performance of the Project shall comply therewith. At all times while any of Contractor's employees, agents or subcontractors are on Project, Contractor shall provide them with a safe place of employment, and Contractor shall inspect the places where its employees, agents or subcontractors are or may be present on the Project and shall promptly take action to correct conditions which are or may become an unsafe place of employment for them.

Contractor shall incorporate necessary safety precautions and programs in a written safety program manual. Contractor shall provide Owner with a copy of such safety program manual.

Contractor shall take reasonable steps to erect and maintain safeguards for the protection of workers and the public and eliminate or abate safety hazards created by or otherwise resulting from the performance of the Work. Contractor shall take all precautions reasonably necessary for the safety and health of, and shall provide all reasonable protection to prevent damage, injury or loss to: (i) persons working at the job site employed by Contractor or its subcontractors in connection with the Work, (ii) all materials and equipment to be incorporated into the Project, whether in storage on or off the job site and (iii) other property at the job site.

Written reports of any accidents, injuries and illnesses at the Project requiring medical attention other than first aid, damage to property of Owner or Contractor, and fires shall be orally reported to Owner at the time of the incident. Written reports, reasonably satisfactory in form and content to Owner, shall be submitted by Contractor within forty-eight (48) hours after each incident.

Contractor shall maintain in form and content approved by Owner, job site accident, injury and illness statistics that shall be available for inspection by and submitted to Owner upon their written request.

In the event of any emergency endangering life or property, Contractor shall take such action as may be reasonable and necessary to prevent, avoid or mitigate injury or damage and shall, as soon as possible, report to Owner's representatives any such incidents, including Contractor's response thereto. If Contractor fails to take sufficient precautions for the safety of the public or the protection of the Work or of structures or property on or adjacent to the job site, creating an emergency requiring immediate action, the Owner may cause such sufficient precautions to be taken or provide such protection.

Construction equipment obtained or furnished by Contractor or its subcontractors that is to be used on the job site shall be in operating condition, safe, fit for the uses for which intended, and suitable for the safe, legal and efficient performance of the Project.

§ 10.2.2 The Contractor shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on safety of persons or property or their protection from damage, injury or loss.

§ 10.2.3 The Contractor shall erect and maintain, as required by existing conditions and performance of the Contract, reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent sites and utilities.

§ 10.2.4 The Contractor will not use, store or keep at the Project any hazardous materials, except those customarily and prudently used in construction of projects similar to the Project and in compliance with all environmental laws. When use or storage of explosives or other hazardous materials or equipment or unusual methods are necessary for execution of the Work, the Contractor shall exercise utmost care and carry on such activities under supervision of properly qualified personnel.

§ 10.2.5 The Contractor shall promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Contract Documents) to property referred to in Sections 10.2.1.2 and 10.2.1.3 caused in whole or in part by the Contractor, a Subcontractor, a Sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Contractor is responsible under

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)     (986536188)

Sections 10.2.1.2 and 10.2.1.3, except damage or loss attributable to acts or omissions of the Owner or ~~Architect or~~ anyone directly or indirectly employed by ~~either of them,~~ the Owner, or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under Section 3.18.

§ 10.2.6 The Contractor shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents. This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the ~~Owner and Architect.~~Owner.

§ 10.2.7 The Contractor shall not load or permit any part of the construction or site to be loaded so as to endanger its safety.

## § 10.3 HAZARDOUS MATERIALS

§ 10.3.1 If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner ~~and Architect~~ in writing.

§ 10.3.2 The Owner shall obtain the services of a licensed laboratory to verify the presence or absence of the material or substance reported by the Contractor and, in the event such material or substance is found to be present, to verify that it has been rendered harmless. Unless otherwise required by the Contract Documents, the Owner shall furnish in writing to the Contractor ~~and Architect~~ the names and qualifications of persons or entities who are to perform tests verifying the presence or absence of such material or substance or who are to perform the task of removal or safe containment of such material or substance. The Contractor ~~and the Architect~~ will promptly reply to the Owner in writing stating whether or not ~~either~~ the Contractor has reasonable objection to the persons or entities proposed by the Owner. If ~~either~~ the Contractor ~~or Architect~~ has an objection to a person or entity proposed by the Owner, the Owner shall propose another to whom the Contractor ~~and the Architect have~~ has no reasonable objection. When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Contractor. The Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Contractor's reasonable additional costs of shut-down, delay and start-up, which adjustments shall be accomplished as provided in Article 7.

§ 10.3.3 To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, Subcontractors, Architect, Architect's consultants and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in Section 10.3.1 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) and provided that such damage, loss or expense is not due to the sole negligence of a party seeking indemnity.

§ 10.4 The Owner shall not be responsible under Section 10.3 for materials and substances brought to the site by the Contractor unless such materials or substances were required by the Contract Documents.

§ 10.5 If, without negligence on the part of the Contractor, the Contractor is held liable for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by the Contract Documents, the Owner shall indemnify the Contractor for all cost and expense thereby incurred.

## § 10.6 EMERGENCIES

§ 10.6.1 In an emergency affecting safety of persons or property, the Contractor shall act, at the Contractor's discretion, to prevent threatened damage, injury or loss. Additional compensation or extension of time claimed by the Contractor on account of an emergency shall be determined as provided in Section 4.3 and Article 7.

## ARTICLE 11  INSURANCE AND BONDS
### § 11.1 CONTRACTOR'S LIABILITY INSURANCE

§ 11.1.1 The Contractor shall purchase from and maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located such insurance as will protect the Contractor from claims

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A801 - Koll - Intellicenter - Dallas v2 (5-19-06)                    (986536188)

R.P. Appx. 071

set forth below which may arise out of or result from the Contractor's operations under the Contract and for which the Contractor may be legally liable, whether such operations be by the Contractor or by a Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

.1     claims under workers' compensation, disability benefit and other similar employee benefit acts which are applicable to the Work to be performed;

.2     claims for damages because of bodily injury, occupational sickness or disease, or death of the Contractor's employees;

.3     claims for damages because of bodily injury, sickness or disease, or death of any person other than the Contractor's employees;

.4     claims for damages insured by usual personal injury liability coverage;

.5     claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;

.6     claims for damages because of bodily injury, death of a person or property damage arising out of ownership, maintenance or use of a motor vehicle;

.7     claims for bodily injury or property damage arising out of completed operations; and

.8     claims involving contractual liability insurance applicable to the Contractor's obligations under Section 3.18.

**§ 11.1.2** The insurance required by Section 11.1.1 shall be written for not less than limits of liability specified in the Contract Documents or required by law, whichever coverage is greater. Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of the Work until date of final payment and termination of any coverage required to be maintained after final payment.

**§ 11.1.3** Certificates of insurance acceptable to the Owner shall be filed with the Owner prior to commencement of the Work. These certificates and the insurance policies required by this Section 11.1 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner. If any of the foregoing insurance coverages are required to remain in force after final payment and are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the final Application for Payment as required by Section 9.10.2. Information concerning reduction of coverage on account of revised limits or claims paid under the General Aggregate, or both, shall be furnished by the Contractor with reasonable promptness in accordance with the Contractor's information and belief.

**§ 11.1.4** Contractor shall cause all architects, engineers and other Design Professionals performing design work for the Project to maintain Professional Liability Insurance having minimum limits of One Million Dollars ($1,000,000) per claim and in the aggregate (including excess coverage) (claims made basis). Such Professional Liability Insurance policies shall (i) provide coverage for claims arising out of any act, error or omission with respect to the rendering of or failure to render design, engineering, professional or architectural services by architects, engineers or other Design Professionals (and their respective officers, directors, employees or agents) who may be employed, engaged or otherwise utilized by Contractor to perform Contractor's design, engineering, architectural and professional duties, obligations and responsibilities under the Contract Documents, (ii) include Owner, and its partners, members, officers, directors, employees, agents, successors and assigns as "additional insureds," (iii) be written on an occurrence basis and not on a claims-made basis, (iv) waive any rights of subrogation against Owner and its partners, members, officers, directors, employees, agents, successors and assigns, and (v) be written by an insurance company or companies with a current A.M. Best Company rating of A-/IX or better and be admitted to do business in the State where the Land is located.

**§ 11.2 OWNER'S LIABILITY INSURANCE**
**§ 11.2.1** The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance.

**§ 11.3 PROJECT MANAGEMENT PROTECTIVE LIABILITY INSURANCE**
**§ 11.3.1** Optionally, the Owner may require the Contractor to purchase and maintain Project Management Protective Liability insurance from the Contractor's usual sources as primary coverage for the Owner's, Contractor's and Architect's vicarious liability for construction operations under the Contract. Unless otherwise required by the Contract Documents, the Owner shall reimburse the Contractor by increasing the Contract Sum to pay the cost of purchasing and maintaining such optional insurance coverage, and the Contractor shall not be responsible for purchasing any other liability insurance on behalf of the Owner. The minimum limits of liability purchased with

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)     (986536188)

**40**

R.P. Appx. 072

such coverage shall be equal to the aggregate of the limits required for Contractor's Liability Insurance under Sections 11.1.1.2 through 11.1.1.5.

§ 11.3.2 To the extent damages are covered by Project Management Protective Liability insurance, the Owner, Contractor and Architect waive all rights against each other for damages, except such rights as they may have to the proceeds of such insurance. The policy shall provide for such waivers of subrogation by endorsement or otherwise.

§ 11.3.3 The Owner shall not require the Contractor to include the Owner, Architect or other persons or entities as additional insureds on the Contractor's Liability Insurance coverage under Section 11.1.

## § 11.4 PROPERTY INSURANCE

§ 11.4.1 ~~Unless otherwise provided, the Owner~~ Contractor shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance written on a builder's risk "all-risk" or equivalent policy form in the amount of the initial Contract Sum, plus value of subsequent Contract modifications and cost of materials supplied or installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made as provided in Section 9.10 or until no person or entity other than the Owner has an insurable interest in the property required by this Section 11.4 to be covered, whichever is later. This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Project.

§ 11.4.1.1 Property insurance shall be on an "all-risk" or equivalent policy form and shall include, without limitation, insurance against the perils of fire (with extended coverage) and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and startup, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Architect's and Contractor's services and expenses required as a result of such insured loss.

§ 11.4.1.2 ~~If the Owner does not intend to purchase such property insurance required by the Contract and with all of the coverages in the amount described above, the Owner shall so inform the Contractor in writing prior to commencement of the Work. The Contractor may then effect insurance which will protect the interests of the Contractor, Subcontractors and Sub-subcontractors in the Work, and by appropriate Change Order the cost thereof shall be charged to the Owner. If the Contractor is damaged by the failure or neglect of the Owner to purchase or maintain insurance as described above, without so notifying the Contractor in writing, then the Owner shall bear all reasonable costs properly attributable thereto.~~[Intentionally Omitted].

§ 11.4.1.3 If the property insurance requires deductibles, the Owner shall pay <u>as a Cost of the Work</u> costs not covered because of such ~~deductibles.~~<u>deductibles; provided, however, that except for claims arising from flood or earthquake damage, the cost of such deductibles shall not exceed $10,000 per occurrence.</u>

§ 11.4.1.4 This property insurance shall cover portions of the Work stored off the site, and also portions of the Work in transit.

§ 11.4.1.5 Partial occupancy or use in accordance with Section 9.9 shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise. The Owner and the Contractor shall take reasonable steps to obtain consent of the insurance company or companies and shall, without mutual written consent, take no action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of insurance.

§ 11.4.2 Boiler and Machinery Insurance. ~~The Owner~~ Contractor shall purchase and maintain boiler and machinery insurance required by the Contract Documents or by law, which shall specifically cover such insured objects during installation and until final acceptance by the Owner; this insurance shall include interests of the Owner, Contractor, Subcontractors and Sub-subcontractors in the Work, and the Owner and Contractor shall be named insureds.

§ 11.4.3 Loss of Use Insurance. ~~The Owner, at the Owner's option, may~~ Contractor shall purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other hazards, however

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)  (986536188)

R.P. Appx. 073

caused. ~~The Owner~~ Contractor waives all rights ~~of action~~ against ~~the Contractor~~ Owner for ~~loss of use of the Owner's property, including consequential losses due to~~ damages caused by fire or other ~~hazards however caused.~~ perils to the extent covered by property insurance obtained pursuant to the terms of this Section 11.4.

**§ 11.4.4** [Intentionally Omitted].
~~§ 11.4.4 If the Contractor requests in writing that insurance for risks other than those described herein or other special causes of loss be included in the property insurance policy, the Owner shall, if possible, include such insurance, and the cost thereof shall be charged to the Contractor by appropriate Change Order.~~

**§ 11.4.5** If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project, or if after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, the Owner shall waive all rights in accordance with the terms of Section 11.4.7 for damages caused by fire or other causes of loss covered by this separate property insurance. All separate policies shall provide this waiver of subrogation by endorsement or otherwise.

**§ 11.4.6** Before an exposure to loss may occur, the ~~Owner~~ Contractor shall file with the ~~Contractor~~ Owner a copy of each policy that includes insurance coverages required by this Section 11.4. Each policy shall contain all generally applicable conditions, definitions, exclusions and endorsements related to this Project. Each policy shall contain a provision that the policy will not be canceled or allowed to expire, and that its limits will not be reduced, until at least 30 days' prior written notice has been given to the Contractor.

**§ 11.4.7** Waivers of Subrogation. The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the ~~Architect, Architect's consultants,~~ separate contractors described in Article 6, if any, and any of their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.4 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. The Owner or Contractor, as appropriate, shall require of the ~~Architect, Architect's consultants,~~ separate contractors described in Article 6, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

**§ 11.4.8** A loss insured under Owner's property insurance shall be adjusted by the Owner as fiduciary and made payable to the Owner as fiduciary for the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause and of Section 11.4.10. The Contractor shall pay Subcontractors their just shares of insurance proceeds received by the Contractor, and by appropriate agreements, written where legally required for validity, shall require Subcontractors to make payments to their Sub-subcontractors in similar manner.

**§ 11.4.9** If required in writing by a party in interest, the Owner as fiduciary shall, upon occurrence of an insured loss, give bond for proper performance of the Owner's duties. The cost of required bonds shall be charged against proceeds received as fiduciary. The Owner shall deposit in a separate account proceeds so received, which the Owner shall distribute in accordance with such agreement as the parties in interest may reach, or in accordance with an arbitration award in which case the procedure shall be as provided in Section 4.6. If after such loss no other special agreement is made and unless the Owner terminates the Contract for convenience, replacement of damaged property shall be performed by the Contractor after notification of a Change in the Work in accordance with Article 7.

**§ 11.4.10** The Owner as fiduciary shall have power to adjust and settle a loss with insurers unless one of the parties in interest shall object in writing within five days after occurrence of loss to the Owner's exercise of this power; if such objection is made, the dispute shall be resolved as provided in Sections 4.5 and 4.6. The Owner as fiduciary shall, in the case of arbitration, make settlement with insurers in accordance with directions of the arbitrators. If distribution of insurance proceeds by arbitration is required, the arbitrators will direct such distribution.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                (986536188)

R.P. Appx. 074

## § 11.5 PERFORMANCE BOND AND PAYMENT BOND
§ 11.5.1 The Owner shall have the right to require the Contractor to furnish bonds covering faithful performance of the Contract and payment of obligations arising thereunder as stipulated in bidding requirements or specifically required in the Contract Documents on the date of execution of the Contract.

§ 11.5.2 Upon the request of any person or entity appearing to be a potential beneficiary of bonds covering payment of obligations arising under the Contract, the Contractor shall promptly furnish a copy of the bonds or shall permit a copy to be made.

## ARTICLE 12   UNCOVERING AND CORRECTION OF WORK
### § 12.1 UNCOVERING OF WORK
§ 12.1.1 If a portion of the Work is covered contrary to the ~~Architect's request or to~~ requirements specifically expressed in the Contract Documents, any written inspection schedule agreed to by Contractor, or as previously requested in writing by Owner, it must, if required in writing by the ~~Architect,~~ Owner, be uncovered for the ~~Architect's~~ Owner's examination and be replaced at the Contractor's expense without change in the Contract Time.

§ 12.1.2 If a portion of the Work has been covered which the ~~Architect~~ Owner has not specifically requested to examine prior to its being covered, the ~~Architect~~ Owner may request to see such Work and it shall be uncovered by the Contractor. If such Work is in accordance with the Contract Documents, costs of uncovering and replacement shall, by appropriate Change Order, be at the Owner's expense. If such Work is not in accordance with the Contract Documents, correction shall be at the Contractor's expense unless the condition was caused by the Owner or a separate contractor in which event the Owner shall be responsible for payment of such costs.

### § 12.2 CORRECTION OF WORK
### § 12.2.1 BEFORE OR AFTER SUBSTANTIAL COMPLETION
§ 12.2.1.1 The Contractor shall promptly correct Work ~~rejected by the Architect or~~ failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspections and compensation for the ~~Architect's services and~~ expenses made necessary thereby, shall be at the Contractor's expense.

### § 12.2.2 AFTER SUBSTANTIAL COMPLETION
§ 12.2.2.1 In addition to the Contractor's obligations under Section 3.5, if, within one year after the date of Substantial Completion of the Work or designated portion thereof or after the date for commencement of warranties established under Section 9.9.1, or by terms of an applicable special warranty required by the Contract Documents, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so unless the Owner has previously given the Contractor a written acceptance of such condition. The Owner shall give such notice promptly after discovery of the condition. During the one-year period for correction of Work, if the Owner fails to notify the Contractor and give the Contractor an opportunity to make the correction, the Owner waives the rights to require correction by the Contractor and to make a claim for breach of warranty. If the Contractor fails to correct nonconforming Work within a reasonable time during that period after receipt of notice from the ~~Owner or Architect,~~ Owner, the Owner may correct it in accordance with Section 2.4.

§ 12.2.2.2 The one-year period for correction of Work shall be extended with respect to portions of Work first performed after Substantial Completion by the period of time between Substantial Completion and the actual performance of the Work.

§ 12.2.2.3 The one-year period for correction of Work shall not be extended by corrective Work performed by the Contractor pursuant to this Section 12.2.

§ 12.2.3 The Contractor shall remove from the site portions of the Work which are not in accordance with the requirements of the Contract Documents and are neither corrected by the Contractor nor accepted by the Owner.

§ 12.2.4 The Contractor shall bear the cost of correcting destroyed or damaged construction, whether completed or partially completed, of the Owner or separate contractors caused by the Contractor's correction or removal of Work which is not in accordance with the requirements of the Contract Documents.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)          (986536188)

R.P. Appx. 075

**§ 12.2.5** Nothing contained in this Section 12.2 shall be construed to establish a period of limitation with respect to other obligations which the Contractor might have under the Contract Documents. Establishment of the one-year period for correction of Work as described in Section 12.2.2 relates only to the specific obligation of the Contractor to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Contractor's liability with respect to the Contractor's obligations other than specifically to correct the Work.

## § 12.3 ACCEPTANCE OF NONCONFORMING WORK

**§ 12.3.1** If the Owner prefers to accept Work which is not in accordance with the requirements of the Contract Documents, the Owner may do so instead of requiring its removal and correction, in which case the Contract Sum will be reduced as appropriate and equitable. Such adjustment shall be effected whether or not final payment has been made.

## ARTICLE 13  MISCELLANEOUS PROVISIONS
## § 13.1 GOVERNING LAW

**§ 13.1.1** The Contract shall be governed by the law of the place where the Project is located.

## § 13.2 SUCCESSORS AND ASSIGNS

**§ 13.2.1** The Owner and Contractor respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto and to partners, successors, assigns and legal representatives of such other party in respect to covenants, agreements and obligations contained in the Contract Documents. Except as provided in Section 13.2.2, neither party to the Contract shall assign the Contract as a whole without written consent of the other. If either party attempts to make such an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.  Notwithstanding the foregoing, Owner may assign the Contract Documents to Prudential or any entity controlled by Prudential.

**§ 13.2.2** The Owner may, without consent of the Contractor, assign the Contract to an institutional lender providing construction financing for the Project. In such event, the lender shall assume the Owner's rights and obligations under the Contract Documents. The Contractor shall execute all consents reasonably required to facilitate such assignment. Contractor hereby subordinates any mechanics'' and materialmen's liens or other claims or encumbrances that may be brought by Contractor against any or all of the Work, the Land or the Project to any liens granted in favor of Owner's lender(s), whether such lien in favor of Owner's lender(s) is created, attached or perfected prior to or after any such liens, claims or encumbrances, and shall require by subcontract its Subcontractors, and Sub-subcontractors to the extent required by Owner's lender(s), to similarly subordinate their lien, claim and encumbrance rights. Contractor agrees to comply with reasonable request of Owner for supporting documentation required by Owner's lender(s), including any necessary lien subordination agreements, affidavits or other documents that may be required to demonstrate that Owner's property and premises are free from liens, claims and encumbrances arising out of the furnishing of Work under the Contract. This subordination of lien is made in consideration of and as an inducement to the execution and delivery of this agreement, and shall be applicable despite any dispute between the parties hereto or any others, or any default by Owner under the Contract Documents or otherwise. Owner's lenders may require periodic inspections and certifications by an inspector or inspecting architect, and Contractor will make the Project available at all times for such inspections.

## § 13.3 WRITTEN NOTICE

**§ 13.3.1** Written notice shall be deemed to have been duly served if delivered in person to the individual or a member of the firm or entity or to an officer of the corporation for which it was intended, or if delivered at or sent by registered or certified mail to the last business address known to the party giving notice.

## § 13.4 RIGHTS AND REMEDIES

**§ 13.4.1** Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law.

**§ 13.4.2** No action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06) (986536188)

R.P. Appx. 076

**§ 13.4.3** If any mediation or arbitration is commenced by either party hereunder to enforce the obligations of the other party, then (a) the identity of the prevailing party in any such proceeding shall be determined by the mediator or arbitrator (whichever is applicable), (b) such prevailing party shall be reimbursed by the nonprevailing party for all of the prevailing party's reasonable out-of-pocket expenses incurred in connection therewith, including without limitation reasonable attorneys' fees and (c) the mediator or arbitrator (whichever is applicable) shall be authorized to make an award of such expense in any such proceeding.

## § 13.5 TESTS AND INSPECTIONS

**§ 13.5.1** Tests, inspections and approvals of portions of the Work required by the Contract Documents or by laws, ordinances, rules, regulations or orders of public authorities having jurisdiction shall be made at an appropriate time. Unless otherwise provided, the Contractor shall make arrangements for such tests, inspections and approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority, and shall bear all related costs of tests, inspections and approvals. The Contractor shall give the ~~Architect~~ Owner timely notice of when and where tests and inspections are to be made so that the ~~Architect~~ Owner may be present for such procedures. The Owner shall bear costs of tests, inspections or approvals which do not become requirements until after bids are received or negotiations concluded.

**§ 13.5.2** If the ~~Architect,~~ Owner or public authorities having jurisdiction determine that portions of the Work require additional testing, inspection or approval not included under Section 13.5.1, the ~~Architect will, upon written authorization from the Owner,~~ Owner will instruct the Contractor to make arrangements for such additional testing, inspection or approval by an entity acceptable to the Owner, and the Contractor shall give timely notice to the ~~Architect~~ Owner of when and where tests and inspections are to be made so that the ~~Architect~~ Owner may be present for such procedures. Such costs, except as provided in Section 13.5.3, shall be at the Owner's expense.

**§ 13.5.3** If such procedures for testing, inspection or approval under Sections 13.5.1 and 13.5.2 reveal failure of the portions of the Work to comply with requirements established by the Contract Documents, all costs made necessary by such failure including those of repeated procedures ~~and compensation for the Architect's services and expenses~~ shall be at the Contractor's expense.

**§ 13.5.4** Required certificates of testing, inspection or approval shall, unless otherwise required by the Contract Documents, be secured by the Contractor and promptly delivered to the ~~Architect.~~ Owner.

**§ 13.5.5** If the ~~Architect~~ Owner is to observe tests, inspections or approvals required by the Contract Documents, the ~~Architect~~ Owner will do so promptly and, where practicable, at the normal place of testing.

**§ 13.5.6** Tests or inspections conducted pursuant to the Contract Documents shall be made promptly to avoid unreasonable delay in the Work.

## § 13.6 INTEREST

**§ 13.6.1** Payments due and unpaid under the Contract Documents shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.

## § 13.7 COMMENCEMENT OF STATUTORY LIMITATION PERIOD

**§ 13.7.1** As between the Owner and Contractor:

.1    Before Substantial Completion. As to acts or failures to act occurring prior to the relevant date of Substantial Completion, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than such date of Substantial Completion;

.2    Between Substantial Completion and Final Certificate for Payment. As to acts or failures to act occurring subsequent to the relevant date of Substantial Completion and prior to issuance of the final Certificate for Payment, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date ~~of issuance of~~ Owner is required to make the final ~~Certificate for Payment;~~ payment hereunder; and

.3    After Final Certificate for Payment. As to acts or failures to act occurring after the ~~relevant~~ date ~~of issuance of the~~ final ~~Certificate for Payment,~~ payment, any applicable statute of limitations shall

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 – Koll - Intellicenter - Dallas v2 (5-19-06)     (986536188)

R.P. Appx. 077

commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of any act or failure to act by the Contractor pursuant to any Warranty provided under Section 3.5, the date of any correction of the Work or failure to correct the Work by the Contractor under Section 12.2, or the date of actual commission of any other act or failure to perform any duty or obligation by the Contractor or Owner, whichever occurs last.

## ARTICLE 14 TERMINATION OR SUSPENSION OF THE CONTRACT
## § 14.1 TERMINATION BY THE CONTRACTOR

§ 14.1.1 The Contractor may terminate the Contract if the Work is stopped for a period of 30 consecutive days through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, for any of the following reasons:

   .1    issuance of an order of a court or other public authority having jurisdiction which requires all Work to be stopped;

   .2    an act of government, such as a declaration of national emergency which requires all Work to be stopped;

   .3    because the ~~Architect~~ Owner has not issued a ~~Certificate for Payment~~ payment and has not notified the Contractor of the reason for withholding ~~certification~~ payment as provided in Section 9.4.1, or because the Owner has not made payment ~~on a Certificate for Payment~~ within the time stated in the Contract Documents; or

   .4    the Owner has failed to furnish to the Contractor promptly, upon the Contractor's request, reasonable evidence as required by Section 2.2.1.

§ 14.1.2 The Contractor may terminate the Contract if, through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, repeated suspensions, delays or interruptions of the entire Work by the Owner as described in Section 14.3 constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less.

§ 14.1.3 If one of the reasons described in Section 14.1.1 or 14.1.2 exists, the Contractor may, upon ~~seven days'~~ written notice to the ~~Owner and Architect,~~ Owner, terminate the Contract and recover from the Owner payment for Work executed and for proven loss with respect to materials, equipment, tools, and construction equipment and machinery, including ~~reasonable overhead, profit and damages.~~ Contractor's Fee based on the percentage set forth in Section 5.1.2 of the Agreement on Work completed to date.

§ 14.1.4 If the Work is stopped for a period of 60 consecutive days through no act or fault of the Contractor or a Subcontractor or their agents or employees or any other persons performing portions of the Work under contract with the Contractor because the Owner has persistently failed to fulfill the Owner's obligations under the Contract Documents with respect to matters important to the progress of the Work, the Contractor may, upon ~~seven additional days'~~ written notice to the ~~Owner and the Architect,~~ Owner, terminate the Contract and recover from the Owner as provided in Section 14.1.3.

## § 14.2 TERMINATION BY THE OWNER FOR CAUSE

§ 14.2.1 The Owner may terminate the Contract if ~~the Contractor:~~:

   .1    the Contractor persistently or repeatedly refuses or fails to supply enough properly skilled workers or proper materials;

   .2    the Contractor fails to make payment to Subcontractors for materials or labor in accordance with the respective agreements between the Contractor and the Subcontractors;

   .3    the Contractor persistently disregards laws, ordinances, or rules, regulations or orders of a public authority having jurisdiction;

   .4    a mechanic's or materialmen's lien, stop notice or other encumbrance is filed or served by a Subcontractor, Sub-subcontractor or any person or entity claiming by, through or under Contractor against the Land or the Project or any funds due Contractor, or any part thereof, and the lien, stop notice or encumbrance is not discharged, insured over, or bonded off within 45 days after filing or service, or

   .4    otherwise is guilty of substantial breach of a provision of the Contract Documents.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)       (986536188)

R.P. Appx. 078

Without limiting the foregoing, Contractor shall be in default (a "**Contractor Default**") allowing Owner to terminate the Contract if Contractor fails to perform any obligation under the Contract Documents and does not correct such failure within five (5) working days following written notice thereof from Owner; provided, however, no Contractor Default shall occur if the matter is not subject to being cured within such five (5) day period, but Contractor has promptly begun the correction thereof and diligently proceeds to the correction thereof within thirty (30) working days. In the event of Contractor's Default, Owner may, without prejudice to any other rights or remedies Owner may have, hold in abeyance further payments to Contractor to the extent reasonably deemed necessary by Owner to correct any Contractor Default and/or terminate Contractor's right to continue performance of the Contract Documents by written notice to Contractor specifying the date of termination. In the event of such termination, Owner may take possession of the Work at the job site and any or all materials and equipment (whether delivered to the job site or on order therefore by Contractor), tools and construction equipment at the job site and finish the Work by whatever method Owner may deem expedient.

In the event of termination by Owner, Contractor shall, upon request by Owner, promptly advise it of all outstanding subcontracts, rental agreements and purchase orders which Contractor has with others pertaining to performance of the Project and furnish Owner with complete copies thereof. Upon request by Owner, Contractor shall assign to Owner, in form and content reasonably satisfactory to Owner, Contractor's title to materials and equipment for the Project and those subcontracts designated by Owner.

In the event of termination by Owner, Contractor shall not be entitled to receive any further payment until the Project is completed. Upon completion and final acceptance of the Project, Owner will determine the total cost incurred in completing the Project including, without limitation, additional overhead, legal and other costs incurred by Owner to effect such termination and to complete the Project. If the total costs noted above exceed the balance of the Contract Sum unpaid at the time of the termination, Contractor shall, promptly after receipt of an invoice, pay to Owner the amount of such excess. Owner shall have the right and is authorized to set-off against and deduct from any excess payable to Contractor any other damages suffered by Owner due to said default or event giving rise to the termination or due to other defaults of Contractor in complying with the terms of the Contract Documents. Contractor shall continue to be fully liable for all such other damages to Owner. A waiver by Owner of one default by Contractor shall not be considered to be a waiver of any subsequent default by Contractor, nor be deemed to amend or modify the terms of the Contract Documents. Contractor expressly waives any formal notice by Owner of Contractor's failure to perform, or passive breach of, Contractor's express obligations under the Contract Documents.

Contractor agrees that upon commencement of a case, receivership, civil action or other proceeding by or against Contractor under state, federal or other applicable insolvency law and if such case is not dismissed within thirty (30) days thereafter, or upon any general assignment by Contractor for the benefit of its creditors, Owner may, in its sole discretion, treat Contractor as in default and may exercise any of the remedies of this Section 14.2.1. In the event Owner's remedies are limited by the commencement by or against the Contractor of a case under any chapter of the United States Bankruptcy Code, Contractor stipulates, acknowledges and agrees that time is of the essence in determination of whether the Contract Documents should be "assumed" or "rejected," within the meaning of 11 U.S.C. § 365; and Contractor therefore further stipulates and agrees that subject only to calendaring constraints of the Bankruptcy Court having jurisdiction, it will take all necessary action to cause the assumption or rejection of the Contract Documents on or before the thirtieth day following the filing of the Petition commencing any such case. In such event, if Contractor seeks to "assume" the Contract Documents, Contractor expressly stipulates, acknowledges and agrees that "adequate assurance of future performance" within the meaning of 11 U.S.C. § 365 (b)(1)(C) means a determination that there is no foreseeable likelihood that there will be any further interruption of Contractor's performance under the Contract Documents following its assumption.

In the event Owner determines, in its reasonable discretion, that Contractor has become insolvent or is in danger of becoming insolvent, then Owner is authorized, but not required, to make direct payment to Contractor's subcontractors with respect to any current or past-due invoices then outstanding. Alternatively, Owner may, in its sole discretion, require that agreements between Contractor and any such subcontractor be assigned to Owner, and Contractor hereby authorizes and consents to any such assignment. Owner shall be entitled to full credit against any obligations to Contractor for any payments made to any subcontractor under this Section, whether made pursuant to assigned subcontracts or

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06) (986536188)

R.P. Appx. 079

otherwise. Title to any materials or equipment for which such direct payment is made shall pass directly from such subcontractor to Owner.

**§ 14.2.2** When any of the above reasons exist, the ~~Owner, upon certification by the Architect that~~ Owner may, if sufficient cause exists to justify such action, ~~may~~ without prejudice to any other rights or remedies of the Owner and after giving the Contractor and the Contractor's surety, if any, seven days' written notice, terminate employment of the Contractor and may, subject to any prior rights of the surety:

 **.1** take possession of the site and of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor;

 **.2** accept assignment of subcontracts pursuant to Section 5.4; and

 **.3** finish the Work by whatever reasonable method the Owner may deem expedient. Upon request of the Contractor, the Owner shall furnish to the Contractor a detailed accounting of the costs incurred by the Owner in finishing the Work.

**§ 14.2.3** When the Owner terminates the Contract for one of the reasons stated in Section 14.2.1, the Contractor shall not be entitled to receive further payment until the Work is finished.

**§ 14.2.4** If the unpaid balance of the Contract Sum exceeds costs of finishing the Work, ~~including compensation for the Architect's services and expenses made necessary thereby,~~ and other damages incurred by the Owner and not expressly waived, such excess shall be paid to the Contractor. If such costs and damages exceed the unpaid balance, the Contractor shall pay the difference to the Owner. ~~The amount to be paid to the Contractor or Owner, as the case may be, shall be certified by the Architect, upon application, and this~~ This obligation for payment shall survive termination of the ~~Contract.~~ Contract Documents.

### § 14.3 SUSPENSION BY THE OWNER FOR CONVENIENCE
**§ 14.3.1** The Owner may, without cause, order the Contractor in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as the Owner may determine. Upon receiving any such notice of suspension, Contractor shall promptly suspend further performance of the Project to the extent specified, and during the period of such suspension shall properly care for and protect all Work in progress and materials, supplies, and equipment Contractor has on hand for performance of the Project. Upon the request of Owner, Contractor shall promptly deliver to Owner copies of outstanding subcontracts of Contractor, and shall take such action relative to such subcontracts as may reasonably be directed by Owner. Contractor shall use its best efforts to utilize its material, labor and equipment in such a manner as to mitigate costs associated with suspension. Owner may at any time withdraw the suspension of performance of the Project as to all or part of the suspended Project by written notice to Contractor specifying the effective date and scope of withdrawal, and Contractor shall resume diligent performance of the Project for which the suspension is withdrawn on the specified effective date of withdrawal.

**§ 14.3.2** The Contract Sum and Contract Time shall be adjusted for increases in the cost and time caused by suspension, delay or interruption as described in Section 14.3.1. Adjustment of the Contract Sum shall include profit. No adjustment shall be made to the extent:

 **.1** that performance is, was or would have been so suspended, delayed or interrupted by another cause for which the Contractor is responsible; or

 **.2** that an equitable adjustment is made or denied under another provision of the Contract.

### § 14.4 TERMINATION BY THE OWNER FOR CONVENIENCE
**§ 14.4.1** The Owner may, at any time, terminate the Contract for the Owner's convenience and without cause.

**§ 14.4.2** Upon receipt of written notice from the Owner of such termination for the Owner's convenience, the Contractor shall:

 **.1** cease operations as directed by the Owner in the notice;

 **.2** take actions necessary, or that the Owner may direct, for the protection and preservation of the Work; and

 **.3** except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing subcontracts and purchase orders and enter into no further subcontracts and purchase orders.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06) (986536188)

R.P. Appx. 080

Upon receipt of said notice, Contractor shall advise Owner of its outstanding subcontracts pertaining to performance of the terminated Work and, upon request, furnish Owner with complete copies. Contractor shall place no further subcontracts except as may be necessary for completion of such portion of the Project as is not terminated. Contractor shall promptly make every reasonable effort to procure cancellation, upon terms satisfactory to Owner, of all subcontracts to the extent they relate to the performance of Work terminated or, as directed by Owner, shall assign to Owner in form satisfactory to Owner such of its subcontracts as are designated by Owner, or shall take such other action relative to such subcontracts as may be directed by Owner.

**§ 14.4.3** In case of such termination for the Owner's convenience, the Contractor shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with ~~reasonable overhead and profit~~ Contractor's Fee based on the percentage set forth in Section 5.1.2 of the Agreement for Work completed to date. Contractor shall not ~~executed.~~be entitled to any prospective profits or any damages from any termination, suspension or otherwise, whether caused by Owner's fault, negligence or otherwise.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)    (986536188)

R.P. Appx. 081

# Certification of Document's Authenticity
## AIA® Document D401™ – 2003

I, , hereby certify, to the best of my knowledge, information and belief, that I created the attached final document simultaneously with this certification at 14:42:43 on 05/19/2006 under Order No. 1000182995_1 from AIA Contract Documents software and that in preparing the attached final document I made no changes to the original text of AIA® Document A201™ – 1997 - General Conditions of the Contract for Construction, as published by the AIA in its software, other than changes shown in the attached final document by underscoring added text and striking over deleted text.

_____
*(Signed)*


_____
*(Title)*


_____
*(Dated)*

**AIA Document D401™ – 2003. Copyright © 1992 and 2003** by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                      (986536188)

R.P. Appx. 082

## DESIGN/LEAD TIMES/PERMITS

### PERMIT/DESIGN ISSUES

| Activity ID | Description | Orig Dur | Early Start | Early Finish | Bar |
|---|---|---|---|---|---|
| 1210 | ARCHITECTURAL DRAWINGS | 55d | 06SEP05 | 21NOV05 | ARCHITECTURAL DRAWINGS |
| 1550 | MEP DESIGN DOC'S | 20d | 20SEP05 | 17OCT05 | MEP DESIGN DOC'S |
| 1020 | STRUCTURAL DRAWINGS | 22d | 27SEP05 | 26OCT05 | STRUCTURAL DRAWINGS |
| 1340 | TOPO/CIVIL DOCUMENTS | 15d | 27SEP05 | 17OCT05 | TOPO/CIVIL DOCUMENTS |
| 1070 | BORING INFO AVAILABLE | 0 | 11OCT05 | | ◆ BORING INFO AVAILABLE |
| 1030 | FOUNDATION DRAWINGS | 12d | 12OCT05 | 27OCT05 | FOUNDATION DRAWINGS |
| 1560 | TILTUP PANEL DESIGN | 10d | 21OCT05 | 03NOV05 | TILTUP PANEL DESIGN |
| 1300 | STEEL BID PACKAGE READY | 0 | 25OCT05 | | ◆ STEEL BID PACKAGE READY |
| 1710 | FINAL SHELL & CORE DRAWINGS AVAILABLE | 0 | 22NOV05 | | ◆ FINAL SHELL & CORE DRAWINGS AVAILABLE |

### FLUOR & KOLL ISSUES/ PERMIT ITEMS

| Activity ID | Description | Orig Dur | Early Start | Early Finish | Bar |
|---|---|---|---|---|---|
| 2160 | CLOSE ON LAND/SITE AVAILABLE TO KOLL | 0 | 06SEP05 | | CLOSE ON LAND/SITE AVAILABLE TO KOLL |
| 1490 | GRADING PERMIT REVIEW PROCESS | 20d | 18OCT05 | 14NOV05 | GRADING PERMIT REVIEW PROCESS |
| 1540 | FOUNDATION PERMIT REVIEW PROCESS | 8d | 28OCT05 | 08NOV05 | FOUNDATION PERMIT REVIEW PROCESS |
| 1500 | GRADING PERMIT ISSUED | 0 | 15NOV05 | | ◆ GRADING PERMIT ISSUED |
| 1670 | BUILDING PERMIT REVIEW PROCESS | 25d | 02JAN06 | 03FEB06 | BUILDING PERMIT REVIEW PROCESS |
| 1680 | BUILDING PERMIT ISSUED | 0 | 06FEB06 | | ◆ BUILDING PERMIT ISSUED |

### MATERIAL/SUB PROCUREMENT/GMP FORMAT

| Activity ID | Description | Orig Dur | Early Start | Early Finish | Bar |
|---|---|---|---|---|---|
| 1510 | KOLL GMP REVIEW AND ACCEPTANCE | 5d | 06SEP05 | 12SEP05 | KOLL GMP REVIEW AND ACCEPTANCE |
| 1530 | BEGIN WORK/FINAL GMP ACCEPTANCE | 0 | 13SEP05 | | ◆ BEGIN WORK/FINAL GMP ACCEPTANCE |
| 1270 | GMP FORMULATION PROCESS/BID PROCESS | 40d | 15NOV05 | 09JAN06 | GMP FORMULATION PROCESS/BID PROCESS |
| 1130 | ELEVATOR BID PROCESS | 10d | 24NOV05 | 07DEC05 | ELEVATOR BID PROCESS |
| 1140 | ELEVATOR LEAD TIME | 60d | 08DEC05 | 01MAR06 | ELEVATOR LEAD TIME |
| 1050 | M,E,P,FP BID PROCESS | 12d | 13DEC05 | 28DEC05 | M,E,P,FP BID PROCESS |
| 1290 | STEEL BUYOUT | 7d | 15DEC05 | 23DEC05 | STEEL BUYOUT |
| 1110 | GLASS/CURTAIN WALL PROCUREMENT PROCESS | 10d | 27DEC05 | 09JAN06 | GLASS/CURTAIN WALL PROCUREMENT PROCESS |
| 1120 | GLASS/GLAZING LEAD TIME | 60d | 10JAN06 | 03APR06 | GLASS/GLAZING LEAD TIME |
| 1160 | PROJECT AWARD | 0 | 10JAN06 | | ◆ PROJECT AWARD |
| 1040 | STEEL SHOPS/APPROVAL/DELIVERY | 70d | 17JAN06 | 24APR06 | STEEL SHOPS/APPROVAL/DELIVERY |
| 1060 | AWARD STEEL | 0 | 17JAN06 | | ◆ AWARD STEEL |

## SITE IMPROVEMENTS

### NEW SITE IMPROVEMENTS

| Activity ID | Description | Orig Dur | Early Start | Early Finish | Bar |
|---|---|---|---|---|---|
| 1080 | MOBILIZE / SITE LAYOUT | 5d | 10FEB06 | 16FEB06 | MOBILIZE / SITE LAYOUT |
| 1150 | SILTATION CONTROL/CLEAR SITE | 12d | 14FEB06 | 01MAR06 | SILTATION CONTROL/CLEAR SITE |
| 1170 | MASS GRADING | 12d | 20FEB06 | 07MAR06 | MASS GRADING |

Legend:
- Early bar
- Progress bar
- Critical bar
- Summary bar
- ◆ Start milestone point
- ◆ Finish milestone point

KOLL DEVELOPMENT CO.
FEBRUARY 20, 2006
DALLAS INTELLICENTER-OWNER SCHEDULE
211,837 SF
ATTACHMENT A

CLAYCO

R.P. Appx. 083

| Activity ID | Description | Orig Dur | Early Start | Early Finish |
|---|---|---|---|---|
| 1200 | WATER LINE/FIRE LOOP | 10d | 08MAR06 | 21MAR06 |
| 1410 | TEMPORARY FIRE ACCESS/TEMPORARY ROADS | 7d | 27MAR06 | 04APR06 |
| 1920 | STORM SEWERS/STRUCTURES/INLETS | 20d | 27MAR06 | 21APR06 |
| 1190 | CONCRETE PAVING/IRRGATION SLEEVES | 35d | 05SEP06 | 23OCT06 |
| 1940 | LANDSCAPING/IRRIGATION/HARDSCAPE WORK | 40d | 19SEP06 | 13NOV06 |
| 1180 | BACKFILL CURBS/FINE GRADING FOR LANDSCAPING | 15d | 24OCT06 | 13NOV06 |
| 1970 | SIDEWALKS/MISC. CONCRETE | 18d | 07NOV06 | 30NOV06 |
| | NEW BUILDING CONSTRUCTION | | | |
| | BUILDING SHELL | | | |
| 1220 | FOUNDATION SYSTEMS | 15d | 09MAR06 | 29MAR06 |
| 1250 | UNDERGROUND ELECTRIC/PLUMBING | 6d | 04APR06 | 11APR06 |
| 2050 | POUR MUDSLAB ON GRADE (CASTING SLAB) | 6d | 10APR06 | 17APR06 |
| 2060 | FORM, REINFORCE & POUR TILTUP PANELS | 15d | 13APR06 | 03MAY06 |
| 2070 | TILT PANELS | 13d | 04MAY06 | 22MAY06 |
| 1240 | STRUCTURAL STEEL/DECKING/POUR DECKS (1 THRU 4) | 70d | 24MAY06 | 30AUG06 |
| 1280 | PATCH PANELS/ETCH/PAINT | 35d | 31JUL06 | 15SEP06 |
| 1310 | PUNCHED WINDOWS/STOREFRONT | 45d | 03AUG06 | 04OCT06 |
| 1430 | MISCELLANEOUS STEEL/STAIRS | 25d | 10AUG06 | 13SEP06 |
| 1330 | MECHANICAL SYSTEMS/ROOFTOP HVAC UNITS | 40d | 17AUG06 | 11OCT06 |
| 1260 | ROOFING WORK | 15d | 24AUG06 | 13SEP06 |
| 1380 | PLUMBING RISERS/BATHROOM ROUGH-INS | 35d | 24AUG06 | 11OCT06 |
| 1420 | STUDS/DRYWALL/FINISHES @ PUBLIC AREAS | 60d | 04SEP06 | 24NOV06 |
| 1460 | DRYWALL SHAFTS @ STAIRS/ELEVATOR/B-ROOMS | 55d | 07SEP06 | 22NOV06 |
| 1350 | POWER DISTRIBUTION/INTERIOR PANELS | 55d | 14SEP06 | 29NOV06 |
| 1450 | MECHANICAL UNITS SET-FINAL TERMINATIONS | 15d | 14SEP06 | 04OCT06 |
| 1360 | PERMANENT POWER AVAILABLE | 0 | 20SEP06 | |
| 1320 | ELEVATOR CONSTRUCTION | 55d | 21SEP06 | 08DEC06 |
| 1370 | CURTAINWALL | 25d | 21SEP06 | 25OCT06 |
| 1590 | CERAMIC TILE/PLUMBING FIXTURES/PARTITIONS | 30d | 16OCT06 | 24NOV06 |
| 1470 | MAIN ENTRY AND REAR CANOPY WORK | 30d | 23OCT06 | 01DEC06 |
| 1440 | MAIN BUILDING DRIED IN | 0 | 26OCT06 | |
| 1720 | MAIN LOBBY/ELEVATOR LOBBY FINISHES | 47d | 02NOV06 | 09JAN07 |
| 1610 | SUBSTANTIAL COMPLETION—SHELL WORK ONLY | 0 | 09JAN07 | |

Legend:
- Early bar
- Progress bar
- Critical bar
- Summary bar
- ◆ Start milestone point
- ◆ Finish milestone point

KOLL DEVELOPMENT CO.
FEBRUARY 20, 2006
DALLAS INTELLICENTER-OWNER SCHEDULE
211,837 SF
ATTACHMENT A

CLAYCO

R.P. Appx. 084

**DESIGN/LEAD TIMES/PERMITS**

**PERMIT/DESIGN ISSUES**

| Activity ID | Description | Orig Dur | Early Start | Early Finish | Gantt label |
|---|---|---|---|---|---|
| 1210 | ARCHITECTURAL DRAWINGS | 55d | 06SEP05 | 21NOV05 | ARCHITECTURAL DRAWINGS |
| 1550 | MEP DESIGN DOC'S | 20d | 20SEP05 | 17OCT05 | MEP DESIGN DOC'S |
| 1020 | STRUCTURAL DRAWINGS | 22d | 27SEP05 | 26OCT05 | STRUCTURAL DRAWINGS |
| 1340 | TOPO/CIVIL DOCUMENTS | 15d | 27SEP05 | 17OCT05 | TOPO/CIVIL DOCUMENTS |
| 1070 | BORING INFO AVAILABLE | 0 | 11OCT05 | | ◆ BORING INFO AVAILABLE |
| 1030 | FOUNDATION DRAWINGS | 12d | 12OCT05 | 27OCT05 | FOUNDATION DRAWINGS |
| 1560 | TILTUP PANEL DESIGN | 10d | 21OCT05 | 03NOV05 | TILTUP PANEL DESIGN |
| 1300 | STEEL BID PACKAGE READY | 0 | 25OCT05 | | ◆ STEEL BID PACKAGE READY |
| 1710 | FINAL SHELL & CORE DRAWINGS AVAILABLE | 0 | 22NOV05 | | ◆ FINAL SHELL & CORE DRAWINGS AVAILABLE |

**FLUOR & KOLL ISSUES/ PERMIT ITEMS**

| Activity ID | Description | Orig Dur | Early Start | Early Finish | Gantt label |
|---|---|---|---|---|---|
| 2160 | CLOSE ON LAND/SITE AVAILABLE TO KOLL | 0 | 06SEP05 | | CLOSE ON LAND/SITE AVAILABLE TO KOLL |
| 1490 | GRADING PERMIT REVIEW PROCESS | 20d | 18OCT05 | 14NOV05 | GRADING PERMIT REVIEW PROCESS |
| 1540 | FOUNDATION PERMIT REVIEW PROCESS | 8d | 28OCT05 | 08NOV05 | FOUNDATION PERMIT REVIEW PROCESS |
| 1500 | GRADING PERMIT ISSUED | 0 | 15NOV05 | | ◆ GRADING PERMIT ISSUED |
| 1670 | BUILDING PERMIT REVIEW PROCESS | 25d | 02JAN06 | 03FEB06 | BUILDING PERMIT REVIEW PROCESS |
| 1680 | BUILDING PERMIT ISSUED | 0 | 06FEB06 | | ◆ BUILDING PERMIT ISSUED |

**MATERIAL/SUB PROCUREMENT/GMP FORMAT**

| Activity ID | Description | Orig Dur | Early Start | Early Finish | Gantt label |
|---|---|---|---|---|---|
| 1510 | KOLL GMP REVIEW AND ACCEPTANCE | 5d | 06SEP05 | 12SEP05 | KOLL GMP REVIEW AND ACCEPTANCE |
| 1530 | BEGIN WORK/FINAL GMP ACCEPTANCE | 0 | 13SEP05 | | ◆ BEGIN WORK/FINAL GMP ACCEPTANCE |
| 1270 | GMP FORMULATION PROCESS/BID PROCESS | 40d | 15NOV05 | 09JAN06 | GMP FORMULATION PROCESS/BID PROCESS |
| 1130 | ELEVATOR BID PROCESS | 10d | 24NOV05 | 07DEC05 | ELEVATOR BID PROCESS |
| 1140 | ELEVATOR LEAD TIME | 60d | 08DEC05 | 01MAR06 | ELEVATOR LEAD TIME |
| 1050 | M,E,P,FP BID PROCESS | 12d | 13DEC05 | 28DEC05 | M,E,P,FP BID PROCESS |
| 1290 | STEEL BUYOUT | 7d | 15DEC05 | 23DEC05 | STEEL BUYOUT |
| 1110 | GLASS/CURTAIN WALL PROCUREMENT PROCESS | 10d | 27DEC05 | 09JAN06 | GLASS/CURTAIN WALL PROCUREMENT PROCESS |
| 1120 | GLASS/GLAZING LEAD TIME | 60d | 10JAN06 | 03APR06 | GLASS/GLAZING LEAD TIME |
| 1160 | PROJECT AWARD | 0 | 10JAN06 | | ◆ PROJECT AWARD |
| 1040 | STEEL SHOPS/APPROVAL/DELIVERY | 70d | 17JAN06 | 24APR06 | STEEL SHOPS/APPROVAL/DELIVERY |
| 1060 | AWARD STEEL | 0 | 17JAN06 | | ◆ AWARD STEEL |

**SITE IMPROVEMENTS**

**NEW SITE IMPROVEMENTS**

| Activity ID | Description | Orig Dur | Early Start | Early Finish | Gantt label |
|---|---|---|---|---|---|
| 1080 | MOBILIZE / SITE LAYOUT | 5d | 10FEB06 | 16FEB06 | MOBILIZE / SITE LAYOUT |
| 1150 | SILTATION CONTROL/CLEAR SITE | 12d | 14FEB06 | 01MAR06 | SILTATION CONTROL/CLEAR SITE |
| 1170 | MASS GRADING | 12d | 20FEB06 | 07MAR06 | MASS GRADING |

Legend:
- Early bar
- Progress bar
- Critical bar
- Summary bar
- ◆ Start milestone point
- ◆ Finish milestone point

KOLL DEVELOPMENT CO.
FEBRUARY 20, 2006
DALLAS INTELLICENTER-OWNER SCHEDULE
211,537 SF
ATTACHMENT A

CLAYCO

R.P. Appx. 085

CLAYCO

| Activity ID | Description | Orig Dur | Early Start | Early Finish |
|---|---|---|---|---|
| 1200 | WATER LINE/FIRE LOOP | 10d | 08MAR06 | 21MAR06 |
| 1410 | TEMPORARY FIRE ACCESS/TEMPORARY ROADS | 7d | 27MAR06 | 04APR06 |
| 1920 | STORM SEWERS/STRUCTURES/INLETS | 20d | 27MAR06 | 21APR06 |
| 1190 | CONCRETE PAVING/IRRIGATION SLEEVES | 35d | 05SEP06 | 23OCT06 |
| 1940 | LANDSCAPING/IRRIGATION/HARDSCAPE WORK | 40d | 19SEP06 | 13NOV06 |
| 1180 | BACKFILL CURBS/FINE GRADING FOR LANDSCAPING | 15d | 24OCT06 | 13NOV06 |
| 1970 | SIDEWALKS/MISC. CONCRETE | 18d | 07NOV06 | 30NOV06 |

**NEW BUILDING CONSTRUCTION**

**BUILDING SHELL**

| Activity ID | Description | Orig Dur | Early Start | Early Finish |
|---|---|---|---|---|
| 1220 | FOUNDATION SYSTEMS | 15d | 09MAR06 | 29MAR06 |
| 1250 | UNDERGROUND ELECTRIC/PLUMBING | 5d | 04APR06 | 11APR06 |
| 2050 | POUR MUDSLAB ON GRADE (CASTING SLAB) | 5d | 10APR06 | 17APR06 |
| 2060 | FORM, REINFORCE & POUR TILTUP PANELS | 15d | 13APR06 | 03MAY06 |
| 2070 | TILT PANELS | 13d | 04MAY06 | 22MAY06 |
| 1240 | STRUCTURAL STEEL/DECKING/POUR DECKS (1 THRU 4) | 70d | 24MAY06 | 30AUG06 |
| 1280 | PATCH PANELS/ETCH/PAINT | 35d | 31JUL06 | 15SEP06 |
| 1310 | PUNCHED WINDOWS/STOREFRONT | 45d | 03AUG06 | 04OCT06 |
| 1430 | MISCELLANEOUS STEEL/STAIRS | 25d | 10AUG06 | 13SEP06 |
| 1330 | MECHANICAL SYSTEMS/ROOFTOP HVAC UNITS | 40d | 17AUG06 | 11OCT06 |
| 1260 | ROOFING WORK | 15d | 24AUG06 | 13SEP06 |
| 1380 | PLUMBING RISERS/BATHROOM ROUGH-INS | 35d | 24AUG06 | 11OCT06 |
| 1420 | STUDS/DRYWALL/FINISHES @ PUBLIC AREAS | 60d | 04SEP06 | 24NOV06 |
| 1460 | DRYWALL SHAFTS @ STAIRS/ELEVATOR/B-ROOMS | 55d | 07SEP06 | 22NOV06 |
| 1350 | POWER DISTRIBUTION/INTERIOR PANELS | 55d | 14SEP06 | 29NOV06 |
| 1450 | MECHANICAL UNITS SET-FINAL TERMINATIONS | 15d | 14SEP06 | 04OCT06 |
| 1360 | PERMANENT POWER AVAILABLE | 0 | 20SEP06 | |
| 1320 | ELEVATOR CONSTRUCTION | 55d | 21SEP06 | 06DEC06 |
| 1370 | CURTAINWALL | 25d | 21SEP06 | 25OCT06 |
| 1590 | CERAMIC TILE/PLUMBING FIXTURES/PARTITIONS | 30d | 18OCT06 | 24NOV06 |
| 1470 | MAIN ENTRY AND REAR CANOPY WORK | 30d | 23OCT06 | 01DEC06 |
| 1440 | MAIN BUILDING DRIED IN | 0 | 26OCT06 | |
| 1720 | MAIN LOBBY/ELEVATOR LOBBY FINISHES | 47d | 02NOV06 | 09JAN07 |
| 1810 | SUBSTANTIAL COMPLETION—SHELL WORK ONLY | 0 | 09JAN07 | |

Legend:
- Early bar
- Progress bar
- Critical bar
- Summary bar
- ◆ Start milestone point
- ◆ Finish milestone point

KOLL DEVELOPMENT CO.
FEBRUARY 20, 2006
DALLAS INTELLICENTER-OWNER SCHEDULE
211,637 SF
ATTACHMENT A

R.P. Appx. 086

# OUTLINE SPECIFICATIONS
## 211, 637 SQUARE FOOT SPECULATIVE OFFICE BUILDING
## INTELLICENTER - DALLAS
### for
## KOLL DEVELOPMENT COMPANY
### February 20, 2006

## DIVISION 1 - GENERAL REQUIREMENTS

### Section 1A - Summary of Work

The project titled Intellicenter – Dallas for Koll Development is a proposed shell office building development located in Irving, Texas.

The project consists of (1), 4-story, building, totaling 211,637 gross square feet with parking as shown on the Glenn Engineering plans.

The exterior surface of the building is to be load bearing, tilt-up concrete, architectural wall panels, aluminum clad punched windows, with insulated tinted glass system and aluminum curtainwall glass system with insulated tinted glass units.

It is the goal of Koll Development to achieve basic LEED certification for Core & Shell (24 points). Refer to the attached Preliminary Project Checklist dated 8/9/05. The GMP includes the direct design and construction related costs associated with these items. Our GMP does not include the costs for the following LEED credits:

> Energy & Atmosphere – Credit 3 – Additional Commissioning
> Energy & Atmosphere – Credit 5 – Measurement & Verification
> Materials & Resources – Prereq. 1 – Storage & Collection of Recyclables
> Innovation in Design & Process – Credit 2 – LEED Accredited Professional

Our GMP also excludes any costs associated with the LEED certification and associated Commissioning of the building systems.

### Section 1B - General Conditions

The Developer is Koll Development Company and shall provide the following items for the use of the Design/Builder (Clayco):

1. Phase I environmental report.

2. Soil Investigation and report; on-site materials testing and inspections.

3. Entry road and utilities to the site.

4. Topographical and boundary survey.

The Design/Builder (Clayco) shall include the following items as required for the execution and/or completion of the Work. PLEASE NOTE: This listing is not to be considered all inclusive nor complete, but merely as a guide for the major items to be included under this Division.

1

R.P. Appx. 087

<u>Section 1B - General Conditions – continued</u>

1.     Civil engineering will meet the design/build requirements and will be provided by the design/build contractor.

2.     Architectural and structural engineering, construction documents and specifications; the engineering documents shall include the plumbing, mechanical, electrical and fire protection work as these items are being completed by engineering consultants.

    The design/builder shall cause the preparation and design of all construction drawings and specifications and incorporates the intent of the scope drawings and construction guidelines utilizing a licensed, registered, insured architect and engineer for all design and structural components of the building. The design/builder will cause the design to comply with all applicable local, state and national codes and all design requirements for obtaining the necessary permits. The design/builder will include any specialized design or consulting services needed.

    Provide all shop drawings, cut sheets, samples, submittals and other required items for Owner's review. Simultaneously both design/builder and design professionals are to review and approve all shop drawings and submittals.

    In addition to all other insurance requirements of design/builder set forth in these general conditions, or the general conditions attached to the AIA Contract Agreement, the design/builder shall require its architect and all other professional subcontractors to obtain and maintain professional errors and omission coverage in connection with such subcontractors work. Professional errors and omissions insurance shall be endorsed to provide contractual liability coverage. Such coverage for the architect and any other professional subcontractor shall be in amounts not less than $2,000,000 each. Certified copies of the policies evidencing such coverage shall be furnished at the same time as the other evidence of insurance required under this agreement.

3.     Temporary utilities - water, telephone, power and portable toilet facilities shall be provided by the Design/Builder (Clayco) of sufficient capacity and at the locations required for their work. Pay for all costs to establish service and usage until the issuance of substantial completion notice.

4.     Supervision - Any and all Design/Builder (Clayco) project site and office supervision required for The Work shall be included, including a full-time qualified field superintendent.

    A part-time Project Manager will be provided to coordinate both design and construction and to serve as liaison between the design team, Owner's representatives, and the field superintendent. The cost of this project manager is included.

5.     A progress schedule will be a part of the contract and the schedule will be updated and delivered to the Owner's representatives not less than monthly.

    Direct project progress meetings at the jobsite. The Owner's representatives will be invited as well as the Owner project manager, all subcontractors and key equipment and material suppliers.

2

R.P. Appx. 088

## Section 1B - General Conditions – continued

There will be written minutes of the meetings and distributed copies to all parties concerned within three days following the meeting.

6. Provide progress photographs. Submit no less than 5 slides of the work in progress with each application for payment to document percent complete.

7. Submit payment requests monthly using AIA G702 format and G703 schedule of values. Confirm billing procedures with the Owner's representatives.

8. The Design/Builder (Clayco) will submit all claims for changes to the Owner's representative for approval, including the add or credit cost of the change and the affect on contract completion date. No change order work will be started prior to Owner's approval.

9. Security - Provide and maintain job site security, as required to secure the project during construction term.

10. Insurance Coverage - Provide a certificate of insurance issued to the Owner evidencing insurance coverage as follows:

    | | |
    |---|---|
    | Workmen's Compensation | $1,000,000 |
    | General Liability including Contractual Liability | $1,000,000 |
    | Comprehensive Auto | $1,000,000 |
    | Builder's Risk Insurance – Included | |
    | Provide $25,000,000.00 umbrella coverage. | |

11. Surveys and Lay-Out - Owner shall provide a monumented boundary survey of the parcel. The Design/Builder (Clayco) shall perform all work required for the lay-out of The Work including line and grade surveying.

12. Coordination of testing and inspection reports and recommendations with actual construction methods.

13. Materials and Workmanship - Materials used in The Work will conform to the latest Standard Specification of the American Society for Testing Materials, The American Concrete Institute, The American Institute of Steel Construction, American Welding Society, American Society of Mechanical Engineers, National Electric Code, N.E.M.A., American Institute of Electrical Engineers and the rules and regulations of the National Board of Fire Underwriters.

    The workmanship will be consistent with the best practice of the various building trades and will conform to the standards of good construction for this class of work.

    Where a product is specified by a trade name, a product of equal performance maybe substituted only with the prior approval of the Owner and Architect or Engineer of record.

3

R.P. Appx. 089

Section 1B - General Conditions – continued

14. Color Selections - Owner and/or Architect will provide a finish color schedule of the exposed surfaces of The Work in a timely manner for the Design/Builder (Clayco)'s use in coordinating building shell.

15. Temporary Heat, Water and Power - Heat, water and power will be provided as required for construction. The permanent heating, cooling and electrical system will be utilize as required for construction use; thus the warranty for the equipment may start prior to the building substantial completion. The Builder has included the cost of operating the systems until Substantial Completion has been achieved.

16. Guarantees - Upon notice from the Owner, the Design/Builder (Clayco) will remedy any defects due to defective workmanship or materials which will appear within a period of one year from the date of Substantial Completion of The Work.

17. The following items are included in the General Conditions/General Requirements for the Design/Builder (Clayco):

    a. office supplies, postage, telephone, shop drawing blueprints, reproduction costs, progress photographs, computer and EDP expenses, first-aid supplies, insurance and other such miscellaneous expenses.

    b. Project staff including salaries and benefits for Project Executive, Project Superintendent, Engineers, Accountants, Assistants, Estimators, Purchasing, Secretaries and Clerks.

    c. Tools and supplies including hand tools and construction equipment having an individual new value of less than $200 and consumable items which are used in the construction operation such as chalk, kerosene, brooms, brushes, etc...

    d. Job office including rental of trailers, temporary buildings or office space for project staff. Also include interior modification and mechanical/electrical work as required to said job offices.

    e. Plant, vehicles and repairs such as purchase of rental charges for plant owned by Design/Builder (Clayco) or outside parties. Items include transits and levels, rental or purchase of job vehicles and repairs and maintenance of plant and vehicles used specifically on this project.

    f. Temporary buildings, barricades and installations including labor, lumber, millwork, and other building materials used in the construction of tool sheds and other temporary structures with the exception of the job office which is included above.

    g. We have included the cost of the Building Permit.

4

R.P. Appx. 090

<u>Section 1B - General Conditions – continued</u>

18.    Project close out requirements will be provided as follows:

    a.    Record drawings plans which will be maintained in the field trailer of all field changes on the contract drawings and at the conclusion of the project a set of reproducible stamped "Record Drawing" including field changes will be turned over to the Owner. All As-built drawings will be provided to owner via CD-ROM.

    b.    Provide (3) sets of operating and maintenance manuals to the Owner.

    c.    Provide operating instructions to the Owner's representatives. Walk the Owner's designate through all systems and demonstrate the proper sequence of starting, normal operation and adjustments and shut-down. Include physical verification that all safeties work properly.

    d.    Provide job clean up during the project and final clean up. Clean and wash windows, remove all debris inside and out and leave the entire building "broom clean".

19.    The Design/Build Contractor's site office must include the following:

    a.    A furnished conference area with seating for a minimum of 12 persons.

    b.    ~~One furnished office for use by the architect, engineer or Owner.~~

    c.    Telephone and DSL quality Internet services for the offices. ~~One additional separate telephone line in a location of the Owner's choice for separate fax use by the Owner/Architect/Engineer.~~ (Fax machine furnished by Owner, if available at site).

    d.    Copier capable of 11x17 format and onsite drawing plotter capable of 36" paper width format for shared use by Design/Build Contractor, Owner and Owner's consultants.

**DIVISION 2 - SITE WORK**

<u>Section 2A - Subsurface Investigation</u>

Subsurface Investigation will be completed by Koll Development.

All on site inspections and monitoring the excavation will be paid for by Koll Development. Every site location will involve different soil characteristics that will affect the earthwork, paving and foundation design.

<u>Section 2B - Site Preparation</u>

Site preparation and clearing shall be provided to remove vegetation, trees and/or shrubs in the new construction areas unless noted to be reused or salvaged.

5

R.P. Appx. 091

## Section 2C - Earthwork

All earthwork shall be performed per the recommendations of the geotechnical design report.

Provide mass grading of entire site including all cut and fill required. The existing pile and any excess material from the cut to fill operation will be hauled off by Koll. Excess topsoil and vegetation will be strategically stockpiled for future placement in landscape berms.

Excavation to subgrade elevations for all interior footings and slabs on grade. General and rough grading of the site to achieve the proposed subgrades.

Finish grading of areas around the buildings, paving and sidewalks to achieve proper drainage and uniform surfaces; finish grading for the building area and site to a 0.1 foot (±) tolerance.

Finish planting areas will be finish graded for planting by landscaping contractor as part of the work. All planting and sod areas shall have a minimum of 4" topsoil. Topsoil work will be completed if necessary out of landscape budget.

Design/builder shall protect and maintain any and all existing utilities, drives and parking areas which are to remain in service and are adjacent to the work during the course of construction activities.

## Section 2D - Storm Sewers and Utilities

Underground storm-sewer system will be installed to collect surface storm water run-off throughout the site and drain to adjacent off site system.

Provide all water service for domestic use and fire protection with new hydrants, as required.

Provide underground service for electric and telephone. TXU fees for electric service will be paid by Koll.

The gas service is by Koll Development.

All utility work will be limited to work on site and as indicated on the civil documents. The sanitary sewer and water utility work are to service building tie roof drains into storm sewer system.

## Section 2E - Paving and Surfacing

The work includes concrete paving and curbs as shown on the Civil drawings including entry and island work along Regent Boulevard.

Provide curb cuts for entrances as shown.

Pavement markings to be white two coat paint system.

Provide concrete pad at loading dock and dumpster pad. Provide concrete pad for transformer.

Provide $25,000 budget allowance for exterior hardscape; this includes fountains, artwork, brick pavers, signage and furniture at the entrance locations. The base bid includes concrete sidewalks @ the 2 entrances.

6

R.P. Appx. 092

<u>Section 2F - Irrigation System</u>

A landscape irrigation system design and installation will be provided as an allowance of $75,000.

<u>Section 2G - Landscaping</u>

An allowance of $225,000 has been provided for landscaping.


# DIVISION 3 - CONCRETE

<u>Section 3A - Cast-In-Place Concrete</u>

Reinforced-concrete at foundations based on 3500psi compressive strength at 28 days.

Provide all concrete work in accordance with the structural drawings.

Concrete sidewalks in locations and width as indicated on the site plan, standard-broom finish on a 60" square pattern, 4" concrete minimum 4000psi and rebar and granular base if required by code.

Reinforced concrete drilled piers with bearing capacities as recommended by the structural engineer.

First, Second, Third and Fourth floor concrete structural slabs over 2" metal decking and beams with mesh reinforcing and 4000psi concrete (3" thick). Concrete to be steel troweled to a smooth finish within normal tolerances.

Provide six (3) sets of pan stairs; regular weight concrete at treads and landings.

Provide non-shrink, non-metallic grout as required for all column base plates.

Provide foundation pits and slab at elevator construction. (Three (3) elevators included).


<u>Section 3B – Tilt-Up Concrete Panels</u>

All concrete panels will be completed as site cast, reinforced, architectural concrete panels. All Tilt-Up panels will be designed and constructed with the most up-to-date quality assurance programs available through the Tilt-Up Concrete Association, Concrete Specification Institute, Concrete Council, and Clayco Construction Company's own high standards. An alternate will be provided to have 15' wide panels instead of 30' wide. The window configuration at the top level will need to change if the 15' wide panel option is pursued.

The system will be detailed in conjunction with all aluminum window and curtain wall systems to provide wholly integrated exterior building cladding system.

A tilt-up screen wall will be provided for the truck dock area.

R.P. Appx. 093

# DIVISION 5 - METALS

## Section 5A - Structural Metal Framing

Structural steel shall comply with ASTM A-36 and A572, GD50 as noted on drawings and structural steel framing shall be provided to include the following:

Elevated floor slabs are designed for 100lb. live load, with Code allowance reductions.

Structural steel column and beam system to support the floor and roof structures. All shapes will be installed.

Steel framing supports for the metal screen wall.

Miscellaneous structural steel as required for new construction.

Steel channel framing as required for floor and roof blockouts.

## Section 5B - Metal Joist and Metal Decking

Structural steel beams for 1st, 2nd ,3rd and 4th floors and bar joist at roof deck. All joists shall be designed and installed per SJI specifications.

Steel roof decking to support roofing system per SDI Standard No. 1 with factory primer. 1 ½" metal decking to be 22 gauge painted. Roof deck and joist shall be sloped to provide 1/4" per foot slope for positive roof drainage.

2" x 19 gage galvanized steel decking to support concrete slab at the first, second, third and fourth floors.

## Section 5C - Metal Support System
All interior partitions shall contain standard metal studs on 16" centers, size and gauge as required unless otherwise noted.
Columns, chases and soffits shall be furred with metal studs, furr ceilings where indicated to be drywalled (fired rated where required).

All lintels, 6" pipe bollards (concrete filled), steel tube and hand rails and miscellaneous other steel as shown on architectural and structural drawings.

Mechanical equipment supports, as required.

Include Morins X-12 type horizontal prefinished panel system for mechanical screen and vertical entry element at all entries.   Include metal stud framing as required.

## Section 5D - Metal Fabrication

Steel angle dock nosing (embedded in concrete at the outer edge of dock).

Stair system with steel pan treads and landings with concrete fill.

R.P. Appx. 094

<u>Section 5D - Metal Fabrication - continued</u>

Include Alucobond metal panel system at vertical features and roof parapet condition per the drawings.

Include sunscreens at 3 levels near both entries and building ends.

Metal access ships ladder to roof hatch at one stair location.

Elevator divider beams and sill support angle.

## DIVISION 6 - WOODS AND PLASTICS

<u>Section 6A - Rough and Finish Carpentry</u>

Wood blocking, nailers, grounds blocking at parapet walls, furring and framing with standard construction grade #2 yellow pine or Douglas for lumber required to complete all new construction, (fire treated as required by Code).

Each electric closet will have one wall with plywood mounted to it for installation of telephone equipment. Telephone equipment by others.

Solid surface lavatory tops for the restroom lavatories for one core at each floor for a total of eight (8) restrooms.

One full length wood shelf only a janitor's storage closets. Shelf constructed of AWI custom grade plywood and exposed edge receiving a hardwood edge.

Installation of all toilet accessories in restroom lavatories.

Window sills shall be 1/16" general purpose plastic laminate on 3/4" APA high density overlay plywood. At curtain wall, provide metal sills.

## DIVISION 7 - THERMAL AND MOISTURE PROTECTION

<u>Section 7A – Insulation and Fireproofing</u>
3-1/2" (R-13) fiberglass with foil faced vapor barrier to above ceilings.

1" rigid insulation board on exterior walls at spandrel glass, otherwise, batt insulation will be used at exterior walls.

2" rigid polystyrene insulation board on foundation perimeter walls below floor slab.

Provide fire rated assembly by use of drywall or spray on fireproofing at beams extending from the rated stairwells to the first adjoining structural member in accordance with applicable codes.

Provide floor to floor fireproofing as required for all penetrations.

Include fireproofing main beam supports as required for all stairwells.

<u>Section 7A – Insulation and Fireproofing (Cont)</u>

9

R.P. Appx. 095

Include vapor barrier type insulation above ceiling areas; seal all joints carefully, especially at perimeter condition at 4th floor attic space.

Section 7B - Roofing

Roofing shall be 45 MIL mechanically attached TPO polymer based roof system with R value of 20 (meet the energy code in each area).

Roof area to be drained by interior roof drains located along the exterior wall.

10 year warranty (material and labor) provided by the manufacturer after his inspection of the roof.

Section 7C - Flashing and Sheet Metal

Flashing and sheet metal as required for the roof parapet walls.

Paint-grip, galvanized sheet metal installed at locations requiring flashing, counterflashing and roof drain pockets unless otherwise noted on drawings.

Prefinished and pre-formed aluminum coping at parapets as required, unless otherwise noted on drawings.

Section 7D - Roof Accessories

Roof hatch and ships ladder installed for access to roof.

Section 7E - Caulking

Caulking at required joints and intersections to two different materials. Exterior joints shall use two component polyurethane based sealing compounds, Tremco Dymeric or equal. Interior joints and under thresholds shall be architectural grade caulking compounds, Sorreborn Kaukit, or equal. Provide closed cell backer rod as required, material shall be round rod.

## DIVISION 8 - DOORS AND WINDOWS

Section 8A - Metal Doors and Frames

Hollow metal doors and frames as shown on drawings will be primed and coated with 2 coats of gloss enamel paint. All hollow metal frames will be welded at seams. All doors shall be 18 gauge, 1-3/4" thick with finish faces, exterior door shall be insulated.

Aluminum frames at passages to restrooms and building maintenance rooms and stairways.

Hollow metal doors at passages to mechanical equipment to be fire-rated as required.

One (1) 8'x9' manual overhead door at loading dock. The compactor opening will be provided by Clayco; the door to the compactor (if necessary) will be provided by the compactor vendor.

Hollow metal frames at pump rooms and building electrical room.

10

R.P. Appx. 096

<u>Section 8B - Wood Doors</u>

Any wood doors used by tenant shall meet or exceed the following specification:

Wood doors at all passages throughout interior unless otherwise noted doors to be 1-3/4" thick, solid core, mahogany veneer doors to be fire-rated as required.  Doors to be 3'-0" x 8'-0" (H) in aluminum metal frames.

<u>Section 8C - Glass and Glazing</u>

Furnish and install an insulated store front window system at building off-sets.  Clear anodized aluminum finish per the architectural drawings, glazed with insulated glass units per the architectural drawings.  Glass to be clear system with low E similar to the Atlanta project.

Aluminum clad insulated punched window system by Vistawall (basis of design) or equal.

Mirror glass in all bathrooms, glass to be 1/4" thick.

Provide glass feature wall at main stairwell (all levels).

Provide two (2) double glass door vestibules at 1 entry.

Provide revolving door and two (2) single glass doors at main entry.

<u>Section 8D - Hardware</u>

Hardware shall include the following and will meet all ADA requirements.

EXTERIOR DOOR HARDWARE:
      1-1/2 pair hinges
      1 door stop
      1 exit device
      1 hydraulic closure
      1 cylinder lock
      1 weather strip and gasketing
      1 sill sweep
      1 strike lock shield
      1 threshold
      Code required panic hardware (where required).

INTERIOR DOOR HARDWARE:
      1-1/2 pair hinges
      silencers
      1 latch set (Mortise)
      1 door stop
      Toilet room doors shall also have push/pull plates, kick plates and closers
      All hardware will be satin chrome
      All tenant supplied material must meet this specification.

R.P. Appx. 097

# DIVISION 9 - FINISHES

## Section 9A - Gypsum Drywall

All columns to have metal studs installed with drywall installation as part of the TI work.

Partitions and furring shall be fire-rated with 5/8" Type "X" gypsum board where required.

Moisture-resistant gypsum board shall be used in toilet rooms, janitor closets and pump room exterior soffits, unless otherwise noted.

Partitions at toilet rooms, mechanical and electrical rooms shall be full height and sound deadened with sound batt insulation. Bathroom ceilings to be drywall.

Stairwells and elevator shaft enclosures shall consist of gypsum 2 hour construction at all levels.

Exterior wall framing shall receive 3-5/8" stud framing with insulation and vapor barrier to allow for voice, data and electrical work in the future.

Main lobby will include architectural grade drywall, coffered ceiling & metal pan ceiling. The elevator lobby on 2nd, 3rd and 4th floor will also receive a drywall ceiling.

Include exterior framing as required for Alucobond supports at parapet elements and upright locations.

## Section 9B - Ceramic and Granite Tile

Provide ceramic tile per drawings at the floor and wet walls (full height) in all public toilet areas.

Provide epoxy terrazzo in the entire main lobby area with tile base.

Provide porcelain tile boarder with cove base at 2nd, 3rd and 4th floor elevator lobbies.

## Section 9C - Acoustical Ceiling

Upgraded 2x2 White aluminum grid for acoustical ceiling furnished and installed at decorative soffit areas. No TI ceiling grid or pads are included.

## Section 9D - Carpeting and Flooring

Carpet in the tenant finish area shall be furnished and installed under the tenant finish contract.

Provide carpet inset at 2nd, 3rd and 4th floor elevator lobby areas.

Main stairwell to be upgraded with carpet. The 2 secondary stairs will have exposed concrete treads with painted stair stringers and drywall partitions.

Include heavy duty traffic rated sheet vinyl at lower level corridor areas.

## Section 9E - Painting

R.P. Appx. 098

The exterior of the building will be acid etched and include a one coat MODAC paint system on all surfaces.

Drywall ceilings and walls to receive two coats of paint.

All exterior sheet metal to receive two coats of paint.

All hollow metal doors and frames to receive two coats of paint.

All exposed miscellaneous metal to receive two coats of paint.

Painting will be provided in the stairways. Two secondary stairwells will have exposed concrete treads with exposed stringers and one stairway to be completely finished with drywall and carpet.

## DIVISION 10 - SPECIALTIES

Section 10A - Identifying Devices

All interior signage and directories will be provided by Koll Development.

Exterior signage will be provided by Koll Development. Include conduit and junction box for a building mounted sign and one conduit and junction box for an entry monument sign.

Section 10B – Partitions at Restrooms

Full height gypsum board with louvered wood doors and wood frames.

Section 10C - Toilet and Bath Accessories

(2) grab bars per handicap toilet stall.

(1) toilet tissue holder per toilet stall to hold two rolls of paper.

(1) paper towel dispenser/disposal per toilet rooms.

(1) sanitary napkin dispenser per ladies room.

(1) sanitary napkin disposal at each stall (ladies only).

lavatory top soap dispensers at each lavatory, per toilet room.

Section 10D – Dock Equipment

Provide dock bumpers and dock edge angle at indicated areas on architectural drawings.

Include one (1) 35,000 pound mechanical dock leveler (6'x7').

Section 10E – Fire Extinguisher Equipment

13

R.P. Appx. 099

Provide Code required quantity of stainless steel semi-recessed fire extinguisher cabinets for the base building.

Section 10F – Access Flooring

Under the shell budget, the access flooring will be stockpiled on the floor. The access flooring locations include all areas in the building besides the following: bathrooms, stairwells, dock areas, elevator lobby at upper levels, and complete 1st floor lobby areas from both main entries across the building.
Base Area -Provide 14" high raised access floor system at 1st, 2nd, 3$^{rd \, and \, 4th}$ floor levels to receive carpet tiles. Support system to be bolted pedestals. Tiles are concrete filled bare metal type with point load capacity of 1,000 lbs. No grounding is provided. An alternate has been provided to utilize 1,250lb for all access floors including laminate tile locations.

Electric Rooms - Provide 14" high raised access floor system with top finish of high-pressure laminate with integral trim. Support System to be pedestals. Tiles are concrete filled metal type with point load capacity of 1250 lbs. No grounding is provided. Material manufacturer is Tate Access Floors or equal.

Four panel lifters are included. Two emergency panel lifter wall plates are included.

## DIVISION 12 - FURNISHINGS

Section 12A - Horizontal Blinds

Blinds will be included at all exterior glass punched window systems. Blinds to be 1" horizontal mini-blinds equal to Bali or Levelor in a manufacturer.

Section 12B - Floor Mats and Frames

Provide one piece polypropylene mats with anodized aluminum frames at two (2) entry vestibules.

## DIVISION 14 - CONVEYING SYSTEMS

Section 14A - Hydraulic Elevators

Provide one (1) freight elevator with a 4,500# capacity. Interior cab shall be 5'-8" x 7'-10" x 9'-0" high.

Provide two (2) passenger elevator with a 3,500# capacity. Interior cab shall be 4'-9" x 6'-8" x 7'-4" high.

Freight elevator will include 1/2" thick damage control pads.

Passenger elevators will be center opening. Freight elevator will be side sliding.

Elevators will operate at 150 f.p.m. and operate on 208V, 3-phase, 60 hertz. Passenger elevator will have a 40hp motor. The freight elevator will have a 60hp motor.
Section 14A - Hydraulic Elevators (cont)

14

R.P. Appx. 100

Provide duplex micro-processor control.

Signals will be standard stainless steel finish, digital car position indicators with illuminated car and hall buttons.

In-car lantern with gong and floor passing signals.

Constant features will be a Lambda II infrared, multi-beam door reversal device with remote elevator monitoring REM ready, fire fighter service Phase I and Phase II and handicap and Braille markings.

## DIVISION 15 - MECHANICAL

Section 15A - Fire Sprinkler System

The contractor shall provide an engineered site five (5) protection layout for installation by others.

This building is classified as a Light Hazard occupancy. The combination sprinkler and standpipe system shall be hydraulically designed to deliver a density of 0.10 gpm. over the most remote 1,500 sq. ft. with hose stream allowance per local requirements. Any Ordinary Hazard Group I areas will be hydraulically designed for a density of 0.15 gpm. over the most remote 1,500 sq. ft. with 250 gpm for hose stream allowance per local requirements. The minimum flow rate for hydraulically most remote standpipe shall be 500 gpm. and 250 gpm. for each additional standpipe, with the total not to exceed 1,250 g.p.m. 100 psi at the top of the standpipe is required. Interconnect each standpipe at the lowest floor level. Provide control valve at the base of each standpipe. Provide roof manifold at required areas per UBC and IFC.

Include pump system if required by code incoming flow/pressure to meet building performance requirements. Contractor shall provide fire flow test on nearest available water supply.

Contractor to provide incoming service backflow preventer of the type required by local authorities.

Fire protection work starts at the flanged lead-in connection inside of the building.

Provide 1" outlets on branchline piping with 1" sprigs and upright brass sprinkler heads to protect the building shell areas. Upon tenant finish, upright sprinklers will be removed and replaced with pendent sprinklers per tenant requirements. In finished shell and core areas provide concealed heads located to work a pattern in the room.

The Fire Protection Contractor shall provide sprinkler head layout, hydraulic calculations, final fire pump and jockey pump selection based on hydraulic calculations, pipe routing with sizes and elevations as required by N.F.P.A. (latest edition) and insurance carrier.

All work shall comply with the fire protection requirements and codes of the City Building Department, the State and Local Fire Marshal and N.F.P.A. National Fire Codes.

Section 15A - Fire Sprinkler System (cont)

R.P. Appx. 101

The Contractor shall submit shop drawings (including device/equipment product data submittals) and hydraulic calculations to the municipality having jurisdiction and the Architect/Engineer prior to commencement of project and purchase of materials. Contractor shall submit as-built drawings and maintenance manuals as directed by the Architect/Engineer.

The Fire Protection Contractor shall coordinate his work with that of all other trades.

The Fire Protection Contractor shall guarantee all labor and materials for the period of one year from the date of completion.

Fire protection sprinkler piping shall be either Schedule 40 black steel pipe with screwed fittings or Schedule 10 black steel pipe with grooved fittings.

Sprinkler heads shall be UL listed and FM approved and shall be quick response rated at 155 deg. F (or temp required for location).

Contractor shall provide and install each of the following devices and pieces of equipment:

1) Fire department connection. (Polished chrome)
2) Fire hose connections and caps at each stair landing.
3) Floor control valves at each floor with drain visor.
4) Inspector's test connection for each zone.
5) Spare sprinkler cabinet with heads and wrench

Contractor shall provide sprinklers of the type installed for the use as spares to the building Owner. The number of sprinklers shall be as required by code. Contractor shall provide sprinkler wrench for each type of sprinkler supplied. Spare sprinkler cabinet shall be located next to the fire pump.
The Fire Protection Contractor is responsible for all leak damage due to system, installation and materials.

Contractor shall perform all tests on system as required by N.F.P.A., local code and insurance carrier.

All piping shall be suspended independently from building structure. Vertical pipe risers shall be supported at least once on each story height. Riser clamps at base of riser shall be supported at building structure. All supports and hangers shall be so constructed as to allow for proper pitch and expansion of pipes. Position exposed riser clamps so they do not create a tripping hazard.

Contractor shall remove all debris from job site daily to Clayco provided dumpster and leave all work and equipment in clean working condition.

Contractor shall provide and install all pipe sleeves. Sleeves shall be at least 1-1/2 times the size of the pipe and shall be similar material to prevent reaction between pipe and sleeve.

Contractor shall provide and install fire stopping as to completely seal all penetrations of fire rated assemblies, walls and ceilings caused by this trade. The system shall be installed
Section 15A – Fire Sprinkler System – continued

R.P. Appx. 102

according to an Underwriter's Laboratories approved through penetration fire stopping protection system, have been tested in accordance with ASTM #E-814 and UL #1479 and shall have an "F" rating not less than the required rating of the wall penetrated. The annular space between pipe and the fire rated assembly shall be filled with the approved material so as to maintain the integrity of the fire rating of the assembly penetrated. Insulation shall not pass through fire rated assemblies.

## Section 15B- Heating, Ventilating and Air Conditioning

Piping, except branch lines feeding heads in rooms, shall not pass through stairwells, five rated exit pathways, electrical rooms/closets, and tele/data rooms.

All heating, ventilating and air conditioning work will be designed and installed in accordance with the local adopted codes (including International Energy Code) and with the ASHRAE standards and guidelines, SMACNA standards and the outline below. All equipment with electrical connections will bear the UL Label and all refrigeration equipment will be labeled in accordance with ARI.

An HVAC system will be provided that utilizes four (4) packaged electric heating and electric cooling, down discharge, roof top package air conditioning units (RTUs). RTUs will provide 550 tons of capacity. The following features are required:

1) Return air bypass with damper, damper actuator and temperature control (supply air temperature must be re-heated to 61-62 degrees F).
2) Multiple stage electric heating coil (4 stages). Step controller required.
3) 100 % power exhaust.
4) 30 % filter section with 2 sets of throwaway filters. Also provide one set of construction filters in the units.
5) 0 to 100 % economizer with enthalpy control and low ambient lock out control.
6) Freeze stat protection.
7) Supply air temperature control.
8) DDC temperature control panel/module with BACNET & or LON capabilities as well as a human interface unit mounted panel.
9) Factory installed and wired unit electrical disconnect switch for a single point connection.
10) Factory installed and wired GFI convenience outlet.
11) Complete manufacturer's 1 year warranty for parts and labor from the date of start up.
12) Additional 4 year extended parts only compressor warranty.
13) High efficiency motors for supply and exhaust.
14) Complete static pressure control capabilities referencing outside, space, duct and under floor pressures.
15) Variable frequency drives on the supply fan as well as spring isolation.
16) 460 VAC / 60 HZ / 3 phase.
17) Hinged access doors.
18) Flat roof curb.
19) Low leak outside air dampers.
20) Low leak supply air dampers.
21) Independent control of outside and return air dampers.

Section 15B- Heating, Ventilating and Air Conditioning

R.P. Appx. 103

The system will be designed meeting the following design conditions:

Outdoor Design Conditions:
    Summer:    100°F DB/74°F WB
    Winter:    17°F WB

Indoor Design Conditions (occupied area):
    Summer:    75°F DB (+/-2) 50% RH
    Winter:72°F DB (+/-2)

| | |
|---|---|
| Outdoor Ventilation: | Per ASHRAE Standard - 20.0 CFM/person |
| Infiltration: | 1.0 CFM/linear foot of exposure |
| Heat Gain: | One person per 120 sq. ft. of occupancy |
| | 1.5 watts per sq. ft. demand for lighting |
| | 3.0 watts per sq. ft. miscellaneous power |
| Occupants: | 1 per 120 SF (at 245/155 sensible/latent BTU/Hr each). |

The design will be based on the use of tinted, double paned, insulated glass for curtain wall and at all other window areas with the blinds open.

Return air will be provided in perforated white finish. In the core areas only, insulated plenum type linear supply slot supply air diffusers in the ceiling will be provided. Exhaust grilles will be square, louvered faced. Return air grilles in each office and conference room (provided in tenant finish) will include acoustically lined sound boots. All in floor supply air will be delivered through the in floor VAV terminal / diffuser. The in floor air devices will be installed in the future T.I.

Zoning of fan terminals and VAV boxes shall not be less than 1 zone per 250 sq. ft. with a dedicated fan terminal unit in each building corner with two exterior exposures. Each fan powered box will incorporate an electric heating coil. All in floor FTUs and VAVs will be stockpiled to the floors and installed in the future T.I. In floor FTUs will be sized at maximum of 50 linear feet at the exposure.

Shell and core construction of toilets, corridor, etc. will be completed using VAV units with a maximum size of 1600 CFM each.

Cabinet unit heaters will be furnished in the vestibules. Heating and cooling will be provided to main stairways and entry vestibule. Temporary heat will be installed by providing and installing (4) 10 kW electric unit heaters above ceiling height per floor. These will be disabled once the in floor FTUs are installed in the T.I. build out.

Exhaust fans will be provided to ventilate the janitor's closets and main toilet rooms. The system will be sized at a minimum of 2 CFM/SF of exhaust for toilet rooms and janitor's closets. Make-up air for the toilet rooms will be provided from HVAC supply air devices. Toilet rooms will be provided with exhaust grilles.

Exhaust for the elevator machine rooms will be provided.

Stairways will be provided with cabinet unit heaters.

R.P. Appx. 104

Fire pump room will be served by a 5 kW electric unit heater.

The dock area will be served by a 10 kW electric unit heater.

Elevator shafts shall have pressure relief as required by code.

All electric rooms will be exhausted. Make up air will be supplied from HVAC supply air devices.

Fire dampers, smoke dampers and combination fire/smoke dampers will be provided as required by code.

## Materials and Methods

Ductwork will be galvanized sheet metal, constructed per latest edition of the SMACNA and ASHRAE. Traverse joints on medium pressure system will be sealed with Hard cast. Insulated, Class 1 flexible air ductwork will be used for the connections from medium pressure trunk ductwork to variable air volume units, fan terminal units and slot diffusers. Acoustical duct lining or flexible duct wrap insulation will be provided where required to avoid noise and condensation. Sound attenuation will be provided as required to achieve an overall maximum NC-40 level in the office spaces.

Vertical medium pressure duct risers will be provided from the RTUs to each floor with, and a duct loop on each tenant floor will be provided. Acoustically lined, hard return air duct risers, in shafts, from the lower floors to the RTUs will be provided with a stub out on each floor. On top floor, a minimum of 20 LF of acoustically lined return air duct from the RTU serving this floor will be provided.

All medium velocity ductwork risers installed in vertical shafts shall be acoustically lined, with lining extending horizontally 20' from the main riser on each floor.

Return air duct and supply air duct mounted smoke detectors will be provided for all air handling units 2000 CFM and greater.

A complete direct digital temperature control and building management system will be provided. Standard features including local PC workstation, dial in and out modem, and complete color graphics to the VAV level. All wiring, software, hardware, sensors, actuators, and control panels will be included for a complete and functional system. All core and parking lot lighting will be controlled and wired to the BMS. Lighting contactors will be provided by Division 16, low voltage wiring to the contactors will be by Division 15. All low voltage temperature control wiring will be plenum rated.

## Section 15C – Plumbing

All plumbing work will be designed and installed in accordance with the codes listed in Section 1A of this outline specification. All equipment with electrical connections will bear the UL Label.

R.P. Appx. 105

Soil, waste, vent, storm and water piping systems will be designed and installed in accordance with the requirements of the local plumbing code.

Soil, waste, and vent piping will be service weight, no-hub cast iron above grade in plenum areas. Schedule 40 PVC may be used otherwise including underground.

Storm water piping will be Schedule 40 PVC above and below grade. Roof drainage will be provided by the use of 6" inboard roof drains. The piping system will connect to storm sewer below first floor grade and exit building foundation wall.

An overflow roof drain system will be provided and will be sized the same as the primary system and connected to a separate piping system within the building. The secondary system is to terminate near through the wall near grade.

Water distribution piping will be Type "K" copper below grade and "L" copper above grade.

Water closets will be wall mounted white vitreous china, open front seats, and with battery operated flush valves.

Urinals will be wall hung, white vitreous china, floor carrier type, with battery operated flush valves.

Lavatories will be integral with the countertop with chrome plated battery operated sensor type faucet, grid drain, P trap with cleanout plug, flexible risers, and stops. Insulation of exposed piping and hot surfaces for handicapped lavatories will be provided.

Mop basins will be 24" x 24" floor set terrazzo with mop hanger, 24" hose, 4" handles, bucket hook, and elevated vacuum breaker.

Brushed stainless steel, dual-level, semi-recessed, barrier-free self contained electric water coolers located at each floor.

Provide three (3) wet columns (water, waste and vent).

Provide 1-1/2" water connection with valve at toilet core area.

Electric water heaters for toilet rooms sized per local plumbing code and ASHRAE guidelines will be provided. Relief valves will be piped to floor drain. Include For piped systems longer than 100 lineal feet a hot water recirculation loop with pump and aqua stat will be provided.

General purpose and toilet room floor drains will be cast iron with nickel bronze, heel proof grates.

A dry sump will be provided for each elevator pit – dry sumps to be pumped out with portable sump pump provided by building maintenance.

Mechanical room floor drains will be medium duty, cast iron, and loose set top with sediment bucket.

R.P. Appx. 106

<u>Section 15C – Plumbing - continued</u>

Roof drains will be cast iron with sump receiver, under deck clamp, adjustable extension and cast iron mushroom dome (plastic domes not acceptable).

Overflow drains will be cast iron with sump receiver, under deck clamp, adjustable extension, exterior water dam and cast iron mushroom dome.

A minimum of 3 frost-proof wall hydrants will be provided at grade. Also 2 hydrants will be provided at the roof level for use for window washing.

4" incoming domestic water service will be provided with a gate valve, a reduced pressure backflow preventor (type as required by local plumbing code), a pressure gauge and with the drain piped to a floor drain. A valved and capped 1-1/2" line for irrigation system backflow preventor and piping system will be provided. The irrigation system is not included.

Insulation will be provided on all vertical and horizontal domestic water, including inside of wet chases, and on all horizontal downspout piping and roof/overflow drain bodies.

A stubbed out sanitary sewer and vent connection will be provided on each side of each toilet room wet wall opening onto the tenant space or corridor for future connections. Provide at each location, a valved and capped 1" domestic cold water stub out.

Provide the following fixtures:

1.    Toilets (wall hung flushometer type)
2.    Handicap toilets (wall hung flushometer type)
3.    Urinals (wall hung flushometer type)
4.    EWC (drinking fountains)
5.    Lavatories (custom), each with (3) bowls
6.    Janitor mop sinks
7.    Hot water heaters

<u>General</u>
All systems will be designed and installed in accordance with all federal, state and local code enforcement agencies, ADA regulations, the Fire Marshall and the local building department.

<u>Scope of Work</u>
Water Service and Distribution, Plumbing Fixtures and Storm Water System
Sanitary, Waste and Vent System

<u>Water Service and Distribution</u>
Underground domestic water piping will extend from water meter with minimum system pressure for core/shell total fixture counts. Backflow preventer will be provided at point of service, separate from fire protection service. Water service will be metered within service pit.

Three (3) hose bibbs around perimeter of building, one (1) hose bibb on roof and (1) 1-1/2" irrigation system connections will be provided.

Include dual level electric water cooler at each bathroom core.

R.P. Appx. 107

<u>Section 15C – Plumbing – continued</u>

Elevator sump and code required discharge will be provided.

Water service is not sized for any special tenant load requirements.

<u>Domestic Water Systems</u>
The Core/shell system will include hot and cold water service and insulated distribution piping to all core areas and stub connections/valves for tenant areas.

Fixtures will include commercial grade products in all bathrooms, ADA compliant. Any exposed plumbing lines (supply and waste) will be chrome plated with appropriate wall escutcheons at penetrations. All plumbing fixtures will be installed with shut-off valves. Drinking fountains with central remote chiller will be provided per code. Domestic hot water will be provided from electric water heaters.

No special water, gas, air or vacuum systems are included for tenant areas.

All water systems will be tested and approved for final use.

<u>Storm Systems</u>
Roof drain bodies and horizontal leader runs to be insulated. A properly sized roof drainage system including roof drains, vertical piping and storm piping under the building will be provided. Roof drain collector pipe system will connect into exterior storm system piping. Include emergency overflow piping from roof drain locations to location above finished grade.

Office ceiling space to be used as a return-air plenum.

<u>Sanitary System</u>
The sanitary sewer will be stubbed into the building and extend through core/shell areas and be stubbed into tenant areas for future interconnection. No special waste provisions are included for lab waste.

<u>Materials</u>
Domestic water system: Type L and M copper, above floor, Type K below floor.

Sanitary system: PVC above floor, cast iron below floor.

Storm system: PVC above floor, cast iron below floor.

## DIVISION 16 – ELECTRICAL DESIGN BUILD

<u>General</u>
All systems will be designed and installed in accordance with all federal, state and local code enforcement agencies, ADA regulations, the Fire Marshall and the local building department.

<u>Temporary and Construction Power</u>
Temporary service and distribution will be provided to all project trailers, electric scaffolds and accessories, welding machines and power and lighting loads. Temporary power service and

R.P. Appx. 108

distribution will be protected in accordance with OSHA requirements. Lighting levels and distribution will be included in all areas to achieve code-required foot-candle levels.

Electrical Service
Service to the building will include (2) 4"C. underground raceway from the property line to electric utility company pad mounted service transformer. The electric utility company will provide underground primary cables, service transformer. Building will be metered at electric utility company secondary voltage rate.

Current transformers, meter compartments, etc. will be included with service switchboards as required by electric utility company.

Secondary underground conduits/cables and terminations from service transformer to interior service switchboard will be provided. A separately metered power service will originate from the electric utility company service transformer to a 75HP fire pump for the building (add alternate, if required by code). Installation and protection of secondary service conductors will be in conformance with NEC.

Telecommunications Systems Service
Service to the building will include (6) 4"C. underground raceways from the property line to the demarcation point within the building. Telecom utility company will provide all service conductors and/or fiber to tenant areas.

A 4'x8' plywood backboard, a dedicated isolated ground bar and a 20A duplex receptacle will be provided at the demarcation point and at each Telecom Room. Tenants/Owner will provide all data and voice wiring and equipment for the building including elevator phone service. Rough-in boxes and conduits will be provided in all core/shell finished office areas.

(2) 4"C. conduit sleeves will be provided through floor slab between Telecom Rooms.

Power Distribution
Service switchboard will include service connection equipment; space for utility company equipment; feeder overcurrent devices to support connected loads outlined. Service switchboard will be rated 480/277V, 3P, 4W Large equipment loads will be 480V, 3 phase; lighting loads will be 277V, 1 phase or 480V, 1 phase; small receptacle and appliance loads will be 120V, 1 phase. Service switchboard will include digital metering and integral TVSS protection on the incoming main.

480/277V panelboards will be provided on each floor and sized to support 1.5W/SF tenant area lighting. Step down transformers and 120/208V panelboards will be provided on each floor to support 3.5W/SF tenant receptacle and equipment power. 480/277V and 120/208V single and multi-pole breakers will be provided within floor panelboards for tenant areas lighting and power loads. Conduits will be installed from tenant receptacle panelboards stubbed into depressed floor slab areas for floor box wiring by tenants.

Separate 480/277V panelboards will be provided on each floor to support tenant area under floor electric fan terminal units. Conduits will be installed from floor HVAC panelboards stubbed into depressed floor slab areas for underfloor fan terminal units by tenants. A separate

R.P. Appx. 109

Section 16A – Electrical – Continued

panelboard will be provided on the 3ʳᵈ Floor Level to support rooftop HVAC units and equipment .

Elevator equipment, trash compactor, domestic water heaters, entry or room electric heaters, etc. will be served from available 480V distribution within building. Site lighting circuits will be fed from 1ˢᵗ Floor lighting panelboard. Core/shell lighting and power circuits will be shared with tenant area lighting and power panelboards.

New power Distribution and Lighting/Appliance panelboards will be dead front furnished with branch protective devices, main bus, main breakers, with AIC rating for available fault current at installed location. Main buses and connectors will be hard drawn copper or tin plated aluminum. Framed directories with protective plastic facing will be attached to the inside of panelboards and
be neatly filled out to identify all circuits and loads. 25% spare breaker and space capacity will be provided.

Circuit breakers will be quick make - quick break, molded case type with the tripping position midway between on and off. Breakers will be the bolt-on type with common trip for multi-pole application. Breakers indicated to be used for lighting circuit control will be switch rated. Fuses will be UL approved and listed for application, NEMA PB-1 complaint.

Step down transformers will be factory-assembled and -tested, air-cooled units for 60-hz service. Grain-oriented cores, non-aging silicon steel. Continuous copper or aluminum coil windings without splices, brazed or pressure type internal coil connections. Comply with NEMA ST 20, and list and label as complying with UL 1561. Enclosures will be ventilated, NEMA 250, Type 2. Insulation class: 220 degree C., UL-component-recognized insulation system with a maximum of 150 degree C. rise above 40 degree C. ambient temperature. Transformers may be hung from structure where acceptable by local authorities.

Receptacle/Equipment Connections
Duplex receptacles will be provided within all core/shell finished corridors 50 feet on center along all routes. Weatherproof duplex receptacles will be provided at all roof-mounted equipment per NEC. Duplex dedicated duplex receptacles will be provided per 200SF within each Electric Room, Mechanical Room, Telecom Room. All wiring devices will be 20A, 125V specification grade. Receptacles will be mounted 18" AFF and will include plastic coverplates.

Tenant will furnish and install all above and below floor lighting and receptacle branch circuit wiring within all tenant areas. No power-data floor boxes are stockpiled on floors. No bay boxes for tenant wiring is included.

Grounding
A fully grounded electrical system per NEC requirements will be provided. Feeder and branch circuits will contain safety ground conductors in lieu of raceway serving as grounding means. No column grounding or building ground loop will be provided except for separately device systems such as transformers, UPS systems, etc.

Lighting Systems
Core/shell lighting will include recessed 3 lamp, (18) 3" deep cell, 2'x4' parabolic troffer fixtures for one fixture every 80SF all finished corridor routes; fluorescent downlights with

R.P. Appx. 110

specular clear alzak reflectors in Entry and Elevator Lobbies and within Restrooms; pendant shop lights in all Elect/Mech Rooms, Janitors Closets, etc. Fluorescent fixtures will utilize electronic ballasts and T-8 lamps.

Tenant Area lighting, branch circuit wiring and control wiring will be provided by tenants during build out and are not included in core/shell. Minimal lighting will be provided within empty tenant areas to support owner and code officials requirements.

Exit signs and emergency egress lighting will be provided along all core/shell egress paths. Life safety lighting will be powered from self-contained battery units.

Exterior metal halide HID site lighting pole mounted fixtures will be provided along all entry and parking areas. Average maintained exterior foot-candle values will be 1.5 for roadway and parking areas. Control of exterior lighting will be from contactors at source panelboards with temperature control system ON/OFF interface.

A material only allowance of $10,000 for decorative Front Office lighting; entry canopy; monument sign lighting, flagpole lighting and exterior entry bollards is included. (This is included as part of the current DFW design.)

Fire Alarm System
Building will include a system with devices, control and signaling in compliance with local authority having jurisdiction and specific project requirements. System will include furnishing and installing heat detectors; smoke detectors within each Electrical and Mechanical Room; manual pull stations; fire alarm annunciator panel at main entrance and AutoDial connections to central monitoring agency.

Duct smoke detectors for all ventilation units over 2,000 CFM will be furnished and installed by HVAC contractor, devices will be monitored by building fire alarm system; duct smoke detectors will be provided by electrical contractor on each floor at each return air opening into return air shaft back to each rooftop unit.

Smoke detectors will be provided at each elevator lobby, Elevator Equipment Room, elevator pit and top of elevator shafts. Heat detectors will be provided in each Elevator Equipment Room, elevator pit and top of elevator shafts. Monitoring and control functions will be in conformance with ASME A17.3-93, Safety Code for Elevators and Escalators.

Signal devices, strobes and horns will be provided within areas in accordance with NFPA, ADA Guidelines and local authority having jurisdiction. Connections to fire sprinkler system water flow switches and tamper switches will be provided.

Fire pump and jockey pump controller monitoring modules will be included (add alternate as / if required by code).

Initiation and signal devices within tenant areas are not included, but main fire alarm panel will be sized to accept initiation and signal devices installed by tenants, based on an open plan finish-out concept.

R.P. Appx. 111

Section 16A – Electrical – Continued

Lightning Protection System
A UL Listed, Master labeled lightning protection system complete with rooftop air terminals, roof conductors, down conductors, perimeter counterpoise and driven ground rods.

Materials
All feeder circuits will be THHN/THWN copper or aluminum conductors. All branch circuits will be THHN/THWN copper conductors. UL Type MC feeder cables will be acceptable for use. UL Type MC cable will be acceptable for branch circuit use. Modular wiring systems will be used for all Office lighting circuits. Feeders and branch circuits will be routed below floor slabs in all areas.

The following types of conduits will be allowed for specific applications as follows:

| | |
|---|---|
| Site Lighting | PVC |
| Feeders – Underground | PVC |
| Feeders – Exposed | IMC, EMT (above 7' AFF) |
| Branch Circuits – Concealed | RGS, IMC, EMT, MC Cables |

## ADDITIONAL CLARIFICATIONS

Contract Documents
The scope of work is based upon Clayco Outline Specification dated December 6, 2005, Architectural drawings through Progress Set # 1 dated 10/07/05, Structural drawings and Tilt-Up Wall drawings through Pricing Set dated 10/14/05, and Civil drawings through Pricing Set dated 10/15/05 and as further clarified in this exhibit to the Agreement ("Outline Specifications").

LEED
The estimate is based upon achieving basic LEED certification for Core & Shell (24 points). No allowances are included for achieving a higher rating.

## ADDITIONAL CLARIFICATIONS

Contract Documents
The scope of work is based upon Clayco Outline Specification dated October 20, 2005 and design drawings from Forum dated October 21, 2005 and as further clarified above and below.

LEED
The estimate is based upon achieving basic LEED certification for Core & Shell (24 points) based upon current design assumptions. No allowances are included for achieving a higher rating.

Exclusions
The following work is excluded from the GMP:

1)   Payment & Performance Bond
2)   Utility use fees
3)   Additional Commissioning required for LEED certification

R.P. Appx. 112

Exclusions (Con't)

4) On-site materials testing services
5) Design services for tenant area build-out
6) Cleanup for owner or TI work
7) Hazardous materials remediation
8) LEED certification costs (Koll has hired Gensler for this process)
9) Painting of interior steel joist and decking
10) Ceiling grid or pads for Tenant Areas
11) Factory Mutual requirements
12) Tenant improvements
13) Undercutting of existing and new subgrade due to poor or unsuitable soil conditions
14) Excludes rock removal or blasting
15) Site fencing & gates
16) Flag poles
17) Trash enclosure
18) Compactor
19) Foundation drainage system
20) Metal lockers
21) Interior or exterior signage
22) Furniture, fixtures and unspecified equipment
23) Installation of raised floor system except at core areas
24) Elevator to the roof
25) Specialty Glass at Decorative Stair or 2nd Level Rail
26) Separate gas or electric meters
27) Gas service to building
28) Building humidification or dehumidification
29) Temporary heating of tenant spaces
30) Tenant area lighting and power branch circuit wiring and light fixtures
31) Tenant area fire alarm devices
32) Tenant Finish Lighting or Power Work
33) Standby power system or Emergency power generation
34) Public Address System
35) Data, Voice, Video Systems
36) Security Systems
37) Excludes accent lighting for metal screen walls @ roof
38) Utility company fee relating to phone, fiber and Gas or Electric
39) Mudslab below crawl space

Miscellaneous Clarifications
1) The access flooring will be stockpiled on each floor as required for future installation by the tenants. Installation of the floor is only included in the Core areas.
2) Our estimate is based upon the minimum lighting as required by applicable codes for the tenant spaces.
3) Our estimate assumes that the excess topsoil and vegetation will be stockpiled for use as fill in the sloped areas north and west of the building.
4) Steel and concrete bids are based upon the 11-23-05 documents.
5) About 20,000 cy of excess material will be loaded and hauled off site by HL Merrill.

R.P. Appx. 113

<u>Allowances</u>
The GMP includes the following allowances:

| | | |
|---|---|---|
| 1) | Entry sidewalks and hardscaping upgrades | $25,000 |
| 2) | Landscaping | $225,000 |
| 3) | Irrigation system | $75,000 |
| 4) | Wood, stone & metal trim at main lobby | $25,000 |
| 5) | Wood & metal trim at level 2 & 3 & 4 lobbies | $7,500 |
| 6) | Light bollards and building accent lighting @ main building entrances—now part of design | |
| 7) | Revolving entrance door—now part of design | |
| 8) | Elevator Cab finishes—now part of design | |

See the Drawing List, attached hereto as Attachment A.

R.P. Appx. 114

# CLAYCO
THE ART & SCIENCE OF BUILDING

| Intellicenter - Dallas | Project # 7-106-005 | Clayco, Inc. |
|---|---|---|
| 3701 Regent Blvd. | Tel:   Fax: | |
| Irving, Texas 75063 | | |

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|---|---|---|---|---|---|---|---|---|---|
|  | | | | | | | | | |
| INDEX | | Drawing Index | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C1 | | Cover Sheet | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C2 | | Grading Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C3 | | Underfloor Grading Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C4 | | Drainage Area Map | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C5 | | Storm Sewer Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C6 | | Storm Sewer Profiles | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C7 | | Utility Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C8 | | Paving Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C9 | | Turn Lane Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C10 | | Turn Lane Plan and Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C11 | | Paving Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C12 | | Erosion Control Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C13 | | Erosion Control Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C14 | | City of Irving Storm Water Pollution Prevention Methods | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C15 | | City of Irving Storm Water Pollution Prevention Details | 10/21/2005 | | 0 | | | Progress Print 1 | |

R.P. Appx. 115                                EXHIBIT A

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|---|---|---|---|---|---|---|---|---|---|
| C16 | | City of Irving Storm Sewer Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C17 | | City of Irving Inlet Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C18 | | City of Irving Trench Embedment, Backfill, and Pavement Repair Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C19 | | City of Irving Details for Trench Sheeting, Shoring, Sloping for Trenches over 5' Deep | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C20 | | City of Irving Water and Sanitary Sewer Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C21 | | City of Irving Sanitary Sewer Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A0-01 | | Life Safety Plans & Code Data | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A0-02 | | Rated Structure Plans | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A1-01 | | Architectural Site Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-01 | | Overall Crawl Space and First Floor Plans | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-02 | | Overall Second and Third Floor Plans | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-03 | | Overall Fourth Floor and Roof Plans | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-11 | | Partial First Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-12 | | Partial First Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-21 | | Partial Second Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-22 | | Partial Second Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-31 | | Partial Third Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-32 | | Partial Third Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-41 | | Partial Fourth Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-42 | | Partial Fourth Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-51 | | Partial Roof Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-52 | | Partial Roof Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |

R.P. Appx. 116                              EXHIBIT A

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|------------|--------|----------|---------------|----------|
| A2-53 | | Roof Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-54 | | Roof Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A3-01 | | Overall Elevations | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A3-02 | | Enlarged Elevations | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A3-03 | | Enlarged Elevations | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A3-04 | | Enlarged Elevations | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A3-05 | | Enlarged Elevations | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A3-10 | | Building Sections | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A3-11 | | Building Sections | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A4-01 | | Enlarged Plans, Toilet Rooms & Lobby | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A5-00 | | Interior Elevations, Typical Information | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A5-01 | | Interior Elevations, Lobby | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A5-02 | | Interior Elevations, Toilet Rooms | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A6-11 | | Partial First Floor Ceiling Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A6-12 | | Partial First Floor Ceiling Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A6-21 | | Partial Second Floor Ceiling Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A6-22 | | Partial Second Floor Ceiling Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A6-31 | | Partial Third Floor Ceiling Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A6-32 | | Partial Third Floor Ceiling Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A6-41 | | Partial Fourth Floor Ceiling Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A6-42 | | Partial Fourth Floor Ceiling Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A7-01 | | Elevator Plans & Sections | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A7-02 | | Elevator Sections | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A7-03 | | Elevator Details | 10/21/2005 | | 0 | | | Progress Print 1 | |

R.P. Appx. 117                                        EXHIBIT A

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|-----------|--------|----------|---------------|----------|
| A7-11 | | Stair 1 Sections & Plans | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A7-12 | | Stair 2 Sections & Plans | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A7-13 | | Stair Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A8-01 | | Wall Sections | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A8-02 | | Wall Sections | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A8-03 | | Wall Sections | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A8-04 | | Wall Sections | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A9-01 | | Partition Types and Details, Door & Frame Types & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A9-02 | | TYP Vapor Barrier & Window Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A9-03 | | Window Frame Types | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A9-10 | | Plan Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A9-11 | | Plan Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A9-20 | | Exterior Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A9-21 | | Exterior Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A9-22 | | Exterior Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A10-01 | | Interior Details, Toilet Rooms | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A10-02 | | Interior Details, 1st Level Lobby | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A10-03 | | Interior Details, 2nd Level Lobby | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A11-11 | | Partial Finish Plans, First Floor | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A11-12 | | Partial Finish Plans, First Floor | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A11-21 | | Partial Finish Plan, Second Floor | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A11-22 | | Partial Finish Plan, Second Floor | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A11-31 | | Partial Finish Plan, Third Floor | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A11-32 | | Partial Finish Plan, Third Floor | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A11-41 | | Partial Finish Plan, Fourth Floor | 10/21/2005 | | 0 | | | Progress Print 1 | |

R.P. Appx. 118                                        EXHIBIT A

CLAYCO

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|-----------|--------|----------|---------------|----------|
| A11-42 | | Partial Finish Plan, Fourth Floor | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S1-01 | | General Notes | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S1-02 | | Typical Sections & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S1-03 | | Typical Sections & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S1-04 | | Typical Sections & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-01 | | Partial Pier Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-02 | | Partial Pier Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-11 | | Partial Foundation Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-12 | | Partial Foundation Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-21 | | Partial Second Floor Framing Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-22 | | Partial Second Floor Framing Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-31 | | Partial Third Floor Framing Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-32 | | Partial Third Floor Framing Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-41 | | Partial Fourth Floor Framing Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-42 | | Partial Fourth Floor Framing Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-51 | | Partial Roof Framing Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-52 | | Partial Roof Framing Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S3-01 | | Foundation Section and Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S3-02 | | Foundation Section and Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S4-01 | | Framing Section & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S4-02 | | Framing Section & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S4-03 | | Framing Section & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S4-04 | | Framing Section & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S5-01 | | Column Schedule & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S6-01 | | Brace Elevation & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |

R.P. Appx. 119                                        EXHIBIT A

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|---|---|---|---|---|---|---|---|---|---|
| MEP1.00 | | Cover Sheet | 10/21/2005 | | 0 | | | Progress Print 1 | |
| MP1.01 | | Site Plan, Mechanical/Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M2.11 | | Partial First Floor Plan - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M2.12 | | Partial First Floor Plan - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M2.21 | | Partial Second Floor Plan - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M2.22 | | Partial Second Floor Plan - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M2.31 | | Partial Third Floor Plan - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M2.32 | | Partial Third Floor Plan - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M2.41 | | Partial Fourth Floor Plan - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M2.42 | | Partial Fourth Floor Plan - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| MEP2.51 | | Partial Roof Plan - Mechanical/Electrical/Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| MEP2.52 | | Partial Roof Plan - Mechanical/Electrical/Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M3.01 | | Partial Enlarged Plans - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M3.02 | | Partial Enlarged Second Floor Plans - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M3.03 | | Partial Enlarged Third Floor Plans - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M3.04 | | Partial Enlarged Fourth Floor Plans - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M4.01 | | Mechanical Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M4.02 | | Mechanical Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M5.01 | | Mechanical Schedules | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.01 | | Partial Underfloor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |

R.P. Appx. 120                                              EXHIBIT A

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|------------|--------|----------|---------------|----------|
| P2.02 | | Partial Underfloor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.11 | | Partial First Floor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.12 | | Partial First Floor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.21 | | Partial Second Floor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.22 | | Partial Second Floor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.31 | | Partial Third Floor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.32 | | Partial Third Floor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.41 | | Partial Fourth Floor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.42 | | Partial Fourth Floor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P3.01 | | Partial Enlarged Plans - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P4.01 | | Plumbing Riser Diagrams | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P5.01 | | Plumbing Details and Schedules | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P5.02 | | Plumbing Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E1.01 | | Site Plan Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E2.11 | | First Floor Plan Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E2.12 | | Partial First Floor Plan Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E2.21 | | Partial Second Floor Plan Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E2.22 | | Partial Second Floor Plan Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E2.31 | | Partial Third Floor Plan Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E2.32 | | Partial Third Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |

**R.P. Appx. 121**                                         EXHIBIT A

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|------------|--------|----------|--------------|----------|
| | | Electrical | | | | | | | |
| E2.41 | | Partial Fourth Floor Plan Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E2.42 | | Partial Fourth Floor Plan Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E4.01 | | Single Line Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E4.02 | | Details Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| EL2.11 | | Partial First Floor Plan Lighting | 10/21/2005 | | 0 | | | Progress Print 1 | |
| EL2.12 | | Partial First Floor Plan Lighting | 10/21/2005 | | 0 | | | Progress Print 1 | |
| EL2.21 | | Partial Second Floor Plan Lighting | 10/21/2005 | | 0 | | | Progress Print 1 | |
| EL2.22 | | Partial Second Floor Plan Lighting | 10/21/2005 | | 0 | | | Progress Print 1 | |
| EL2.31 | | Partial Third Floor Plan Lighting | 10/21/2005 | | 0 | | | Progress Print 1 | |
| EL2.32 | | Partial Third Floor Plan Lighting | 10/21/2005 | | 0 | | | Progress Print 1 | |
| EL2.41 | | Partial Fourth Floor Plan Lighting | 10/21/2005 | | 0 | | | Progress Print 1 | |
| EL2.42 | | Partial Fourth Floor Plan Lighting | 10/21/2005 | | 0 | | | Progress Print 1 | |
| 02466 | - | Drilled Piers | 10/21/2005 | | 0 | | | 9 Pages | |
| 03300 | 0 | Cast-In-Place Concrete | 10/21/2005 | | 0 | | | | |
| 03301 | - | Under Slab Vapor Barrier/Retarder | 10/21/2005 | | 0 | | | 2 Pages | |
| 03470 | - | Tilt-Up Concrete Construction | 10/21/2005 | | 0 | | | 6 Pages | |
| 03490 | - | Glass Fiber Reinforced Precast Concrete | 10/21/2005 | | 0 | | | 5 Pages | |
| 05120 | - | Structural Steel | 10/21/2005 | | 0 | | | 6 Pages | |
| 05210 | - | Steel Joists | 10/21/2005 | | 0 | | | 6 Pages | |
| 05310 | - | Steel Deck | 10/21/2005 | | 0 | | | 2 Pages | |
| 05500 | - | Metal Fabrications | 10/21/2005 | | 0 | | | 7 Pages | |
| 05511 | - | Metal Stairs | 10/21/2005 | | 0 | | | 8 Pages | |
| 05521 | - | Pipe and Tube Railing | 10/21/2005 | | 0 | | | 8 Pages | |

R.P. Appx. 122                                    EXHIBIT A

CLAYCO

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|------------|--------|----------|--------------|----------|
| 05811 | - | Architectural Joint System | 10/21/2005 | | 0 | | | 8 Pages | |
| 06100 | - | Rough Carpentry | 10/21/2005 | | 0 | | | 5 Pages | |
| 06402 | - | Interior Architectural Woodwork | 10/21/2005 | | 0 | | | 5 Pages | |
| 07170 | - | Bentonite waterproofing | 10/21/2005 | | 0 | | | 5 Pages | |
| 07210 | - | Building Insulation | 10/21/2005 | | 0 | | | 7 Pages | |
| 07412 | - | Metal Wall Panels | 10/21/2005 | | 0 | | | 9 Pages | |
| 07540 | - | Thermoplastic Membrane Roofing | 10/21/2005 | | 0 | | | 6 Pages | |
| 07620 | - | Sheet Metal Flashing and Trim | 10/21/2005 | | 0 | | | 5 Pages | |
| 07720 | - | Roof Accessories | 10/21/2005 | | 0 | | | 3 Pages | |
| 07811 | - | Sprayed Fire- Resistive Materials | 10/21/2005 | | 0 | | | 5 Pages | |
| 07842 | - | Fire Resistive Joint Systems | 10/21/2005 | | 0 | | | 4 Pages | |
| 07920 | - | Joint Sealants | 10/21/2005 | | 0 | | | 7 Pages | |
| 08110 | - | Steel Doors and Frames | 10/21/2005 | | 0 | | | 5 Pages | |
| 08125 | - | Interior Aluminum Frames | 10/21/2005 | | 0 | | | 4 Pages | |
| 08211 | - | Flush Wood Doors | 10/21/2005 | | 0 | | | 4 Pages | |
| 08311 | - | Access Doors | 10/21/2005 | | 0 | | | 5 Pages | |
| 08331 | - | Overhead Coiling Doors | 10/21/2005 | | 0 | | | 4 Pages | |
| 08410 | - | Aluminum Entrances and Storefronts | 10/21/2005 | | 0 | | | 10 Pages | |
| 08470 | - | Revolving Entrance Doors | 10/21/2005 | | 0 | | | 7 Pages | |
| 08620 | - | Unit Skylights | 10/21/2005 | | 0 | | | 3 Pages | |
| 08711 | 0 | Door Schedule | 10/21/2005 | | 0 | | | | |
| 08800 | - | Glass & Glazing | 10/21/2005 | | 0 | | | 7 Pages | |
| 08830 | - | Mirrors | 10/21/2005 | | 0 | | | 5 Pages | |
| 08911 | - | Glazed Aluminum Curtain Wall | 10/21/2005 | | 0 | | | 9 Pages | |
| 09000 | 0 | Material Legend | 10/21/2005 | | 0 | | | 2 Pages | |
| 09253 | - | Gypsum Sheathing | 10/21/2005 | | 0 | | | 3 Pages | |

R.P. Appx. 123                                    EXHIBIT A

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|---|---|---|---|---|---|---|---|---|---|
| 09260 | - | Gypsum Board Assemblies | 10/21/2005 | | 0 | | | 14 Pages | |
| 09265 | - | Gypsum Board Shaft-Wall Assemblies | 10/21/2005 | | 0 | | | 5 Pages | |
| 09310 | - | Ceramic Tile | 10/21/2005 | | 0 | | | 7 Pages | |
| 09402 | - | Epoxy Terrazo | 10/21/2005 | | 0 | | | 5 Pages | |
| 09514 | - | Acoustical Pan Ceilings | 10/21/2005 | | 0 | | | 4 Pages | |
| 09653 | - | Resilient Wall Base | 10/21/2005 | | 0 | | | 4 Pages | |
| 09861 | - | Carpet Tile | 10/21/2005 | | 0 | | | 3 Pages | |
| 09912 | - | Painting | 10/21/2005 | | 0 | | | 9 Pages | |
| 09970 | - | Special Wall Surfaces (Fiberglass Reinforced Plastic Panels) | 10/21/2005 | | 0 | | | 4 Pages | |
| 09980 | 0 | Special Coatings for Concrete Surfaces | 10/21/2005 | | 0 | | | | |
| 10270 | - | Access Flooring | 10/21/2005 | | 0 | | | 6 Pages | |
| 10520 | - | Fire Protection Specialties | 10/21/2005 | | 0 | | | 5 Pages | |
| 10801 | - | Toilet Accessories | 10/21/2005 | | 0 | | | 3 Pages | |
| 11160 | - | Loading Dock Equipment | 10/21/2005 | | 0 | | | 5 Pages | |
| 12491 | - | Horizontal Blinds | 10/21/2005 | | 0 | | | 3 Pages | |
| 14240 | - | Hydraulic Elevators | 10/21/2005 | | 0 | | | 8 Pages | |
| 15010 | - | Basic Mechanical Requirements | 10/21/2005 | | 0 | | | 4 Pages | |
| 15071 | - | Mechanical Vibration Controls | 10/21/2005 | | 0 | | | 4 Pages | |
| 15081 | - | Duct Insulation | 10/21/2005 | | 0 | | | 8 Pages | |
| 15083 | - | Pipe Insulation | 10/21/2005 | | 0 | | | 10 Pages | |
| 15100 | - | Valves | 10/21/2005 | | 0 | | | 7 Pages | |
| 15135 | - | Meters and Gages | 10/21/2005 | | 0 | | | 4 Pages | |
| 15140 | - | Hangers and Supports | 10/21/2005 | | 0 | | | 4 Pages | |
| 15300 | - | Fire Suppression Piping | 10/21/2005 | | 0 | | | 14 Pages | |
| 15411 | - | Water Distribution Piping | 10/21/2005 | | 0 | | | 8 Pages | |

R.P. Appx. 124                    EXHIBIT A

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|------------|--------|----------|---------------|----------|
| 15420 | - | Drainage and Vent Systems | 10/21/2005 | | 0 | | | 7 Pages | |
| 15440 | - | Plumbing Fixtures | 10/21/2005 | | 0 | | | 4 Pages | |
| 15453 | - | Plumbing Pumps | 10/21/2005 | | 0 | | | 4 Pages | |
| 15460 | - | Water Heaters | 10/21/2005 | | 0 | | | 3 Pages | |
| 15730 | - | Section Packaged Rooftop Air Conditioning Units | 10/21/2005 | | 0 | | | 10 Pages | |
| 15838 | - | Power Ventilators and Exhaust Fans | 10/21/2005 | | 0 | | | 7 Pages | |
| 15883 | - | Variable Frequency Drives | 10/21/2005 | | 0 | | | 5 Pages | |
| 15891 | - | Metal Ducts | 10/21/2005 | | 0 | | | 8 Pages | |
| 15910 | - | Duct Accessories | 10/21/2005 | | 0 | | | 6 Pages | |
| 15932 | - | Air Outlets and Inlets | 10/21/2005 | | 0 | | | 3 Pages | |
| 15933 | - | Air Terminals | 10/21/2005 | | 0 | | | 4 Pages | |
| 15990 | - | Testing, Adjusting, and Balancing | 10/21/2005 | | 0 | | | 7 Pages | |
| 15995 | - | Commissioning | 10/21/2005 | | 0 | | | 4 Pages | |
| 16010 | - | Basic Electrical Requirements | 10/21/2005 | | 0 | | | 4 Pages | |
| 16110 | - | Raceways | 10/21/2005 | | 0 | | | 5 Pages | |
| 16120 | - | Wires and Cables | 10/21/2005 | | 0 | | | 3 Pages | |
| 16135 | - | Cabinets, Boxes, and Fittings | 10/21/2005 | | 0 | | | 5 Pages | |
| 16143 | - | Wiring Devices | 10/21/2005 | | 0 | | | 4 Pages | |
| 16170 | - | Circuit and Motor Disconnect Switches | 10/21/2005 | | 0 | | | 2 Pages | |
| 16190 | - | Circuit and Motor Disconnect Switches | 10/21/2005 | | 0 | | | 4 Pages | |
| 16195 | - | Electrical Identification | 10/21/2005 | | 0 | | | 3 Pages | |
| 16420 | - | Service Entrance | 10/21/2005 | | 0 | | | 4 Pages | |
| 16425 | - | Switchboards | 10/21/2005 | | 0 | | | 6 Pages | |
| 16452 | - | Grounding | 10/21/2005 | | 0 | | | 5 Pages | |
| 16460 | - | Transformers | 10/21/2005 | | 0 | | | 3 Pages | |

R.P. Appx. 125                                          EXHIBIT A


| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|------------|--------|----------|---------------|----------|
| 16470 | - | Panelboards | 10/21/2005 | | 0 | | | 5 Pages | |
| 16471 | - | Transient Voltage Surge Suppressors | 10/21/2005 | | 0 | | | 4 Pages | |
| 16475 | - | Overcurrent Protective Devices | 10/21/2005 | | 0 | | | 5 Pages | |
| 16481 | - | Motor Controllers | 10/21/2005 | | 0 | | | 3 Pages | |
| 16515 | - | Lighting | 10/21/2005 | | 0 | | | 6 Pages | |
| 16670 | - | Lightning Protection Systems | 10/21/2005 | | 0 | | | 3 Pages | |
| 16721 | - | Fire Alarm Systems | 10/21/2005 | | 0 | | | 7 Pages | |

R.P. Appx. 126                                    EXHIBIT A

## INTELLICENTER
## Dallas, TX
## 211,637 SF - 4 STORY OFFICE BLDG.
## KOLL DEVELOPMENT COMPANY
## February 20, 2006

| EST. #: | | | | TOTAL AREA: | 211,638 | Sf | 52,910 | 1st Flr | | 5/19/2006 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE: | ####### | 3:52 PM | | PERIMETER: | 1,226 | Lf | 158,728 | Upper Flrs | | 3:52 PM | |
| BY: | SAM/TS | | | CLEAR HT.: | | | | | | | |
| SITE: | Dallas, TX | | | SCHEDULE: | 9.00 | Mos | 211,638 | Total | 0.500% | INSURANCE | |
| FILE: | | | | | 39 | Wks | | | 4.00% | O.H. & PROFIT | |

### 1. SITE IMPROVEMENTS

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | - | | |
| 02050 | Demolition / Site Clearing | | | | | | | - | | |
| | Curb Cuts | | 3 | EA | | | 3,000.00 | 9,000 | | |
| | Site Clearing | | 14.30 | ACR | | | 800.00 | 11,440 | | |
| | Tree/shrub removal | | - | LS | | | | - | | |
| | Sawcut existing island and entrance pavement | | see above | | | | 3.00 | - | | |
| | Demo and fill for 2 entrance and island rework | | 1 | LS | | | 7,000.00 | 7,000 | | |
| | Traffic control/barricades etc. | | 1 | LS | | | 7,000.00 | 7,000 | 34,440 | |
| | Discount | | 1 | LS | | | | - | 0.18 | |
| 02200 | Earthwork | | | | | discount | - | - | | |
| | Mob/Layout/surveying/dewatering | | 1 | LS | | | 20,000.00 | 20,000 | | |
| | Cut/Fill on-site materials | | 14,000 | CY | | | 3.50 | 49,000 | | |
| | Prep Building Pad | | 5,555 | SY | | | 0.75 | 4,166 | | |
| | Cement Mix Clay Under Pavement Areas | Top 5" of subgrade | SEE ALT | SY | | | 2.85 | - | | |
| | Lime at city Street Work | | 1,604 | sy | | | 5.00 | 8,020 | | |
| | Moisture Conditioning of Slab On Grade areas | Top 2.5' below slab | - | SY | | | 2.00 | - | | |
| | Spoils from utility work---Stockpiled On Site | | 2,000 | CY | | | 2.00 | 4,000 | | |
| | Strip and stockpile topsoil | | 4,500 | CY | | | 1.50 | 6,750 | | |
| | Respread topsoil | Based on 4" | 3,000 | CY | | | 4.00 | 12,000 | | |
| | Topsoil--Stockpiled on Site | | 1,500 | CY | | | 2.00 | 3,000 | | |
| | Fire Marshall Road (8" thickness) | | 3,251 | Tons | | | 17.00 | 55,267 | | |
| | Temporary staging area | 8" Stone | 10,000 | SF | | | 0.70 | 7,000 | | |
| | Maintain access road | w/access road | 3 | MO | | | 3,500.00 | 10,500 | | |
| | Select fill material at City Road | | 844 | Tons | | | 20.00 | 16,880 | 224,816 | |
| | Final Grade paved areas | | 16,683 | sy | | | 1.00 | 16,683 | 1.06 | |
| | Build Mounds on site for excess utility spoils | | 1,350 | cy | | | 3.00 | 4,050 | | |
| | Move excess on site | | 3,000 | CY | | | 2.50 | 7,500 | | |
| 02210 | Finish Grading / Backfill Footings | | 1 | LS | | | 4,200.00 | 4,200 | 4,200 | |
| | | | | | | | | - | 0.02 | |
| 02201 | Grading Contingncy | | - | | | | - | - | | |
| | Undercut allowance | Excluded    By Koll | - | Allow | | | - | - | - | |
| | | | | | | | | - | - | |
| 02202 | Detention Pond | | | | | | | - | | |
| | w/storm system | | | | | | | - | - | |
| | | | | | | | | - | - | |
| 02300 | Surface Water Control | | | | | | | - | | |
| | Erosion control per plans | Allowance | 1 | LS | | | 1,000.00 | 1,000 | | |
| | Silt fence | | 1,800 | LF | | | 2.00 | 3,600 | | |
| | Temporary seed & mulch | | 2 | AC | | | 1,200.00 | 2,400 | | |
| | Protect inlets | | 10 | EA | | | 200.00 | 2,000 | 9,000 | |
| | | | | | | | | - | 0.04 | |
| 02500 | Asphalt Paving and Striping | | | | | | | - | | |
| | 3.5" + 2.0" asphalt paving | w/concrete paving | - | | | | | - | | |
| | 3.0" + 1.5" asphalt paving | w/concrete paving | - | | | | | - | | |
| | Roadway 2+8 1/2+4 | | - | | | | | - | | |
| | Exterior Dock stairs/fndn wall | w/foundations | - | | | | - | - | | |
| | Patch Drive After Construction | | - | | | | | - | | |
| | Paving Fabric - Mirafi 500 | | | | | | | - | | |
| | Stripe Parking Stalls - Cars | Need to count spaces | 639 | EA | | | 5.00 | 3,195 | | |

6-30-05atlantaupdate

R.P. Appx. 127                                    EXHIBIT A

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|---|-----|-----|-------|----------|---------|-------|---|
| | Stripe Parking Stalls - Trailers | | | | | | | - | |
| | Parking Blocks | | | | | | | - | 3,195 |
| | | | | | | | | - | 0.02 |
| 02510 | Concrete Paving & Curbs—TAS | | | | | | | - | |
| | 5 " Light duty paving | | 257,400 | sf | | | 2.20 | 566,280 | |
| | 6 " Medium duty paving | | 56,000 | sf | | | 2.50 | 140,000 | |
| | 6 " Islands and Decel lanes | | 14,450 | sf | | | 4.75 | 68,636 | |
| | Seal Joints w/ Hot Tar | | 327,850 | SF | - | | 0.07 | 22,950 | |
| | 4 " Sidewalk along the building | | 11,099 | SF | | | 3.25 | 36,072 | |
| | 4 " Sidewalk along main road | | 7,500 | SF | | | 4.00 | 30,000 | |
| | Transformer Pad | | 50 | SF | | | 8.00 | 400 | |
| | Light Pole Bases | | 36 | EA | | | 240.00 | 8,640 | 876,355 |
| | Pipe Bollards—install & pour | | 25 | ea | | | 135.00 | 3,375 | 4.14 |
| 02511 | Concrete Curbs | | | | | | | - | |
| | 6 " Extruded Curb | | 10,611 | LF | | | 3.00 | 31,833 | |
| | 24 " Curb & Gutter @ road | Existing | | | | | | - | |
| | discount | | 1 | LF | | | (27,000.00) | (27,000) | 4,833 |
| | | | | | | | | - | 0.02 |
| 02805 | Sanitary Sewer | | | | | | | - | |
| | Layout | | - | LS | | | 500.00 | - | |
| | 6 " Lateral Line | | 305 | LF | | | 22.00 | | |
| | Gravel bedding | | 75 | TON | | | 24.00 | | |
| | Sanitary Manhole (modify existing) | | 2 | EA | | | 750.00 | | |
| | Cleanouts | | - | | | | 875.00 | | |
| | Grinder Pump / Sewage Ejector | Not Included | - | | | | | | |
| | Street Bore | EXCLUDED | | | | | | | |
| | Tie-in to Existing Manhole | | 1 | EA | | | 1,500.00 | | 11,510 |
| | | | | | | | | - | 0.05 |
| 02806 | Sanitary Recoupment or Capacity Fees | EXCLUDED | | | | | | - | - |
| | | | | | | | | - | - |
| 02660 | Water Distribution | | | | | | | - | |
| | Meter Fees | | 1 | LS | | | 2,600.00 | | |
| | Meter Vault & Pit | | 1 | EA | | | 12,000.00 | | |
| | Combination Water Tap | 8" | 1 | EA | | | 5,000.00 | | |
| | Combination Water Tap | two @ 2" | 1 | EA | | | 2,000.00 | | |
| | 12 " Fire Line | | - | | | | 60.00 | | |
| | 8 " Fire Line | | 1,800 | LF | | | 20.00 | | |
| | 4 " Domestic Line | | 820 | LF | | | 18.00 | | |
| | Jack & bore | Not Required | - | LF | | | 275.00 | | |
| | 8" Detector check valve | | 1 | EA | | | 8,000.00 | | |
| | 2" Detector check valve | | 1 | EA | | | 2,500.00 | | |
| | Fire Hydrants | | 4 | EA | | | 2,700.00 | | |
| | Detector Check In Pyramid Box for Sprinklers | | 1 | EA | | | 2,500.00 | | 94,520 |
| | | | | | | | | - | 0.45 |
| 02680 | Gas Main to Building | EXCLUDED—BY KOLL | | | | | | - | - |
| | | | | | | | | - | - |
| 02700 | Storm Sewers | ALLOWANCE | | | | | | - | |
| | Layout | | - | LS | | | | - | |
| | Pumping | | 1 | LS | | | | - | |
| | Curb Inlets | | 5 | EA | | | 1,600.00 | | |
| | Drain Tile at Building Mud Slab | | 800 | LF | | | 16.00 | | |
| | Rip Rap around Flared Ends & Flumes | | 170 | TONS | | | 23.00 | | |
| | Manholes | | 3 | EA | | | 1,800.00 | | |
| | Roof drains | W/Storm Piping | - | LS | | | - | | |
| | Downspout Connections | | 12 | EA | | | 250.00 | | |
| | 6 " Storm Pipe | | 600 | LF | | | 24.00 | | |
| | 12 " Storm Pipe | | 964 | LF | | | 25.00 | | |
| | 15 " Storm Pipe | | - | | | | 36.00 | | |
| | 18 " Storm Pipe | | 175 | LF | | | 28.00 | | |
| | 21 " Storm Pipe | | | | | | 45.00 | | |
| | 24 " Storm Pipe | | 400 | LF | | | 32.00 | | |
| | 27 " Storm Pipe | | | | | | | | |
| | 30 " Storm Pipe | | - | | | | | - | |
| | 36 " Storm Pipe | | | | | | | - | |
| | 42 " Storm Pipe | | - | | | | | - | |
| | 48 " Storm Pipe | | - | | | | | - | |
| | 54 " Storm Pipe | | | | | | | - | |



8-30-05atlantaupdate

R.P. Appx. 128

EXHIBIT A

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|---|-----|-----|-------|----------|---------|-------|---|
| | 60 " Storm Pipe | | | | | | | - | |
| | Rock Excavation  EXCLUDED | | - | ALL | | | - | - | 89,310 |
| | | | | | | | | - | 0.42 |
| 02780 | Landscape lighting conduit | | See Div 16 | LF | | | 9.50 | - | |
| 02781 | Underground Electric Conduit | Allowance | See Div 17 | | | | 32.00 | - | |
| 02782 | Underground Conduit & Circuit to Sign | | See Div 18 | | | | 11.00 | - | |
| 02783 | Underground Telephone Conduit--discount | | 800 | LF | | (12.50) | 12.50 | - | - |
| | | | | | | | | - | - |
| 02800 | Hardscape Allowance | ALLOWANCE | 1 | LS | | | 25,000.00 | 25,000 | |
| 02802 | Site Screen Walls | IN TILT-UP | | SF | | | | - | |
| 02805 | Trash Enclosure | IN TILT-UP | | | | | | - | |
| 02806 | Pavers | | - | SF | | | | - | |
| 02806 | Fencing | EXCLUDED | | | | | 11.60 | - | |
| 02807 | Architectural Hardscape | | - | ALL | | - | | - | |
| 02808 | Flag Poles | EXCLUDED | - | | 266.50 | 1,200.00 | 200.00 | - | 25,000 |
| | | | | | | | | - | 0.12 |
| 02900 | Landscaping Allowance | ALLOWANCE | 1 | LS | | | 225,000.00 | 225,000 | 225,000 |
| | | | | | | | | - | 1.06 |
| 02950 | Irrigation Allowance | ALLOWANCE | 1 | LS | | | 75,000.00 | 75,000 | 75,000 |
| | | | | | | | | - | 0.35 |
| | **SUBTOTAL SITE IMPROVEMENTS COSTS** | | | | | | | 1,677,179 | 1,677,179 |
| | | | | | | | | | 7.91 |
| | DIVISION 17 - MISCELLANEOUS | | | | | | | | |
| | EROSION CONTROL BOND | | | | | | | - | |
| | SITE IMPROVEMENT BOND | | | | | | | - | |
| | INSURANCE | | 0.500% | % | | | | 8,386 | |
| | OVERHEAD AND PROFIT | | 4.00% | | | | | 67,423 | |
| | **TOTAL SITE IMPROVEMENTS COSTS** | | 211,638 | SF | 8.28 | | | 1,752,988 | |

## 2. BUILDING SHELL

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|-----|-----|-------|----------|---------|-------|---|
| | **Division 1-GENERAL CONDITIONS** | | | | | | - | |
| | | | | | | | - | |
| 18010 | Project Manager--discount | 1.00 | Ls | | | | - | |
| | Project exec | | MO | | | 500.00 | - | |
| | Project Mgr (50% TIME) | 9.00 | MO | | | 6,800.00 | 61,200 | |
| | Project Engineer | 1.00 | MO | | | 3,800.00 | 3,800 | |
| | Mission control | 9.00 | MO | 700.00 | | | 6,300 | 71,300 |
| | General Supt | - | MO | 500.00 | | | - | 0.34 |
| 18020 | Field Superintendent (local wage only) | 41 | WK | | | 2,550.28 | 104,561 | |
| | Assistant Superintendent | | | | | | - | 104,561 |
| | | | | | | | - | 0.49 |
| 18025 | Travel Expenses--discount | | LS | | | | - | |
| | JobSite Superintendent - Per Diem Expenses--Bill Back is Local | | days | | | | - | |
| | Housing Expense | - | | | | | - | |
| | PM Lodging (one per week) | 30 | Trips | | | 725.00 | 21,750 | |
| | Project Manager/Proj. Exec | 40 | trips | | | - | - | 21,750 |
| | Corporate Travel (1/2 TO Overhead) | 3 | EA | | | | - | 0.10 |
| 18030 | Drawing Reproduction & Progress Photos | | | | | | - | |
| | Reproduction Costs | 1 | LS | | 7,500.00 | | 7,500 | |
| | Progress Photos | 9.00 | MO | | 120.00 | | 1,080 | |
| | FedEx Charges | 9.00 | MO | | 125.00 | | 1,125 | 9,705 |
| | Web Cam | BY KOLL | | | | | - | 0.05 |
| 18040 | Field Engineering & Layout | | | | | | - | |
| | Topographic Survey | | | | | | - | |
| | Foundation Survey | | | | | | - | |
| | As-Built Survey | | | | | | - | |
| | Site Staking | 1 | LS | | | 13,000.00 | 13,000 | |
| | Layout | 1 | EA | | | 5,000.00 | 5,000 | 18,000 |
| | | | | | | | | 0.09 |
| 18060 | Construction Cleaning & General Labor--discount | 1 | Ls | | | | - | |
| | General Labor | 200 | HR | 12.00 | | | 2,400 | |

6-30-05atlantaupdate

R.P. Appx. 129                                 EXHIBIT A

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|---|---|---|---|---|---|---|---|---|---|
| | Clean Streets | | 80 | HR | 34.00 | | | 2,720 | |
| | Building Clean-up | | 211,638 | SF | 0.02 | 0.09 | | 23,280 | |
| | Final Clean-Up | | 211,638 | SF | | | 0.10 | 21,164 | |
| | Trash Hauling | | 20 | LDS | | | 300.00 | 6,000 | |
| | Dumpster Box Rental | Concrete | 3 | LDS | | | 500.00 | 1,500 | |
| | Dumpster Box Rental | Steel | 3 | LDS | | | 500.00 | 1,500 | |
| | Dumpster Box Rental | Wood | 3 | LDS | | | 300.00 | 900 | |
| | Dumpster Box Rental | Glass | 3 | LDS | | | 300.00 | 900 | |
| | Dumpster Box Rental | Plastic | 3 | LDS | | | 300.00 | 900 | |
| | Dumpster Box Rental | Drywall | 3 | LDS | | | 300.00 | 900 | |
| | Dumpster Box Rental | Insulation | 3 | LDS | | | 300.00 | 900 | |
| | Dumpster Box Rental | Misc. | 10 | LDS | | | 300.00 | 3,000 | 66,064 |
| | | | | | | | | - | 0.31 |
| 18100 | Equipment Rental & Small Tools | | | | | | | - | |
| | Job Trailers | | 9.00 | MO | | 200.00 | 325.00 | 4,725 | |
| | Tool Trailers | | 9.00 | MO | | | 350.00 | 3,150 | |
| | Superintendent Pick-up Truck | | 9.00 | MO | | 500.00 | | 4,500 | |
| | Fuel, Oil, & Repairs | | 9.00 | MO | | 145.00 | | 1,305 | |
| | Field Office Supplies | | 9.00 | MO | | 35.00 | | 315 | |
| | Small Tools | | 8.00 | MO | | | 600.00 | 4,800 | |
| | Hoisting Equipment | | | | | | | - | |
| | Barricades & Lights | | 9.00 | MO | - | - | | - | |
| | Scaffolding / Ladders | | 9.00 | MO | | 200.00 | | 1,800 | |
| | Jobsite Communications | | 9.00 | MO | | 200.00 | | 1,800 | 22,395 |
| | | | | | | | | - | 0.11 |
| 18200 | Miscellaneous G. C.'s & Safety | | | | | | | - | |
| | Miscellaneous Hauling | | 5.00 | MO | | | 400.00 | 2,000 | |
| | Job Signs | | 1 | EA | | 800.00 | 1,600.00 | 2,400 | |
| | Temporary Protection | | 1 | ls | | | 2,000.00 | 2,000 | |
| | Temporary Shoring | | | | | | | - | |
| | Ice, Cups & Water | | 40 | WK | 40.00 | 10.00 | | 2,000 | |
| | Protect Finish Work | | 1 | LS | 555.00 | 500.00 | | 1,055 | |
| | OSHA Handrails | | 2,200 | LF | 2.00 | 1.00 | 0.70 | 8,140 | |
| | Safety Supplies | | 9.00 | MO | | 200.00 | | 1,800 | |
| | First Aid Supplies | | 9.00 | MO | | 50.00 | | 450 | |
| | Security | | Excluded | | | | - | - | |
| | Site Fencing - Security | | Excluded | LF | | | 5.00 | - | |
| | Special Insurance | EXCLUDED | | | | | - | - | 19,845 |
| | | | | | | | | - | 0.09 |
| 18210 | Winter Protection | EXCLUDED | - | | | | - | - | - |
| | | | | | | | | - | - |
| 18220 | Temporary Roads | w/earthwork | 1 | LS | | | 3,500.00 | 3,500 | 3,500 |
| | | | | | | | | - | 0.02 |
| | | | | | | | | - | - |
| 18250 | Building Permit | | 211,000 | SF | | | 0.18 | 37,980 | 37,980 |
| | | | | | | | | - | 0.18 |
| 18255 | Builder's Risk Insurance | $.009/Hundred x Months + Soft Costs | 9 | MO | | | 1,650.00 | 14,850 | 14,850 |
| | | | | | | | | - | 0.07 |
| 18260 | Quality Control & Testing | BY KOLL | | | | | | - | |
| | Soils Testing Services | | | | | | | - | |
| | Concrete Testing Services | | | | | | | - | |
| | Asphalt Testing Services | | | | | | | - | |
| | Floor Flatness Testing | | | | | | | - | |
| | Steel Tests & Inspections | | | | | | | - | - |
| | | | | | | | | - | - |
| 18270 | Temporary Utilities | | | | | | | - | |
| | Telephone Setup & Connection | | 1 | LS | | | 1,000.00 | 1,000 | |
| | DSL Set Up | ALLOW | 1 | LS | | | 4,000.00 | 4,000 | |
| | Telephone | | 9.00 | MO | | | 600.00 | 5,400 | |
| | Temporary Electric Hookup | | 1 | LS | | | 2,500.00 | 2,500 | |
| | Temporary Electric | | 7.00 | MO | | | 750.00 | 5,250 | |
| | Permanent Electric | | 2.00 | MO | | | 4,000.00 | 8,000 | |
| | Temporary Water | | 9.00 | MO | | | 100.00 | 900 | |
| | Temporary Fire Protection | | 9.00 | MO | | | 75.00 | 875 | |
| | Temporary Toilets | | 9.00 | MO | | | 350.00 | 3,150 | 30,875 |
| | | | | | | | | - | 0.15 |

8-30-05atlantaupdate

R.P. Appx. 130                    EXHIBIT A

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total | |
|---|---|---|---|---|---|---|---|---|
| | | | | GENERAL CONDITIONS TOTAL | | | 420,825 | 420,825 |
| | | | | | | | | 2.00 |
| | **Division 2-EARTHWORK** | | | | | | - | |
| | | | | | | | - | |
| 02220 | **Excavation and Backfill** | | | | | | - | |
| | Excavate Footings, Grade Beams, & Tie Beams | 60 | HR | 20.00 | | 70.00 | 5,400 | |
| | Pumping & Dewatering | 20 | HR | 20.00 | 10.00 | | 600 | |
| | Backfill Footings, Grade Beams, & Tie Beams | See Div 2 | | - | - | 6.25 | - | 6,000 |
| | | | | | | | - | 0.03 |
| 02370 | **Drilled Piers** | | LS | | | | - | |
| | Drilled piers    INCLUDED | 119    91 | EA | | | 2,950 | 268,450 | |
| | Drilling in Earth | | | | | | - | |
| | Drilling in Rock | | | | | | - | |
| | Auger Cast Piles | | | | | | - | |
| | Mobilization Charge | | | | | | - | |
| | Temporary Casing | | | | | | - | |
| | Layout of Piles | | | | | | - | |
| | Resteel in Piers | | | | | | - | 268,450 |
| | | | | | | | - | 1.27 |
| | | | | EARTHWORK  TOTAL | | | 274,450 | 274,450 |
| | | | | | | | | 1.30 |
| | **Division 3-CONCRETE** | | | | | | - | |
| | | | | | | | - | |
| 03210 | **Reinforcing Steel** | | | | | | - | |
| | Masonry | 0.4 #/SF x | #REFI   SF | | | | - | |
| | Pile Caps | 65 #/CY x | 74.0  CY | | | | - | |
| | Exterior Pads | 60 #/CY x | #REFI   CY | | | | - | |
| | Cont. Footing | 65 #/CY x | 0.0  CY | | | | - | |
| | Tie Beams | 65 #/CY x | 0.0  CY | | | | - | |
| | Walls | 100 #/CY x | 3.0  CY | | | | - | |
| | Grade Beams | 100 #/CY x | 1.0  CY | | | | - | |
| | Miscellaneous Reinforcing | | | | | | - | |
| | | Total | 50,000  LBS | | | 0.60 | 30,000 | 30,000 |
| | | | | | | | - | 0.14 |
| 03300 | **Cast-in-place Concrete** | | | | | | - | |
| | Elevated beams   304 lf x 4 x 1.5 | 74 | CY | | | 950.00 | 70,300 | |
| | Continuous Perimeter Grade Beam | excluded w/piers | LS | | | - | - | |
| | Premium to form elevated slab areas | w/flatwork | Ls | | | - | - | |
| | Elevator Pits | 3 | EA | | | 6,000.00 | 18,000 | |
| | Install column isolation boxes | 1 | LS | | | 3,000.00 | 3,000 | |
| | Install cast-over @ diamonds & elevator pits | 1 | LS | | | 6,000.00 | 6,000 | |
| | Ducts below raised slab areas | 1 | EA | | | 3,500.00 | 3,500 | |
| | Slab Edge Forms & Column Blockouts | 1 | LS | | | 10,000.00 | 10,000 | 110,800 |
| | | | | | | | - | 0.52 |
| 03345 | **Cement Flatwork** | | | | | | - | |
| | 4   MUD SLAB | Excluded | | | | 2.50 | - | |
| | Concrete Fill Pan Stairs | 2,400 | SF | | | 6.00 | 14,400 | |
| | Rooftop Unit Sound Absorbing Slabs | 4,860 | SF | | | 5.00 | 24,300 | |
| | ## " Composite Office Slab On Mezzanine with mesh | 211,638 | SF | | | 3.00 | 634,914 | |
| | Vapor Barrier | - | | | | 0.14 | - | 704,970 |
| | Raised Slabs with Insulation (includes beam at expn joints) | 9,648 | sf | | | 3.25 | 31,356 | 3.33 |
| 03350 | Caulk Floor Joints w/ MM80 Sealer | | | | | 1.90 | - | |
| 03355 | Concrete Sealer | - | | | | 0.09 | - | |
| 03346 | 4  " Granular Fill Under Slab | - | | | | 16.00 | - | |
| 03347 | W.W. Mesh - 6x6-10/10 | in above | | | - | - | - | - |
| | | | | | | | - | - |
| 03400 | **Architectural Concrete Wall Panels** | | | | | | - | |
| | Tilt-up Panel Design | PART OF KOLL SCOPE | | | | | - | |
| | Casting beds for panels | 78,000 | SF | | | 1.65 | 128,700 | |
| | Loading dock area panels | 3,000 | SF | | | 7.00 | 21,000 | |
| | Joint chasing | 1 | LS | | | 7,500.00 | 7,500 | |
| | Perimeter Deadmen with removal | 272 | CY | | | 120.00 | 32,640 | |
| | Add for winter concrete | - | LS | | | 9,000.00 | - | |
| | Panel Erection w/ strongbacks | H&H STEEL | | | | | | |
| | Clayco Panel Supervision for Top Flight | | | | | | | |
| | Braces for tilt-up panels | Included above | EA | | | 250.00 | - | |
| | 10 " Flat Slab TiltUp Panels @ Office | 72,000 | SF | | | 9.10 | 655,200 | 1,048,040 |

Page 5

6-30-05atlantaupdate

R.P. Appx. 131

EXHIBIT A

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|---|---|---|---|---|---|---|---|---|---|
| 3490 | GFRC Column Covers | | | | | | | | 4.95 |
| | Exterior Columns | | 2 | EA | | | 6,500.00 | 13,000 | |
| | | | | | | | | - | 13,000 |
| | | | | | | | | - | 0.06 |
| | | | | | | | | | |
| | | CONCRETE TOTAL | | | | | | 1,906,810 | 1,906,810 |
| | | | | | | | | | 9.00 |
| | **Division 4-MASONRY** | | | | | | | - | |
| | | | | | | | | - | |
| 04210 | Masonry | | | | | | | - | |
| | Pilasters | | | | | | | - | |
| | Bond Beams | | | | | | | - | - |
| | | | | | | | | - | - |
| 04400 | Stone or Granite | | | | | | | - | - |
| | | | | | | | | - | - |
| | | MASONRY TOTAL | | | | | | - | - |
| | | | | | | | | | - |
| | **Division 5-METALS** | | | | | | | - | |
| | | | | | | | | - | |
| 05120 | Structural Steel | | | | | | | - | |
| | Structural Steel | | 1,520,000 | LBS | | 0.60 | | | |
| | Steel cantilever and column at 2 bulk w/structural steel | | 2 | EA | | | 5,000.00 | | |
| | Less Galvanizing Roof Screen Steel | | 1 | Ls | | | (28,000.00) | | |
| | Roof screen framing | w/structural steel | - | LBS | | 0.85 | | | |
| | Mechanical Frames | w/structural steel | 8 | EA | | | 1,200.00 | | |
| | Dock Stair & Railing | | 1 | EA | | | 4,000.00 | | |
| | Pipe Bollards | | 5 | EA | 75.00 | 129.00 | 60.00 | | |
| | Stairs to Office | | 9 | EA | | | 8,900.00 | | |
| | Ships Ladder to Roof | | 1 | EA | | | 3,500.00 | | |
| | Misc. roof penetration framing | w/structural steel | - | Allow | | | 5,000.00 | | |
| | Misc. bracing & supports | | 20 | Tons | | | 1,600.00 | | |
| | Premium for lower level railing system at main stair | | - | LS | | | | | 1,040,520 |
| | Galvanizing Steel @ roof | | 1 | LS | | | 12,000.00 | | 4.92 |
| | | | | | | | | | |
| 05200 | Miscellaneous for Tilt-Up | | 1 | EA | | | 15,000.00 | | 15,000 |
| | | | | | | | | | 0.07 |
| 05210 | Steel Joists | | | | | | | | |
| | Roof Joists | 4.5#/SF | 65,000 | LB | | 0.55 | | | |
| | Truck Canopy Roof Joists | | - | | | 0.55 | | | |
| | Floor Joists | | - | | | | | | 35,750 |
| | | | | | | | | | 0.17 |
| 05300 | Metal Decking | | | | | | | | |
| | Roof Deck—1.5" | | 52,910 | SF | | 0.90 | | | |
| | Truck area canopy deck | | - | | | 0.90 | | | |
| | Floor Deck—3" | | 211,636 | SF | | 1.20 | | | 301,585 |
| | | | | | | | | | 1.43 |
| 05340 | Structural Erection | | | | | | | | |
| | Structural Steel & Joists | | 264,548 | SF | | | 1.75 | | |
| | Stair erection | w/structural steel | - | ea | | | | | |
| | Floor and Roof Deck | w/structural steel | - | | | | | | |
| | Div 5 Discount | w/structural steel | 1 | LS | | | (30,000.00) | | |
| | Tilt-Up erection | see div 3 | | SF | | | | | |
| | Braces for Tilt-Up panels | 6 per panel | 184 | LS | | | - | | 432,959 |
| | | | | | | | | | 2.05 |
| 05580 | Sheet Metal Fabrications | | | | | | | | |
| | Front entry high alucobond w/ framing (CMP-1) | | See Div 7 | SF | | | 22.75 | | |
| | Metal panel cladding - 10' per lf (MP-2) | | See Div 7 | | | | 12.25 | | |
| | Metal panel cladding - 9.2' per lf (MP-1) | | See Div 7 | | | | 12.25 | | |
| | Louver | | 1 | LS | | | 4,000.00 | | |
| | Roof gates | | 2 | LS | | | 350.00 | | |
| | Flashings & sheetmetal | | See Div 7 | LS | | | 32,000.00 | | |
| | Vents | | 10 | LS | | | 90.00 | | |
| | Adjustment for alternate manufacturer | | - | LS | | | | | |
| | Roof screen Steel | | 950 | Lf | | | 63.00 | | 65,450 |
| | | | | | | | | | 0.31 |
| | | | | | | | | - | |
| | | METALS TOTAL | | | | | | 1,891,264 | 1,891,264 |
| | | | | | | | | | 8.95 |

6-30-05atlantaupdate

R.P. Appx. 132

EXHIBIT A

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|---|---|---|---|---|---|---|---|---|---|
| | **Division 6-WOOD AND FINISHES** | | | | | | | - | |
| | | | | | | | | - | |
| 06100 | Rough Carpentry | | | | | | | - | |
| | Treated Wood Blocking | | 1,226 | LF | 4.00 | 1.00 | | 6,130 | |
| | Expansion Joint Blocking | | 240 | LF | 4.00 | 1.00 | | 1,200 | |
| | Misc. wood blocking | | 400 | LF | 4.00 | 1.00 | | 2,000 | |
| | Fire Treated plywood at CW Intersection | | 340 | LF | | | 11.00 | 3,740 | |
| | Window Sill Blocking | | 2,470 | LF | 2.05 | 1.00 | | 7,534 | |
| | Plywood At Parapet | | | | | | | - | |
| | Soffit Overhang Framing @ Entry | | 400 | SF | 3.00 | 2.00 | | 2,000 | 22,604 |
| | Finish Carpentry | | | | | | | - | 0.11 |
| | Cabinets @ Kitchen Area | | | | | | | - | |
| | Vanities @ Restrooms | MW2 | 144 | LF | 105.00 | 190.00 | | 42,480 | |
| | Window Sills | | 2,470 | LF | 5.00 | 8.60 | | 33,592 | |
| | Trim at main lobby/1st floor public area | ALLOWANCE | 1 | LS | | | 17,500.00 | 17,500 | |
| | Trim @ elevator Lobby | ALLOWANCE | 3 | EA | | | 5,000.00 | 15,000 | 108,572 |
| | | | | | | | | - | 0.51 |
| | **WOOD AND FINISHES TOTAL** | | | | | | | **131,176** | 131,176 |
| | | | | | | | | | 0.62 |
| | **Division 7-THERMAL AND MOISTURE PROTECTION** | | | | | | | - | |
| | | | | | | | | - | |
| 07100 | Waterproofing --elevator pits | | 2 | ea | | | 3,500.00 | 7,000 | 7,000 |
| | | | | | | | | - | 0.03 |
| 07200 | Insulation | | | | | | | - | |
| | Foundation Insulation | | 2,452 | SF | 0.40 | 0.50 | | 2,207 | |
| | Insulation at CW Glass | | 630 | SF | | | 3.00 | 1,890 | 4,097 |
| | | | | | | | | - | 0.02 |
| 07300 | Spray-On Fireproofing | at stairwells (9 locations) | 1 | LS | | 4,500.00 | 12,500.00 | 17,000 | 17,000 |
| | | | | | | | | - | 0.08 |
| 07500 | Roofing | | | | | | | - | |
| | TPO Roofing w/R= | 20  Insulation | 52,910 | SF | | | 4.00 | 211,640 | |
| | Roofing Membrane W/out Insulation | | - | SF | | | 0.80 | - | |
| | 15 Year Extended Warranty | excluded | | | | | | - | |
| | Walkway pads | | 2,100 | SF | | | 1.00 | 2,100 | |
| | Ballast Roofing at Lobby Area | | 290 | SF | | | 15.00 | 4,350 | |
| | Attic Vents | | 53 | ea | | | 50.00 | 2,650 | 225,540 |
| | Mech Unit Flashings | | 6 | ea | | | 800.00 | 4,800 | 1.07 |
| 07600 | Flashing and Sheet Metal | | | | | | | - | |
| | Decorative railing at 2 level atrium | | 32 | LF | | | 425.00 | 13,600 | |
| | Alucobond eye brow | | 11,600 | sf | | | 17.00 | 197,200 | |
| | Alucobond soffit @ entries | | 860 | sf | | | 23.00 | 19,780 | |
| | Metal Panel Cladding 10' per LF (MP2) | | 2,870 | sf | | | - | - | |
| | Roof Screen Morins X-12 | | 13,250 | sf | | | 11.00 | 145,750 | |
| | Cap Flashing / Gravel Stop | | 1,226 | LF | | | 8.00 | 9,808 | |
| | 22 g closer plate | | 510 | LF | | | 9.00 | 4,590 | |
| | CounterFlashings | | 716 | LF | 2.20 | | 6.00 | 7,303 | 411,531 |
| | Stainless Steel Railing at entry | | 30 | LF | | 450.00 | | 13,500 | 1.94 |
| 07700 | Skylights & Roof Hatch | | | | | | | - | |
| | Skylight | | 1 | EA | | | 4,500.00 | 4,500 | |
| | Roof Hatch | | 1 | EA | | | 1,000.00 | 1,000 | 5,500 |
| | | | | | | | | - | 0.03 |
| 07920 | Sealants and Caulking | | | | | | | - | |
| | Misc Interior caulking | | 2,000 | LF | | | 2.00 | 4,000 | |
| | TiltUp  Walls - Outside Joints | | 72,000 | SF | | | 0.18 | 12,960 | |
| | TiltUp  Walls - Inside Joints | | 52,502 | SF | | | 0.15 | 7,875 | 24,835 |
| | | | | | | | | - | 0.12 |
| | **THERMAL & MOISTURE TOTAL** | | | | | | | **695,503** | 695,503 |
| | | | | | | | | | 3.21 |
| | **Division 8-DOORS AND WINDOWS** | | | | | | | - | |
| | | | | | | | | - | |
| 08200 | Doors,Frames,and Hardware--discount | | 1 | Ls | | - | (6,500.00) | (6,500) | |
| | Hollow Metal Door Frames - Single | | - | | | | | - | |
| | Hollow Metal Door Frames - Double | | - | | | | | - | |
| | Aluminum Door Frames(includes 3 doubles) | | 100 | EA | 180.00 | 75.00 | 5.00 | 26,000 | |
| | Bathroom Louver doors | | 40 | EA | | | 800.00 | 32,000 | |
| | Solid Core Wood Doors | | 60 | EA | 280.00 | 75.00 | 5.00 | 21,600 | |

8-30-05atlantaupdate

R.P. Appx. 133

EXHIBIT A

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|---|---|---|---|---|---|---|---|---|---|
| | HM doors | | 3 | EA | 200.00 | 50.00 | 5.00 | 765 | |
| | Exterior Hollow Metal Door with frame & hardware | | 1 | EA | | | 1,200.00 | 1,200 | |
| | A.D.A. Hardware | | 100 | EA | 150.00 | 95.00 | 5.00 | 25,000 | |
| | Panic Devices / Automatic Closers | | 12 | EA | - | - | 300.00 | 3,600 | 101,685 |
| | | | | | | | | - | 0.48 |
| | | | | | | | | - | |
| 08300 | Overhead Doors & Operators | | | | | | | | |
| | Dock / Rail Doors 9 ' X 10 ' | | 1 | EA | | | 4,000.00 | 4,000 | |
| | Drive-in & Garage 12 ' X 14 ' | | | | | | 1,400.00 | - | |
| | Electric Operator | | 1 | EA | | | 550.00 | 550 | |
| | Overhead Coiling Doors @ main entry stair/lower level | | - | | | | 4,500.00 | - | 4,550 |
| | | | | | | | | - | 0.02 |
| 08800 | Glazing (based on National Agreement pricing) | PALS | | | | | | | |
| | Aluminum Curtainwall (Vistawall) | | 7,580 | sf | | | 42.00 | 318,360 | |
| | Glass & Glazing (Viracon) | | 29,300 | sf | | | 26.50 | 776,450 | |
| | Revolving door | | 1 | EA | | | 28,000.00 | 28,000 | |
| | Secondary Sealant | Excluded | | | | | | - | |
| | Aluminum Doors | | 8 | EA | | | 1,950.00 | 15,600 | |
| | Mirrors @ Restrooms | | 16 | EA | | | 500.00 | 8,000 | 1,158,560 |
| | Interior Glass--tempered only | | 675 | SF | | | 18.00 | 12,150 | 5.47 |
| | DOORS AND WINDOWS TOTAL | | | | | | | 1,264,775 | 1,264,775 |
| | | | | | | | | | 5.98 |
| | **Division 9-FINISHES** | | | | | | | - | |
| | | | | | | | | - | |
| 09200 | Framing and Drywall | | - | | | | - | - | |
| | Perimeter stud/insulation/vapor barrier/DRYWALL | | 47,840 | SF | | | 4.40 | 210,496 | |
| | Perimeter insulation above ceiling | | 14,352 | SF | | | 2.35 | 33,727 | |
| | Drywall ceiling at 2nd & 3rd level elevator lobby w/decorative s | | | SF | | | 6.00 | - | |
| | drywall ceiling at 1st level main lobby--some coffers | | | SF | | | 7.00 | - | |
| | Framing at 2 entries for vertical feature | | 560 | SF | | | 7.00 | 3,920 | |
| | Framing for eyebrows | | 11,920 | SF | | | 5.00 | 59,600 | |
| | 1st level corridor/lobby area--1 hour to deck | | - | SF | | | 4.50 | - | |
| | Interior Wall Totals | | | SF | | | 4.50 | - | |
| | Elevator room/Elec/Tech rooms | | 5,960 | SF | | | 5.00 | 29,800 | |
| | Partitions at staging/fire room | | - | SF | | | 6.00 | - | |
| | Mechanical shafts/elevator & stair shafts--1 hr | | 26,800 | SF | | | 5.00 | 134,000 | |
| | Toilet Room Partition Walls | | 16,000 | SF | | | 4.50 | 72,000 | |
| | Drywall columns | | | SF | | | 4.50 | - | |
| | First Floor Lobby walls | | 2,520 | SF | | | 5.00 | 12,600 | |
| | Gyp enclosure below stair | | 135 | SF | | | 5.00 | 675 | |
| | Elevator Shaft Wall see above | | - | | | | 4.75 | - | |
| | Drywall Ceiling Taped @ bathrooms--includeds vestibules | | 5,340 | SF | | | 5.00 | 26,700 | |
| | Front Lobby bulkhead--radiused | | 213 | SF | | | 10.00 | 2,130 | |
| | Lobby drywall ceilings 1-4 | | 3,285 | SF | | | 6.00 | 19,710 | |
| | Stair 2 drywall soffits & fascias | | 1,500 | SF | | | 5.50 | 8,250 | |
| | Premium for skylight framing & Drywall | | 1 | LS | | | 1,500.00 | 1,500 | |
| | Soffit outside of main stair | | 385 | sf | | | 5.00 | 1,925 | |
| | Expansion Joint materials--at floor level only, ceiling with TI | | 294 | LF | | | 27.00 | 7,938 | |
| | Fascia/misc bulkheads | | 150 | lf | | | 18.00 | 2,700 | |
| | Entry Soffit Taped | | 600 | SF | | | 5.00 | 3,000 | |
| | Partially enclosed soffit @ truck dock area--studs/board/plaster | | 1,375 | SF | | | 6.00 | 8,250 | |
| | Misc. Framing for sheet metal | | 4,500 | SF | | | 6.00 | 27,000 | |
| | Framing for GFRC columns | | 2 | EA | | | 1,400.00 | 2,800 | |
| | | | | | | | | - | 668,721 |
| | | | | | | | | - | 3.16 |
| 09250 | Lath & Plaster | | | | | | | - | |
| | DryVit | | | | | | | - | - |
| 9402 | Epoxy Terrazzo | | | | | | | | |
| | Lobby and Stair #2 Landings | | 2,716 | SF | | | 14.00 | 38,024 | |
| | | | | | | | | | 38,024 |
| 09500 | Ceiling | | | | | | | - | 0.16 |
| | 2' x 2' @ Lobby Areas--METAL | | 1,850 | SF | | | 15.25 | 28,213 | |
| | Standard 2' x 2' second look--FURNISH ONLY | | - | | | | | - | |
| | | | - | | | | | - | |
| | Batt Laid Insulation Over Restrooms | | - | | | | 0.65 | - | 28,213 |
| | | | | | | | | - | 0.13 |
| 09650 | Ceramic Tile | | | | | | | - | |
| | Ceramic tile in lobbies in lieu of terrazzo Included as Terrazzo | | - | | | | | - | |

8-30-05atlantaupdate

R.P. Appx. 134

EXHIBIT A

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|---|---|---|---|---|---|---|---|---|---|
| | Ceramic Wall Tile @ Bathrooms | | 1,950 | SF | | | 14.00 | 27,300 | |
| | Ceramic Floor Tile @ Bathrooms | | 3,408 | SF | | | 12.00 | 40,896 | |
| | Porcelain tile at 1st floor main lobby areas with base | | - | sf | | | | - | |
| | Porcelain tile boarder at 2 lower level entry at perimeter of pedimat | | - | sf | | | | - | |
| | Porcelain tile boarder 2nd and 3rd fl elevator lobby areas | | - | sf | | | | - | 79,416 |
| | Pordelain Tile base at 2nd & 3rd fl elevator lobby areas | | 1,020 | LF | | | 11.00 | 11,220 | 0.38 |
| 09680 | Carpet & Resilient Flooring | IN FINISH ALLOW. | | | | | | - | |
| | Carpet @ elevator lobbies | | 200 | SY | | | 32.00 | 6,400 | |
| | Stair Carpet—main stair only | | - | | | | | - | |
| | VCT | | 1,900 | SF | | | 2.00 | 3,800 | |
| | Vinyl Base    B1&2 | | 4,536 | LF | | | 1.25 | 5,670 | 15,870 |
| | Vinyl flooring at 2 perimeter stairs | excluded | | | | | | - | 0.07 |
| 09900 | Painting | | | | | | | - | |
| | Exterior TiltUp Concrete Panels | | 68,000 | SF | | | 0.45 | 30,600 | |
| | Drywall—no painting the core areas | | 50,000 | SF | | | 0.35 | 17,500 | |
| | Plaster Soffits | | 600 | SF | | | 1.00 | 600 | |
| | Epoxy Floor at pump room | | 320 | SF | | | 3.00 | 960 | |
| | Stairs @ Loading Dock | | 1 | EA | | | 1,000.00 | 1,000 | |
| | Man Doors | | 45 | EA | | | 75.00 | 3,375 | |
| | Overhead Doors | | 1 | EA | | | 300.00 | 300 | |
| | Stairways | | 9 | FLIGHTS | | | 1,200.00 | 10,800 | 74,635 |
| | Paint Exterior Steel @ Roof Screen | | 1 | LS | | | 9,500.00 | 9,500 | 0.35 |
| 09950 | Wall Covering & Zolotone Allowance | | | | | | | - | |
| | Vinyl Wall Cover @ Restrooms (w-2) | | 7,200 | SF | | | 1.50 | 10,800 | |
| | Vinyl Wall Cover Lobby Areas (W-1) | | 3,932 | SF | | | 1.50 | 5,898 | |
| | | | | | | | | | 16,698 |
| | | | | | | | | | 0.08 |
| 9970 | Special Wall Surfaces (FRP) | | | | | | | | |
| | FRP | | 300 | SF | | | 5.00 | 1,500 | 1,500 |
| | | | | | | | | | |
| | | | | | | | | - | 0.01 |
| | **FINISHES TOTAL** | | | | | | | **923,077** | 923,077 |
| | | | | | | | | | 4.36 |
| | **Division 10-SPECIALTIES** | | | | | | | - | |
| 10150 | Toilet Partitions and Acces. | | | | | | | - | |
| | Ceiling Mounted Painted Steel Partitions | | | | | | | - | |
| | Floor Mounted Painted Partitions | | - | | | | 800.00 | - | |
| | Wall Mounted Painted Metal Urinal Screens | | - | | | | 380.00 | - | |
| | Wall Mounted Stainless Urinal Screens | | | | | | | - | |
| | Toilet Room Accessories | | 12 | RMS | 560.00 | 985.00 | | 18,540 | 18,540 |
| | | | | | | | | | 0.09 |
| 10550 | Metal Lockers | | | | | | | - | |
| | Full Lockers | | | | | | | - | |
| | Locker Room Benches | | | | | | | - | - |
| | | | | | | | | - | - |
| 10600 | Miscellaneous Specialties | | | | | | | - | |
| | Entry Mats | | 480 | SF | | | 25.00 | 12,000 | |
| | Fire Extinguisher Cabinets | | 10 | EA | 35.00 | 120.00 | | 1,550 | |
| | Wall Expansion Joints @ Interior | | 320 | LF | | | 6.00 | 1,920 | |
| | Floor Expansion Joints | | 460 | LF | | | 18.00 | 8,280 | |
| | Handicap Parking Signs | | 22 | EA | 80.00 | 60.00 | | 3,080 | 28,230 |
| | Exterior Expansion Joint (EJ1) | | 140 | LF | | | 10.00 | 1,400 | 0.13 |
| 10610 | Appliances | | | | | | | - | - |
| | | | | | | | | - | - |
| 10900 | Interior Signage & Directories | | | | | | | - | |
| | Building Directory | Excluded | | ALL | | | | - | - |
| | Interior Signage Allowance | Excluded | | ALL | | | | - | - |
| | | | | | | | | - | - |
| 10950 | Exterior Signage Allowance | Excluded | | ALL | | | | - | - |
| | | | | | | | | - | - |
| | **SPECIALTIES TOTAL** | | | | | | | **46,770** | 46,770 |
| | | | | | | | | | 0.22 |
| | **Division 11-EQUIPMENT** | | | | | | | - | |
| 11161 | Dock Equipment | | | LS | | | | - | |
| | Dock Bumpers | | - | | | | | - | |

6-30-05atlantaupdate

R.P. Appx. 135                                    EXHIBIT A

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|-----|-----|-------|----------|---------|-------|---|
| 11160 | Mechanical Dock Levelers - 35,000# Capacity | 1 | LS | | | 2,045.00 | 2,045 | |
| 11161 | Dock Levelers - Self Leveling Pans | | | | | | - | |
| 11162 | Dock Levelers - Form Pits | - | | | | | - | |
| 11163 | Dock Levelers - Dock Pit Angle | - | | | | | - | |
| 11164 | Dock Locks | - | | | | | - | |
| 11165 | Dock Seals | - | | | | 650.00 | - | |
| 11166 | Dock Shelters | | | | | | - | |
| 11167 | Dock Lights | 1 | Ls | | | 300.00 | 300 | 2,345 |
| | | | | | | | - | 0.01 |
| | **EQUIPMENT TOTAL** | | | | | | **2,345** | 2,345 |
| | | | | | | | | 0.01 |
| | **Division 12-FURNISHINGS** | | | | | | - | |
| | | | | | | | - | |
| 12510 | Horizontal Blinds - 1" | 28,000 | SF | | | 2.10 | 58,800 | 58,800 |
| | | | | | | | - | 0.28 |
| | **FURNISHINGS TOTAL** | | | | | | **58,800** | 58,800 |
| | | | | | | | | 0.28 |
| | **Division 13-SPECIAL CONSTRUCTION** | | | | | | - | |
| | | | | | | | - | |
| 13320 | Access Flooring | | | | | | - | |
| | 14" Access Flooring—stockpile on floors, tech rooms installed | 191,000 | SF | | | 3.77 | 720,070 | |
| | Computer Access Flooring - Ramp Grade Change | | | | | | - | 720,070 |
| | | | | | | | - | 3.40 |
| | **SPECIAL CONSTRUCTION TOTAL** | | | | | | **720,070** | 720,070 |
| | | | | | | | | 3.40 |
| | **Division 14-CONVEYING SYSTEMS** | | | | | | - | |
| | | | | | | | - | |
| 14200 | Elevators | | | | | | - | |
| | Hydraulic | 3 | EA | | | 64,500.00 | 193,500 | |
| | Traction | | | | | | - | |
| | Finish cab for flooring/1 wall panel | 3 | EA | | | 3,500.00 | 10,500 | 204,000 |
| | | | | | | | - | 0.96 |
| | **CONVEYING SYSTEMS TOTAL** | | | | | | **204,000** | 204,000 |
| | | | | | | | | 0.96 |
| | **Division 15-MECHANICAL** | | | | | | - | |
| | | | | | | | - | |
| 15300 | Fire Protection | 211,638 | SF | | | 0.82 | 173,543 | |
| | Glass protection at 4 levels | 30 | heads | | | 465.00 | 13,950 | |
| | Standpipe system | 3 | Ea | | | 4,000.00 | 12,000 | |
| | Dry pipe system @ dock soffit area | - | sf | | | 2.00 | - | |
| | Compressor for dry pipe system | - | LS | | | 1,500.00 | - | 199,493 |
| | | | | | | | - | 0.94 |
| 15310 | Booster Pumps—75 hp | 1 | EA | | | 35,000.00 | 35,000 | |
| | In-Rack Sprinklers | | | | | | - | 35,000 |
| | | | | | | | - | 0.17 |
| 15400 | Plumbing—discount | 1 | LS | | | (6,000.00) | (6,000) | |
| | Water Closet Fixtures (low usage) | 34 | EA | | | 1,300.00 | 44,200 | |
| | Handicapped Water Closet Fixtures (low usage) | 6 | EA | | | 1,300.00 | 7,800 | |
| | Urinals (low usage) | 8 | EA | | | 800.00 | 6,400 | |
| | Drinking Fountains | 8 | EA | | | 2,200.00 | 17,600 | |
| | Domestic Water in Building-includes 2 extra wet stacks | 920 | LF | | | 25.00 | 23,000 | |
| | Sewer Line in Building—includes 2 extra wet stacks | 920 | LF | | | 30.00 | 27,600 | |
| | Hose Bibbs | 6 | EA | | | 270.00 | 1,620 | |
| | Interior Downspout Piping | 1,600 | LF | | | 35.00 | 56,000 | |
| | Interior Downspout Roof Drains | 16 | EA | | | 4,500.00 | 72,000 | |
| | Sinks or Rough-ins | 32 | EA | | | 820.00 | 26,240 | |
| | Emergency Overflow Drains | 16 | EA | | | 3,200.00 | 51,200 | |
| | Oilminder for elevator | 1 | EA | | | 4,500.00 | 4,500 | |
| | Mop basins | 8 | EA | | | 2,500.00 | 20,000 | |
| | Floor Drains | 15 | EA | | | 700.00 | 10,500 | |
| | Grease / Oil Interceptor for Garage | | | | | | - | |
| | Trench Drains | | | | | | - | |
| | Hot Water Heaters | 8 | EA | | | 1,600.00 | 12,800 | 375,460 |
| | | | | | | | - | 1.77 |
| 15500 | HVAC | | | | | | - | |
| | Trane rooftop units | Furnish only | | | | | 5.96 | 1,281,362 | |
| | Nailor - underfloor HVAC | Furnish only | 1 | LS | | | | - | |

6-30-05atlantaupdate

R.P. Appx. 136

EXHIBIT A

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|---|---|---|---|---|---|---|---|---|---|
| | HVAC core & shell | Excludes restrooms & lobby's | 1 | LS | | | | - | |
| | HVAC - restrooms & lobbies | | 1 | LS | | | | - | |
| | Prof. Liab. Insurance | | 1 | LS | | | | - | |
| | Control system | w/HVAC | | | | | | - | |
| | Compressed Air Piping | Excluded | | | | | | - | 1,261,382 |
| | | | | | | | | | 5.96 |
| | | | | | | | | | - |
| | **MECHANICAL TOTAL** | | | | | | 1,871,315 | 1,871,315 | |
| | | | | | | | | | 8.84 |
| | **Division 16-ELECTRICAL** | | | | | | | - | |
| | | | | | | | | | |
| 16050 | Electrical | | | | | | | | |
| | Main Building Service | | 4,000 | AMP | | | 61.00 | 244,000 | |
| | Service Feeder | | 150 | LF | | | 300.00 | 45,000 | |
| | Panel Boards for lighting | | 8 | EA | | | 3,000.00 | 24,000 | |
| | Panel boards for heating | | 3 | EA | | | 3,000.00 | 9,000 | |
| | Panel boards for receptacles | | 8 | EA | | | 3,000.00 | 24,000 | |
| | Panel for HVAC RTU (feeds to 4 RTU) | | 2,000 | amp | | | 25.00 | 50,000 | |
| | Transformer | | 8 | EA | | | 8,000.00 | 64,000 | |
| | Branch Circuits, raceways, supports | | 1 | LS | | | 6,000.00 | 6,000 | |
| | Can lighting for main lobby and elevator lobby | | 80 | EA | | | 225.00 | 18,000 | |
| | Fire pump hookup | | - | LS | | | 35,000.00 | - | |
| | Back of house ligt 2 x 4 Parabolics | | 118 | EA | | | 300.00 | 35,400 | |
| | Stairwell light fixtures | | 28 | EA | | | 300.00 | 8,400 | |
| | Stairwell light fixtures—main stair | | 14 | EA | | | 550.00 | 7,700 | |
| | Exit Fixtures | | 60 | EA | | | 270.00 | 16,200 | |
| | Restroom Downlights | | 72 | EA | | | 375.00 | 27,000 | |
| | Other Downlights | | 80 | EA | | | 375.00 | 30,000 | |
| | Strip lights | | 27 | EA | | | 530.00 | 14,310 | |
| | 250 W Metal Halide Exterior Flood Lights | | 8 | EA | | | 980.00 | 7,840 | |
| | Wall Sconces | | 66 | EA | | | 800.00 | 52,800 | |
| | Ground Fault Receptacle | | 12 | EA | | | 180.00 | 2,160 | |
| | Duplex recep for Water Cooler | | 6 | EA | | | 125.00 | 750 | |
| | Duplex for telephone | | 6 | EA | | | 200.00 | 1,200 | |
| | Four " PVC thru floors | | - | LS | | | 2,000.00 | - | |
| | Miscellaneous Outlets | | 60 | EA | | | 250.00 | 15,000 | |
| | Elevator Hookup | | 2 | EA | | | 5,000.00 | 10,000 | |
| | HVAC Hookup | | 4 | EA | | | 7,000.00 | 28,000 | |
| | Power to ERU units | | - | EA | | | 2,000.00 | - | |
| | Misc. HVAC | | 6 | EA | | | 750.00 | 4,500 | |
| | Sprinkler Hookup | | 1 | LS | | | 12,000.00 | 12,000 | |
| | Fire Alarm System | | 1 | LS | | | 75,000.00 | 75,000 | |
| | Telephone Board | | 7 | EA | 91.71 | 50.00 | | 992 | |
| | Security / Card Access System - EXCLUDED | | - | ALL | | | | - | |
| | Value engineering required to get to budget | | - | ALL | | | | - | |
| | Temporary Electric | | 1 | EA | | | 10,000.00 | 10,000 | 843,252 |
| | | | | | | | | | 3.98 |
| | | | | | | | | - | |
| 16100 | Site Lighting & Building Accent Lighting | | | | | | | - | |
| | Bid based upon 10/21 Drawings--this bid does anticipate about $50k VE savings (conductor & gear) with about $40k smoke damper Add | | | | | | | - | |
| | Ground mounted flood lighting | | - | EA | | | | - | |
| | Light Bollards, building accent wall lights, specialty exter. Light ALLOWANCE | | 1 | LS | | | 15,000.00 | 15,000 | |
| | Fountain Lighting / Power | Excluded | - | EA | | | | - | |
| | Concrete bases for new sidewalk lighting | Excluded | - | Fixtures | | | | - | |
| | Added lighting along new sidewalk | Excluded | - | Fixtures | | | | - | |
| | Concrete Bases for Lights Bollards | ALLOWANCE | 32 | EA | | | 360.00 | 11,520 | |
| | Pole Lights @ Parking Lot | ALLOWANCE | 32 | EA | | | 3,200.00 | 102,400 | |
| | Wall Paks For Dock & Side Walls | | 5 | EA | | | 450.00 | 2,250 | 131,164 |
| | | | | | | | | | 0.62 |
| | | | | | | | | - | |
| | **ELECTRICAL TOTAL** | | | | | | 974,422 | 974,416 | |
| | | | | | | | | | 4.60 |
| | **SUBTOTAL BUILDING SHELL COSTS** | | | | | | 11,385,602 | 11,385,601 | |
| | | | | | | | | | 53.73 |
| | DIVISION 17 - MISCELLANEOUS | | | | | | | | |
| | COMMISSIONS | | | | | | | - | |
| | CONTINGENCY | | | | | | | - | |
| | INSURANCE | | 0.500% | % | | | | 56,928.01 | |
| | OVERHEAD AND PROFIT | | 4.00% | | | | | 457,701 | |

6-30-05atlantaupdate

R.P. Appx. 137                    EXHIBIT A

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|-----|-----|-------|----------|---------|-------|--|
| | TOTAL BUILDING SHELL COSTS | 211,638 | SF | 56.23 | | | 11,900,231 | |

### 3. TENANT FINISH ALLOWANCE

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|-----|-----|-------|----------|---------|-------|--|
| 06200 | Finish Carpentry Allowance | | | | | | - | |
| | LEED REQUIRED ISSUES--ALLOWANCE | 1 | LS | | | 20,000.00 | 20,000 | |
| | Sliding Closet Bi-Fold Doors | | | | | | - | |
| | Additional Shelving & Worktops | | | | | | - | 20,000 |
| | | | | | | | | 0.09 |
| 08200 | Hollow Metal Doors & Frames | | | | | | - | |
| | Solid Core Wood Doors | | | | | | - | |
| | Lever Style Hardware | | | | | | - | |
| | Automatic Closers | | | | | | - | |
| | | | | | | | - | - |
| | | | | | | | | - |
| 08800 | Glazing | | | | | | - | |
| | Interior Glass Doors | | | | | | - | |
| | Interior Glass Borrowlites in H.M. | | | | | | - | |
| | Mirrors | | | | | | - | - |
| | | | | | | | - | - |
| 09200 | Framing and Drywall | | | | | | - | |
| | Furred Columns Taped | | | | | | - | |
| | Taping | | | | | | - | - |
| | | | | | | | - | - |
| 09300 | Ceramic Tile | | | | | | - | |
| | Floors of Kitchen | | | | | | - | |
| | Wet Walls of Office Restrooms | | | | | | - | |
| | Quarry Tile @ Lobby | | | | | | - | - |
| | | | | | | | - | - |
| 09500 | Install Acoustical Tiles | | | | | | - | |
| | Std. 2 X 4        Second Look II System | | | | | | - | |
| | Install Pads | | | | | | - | |
| | Batt Laid Insulation | | | | | | - | - |
| | | | | | | | - | - |
| 09650 | Resilient Flooring | | | | | | - | |
| | Vinyl Base | | | | | | - | |
| | Vinyl Tile | | | | | | - | - |
| | | | | | | | - | - |
| 09680 | Carpet Allowance | | | | | | - | |
| | Office & Common Areas | | | | | | - | |
| | Stair Treads | | | | | | - | - |
| | | | | | | | - | - |
| 09900 | Painting | | | | | | - | |
| | VWC Allowance | | | | | | - | |
| | Paint New Doors & Frames | | | | | | - | - |
| | | | | | | | - | - |
| 10150 | Computer Flooring | | | | | | - | |
| | Computer Floor | | | | | | - | |
| | Ramp | | | | | | - | - |
| | | | | | | | - | - |
| 10990 | Miscellaneous Specialties | | | | | | - | |
| | Lockers | | | | | | - | |
| | Locker Room Benches | | | | | | - | - |
| | | | | | | | - | - |
| 12510 | Window Blinds or Drapes | | | | | | - | - |
| | | | | | | | - | - |
| 15300 | Fire Protection | | | | | | - | |
| | Office Sprinklers | | | | | | - | |
| | Recessed Heads | | | | | | - | |
| | Concealed Heads | | | | | | - | - |
| | | | | | | | - | - |
| 15400 | Plumbing | | | | | | - | |
| | Coffee Bar Areas | | | | | | - | |
| | Sinks or Rough-Ins | | | | | | - | |

6-30-05atlantaupdate

R.P. Appx. 138

EXHIBIT A

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|-----|-----|-------|----------|---------|-------|---|
| | Shower Doors | | | | | | - | - |
| | | | | | | | - | - |
| 15500 | HVAC | | | | | | - | |
| | Added VAV Boxes and Slot Diffusers | | | | | | - | |
| | Exhaust Fans @ Rest Room & Break Room | | | | | | - | |
| | Extended Warranty | | | | | | - | - |
| | | | | | | | - | - |
| 16050 | Electrical | | | | | | - | |
| | Distribution | | | | | | - | |
| | Plumbing Hookup | | | | | | - | |
| | Cable Tray System | | | | | | - | - |
| | | | | | | | - | - |
| 16150 | Security / Fire Alarm Systems Allowance | | | | | | - | |
| | Security System | | | | | | - | - |
| | Fire Alarm System | | | | | | - | - |
| | | | | | | | - | - |
| 18001 | Space Planning & Design | | | | | | - | - |
| | | | | | | | - | - |
| | SUBTOTAL TENANT FINISH COSTS | | | | | | 20,000 | 20,000 |
| | | | | | | | | 0.09 |
| | DIVISION 17 - MISCELLANEOUS | | | | | | | |
| | INSURANCE | 0.50% | % | | | | 100.00 | |
| | OVERHEAD AND PROFIT | 4.00% | | | | | 804 | |
| | TOTAL TENANT FINISH COSTS | 211,638 | SF | 0.10 | | | 20,904 | |

## 4. ARCHITECTURAL & ENGINEERING SERVICES

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|---|-----|-----|-------|----------|---------|-------|---|
| | Preliminary Fees | | 1 | LS | | | - | - | - |
| | | | | | | | | - | - |
| | Architectural Services | | 1 | LS | | | 340,000 | 340,000 | |
| | Interior Services / Space Planning | Part of TI | | | | | | - | |
| | Reimbursables | | 1 | LS | | | 25,950 | 25,950 | 365,950 |
| | | | | | | | | - | 1.73 |
| | Building Envelope | | 1 | LS | | | 3,500 | 3,500 | 3,500 |
| | | | | | | | | - | 0.02 |
| | Code Review | | 1 | LS | | | 3,000 | 3,000 | 3,000 |
| | | | | | | | | - | 0.01 |
| | Energy modeling | | | | | | 5,000 | - | - |
| | | | | | | | | - | - |
| | LEED certification | BY KOLL | | | | | - | - | - |
| | | | | | | | | - | - |
| | Structural Services | | 1 | LS | | | 110,000 | 110,000 | 110,000 |
| | | | | | | | | - | 0.52 |
| | MEP Services | | 1 | LS | | | 102,000 | 102,000 | 102,000 |
| | | | | | | | | - | 0.48 |
| | Plumbing Services | | | | | | w/HVAC | - | - |
| | | | | | | | | - | - |
| | Lighting Design | | 1 | LS | | | | - | - |
| | | | | | | | | - | - |
| | Sprinkler Services | | | | | | w/HVAC | - | - |
| | | | | | | | | - | - |
| | Civil Services | | 1 | LS | | | 33,000 | 33,000 | |
| | Topographic Survey | BY KOLL | | | | | | - | |
| | Foundation Spot | BY KOLL | | | | | | - | |
| | As Built Survey | BY KOLL | | | | | | - | |
| | Site Staking | w/GC's | | | | | - | - | 33,000 |
| | | | | | | | | - | 0.16 |
| | Landscaping | | 1 | LS | | | 25,000 | 25,000 | 25,000 |
| | | | | | | | | - | 0.12 |
| | Subsurface Soil Report | BY KOLL | | | | | | - | - |
| | | | | | | | | - | - |
| | Roofing Inspections | | 1 | LS | | | 3,000 | 3,000 | 3,000 |

6-30-05atlantaupdate

R.P. Appx. 139                                        EXHIBIT A

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|-----|-----|-------|----------|---------|-------|---|
| | | | | | | | - | 0.01 |
| | Renderings | | | | | 2,000 | - | 5,000 |
| | Energy Model | 1 | LS | | | 5,000 | 5,000 | 0.02 |
| | Hardware, signage, acoustics & contingency | | | | | | - | - |
| | Models | | | | | | - | - |
| | SUBTOTAL ARCHITECTURAL COSTS | | | | | | 650,450 | 650,450 |
| | | | | | | | | 2.91 |
| | MISCELLANEOUS | | | | | | | |
| | INSURANCE | 0.500% | % | | | | 3,252 | |
| | OVERHEAD AND PROFIT | 4.00% | | | | | 26,148 | |
| | | | | | | | | |
| | SUBTOTAL ARCHITECTURAL COSTS | 211,638 | SF | 3.21 | | | 679,850 | |

PROJECT SUMMARY

| DESCRIPTION | PER /S.F. | TOTAL |
|-------------|-----------|-------|
| 1. SITE IMPROVEMENTS | $7.92 | 1,677,179 |
| 2. BUILDING SHELL | $53.80 | 11,385,602 |
| 3. LEED CERTIFICATION ALLOWANCE | $0.09 | 20,000 |
| 4. ARCHITECTURAL & ENGINEERING SERVICES | $3.07 | 650,450 |
| MISCELLANEOUS | $0.32 | 68,666 |
| | $65.20 | 13,801,897 |
| Adjustment | | |
| OVERHEAD & PROFIT | $2.61 | 552,076 |

| TOTAL ESTIMATE ==========> | $67.82 /SqFt | 14,353,973 |
|---|---|---|

## Dallas Intellicenter Exhibit C
## Dallas, TX
## 211,637 SF - 4 STORY OFFICE BLDG.
## KOLL DEVELOPMENT COMPANY
## February 20, 2006

| 02000 | SITE WORK | CONTROL BUDGET | COST PER/SF |
|-------|-----------|----------------|-------------|
| 02050 | Demolition / Site Clearing | 34,440 | 0.16 |
| 02200 | Earthwork | 224,816 | 1.06 |
| 02210 | Finish Grading / Backfill Footings | 4,200 | 0.02 |
| 02300 | Surface Water Control | 9,000 | 0.04 |
| 02500 | Asphalt Paving and Striping | 3,195 | 0.02 |
| 02510 | Concrete Paving & Curbs—TAS | 881,188 | 4.16 |
| 02605 | Sanitary Sewer | 11,510 | 0.05 |
| 02660 | Water Distribution | 94,520 | 0.45 |
| 02680 | Gas Main to Building | 0 | 0.00 |
| 02700 | Storm Sewers | 89,310 | 0.42 |
| 02780 | Underground Electric Conduit | 0 | 0.00 |
| 02781 | Hardscape Allowance | 25,000 | 0.12 |
| 02850 | Landscaping Allowance | 225,000 | 1.06 |
| 02900 | Irrigation Allowance | 75,000 | 0.35 |

6-30-05allantaupdate

R.P. Appx. 140

EXHIBIT A

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total |
|------|-------------|---|-----|-----|-------|----------|---------|-------|
| | SITE WORK TOTAL | | 1,677,179 | 7.92 | | | | |
| | | | | | | | | |
| 02000 | EARTHWORK | | | | | | | |
| | | | | | | | | |
| 02220 | Excavation and Backfill | | 6,000 | 0.03 | | | | |
| 02370 | Drilled Piers | | 268,450 | 1.27 | | | | |
| | EARTHWORK TOTAL | | 274,450 | 1.30 | | | | |
| | | | | | | | | |
| 03000 | CONCRETE | | | | | | | |
| | | | | | | | | |
| 03210 | Reinforcing Steel | | 30,000 | 0.14 | | | | |
| 03300 | Cast-in-place Concrete | | 110,800 | 0.52 | | | | |
| 03345 | Cement Flatwork | | 704,970 | 3.33 | | | | |
| 03350 | Caulk Floor joints w/ MM80 Sealer | | 0 | 0.00 | | | | |
| 03355 | Concrete Sealer | | 0 | 0.00 | | | | |
| 03400 | Architectural Concrete Wall Panels | | 1,061,040 | 5.01 | | | | |
| | CONCRETE TOTAL | | 1,906,810 | 9.01 | | | | |
| | | | | | | | | |
| 04000 | MASONRY | | | | | | | |
| | | | | | | | | |
| 04210 | Masonry | | 0 | 0.00 | | | | |
| | MASONRY TOTAL | | 0 | 0.00 | | | | |
| | | | | | | | | |
| 05000 | METALS | | | | | | | |
| | | | | | | | | |
| 05120 | Structural Steel | | 1,040,520 | 4.92 | | | | |
| 05200 | Miscellaneous for Tilt-Up | | 15,000 | 0.07 | | | | |
| 05210 | Steel Joists | | 35,750 | 0.17 | | | | |
| 05300 | Metal Decking | | 301,585 | 1.43 | | | | |
| 05340 | Structural Erection | | 432,959 | 2.05 | | | | |
| 05580 | Sheet Metal Fabrications | | 65,450 | 0.31 | | | | |
| | METALS TOTAL | | 1,891,264 | 8.94 | | | | |
| | | | | | | | | |
| 06000 | WOOD & PLASTICS | | | | | | | |
| | | | | | | | | |
| 06100 | Rough Carpentry | | 22,604 | 0.11 | | | | |
| #REFI | #REFI | | 108,572 | 0.51 | | | | |
| | WOOD & PLASTICS TOTAL | | 131,176 | 0.62 | | | | |

6-30-05atlantaupdate

**R.P. Appx. 141**          **EXHIBIT A**

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| 07000 | **THERMAL & MOISTURE PROTECTION** | | | | | | |
| 07100 | Waterproofing --elevator pits | 7,000 | 0.03 | | | | |
| 07200 | Insulation | 21,097 | 0.10 | | | | |
| 07500 | Roofing | 225,540 | 1.07 | | | | |
| 07600 | Flashing and Sheet Metal | 411,531 | 1.94 | | | | |
| 07700 | Skylights & Roof Hatch | 5,500 | 0.03 | | | | |
| 07920 | Sealants and Caulking | 24,835 | 0.12 | | | | |
| | MOISTURE PROTECTION TOTAL | 695,503 | 3.29 | | | | |
| 08000 | **DOORS & WINDOWS** | | | | | | |
| 08200 | Doors,Frames,and Hardware--discount | 101,665 | 0.48 | | | | |
| 08300 | Overhead Doors & Operators | 4,550 | 0.02 | | | | |
| 08800 | Glazing (based on National Agreement pricing) | 1,158,560 | 5.47 | | | | |
| | DOORS & WINDOWS TOTAL | 1,264,775 | 5.98 | | | | |
| 09000 | **FINISHES** | | | | | | |
| 09200 | Framing and Drywall | 668,721 | 3.16 | | | | |
| 9402 | Epoxy Terrrazzo | 38,024 | 0.18 | | | | |
| 09500 | Ceiling | 28,213 | 0.13 | | | | |
| 09650 | Ceramic Tile | 79,416 | 0.38 | | | | |
| 09680 | Carpet & Resilient Flooring | 15,870 | 0.07 | | | | |
| 09900 | Painting | 74,635 | 0.35 | | | | |
| 09950 | Wall Covering & Zolotone Allowance | 16,698 | 0.08 | | | | |
| 9970 | Special Wall Surfaces (FRP) | 1,500 | 0.01 | | | | |
| | FINISHES TOTAL | 923,077 | 4.36 | | | | |
| 10000 | **SPECIALTIES** | | | | | | |
| 10150 | Toilet Partitions and Acces. | 18,540 | 0.09 | | | | |
| 10550 | Metal Lockers | 0 | 0.00 | | | | |
| 10600 | Miscellaneous Specialties | 28,230 | 0.13 | | | | |
| 10610 | Appliances | 0 | 0.00 | | | | |
| 10900 | Interior Signage & Directories | 0 | 0.00 | | | | |
| 10950 | Exterior Signage Allowance | 0 | 0.00 | | | | |
| | SPECIALTIES TOTAL | 46,770 | 0.22 | | | | |
| 11000 | **EQUIPMENT** | | | | | | |
| 11160 | Mechanical Dock Levelers - 35,000# Capacity | 2,045 | 0.01 | | | | |
| 11162 | Dock Levelers - Form Pits | 0 | 0.00 | | | | |
| 11164 | Dock Locks | 0 | 0.00 | | | | |
| 11165 | Dock Seals | 0 | 0.00 | | | | |
| 11166 | Dock Shelters | 0 | 0.00 | | | | |
| 11167 | Dock Lights | 300 | 0.00 | | | | |
| | EQUIPMENT TOTAL | 2,345 | 0.01 | | | | |
| 12000 | **FURNISHINGS** | | | | | | |
| 12510 | Horizontal Blinds - 1" | 58,800 | 0.28 | | | | |
| | FURNISHINGS TOTAL | 58,800 | 0.28 | | | | |
| 13000 | **SPECIAL CONSTRUCTION** | | | | | | |
| 13320 | Access Flooring | 720,070 | 3.40 | | | | |
| | SPECIAL CONSTRUCTION TOTAL | 720,070 | 3.40 | | | | |
| 14000 | **CONVEYING SYSTEMS** | | | | | | |
| 14200 | Elevators | 204,000 | 0.96 | | | | |

6-30-05atlantaupdate

R.P. Appx. 142

EXHIBIT A

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|------|-------------|-----|-----|-------|----------|---------|-------|
| | CONVEYING SYSTEMS TOTAL | 204,000 | 0.96 | | | | |
| 15000 | MECHANICAL SYSTEMS | | | | | | |
| 15300 | Fire Protection | 199,493 | 0.94 | | | | |
| 15310 | Booster Pumps—75 hp | 35,000 | 0.17 | | | | |
| 15400 | Plumbing—discount | 375,460 | 1.77 | | | | |
| 15500 | HVAC | 1,261,362 | 5.96 | | | | |
| | MECHANICAL SYSTEMS TOTAL | 1,871,315 | 8.84 | | | | |

5-30-05atlantaupdate

**R.P. Appx. 143**

**EXHIBIT A**

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| 16000 | ELECTRICAL | | | | | | |
| 16050 | Electrical | 843,252 | 3.98 | | | | |
| 16100 | Site Lighting & Building Accent Lighting | 131,164 | 0.62 | | | | |
| | ELECTRICAL TOTAL | 974,416 | 4.60 | | | | |

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| 17000 | CONSULTING SERVICES | | | | | | |
| 17000 | Preliminary Fees | Incl | 0.00 | | | | |
| 17100 | Architectural Services | Incl | 0.00 | | | | |
| 17150 | Code Review | Incl | 0.00 | | | | |
| 17200 | Structural Services | Incl | 0.00 | | | | |
| 17300 | Mechanical-Electrical-Plumbing-Sprinklers | Incl | 0.00 | | | | |
| 17400 | Civil Services | Incl | 0.00 | | | | |
| 17470 | Subsurface Soil Report | Incl | 0.00 | | | | |
| 17600 | Roofing Inspections | Incl | 0.00 | | | | |
| 17600 | Rendering | Incl | 0.00 | | | | |
| 17900 | Reimbursables | Incl | 0.00 | | | | |
| | CONSULTING SERVICES TOTAL | 650,450 | 3.07 | | | | |

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| 18000 | TENANT FINISH | | | | | | |
| 06200 | Finish Carpentry Allowance | 20,000 | 0.09 | | | | |
| 08200 | Hollow Metal Doors & Frames | 0 | 0.00 | | | | |
| 08800 | Glazing | 0 | 0.00 | | | | |
| 09200 | Framing and Drywall | 0 | 0.00 | | | | |
| 09300 | Ceramic Tile | 0 | 0.00 | | | | |
| 09500 | Install Acoustical Tiles | 0 | 0.00 | | | | |
| 09650 | Resilient Flooring | 0 | 0.00 | | | | |
| 09680 | Carpet Allowance | 0 | 0.00 | | | | |
| 09900 | Painting | 0 | 0.00 | | | | |
| 10150 | Computer Flooring | 0 | 0.00 | | | | |
| 10990 | Miscellaneous Specialties | 0 | 0.00 | | | | |
| 12510 | Window Blinds or Drapes | 0 | 0.00 | | | | |
| 15300 | Fire Protection | 0 | 0.00 | | | | |
| 15400 | Plumbing | 0 | 0.00 | | | | |
| 15500 | HVAC | 0 | 0.00 | | | | |
| 16050 | Electrical | 0 | 0.00 | | | | |
| 16150 | Security / Fire Alarm Systems Allowance | 0 | 0.00 | | | | |
| 18001 | Space Planning & Design | 0 | 0.00 | | | | |
| | TENANT FINISH TOTAL | 20,000 | 0.09 | | | | |

6-30-05atlantaupdate

**R.P. Appx. 144**                    EXHIBIT A

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| 01000 | GENERAL CONDITIONS | | | | | | |
| 18010 | Project Manager--discount | 71,300 | 0.34 | | | | |
| 18020 | Field Superintendent (local wage only) | 104,561 | 0.49 | | | | |
| 18025 | Travel Expenses--discount | 21,750 | 0.10 | | | | |
| 18030 | Drawing Reproduction & Progress Photos | 9,705 | 0.05 | | | | |
| 18040 | Field Engineering & Layout | 18,000 | 0.09 | | | | |
| 18060 | Construction Cleaning & General Labor--discount | 66,064 | 0.31 | | | | |
| 18100 | Equipment Rental & Small Tools | 22,395 | 0.11 | | | | |
| 18200 | Miscellaneous G. C.'s & Safety | 19,845 | 0.09 | | | | |
| 18210 | Winter Protection | 0 | 0.00 | | | | |
| 18220 | Temporary Roads | 3,500 | 0.02 | | | | |
| 18240 | Performance Bond | 0 | 0.00 | | | | |
| 18250 | Building Permit | 37,980 | 0.18 | | | | |
| 18255 | Builder's Risk Insurance | 14,850 | 0.07 | | | | |
| 18260 | Quality Control & Testing | 0 | 0.00 | | | | |
| 18270 | Temporary Utilities | 30,875 | 0.15 | | | | |
| | **GENERAL CONDITIONS TOTAL** | **420,825** | **1.99** | | | | |

| | SUMMARY | CONTROL BUDGET | COST PER/SF |
|---|---|---|---|
| 02000 | SITE WORK | 1,677,179 | 7.92 |
| 02000 | EARTHWORK | 274,450 | 1.30 |
| 03000 | CONCRETE | 1,906,810 | 9.01 |
| 04000 | MASONRY | 0 | 0.00 |
| 05000 | METALS | 1,891,264 | 8.94 |
| 06000 | WOOD & PLASTICS | 131,176 | 0.62 |
| 07000 | THERMAL & MOISTURE PROTECTION | 695,503 | 3.29 |
| 08000 | DOORS & WINDOWS | 1,264,775 | 5.98 |
| 09000 | FINISHES | 923,077 | 4.36 |
| 10000 | SPECIALTIES | 46,770 | 0.22 |
| 11000 | EQUIPMENT | 2,345 | 0.01 |
| 12000 | FURNISHINGS | 58,800 | 0.28 |
| 13000 | SPECIAL CONSTRUCTION | 720,070 | 3.40 |
| 14000 | CONVEYING SYSTEMS | 204,000 | 0.96 |
| 15000 | MECHANICAL SYSTEMS | 1,871,315 | 8.84 |
| 16000 | ELECTRICAL | 974,416 | 4.60 |
| 18000 | TENANT FINISH | 20,000 | 0.09 |
| 17000 | CONSULTING SERVICES | 650,450 | 3.07 |
| 01000 | GENERAL CONDITIONS | 420,825 | 1.99 |
| | MISCELLANEOUS | 68,672 | 0.32 |
| | OVERHEAD & PROFIT | 552,076 | 2.61 |
| | **TOTAL ESTIMATE =======>** | **14,353,973** | **67.81** |

1/21/06

| DESCRIPTION | QUANTITY | UNIT | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|
| ALT #1 - Add Mud slab | | | | | | |
| Slab--4" with Mesh | 52000 | sf | | | 2.20 | 114,400 |

6-30-05atlantaupdate

R.P. Appx. 145                                    EXHIBIT A

| CODE          DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|
| Misc | 1 | LS | | | 5,000.00 | 5,000 |
| | | | | | | - |
| | | | | | | 119,400 |
| Insurance | 0.60% | | | | | 716 |
| Overhead & Profit | 4.00% | | | | | 4,805 |
| | | | | | | 124,921 |
| | | | | | | |
| **ALT #2 - PROVIDE 20GAUGE VS. 18 GAUGE METAL PANELS MP-1 & MP-2** | | | | | | |
| Metal panels | 1 | LS | | | (10,900.00) | (10,900) |
| | | | | | | - |
| | | | | | | (10,900) |
| Insurance | 0.60% | | | | | (65) |
| Overhead & Profit | 4.00% | | | | | (439) |
| | | | | | | VOID |
| | | | | | | |
| **ALT #3 - PROVIDE METAL PANELS MP-1 & MP-2 W/STANDARD BUTT JOINT CORNERS** | | | | | | |
| Metal panels | 1 | LS | | | (14,400.00) | (14,400) |
| | | | | | | - |
| | | | | | | (14,400) |
| Insurance | 0.60% | | | | | (86) |
| Overhead & Profit | 4.00% | | | | | (579) |
| | | | | | | VOID |
| | | | | | | |
| **ALT#4 --DELETE GFRC PANEL AT LEVELS 2-4 AT 2 LOCATIONS** | | | | | | |
| Delete GFRC | 1 | LS | | | (8,500.00) | (8,500) |
| Less Framing | 1 | Ls | | | (750.00) | (750) |
| | | | | | | (9,250) |
| Insurance | 0.60% | | | | | (56) |
| Overhead & Profit | 4.00% | | | | | (372) |
| | | | | | | (9,678) |
| | | | | | | |
| **ALT#5 - DELETE ROOF SCREEN WALL AND STEEL SUPPORTS** | | | | | | |
| Metal panels | 1 | LS | | | (50,000.00) | (50,000) |
| Structural steel | 1 | LS | | | (100,000.00) | (100,000) |
| Rough carpentry | 1 | LS | | | (1,000.00) | (1,000) |
| Roofing & flashings | 1 | LS | | | 2,000.00 | 2,000 |
| Drywall Framing | 1 | LS | | | (10,000.00) | (10,000) |
| ADD FOR NEW SCREEN WALL | 675 | lf | | | 125.00 | 84,375 |
| | | | | | | - |
| | | | | | | (74,625) |
| Insurance | 0.60% | | | | | (448) |
| Overhead & Profit | 4.00% | | | | | (3,003) |
| | | | | | | VOID |
| | | | | | | |
| **ALT #6 - DELETE CORNICE CMP-1 @ ROOF PERIMETER** | | | | | | |
| Metal panels | 1 | LS | | | (125,000.00) | (125,000) |
| Roofing & flashings | 1 | LS | | | (10,000.00) | (10,000) |
| Rough carpentry | 1 | LS | | | (75,000.00) | (75,000) |
| | | | | | | (210,000) |
| Insurance | 0.60% | | | | | (1,260) |
| Overhead & Profit | 4.00% | | | | | (8,450) |
| | | | | | | VOID |
| | | | | | | |
| **ALT #7 - MECHANICALLY FASTENED ROOF SYSTEM IN LIEU OF FULLY ADHERED** | | | | | | |
| Roofing | 1 | LS | | | (7,000.00) | (7,000) |
| | | | | | | - |
| | | | | | | - |
| | | | | | | (7,000) |
| Insurance | 0.60% | | | | | (42) |
| Overhead & Profit | 4.00% | | | | | (282) |

8-30-05atlantaupdate

R.P. Appx. 146

EXHIBIT A

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|------|-------------|-----|-----|-------|----------|---------|-------|
| | | | | | | | May use either system |
| | **ALT #8 - FURNISH 12"X12" POCELAIN TILE IN LIEU OF THE SPECIFIED 12"X24"** | | | | | | |
| | Ceramic tile | 1 | LS | | | (12,000.00) | (12,000) |
| | | | | | | | - |
| | | | | | | | (12,000) |
| | Insurance | 0.60% | | | | | (72) |
| | Overhead & Profit | 4.00% | | | | | (483) |
| | | | | | | | May use either system |
| | **ALT #9 - FLOOR JOISTS IN LIEU OF BEANS ON LEVELS 2 THRU 4** | | | | | | |
| | Concrete | 1 | LS | | | | - |
| | Structural steel | 1 | LS | | | | - |
| | | | | | | | - |
| | Insurance | 0.60% | | | | | - |
| | Overhead & Profit | 4.00% | | | | | - |
| | | | | | | | VOID |
| | **ALT#10 - DELETE STUMBLE LIGHTING IN TENANT AREAS (INCL. CONDUIT & WIRE)** | | | | | | |
| | Leave construction temp. lighting in place | | | | | | |
| | Electrical | 1 | LS | | | (15,000.00) | (15,000) |
| | | | | | | | (15,000) |
| | Insurance | 0.60% | | | | | (90) |
| | Overhead & Profit | 4.00% | | | | | (604) |
| | | | | | | | (15,694) |
| | **ALT#11 - DELETE CURTAIN WALL SYSTEM ON COL. LINE 1 AND 16** | | | | | | |
| | Replace with tilt wall and storefront | | | | | | |
| | Foundations | 1 | LS | | | (55,000.00) | (55,000) |
| | Flatwork concrete | 1 | LS | | | (2,000.00) | (2,000) |
| | Tilt-wall | 1,800 | SF | | | 10.00 | 18,000 |
| | Structural steel | 1 | LS | | | (10,000.00) | (10,000) |
| | Metal wall panels | 1 | LS | | | (15,000.00) | (15,000) |
| | Rough carpentry | 1 | LS | | | (2,000.00) | (2,000) |
| | Roofing | 1 | LS | | | (2,000.00) | (2,000) |
| | Curtainwall & storefront | 1 | LS | | | (85,000.00) | (85,000) |
| | Drywall | 1 | LS | | | - | - |
| | Painting | 1 | LS | | | (500.00) | (500) |
| | Access flooring | 1 | LS | | | (3,000.00) | (3,000) |
| | | | | | | | (156,500) |
| | Insurance | 0.60% | | | | | (939) |
| | Overhead & Profit | 4.00% | | | | | (6,295) |
| | | | | | | | VOID |
| | **ALT #12 - DELETE STOREFRONT SUNSHADES LEVELS 1 AND 2** | | | | | | |
| | Storefront | 1 | LS | | | (25,000.00) | (25,000) |
| | | | | | | | (25,000) |
| | Insurance | 0.60% | | | | | (150) |
| | Overhead & Profit | 4.00% | | | | | (1,006) |
| | | | | | | | VOID |
| | **ALT#13 - DELETE SUNSHADES AT CURTAINWALL AREAS** | | | | | | |
| | Curtainwall | 1 | LS | | | (50,000.00) | (50,000) |
| | | | | | | | (50,000) |

6-30-05atlantaupdate

R.P. Appx. 147

EXHIBIT A

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| Insurance | | 0.60% | | | | | (300) |
| Overhead & Profit | | 4.00% | | | | | (2,012) |
| | | | | | | | VOID |

**ALT #14 - DELETE INTERIOR GLASS @ STAIR 2 (LEVELS 1, 2,3 & 4)**

| | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| | Also delete terrazzo @ top landings | | | | | | - |
| | GL 7 | 1 | LS | | | (25,000.00) | (25,000) |
| | Drywall | 1 | LS | | | 5,000.00 | 5,000 |
| | Terrazzo | 1 | LS | | | (3,000.00) | (3,000) |
| | Fire protection | 1 | LS | | | (5,000.00) | (5,000) |
| | | | | | | | - |
| | | | | | | | (28,000) |
| Insurance | | 0.60% | | | | | (168) |
| Overhead & Profit | | 4.00% | | | | | (1,127) |
| | | | | | | | VOID |

**ALT #15 - REDUCE STEORFRONT PUNCHED OPENINGS**

| | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| | 8X8 ON LEVELS 1,2&3, 20X8 ON LEVEL 4, LESS MULLIONS | | | | | | |
| | Tilt panels | 1 | LS | | | 5,000.00 | 5,000 |
| | Curtainwall & storefront | 1 | LS | | | (218,750.00) | (218,750) |
| | Painting | 1 | LS | | | 5,000.00 | 5,000 |
| | | | | | | | - |
| | | | | | | | (208,750) |
| Insurance | | 0.60% | | | | | (1,253) |
| Overhead & Profit | | 4.00% | | | | | (8,400) |
| | | | | | | | VOID |

**ALT#16 - DELETE TRUCKING EXCESS SPOILS OFF SITE AND LEAVE ON SITE**

| | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| | | | | | | | - |
| | Earthwork--keep cut & stockpile in number | 17,000 | CY | | | (5.00) | (85,000) |
| | | | | | | | - |
| | | | | | | | (85,000) |
| Insurance | | 0.60% | | | | | (510) |
| Overhead & Profit | | 4.00% | | | | | (3,420) |

**ALT#16a - DELETE TRUCKING EXCESS SPOILS (FROM EXTRA TOPSOIL AND UTILITY SPOILS)/LEAVE ON SITE**

| | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| | Earthwork--keeps excavating & stockpiling in number | 3,500 | CY | | | (5.00) | (17,500) |
| | | | | | | | - |
| | | | | | | | (17,500) |
| Insurance | | 0.60% | | | | | (105) |
| Overhead & Profit | | 4.00% | | | | | (704) |
| | | | | | | | leave on site |

**ALT #17 - DELETE LEED CERTIFICATION REQUIREMENTS**

| | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| | Design remains unchanged | | | | | | - |
| | Staff | 1 | LS | | | (10,000.00) | (10,000) |
| | Dumpsters | 1 | LS | | | (15,000.00) | (15,000) |
| | | | | | | | - |
| | | | | | | | - |
| | | | | | | | - |
| | | | | | | | (25,000) |
| Insurance | | 0.60% | | | | | (150) |
| Overhead & Profit | | 4.00% | | | | | (1,006) |
| | | | | | | | VOID |

**ALT#18 - ADD GL-7 GLAZING AND DELETE 1/4" TEMPERED (Joel Berman Glass was not quoted to other GC's)**

| | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| | Glazing | 1 | LS | | | 43,000.00 | |

6-30-05atlantaupdate

R.P. Appx. 148                     EXHIBIT A

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| Insurance | | 0.60% | | | | | |
| Overhead & Profit | | 4.00% | | | | | |
| | | | | | | | |
| **ALT#19 - ADD LIME STABILIZE BELOW PAVING AND CLOSE BLDG SW'S** | | | | | | | |
| | LIME WORK | 38,000 | SY | | | 3.75 | 142,500 |
| | | | | | | | - |
| | | | | | | | - |
| | | | | | | | 142,500 |
| Insurance | | 0.60% | | | | | 855 |
| Overhead & Profit | | 4.00% | | | | | 5,734 |
| | | | | | | | 149,089 |
| **ALT#20 - PROVIDE WINDOW WALL CONSULTANT** | | | | | | | |
| | CONSULTING & WATER TESTING | 1 | ls | | | 15,000.00 | 15,000 |
| | | | | | | | - |
| | | | | | | | - |
| | | | | | | | 15,000 |
| Insurance | | 0.60% | | | | | 90 |
| Overhead & Profit | | 4.00% | | | | | 604 |
| | | | | | | | 15,694 |
| | | | | | | | |
| **ALT#21 -- MEPFP CLAYCO COORDINATION** | | | | | | | |
| | MEPFP | 1 | ls | | | 10,000.00 | 10,000 |
| | | | | | | | - |
| | | | | | | | - |
| | | | | | | | 10,000 |
| Insurance | | 0.60% | | | | | 60 |
| Overhead & Profit | | 4.00% | | | | | 402 |
| | | | | | | | 10,462 |
| **ALT#22 - CHANGE PANELS TO 15' WIDE, MODIFY TOP GLASS** | | | | | | | |
| | TILTUP PANEL ERECTION CREDIT | 1 | ls | | | (15,000.00) | (15,000) |
| | GLASS CREDIT | 1 | LS | | | (100,000.00) | (100,000) |
| | PIER & PANEL ADD PER TAS | 1 | LS | | | 75,000.00 | 75,000 |
| | | | | | | | - |
| | | | | | | | (40,000) |
| Insurance | | 0.60% | | | | | (240) |
| Overhead & Profit | | 4.00% | | | | | (1,610) |
| | | | | | | | Void |
| **ALT#23 -- REMOVE SCOPE TO PROVIDE FIRE MARSHALL ACCESS** | | | | | | | |
| | WEIR AMOUNT | 1 | ls | | | (53,000.00) | (53,000) |
| | | 1 | LS | | | - | - |
| | | 1 | LS | | | - | - |
| | | | | | | | - |
| | | | | | | | (53,000) |
| Insurance | | 0.60% | | | | | (318) |
| Overhead & Profit | | 4.00% | | | | | (2,133) |
| | | | | | | | Void |
| | | | | | | | |
| **ALT#24 -- DELETE 2ND PASSENGER ELEVATOR** | | | | | | | |
| | ELEVATOR CREDIT | 1 | ls | | | (56,000.00) | (56,000) |
| | DEDUCT DRYWALL | 1,440 | SF | | | (4.00) | (5,760) |
| | LESS ELECTRIC/F.ALARM | 1 | LS | | | (3,200.00) | (3,200) |
| | | | | | | | (64,960) |
| Insurance | | 0.60% | | | | | (390) |
| Overhead & Profit | | 4.00% | | | | | (2,614) |
| | | | | | | | Void |
| | | | | | | | |
| **ALT#25 -- CHANGE HVAC TO O/H SYSTEM** | | | | | | | |
| | TD CREDIT | 1 | ls | | | (150,000.00) | (150,000) |
| | DEDUCT DRYWALL | 1 | SF | | | (5.00) | - |
| | | 1 | LS | | | - | - |
| | | | | | | | - |
| | | | | | | | (150,000) |
| Insurance | | 0.60% | | | | | (900) |
| Overhead & Profit | | 4.00% | | | | | (6,035) |

6-30-05atlantaupdate

R.P. Appx. 149                    EXHIBIT A

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|------|-------------|-----|-----|-------|----------|---------|-------|
| | | | | | | | VOID |
| ALT#26 -UTILIZE H&H STEEL | | | | | | | |
| | CREDIT FROM ENNIS (WITH PANEL ERECTION) | 1 | ls | | | (2,318,000.00) | (2,318,000) |
| | Add for H&H | 1 | LS | | | 2,091,207.00 | 2,091,207 |
| | Contingency | 1 | LS | | | 40,000.00 | 40,000 |
| | | | | | | | - |
| | | | | | | | (186,793) |
| Insurance | | 0.60% | | | | | (1,121) |
| Overhead & Profit | | 4.00% | | | | | (7,517) |
| | | | | | | | VOID |
| ALT#27 --ELECTRICAL VALUE ENGINEERING FROM DFW PLAN | | | | | | | |
| | JMEG | 1 | ls | | | (60,000.00) | (60,000) |
| | | | SF | | | | - |
| | | 1 | LS | | | - | - |
| | | | | | | | - |
| | | | | | | | (60,000) |
| Insurance | | 0.60% | | | | | (360) |
| Overhead & Profit | | 4.00% | | | | | (2,414) |
| | | | | | | | Void - offset Damper add |
| | | | | | | | - |
| ALT#28 --ADD TO DFW DRAWINGS FOR MISSING HVAC | | | | | | | |
| Power & FA Connections to Fire Smoke Dampers per M3.01—currently being redesigned | | | | | | | |
| | JMEG—Will be reduced | 1 | ls | | | 53,200.00 | 53,200 |
| | | | SF | | | | - |
| | | 1 | LS | | | - | - |
| | | | | | | | - |
| | | | | | | | 53,200 |
| Insurance | | 0.60% | | | | | 319 |
| Overhead & Profit | | 4.00% | | | | | 2,141 |
| | | | | | | | Void - offset VE |
| ALT#29 --ADD LIGHTING PER NEW 11/1/05 DOC'S NOT RECEIVED BY CLAYCO | | | | | | | |
| Lighting Schedule provided to JMEG via Constructors | | | | | | | |
| | JMEG | 1 | ls | | | 117,000.00 | 117,000 |
| | | | SF | | | | - |
| | | 1 | LS | | | - | - |
| | | | | | | | 117,000 |
| Insurance | | 0.60% | | | | | 702 |
| Overhead & Profit | | 4.00% | | | | | 4,708 |
| | | | | | | | 122,410 |
| | | | | | | | |
| ALT#30 -Change roof screen Steel to Galvanized | | | | | | | |
| - | | | | | | | - |
| | H&H | 1 | ls | | | 31,000.00 | 31,000 |
| | Painting | 1 | Ls | | | (5,000.00) | (5,000) |
| | | 1 | LS | | | - | - |
| | | | | | | | 26,000 |
| Insurance | | 0.60% | | | | | 156 |
| Overhead & Profit | | 4.00% | | | | | 1,046 |
| | | | | | | | 27,202 |
| ALT#31 --Caulk interior side of window frames | | | | | | | |
| - | | | | | | | - |
| | Pais | 1 | ls | | | 11,500.00 | 11,500 |
| | | 1 | Ls | | | - | - |
| | | 1 | LS | | | - | - |
| | | | | | | | - |
| | | | | | | | 11,500 |
| Insurance | | 0.60% | | | | | 69 |
| Overhead & Profit | | 4.00% | | | | | 463 |
| | | | | | | | 12,032 |

ALT #1 - A ADD MUD SLAB     ADD     124,921
ALT #2 - PROVIDE 20GAUGE VS. 18 GAUGE METAL PANELS MP-1 & MP-2     DEDUCT     VOID
ALT #3 - PROVIDE METAL PANELS MP-1 & MP-2 W/STANDARD BUTT JOINT CORNERS     DEDUCT     VOID
ALT#4 --DELETE GFRC PANEL AT LEVELS 2-4 AT 2 LOCATIONS     DEDUCT     (9,678)
ALT#5 - DELETE ROOF SCREEN WALL AND STEEL SUPPORTS     DEDUCT     VOID
ALT #6 - DELETE CORNICE CMP-1 @ ROOF PERIMETER     DEDUCT     VOID

6-30-05atlantaupdate

R.P. Appx. 150       EXHIBIT A

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|------|-------------|-----|-----|-------|----------|---------|-------|
| | ALT #7 - MECHANICALLY FASTENED ROOF SYSTEM IN LIEU OF FULLY ADHERED | | | | DEDUCT | Either System | |
| | ALT #8 - FURNISH 12"X12" POCELAIN TILE IN LIEU OF THE SPECIFIED 12"X24" | | | | DEDUCT | May use either system | |
| | ALT #9 - FLOOR JOISTS IN LIEU OF BEANS ON LEVELS 2 THRU 4 | | | | DEDUCT | VOID | |
| | ALT#10 - DELETE STUMBLE LIGHTING IN TENANT AREAS (INCL. CONDUIT & WIRE) | | | | DEDUCT | (15,694) | |
| | ALT#11 - DELETE CURTAIN WALL SYSTEM ON COL. LINE 1 AND 16 | | | | DEDUCT | VOID | |
| | ALT #12 - DELETE STOREFRONT SUNSHADES LEVELS 1 AND 2 | | | | DEDUCT | VOID | |
| | ALT#13 - DELETE SUNSHADES AT CURTAINWALL AREAS | | | | DEDUCT | VOID | |
| | ALT #14 - DELETE INTERIOR GLASS @ STAIR 2 (LEVELS 1, 2,3 & 4) | | | | DEDUCT | VOID | |
| | ALT #15 - REDUCE STEORFRONT PUNCHED OPENINGS | | | | DEDUCT | VOID | |
| | ALT#16 - DELETE TRUCKING EXCESS SPOILS OFF SITE AND LEAVE ON SITE | | | | DEDUCT | BALANCED SITE | |
| | ALT#16a - DELETE TRUCKING EXCESS SPOILS (FROM EXTRA TOPSOIL AND UTILITY SPOILS)/LEAVE ON SI | | | | DEDUCT | BALANCED SITE | |
| | ALT #17 - DELETE LEED CERTIFICATION REQUIREMENTS | | | | DEDUCT | void | |
| | ALT#18 - ADD GL-7 GLAZING AND DELETE 1/4" TEMPERED (Joel Berman Glass was not quoted to other GC's | | | | ADD | 44,988 | |
| | ALT#19 - ADD LIME STABILIZE BELOW PAVING AND CLOSE BLDG SW'S | | | | ADD | 149,089 | |
| | ALT#20 -PROVIDE WINDOW WALL CONSULTANT | | | | ADD | 15,694 | |
| | ALT#21 -- MEPFP CLAYCO COORDINATION | | | | ADD | 10,462 | |
| | ALT#22 --CHANGE PANELS TO 15' WIDE, MODIFY TOP GLASS | | | | DEDUCT | void | |
| | ALT#23 --REMOVE SCOPE TO PROVIDE FIRE MARSHALL ACCESS | | | | DEDUCT | void | |
| | ALT#24 --DELETE 2ND PASSENGER ELEVATOR | | | | DEDUCT | void | |
| | ALT#25 --CHANGE HVAC TO O/H SYSTEM | | | | DEDUCT | void | |
| | ALT#26 -UTILIZE H&H STEEL | | | | DEDUCT | void | |
| | ALT#27 --ELECTRICAL VALUE ENGINEERING FROM DFW PLAN | | | | DEDUCT | void--offset Damper add | |
| | ALT#28 --ADD TO DFW DRAWINGS FOR MISSING HVAC | | | | ADD | void--offset VE | |
| | ALT#29 --ADD LIGHTING PER NEW 11/1/05 DOC'S NOT RECEIVED BY CLAYCO | | | | ADD | 122,410 | |
| | ALT#30 -Change roof screen Steel to Galvanized | | | | ADD | 27,202 | |
| | ALT#31 --Caulk Interior side of window frames | | | | ADD | 12,032 | |

8-30-05atlantaupdate

R.P. Appx. 151                               EXHIBIT A

## Design Fee and Expense Summary

| Building Component | Gross SF Area | Est Cost per SF | Est Cost "Shell & Core" | | | Fee Basis $/SF | % | Design Fee | Fee Basis |
|---|---|---|---|---|---|---|---|---|---|
| **Intellicenter Dallas** | | | | | | | | | |
| | | (estimate) | | **Basic Design Fee** | | | | | |
| Building | 212,000 | $70 | $14,840,000 | Architectural | Forum | $1.60 | 2.3% | $340,000 | Lump Sum |
| | | | | | | | | | |
| Fee per sqft, before | | $2.95 | | **Consultants** | | | | | |
| expenses budget | | | | Structural | Alper | $0.52 | 0.7% | $110,000 | Lump Sum |
| | | | | MEP+FP | DFW | $0.48 | 0.7% | $102,000 | Lump Sum |
| | | | | Civil | Glenn | $0.16 | 0.2% | $33,000 | LS Fee, less Topo, ALTA, Storm Water |
| | | | | Landscape | TBG | $0.12 | 0.2% | $25,000 | Lump Sum |
| | | | | Energy Model | Coolshadow | $0.02 | 0.0% | $5,000 | Hourly NTE |
| | | | | Code/Life Safety | RJA | $0.01 | 0.0% | $3,000 | Hourly NTE |
| | | | | Roof Consulting | Maue | $0.01 | 0.0% | $3,000 | Hourly NTE |
| | | | | Bldg Envelope | Heitmann | $0.02 | 0.0% | $3,500 | Hourly NTE |

| | Fee Basis $/SF | % | Design Fee |
|---|---|---|---|
| **Total Basic and Consultant Fees** | $2.95 | 4.2% | **$624,500** |
| **Total "Estimated" Expenses Budget** | | | **$25,950** |
| **TOTAL FEES & ESTIMATED EXPENSES** | **$3.07** | **4.1%** | **$650,450** |

**"Estimated" Total Expenses**

| Consultant | SD | DD | CD | CA | Total Trips | Cost |
|---|---|---|---|---|---|---|
| Forum | 1 | 1 | 1 | 15 | 18 | $17,100 |
| Alper Audi | 0 | 0 | 0 | 3 | 3 | $2,850 |
| DFW | 0 | 0 | 0 | 0 | 0 | $0 |
| Total Travel | 1 | 1 | 1 | 18 | 21 | $19,950 |

| | | |
|---|---|---|
| ADA Accessology | | $3,000 |
| Total Printing, Courier, etc. | | $3,000 |
| **Total Expenses** | | **$25,950** Budget |

**"Estimated" Travel Expenses** (1 round trip to jobsite per person - 2 days & 1 night)

| | |
|---|---|
| Airfare | $500 |
| Rental Car | $125 |
| Hotel | $150 |
| Food | $100 |
| Parking & Mileage | $75 |
| Total Travel Cost/person | $950 |

**Forum CA Phase Trips**

| | |
|---|---|
| Months | 12 |
| Punchlist | 3 |
| Total | 15 |

Forum Studio, Inc.

1 of 1

R.P. Appx. 152

EXHIBIT A

# FORM OF CONSTRUCTION INDEMNITY AND
## ASSIGNMENT AGREEMENT
### (General Contractor)

THIS CONSTRUCTION INDEMNITY AND ASSIGNMENT AGREEMENT, dated as of the _____ day of _____, _____, from _____, a _____ (the "Contractor") to THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation ("Prudential"), _____ , a _____- ("Developer") and _____, a _____ (the "Venture").

## RECITALS

A.    Prudential and Developer shall be partners in the Venture, pursuant to Acquire Joint Venture Interest, dated _____, _____ (the "Acquisition Agreement") and the Amended and Restated Limited Liability Partnership Agreement of the Venture, dated _____, _____ (the "JVA"). The Venture is the owner of the Project as more particularly described in the Acquisition Agreement. All capitalized terms used, but not defined herein, have the meanings given to such terms in the Acquisition Agreement.

B.    The Venture and the Contractor have entered into the _____, dated _____, _____ (the "Construction Contract"), whereby the Contractor agreed to construct the Improvements.

C.    The Contractor desires to enter into this Agreement to induce: (i) Prudential to make Prudential's Initial Contribution (as defined in the Acquisition Agreement) to the Venture; and (ii) acquire an interest in the Venture, in the manner contemplated by the Acquisition Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Contractor hereby agrees as follows:

1.    Guarantee.  The Contractor hereby guarantees all the work performed in connection with the construction of the Improvements and all materials furnished and installed, or either, under the Construction Contract including all change orders thereto, to be: (i) substantially in accordance with the Plans and Specifications attached to the Acquisition Agreement as Exhibit B and/or modifications thereof permitted pursuant to the Acquisition Agreement (including any and all replacements or corrections of work performed in connection with construction of the Improvements and materials that may be required pursuant thereto); (ii) substantially in accordance with all federal, State of _____, _____ County and City of _____ laws, ordinances, statutes, rules and regulations applicable to the construction of office buildings, including, without limitation, local building, environmental, land use and persons with disabilities requirements, in effect on the date of this Agreement (collectively, the "Legal Requirements"); and (iii) free from faulty, defective workmanship and materials. The Contractor agrees to repair, correct or replace, at their own cost and expense, all of the work performed in connection with construction of the Improvements and materials, or either, covered

under said Construction Contract, change orders, modifications or corrections pursuant thereto that may prove not to be substantially in accordance with the Plans and Specifications (and/or modifications thereof permitted pursuant to the Acquisition Agreement) or the Legal Requirements or not to be free from faulty, defective workmanship and/or materials, ordinary wear and tear excepted. The Contractor does further agree to pay the cost of repairing all damage to other property resulting from defects in the work, performed in connection with construction of the Improvements, and materials, or either, covered by this Agreement and to pay the cost and expenses of replacing other property which may be damaged or disturbed in making good any defects as provided herein.

This Agreement shall be for a period of 1 year commencing the date of substantial completion of the Project. This Agreement shall be for the entire work performed in connection with construction of the Improvements except as may be extended by other guarantees specified elsewhere in the Construction Contract or as required by applicable law, and materials under the Construction Contract, and is in no way to be construed as invalidating guarantees for longer periods where required by the Construction Contract. This Guarantee shall not broaden the scope of the guarantees specified in the Construction Contract.

All replacements and corrections to defective work performed in connection with construction of the Improvements and materials, or either, are to be done at the convenience of the Venture.

The obligation of Contractor under this Agreement shall survive both final payment for the work performed in connection with the construction of the Improvements or designated portion thereof and termination of the Construction Contract.

2.      Indemnification. The Contractor shall indemnify, defend and hold harmless Prudential and the Venture, their officers, agents and employees for from and against any and all claims and demands, just or unjust, of third persons for death, for bodily injury, for personal injury, for property damage, direct or consequential, or for breach of contract arising or alleged to arise out of the construction of the Improvements and for all expenses incurred by them in the defense, settlement or satisfaction thereof except to the extent such claims and demands result from the intentional acts of Prudential or the Venture.

In any and all claims against Prudential or the Venture or any of their agents or employees by any employee of the Contractor, any subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, the indemnification obligation under this Agreement shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Contractor or any subcontractor under workers' or workmen's compensation acts, disability benefit acts or other employee benefit acts.

If so directed by Prudential or the Venture, the Contractor shall at its own expense defend any suit based upon any such claim or demand within the scope of the foregoing indemnity with counsel reasonably acceptable to Prudential or the Venture, as applicable (even if such suit, claim or demand is groundless, false or fraudulent).

3.     Assignment of Guarantees and Warranties. Contractor, as assignor, hereby conditionally assigns, transfers and sets over to the Venture, as assignee, all of its right, title and interest in and to all guarantees and warranties received by Contractor from subcontractors and suppliers in connection with the construction of the Improvements. This assignment shall be effective upon default by the Contractor under this Agreement or upon complete satisfaction of the obligations of Contractor hereunder. Contractor shall not and has not taken any action or done any thing which could limit the enforceability of such guarantees and warranties.

4.     Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of _____.

5.     No Assignment of Benefits Under this Agreement. Neither Prudential nor the Venture may assign this Agreement or its rights under this Agreement. This Agreement shall terminate as to both Prudential and the Venture upon any transfer by Prudential of its interest in the Venture to other than an affiliate of Prudential.

[CONTRACTOR]

By:_____
Name:_____
Its:_____

## FORM OF ARCHITECT'S CERTIFICATE

[LETTERHEAD OF ARCHITECT FOR THE PROJECT]

[Dated no later than 5 days prior to the Closing date]

The Prudential Insurance Company
of America
Prudential Real Estate Investors

Re: _____

Gentlemen:

We understand that you intend to acquire an interest in _____ _____ (the "Venture"), which Venture acquired the real property in _____, more particularly described in Exhibit A attached hereto (the "Land"), and constructed an office building consisting of approximately _____ net rentable square feet, plus _____ parking spaces (collectively, the "Improvements"), pursuant to an Agreement To Acquire Joint Venture Interest, dated _____, 200___ (the "Commitment"). (The Land and Improvements shall be referred to herein collectively as the "Project".)

We understand that the receipt by you of certain written certifications from us is a condition precedent to your obligation to make a capital contribution to the Venture and to acquire an interest in the Venture. Accordingly, we hereby certify the following to the best of our knowledge, information and belief:

1.     We prepared the working drawings, a true and complete copy of which is attached hereto as Exhibit B (the "Plans and Specifications"). The working drawings describe the Improvements completely and accurately.

2.     The Project lies in a district designated _____ zoning under the applicable zoning ordinances of the _____. The Project, if built and used in conformity with the Plans and Specifications, is in full compliance with such zoning ordinances.

3.     The Improvements contemplated by the Plans and Specifications are permitted by and in conformance with all applicable building codes and regulations and all other federal, state and local laws, rules and regulations relating to the physical aspects of improvements to land.

1638252.21638252.3

4. Based on our observation of the Improvements during their construction and at the time all certificates of occupancy were issued, (a) the Improvements as actually built substantially conform to the Plans and Specifications, and comply with all Federal, state and local laws, rules, and regulations relating to the physical aspects of improvements to land, including, without limitation, those relating to zoning, building and fire codes, of which we have been made aware by the owner, and environmental laws, rules and regulations and (b) no amendment to the building permits were required subsequent to [_____].

5. The Project complies in all respects with the Americans with Disabilities Act and all rules, regulations and guidelines promulgated in connection therewith.

6. The specified materials for the Project do not contain asbestos or polychlorinated biphenyl (PCB) products or any other hazardous or toxic wastes or substances in violation of applicable environmental laws.

7. The Project, if built in conformity with the Plans and Specifications, is in substantial compliance with all conditions and requirements specifically relating to construction and development of the Project contained in the following documents: [list of Private Development Covenants].

This letter is being delivered to you as a condition precedent to your making a capital contribution to the Venture and acquiring an interest in the Venture. We understand that you and the Venture are relying on this letter and that you or the Venture may pursue a claim against us in the event that you or the Venture has any loss or damage as a result of facts or circumstances that exist at the Project which make any of our certifications incorrect or inaccurate. This letter does not constitute, however, a guarantee of the work of the builder of the Improvements, and the builder and its subcontractors are solely responsible for all construction means, methods, techniques, sequences and procedures and compliance with the drawings, specifications and contract documents.

Very truly yours,

_____

By_____
Its_____

(Attachments)

16382523.21638252.3

_EXHIBIT F_

## FORM OF ENGINEER'S CERTIFICATE

[LETTERHEAD OF PROJECT'S ON-SITE ENGINEER]


[Dated no later than 5 days prior to Second Closing date]


The Prudential Insurance Company
of America
Prudential Real Estate Investors


    Re: _____

Gentlemen:

        We understand that you intend to acquire an interest in _____
_____ (the "Venture"), which Venture acquired the real property in _
_____, more particularly described in Exhibit A
attached hereto (the "Land"), and constructed an office building consisting of approximately
_____ net rentable square feet, plus ____ parking spaces (collectively, the
"Improvements"), pursuant to an Agreement To Acquire Joint Venture Interest, dated
_____, 200___ (the "Commitment"). (The Land and Improvements
shall be referred to herein collectively as the "Project".)


        We understand that the receipt by you of certain written certifications from us is a
condition precedent to your obligation to make a capital contribution to the Venture and to
acquire an interest in the Venture. Accordingly, we hereby certify the following:

        1.     We are civil engineers licensed in the State of _____. We provided civil
engineering design and construction observation services for the Improvements. Our
involvement has included preparing civil engineering design plans dated [_____] (the
"Plans"). In connection with rendering the Plans, we performed such research and made such
investigations as we deemed appropriate in our professional judgment with respect to the Plans.
Our firm provided construction observation services during site preparation and grading prior to
beginning construction of buildings. In addition, we periodically observed the contractor's
progress and procedures during the preparation of the site and full course of construction.

        2.     We hereby represent to you that, in our professional opinion, based upon our
services rendered, the Project has been designed by this office in compliance with applicable
Federal, state and local approvals and design standards relating to the site improvements for the
land.

1638252.21638252.3

R.P. Appx. 158                  EXHIBIT A

3.     We hereby represent to you that the following utilities are connected to the Improvements and fully operational:_____. Such utilities comprise all of the utilities which were designed by this office.

4.     We have concluded that on the basis of our observations that the contractor has completed the Project in substantial conformity with the "Plans and Specifications", attached hereto as Exhibit B. Further, the work we observed was completed in a manner compatible with the relevant aspects of the Land as we understood them at the time of design and in substantial compliance with our recommendations.

This letter is being delivered to you as a condition precedent to your making a capital contribution to the Venture and acquiring an interest in the Venture.  We understand that you and the Venture are relying on this letter and that you or the Venture may pursue a claim against us in the event that you or the Venture has any loss or damage as a result of facts or circumstances that exist at the Project which make any of our certifications incorrect or inaccurate.  This letter does not constitute, however, a guarantee of the work of the builder of the Improvements.

Very truly yours,

_____

By_____
Its_____

(Attachments)

## CONTRACTOR'S CONSENT AND AGREEMENT

The undersigned ("Contractor") acknowledges the assignment by Intellicenter Atlanta Investments, LLP, a Delaware limited liability partnership ("Owner"), to Bank of America, N.A., a national banking association, as administrative agent ("Administrative Agent") on behalf of the lenders ("Lenders") from time to time parties to the Loan Agreement (as herein defined), as additional security for the obligations of Owner under a Construction Loan Agreement ("Loan Agreement") between Owner (as Borrower), Administrative Agent and Lenders dated September 26, 2005, of Owner's rights (but not Owner's obligations) under the Construction Contract and any future modifications thereof or change orders ("Contract") between Owner and the Contractor pertaining to the project contemplated by the Loan Agreement, such project to be located upon certain real property described on Exhibit "A" attached hereto and made a part hereof (the "Property"). Contractor hereby consents to and agrees to be bound by such assignment. Contractor further represents and warrants to and agrees with Administrative Agent and Lenders as follows:

1.      The copy of the Contract attached hereto as Exhibit "B" is a true, correct and complete copy of the Contract, the Contract has not been changed or modified, and to Contractor's knowledge, the Contract is in full force and effect.

2.      If Owner defaults under the Loan Agreement or certain other Loan Documents (as defined in the Loan Agreement), Lenders may elect by a specific request in writing to (i) have Contractor continue performance under the Contract, in which case Contractor shall thereafter perform under the Contract pursuant to the remainder of this Paragraph 2, or (ii) have Contractor stop work on the project and vacate the Property, in which case Contractor shall promptly do so. If Lenders elect by specific request in writing to have Contractor continue or recommence to perform work under the Contract, Contractor shall continue or recommence performance on Lenders' behalf under the Contract in accordance with the terms thereof, and Contractor shall be reimbursed in accordance with the Contract for all work, labor and materials performed or furnished at Lender's request and prior to Lender's request; provided that, (i) with respect to reimbursement for work, labor or materials prior to Lender's request, Contractor has notified Administrative Agent in writing of the amounts owed Contractor and (ii) Lenders shall not be required to pay any amounts for work, labor or materials for which Lenders have already made an advance under the Loan Agreement . Contractor will look solely to the Owner for all sums owing under the Contract which Lenders are not required to advance pursuant to this paragraph. Contractor's agreement to act under the Contract for Lenders will not depend upon Contractor being paid any sums which Lenders are not required to advance hereunder nor on whether the Owner has otherwise defaulted under the Contract. Nor will Administrative Agent or Lenders be liable for any amounts owing Contractor if Administrative Agent (on behalf of Lenders) requests Contractor to stop work and vacate the Property pursuant to clause (ii) above. Neither Administrative Agent nor Lenders shall be liable for any damages Contractor may be entitled to recover from Owner or for change orders made by Contractor and not approved by Lenders pursuant to the Loan Agreement. In the event the Contract is terminated for any reason, Contractor shall notify Administrative Agent in writing within seven (7) days of such termination. After such termination, Contractor shall, at Lenders' option, enter into a new contract with Administrative Agent (on behalf of Lenders) upon substantially the same terms as the Contract. "Lenders" as used in this Paragraph includes Lenders' successors or assigns, any receiver in possession of the Property, any purchaser upon foreclosure of Lenders' security, or any corporation or other nominee formed by or on Lenders' behalf (collectively "Lenders' Successors"). This Paragraph 2 shall not affect the rights of Lenders or Lenders' Successors upon or following a foreclosure or transfer of title to the Property.

3.    If Owner defaults in making any payment or in performing any other obligation under the Contract, Contractor shall promptly give Administrative Agent written notice thereof, specifying the default and the steps necessary to cure same; and if Contractor learns of any default in payment due any subcontractor or other person supplying labor or materials for the project, Contractor shall similarly advise the Administrative Agent thereof. Contractor will not exercise any remedy available under the Contract, at law, or in equity arising from such default by Owner until Lenders shall have had the same opportunity to cure such default to which Owner is entitled, but at least thirty (30) days in any event, if Lenders so elect to cure such default, and such longer period of time as may be necessary to obtain possession of, or title to, the Property, provided that Lenders shall have no obligation to cure any Owner default. Any curative act done by Lenders shall be as effective as if done by Owner.

4.    Contractor shall not perform work under any change order without first securing Administrative Agent's written consent to such change order unless: (a) the Owner has certified to Contractor that Lenders' consent is not required for such change order; and (b) the cost of or reduction resulting from any single change or modification does not exceed $50,000, and the aggregate amount of all such changes and modifications does not exceed $500,000. In any such case, Contractor shall promptly provide Administrative Agent or its construction consultant with a copy of such change order or other modification. Administrative Agent's consent shall not constitute any assumption by Administrative Agent or Lenders of any obligation under the Contract. In addition, Contractor will not terminate, or in any material respect, modify or amend, the Contract without the prior written consent of Administrative Agent, provided that Contractor may terminate the Contract because of a default by Owner thereunder to the extent Contractor has such right in the Contract, provided Contractor has first complied with Paragraphs 2 and 3 above.

5.    Contractor acknowledges that the plans (the "Plans") described in the Schedule attached hereto were prepared by an architect on Contractor's staff or engaged by Contractor to prepare such Plans (the "Architect). Contractor represents and warrants to Administrative Agent and Lenders that such Architect is authorized to practice architecture under the laws of the State in which the Property is located and is familiar with the federal, state, and local laws and ordinances relevant to the construction of the improvements (the "Improvements") described in the Plans. Architect prepared all of the Plans, or such Plans were prepared under its supervision and direction, and Architect is responsible therefor. To the best of Contractor's knowledge, the Plans comply with all applicable laws, including all zoning, building, and other pertinent statutes, ordinances, rules and regulations. The Plans were prepared in accordance with customary professional standards of architectural practice for projects similar to the Improvements. The Plans are complete and adequate for the construction of the Improvements, and there have been no modifications thereof except as described on the attached Schedule. The Plans have been approved by all applicable governmental authorities. To the best of Contractor's knowledge: (a) the Improvements, if constructed in accordance with the Plans, will fully comply with all applicable laws, statutes, ordinances, codes, rules, regulations, decrees and orders (including but not limited to those relating to access and facilities for handicapped persons), applicable restrictive covenants and the site plan approved by Administrative Agent; and (b) the structural design of the Improvements, the proposed method of construction, the foundation plan, and the materials specified by the Plans for the project are adequate and appropriate for the contemplated Improvements and for the soil conditions of the construction site.

6.    Contractor hereby expressly subordinates all contractual, constitutional and statutory mechanics' and materialmen's liens to which Contractor may be or become entitled, to all liens and security interests securing the loan contemplated by the Loan Agreement (all indebtedness of Borrower, Administrative Agent and Lenders evidenced by the Loan Agreement and related loan documents are referred to herein as the "Secured Indebtedness") and expressly waives any right to remove any removable improvements from the Property. Contractor hereby expressly waives any equitable lien upon the loan funds to which Contractor might otherwise be entitled. Contractor acknowledges and agrees that,

R.P. Appx. 161                    EXHIBIT A

foreclosure of the liens and security interests securing the loan contemplated by the Loan Agreement shall be fully and automatically effective to cut off, terminate, and extinguish all of Contractor's liens and claims of any kind against the Property (provided, that, such termination shall not affect any rights that Contractor may have in any proceeds paid at any foreclosure of the Property in excess of the amount necessary to pay the Secured Indebtedness in full). Contractor shall require all material subcontracts and material purchase orders to contain a provision subordinating the subcontractors' and materialmen's liens to the liens and security interests securing the loan contemplated by the Loan Agreement and expressly waiving the right to remove removable improvements from the Property.

7.      As of the date hereof, Contractor has no counterclaim, right of set-off, defense or like right against Owner or Lenders, and to the best of Contractor's knowledge and belief, the Owner is not in default under the terms of the Contract. Contractor is not in default under the terms of the Contract.

8.      Nothing herein shall be construed to confer any present benefits on Contractor or to create any contractual arrangement between Contractor and Administrative Agent or Lenders or to impose upon Administrative Agent or Lenders any duty to see to the application of the proceeds of the loan contemplated by the Loan Agreement or to give any notice of any type to Contractor. Contractor acknowledges that Administrative Agent and Lenders are obligated under the Loan Agreement only to the Owner and to no other person or entity. Contractor is executing this Contractor's Consent and Agreement to induce Lenders to advance funds under the Loan Agreement, and Contractor understands that Lenders would not do so but for Contractor's execution and delivery of this Contractor's Consent and Agreement.

9.      Contractor shall provide Administrative Agent promptly in each case with (a) any information Contractor may have regarding defects in workmanship or materials incorporated into or provided for the project which come to Contractor's attention, (b) Contractor's estimate(s) of the stage(s) of completion of the project, (c) any deviations or variations in construction of the project from the plans and specifications used by Contractor, (d) any information Contractor may have regarding any defaults by Owner, or any other contractor or subcontractor under any construction contracts, and (e) any claims of non-payment by any person furnishing labor or material in connection with construction of the project.

10.     This Contractor's Consent and Agreement shall bind and benefit Contractor, Administrative Agent, Lenders and their respective successors and assigns, including Lenders' Successors, their successors and assigns.

11.     Any notice for purposes of this Contractor's Consent and Agreement shall be given in writing and shall be addressed or delivered to the respective addresses set forth below, or to such other address as may have been previously designated by the intended recipient by notice given in accordance with this Section and shall be delivered by personal delivery, by nationally recognized overnight courier service, by prepaid registered or certified United States mail (return receipt requested), or by facsimile. The notice shall be deemed effective when the receipt is signed or when the attempted initial delivery is refused or cannot be made because of a change of address of which the sending party has not been notified; and if transmitted by facsimile or personal delivery, the notice shall be effective when received. Until changed by notice given in accordance with this Section, the initial respective addresses for notices are the following:

To Administrative
Agent and Lender:                   Bank of America, N.A.
                                    901 Main Street, 21st Floor
                                    Dallas, Texas 75202-3714
                                    Attention: Real Estate Loan Administration
                                    Fax No. 214.209.1832

To Contractor: _____

_____

_____

_____

Attention: _____

Fax No. _____

12.     The provisions of this Contractor's Consent and Agreement cannot be waived, modified or amended unless such waiver, modification or amendment is in writing and is executed on behalf of each of Administrative Agent and Contractor.

13.     Prior to the date hereof, no work of any kind, including the destruction or removal of any existing improvements, site work, clearing, grubbing, draining or fencing of the Property, has been commenced or performed on the Property and no equipment or materials have been delivered to the Property for any purpose whatsoever.

14.     Neither the Contract, nor any memorandum, affidavit or notice thereof, has been recorded by or on behalf of Contractor in the county where the Property is located or in any other county. No affidavit of commencement of construction of any improvements, performance of labor, furnishing of materials, or providing of specially fabricated materials in connection with the construction contemplated by the Contract has been executed or filed by Contractor in the county where the Property is located or in any other county. Contractor will, however, join in the execution of such an affidavit once such work has commenced in form and substance satisfactory to Administrative Agent.

15.     Contractor will address to Administrative Agent, naming Administrative Agent as an additional named party or beneficiary, all certificates, statements, or representations regarding the completion of the project or any portion thereof.

16.     THIS CONTRACTOR'S CONSENT AND AGREEMENT AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION, SHALL BE GOVERNED BY TEXAS LAW (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES) AND APPLICABLE UNITED STATES FEDERAL LAW.

EXECUTED this _____ day of _____, 2005.

"CONTRACTOR"

_____

By:_____
Name: _____
Title:_____

# EXHIBIT A

## LAND

## EXHIBIT B

## CONTRACT

## SCHEDULE OF PLANS AND SPECIFICATIONS

Project: _____

Location: _____

Drawing No.
& Page Nos.                          Description                          Date



4049692v.2

## FORM OF ARCHITECT'S CERTIFICATE

The Prudential Insurance Company of America

Prudential Real Estate Investors

Two Ravina Drive, Suite 400

Atlanta, GA 30346

Attn: Mark W. Seedorff

Re: 3701 Regent Blvd., Irving TX

Gentlemen:

We understand that you intend to acquire an interest in Intellicenter Dallas Investments, LLP, a Delaware limited liability partnership (the "Venture"), which Venture acquired the real property in Irving, Texas, more particularly described in Exhibit A attached hereto (the "Land"), and constructed an office building consisting of approximately 199,276 net rentable square feet, plus 850 parking spaces (collectively, the "Improvements"), pursuant to an Agreement To Acquire Interest, dated January 5, 2006 (the "Commitment"). (The Land and Improvements shall be referred to herein collectively as the "Project".)

We understand that the receipt by you of certain written certifications from us is a condition precedent to your obligation to make a capital contribution to the Venture and to acquire an interest in the Venture. Accordingly, we hereby certify the following:

## ARCHITECTURE

1.      We prepared the working drawings, a true and complete copy of which is attached hereto as Exhibit B (the "Plans and Specifications"). The working drawings describe the Improvements completely and accurately.

2.      The Project lies in a district designated FWY (Freeway) zoning under the applicable zoning ordinance No. 4681, City of Irving Planning and Development Department. The Project, if built and used in conformity with the Plans and Specifications, is in full compliance with such zoning ordinances.

3.      All Improvements contemplated by the Plans and Specifications are permitted by and in conformance with all applicable building codes and regulations and all other federal, state and local laws, rules and regulations relating to the physical aspects of improvements to land.

4.      Based on our observation of the Improvements during their construction and at the time all certificates of occupancy were issued, (a) the Improvements as actually built substantially conform to the Plans and Specifications, and comply with all Federal, state and local laws, rules, and regulations relating to the physical aspects of improvements to land, including, without limitation, those relating to zoning, building and fire codes, of which we have been made aware

1855559.2

R.P. Appx. 168

by the owner, and environmental laws, rules and regulations and (b) no amendment to the building permits were required subsequent to April 26, 2006.

5. The Project complies in all respects with the Americans with Disabilities Act and all rules, regulations and guidelines promulgated in connection therewith.

6. Intentionally deleted.

7. The specified materials for the Project do not contain asbestos or polychlorinated biphenyl (PCB) products or any other hazardous or toxic wastes or substances in violation of applicable environmental laws.

8. The Project, if built in conformity with the Plans and Specifications, is in substantial compliance with all conditions and requirements specifically relating to construction and development of the Project contained in the following documents:
[None]

## LANDSCAPE ARCHITECTURE

1. The landscape architects are licensed in the State of Texas. They provided landscape architecture design and construction observation services for the site improvements for the Project. Their involvement included preparing landscape design plans, as noted on Exhibit B. In connection with rendering such plans, they performed such research and made such investigations as they deemed appropriate in their professional judgment with respect to such plans. They provided limited construction observation services pursuant to our contract. In addition, they periodically observed the contractor's progress and procedures during the preparation of the site and full course of construction.

2. In our professional opinion and based upon our services rendered, the Project's landscape improvements (the "Site Improvements") have been designed in compliance with applicable federal, state and local approvals and design standards relating to the Site Improvements.

3. Further, the work was completed in a manner compatible with the relevant aspects of the Land as understood by the landscape architects at the time of design and in substantial compliance with their recommendations.

## ENGINEERING

1. The civil engineers are licensed in the State of Texas. They provided civil engineering design and construction observation services for the Improvements. Their involvement has included preparing civil engineering design plans noted on Exhibit B. In connection with rendering the Plans, they performed such research and made such investigations as deemed appropriate in their professional judgment with respect to the Plans. They provided construction observation services during site preparation and grading prior to beginning construction of buildings. In addition, they periodically observed the contractor's progress and procedures during the preparation of the site and full course of construction.

2. We hereby represent to you that, in our professional opinion, based upon our services rendered, the Project has been designed with respect to the civil engineering aspects in

1855559.2

R.P. Appx. 169

compliance with applicable Federal, state and local approvals and design standards relating to the site improvements for the land.

3.      We hereby represent to you that the following utilities are connected to the Improvements and fully operational: water, electric, sanitary/sewer and telephone. Such utilities comprise all of the utilities which were designed by the civil engineers.

4.      We have concluded that on the basis of our observations that the contractor has completed the Project in substantial conformity with the Plans. Further, the work was completed in a manner compatible with the relevant aspects of the Land as understood by the civil engineers at the time of design and in substantial compliance with their recommendations.

This letter is being delivered to you as a condition precedent to your making a capital contribution to the Venture and acquiring an interest in the Venture. We understand that you and the Venture are relying on this letter and that you or the Venture may pursue a claim against us in the event that you or the Venture has any loss or damage as a result of facts or circumstances that exist at the Project which make any of our certifications incorrect or inaccurate. This letter does not constitute, however, a guarantee of the work of the builder of the Improvements, and the builder and its subcontractors are solely responsible for all construction means, methods, techniques, sequences and procedures and compliance with the drawings, specifications and contract documents.

Very truly yours,

Forum Studio, Inc.

By_____

Its_____

(Attachments)

EXHIBIT A
Land

EXHIBIT B
Plans and Specifications

1855559.2

## EXHIBIT A
## LEGAL DESCRIPTION OF THE LAND

BEING a 14.84 acre tract of land situated in the Jefferson Tilley Survey, Abstract No. 1474, City of Irving, Dallas County, Texas, and being part of a tract of land conveyed to The Travelers Insurance Company by deed as recorded in Volume 91244, Page 4044 of the Deed Records, Dallas County, Texas, and being more particularly described by metes and bounds as follows:

COMMENCING at a 1/2 inch iron rod found at the new West line of Beltline Road, said point being the Northwest corner of a tract of land conveyed to the County of Dallas by deed recorded in Volume 91189, Page 2171, of the Deed Records of Dallas County, Texas, said point also being in the southerly line of Interstate Highway No. 635 (LBJ Freeway, a variable width right-of-way);

THENCE North 71 degrees 07 minutes 55 seconds West, along the southerly line of said Interstate Highway No. 635 (LBJ Freeway), a distance of 518.07 feet to a 1/2 inch iron rod found for corner;

THENCE North 61 degrees 27 minutes 23 seconds West, continuing along the southerly line of said Interstate Highway No. 635 (LBJ Freeway) , a distance of 26.87 feet to a 1/2 inch iron rod found for corner, said point being the POINT OF BEGINNING, same point being the Northwest corner of a tract of land conveyed to SMPD-TEXAS-IRVING-203, LLC by deed as recorded in Volume 2003066, Page 01481, Deed Records, Dallas County, Texas, said point also being the Northeast corner of said 14.83 acre tract of land being described;

THENCE South 28 degrees 32 minutes 37 seconds West, departing the southerly line of said Interstate Highway No. 635 (LBJ Freeway) and along the common line of said SMPD-TEXAS-IRVING-203, LLC tract and said 14.83 acre tract of land being described, a distance of 775.69 feet to a 1/2 inch iron rod set for corner, said point being in the northeasterly line of Regent Boulevard (a variable width right-of-way) according to the plat thereof recorded in Volume 85244, Page 3298, Map Records, Dallas County, Texas, said point being the Southeast corner of said 14.83 acre tract of land being described, said point also being the Southwest corner of a tract of land conveyed to SECOND CENTURY INVESTMENTS by deed as recorded in Volume 2003066, Page 01466, Deed Records, Dallas County, Texas, same point being the beginning of a curve to the right having a radius of 900.00 feet a delta angle of 22 degrees 59 minutes 22 seconds, and a chord bearing and distance of North 56 degrees 37 minutes 34 seconds West, 358.70 feet;

THENCE in a northwesterly direction continuing along the said curve to the right an arc distance of 361.12 feet and to a 1/2 inch iron rod found for corner;

THENCE North 45 degrees 07 minutes 53 seconds West, continuing along the northeasterly line of said Regent Boulevard, a distance of 119.07 feet to a 1/2 inch iron

rod found for corner, said point being the beginning of a curve to the right having a radius of 607.74 feet a delta angle of 40 degrees 07 minutes 46 seconds, and a chord bearing and distance of North 25 degrees 04 minutes 00 seconds West, 417.01 feet;

THENCE in a northwesterly direction continuing along the said curve to the right an arc distance of 425.66 feet and to a 1/2 inch iron rod found for corner:

THENCE North 05 degrees 00 minutes 07 seconds West, continuing along the northeasterly line of said Regent Boulevard, a distance of 337.64 feet to a 1/2 inch iron rod found for corner, said point being the beginning of a curve to the left having a radius of 708.50 feet a delta angle of 34 degrees 03 minutes 09 seconds, and a chord bearing and distance of North 21 degrees 57 minutes 59 seconds West, 414.91 feet;

THENCE in a northwesterly direction continuing along the said curve to the right an arc distance of 421.08 feet and to a 1/2 inch iron rod found for corner, said point being the Northwest corner of said 14.83 acre tract of land being described and being in the southerly line of said Interstate Highway No. 635 (LBJ Freeway);

THENCE South 45 degrees 07 minutes 23 seconds East, along the southerly line of said Interstate Highway No. 635 (LBJ Freeway), a distance of 286.79 feet to a 1/2 inch iron rod found for corner;

THENCE South 61 degrees 27 minutes 23 seconds East, continuing along the southerly line of said Interstate Highway No. 635 (LBJ Freeway), a distance of 1038.95 feet to the POINT OF BEGINNING and containing 646,585 square feet or 14.84 acres of computed land.

R.P. Appx. 172

# EXHIBIT B - DALLAS

# Drawing List

**Intellicenter - Dallas**
3701 Regent Blvd.
Irving, Texas 75063

| Number Drawing Civil | Title | Rev Date |
|---|---|---|
| C1 | Cover Sheet | 3/26/2007 |
| C2 | Grading Plan | 3/26/2007 |
| C3 | Underfloor Grading Plan | 3/26/2007 |
| C4 | Drainage Area Map | 3/26/2007 |
| C5 | Storm Sewer Plan | 3/26/2007 |
| C6 | Storm Sewer Profiles | 3/26/2007 |
| C7 | Utility Plan | 3/26/2007 |
| C8 | Paving Plan | 3/26/2007 |
| C9 | Turn Lane Plan | 3/26/2007 |
| C10 | Turn Lane Plan and Details | 3/26/2007 |
| C11 | Paving Details | 3/26/2007 |
| C12 | Erosion Control Plan | 3/26/2007 |
| C13 | Erosion Control Details | 3/26/2007 |
| C14 | City of Irving Storm Water Pollution Prevention Methods | 5/8/2006 |
| C15 | City of Irving Storm Water Pollution Prevention Details | 5/8/2006 |
| C16 | City of Irving Storm Sewer Details | 3/26/2007 |
| C17 | City of Irving Inlet Details | 3/26/2007 |
| C18 | City of Irving Trench Embedment, Backfill, and Pavement Repair Details | 3/26/2007 |
| C19 | City of Irving Details for Trench Sheeting, Shoring, Sloping for Trenches over 5' Deep | 3/26/2007 |
| C20 | City of Irving Water and Sanitary Sewer Details | 3/26/2007 |
| C21 | City of Irving Sanitary Sewer Details | 3/26/2007 |

**Architectural**

| | | |
|---|---|---|
| Cover | Cover | 3/26/2007 |
| A0-00 | Project Information | 3/26/2007 |
| INDEX | Drawing Index | 3/26/2007 |
| A0-01 | Life Safety Plans & Code Data | 3/26/2007 |
| A0-02 | Rated Structure Plans | 3/26/2007 |

1

R.P. Appx. 173

| A0-03 | UL Assemblies | 3/26/2007 |
|-------|--------------|-----------|
| A1-01 | Architectural Site Plan | 3/26/2007 |
| A1-02 | Enlarged Site Plans and Details | 3/26/2007 |
| A2-01 | Overall Crawl Space and First Floor Plans | 3/26/2007 |
| A2-02 | Overall Second and Third Floor Plans | 3/26/2007 |
| A2-03 | Overall Fourth Floor and Roof Plans | 3/26/2007 |
| A2-11 | Partial First Floor Plan | 3/26/2007 |
| A2-12 | Partial First Floor Plan | 3/26/2007 |
| A2-21 | Partial Second Floor Plan | 3/26/2007 |
| A2-22 | Partial Second Floor Plan | 3/26/2007 |
| A2-31 | Partial Third Floor Plan | 3/26/2007 |
| A2-32 | Partial Third Floor Plan | 3/26/2007 |
| A2-41 | Partial Fourth Floor Plan | 3/26/2007 |
| A2-42 | Partial Fourth Floor Plan | 3/26/2007 |
| A2-51 | Partial Roof Plan | 3/26/2007 |
| A2-52 | Partial Roof Plan | 3/26/2007 |
| A2-53 | Roof Details | 3/26/2007 |
| A2-54 | Roof Details | 3/26/2007 |
| A3-01 | Overall Elevations | 3/26/2007 |
| A3-02 | Enlarged Elevations | 3/26/2007 |
| A3-03 | Enlarged Elevations | 3/26/2007 |
| A3-04 | Enlarged Elevations | 3/26/2007 |
| A3-05 | Enlarged Elevations | 3/26/2007 |
| A3-10 | Building Sections | 3/26/2007 |
| A3-11 | Building Sections | 3/26/2007 |
| A4-01 | Enlarged Plans, Toilet Rooms & Lobby | 3/26/2007 |
| A5-00 | Interior Elevations, Typical Information | 3/26/2007 |
| A5-01 | Interior Elevations, Lobby | 3/26/2007 |
| A5-02 | Interior Elevations, Toilet Rooms | 3/26/2007 |
| A5-03 | Interior Elevations Elevator Cabs | 3/26/2007 |
| A6-11 | Partial First Floor Ceiling Plan | 3/26/2007 |
| A6-12 | Partial First Floor Ceiling Plan | 3/26/2007 |
| A6-21 | Partial Second Floor Ceiling Plan | 3/26/2007 |
| A6-22 | Partial Second Floor Ceiling Plan | 3/26/2007 |
| A6-31 | Partial Third Floor Ceiling Plan | 3/26/2007 |
| A6-32 | Partial Third Floor Ceiling Plan | 3/26/2007 |
| A6-41 | Partial Fourth Floor Ceiling Plan | 3/26/2007 |

2

R.P. Appx. 174

| A6-42 | Partial Fourth Floor Ceiling Plan | 3/26/2007 |
| A7-01 | Elevator Plans & Sections | 3/26/2007 |
| A7-02 | Elevator Sections | 3/26/2007 |
| A7-03 | Elevator Details | 3/26/2007 |
| A7-11 | Stair 1 Sections & Plans | 3/26/2007 |
| A7-11A | Stair 3 Section & Plans | 3/26/2007 |
| A7-12 | Stair 2 Sections & Plans | 3/26/2007 |
| A7-13 | Stair Details | 3/26/2007 |
| A8-01 | Wall Sections | 3/26/2007 |
| A8-02 | Wall Sections | 3/26/2007 |
| A8-03 | Wall Sections | 3/26/2007 |
| A8-04 | Wall Sections | 3/26/2007 |
| A9-01 | Partition Types and Details, Door & Frame Types & Details | 3/26/2007 |
| A9-02 | TYP Window Details | 3/26/2007 |
| A9-03 | Window Frame Types | 3/26/2007 |
| A9-10 | Plan Details | 3/26/2007 |
| A9-11 | Plan Details | 3/26/2007 |
| A9-20 | Exterior Details | 3/26/2007 |
| A9-21 | Exterior Details | 3/26/2007 |
| A9-22 | Exterior Details | 3/26/2007 |
| A10-01 | Interior Details, Toilet Rooms | 3/26/2007 |
| A10-02 | Interior Details, 1st Level Lobby | 3/26/2007 |
| A10-03 | Interior Details, 2nd Level Lobby | 3/26/2007 |
| A11-11 | Partial Finish Plans, First Floor | 3/26/2007 |
| A11-12 | Partial Finish Plans, First Floor | 3/26/2007 |
| A11-21 | Partial Finish Plan, Second Floor | 3/26/2007 |
| A11-22 | Partial Finish Plan, Second Floor | 3/26/2007 |
| A11-31 | Partial Finish Plan, Third Floor | 3/26/2007 |
| A11-32 | Partial Finish Plan, Third Floor | 3/26/2007 |
| A11-41 | Partial Finish Plan, Fourth Floor | 3/26/2007 |
| A11-42 | Partial Finish Plan, Fourth Floor | 3/26/2007 |

**Structural**

| S1-01 | General Notes | 3/26/2007 |
| S1-02 | Typical Sections & Details | 3/26/2007 |
| S1-03 | Typical Sections & Details | 3/26/2007 |
| S1-04 | Typical Sections & Details | 3/26/2007 |
| S2-01 | Partial Pier Plan | 3/26/2007 |

R.P. Appx. 175

| | | |
|---|---|---|
| S2-02 | Partial Pier Plan | 3/26/2007 |
| S2-03 | Dock Plan | 3/26/2007 |
| S2-11 | Partial Foundation Plan | 3/26/2007 |
| S2-12 | Partial Foundation Plan | 3/26/2007 |
| S2-21 | Partial Second Floor Framing Plan | 3/26/2007 |
| S2-22 | Partial Second Floor Framing Plan | 3/26/2007 |
| S2-31 | Partial Third Floor Framing Plan | 3/26/2007 |
| S2-32 | Partial Third Floor Framing Plan | 3/26/2007 |
| S2-41 | Partial Fourth Floor Framing Plan | 3/26/2007 |
| S2-42 | Partial Fourth Floor Framing Plan | 3/26/2007 |
| S2-51 | Partial Roof Framing Plan | 3/26/2007 |
| S2-52 | Partial Roof Framing Plan | 3/26/2007 |
| S3-01 | Foundation Section and Details | 3/26/2007 |
| S3-02 | Foundation Section and Details | 3/26/2007 |
| S3-03 | Foundation Section & Details | 3/26/2007 |
| S4-01 | Framing Section & Details | 3/26/2007 |
| S4-02 | Framing Section & Details | 3/26/2007 |
| S4-03 | Framing Section & Details | 3/26/2007 |
| S4-04 | Framing Section & Details | 3/26/2007 |
| S5-01 | Column Schedule & Details | 3/26/2007 |
| S6-01 | Brace Elevation & Details | 3/26/2007 |

**Tilt Up**

| | | |
|---|---|---|
| T1-11 | Partial Panel Layout Plan | 3/26/2007 |
| T1-12 | Partial Panel Layout Plan | 3/26/2007 |
| T2-11 | Typical Sections & Details | 3/26/2007 |
| T3-11 | Tilt-Up Wall Elevations | 3/26/2007 |
| T3-12 | Tilt-Up Wall Elevations | 3/26/2007 |
| T3-13 | Tilt-Up Wall Elevations | 3/26/2007 |
| T3-14 | Tilt-Up Wall Elevations | 3/26/2007 |
| T4-11 | Reinforcing Details | 3/26/2007 |
| T4-12 | Reinforcing Details | 3/26/2007 |

**Fire Protection**

| | | |
|---|---|---|
| Sheet 1 of 10 | Site Plan | 3/13/2007 |
| Sheet 2 of 10 | Level 1 - East Wing | 3/13/2007 |
| Sheet 3 of 10 | Level 1 - West Wing | 3/13/2007 |
| Sheet 4 of 10 | Level 2 - East Wing | 3/13/2007 |

4

R.P. Appx. 176

| Sheet 5 of 10 | Level 2 - West Wing | 3/13/2007 |
| Sheet 6 of 10 | Level 3 - East Wing | 3/13/2007 |
| Sheet 7 of 10 | Level 3 - West Wing | 3/13/2007 |
| Sheet 8 of 10 | Level 4 - East Wing | 3/13/2007 |
| Sheet 9 of 10 | Level 4 - West Wing | 3/13/2007 |
| Sheet 10 of 10 | Details | 3/13/2007 |

**Mechanical**

| M2.11 | Partial First Floor Plan - Mechanical | 1/26/2007 |
| M2.12 | Partial First Floor Plan - Mechanical | 1/26/2007 |
| M2.21 | Partial Second Floor Plan - Mechanical | 1/26/2007 |
| M2.22 | Partial Second Floor Plan - Mechanical | 1/26/2007 |
| M2.31 | Partial Third Floor Plan - Mechanical | 1/26/2007 |
| M2.32 | Partial Third Floor Plan - Mechanical | 1/26/2007 |
| M2.41 | Partial Fourth Floor Plan - Mechanical | 1/26/2007 |
| M2.42 | Partial Fourth Floor Plan - Mechanical | 1/26/2007 |
| MEP2.51 | Partial Roof Plan - Mechanical/Electrical/Plumbing | 1/26/2007 |
| MEP2.52 | Partial Roof Plan - Mechanical/Electrical/Plumbing | 1/26/2007 |
| M3.01 | Partial Floor Plans - Mechanical | 1/26/2007 |
| M3.02 | Partial Second Floor Plans - Mechanical | 1/26/2007 |
| M3.03 | Partial Third Floor Plans - Mechanical | 1/26/2007 |
| M3.04 | Partial Fourth Floor Plans - Mechanical | 1/26/2007 |
| M4.02 | Mechanical Details | 1/26/2007 |

**Plumbing**

| P2.01 | Partial Underfloor Plan - Plumbing | 1/26/2007 |
| P2.02 | Partial Underfloor Plan - Plumbing | 1/26/2007 |
| P2.11 | Partial First Floor Plan - Plumbing | 1/26/2007 |
| P2.12 | Partial First Floor Plan - Plumbing | 1/26/2007 |
| P2.21 | Partial Second Floor Plan - Plumbing | 1/26/2007 |
| P2.22 | Partial Second Floor Plan - Plumbing | 1/26/2007 |
| P2.31 | Partial Third Floor Plan - Plumbing | 1/26/2007 |
| P2.32 | Partial Third Floor Plan - Plumbing | 1/26/2007 |
| P2.41 | Partial Fourth Floor Plan - Plumbing | 1/26/2007 |
| P2.42 | Partial Fourth Floor Plan - Plumbing | 1/26/2007 |
| P3.01 | Partial Enlarged Plans - Plumbing | 1/26/2007 |
| P3.02 | Partial Enlarged Plans - Plumbing | 1/26/2007 |
| P4.01 | Plumbing Riser Diagrams | 1/26/2007 |

R.P. Appx. 177

## Electrical

| E1.01 | Site Plan Electrical | 3/9/2007 |
|---|---|---|
| E2.11 | First Floor Plan Electrical | 3/9/2007 |
| E2.12 | Partial First Floor Plan Electrical | 3/9/2007 |
| E2.21 | Partial Second Floor Plan Electrical | 3/9/2007 |
| E2.22 | Partial Second Floor Plan Electrical | 3/9/2007 |
| E2.31 | Partial Third Floor Plan Electrical | 3/9/2007 |
| E2.32 | Partial Third Floor Plan Electrical | 3/9/2007 |
| E2.41 | Partial Fourth Floor Plan Electrical | 3/9/2007 |
| E2.42 | Partial Fourth Floor Plan Electrical | 3/9/2007 |
| E4.01 | Single Line Electrical | 3/9/2007 |
| E4.02 | Details Electrical | 3/9/2007 |
| E4.03 | Details Electrical | 3/9/2007 |
| E5.01 | Electrical Schedules | 3/9/2007 |
| E5.02 | Electrical Schedules | 3/9/2007 |
| E5.03 | Electrical Schedules | 3/9/2007 |
| E5.04 | Electrical Schedules | 3/9/2007 |
| E5.05 | Electrical Schedules | 3/9/2007 |
| E5.06 | Lighting Fixture Schedule | 3/9/2007 |
| EL2.11 | Partial First Floor Plan Lighting | 3/9/2007 |
| EL2.12 | Partial First Floor Plan Lighting | 3/9/2007 |
| EL2.21 | Partial Second Floor Plan Lighting | 3/9/2007 |
| EL2.22 | Partial Second Floor Plan Lighting | 3/9/2007 |
| EL2.31 | Partial Third Floor Plan Lighting | 3/9/2007 |
| EL2.32 | Partial Third Floor Plan Lighting | 3/9/2007 |
| EL2.41 | Partial Fourth Floor Plan Lighting | 3/9/2007 |
| EL2.42 | Partial Fourth Floor Plan Lighting | 3/9/2007 |

## Landscape & Irrigation

| LC 1.1 | General Notes & Materials Schedule | 4/18/06 |
|---|---|---|
| LS 1.1 | Overall Landscape Sitework Plan | 4/18/06 |
| LS 1.2 | Sitework & Paving Enlargements | 4/18/06 |
| LS 2.1 | Sitework Details | 4/18/06 |
| LP 1.1 | Planting Plan | 4/18/06 |
| LP 1.2 | Planting Entry Enlargement | 4/18/06 |
| LP 1.3 | Planting Entry Enlargement | 4/18/06 |
| LP 2.1 | Planting Details | 4/18/06 |
| LI 1.1 | Overall Landscape Irrigation Plan | 4/18/06 |

R.P. Appx. 178

| LI 1.3 | Landscape Irrigation Building Enlargement | 4/18/06 | |
| LI 1.2 | Landscape Irrigation Building Enlargement | 4/18/06 | |
| LI 2.1 | Landscape Irrigation Details | 4/18/06 | |

**Specification**

| 00010 | Table of Contents | 9/1/2006 | 4 Pages |
|---|---|---|---|
| 02110 | Site Clearing | 1/19/2006 | 2 Pages |
| 02122 | Tree Protection and Trimming | 1/19/2006 | 3 Pages |
| 02200 | Site Earthwork | 1/19/2006 | 8 Pages |
| 02201 | Trenching, Embedment and Backfilling | 1/19/2006 | 2 Pages |
| 02244 | Lime Soil Stabilization | 1/19/2006 | 4 Pages |
| 02400 | Trench Safety Sheeting and Shoring | 1/19/2006 | 8 Pages |
| 02466 | Drilled Piers | 10/21/2005 | 9 Pages |
| 02520 | Portland Cement Concrete Paving | 1/19/2006 | 4 Pages |
| 02624 | Concrete Curb and Gutter | 1/19/2006 | 2 Pages |
| 02660 | Water and Pipe Fittings | 1/19/2006 | 5 Pages |
| 02661 | Gate Valves and Butterfly Valves | 1/19/2006 | 6 Pages |
| 02662 | Fire Hydrants | 1/19/2006 | 1 Pages |
| 02663 | Wet Connection | 1/19/2006 | 1 Pages |
| 02665 | Water Pipe Test | 1/19/2006 | 3 Pages |
| 02666 | Water Dechlorination | 1/19/2006 | 1 Pages |
| 02667 | Cutting, Plugging and Blocking off Existing Water Mains | 1/19/2006 | 1 Pages |
| 02720 | Reinforced Concrete Pipe Culverts | 1/19/2006 | 1 Pages |
| 02721 | Drainage Structures | 1/19/2006 | 1 Pages |
| 02722 | Corrugated Polyethylene Pipe | 1/19/2006 | 3 Pages |
| 02730 | Sanitary Sewer Mains | 1/19/2006 | 2 Pages |
| 02731 | Sanitary Sewer Manholes | 1/19/2006 | 2 Pages |
| 02732 | Sanitary Sewer Testing | 1/19/2006 | 1 Pages |
| 03300 | Cast-In-Place Concrete | 10/25/2005 | 13 Pages |
| 03301 | Under Slab Vapor Barrier/Retarder | 10/21/2005 | 2 Pages |
| 03305 | Concrete Curing, Sealing and Hardening | 11/7/2005 | 3 Pages |
| 03470 | Tilt-Up Concrete Construction | 10/21/2005 | 6 Pages |
| 03490 | Glass Fiber Reinforced Precast Concrete | 10/21/2005 | 5 Pages |
| 05120 | Structural Steel | 10/21/2005 | 6 Pages |

R.P. Appx. 179

| | | | |
|---|---|---|---|
| 05210 | Steel Joists | 10/21/2005 | 6 Pages |
| 05310 | Steel Deck | 10/21/2005 | 2 Pages |
| 05500 | Metal Fabrications | 10/21/2005 | 7 Pages |
| 05511 | Metal Stairs | 10/21/2005 | 8 Pages |
| 05521 | Pipe and Tube Railing | 10/21/2005 | 8 Pages |
| 05811 | Architectural Joint System | 10/21/2005 | 6 Pages |
| 06100 | Rough Carpentry | 10/21/2005 | 5 Pages |
| 06402 | Interior Architectural Woodwork | 10/21/2005 | 5 Pages |
| 07170 | Bentonite waterproofing | 10/21/2005 | 5 Pages |
| 07210 | Building Insulation | 10/21/2005 | 7 Pages |
| 07412 | Metal Wall Panels | 10/21/2005 | 9 Pages |
| 07540 | Thermoplastic Membrane Roofing | 10/21/2005 | 6 Pages |
| 07620 | Sheet Metal Flashing and Trim | 10/21/2005 | 5 Pages |
| 07720 | Roof Accessories | 6/22/2006 | 3 Pages |
| 07811 | Sprayed Fire- Resistive Materials | 10/21/2005 | 5 Pages |
| 07842 | Fire Resistive Joint Systems | 10/21/2005 | 4 Pages |
| 07920 | Joint Sealants | 2/27/2006 | 7 Pages |
| 08110 | Steel Doors and Frames | 10/21/2005 | 5 Pages |
| 08125 | Interior Aluminum Frames | 10/21/2005 | 4 Pages |
| 08211 | Flush Wood Doors | 10/21/2005 | 4 Pages |
| 08311 | Access Doors | 10/21/2005 | 5 Pages |
| 08331 | Overhead Colling Doors | 10/21/2005 | 4 Pages |
| 08410 | Aluminum Entrances and Storefronts | 10/21/2005 | 10 Pages |
| 08470 | Revolving Entrance Doors | 10/21/2005 | 7 Pages |
| 08620 | Unit Skylights | 10/21/2005 | 3 Pages |
| 08710 | Door Hardware | 6/12/2006 | 18 Pages |
| 08711 | Door Schedule | 6/22/2006 | 7 Pages |
| 08800 | Glass & Glazing | 10/21/2005 | 7 Pages |
| 08830 | Mirrors | 10/21/2005 | 5 Pages |
| 08911 | Glazed Aluminum Curtain Wall | 10/21/2005 | 9 Pages |
| 09000 | Material Legend | 6/22/2006 | 2 Pages |
| 09253 | Gypsum Sheathing | 10/21/2005 | 3 Pages |
| 09260 | Gypsum Board Assemblies | 10/21/2005 | 14 Pages |

8

R.P. Appx. 180

| | | | |
|---|---|---|---|
| 09265 | Gypsum Board Shaft-Wall Assemblies | 10/21/2005 | 5 Pages |
| 09310 | Ceramic Tile | 10/21/2005 | 7 Pages |
| 09402 | Epoxy Terrazo | 10/21/2005 | 5 Pages |
| 09514 | Acoustical Pan Ceilings | 10/21/2005 | 4 Pages |
| 09653 | Resilient Wall Base | 10/21/2005 | 4 Pages |
| 09671 | Resinous Flooring | 10/27/2005 | 6 Pages |
| 09861 | Carpet Tile | 10/21/2005 | 3 Pages |
| 09912 | Painting | 10/21/2005 | 9 Pages |
| 09950 | Wall Covering | 9/1/2006 | 2 Pages |
| 09970 | Special Wall Surfaces(Fiberglass Reinforced Plastic Panels) | 10/21/2005 | 4 Pages |
| 09980 | Special Coatings for Concrete Surfaces | 6/22/2006 | 6 Pages |
| 10155 | Toilet Compartments | 7/28/2006 | 2 Pages |
| 10270 | Access Flooring | 10/21/2005 | 6 Pages |
| 10520 | Fire Protection Specialties | 10/21/2005 | 5 Pages |
| 10801 | Toilet and Bath Accessories | 6/22/2006 | 2 Pages |
| 11160 | Loading Dock Equipment | 10/21/2005 | 5 Pages |
| 12491 | Horizontal Blinds | 10/21/2005 | 3 Pages |
| 14240 | Hydraulic Elevators | 2/27/2006 | 8 Pages |
| 15010 | Basic Mechanical Requirements | 1/19/2006 | 4 Pages |
| 15071 | Mechanical Vibration Controls | 1/19/2006 | 4 Pages |
| 15075 | Mechanical Identification | 1/19/2006 | 4 Pages |
| 15081 | Duct Insulation | 1/19/2006 | 8 Pages |
| 15083 | Pipe Insulation | 1/19/2006 | 10 Pages |
| 15100 | Valves | 1/19/2006 | 8 Pages |
| 15135 | Meters and Gages | 1/19/2006 | 4 Pages |
| 15140 | Hangers and Supports | 1/19/2006 | 4 Pages |
| 15300 | Fire Suppression Piping | 1/19/2006 | 14 Pages |
| 15411 | Water Distribution Piping | 1/19/2006 | 8 Pages |
| 15420 | Drainage and Vent Systems | 1/19/2006 | 7 Pages |
| 15440 | Plumbing Fixtures | 1/19/2006 | 4 Pages |
| 15453 | Plumbing Pumps | 1/19/2006 | 4 Pages |
| 15460 | Water Heaters | 1/19/2006 | 3 Pages |

R.P. Appx. 181

| | | | |
|---|---|---|---|
| 15730 | Section Packaged Rooftop Air Conditioning Units | 1/19/2006 | 10 Pages |
| 15838 | Power Ventilators and Exhaust Fans | 1/19/2006 | 7 Pages |
| 15883 | Variable Frequency Drives | 1/19/2006 | 5 Pages |
| 15891 | Metal Ducts | 1/19/2006 | 8 Pages |
| 15910 | Duct Accessories | 1/19/2006 | 6 Pages |
| 15932 | Air Outlets and Inlets | 1/19/2006 | 3 Pages |
| 15933 | Air Terminals | 1/19/2006 | 4 Pages |
| 15970 | Automatic Controls | 6/7/2006 | 32 Pages |
| 15990 | Testing, Adjusting, and Balancing | 1/19/2006 | 7 Pages |
| 15995 | Commissioning | 1/19/2006 | 5 Pages |
| 16010 | Basic Electrical Requirements | 1/19/2006 | 4 Pages |
| 16110 | Raceways | 1/19/2006 | 5 Pages |
| 16120 | Wires and Cables | 1/19/2006 | 3 Pages |
| 16135 | Cabinets, Boxes, and Fittings | 1/19/2006 | 5 Pages |
| 16143 | Wiring Devices | 1/19/2006 | 4 Pages |
| 16170 | Circuit and Motor Disconnect Switches | 1/19/2006 | 2 Pages |
| 16190 | Circuit and Motor Disconnect Switches | 1/19/2006 | 4 Pages |
| 16195 | Electrical Identification | 1/19/2006 | 3 Pages |
| 16420 | Service Entrance | 1/19/2006 | 4 Pages |
| 16425 | Switchboards | 1/19/2006 | 6 Pages |
| 16452 | Grounding | 1/19/2006 | 5 Pages |
| 16460 | Transformers | 1/19/2006 | 3 Pages |
| 16470 | Panelboards | 1/19/2006 | 4 Pages |
| 16471 | Transient Voltage Surge Suppressors | 1/19/2006 | 4 Pages |
| 16475 | Overcurrent Protective Devices | 1/19/2006 | 5 Pages |
| 16481 | Motor Controllers | 1/19/2006 | 4 Pages |
| 16515 | Lighting | 1/19/2006 | 6 Pages |
| 16670 | Lightning Protection Systems | 1/19/2006 | 3 Pages |
| 16721 | Fire Alarm Systems | 1/19/2006 | 7 Pages |

R.P. Appx. 182



**MUNSCH HARDT
KOPF & HARR** PC
ATTORNEYS & COUNSELORS

DALLAS | HOUSTON | AUSTIN

3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201-6659
Main 214.855.7500
Fax 214.855.7584
munsch.com

Direct Dial 214.855.7589
Direct Fax 214.978.4378
gnoschese@munsch.com

September 13, 2013

Clayco, Inc.
Attn: Tom Sieckhaus
2199 Innerbelt Business Center Drive
St. Louis, MO 63114

RE:     Agreement between Owner and Contractor dated May 19, 2006 ("Contract"), by and between Intellicenter Dallas Investments LLP ("Owner"), and Clayco, Inc. ("Contractor"), for the design and construction of a four story office building consisting of approximately 211,637 gross square feet located at 3701 Regent Boulevard, Irving, Texas ("Project").

Dear Mr. Sieckhaus:

This law firm serves as litigation counsel to Owner. As Owner previously advised by email and a phone call to Contractor's authorized representative, Owner recently discovered shear cracks in the tilt wall panels at the Project. Owner retained a structural engineer to evaluate the cause of the cracks, and, after investigating the cracks, the engineer concluded that the cracking occurred because of insufficient shear friction reinforcing above the openings. Additionally, the engineer noted the flextural reinforcing appears to be inadequate below the girders along the east and west ends of the building. Project was not designed pursuant to applicable codes and that the design failed to comply with the requirements of the Contract's construction documents. I am enclosing a copy of the engineer's report for your review.

Pursuant to its rights and remedies under the Contract and applicable law, Owner is hereby demanding Contractor complete, repair and/or replace the recently discovered incomplete and/or defective work immediately. To the extent Contractor requires access to the Project, please contact Mike Rosamond, 8115 Preston Road, Suite 700, Dallas, Texas 75225; Phone: 214 696 7826 (Direct); 214 957 6075 (Cell); email: mike.rosamond@kdc.com.

Additionally, under the Contract, Contractor was required to secure errors and omissions policies for the design professionals which named Owner as an additional insured. Please provide the Certificates of Insurance to Owner upon receipt of this letter so that proper notification can be made under the terms of those policies.

Please be advised that Owner's investigation is ongoing and that Owner may discover additional errors and omissions and incomplete failures to comply with the terms of the Contract. Nothing in this letter is intended to limit or waive or estop Owner from asserting its legal rights or remedies and any and all rights and remedies are herein reserved.

To the extent that you would like to discuss this matter in further detail, please don't hesitate to contact me.

MHDocs 4694265_1 5554.38

R.P. Appx. 183

Clayco, Inc.
Attn: Tom Sieckhaus
September 16, 2013

Sincerely,

Greg Noschese

GCN:ld

c:    Ron Rolfes (via email)
       Scott Ozymy (via email)
       Mike Rosamond (via email)
       David Coligado (via email)
       Amy Altshuler (via email)
       Ben Ochoa (via email)
       Justin Chapman (via email)

# MCHALE ENGINEERING, INC.

2000 AVENUE G        SUITE 800        PLANO, TEXAS  75074
(972) 423-5908    FAX (972) 424-8100

September 10, 2013


Mr. Mike Rosamond
KDC Real Estate Development and Investment
8115 Preston Road, Suite 700
Dallas, TX 75225


Re:    Intellicenter Dallas
       3701 Regent Boulevard
       Irving, TX


Dear Mr. Rosamond:

Per the request of James Williams, the exterior tilt-wall panels at the referenced project were reviewed on August 29, 2013. The review was strictly visual and was limited to the exterior tilt-wall panels. The purpose of this review was to provide a general assessment of the reported cracks in the tilt-wall panels. A review of the construction documents for the building was also conducted.

The following documents were made available for review.

1.  Geotechnical report prepared by Reed Engineering, Report Number 12567, dated September 9, 2005.

2.  Structural drawings prepared by Alper Audi, Inc., Record Drawings dated 3-26-07.


The project consists of a four story office building. The exterior facade consists of load bearing concrete tilt-wall panels. The roof is framed with steel joists and beams. The first, second, third and fourth floors are framed with composite steel beams with a steel deck and concrete slab. The exterior tilt-wall panels and interior columns are supported on auger excavated reinforced concrete piers bearing in a deeper shale stratum. The project is estimated to be approximately five (5) years old. The building is assumed to face south.

## Observations

The tilt-walls panels span four stories high. Each of the thirty (30'- 0) foot wide panels has two ten (10'-0) feet wide openings at each floor. The floor purlins are connected to the panels along the north and south sides of the building. The main floor girders connect to the tilt-wall panels along the east and west sides of the building. Most of the beam connections occur just above an opening.

Cracks were found in the tilt-wall panels along the north and south sides of the building. These cracks occur below the windows at the first floor, second, third and fourth floors. The cracks generally appear to align with the location of the floor purlins. Cracks can also be found along the east and west sides of the building near the location where the girders connect to the tilt wall panels. The cracks vary from hairline to 1/16" in width. Some evidence of previously repaired cracks was noted.

No evidence of foundation movement was found in the tilt-wall panels. No separation of the panel joints was noted, which is usually an indication of foundation movement. No significant deflection of the tilt-wall panels was noted.


R.P. Appx. 185

Mr. Mike Rosamond
KDC Real Estate Investment and Development


Intellicenter Dallas
3701 Regent Boulevard
Irving, TX


A review of the design of the tilt-wall panels was performed based on the 2000 International Building Code, American Concrete Institute - "Building Code Requirements for Structural Concrete 318-02" and ASCE -7 "Minimum Design Loads for Buildings and Other Structures". The International Building Code was referenced on Record Drawing Sheet S1-01 as the code standard. The design floor loads were indicated on the Record Drawings as a total Dead Load of 80 pounds per square foot and total Live Load of 100 pounds per square foot. The review of the design of the panels was based on these loads.

The record drawings specify the panel reinforcing on Sheets T4-11 and T4-12. The drawings indicate that 1-#5 were to be installed above and below each opening on each face of the panel. This appears to be typical reinforcing for all of the panels. At locations were the floor purlins and girders are connected to the panel above the openings, it does not appear to be adequate to meet the requirements ACI 318 Section 11.7 for shear friction reinforcing. This condition is particularly acute below the first floor where the bottom of the beam connection occurs just 1'-7 above the bottom of the panel. At the second, third and fourth floors, the bottom of the beam connection occurs 1'-11 above the bottom of the panel. However, at all locations where the purlin or girder are located above the openings there does not appear to be sufficient shear friction reinforcing. In addition, there does not appear to be sufficient flexural reinforcing below the girder connections on the east and west ends of the building at the locations where the girders connect to the panels above the windows.

In my opinion, the cracking that occurs in the tilt-wall panels occurs because of insufficient shear friction reinforcing above the openings. In addition, the flexural reinforcing appears to be inadequate below the girders along the east and west ends of the building. Further investigation may reveal other areas of concern after additional information is provided.

This concludes this report, if I can be of any further assistance or if there should be any questions, please do not hesitate to call. This report is based on the observed conditions on this date, which are subject to change.

Sincerely,
MCHALE ENGINEERING, INC.


Gary B. McHale, P.E.

Attachments: Photographs



**Photograph Number 1 - Typical Panel Cracking Along North Side**



**Photograph Number 2 - Typical Panel Cracking Along North Side**

R.P. Appx. 187



**Photograph Number 3 - Typical Panel Cracking Along North Side**



**Photograph Number 4 - Typical Panel Cracking Along North Side**



**Photograph Number 5 - Typical Panel Cracking Along North Side**



**Photograph Number 6 - Typical Panel Cracking Along North Side**

R.P. Appx. 189



**Photograph Number 7 - Typical Panel Cracking Along West Side**



**Photograph Number 8 - Previously Repaired Crack Along North Side**



**Photograph Number 9 - Typical Panel Cracking Along South Side**



**Photograph Number 10 - Typical Panel Cracking Along North Side**

R.P. Appx. 191

## AMERICAN ARBITRATION ASSOCIATION
### Construction Industry Arbitration

INTELLICENTER DALLAS ) 
INVESTMENTS LP, ) 
                           )     Case Number: 01-14-0001-0249
    Claimant, ) 
                           ) 
v. ) 
                           ) 
CLAYCO, INC., et al. ) 
                           ) 
    Respondents. ) 

## RESPONDENTS' OBJECTIONS, RESERVATION OF RIGHTS AND, SUBJECT TO AND WITHOUT WAIVER OF THE SAME, THEIR ANSWERING STATEMENT

Respondents Clayco, Inc. ("Clayco") and FS Architecture ("FS") (Clayco and FS are hereinafter collectively referred to as "Respondents") submit their Objections, Reservation of Rights and, Subject to and without Waiver of the Same, their Answering Statement, and state as follows:

## RESPONDENTS' OBJECTIONS AND RESERVATION OF RIGHTS

Respondents affirmatively asserted their respective rights to seek the dismissal of Claimant Intellicenter Dallas Investments LP's arbitration complaint/demand (the "Demand"), pursuant to § 150.002(e), TEX. CIV. PRAC. & REM. CODE, in the 160th Judicial District Court of Dallas County, Texas, Cause No. DC-15-02018 (the "Lawsuit"). Section 150.002(d) expressly excuses a defendant (in a judicial or arbitration proceeding) who seeks dismissal pursuant to § 150.002(e) from filing an answer to a complaint against it, and by implication (if not expressly), it further excuses such a defendant from participating in litigation on the merits of such a complaint until the § 150.002 dismissal issue is resolved, and all expressly authorized interlocutory appeals, under § 150.002(f) have been fully exhausted.

R.P. Appx. 192

Because Respondents affirmatively exercised their statutory rights to seek dismissal of the Demand, which is their *response* to the Demand, Respondents object to the imposition by the American Arbitration Association of a deadline for filing an *answer* to the Demand because they are statutorily excused from doing so. Respondents also object to the imposition of any other deadlines that advance the litigation of the Demand, on the merits, prior to a final disposition of the § 150.002 dismissal request, by appeal or otherwise.

Subject to the above-stated objections and without waiver of the same, Respondents' following Answering Statement, including their assertion of denials and affirmative defenses to Claimant's Demand, are expressly subject to a full reservation of rights with respect to Respondent's position ("Reservation of Rights") that the American Arbitration Association ("AAA") may not take any further action in this matter during the pendency of the lawsuit commenced by Respondents in the Lawsuit, in particular prior to the final disposition of their § 150.002(e) dismissal request, via final appeal, unless and until expressly ordered to do so by a court. Specifically, while the Lawsuit is pending, the AAA has no authority to act with respect to this matter in any manner whatsoever, while Respondents affirmatively seek a dismissal order from the Court in the Lawsuit pursuant to § 150.002(e), while relying on their statutory rights not to file an answer to the Demand, under § 150.002(d). The basis for the relief sought by Respondents in the Lawsuit is Claimant's undisputed failure to comply with the requirements of § 150.002(a) and (b), which is a statutory, substantive condition precedent to Claimant's purported right to arbitrate the claims that are stated in the Demand, or to seek any damages, losses, or other relief associated therewith.

As a result of the Lawsuit and pursuant to §§ 150.002(d) and (e), this matter should be deemed stayed pending: (a) the final resolution of the Lawsuit, including appeals, interlocutory

2

R.P. Appx. 193

or otherwise; and/or (b) the Court's issuance of any interim orders expressly directing the AAA to take further action in this arbitration.

Subject to the Objections and full Reservation of Rights asserted herein above, and for the sole purpose of preserving their rights and defenses in connection with this arbitration (in the event that this arbitration is ordered to proceed), and to avoid any waiver or default, Respondents submit the following Answering Statement and Affirmative Defenses to Claimant's Demand.

## RESPONDENTS' ANSWERING STATEMENT TO CLAIMANT'S DEMAND

Subject to the foregoing Objections and Reservations of Rights and their pending Motion to Dismiss under Section 150.002, in the Lawsuit, Respondents, for their Answering Statement to Claimant's Demand, state as follows:

1. Claimant's Demand is so vague and ambiguous that Respondents cannot properly prepare a response or prepare for an arbitration hearing, and thus, Claimant should be required to restate the allegations, claims, damages, losses, and all relief sought in the Demand with more specificity.

2. Respondents generally deny each of the allegations and claims asserted in the Demand. Furthermore, Respondents also generally deny any liability to Claimant for any of the damages, losses, or other items sought in the Demand. Finally, Respondents generally deny that Claimant is entitled to any of the relief sought in the Demand.

**WHEREFORE**, subject to and without waiver of their Objections and Reservations of Rights and their pending Motion to Dismiss in the Lawsuit, having answered and generally denied Claimant's Demand, Respondents request that Claimant's Demand be denied and/or that the arbitrator(s) enter an award in favor of Respondents and against Claimant; Respondents also request that the arbitrator(s) grant Respondents their costs and expenses, including reasonable

3

R.P. Appx. 194

attorneys' fees, incurred herein; Respondents further request any other and further relief deemed just and proper.

## RESPONDENTS' AFFIRMATIVE DEFENSES TO CLAIMANT'S DEMAND

Subject to the foregoing Objections and Reservations of Rights and their pending Motion to Dismiss in the Lawsuit, Respondents, for their Affirmative Defenses to Claimant's Demand, state as follows:

1. Claimant's Demand is so vague and ambiguous that Respondents cannot properly prepare a response or prepare for the arbitration hearing, and thus, Claimant should be required to restate the allegations, claims, damages, losses, and all relief sought in the Demand with more specificity.

2. Claimant's Demand fails to state a cause of action upon which relief can be granted.

3. Claimant's Demand is barred by Claimant's failure to comply with or satisfy conditions precedent to its right to arbitrate the claims in its Demand, where such failure constitutes a waiver of any contractual right to arbitrate, or the legal non-existence of an agreement to arbitrate such claims.

4. In the event it is judicially determined that the § 150.002 dismissal motion now pending in the Lawsuit is an arbitrable question, and only in such event, Claimant's Demand fails to comply with § 150.002, TEX. CIV. PRAC. & REM. CODE, titled "Certificate of Merit," and, therefore, must be dismissed. Section 150.002 mandates that "in any action or arbitration proceeding in Texas for damages arising out of the provision of professional services by a licensed or registered professional, the plaintiff shall be required to file with the complaint an affidavit of a third-party licensed architect, licensed professional engineer . . .," meeting the

4

R.P. Appx. 195

qualifications set forth in § 152.002(a)(1)-(3). The mandatory affidavit "shall set forth, specifically for each theory of recovery for which damages are sought, the negligence, if any, or other action, error, or omission of the licensed or registered professional in providing the professional service, including any error or omission in providing advice, judgment, opinion, or a similar professional skill claimed to exist, and the factual basis for each such claim." § 150.002(b), Tex. Civ. Prac. & Rem. Code. Claimant did not file any certificate of merit, let alone one that complies with the requirements of § 150.002(a) and (b), with the Arbitration Complaint. Section 150.002(e), Tex. Civ. Prac. & Rem. Code mandates that a claimant's failure to file the affidavit(s) required under §§ 150.002(a) and (b) (commonly known as a "certificate of merit"), in accordance with § 150.002, shall result in the dismissal of the arbitration complaint against the defendant(s), and the dismissal may be with prejudice.

5. Each of Claimant's claims are time barred under §§ 16.003 and 16.004, Tex. Civ. Prac. & Rem. Code (and/or any other applicable limitations periods) in that Claimant's claims were filed more than two or four years (as appropriate) after Claimant's claims arose and/or accrued, including any tolling periods that may apply. Specifically, Claimant discovered, or should have discovered, the physical manifestations of the alleged design and/or construction defects in subject property that caused the alleged losses and/or damages sought in the Demand more than two or four years (as appropriate) before Claimant filed its Demand, including any tolling periods that may apply. Furthermore, regardless of when Claimant may have actually discovered the physical manifestations of the alleged design and/or construction defects in the subject property, Claimant's claims with respect thereto arose and/or accrued upon substantial completion of the subject property, which occurred on or about March 6, 2007, pursuant to Sub-section 13.7.1(.1) of the General Conditions to Claimant's written contract with Clayco, which

5

governs the commencement of any applicable statutory limitations periods, and provides as follows with respect to any acts or failures to act occurring prior to substantial completion of the subject property: "[A]ny applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than such date of Substantial Completion." Therefore, each of Claimant's claims with respect to any alleged design and/or construction defects are time-barred, where said claims were not filed within two or four years (as appropriate) of substantial completion of the subject property, which occurred on or about March 6, 2007.

6. Claimant is estopped to enforce any contracts or agreements with Respondents upon which it may seek damages, losses, or other relief.

7. Claimant has waived its right to enforce any contracts or agreements with Respondents upon which it may seek damages, losses, or other relief.

8. Claimant's alleged damages and/or losses, if any (which Respondents expressly deny), should be barred and/or reduced because Claimant has failed to mitigate its alleged damages and/or losses, including but not limited to Claimant's performance of unnecessary and destructive "repairs" on the building. Said "repairs" caused or contributed to Claimant's alleged damages. In addition, Claimant's failure to perform necessary maintenance and/or other upkeep on the portions of the property that are the subject of Claimant's claims substantially contributed to Claimant's alleged damages and/or losses.

9. To the extent, if any, that Respondents may be found liable to Claimant for any of the damages and/or losses sought in the Demand (which liability Respondents expressly deny), Respondents are entitled to deductions, credits, and/or setoffs for, among other things, the depreciation of the subject property since substantial completion thereof.

6

R.P. Appx. 197

10.     Claimant's breach of implied warranty claim is barred by virtue of Clayco's express written disclaimer of any and all express or implied warranties in connection with the subject property, which disclaimer is contained in the General Conditions of Claimant's written contract with Clayco.

11.     Claimant's losses and/or damages, if any (which Respondents expressly deny), are the result of Claimant's comparative negligence, which is sufficient to bar or proportionately reduce any recovery by Claimant under applicable law.

12.     Claimant's losses and/or damages, if any (which Respondents expressly deny), are the result of actions of third parties over whom Respondents had no control or right to control.

13.     Claimant's recovery, if any, must be reduced by any amounts received from any collateral sources pursuant to applicable law.

14.     Respondents hereby incorporate by reference any other and further affirmative defenses identified or made known through the course of discovery in this matter, and expressly reserve the right to so amend their affirmative defenses.

**BLITZ, BARDGETT & DEUTSCH, L.C.**

By: _____

R. Thomas Avery, Missouri Bar #45340
Douglas A. Stockenberg, Missouri Bar #57865
120 S. Central Ave., Ste. 1650
St. Louis, MO  63105
(314) 863-1500
(314) 863-1877 (facsimile)
rtavery@bbdlc.com
dstockenberg@bbdlc.com
*Attorneys for Respondents Clayco, Inc.
and FS Architecture, PC*

7

R.P. Appx. 198

## CERTIFICATE OF SERVICE

I hereby certify that on the _18th_ day of March, 2015, a true and accurate copy of the foregoing document was filed with the American Arbitration Association and served upon the following parties of record as follows:

**Erika G. Kleinschmidt**
Director of ADR Services
American Arbitration Association
Central Case Management Center
13727 Noel Road, Suite 700
Dallas, TX  75240
Via e-mail to: ErikaKleinschmidt@adr.org

**Gregory C. Noschese**
Munsch Hardt Kopf & Harr, PC
500 North Akard Street, Suite 3800
Dallas, TX  75201-6659
Via e-mail to: gnoschese@munsch.com
*Attorney for Claimant Intellicenter*
*Dallas Investments LP*

8

R.P. Appx. 199

| | | |
|---|---|---|
| INTELLICENTER DALLAS INVESTMENTS, LP, | § § § | |
| *Claimant,* | § § § § | |
| v. | § § § § | Case Number: 01-14-0001-0249 |
| CLAYCO, INC., and FS ARCHITECTURE, P.C., | § § § § | |
| *Respondents.* | § § | |

## ORDER PARTIALLY GRANTING AND PARTIALLY DENYING RESPONDENTS' MOTION TO DISMISS ON STATUTES OF LIMITATIONS

The arbitration panel has reviewed and considered Respondents' August 14, 2015 Motion to Dismiss Arbitration On Statutes of Limitations, filed by both of the above named Respondents in this matter. The panel also considered Claimant's August 24, 2015 Response to same, as well as Respondents' Reply of August 31, 2015. In addition to the above submissions, the panel received and deliberated upon the oral argument of the parties in support of said submissions.

After consideration of all of the above, the panel determines that Respondent Clayco, Inc.'s ("Clayco") Motion to Dismiss is well taken, and should be Granted for the reasons that briefly follow. The panel further determines that Respondent FS Architecture, P.C.'s ("FSA") Motion to Dismiss is not well taken, and should be Denied.

Intellicenter Dallas Investments, L.P. ("Claimant" or "Intellicenter" brought claims against Clayco for breach of contract, as well as for failure to indemnify, negligent misrepresentation, and fraud. The majority of the facts relevant and necessary to the

R.P. Appx. 200

determination of Clayco's Motion against Claimant are not in dispute or are conclusively established. There is no dispute that the contract between the parties in this matter is a modified *AIA Document A111 – 1997 Standard Form of Agreement Between Owner and Contractor* design-build contract ("Standard Form"), which incorporates a modified *AIA Document A201 – 1997 General Conditions of the Contract for Construction* ("General Conditions").

There is also no dispute that the date of Substantial Completion of the Project was March 6, 2007. The parties also agree that Section 13.7 of the General Conditions of the Contract ("Commencement of Statutory Limitations Period,") governs the accrual of any and all claims arising from any acts or omissions related to the Contract. Specifically, Section 13.7.1(3) provides, as between the Owner and Contractor, as follows: "[a]s to acts or failures to act occurring after the payment, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of any act or failure to act by the Contractor pursuant to any Warranty provided under Section 3.5, the date of any correction of the Work or failure to correct the Work by the Contractor under Section 12.2, or the date of actual commission of any other act or failure to perform any duty or obligation by the Contractor or Owner, whichever occurs last.

Section 3.5 of the General Conditions, provides that the warranty period is for one (1) year from the March 6, 2007 date of Substantial Completion. Consequently, any claims, as between Owner and Contractor, relating to any acts or failures to act occurring subsequent to the date of final payment, would begin to accrue no later than March 6,

R.P. Appx. 201

2008 and the applicable statute of limitations would begin to run no later than March 6, 2008.

Intellicenter argued that the "accrual" provision constitutes an unenforceable contractual waiver of the application of the discovery rule, and requests that the panel hold that such a provision is void as against the public policy of the state of Texas. Although the parties presented cogent arguments both for and against Intellicenter's request, Intellicenter was unable to present any Texas case authority for the proposition that the parties' bargained-for allocation of risk should be disturbed under the circumstances of this case. Virtually all sister State courts who have considered the enforceability of Section 13.7 of AIA Document A201 have held that it does not violate public policy. Absent any Texas authority to the contrary, this arbitration panel declines the invitation to interfere with the bargain entered into and memorialized by these parties. Consequently, Intellicenter's request for relief from the contractual provision waiving application of the discovery rule is denied.

Alternatively, Intellicenter argues that its claims were revived pursuant to the operation of §16.069 of the Texas Civil Practice and Remedies Code, which provides that "if a counterclaim or cross claim arises out of the same transaction or occurrence that is the basis of an action, a party to the action may file the counterclaim or cross claim, even though as a separate action it would be barred by limitation on the date the party's answer is required," so long as the counterclaim or cross claim is filed within thirty days after the date the party's answer is required.

Clayco filed their action in District Court on February 20, 2015, and amended their petition on March 16, 2015. Clayco's District Court pleading sought to have the

---

Order on Respondents' Motion to Dismiss                                        Page 3

R.P. Appx. 202

Court determine that Intellicenter's claims were time-barred, and sought to enjoin Intellicenter and the AAA from proceeding with the arbitration. Clayco also sought dismissal of the arbitration matter based on the certificate of merit statute. Clayco also sought attorney's fees as appropriate.

On March 2, 2015, in response to Clayco's District Court filing, Intellicenter filed claims which Intellicenter asserts are counterclaims arising out of the same transaction or occurrence, such that they would no longer be barred, under Texas Civil Practice and Remedies Code § 16.069.

After review and consideration of the parties' submissions on this issue, it is clear that Intellicenter's claims should not be considered to be "automatically revived" by § 16.069, because Intellicenter's claims cannot fairly be characterized as cross-claims or counterclaims to the declaratory relief that Clayco sought in the District Court action. The relief Clayco sought was both declaratory and defensive in nature. Additionally, Clayco's generic request for attorney's fees, as appropriate, does not serve to convert the declaratory relief sought by Clayco, into the type of affirmative relief that would allow for Intellicenter's otherwise time-barred claims to be revived under § 16.069.

Finally, Intellicenter asserts that its arbitration claims are timely because they were filed within one year after Clayco allegedly refused Intellicenter's indemnification request. Intellicenter's argument fails because the indemnification provision relied upon by Intellicenter (Section 4.4.1) is an indemnification provision which is not triggered by liability claims between the parties, but instead obligates Clayco to protect Intellicenter against the liability claims of third parties or actors who are not parties to the agreement. Adoption of Intellicenter's interpretation (that Intellicenter can sue on Intellicenter's **own**

R.P. Appx. 203

claims, within a certain period of time that only begins to run after the rejection of a request for indemnity) would render meaningless several provisions of the contract (including the accrual provision discussed above). The parties' briefing presented no evidence that the parties intended to allow for such a circular result.

Intellicenter's claims against Clayco in this arbitration, were all filed outside the respective statute of limitations, but for application of the discovery rule. For the reasons described above, the discovery rule does not apply to Intellicenter's claims against Clayco. Consequently, the arbitration panel determines that Intellicenter's claims against Clayco are time-barred and Clayco's Motion to Dismiss should be, and is hereby, GRANTED.

SIGNED THIS 3RD DAY OF NOVEMBER, 2015.

_____
HON. CARLOS G. LOPEZ
CHAIR OF ARBITRATION PANEL

_____
MICHAEL ALBERS
ARBITRATOR

_____
JOHN TORKELSON
ARBITRATOR

R.P. Appx. 204

1 CIT/ ESERVE

CAUSE NO. DC-15-02018 _____

| | | |
|---|---|---|
| FORUM STUDIO, INC. and CLAYCO, INC., | § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § § | |
| V. | § § § | _____ JUDICIAL DISTRICT |
| INTELLICENTER DALLAS INVESTMENTS LLP, | § § § § | |
| Defendant. | § | DALLAS COUNTY, TEXAS |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE:

Plaintiffs Forum Studio, Inc. and Clayco, Inc. file this Original Petition pursuant to Sections 171.023, 171.096, 150.002 and 37.001 *et seq.*, Tex. Civ. Prac. & Rem. Code, complaining of Defendant Intellicenter Dallas Investments LLP, and for causes of action show as follows:

## DISCOVERY CONTROL PLAN

1. Plaintiffs intend to conduct discovery under Level 1 of the Texas Rules of Civil Procedure, Rule 190.2.

## PARTIES

2. Plaintiff Clayco, Inc. ("Clayco") is a Missouri corporation with its principal place of business in St. Louis County, Missouri, that transacts business in Texas.

3. Plaintiff Forum Studio, Inc. ("Forum") is a Missouri corporation with its principal place of business in St. Louis County, Missouri, that transacts business in Texas.

4. Defendant Intellicenter Dallas Investments LLP ("Intellicenter") is a Delaware limited liability partnership that transacts business in Texas, that may be served with citation by

R.P. Appx. 205

delivery of the same to its registered agent in Texas:  National Registered Agents, Inc., 1021 Main Street, Suite 1150, Houston, Texas  77002.

**JURISDICTION AND VENUE**

5.      Jurisdiction is proper pursuant to §§ 171.023, 171.096, 150.002 and 37.001 *et seq.*, Tex. Civ. Prac. & Rem. Code.

6.      Mandatory venue in Dallas County exists pursuant to § 15.001(b)(1), Tex. Civ. Prac. & Rem. Code because:  (a) § 171.096(a) and (b), Tex. Civ. Prac. & Rem. Code mandates that Dallas County is the proper venue because it is the county in which Defendant resides or has a place of business and/or the parties' agreements provide that any arbitration that is to be held to resolve arbitrable disputes between them must be heard in Dallas County; and (b) § 15.020, Tex. Civ. Prac. & Rem. Code mandates venue in Dallas County because this case involves an action arising out of a "major transaction" that is evidenced by a written agreement in which the parties selected and agreed upon Dallas County as the mandatory venue of any proceedings between them.

7.      Plaintiffs do not seek a monetary recovery other than attorneys' fees, as may be authorized by law, in an amount not to exceed $100,000.00.

**FACTS**

**A.      The Contract for the Design and Construction of the Building**

8.      On or about May 19, 2006, Intellicenter (as owner) and Clayco (as design-build contractor) entered into a modified *AIA Document A111 – 1997 Standard Form of Agreement Between Owner and Contractor* design-build contract ("Standard Form") for the design and construction of a four-story office building located in Irving, Texas (the "Building").  The Standard Form incorporates by reference a modified *AIA Document A201 – 1997 General Conditions of the Contract for Construction* ("General Conditions").  The Standard Form also

---

**PLAINTIFFS' ORIGINAL PETITION**                                                    **Page 2**

incorporates by reference the Outline Specifications. The Standard Form, General Conditions and Outline Specifications are hereinafter collectively referred to as the "Contract."

9. Pursuant to Subsection 13.1.1 of the General Conditions, the parties agreed that Texas law governs the Contract.

10. The Standard Form describes the subject project (i.e., the Building) as follows: "The design and construction of a 4-story speculative office building, consisting of approximately 211,637 gross square feet, located at 3701 Regent Blvd., Irving, Texas."

11. Pursuant to the Contract, Clayco provided architectural and engineering services to Intellicenter. The Standard Form identifies Forum as the architect of the Building, and Forum performed architectural services in connection with the design of the Building pursuant to a separate contract with Clayco. Forum is an architectural firm licensed to provide architectural services in several states, including Texas.

12. Forum separately contracted for certain structural, mechanical, electrical, and civil engineering services with other design professionals.

13. Section 13.7 of the General Conditions is titled "COMMENCEMENT OF STATUTORY LIMITATIONS PERIOD," and governs the commencement of statutory limitations periods with respect to claims arising from the Contract, and in this regard Subsection 13.7.1 of the General Conditions provides as follows:

As between the Owner and Contractor:

.1 Before Substantial Completion. As to acts or failures to act occurring prior to the relevant date of Substantial Completion, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than such date of Substantial Completion.

.2 Between Substantial Completion and Final Certificate for Payment. As to acts or failures to act occurring subsequent to the relevant date of Substantial Completion and prior to issuance of the final Certificate for Payment, any applicable statute of limitations

R.P. Appx. 207

shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date ~~of issuance of~~ Owner is required to make the final ~~Certificate for Payment;~~ payment hereunder; and

.3 After Final Certificate for Payment. As to acts or failures to act occurring after the ~~relevant~~ date ~~of issuance~~ of ~~the~~ final ~~Certificate for Payment,~~ payment, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of any act or failure to act by the Contractor pursuant to any Warranty provided under Section 3.5, the date of any correction of the Work or failure to correct the Work by the Contractor under Section 12.2, or the date of actual commission of any other act or failure to perform any duty or obligation by the Contractor or Owner, whichever occurs last.

14.     Construction of the Building was substantially complete on **March 6, 2007**, as evidenced by an *AIA Document G704 – 2000 Certificate of Substantial Completion* issued by Forum. Intellicenter never contested Forum's certification of substantial completion.

**B.      The Commencement of Arbitration Proceedings with the AAA**

15.     On or about September 5, 2014, Intellicenter filed a Demand for Arbitration (the "Arbitration Complaint") with the American Arbitration Association ("AAA"), and commenced Case No. 01-14-0001-0249 against Forum and Clayco (the "Arbitration Case"). A true and accurate copy of the Arbitration Complaint is attached hereto as "Exhibit 1."[1]

16.     The filing of the Arbitration Complaint commenced an action or arbitration proceeding for damages against Forum and Clayco arising out of the provision of professional services by a licensed or registered professional. To date, no arbitrators have been selected for the arbitration and Forum and Clayco have not filed an answering statement, and they are not required to do so, as detailed below.

---

[1] In January of 2015, Intellicenter's foreign entity registration to do business in Texas expired or terminated, as did its right to maintain any suits filed in Texas. *See* § 9.051(b), Tex. Bus. Org. Code.

**PLAINTIFFS' ORIGINAL PETITION**                                                    **Page 4**

**C.** **Texas' "Certificate of Merit" Requirement Under § 150.002, Tex. Civ. Prac. & Rem. Code**

17. Section 150.002, Tex. Civ. Prac. & Rem. Code, titled "Certificate of Merit," mandates that "in any action or arbitration proceeding in Texas for damages arising out of the provision of professional services by a licensed or registered professional, the plaintiff shall be required to file with the complaint an affidavit of a third-party licensed architect, licensed professional engineer . . .," meeting the qualifications set forth in § 152.002(a)(1-3). The mandatory affidavit "shall set forth, specifically for each theory of recovery for which damages are sought, the negligence, if any, or other action, error, or omission of the licensed or registered professional in providing the professional service, including any error or omission in providing advice, judgment, opinion, or a similar professional skill claimed to exist, and the factual basis for each such claim." § 150.002(b), Tex. Civ. Prac. & Rem. Code.

18. Intellicenter did not file any certificate of merit, let alone one that complies with the requirements of § 150.002(a) and (b), with the Arbitration Complaint.

19. Section 150.002(e), Tex. Civ. Prac. & Rem. Code mandates that a plaintiff's failure to file the affidavit(s) required under § 150.002(a) and (b) (commonly known as a "certificate of merit"), in accordance with § 150.002, *shall* result in the dismissal of the complaint against the defendant(s), and the dismissal may be with prejudice.

20. As defendants sued in an arbitration proceeding for damages arising out of the provision for professional services, Defendants are not required to answer the Arbitration Complaint, and instead, they may seek its dismissal. *See* § 150.002(d) and (e), Tex. Civ. Prac. & Rem. Code.

R.P. Appx. 209

**D.      Intellicenter's Arbitration Complaint is also Time-Barred Under Texas Law**

21.      Independent of the Chapter 150 dismissal requirement described above, Intellicenter's claims are also time barred.

22.      Subsection 13.7 of the General Conditions governs the commencement of statutory limitation periods with respect to claims arising from the Contract, and Subsection 13.7.1(.1) provides as follows with respect to any "acts or failures to act" that occurred prior to the substantial completion of the Building: "[A]ny applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events **not later than such date of Substantial Completion**" (emphasis added).

23.      Each of the claims in Intellicenter's Arbitration Complaint arise from and directly relate to the Contract, and further, each of the claims concerns "acts or failures to act" that occurred, if at all, prior to the date of Substantial Completion of the Building.[2]

24.      As previously alleged, Construction of the Building was substantially complete on March 6, 2007, the contractual accrual date of any claims or causes of action. The Contract expressly waives application of the so-called discovery rule, as a means for achieving equitable tolling of the applicable limitations period.

25.      Intellicenter's claims in the Arbitration Complaint are governed by either a two or four year limitations period. *See* §§ 16.003(a), 16.004(a)(3) and 16.004(a)(4), Tex. Civ. Prac. & Rem. Code. The Arbitration Complaint was filed with the AAA on September 5, 2014, which is over **seven years and five months** after accrual of the asserted claims, and commencement of the limitations period(s). The claims are time barred.

---

[2] Notwithstanding Forum and Clayco's statute of limitations argument herein, they each continue to deny *any* liability to Intellicenter in connection with the claims in the Arbitration Complaint.

R.P. Appx. 210

## CAUSES OF ACTION

### Count One: Application to Stay the Arbitration Case

26.     Section 171.023, entitled "Proceeding to Stay Arbitration," authorizes a court to stay an arbitration commenced or threatened, on application and a showing that there is not any agreement to arbitrate." § 171.023(a), Tex. Civ. Prac. & Rem. Code.

27.     Intellicenter's Arbitration Complaint purports to assert claims and/or causes of action that arise from and relate to the Contract, which adopted Texas law as the governing law in Subsection 13.1.1 of the General Conditions. Because the Arbitration Complaint commenced an arbitration proceeding for damages arising from the provision of professional services, and Intellicenter agreed to the application of Texas law (which includes Chapter 150, Tex. Civ. Prac. & Rem. Code), its failure to comply with the certificate of merit filing requirement in § 150.002(a) and (b) constitutes Intellicenter's failure to satisfy a statutory condition precedent to any purported right to arbitrate the claims in the Arbitration Complaint. *As a matter of law, including but not limited to § 150.002(d), Tex. Civ. Prac. & Rem. Code, until that condition precedent is satisfied (if it can be satisfied), there is no agreement to arbitrate.* And, if the condition precedent cannot be satisfied (and in this case, it cannot be satisfied), there is a waiver of any purported right to arbitrate the claims in the Arbitration Complaint, because dismissal of the Complaint is statutorily mandated with prejudice.

28.     Pursuant to § 150.002(e), Tex. Civ. Prac. & Rem. Code, the Arbitration Complaint should be dismissed, with prejudice, because of Intellicenter's failure to comply with § 150.002(a) and (b) and, if necessary, with prejudice due further to the fact that the claims in the Arbitration Complaint are time barred under the applicable statutes of limitations. *See below*, Count Two.

R.P. Appx. 211

29. Pending the Court's adjudication of the dismissal motion, a stay of the Arbitration Case is appropriate and necessary for the following reasons:

a. There is no agreement to arbitrate under the circumstances presented because of Intellicenter's failure to comply with § 150.002(a) and (b);

b. A motion to dismiss under Chapter 150 is, by statute, a procedural request for relief that must be considered on an interlocutory basis, prior to the occurrence of any proceeding on the merits, if any such proceeding can occur; and,

c. Any activity in the Arbitration Case will interfere with the parties' rights and obligations to adjudicate the occurrence or satisfaction of the mandatory conditions precedent to the mere occurrence of the Arbitration Case.

30. Plaintiffs apply for such a stay.

**Count Two:  Application/Motion for Dismissal and
Request for Declaratory Judgment**

31. For the reasons set forth herein above, Intellicenter's Arbitration Complaint must be dismissed because no certificate of merit was filed with the Arbitration Complaint, where one was required by § 150.002, Tex. Civ. Prac. & Rem. Code.  Plaintiffs apply for and/or move for a dismissal with prejudice.

32. A justiciable controversy exists between Forum and Clayco, on the one hand, and Intellicenter, on the other hand.  Because Texas law does not permit amendment of the Arbitration Complaint to cure Intellicenter's failure of compliance with the § 150.002 certificate of merit filing requirement, the Court's dismissal is a final judgment on the Arbitration Complaint, so the Court should enter a judgment declaring such non-compliance as grounds for dismissal of the Arbitration Complaint, with prejudice.

33. Pleading further or in the alternative, under its equity jurisdiction, the Court should declare that the claims in the Arbitration Complaint are time barred by application of the

R.P. Appx. 212

statute of limitations set forth in Chapter 16, Tex. Civ. Prac. & Rem. Code, as a further basis for its dismissal, with prejudice.

34. The foregoing declarations will resolve the disputes, controversies and insecurities that now exist between the parties, regarding whether the Arbitration Claims are arbitrable, under the prevailing circumstances.

35. The Court should award Plaintiffs reasonable and necessary attorneys' fees, pursuant to § 37.009, Tex. Civ. Prac. & Rem. Code.

## CONDITIONS PRECEDENT

36. All conditions precedent to Plaintiffs' right to file this petition and to recover the relief requested herein have occurred or been performed.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Clayco, Inc. and Forum Studios, Inc. pray that Defendant Intellicenter Dallas Investments, LLP be cited to appear and answer, and that on final trial, Plaintiffs have the interim relief applied for above and a final judgment against Defendant, including the following:

a. An interim order, pursuant to § 171.023, Tex. Civ. Prac. & Rem. Code, staying any further proceedings in the Arbitration Case;

b. Judgment making the declarations prayed for above and/or dismissing the Arbitration Complaint, with prejudice;

c. Judgment awarding Plaintiffs reasonable and necessary attorneys' fees and costs of court; and,

d. Any other and further relief the Court deems just and proper.

R.P. Appx. 213

Respectfully submitted,

 /s/ *Kenneth B. Chaiken*
Kenneth B. Chaiken
State Bar No. 04057800
kchaiken@chaikenlaw.com
**CHAIKEN & CHAIKEN, P.C.**
Legacy Town Center III
5801 Tennyson Pkwy, Suite 440
Plano, Texas  75024
(214) 265-0250 telephone
(214) 265-1537 facsimile

**ATTORNEYS FOR PLAINTIFFS**

OF COUNSEL:

R. Thomas Avery
Missouri State Bar No. 45340
rtavery@bbdlc.com
**BLITZ, BARDGETT & DEUTSCH, LC**
120 South Central Avenue, Suite 1650
St. Louis, Missouri  63105
(314) 863-1500 telephone
(314) 863-1877 facsimile

**PRO HAC VICE MOTION TO BE FILED**

R.P. Appx. 214

**EXHIBIT 1**

# AMERICAN ARBITRATION ASSOCIATION
# ONLINE FILING ACKNOWLEDGEMENT
**This confirmation serves as the Demand for Arbitration or Request for Mediation for this filing.**
**To institute proceedings, please send a copy of this form and the parties' dispute resolution agreement to the opposing party.**
**Case # : 01-14-0001-0249**
This will acknowledge receipt of a request for dispute resolution services for the claim and parties detailed below.

| | |
|---|---|
| This claim has been filed for | Arbitration |
| This matter has been filed in accordance with | Construction Industry Arbitration Rules |
| The fee paid at the time of filing was | $8,200.00 |
| This request was received by the AAA on | 05-Sep-2014 |

**Claim Description**
On or about May 19, 2006, Intellicenter Dallas Investments, LP ("Intellicenter") contracted with Clayco Inc ("Contractor") under a Design Build contract ("Design Build Contract") for the design and construction of a 4 story speculative office building consisting of approximately 211,637 square feet located at 3701 Regent Boulevard, Irving Texas ("Project").
The Design Build Contract provided that the Contractor shall be responsible to Intellicenter for acts and omissions of the Contractor's employees, subcontractors and their agents and employees, and other persons, including the Architect, engineers and other Design Professionals, performing any portion of the Contractor's obligations under Article 3 with respect to the design of the Project.

The Design Build Contract Documents included a specification manual which required the elevated floor slabs to be designed for a 100lb live load with Code allowance reductions. The Contractor completed construction on March 6, 2007 as indicated in the architect's certification under the Certificate of Substantial Completion. In September 2007, six months after Substantial Completion, the architect, Forum Studio Inc. ("FS"), represented to Intellicenter that the Project was built in accordance with the plans and specifications. Further, FS indicated that it understood Intellicenter was relying upon the architect's representation and that Intellicenter may pursue a claim in the event that Intellicenter has any loss or damage as a result of the facts and circumstances that exist at the Project which made any of the FS's certifications incorrect or inaccurate.

Last year, as Intellicenter was preparing the building for sale, a broker noted some cracking in the exterior tilt panels. After evaluating the cracks, the design, and the building, Intellicenter learned that the cracks, some of which appeared to have been intentionally concealed by repair at the time of initial construction, were the result

R.P. Appx. 216

of inadequate structural design in portions of the perimeter concrete wall panels and a portion of the steel beam to wall panel connections in such a way that some, if not all, failed to meet applicable building code based upon contract specified live load on design drawings. Upon its first discovery of the cracks, Intellicenter wrote Contractor and requested that Contractor correct the deficient design and/or construction. Intellicenter even met with Contractor in person and requested more information. Despite the request to repair the deficiency, Contractor has refused to correct the design and construction deficiencies. Because of Contractor's refusal, Intellicenter has sought bids and contracted for the Project to be repaired to correct the defects. Until undertaking these repairs, Intellicenter had not made any repairs to the outside of the Project.

Intellicenter files this demand for arbitration to recover the losses it has sustained as a result of Contractor's and/or FS's breach of contract, breach of implied warranty, unjust enrichment, deficient design, fraud and/or negligent misrepresentation. Intellicenter also seeks to recover its attorney's fees, and all reasonable and necessary costs and expenses recoverable under the Design Build Contract and/or applicable law and further seeks all other relief permitted by law.

| | |
|---|---|
| Claim Amount | $1.500.000.00 |
| Do you have a Non-monetary aspect to your claim? | N |

Additional Damages

| | Amount |
|---|---|
| Attorney fees | |
| Interest | |
| Other | |

| | |
|---|---|
| **Fee Schedule Option** | Standard |
| **ADR Agreement** | Contained in AIA Document. |

---

**Parties and Representatives**

**Party 1**

| | |
|---|---|
| Category | Owner |
| Name | |
| Company Name | Intellicenter Dallas Investments LP |
| Address | 8115 Preston Road |
| | Suite 700 |
| | Dallas, TX 75225 |
| Phone | |
| Fax | |
| Email | |
| The Party is the | Company |

**Representative 1**

| | |
|---|---|
| Name | Gregory C. Noschese |
| Firm Name | Munsch Hardt Kopf Harr |

| | |
|---|---|
| Address | 500 North Akard |
| | Suite 3800 |
| | Dallas, TX 75201 |
| Phone | |
| Fax | |
| Email | gnoschese@munsch.com |

**Party 2**

| | |
|---|---|
| Category | Design / Builder |
| Name | |
| Company Name | Clayco Inc. |
| Address | 2199 Innerbelt Business Drive |
| | St. Louis, MO 63114 |
| Phone | |
| Fax | |
| Email | |
| The Party is the | Company |

**Representative 2**

| | |
|---|---|
| Name | Thomas Avery |
| Firm Name | |
| Address | 120 South Central Avenue |
| | Suite 1650 |
| | St. Louis , MO 63105 |
| Phone | |
| Fax | |
| Email | |

**Party 3**

| | |
|---|---|
| Category | Architect |
| Name | |
| Company Name | FS Architecture, PC |
| Address | c/o Forum Studios, Inc. |
| | 2199 Innerbelt Business Ctr. Dr. |
| | St. Louis, MO 63114 |
| Phone | |
| Fax | |
| Email | |
| The Party is the | Company |

**Representative 3**

| | |
|---|---|
| Name | Registered Agent |
| Firm Name | FS Architecture, PC |
| Address | c/o Forum Studios, Inc. |
| | 2199 Innerbelt Business Ctr. Dr. |
| | St. Louis, MO 63114 |
| Phone | |
| Fax | |
| Email | |

PENGAD 800-631-6989

**EXHIBIT**

A

| Activity ID | Description | Orig Dur | Early Start | Early Finish |
|---|---|---|---|---|
| **DESIGN/LEAD TIMES/PERMITS** | | | | |
| **PERMIT/DESIGN ISSUES** | | | | |
| 1210 | ARCHITECTURAL DRAWINGS | 55d | 06SEP05 | 21NOV05 |
| 1550 | MEP DESIGN DOC'S | 20d | 20SEP05 | 17OCT05 |
| 1020 | STRUCTURAL DRAWINGS | 22d | 27SEP05 | 26OCT05 |
| 1340 | TOPO/CIVIL DOCUMENTS | 15d | 27SEP05 | 17OCT05 |
| 1070 | BORING INFO AVAILABLE | 0 | 11OCT05 | |
| 1030 | FOUNDATION DRAWINGS | 12d | 12OCT05 | 27OCT05 |
| 1560 | TILTUP PANEL DESIGN | 10d | 21OCT05 | 03NOV05 |
| 1300 | STEEL BID PACKAGE READY | 0 | 25OCT05 | |
| 1710 | FINAL SHELL & CORE DRAWINGS AVAILABLE | 0 | 22NOV05 | |
| **FLUOR & KOLL ISSUES/ PERMIT ITEMS** | | | | |
| 2160 | CLOSE ON LAND/SITE AVAILABLE TO KOLL | 0 | 06SEP05 | |
| 1490 | GRADING PERMIT REVIEW PROCESS | 20d | 18OCT05 | 14NOV05 |
| 1540 | FOUNDATION PERMIT REVIEW PROCESS | 8d | 28OCT05 | 08NOV05 |
| 1500 | GRADING PERMIT ISSUED | 0 | 15NOV05 | |
| 1670 | BUILDING PERMIT REVIEW PROCESS | 25d | 02JAN06 | 03FEB06 |
| 1680 | BUILDING PERMIT ISSUED | 0 | 06FEB06 | |
| **MATERIAL/SUB PROCUREMENT/GMP FORMAT** | | | | |
| 1510 | KOLL GMP REVIEW AND ACCEPTANCE | 5d | 06SEP05 | 12SEP05 |
| 1530 | BEGIN WORK/FINAL GMP ACCEPTANCE | 0 | 13SEP05 | |
| 1270 | GMP FORMULATION PROCESS/BID PROCESS | 40d | 15NOV05 | 09JAN06 |
| 1130 | ELEVATOR BID PROCESS | 10d | 24NOV05 | 07DEC05 |
| 1140 | ELEVATOR LEAD TIME | 60d | 08DEC05 | 01MAR06 |
| 1050 | M,E,P,FP BID PROCESS | 12d | 13DEC05 | 28DEC05 |
| 1290 | STEEL BUYOUT | 7d | 15DEC05 | 23DEC05 |
| 1110 | GLASS/CURTAIN WALL PROCUREMENT PROCESS | 10d | 27DEC05 | 09JAN06 |
| 1120 | GLASS/GLAZING LEAD TIME | 60d | 10JAN06 | 03APR06 |
| 1160 | PROJECT AWARD | 0 | 10JAN06 | |
| 1040 | STEEL SHOPS/APPROVAL/DELIVERY | 70d | 17JAN06 | 24APR06 |
| 1060 | AWARD STEEL | 0 | 17JAN06 | |
| **SITE IMPROVEMENTS** | | | | |
| **NEW SITE IMPROVEMENTS** | | | | |
| 1080 | MOBILIZE / SITE LAYOUT | 5d | 10FEB06 | 16FEB06 |
| 1150 | SILTATION CONTROL/CLEAR SITE | 12d | 14FEB06 | 01MAR06 |
| 1170 | MASS GRADING | 12d | 20FEB06 | 07MAR06 |

Legend:
- Early bar
- Progress bar
- Critical bar
- Summary bar
- ◆ Start milestone point
- ◆ Finish milestone point

KOLL DEVELOPMENT CO.
FEBRUARY 20, 2006
DALLAS INTELUCENTER-OWNER SCHEDULE
211,637 SF
ATTACHMENT A

CLAYCO

R.P. Appx. 219

R.P. Appx. 220

| Activity ID | Description | Orig Dur | Early Start | Early Finish |
|---|---|---|---|---|
| 1200 | WATER LINE/FIRE LOOP | 10d | 08MAR06 | 21MAR06 |
| 1410 | TEMPORARY FIRE ACCESS/TEMPORARY ROADS | 7d | 27MAR06 | 04APR06 |
| 1920 | STORM SEWERS/STRUCTURES/INLETS | 20d | 27MAR06 | 21APR06 |
| 1190 | CONCRETE PAVING/IRRGATION SLEEVES | 35d | 05SEP06 | 23OCT06 |
| 1940 | LANDSCAPING/IRRIGATION/HARDSCAPE WORK | 40d | 19SEP06 | 13NOV06 |
| 1180 | BACKFILL CURBS/FINE GRADING FOR LANDSCAPING | 15d | 24OCT06 | 13NOV06 |
| 1970 | SIDEWALKS/MISC. CONCRETE | 18d | 07NOV06 | 30NOV06 |

**NEW BUILDING CONSTRUCTION**

**BUILDING SHELL**

| Activity ID | Description | Orig Dur | Early Start | Early Finish |
|---|---|---|---|---|
| 1220 | FOUNDATION SYSTEMS | 15d | 09MAR06 | 29MAR06 |
| 1250 | UNDERGROUND ELECTRIC/PLUMBING | 6d | 04APR06 | 11APR06 |
| 2050 | POUR MUDSLAB ON GRADE (CASTING SLAB) | 6d | 10APR06 | 17APR06 |
| 2060 | FORM, REINFORCE & POUR TILTUP PANELS | 15d | 13APR06 | 03MAY06 |
| 2070 | TILT PANELS | 13d | 04MAY06 | 22MAY06 |
| 1240 | STRUCTURAL STEEL/DECKING/POUR DECKS (1 THRU 4) | 70d | 24MAY06 | 30AUG06 |
| 1280 | PATCH PANELS/ETCH/PAINT | 35d | 31JUL06 | 15SEP06 |
| 1310 | PUNCHED WINDOWS/STOREFRONT | 45d | 03AUG06 | 04OCT06 |
| 1430 | MISCELLANEOUS STEEL/STAIRS | 25d | 10AUG06 | 13SEP06 |
| 1330 | MECHANICAL SYSTEMS/ROOFTOP HVAC UNITS | 40d | 17AUG06 | 11OCT06 |
| 1260 | ROOFING WORK | 15d | 24AUG06 | 13SEP06 |
| 1380 | PLUMBING RISERS/BATHROOM ROUGH-INS | 35d | 24AUG06 | 11OCT06 |
| 1420 | STUDS/DRYWALL/FINISHES @ PUBLIC AREAS | 60d | 04SEP06 | 24NOV06 |
| 1460 | DRYWALL SHAFTS @ STAIRS/ELEVATOR/B-ROOMS | 55d | 07SEP06 | 22NOV06 |
| 1350 | POWER DISTRIBUTION/INTERIOR PANELS | 55d | 14SEP06 | 29NOV06 |
| 1450 | MECHANICAL UNITS SET-FINAL TERMINATIONS | 15d | 14SEP06 | 04OCT06 |
| 1360 | PERMANENT POWER AVAILABLE | 0 | 20SEP06 | |
| 1320 | ELEVATOR CONSTRUCTION | 55d | 21SEP06 | 06DEC06 |
| 1370 | CURTAINWALL | 25d | 21SEP06 | 25OCT06 |
| 1590 | CERAMIC TILE/PLUMBING FIXTURES/PARTITIONS | 30d | 16OCT06 | 24NOV06 |
| 1470 | MAIN ENTRY AND REAR CANOPY WORK | 30d | 23OCT06 | 01DEC06 |
| 1440 | MAIN BUILDING DRIED IN | 0 | 26OCT06 | |
| 1720 | MAIN LOBBY/ELEVATOR LOBBY FINISHES | 47d | 02NOV06 | 09JAN07 |
| 1610 | SUBSTANTIAL COMPLETION—SHELL WORK ONLY | 0 | 09JAN07 | |

Legend:
- Early bar
- Progress bar
- Critical bar
- Summary bar
- ◆ Start milestone point
- ◆ Finish milestone point

KOLL DEVELOPMENT CO.
FEBRUARY 20, 2006
DALLAS INTELLICENTER-OWNER SCHEDULE
211,637 SF
ATTACHMENT A

CLAYCO

| Activity ID | Description | Orig Dur | Early Start | Early Finish |
|---|---|---|---|---|
| **PERMIT/DESIGN ISSUES** | | | | |
| 1210 | ARCHITECTURAL DRAWINGS | 55d | 06SEP05 | 21NOV05 |
| 1550 | MEP DESIGN DOC'S | 20d | 20SEP05 | 17OCT05 |
| 1020 | STRUCTURAL DRAWINGS | 22d | 27SEP05 | 26OCT05 |
| 1340 | TOPO/CIVIL DOCUMENTS | 15d | 27SEP05 | 17OCT05 |
| 1070 | BORING INFO AVAILABLE | 0 | 11OCT05 | |
| 1030 | FOUNDATION DRAWINGS | 12d | 12OCT05 | 27OCT05 |
| 1560 | TILTUP PANEL DESIGN | 10d | 21OCT05 | 03NOV05 |
| 1300 | STEEL BID PACKAGE READY | 0 | 25OCT05 | |
| 1710 | FINAL SHELL & CORE DRAWINGS AVAILABLE | 0 | 22NOV05 | |
| **FLUOR & KOLL ISSUES/ PERMIT ITEMS** | | | | |
| 2160 | CLOSE ON LAND/SITE AVAILABLE TO KOLL | 0 | 06SEP05 | |
| 1490 | GRADING PERMIT REVIEW PROCESS | 20d | 18OCT05 | 14NOV05 |
| 1540 | FOUNDATION PERMIT REVIEW PROCESS | 8d | 28OCT05 | 08NOV05 |
| 1500 | GRADING PERMIT ISSUED | 0 | 15NOV05 | |
| 1670 | BUILDING PERMIT REVIEW PROCESS | 25d | 02JAN06 | 03FEB06 |
| 1680 | BUILDING PERMIT ISSUED | 0 | 06FEB06 | |
| **MATERIAL/SUB PROCUREMENT/GMP FORMAT** | | | | |
| 1510 | KOLL GMP REVIEW AND ACCEPTANCE | 5d | 06SEP05 | 12SEP05 |
| 1530 | BEGIN WORK/FINAL GMP ACCEPTANCE | 0 | 13SEP05 | |
| 1270 | GMP FORMULATION PROCESS/BID PROCESS | 40d | 15NOV05 | 09JAN06 |
| 1130 | ELEVATOR BID PROCESS | 10d | 24NOV05 | 07DEC05 |
| 1140 | ELEVATOR LEAD TIME | 60d | 08DEC05 | 01MAR06 |
| 1050 | M,E,P,FP BID PROCESS | 12d | 13DEC05 | 28DEC05 |
| 1290 | STEEL BUYOUT | 7d | 15DEC05 | 23DEC05 |
| 1110 | GLASS/CURTAIN WALL PROCUREMENT PROCESS | 10d | 27DEC05 | 09JAN06 |
| 1120 | GLASS/GLAZING LEAD TIME | 60d | 10JAN06 | 03APR06 |
| 1160 | PROJECT AWARD | 0 | 10JAN06 | |
| 1040 | STEEL SHOPS/APPROVAL/DELIVERY | 70d | 17JAN06 | 24APR06 |
| 1060 | AWARD STEEL | 0 | 17JAN06 | |
| **SITE IMPROVEMENTS** | | | | |
| **NEW SITE IMPROVEMENTS** | | | | |
| 1080 | MOBILIZE / SITE LAYOUT | 5d | 10FEB06 | 16FEB06 |
| 1150 | SILTATION CONTROL/CLEAR SITE | 12d | 14FEB06 | 01MAR06 |
| 1170 | MASS GRADING | 12d | 20FEB06 | 07MAR06 |

Legend:
- Early bar
- Progress bar
- Critical bar
- Summary bar
- ◆ Start milestone point
- ◆ Finish milestone point

KOLL DEVELOPMENT CO.
FEBRUARY 20, 2006
DALLAS INTELLICENTER-OWNER SCHEDULE
211,637 SF
ATTACHMENT A

CLAYCO

R.P. Appx. 221

KOLL DEVELOPMENT CO.
FEBRUARY 20, 2006
DALLAS INTELLICENTER-OWNER SCHEDULE
211,637 SF
ATTACHMENT A

| Activity ID | Description | Orig Dur | Early Start | Early Finish |
|---|---|---|---|---|
| 1200 | WATER LINE/FIRE LOOP | 10d | 08MAR06 | 21MAR06 |
| 1410 | TEMPORARY FIRE ACCESS/TEMPORARY ROADS | 7d | 27MAR06 | 04APR06 |
| 1920 | STORM SEWERS/STRUCTURES/INLETS | 20d | 27MAR06 | 21APR06 |
| 1190 | CONCRETE PAVING/IRRGATION SLEEVES | 35d | 05SEP06 | 23OCT06 |
| 1940 | LANDSCAPING/IRRIGATION/HARDSCAPE WORK | 40d | 19SEP06 | 13NOV06 |
| 1180 | BACKFILL CURBS/FINE GRADING FOR LANDSCAPING | 15d | 24OCT06 | 13NOV06 |
| 1970 | SIDEWALKS/MISC. CONCRETE | 18d | 07NOV06 | 30NOV06 |
| **NEW BUILDING CONSTRUCTION** | | | | |
| **BUILDING SHELL** | | | | |
| 1220 | FOUNDATION SYSTEMS | 15d | 09MAR06 | 29MAR06 |
| 1250 | UNDERGROUND ELECTRIC/PLUMBING | 6d | 04APR06 | 11APR06 |
| 2050 | POUR MUDSLAB ON GRADE (CASTING SLAB) | 6d | 10APR06 | 17APR06 |
| 2060 | FORM, REINFORCE & POUR TILTUP PANELS | 15d | 13APR06 | 03MAY06 |
| 2070 | TILT PANELS | 13d | 04MAY06 | 22MAY06 |
| 1240 | STRUCTURAL STEEL/DECKING/POUR DECKS (1 THRU 4) | 70d | 24MAY06 | 30AUG06 |
| 1280 | PATCH PANELS/ETCH/PAINT | 35d | 31JUL06 | 15SEP06 |
| 1310 | PUNCHED WINDOWS/STOREFRONT | 45d | 03AUG06 | 04OCT06 |
| 1430 | MISCELLANEOUS STEEL/STAIRS | 25d | 10AUG06 | 13SEP06 |
| 1330 | MECHANICAL SYSTEMS/ROOFTOP HVAC UNITS | 40d | 17AUG06 | 11OCT06 |
| 1260 | ROOFING WORK | 15d | 24AUG06 | 13SEP06 |
| 1380 | PLUMBING RISERS/BATHROOM ROUGH-INS | 35d | 24AUG06 | 11OCT06 |
| 1420 | STUDS/DRYWALL/FINISHES @ PUBLIC AREAS | 60d | 04SEP06 | 24NOV06 |
| 1480 | DRYWALL SHAFTS @ STAIRS/ELEVATOR/B-ROOMS | 55d | 07SEP06 | 22NOV06 |
| 1350 | POWER DISTRIBUTION/INTERIOR PANELS | 55d | 14SEP06 | 29NOV06 |
| 1450 | MECHANICAL UNITS SET-FINAL TERMINATIONS | 15d | 14SEP06 | 04OCT06 |
| 1360 | PERMANENT POWER AVAILABLE | 0 | 20SEP06 | |
| 1320 | ELEVATOR CONSTRUCTION | 55d | 21SEP06 | 06DEC06 |
| 1370 | CURTAINWALL | 25d | 21SEP06 | 25OCT06 |
| 1590 | CERAMIC TILE/PLUMBING FIXTURES/PARTITIONS | 30d | 16OCT06 | 24NOV06 |
| 1470 | MAIN ENTRY AND REAR CANOPY WORK | 30d | 23OCT06 | 01DEC06 |
| 1440 | MAIN BUILDING DRIED IN | 0 | 26OCT06 | |
| 1720 | MAIN LOBBY/ELEVATOR LOBBY FINISHES | 47d | 02NOV06 | 09JAN07 |
| 1610 | SUBSTANTIAL COMPLETION—SHELL WORK ONLY | 0 | 09JAN07 | |

Legend:
Early bar
Progress bar
Critical bar
Summary bar
◆ Start milestone point
◆ Finish milestone point

CLAYCO

**EXHIBIT B**
**OUTLINE SPECIFICATIONS**
**211, 637 SQUARE FOOT SPECULATIVE OFFICE BUILDING**
**INTELLICENTER - DALLAS**
**for**
**KOLL DEVELOPMENT COMPANY**
**February 20, 2006**

**DIVISION 1 - GENERAL REQUIREMENTS**

Section 1A - Summary of Work

The project titled Intellicenter – Dallas for Koll Development is a proposed shell office building development located in Irving, Texas.

The project consists of (1), 4-story, building, totaling 211,637 gross square feet with parking as shown on the Glenn Engineering plans.

The exterior surface of the building is to be load bearing, tilt-up concrete, architectural wall panels, aluminum clad punched windows, with insulated tinted glass system and aluminum curtainwall glass system with insulated tinted glass units.

It is the goal of Koll Development to achieve basic LEED certification for Core & Shell (24 points). Refer to the attached Preliminary Project Checklist dated 8/9/05. The GMP includes the direct design and construction related costs associated with these items. Our GMP does not include the costs for the following LEED credits:

> Energy & Atmosphere – Credit 3 – Additional Commissioning
> Energy & Atmosphere – Credit 5 – Measurement & Verification
> Materials & Resources – Prereq. 1 – Storage & Collection of Recyclables
> Innovation in Design & Process – Credit 2 – LEED Accredited Professional

Our GMP also excludes any costs associated with the LEED certification and associated Commissioning of the building systems.

Section 1B - General Conditions

The Developer is Koll Development Company and shall provide the following items for the use of the Design/Builder (Clayco):

1. Phase I environmental report.

2. Soil Investigation and report; on-site materials testing and inspections.

3. Entry road and utilities to the site.

4. Topographical and boundary survey.

The Design/Builder (Clayco) shall include the following items as required for the execution and/or completion of the Work. PLEASE NOTE: This listing is not to be considered all inclusive nor complete, but merely as a guide for the major items to be included under this Division.

R.P. Appx. 223

1. Civil engineering will meet the design/build requirements and will be provided by the design/build contractor.

2. Architectural and structural engineering, construction documents and specifications; the engineering documents shall include the plumbing, mechanical, electrical and fire protection work as these items are being completed by engineering consultants.

   The design/builder shall cause the preparation and design of all construction drawings and specifications and incorporates the intent of the scope drawings and construction guidelines utilizing a licensed, registered, insured architect and engineer for all design and structural components of the building. The design/builder will cause the design to comply with all applicable local, state and national codes and all design requirements for obtaining the necessary permits. The design/builder will include any specialized design or consulting services needed.

   Provide all shop drawings, cut sheets, samples, submittals and other required items for Owner's review. Simultaneously both design/builder and design professionals are to review and approve all shop drawings and submittals.

   In addition to all other insurance requirements of design/builder set forth in these general conditions, or the general conditions attached to the AIA Contract Agreement, the design/builder shall require its architect and all other professional subcontractors to obtain and maintain professional errors and omission coverage in connection with such subcontractors work. Professional errors and omissions insurance shall be endorsed to provide contractual liability coverage. Such coverage for the architect and any other professional subcontractor shall be in amounts not less than $2,000,000 each. Certified copies of the policies evidencing such coverage shall be furnished at the same time as the other evidence of insurance required under this agreement.

3. Temporary utilities - water, telephone, power and portable toilet facilities shall be provided by the Design/Builder (Clayco) of sufficient capacity and at the locations required for their work. Pay for all costs to establish service and usage until the issuance of substantial completion notice.

4. Supervision - Any and all Design/Builder (Clayco) project site and office supervision required for The Work shall be included, including a full-time qualified field superintendent.

   A part-time Project Manager will be provided to coordinate both design and construction and to serve as liaison between the design team, Owner's representatives, and the field superintendent. The cost of this project manager is included.

5. A progress schedule will be a part of the contract and the schedule will be updated and delivered to the Owner's representatives not less than monthly.

   Direct project progress meetings at the jobsite. The Owner's representatives will be invited as well as the Owner project manager, all subcontractors and key equipment and material suppliers.

R.P. Appx. 224

There will be written minutes of the meetings and distributed copies to all parties concerned within three days following the meeting.

6. Provide progress photographs. Submit no less than 5 slides of the work in progress with each application for payment to document percent complete.

7. Submit payment requests monthly using AIA G702 format and G703 schedule of values. Confirm billing procedures with the Owner's representatives.

8. The Design/Builder (Clayco) will submit all claims for changes to the Owner's representative for approval, including the add or credit cost of the change and the affect on contract completion date. No change order work will be started prior to Owner's approval.

9. Security - Provide and maintain job site security, as required to secure the project during construction term.

10. Insurance Coverage - Provide a certificate of insurance issued to the Owner evidencing insurance coverage as follows:

    Workmen's Compensation                              $1,000,000
    General Liability including Contractual Liability    $1,000,000
    Comprehensive Auto                                   $1,000,000
    Builder's Risk Insurance – Included
    Provide $25,000,000.00 umbrella coverage.

11. Surveys and Lay-Out - Owner shall provide a monumented boundary survey of the parcel. The Design/Builder (Clayco) shall perform all work required for the lay-out of The Work including line and grade surveying.

12. Coordination of testing and inspection reports and recommendations with actual construction methods.

13. Materials and Workmanship - Materials used in The Work will conform to the latest Standard Specification of the American Society for Testing Materials, The American Concrete Institute, The American Institute of Steel Construction, American Welding Society, American Society of Mechanical Engineers, National Electric Code, N.E.M.A., American Institute of Electrical Engineers and the rules and regulations of the National Board of Fire Underwriters.

    The workmanship will be consistent with the best practice of the various building trades and will conform to the standards of good construction for this class of work.

    Where a product is specified by a trade name, a product of equal performance maybe substituted only with the prior approval of the Owner and Architect or Engineer of record.

R.P. Appx. 225                    3

14. Color Selections - Owner and/or Architect will provide a finish color schedule of the exposed surfaces of The Work in a timely manner for the Design/Builder (Clayco)'s use in coordinating building shell.

15. Temporary Heat, Water and Power - Heat, water and power will be provided as required for construction. The permanent heating, cooling and electrical system will be utilize as required for construction use; thus the warranty for the equipment may start prior to the building substantial completion. The Builder has included the cost of operating the systems until Substantial Completion has been achieved.

16. Guarantees - Upon notice from the Owner, the Design/Builder (Clayco) will remedy any defects due to defective workmanship or materials which will appear within a period of one year from the date of Substantial Completion of The Work.

17. The following items are included in the General Conditions/General Requirements for the Design/Builder (Clayco):

    a. office supplies, postage, telephone, shop drawing blueprints, reproduction costs, progress photographs, computer and EDP expenses, first-aid supplies, insurance and other such miscellaneous expenses.

    b. Project staff including salaries and benefits for Project Executive, Project Superintendent, Engineers, Accountants, Assistants, Estimators, Purchasing, Secretaries and Clerks.

    c. Tools and supplies including hand tools and construction equipment having an individual new value of less than $200 and consumable items which are used in the construction operation such as chalk, kerosene, brooms, brushes, etc...

    d. Job office including rental of trailers, temporary buildings or office space for project staff. Also include interior modification and mechanical/electrical work as required to said job offices.

    e. Plant, vehicles and repairs such as purchase of rental charges for plant owned by Design/Builder (Clayco) or outside parties. Items include transits and levels, rental or purchase of job vehicles and repairs and maintenance of plant and vehicles used specifically on this project.

    f. Temporary buildings, barricades and installations including labor, lumber, millwork, and other building materials used in the construction of tool sheds and other temporary structures with the exception of the job office which is included above.

    g. We have included the cost of the Building Permit.

R.P. Appx. 226

4

Section 1B - General Conditions – continued

18.  Project close out requirements will be provided as follows:

   a.  Record drawings plans which will be maintained in the field trailer of all field changes on the contract drawings and at the conclusion of the project a set of reproducible stamped "Record Drawing" including field changes will be turned over to the Owner. All As-built drawings will be provided to owner via CD-ROM.

   b.  Provide (3) sets of operating and maintenance manuals to the Owner.

   c.  Provide operating instructions to the Owner's representatives. Walk the Owner's designate through all systems and demonstrate the proper sequence of starting, normal operation and adjustments and shut-down. Include physical verification that all safeties work properly.

   d.  Provide job clean up during the project and final clean up. Clean and wash windows, remove all debris inside and out and leave the entire building "broom clean".

19.  The Design/Build Contractor's site office must include the following:

   a.  A furnished conference area with seating for a minimum of 12 persons.

   b.  ~~One furnished office for use by the architect, engineer or Owner.~~

   c.  Telephone and DSL quality Internet services for the offices. ~~One additional separate telephone line in a location of the Owner's choice for separate fax use by the Owner/Architect/ Engineer.~~ (Fax machine furnished by Owner, if available at site).

   d.  Copier capable of 11x17 format and onsite drawing plotter capable of 36" paper width format for shared use by Design/Build Contractor, Owner and Owner's consultants.

## DIVISION 2 - SITE WORK

Section 2A - Subsurface Investigation

Subsurface Investigation will be completed by Koll Development.

All on site inspections and monitoring the excavation will be paid for by Koll Development. Every site location will involve different soil characteristics that will affect the earthwork, paving and foundation design.

Section 2B - Site Preparation

Site preparation and clearing shall be provided to remove vegetation, trees and/or shrubs in the new construction areas unless noted to be reused or salvaged.

<u>Section 2C - Earthwork</u>

All earthwork shall be performed per the recommendations of the geotechnical design report.

Provide mass grading of entire site including all cut and fill required. The existing pile and any excess material from the cut to fill operation will be hauled off by Koll. Excess topsoil and vegetation will be strategically stockpiled for future placement in landscape berms.

Excavation to subgrade elevations for all interior footings and slabs on grade. General and rough grading of the site to achieve the proposed subgrades.

Finish grading of areas around the buildings, paving and sidewalks to achieve proper drainage and uniform surfaces; finish grading for the building area and site to a 0.1 foot (±) tolerance.

Finish planting areas will be finish graded for planting by landscaping contractor as part of the work. All planting and sod areas shall have a minimum of 4" topsoil. Topsoil work will be completed if necessary out of landscape budget.

Design/builder shall protect and maintain any and all existing utilities, drives and parking areas which are to remain in service and are adjacent to the work during the course of construction activities.

<u>Section 2D - Storm Sewers and Utilities</u>

Underground storm-sewer system will be installed to collect surface storm water run-off throughout the site and drain to adjacent off site system.

Provide all water service for domestic use and fire protection with new hydrants, as required.

Provide underground service for electric and telephone. TXU fees for electric service will be paid by Koll.

The gas service is by Koll Development.

All utility work will be limited to work on site and as indicated on the civil documents. The sanitary sewer and water utility work are to service building tie roof drains into storm sewer system.

<u>Section 2E - Paving and Surfacing</u>

The work includes concrete paving and curbs as shown on the Civil drawings including entry and island work along Regent Boulevard.

Provide curb cuts for entrances as shown.

Pavement markings to be white two coat paint system.

Provide concrete pad at loading dock and dumpster pad. Provide concrete pad for transformer.

Provide $25,000 budget allowance for exterior hardscape; this includes fountains, artwork, brick pavers, signage and furniture at the entrance locations. The base bid includes concrete sidewalks @ the 2 entrances.

R.P. Appx. 228

## Section 2F - Irrigation System

A landscape irrigation system design and installation will be provided as an allowance of $75,000.

## Section 2G - Landscaping

An allowance of $225,000 has been provided for landscaping.

# DIVISION 3 - CONCRETE

## Section 3A - Cast-In-Place Concrete

Reinforced-concrete at foundations based on 3500psi compressive strength at 28 days.

Provide all concrete work in accordance with the structural drawings.

Concrete sidewalks in locations and width as indicated on the site plan, standard-broom finish on a 60" square pattern, 4" concrete minimum 4000psi and rebar and granular base if required by code.

Reinforced concrete drilled piers with bearing capacities as recommended by the structural engineer.

First, Second, Third and Fourth floor concrete structural slabs over 2" metal decking and beams with mesh reinforcing and 4000psi concrete (3" thick). Concrete to be steel troweled to a smooth finish within normal tolerances.

Provide six (3) sets of pan stairs; regular weight concrete at treads and landings.

Provide non-shrink, non-metallic grout as required for all column base plates.

Provide foundation pits and slab at elevator construction. (Three (3) elevators included).

## Section 3B -- Tilt-Up Concrete Panels

All concrete panels will be completed as site cast, reinforced, architectural concrete panels. All Tilt-Up panels will be designed and constructed with the most up-to-date quality assurance programs available through the Tilt-Up Concrete Association, Concrete Specification Institute, Concrete Council, and Clayco Construction Company's own high standards. An alternate will be provided to have 15' wide panels instead of 30' wide. The window configuration at the top level will need to change if the 15' wide panel option is pursued.

The system will be detailed in conjunction with all aluminum window and curtain wall systems to provide wholly integrated exterior building cladding system.

A tilt-up screen wall will be provided for the truck dock area.

# DIVISION 5 - METALS

## Section 5A - Structural Metal Framing

Structural steel shall comply with ASTM A-36 and A572, GD50 as noted on drawings and structural steel framing shall be provided to include the following:

Elevated floor slabs are designed for 100lb. live load, with Code allowance reductions.

Structural steel column and beam system to support the floor and roof structures. All shapes will be installed.

Steel framing supports for the metal screen wall.

Miscellaneous structural steel as required for new construction.

Steel channel framing as required for floor and roof blockouts.

## Section 5B - Metal Joist and Metal Decking

Structural steel beams for 1st, 2nd ,3rd and 4th floors and bar joist at roof deck. All joists shall be designed and installed per SJI specifications.

Steel roof decking to support roofing system per SDI Standard No. 1 with factory primer. 1 ½" metal decking to be 22 gauge painted. Roof deck and joist shall be sloped to provide 1/4" per foot slope for positive roof drainage.

2" x 19 gage galvanized steel decking to support concrete slab at the first, second, third and fourth floors.

## Section 5C - Metal Support System

All interior partitions shall contain standard metal studs on 16" centers, size and gauge as required unless otherwise noted.

Columns, chases and soffits shall be furred with metal studs, furr ceilings where indicated to be drywalled (fired rated where required).

All lintels, 6" pipe bollards (concrete filled), steel tube and hand rails and miscellaneous other steel as shown on architectural and structural drawings.

Mechanical equipment supports, as required.

Include Morins X-12 type horizontal prefinished panel system for mechanical screen and vertical entry element at all entries.   Include metal stud framing as required.

## Section 5D - Metal Fabrication

Steel angle dock nosing (embedded in concrete at the outer edge of dock).

Stair system with steel pan treads and landings with concrete fill.

<u>Section 5D - Metal Fabrication - continued</u>

Include Alucobond metal panel system at vertical features and roof parapet condition per the drawings.

Include sunscreens at 3 levels near both entries and building ends.

Metal access ships ladder to roof hatch at one stair location.

Elevator divider beams and sill support angle.

# DIVISION 6 - WOODS AND PLASTICS

<u>Section 6A - Rough and Finish Carpentry</u>

Wood blocking, nailers, grounds blocking at parapet walls, furring and framing with standard construction grade #2 yellow pine or Douglas for lumber required to complete all new construction, (fire treated as required by Code).

Each electric closet will have one wall with plywood mounted to it for installation of telephone equipment. Telephone equipment by others.

Solid surface lavatory tops for the restroom lavatories for one core at each floor for a total of eight (8) restrooms.

One full length wood shelf only a janitor's storage closets. Shelf constructed of AWI custom grade plywood and exposed edge receiving a hardwood edge.

Installation of all toilet accessories in restroom lavatories.

Window sills shall be 1/16" general purpose plastic laminate on 3/4" APA high density overlay plywood. At curtain wall, provide metal sills.

# DIVISION 7 - THERMAL AND MOISTURE PROTECTION

<u>Section 7A – Insulation and Fireproofing</u>
3-1/2" (R-13) fiberglass with foil faced vapor barrier to above ceilings.

1" rigid insulation board on exterior walls at spandrel glass, otherwise, batt insulation will be used at exterior walls.

2" rigid polystyrene insulation board on foundation perimeter walls below floor slab.

Provide fire rated assembly by use of drywall or spray on fireproofing at beams extending from the rated stairwells to the first adjoining structural member in accordance with applicable codes.

Provide floor to floor fireproofing as required for all penetrations.

Include fireproofing main beam supports as required for all stairwells.

<u>Section 7A – Insulation and Fireproofing (Cont)</u>

R.P. Appx. 231                                                    9

Include vapor barrier type insulation above ceiling areas; seal all joints carefully, especially at perimeter condition at 4th floor attic space.

## Section 7B - Roofing

Roofing shall be 45 MIL mechanically attached TPO polymer based roof system with R value of 20 (meet the energy code in each area).

Roof area to be drained by interior roof drains located along the exterior wall.

10 year warranty (material and labor) provided by the manufacturer after his inspection of the roof.

## Section 7C - Flashing and Sheet Metal

Flashing and sheet metal as required for the roof parapet walls.

Paint-grip, galvanized sheet metal installed at locations requiring flashing, counterflashing and roof drain pockets unless otherwise noted on drawings.

Prefinished and pre-formed aluminum coping at parapets as required, unless otherwise noted on drawings.

## Section 7D - Roof Accessories

Roof hatch and ships ladder installed for access to roof.

## Section 7E - Caulking

Caulking at required joints and intersections to two different materials. Exterior joints shall use two component polyurethane based sealing compounds, Tremco Dymeric or equal. Interior joints and under thresholds shall be architectural grade caulking compounds, Sorreborn Kaukit, or equal. Provide closed cell backer rod as required, material shall be round rod.

## DIVISION 8 - DOORS AND WINDOWS

### Section 8A - Metal Doors and Frames

Hollow metal doors and frames as shown on drawings will be primed and coated with 2 coats of gloss enamel paint. All hollow metal frames will be welded at seams. All doors shall be 18 gauge, 1-3/4" thick with finish faces, exterior door shall be insulated.

Aluminum frames at passages to restrooms and building maintenance rooms and stairways.

Hollow metal doors at passages to mechanical equipment to be fire-rated as required.

One (1) 8'x9' manual overhead door at loading dock. The compactor opening will be provided by Clayco; the door to the compactor (if necessary) will be provided by the compactor vendor.

Hollow metal frames at pump rooms and building electrical room.

R.P. Appx. 232

10

## Section 8B - Wood Doors

Any wood doors used by tenant shall meet or exceed the following specification:

Wood doors at all passages throughout interior unless otherwise noted doors to be 1-3/4" thick, solid core, mahogany veneer doors to be fire-rated as required. Doors to be 3'-0" x 8'-0" (H) in aluminum metal frames.

## Section 8C - Glass and Glazing

Furnish and install an insulated store front window system at building off-sets. Clear anodized aluminum finish per the architectural drawings, glazed with insulated glass units per the architectural drawings. Glass to be clear system with low E similar to the Atlanta project.

Aluminum clad insulated punched window system by Vistawall (basis of design) or equal.

Mirror glass in all bathrooms, glass to be 1/4" thick.

Provide glass feature wall at main stairwell (all levels).

Provide two (2) double glass door vestibules at 1 entry.

Provide revolving door and two (2) single glass doors at main entry.

## Section 8D - Hardware

Hardware shall include the following and will meet all ADA requirements.

EXTERIOR DOOR HARDWARE:
        1-1/2 pair hinges
        1 door stop
        1 exit device
        1 hydraulic closure
        1 cylinder lock
        1 weather strip and gasketing
        1 sill sweep
        1 strike lock shield
        1 threshold
        Code required panic hardware (where required).

INTERIOR DOOR HARDWARE:
        1-1/2 pair hinges
        silencers
        1 latch set (Mortise)
        1 door stop
        Toilet room doors shall also have push/pull plates, kick plates and closers
        All hardware will be satin chrome
        All tenant supplied material must meet this specification.

R.P. Appx. 233                    11

# DIVISION 9 - FINISHES

## Section 9A - Gypsum Drywall

All columns to have metal studs installed with drywall installation as part of the TI work.

Partitions and furring shall be fire-rated with 5/8" Type "X" gypsum board where required.

Moisture-resistant gypsum board shall be used in toilet rooms, janitor closets and pump room exterior soffits, unless otherwise noted.

Partitions at toilet rooms, mechanical and electrical rooms shall be full height and sound deadened with sound batt insulation. Bathroom ceilings to be drywall.

Stairwells and elevator shaft enclosures shall consist of gypsum 2 hour construction at all levels.

Exterior wall framing shall receive 3-5/8" stud framing with insulation and vapor barrier to allow for voice, data and electrical work in the future.

Main lobby will include architectural grade drywall, coffered ceiling & metal pan ceiling. The elevator lobby on 2nd, 3rd and 4th floor will also receive a drywall ceiling.

Include exterior framing as required for Alucobond supports at parapet elements and upright locations.

## Section 9B - Ceramic and Granite Tile

Provide ceramic tile per drawings at the floor and wet walls (full height) in all public toilet areas.

Provide epoxy terrazzo in the entire main lobby area with tile base.

Provide porcelain tile boarder with cove base at 2nd, 3rd and 4th floor elevator lobbies.

## Section 9C - Acoustical Ceiling

Upgraded 2x2 White aluminum grid for acoustical ceiling furnished and installed at decorative soffit areas. No TI ceiling grid or pads are included.

## Section 9D - Carpeting and Flooring

Carpet in the tenant finish area shall be furnished and installed under the tenant finish contract.

Provide carpet inset at 2nd, 3rd and 4th floor elevator lobby areas.

Main stairwell to be upgraded with carpet. The 2 secondary stairs will have exposed concrete treads with painted stair stringers and drywall partitions.

Include heavy duty traffic rated sheet vinyl at lower level corridor areas.

## Section 9E - Painting

R.P. Appx. 234

12

The exterior of the building will be acid etched and include a one coat MODAC paint system on all surfaces.

Drywall ceilings and walls to receive two coats of paint.

All exterior sheet metal to receive two coats of paint.

All hollow metal doors and frames to receive two coats of paint.

All exposed miscellaneous metal to receive two coats of paint.

Painting will be provided in the stairways. Two secondary stairwells will have exposed concrete treads with exposed stringers and one stairway to be completely finished with drywall and carpet.

## DIVISION 10 - SPECIALTIES

Section 10A - Identifying Devices

All interior signage and directories will be provided by Koll Development.

Exterior signage will be provided by Koll Development. Include conduit and junction box for a building mounted sign and one conduit and junction box for an entry monument sign.

Section 10B – Partitions at Restrooms

Full height gypsum board with louvered wood doors and wood frames.

Section 10C - Toilet and Bath Accessories

(2) grab bars per handicap toilet stall.

(1) toilet tissue holder per toilet stall to hold two rolls of paper.

(1) paper towel dispenser/disposal per toilet rooms.

(1) sanitary napkin dispenser per ladies room.

(1) sanitary napkin disposal at each stall (ladies only).

lavatory top soap dispensers at each lavatory, per toilet room.

Section 10D – Dock Equipment

Provide dock bumpers and dock edge angle at indicated areas on architectural drawings.

Include one (1) 35,000 pound mechanical dock leveler (6'x7').

Section 10E – Fire Extinguisher Equipment

R.P. Appx. 235

13

Provide Code required quantity of stainless steel semi-recessed fire extinguisher cabinets for the base building.

Section 10F – Access Flooring

Under the shell budget, the access flooring will be stockpiled on the floor. The access flooring locations include all areas in the building besides the following: bathrooms, stairwells, dock areas, elevator lobby at upper levels, and complete 1st floor lobby areas from both main entries across the building.

Base Area -Provide 14" high raised access floor system at 1st, 2nd, 3rd and 4th floor levels to receive carpet tiles. Support system to be bolted pedestals. Tiles are concrete filled bare metal type with point load capacity of 1,000 lbs. No grounding is provided. An alternate has been provided to utilize 1,250lb for all access floors including laminate tile locations.

Electric Rooms - Provide 14" high raised access floor system with top finish of high-pressure laminate with integral trim. Support System to be pedestals. Tiles are concrete filled metal type with point load capacity of 1250 lbs. No grounding is provided. Material manufacturer is Tate Access Floors or equal.

Four panel lifters are included. Two emergency panel lifter wall plates are included.

## DIVISION 12 - FURNISHINGS

Section 12A - Horizontal Blinds

Blinds will be included at all exterior glass punched window systems. Blinds to be 1" horizontal mini-blinds equal to Bali or Levelor in a manufacturer.

Section 12B - Floor Mats and Frames

Provide one piece polypropylene mats with anodized aluminum frames at two (2) entry vestibules.

## DIVISION 14 - CONVEYING SYSTEMS

Section 14A - Hydraulic Elevators

Provide one (1) freight elevator with a 4,500# capacity. Interior cab shall be 5'-8" x 7'-10" x 9'-0" high.

Provide two (2) passenger elevator with a 3,500# capacity. Interior cab shall be 4'-9" x 6'-8" x 7'-4" high.

Freight elevator will include 1/2" thick damage control pads.

Passenger elevators will be center opening. Freight elevator will be side sliding.

Elevators will operate at 150 f.p.m. and operate on 208V, 3-phase, 60 hertz. Passenger elevator will have a 40hp motor. The freight elevator will have a 60hp motor.

Section 14A - Hydraulic Elevators (cont)

R.P. Appx. 236

14

Provide duplex micro-processor control.

Signals will be standard stainless steel finish, digital car position indicators with illuminated car and hall buttons.

In-car lantern with gong and floor passing signals.

Constant features will be a Lambda II infrared, multi-beam door reversal device with remote elevator monitoring REM ready, fire fighter service Phase I and Phase II and handicap and Braille markings.

## DIVISION 15 - MECHANICAL

Section 15A - Fire Sprinkler System

The contractor shall provide an engineered site five (5) protection layout for installation by others.

This building is classified as a Light Hazard occupancy. The combination sprinkler and standpipe system shall be hydraulically designed to deliver a density of 0.10 gpm. over the most remote 1,500 sq. ft. with hose stream allowance per local requirements. Any Ordinary Hazard Group I areas will be hydraulically designed for a density of 0.15 gpm. over the most remote 1,500 sq. ft. with 250 gpm for hose stream allowance per local requirements. The minimum flow rate for hydraulically most remote standpipe shall be 500 gpm. and 250 gpm. for each additional standpipe, with the total not to exceed 1,250 g.p.m. 100 psi at the top of the standpipe is required. Interconnect each standpipe at the lowest floor level. Provide control valve at the base of each standpipe. Provide roof manifold at required areas per UBC and IFC.

Include pump system if required by code incoming flow/pressure to meet building performance requirements. Contractor shall provide fire flow test on nearest available water supply.

Contractor to provide incoming service backflow preventer of the type required by local authorities.

Fire protection work starts at the flanged lead-in connection inside of the building.

Provide 1" outlets on branchline piping with 1" sprigs and upright brass sprinkler heads to protect the building shell areas. Upon tenant finish, upright sprinklers will be removed and replaced with pendent sprinklers per tenant requirements. In finished shell and core areas provide concealed heads located to work a pattern in the room.

The Fire Protection Contractor shall provide sprinkler head layout, hydraulic calculations, final fire pump and jockey pump selection based on hydraulic calculations, pipe routing with sizes and elevations as required by N.F.P.A. (latest edition) and insurance carrier.

All work shall comply with the fire protection requirements and codes of the City Building Department, the State and Local Fire Marshal and N.F.P.A. National Fire Codes.

Section 15A - Fire Sprinkler System (cont)
R.P. Appx. 237                                    15

The Contractor shall submit shop drawings (including device/equipment product data submittals) and hydraulic calculations to the municipality having jurisdiction and the Architect/Engineer prior to commencement of project and purchase of materials. Contractor shall submit as-built drawings and maintenance manuals as directed by the Architect/Engineer.

The Fire Protection Contractor shall coordinate his work with that of all other trades.

The Fire Protection Contractor shall guarantee all labor and materials for the period of one year from the date of completion.

Fire protection sprinkler piping shall be either Schedule 40 black steel pipe with screwed fittings or Schedule 10 black steel pipe with grooved fittings.

Sprinkler heads shall be UL listed and FM approved and shall be quick response rated at 155 deg. F (or temp required for location).

Contractor shall provide and install each of the following devices and pieces of equipment:

1)    Fire department connection. (Polished chrome)
2)    Fire hose connections and caps at each stair landing.
3)    Floor control valves at each floor with drain visor.
4)    Inspector's test connection for each zone.
5)    Spare sprinkler cabinet with heads and wrench

Contractor shall provide sprinklers of the type installed for the use as spares to the building Owner. The number of sprinklers shall be as required by code. Contractor shall provide sprinkler wrench for each type of sprinkler supplied. Spare sprinkler cabinet shall be located next to the fire pump.
The Fire Protection Contractor is responsible for all leak damage due to system, installation and materials.

Contractor shall perform all tests on system as required by N.F.P.A., local code and insurance carrier.

All piping shall be suspended independently from building structure. Vertical pipe risers shall be supported at least once on each story height. Riser clamps at base of riser shall be supported at building structure. All supports and hangers shall be so constructed as to allow for proper pitch and expansion of pipes. Position exposed riser clamps so they do not create a tripping hazard.

Contractor shall remove all debris from job site daily to Clayco provided dumpster and leave all work and equipment in clean working condition.

Contractor shall provide and install all pipe sleeves. Sleeves shall be at least 1-1/2 times the size of the pipe and shall be similar material to prevent reaction between pipe and sleeve.

Contractor shall provide and install fire stopping as to completely seal all penetrations of fire rated assemblies, walls and ceilings caused by this trade. The system shall be installed
Section 15A – Fire Sprinkler System – continued

according to an Underwriter's Laboratories approved through penetration fire stopping protection system, have been tested in accordance with ASTM #E-814 and UL #1479 and shall have an "F" rating not less than the required rating of the wall penetrated. The annular space between pipe and the fire rated assembly shall be filled with the approved material so as to maintain the integrity of the fire rating of the assembly penetrated. Insulation shall not pass through fire rated assemblies.

## Section 15B- Heating, Ventilating and Air Conditioning

Piping, except branch lines feeding heads in rooms, shall not pass through stairwells, five rated exit pathways, electrical rooms/closets, and tele/data rooms.

All heating, ventilating and air conditioning work will be designed and installed in accordance with the local adopted codes (including International Energy Code) and with the ASHRAE standards and guidelines, SMACNA standards and the outline below. All equipment with electrical connections will bear the UL Label and all refrigeration equipment will be labeled in accordance with ARI.

An HVAC system will be provided that utilizes four (4) packaged electric heating and electric cooling, down discharge, roof top package air conditioning units (RTUs). RTUs will provide 550 tons of capacity. The following features are required:

1) Return air bypass with damper, damper actuator and temperature control (supply air temperature must be re-heated to 61-62 degrees F).
2) Multiple stage electric heating coil (4 stages). Step controller required.
3) 100 % power exhaust.
4) 30 % filter section with 2 sets of throwaway filters. Also provide one set of construction filters in the units.
5) 0 to 100 % economizer with enthalpy control and low ambient lock out control.
6) Freeze stat protection.
7) Supply air temperature control.
8) DDC temperature control panel/module with BACNET & or LON capabilities as well as a human interface unit mounted panel.
9) Factory installed and wired unit electrical disconnect switch for a single point connection.
10) Factory installed and wired GFI convenience outlet.
11) Complete manufacturer's 1 year warranty for parts and labor from the date of start up.
12) Additional 4 year extended parts only compressor warranty.
13) High efficiency motors for supply and exhaust.
14) Complete static pressure control capabilities referencing outside, space, duct and under floor pressures.
15) Variable frequency drives on the supply fan as well as spring isolation.
16) 460 VAC / 60 HZ / 3 phase.
17) Hinged access doors.
18) Flat roof curb.
19) Low leak outside air dampers.
20) Low leak supply air dampers.
21) Independent control of outside and return air dampers.

Section 15B- Heating, Ventilating and Air Conditioning

The system will be designed meeting the following design conditions:

Outdoor Design Conditions:
  Summer:      100°F DB/74°F WB
  Winter:      17°F WB

Indoor Design Conditions (occupied area):
  Summer:      75°F DB (+/-2) 50% RH
  Winter:72°F DB (+/-2)

Outdoor Ventilation:   Per ASHRAE Standard - 20.0 CFM/person
Infiltration:          1.0 CFM/linear foot of exposure
Heat Gain:             One person per 120 sq. ft. of occupancy
                       1.5 watts per sq. ft. demand for lighting
                       3.0 watts per sq. ft. miscellaneous power
Occupants:             1 per 120 SF (at 245/155 sensible/latent BTU/Hr each).

The design will be based on the use of tinted, double paned, insulated glass for curtain wall and at all other window areas with the blinds open.

Return air will be provided in perforated white finish. In the core areas only, insulated plenum type linear supply slot supply air diffusers in the ceiling will be provided. Exhaust grilles will be square, louvered faced. Return air grilles in each office and conference room (provided in tenant finish) will include acoustically lined sound boots. All in floor supply air will be delivered through the in floor VAV terminal / diffuser. The in floor air devices will be installed in the future T.I.

Zoning of fan terminals and VAV boxes shall not be less than 1 zone per 250 sq. ft. with a dedicated fan terminal unit in each building corner with two exterior exposures. Each fan powered box will incorporate an electric heating coil. All in floor FTUs and VAVs will be stockpiled to the floors and installed in the future T.I. In floor FTUs will be sized at maximum of 50 linear feet at the exposure.

Shell and core construction of toilets, corridor, etc. will be completed using VAV units with a maximum size of 1600 CFM each.

Cabinet unit heaters will be furnished in the vestibules. Heating and cooling will be provided to main stairways and entry vestibule. Temporary heat will be installed by providing and installing (4) 10 kW electric unit heaters above ceiling height per floor. These will be disabled once the in floor FTUs are installed in the T.I. build out.

Exhaust fans will be provided to ventilate the janitor's closets and main toilet rooms. The system will be sized at a minimum of 2 CFM/SF of exhaust for toilet rooms and janitor's closets. Make-up air for the toilet rooms will be provided from HVAC supply air devices. Toilet rooms will be provided with exhaust grilles.

Exhaust for the elevator machine rooms will be provided.

Stairways will be provided with cabinet unit heaters.

R.P. Appx. 240

Fire pump room will be served by a 5 kW electric unit heater.

The dock area will be served by a 10 kW electric unit heater.

Elevator shafts shall have pressure relief as required by code.

All electric rooms will be exhausted. Make up air will be supplied from HVAC supply air devices.

Fire dampers, smoke dampers and combination fire/smoke dampers will be provided as required by code.

Materials and Methods
Ductwork will be galvanized sheet metal, constructed per latest edition of the SMACNA and ASHRAE. Traverse joints on medium pressure system will be sealed with Hard cast. Insulated, Class 1 flexible air ductwork will be used for the connections from medium pressure trunk ductwork to variable air volume units, fan terminal units and slot diffusers. Acoustical duct lining or flexible duct wrap insulation will be provided where required to avoid noise and condensation. Sound attenuation will be provided as required to achieve an overall maximum NC-40 level in the office spaces.

Vertical medium pressure duct risers will be provided from the RTUs to each floor with, and a duct loop on each tenant floor will be provided. Acoustically lined, hard return air duct risers, in shafts, from the lower floors to the RTUs will be provided with a stub out on each floor. On top floor, a minimum of 20 LF of acoustically lined return air duct from the RTU serving this floor will be provided.

All medium velocity ductwork risers installed in vertical shafts shall be acoustically lined, with lining extending horizontally 20' from the main riser on each floor.

Return air duct and supply air duct mounted smoke detectors will be provided for all air handling units 2000 CFM and greater.

A complete direct digital temperature control and building management system will be provided. Standard features including local PC workstation, dial in and out modem, and complete color graphics to the VAV level. All wiring, software, hardware, sensors, actuators, and control panels will be included for a complete and functional system. All core and parking lot lighting will be controlled and wired to the BMS. Lighting contactors will be provided by Division 16, low voltage wiring to the contactors will be by Division 15. All low voltage temperature control wiring will be plenum rated.

Section 15C – Plumbing

All plumbing work will be designed and installed in accordance with the codes listed in Section 1A of this outline specification. All equipment with electrical connections will bear the UL Label.

Soil, waste, vent, storm and water piping systems will be designed and installed in accordance with the requirements of the local plumbing code.

Soil, waste, and vent piping will be service weight, no-hub cast iron above grade in plenum areas. Schedule 40 PVC may be used otherwise including underground.

Storm water piping will be Schedule 40 PVC above and below grade. Roof drainage will be provided by the use of 6" inboard roof drains. The piping system will connect to storm sewer below first floor grade and exit building foundation wall.

An overflow roof drain system will be provided and will be sized the same as the primary system and connected to a separate piping system within the building. The secondary system is to terminate near through the wall near grade.

Water distribution piping will be Type "K" copper below grade and "L" copper above grade.

Water closets will be wall mounted white vitreous china, open front seats, and with battery operated flush valves.

Urinals will be wall hung, white vitreous china, floor carrier type, with battery operated flush valves.

Lavatories will be integral with the countertop with chrome plated battery operated sensor type faucet, grid drain, P trap with cleanout plug, flexible risers, and stops. Insulation of exposed piping and hot surfaces for handicapped lavatories will be provided.

Mop basins will be 24" x 24" floor set terrazzo with mop hanger, 24" hose, 4" handles, bucket hook, and elevated vacuum breaker.

Brushed stainless steel, dual-level, semi-recessed, barrier-free self contained electric water coolers located at each floor.

Provide three (3) wet columns (water, waste and vent).

Provide 1-1/2" water connection with valve at toilet core area.

Electric water heaters for toilet rooms sized per local plumbing code and ASHRAE guidelines will be provided. Relief valves will be piped to floor drain. Include For piped systems longer than 100 lineal feet a hot water recirculation loop with pump and aqua stat will be provided.

General purpose and toilet room floor drains will be cast iron with nickel bronze, heel proof grates.

A dry sump will be provided for each elevator pit – dry sumps to be pumped out with portable sump pump provided by building maintenance.

Mechanical room floor drains will be medium duty, cast iron, and loose set top with sediment bucket.

Section 15C – Plumbing - continued

Roof drains will be cast iron with sump receiver, under deck clamp, adjustable extension and cast iron mushroom dome (plastic domes not acceptable).

Overflow drains will be cast iron with sump receiver, under deck clamp, adjustable extension, exterior water dam and cast iron mushroom dome.

A minimum of 3 frost-proof wall hydrants will be provided at grade. Also 2 hydrants will be provided at the roof level for use for window washing.

4" incoming domestic water service will be provided with a gate valve, a reduced pressure backflow preventor (type as required by local plumbing code), a pressure gauge and with the drain piped to a floor drain. A valved and capped 1-1/2" line for irrigation system backflow preventor and piping system will be provided. The irrigation system is not included.

Insulation will be provided on all vertical and horizontal domestic water, including inside of wet chases, and on all horizontal downspout piping and roof/overflow drain bodies.

A stubbed out sanitary sewer and vent connection will be provided on each side of each toilet room wet wall opening onto the tenant space or corridor for future connections. Provide at each location, a valved and capped 1" domestic cold water stub out.

Provide the following fixtures:

1.  Toilets (wall hung flushometer type)
2.  Handicap toilets (wall hung flushometer type)
3.  Urinals (wall hung flushometer type)
4.  EWC (drinking fountains)
5.  Lavatories (custom), each with (3) bowls
6.  Janitor mop sinks
7.  Hot water heaters

General
All systems will be designed and installed in accordance with all federal, state and local code enforcement agencies, ADA regulations, the Fire Marshall and the local building department.

Scope of Work
Water Service and Distribution, Plumbing Fixtures and Storm Water System
Sanitary, Waste and Vent System

Water Service and Distribution
Underground domestic water piping will extend from water meter with minimum system pressure for core/shell total fixture counts. Backflow preventer will be provided at point of service, separate from fire protection service. Water service will be metered within service pit.

Three (3) hose bibbs around perimeter of building, one (1) hose bibb on roof and (1) 1-1/2" irrigation system connections will be provided.

Include dual level electric water cooler at each bathroom core.

R.P. Appx. 243                                    21

<u>Section 15C – Plumbing - continued</u>

Elevator sump and code required discharge will be provided.

Water service is not sized for any special tenant load requirements.

<u>Domestic Water Systems</u>
The Core/shell system will include hot and cold water service and insulated distribution piping to all core areas and stub connections/valves for tenant areas.

Fixtures will include commercial grade products in all bathrooms, ADA compliant. Any exposed plumbing lines (supply and waste) will be chrome plated with appropriate wall escutcheons at penetrations. All plumbing fixtures will be installed with shut-off valves. Drinking fountains with central remote chiller will be provided per code. Domestic hot water will be provided from electric water heaters.

No special water, gas, air or vacuum systems are included for tenant areas.

All water systems will be tested and approved for final use.

<u>Storm Systems</u>
Roof drain bodies and horizontal leader runs to be insulated. A properly sized roof drainage system including roof drains, vertical piping and storm piping under the building will be provided. Roof drain collector pipe system will connect into exterior storm system piping. Include emergency overflow piping from roof drain locations to location above finished grade.

Office ceiling space to be used as a return-air plenum.

<u>Sanitary System</u>
The sanitary sewer will be stubbed into the building and extend through core/shell areas and be stubbed into tenant areas for future interconnection. No special waste provisions are included for lab waste.

<u>Materials</u>
Domestic water system: Type L and M copper, above floor, Type K below floor.

Sanitary system: PVC above floor, cast iron below floor.

Storm system: PVC above floor, cast iron below floor.

## DIVISION 16 – ELECTRICAL DESIGN BUILD

<u>General</u>
All systems will be designed and installed in accordance with all federal, state and local code enforcement agencies, ADA regulations, the Fire Marshall and the local building department.

<u>Temporary and Construction Power</u>
Temporary service and distribution will be provided to all project trailers, electric scaffolds and accessories, welding machines and power and lighting loads. Temporary power service and

R.P. Appx. 244

distribution will be protected in accordance with OSHA requirements. Lighting levels and distribution will be included in all areas to achieve code-required foot-candle levels.

Electrical Service

Service to the building will include (2) 4"C. underground raceway from the property line to electric utility company pad mounted service transformer. The electric utility company will provide underground primary cables, service transformer. Building will be metered at electric utility company secondary voltage rate.

Current transformers, meter compartments, etc. will be included with service switchboards as required by electric utility company.

Secondary underground conduits/cables and terminations from service transformer to interior service switchboard will be provided. A separately metered power service will originate from the electric utility company service transformer to a 75HP fire pump for the building (add alternate, if required by code). Installation and protection of secondary service conductors will be in conformance with NEC.

Telecommunications Systems Service

Service to the building will include (6) 4"C. underground raceways from the property line to the demarcation point within the building. Telecom utility company will provide all service conductors and/or fiber to tenant areas.

A 4'x8' plywood backboard, a dedicated isolated ground bar and a 20A duplex receptacle will be provided at the demarcation point and at each Telecom Room. Tenants/Owner will provide all data and voice wiring and equipment for the building including elevator phone service. Rough-in boxes and conduits will be provided in all core/shell finished office areas.

(2) 4"C. conduit sleeves will be provided through floor slab between Telecom Rooms.

Power Distribution

Service switchboard will include service connection equipment; space for utility company equipment; feeder overcurrent devices to support connected loads outlined. Service switchboard will be rated 480/277V, 3P, 4W Large equipment loads will be 480V, 3 phase; lighting loads will be 277V, 1 phase or 480V, 1 phase; small receptacle and appliance loads will be 120V, 1 phase. Service switchboard will include digital metering and integral TVSS protection on the incoming main.

480/277V panelboards will be provided on each floor and sized to support 1.5W/SF tenant area lighting. Step down transformers and 120/208V panelboards will be provided on each floor to support 3.5W/SF tenant receptacle and equipment power. 480/277V and 120/208V single and multi-pole breakers will be provided within floor panelboards for tenant areas lighting and power loads. Conduits will be installed from tenant receptacle panelboards stubbed into depressed floor slab areas for floor box wiring by tenants.

Separate 480/277V panelboards will be provided on each floor to support tenant area under floor electric fan terminal units. Conduits will be installed from floor HVAC panelboards stubbed into depressed floor slab areas for underfloor fan terminal units by tenants. A separate

R.P. Appx. 245

panelboard will be provided on the 3rd Floor Level to support rooftop HVAC units and equipment .

Elevator equipment, trash compactor, domestic water heaters, entry or room electric heaters, etc. will be served from available 480V distribution within building. Site lighting circuits will be fed from 1st Floor lighting panelboard. Core/shell lighting and power circuits will be shared with tenant area lighting and power panelboards.

New power Distribution and Lighting/Appliance panelboards will be dead front furnished with branch protective devices, main bus, main breakers, with AIC rating for available fault current at installed location. Main buses and connectors will be hard drawn copper or tin plated aluminum. Framed directories with protective plastic facing will be attached to the inside of panelboards and
be neatly filled out to identify all circuits and loads. 25% spare breaker and space capacity will be provided.

Circuit breakers will be quick make - quick break, molded case type with the tripping position midway between on and off. Breakers will be the bolt-on type with common trip for multi-pole application. Breakers indicated to be used for lighting circuit control will be switch rated. Fuses will be UL approved and listed for application, NEMA PB-1 complaint.

Step down transformers will be factory-assembled and -tested, air-cooled units for 60-hz service. Grain-oriented cores, non-aging silicon steel. Continuous copper or aluminum coil windings without splices, brazed or pressure type internal coil connections. Comply with NEMA ST 20, and list and label as complying with UL 1561. Enclosures will be ventilated, NEMA 250, Type 2. Insulation class: 220 degree C., UL-component-recognized insulation system with a maximum of 150 degree C. rise above 40 degree C. ambient temperature. Transformers may be hung from structure where acceptable by local authorities.

Receptacle/Equipment Connections
Duplex receptacles will be provided within all core/shell finished corridors 50 feet on center along all routes. Weatherproof duplex receptacles will be provided at all roof-mounted equipment per NEC. Duplex dedicated duplex receptacles will be provided per 200SF within each Electric Room, Mechanical Room, Telecom Room. All wiring devices will be 20A, 125V specification grade. Receptacles will be mounted 18" AFF and will include plastic coverplates.

Tenant will furnish and install all above and below floor lighting and receptacle branch circuit wiring within all tenant areas. No power-data floor boxes are stockpiled on floors. No bay boxes for tenant wiring is included.

Grounding
A fully grounded electrical system per NEC requirements will be provided. Feeder and branch circuits will contain safety ground conductors in lieu of raceway serving as grounding means. No column grounding or building ground loop will be provided except for separately device systems such as transformers, UPS systems, etc.

Lighting Systems
Core/shell lighting will include recessed 3 lamp, (18) 3" deep cell, 2'x4' parabolic troffer fixtures for one fixture every 80SF all finished corridor routes; fluorescent downlights with

R.P. Appx. 246

specular clear alzak reflectors in Entry and Elevator Lobbies and within Restrooms; pendant shop lights in all Elect/Mech Rooms, Janitors Closets, etc. Fluorescent fixtures will utilize electronic ballasts and T-8 lamps.

Tenant Area lighting, branch circuit wiring and control wiring will be provided by tenants during build out and are not included in core/shell. Minimal lighting will be provided within empty tenant areas to support owner and code officials requirements.

Exit signs and emergency egress lighting will be provided along all core/shell egress paths. Life safety lighting will be powered from self-contained battery units.

Exterior metal halide HID site lighting pole mounted fixtures will be provided along all entry and parking areas. Average maintained exterior foot-candle values will be 1.5 for roadway and parking areas. Control of exterior lighting will be from contactors at source panelboards with temperature control system ON/OFF interface.

A material only allowance of $10,000 for decorative Front Office lighting; entry canopy; monument sign lighting, flagpole lighting and exterior entry bollards is included. (This is included as part of the current DFW design.)

Fire Alarm System
Building will include a system with devices, control and signaling in compliance with local authority having jurisdiction and specific project requirements. System will include furnishing and installing heat detectors; smoke detectors within each Electrical and Mechanical Room; manual pull stations; fire alarm annunciator panel at main entrance and AutoDial connections to central monitoring agency.

Duct smoke detectors for all ventilation units over 2,000 CFM will be furnished and installed by HVAC contractor, devices will be monitored by building fire alarm system; duct smoke detectors will be provided by electrical contractor on each floor at each return air opening into return air shaft back to each rooftop unit.

Smoke detectors will be provided at each elevator lobby, Elevator Equipment Room, elevator pit and top of elevator shafts. Heat detectors will be provided in each Elevator Equipment Room, elevator pit and top of elevator shafts. Monitoring and control functions will be in conformance with ASME A17.3-93, Safety Code for Elevators and Escalators.

Signal devices, strobes and horns will be provided within areas in accordance with NFPA, ADA Guidelines and local authority having jurisdiction. Connections to fire sprinkler system water flow switches and tamper switches will be provided.

Fire pump and jockey pump controller monitoring modules will be included (add alternate as / if required by code).

Initiation and signal devices within tenant areas are not included, but main fire alarm panel will be sized to accept initiation and signal devices installed by tenants, based on an open plan finish-out concept.

R.P. Appx. 247

Lightning Protection System
A UL Listed, Master labeled lightning protection system complete with rooftop air terminals, roof conductors, down conductors, perimeter counterpoise and driven ground rods.

Materials
All feeder circuits will be THHN/THWN copper or aluminum conductors. All branch circuits will be THHN/THWN copper conductors. UL Type MC feeder cables will be acceptable for use. UL Type MC cable will be acceptable for branch circuit use. Modular wiring systems will be used for all Office lighting circuits. Feeders and branch circuits will be routed below floor slabs in all areas.

The following types of conduits will be allowed for specific applications as follows:

| | |
|---|---|
| Site Lighting | PVC |
| Feeders – Underground | PVC |
| Feeders – Exposed | IMC, EMT (above 7' AFF) |
| Branch Circuits – Concealed | RGS, IMC, EMT, MC Cables |

## ADDITIONAL CLARIFICATIONS

Contract Documents
The scope of work is based upon Clayco Outline Specification dated December 6, 2005, Architectural drawings through Progress Set # 1 dated 10/07/05, Structural drawings and Tilt-Up Wall drawings through Pricing Set dated 10/14/05, and Civil drawings through Pricing Set dated 10/15/05 and as further clarified in this exhibit to the Agreement ("Outline Specifications").

LEED
The estimate is based upon achieving basic LEED certification for Core & Shell (24 points). No allowances are included for achieving a higher rating.

## ADDITIONAL CLARIFICATIONS

Contract Documents
The scope of work is based upon Clayco Outline Specification dated October 20, 2005 and design drawings from Forum dated October 21, 2005 and as further clarified above and below.

LEED
The estimate is based upon achieving basic LEED certification for Core & Shell (24 points) based upon current design assumptions. No allowances are included for achieving a higher rating.

Exclusions
The following work is excluded from the GMP:

1)    Payment & Performance Bond
2)    Utility use fees
3)    Additional Commissioning required for LEED certification

R.P. Appx. 248

Exclusions (Con't)

4) On-site materials testing services
5) Design services for tenant area build-out
6) Cleanup for owner or TI work
7) Hazardous materials remediation
8) LEED certification costs (Koll has hired Gensler for this process)
9) Painting of interior steel joist and decking
10) Ceiling grid or pads for Tenant Areas
11) Factory Mutual requirements
12) Tenant improvements
13) Undercutting of existing and new subgrade due to poor or unsuitable soil conditions
14) Excludes rock removal or blasting
15) Site fencing & gates
16) Flag poles
17) Trash enclosure
18) Compactor
19) Foundation drainage system
20) Metal lockers
21) Interior or exterior signage
22) Furniture, fixtures and unspecified equipment
23) Installation of raised floor system except at core areas
24) Elevator to the roof
25) Specialty Glass at Decorative Stair or 2nd Level Rail
26) Separate gas or electric meters
27) Gas service to building
28) Building humidification or dehumidification
29) Temporary heating of tenant spaces
30) Tenant area lighting and power branch circuit wiring and light fixtures
31) Tenant area fire alarm devices
32) Tenant Finish Lighting or Power Work
33) Standby power system or Emergency power generation
34) Public Address System
35) Data, Voice, Video Systems
36) Security Systems
37) Excludes accent lighting for metal screen walls @ roof
38) Utility company fee relating to phone, fiber and Gas or Electric
39) Mudslab below crawl space

Miscellaneous Clarifications
1) The access flooring will be stockpiled on each floor as required for future installation by the tenants. Installation of the floor is only included in the Core areas.
2) Our estimate is based upon the minimum lighting as required by applicable codes for the tenant spaces.
3) Our estimate assumes that the excess topsoil and vegetation will be stockpiled for use as fill in the sloped areas north and west of the building.
4) Steel and concrete bids are based upon the 11-23-05 documents.
5) About 20,000 cy of excess material will be loaded and hauled off site by HL Merrill.

R.P. Appx. 249                                    27

<u>Allowances</u>
The GMP includes the following allowances:

| | | |
|---|---|---|
| 1) | Entry sidewalks and hardscaping upgrades | $25,000 |
| 2) | Landscaping | $225,000 |
| 3) | Irrigation system | $75,000 |
| 4) | Wood, stone & metal trim at main lobby | $25,000 |
| 5) | Wood & metal trim at level 2 & 3 & 4 lobbies | $7,500 |
| 6) | Light bollards and building accent lighting @ main building entrances—now part of design | |
| 7) | Revolving entrance door—now part of design | |
| 8) | Elevator Cab finishes—now part of design | |

See the Drawing List, attached hereto as Attachment A.

R.P. Appx. 250                                    28



THE ART & SCIENCE OF BUILDING

| **Intellicenter - Dallas** | **Project # 7-106-005** | **Clayco, Inc.** |
| --- | --- | --- |
| 3701 Regent Blvd. | Tel:    Fax: | |
| Irving, Texas 75063 | | |

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| INDEX | | Drawing Index | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C1 | | Cover Sheet | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C2 | | Grading Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C3 | | Underfloor Grading Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C4 | | Drainage Area Map | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C5 | | Storm Sewer Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C6 | | Storm Sewer Profiles | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C7 | | Utility Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C8 | | Paving Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C9 | | Turn Lane Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C10 | | Turn Lane Plan and Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C11 | | Paving Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C12 | | Erosion Control Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C13 | | Erosion Control Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C14 | | City of Irving Storm Water Pollution Prevention Methods | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C15 | | City of Irving Storm Water Pollution Prevention Details | 10/21/2005 | | 0 | | | Progress Print 1 | |

R.P. Appx. 251


| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|-----------|--------|----------|---------------|----------|
| C16 | | City of Irving Storm Sewer Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C17 | | City of Irving Inlet Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C18 | | City of Irving Trench Embedment, Backfill, and Pavement Repair Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C19 | | City of Irving Details for Trench Sheeting, Shoring, Sloping for Trenches over 5' Deep | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C20 | | City of Irving Water and Sanitary Sewer Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| C21 | | City of Irving Sanitary Sewer Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A0-01 | | Life Safety Plans & Code Data | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A0-02 | | Rated Structure Plans | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A1-01 | | Architectural Site Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-01 | | Overall Crawl Space and First Floor Plans | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-02 | | Overall Second and Third Floor Plans | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-03 | | Overall Fourth Floor and Roof Plans | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-11 | | Partial First Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-12 | | Partial First Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-21 | | Partial Second Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-22 | | Partial Second Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-31 | | Partial Third Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-32 | | Partial Third Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-41 | | Partial Fourth Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-42 | | Partial Fourth Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-51 | | Partial Roof Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-52 | | Partial Roof Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |

R.P. Appx. 252



| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|------------|--------|----------|---------------|----------|
| A2-53 | | Roof Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A2-54 | | Roof Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A3-01 | | Overall Elevations | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A3-02 | | Enlarged Elevations | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A3-03 | | Enlarged Elevations | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A3-04 | | Enlarged Elevations | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A3-05 | | Enlarged Elevations | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A3-10 | | Building Sections | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A3-11 | | Building Sections | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A4-01 | | Enlarged Plans, Toilet Rooms & Lobby | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A5-00 | | Interior Elevations, Typical Information | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A5-01 | | Interior Elevations, Lobby | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A5-02 | | Interior Elevations, Toilet Rooms | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A6-11 | | Partial First Floor Ceiling Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A6-12 | | Partial First Floor Ceiling Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A6-21 | | Partial Second Floor Ceiling Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A6-22 | | Partial Second Floor Ceiling Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A6-31 | | Partial Third Floor Ceiling Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A6-32 | | Partial Third Floor Ceiling Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A6-41 | | Partial Fourth Floor Ceiling Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A6-42 | | Partial Fourth Floor Ceiling Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A7-01 | | Elevator Plans & Sections | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A7-02 | | Elevator Sections | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A7-03 | | Elevator Details | 10/21/2005 | | 0 | | | Progress Print 1 | |

R.P. Appx. 253



**CLAYCO**

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|------------|--------|----------|---------------|----------|
| A7-11 | | Stair 1 Sections & Plans | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A7-12 | | Stair 2 Sections & Plans | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A7-13 | | Stair Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A8-01 | | Wall Sections | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A8-02 | | Wall Sections | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A8-03 | | Wall Sections | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A8-04 | | Wall Sections | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A9-01 | | Partition Types and Details, Door & Frame Types & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A9-02 | | TYP Vapor Barrier & Window Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A9-03 | | Window Frame Types | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A9-10 | | Plan Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A9-11 | | Plan Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A9-20 | | Exterior Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A9-21 | | Exterior Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A9-22 | | Exterior Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A10-01 | | Interior Details, Toilet Rooms | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A10-02 | | Interior Details, 1st Level Lobby | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A10-03 | | Interior Details, 2nd Level Lobby | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A11-11 | | Partial Finish Plans, First Floor | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A11-12 | | Partial Finish Plans, First Floor | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A11-21 | | Partial Finish Plan, Second Floor | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A11-22 | | Partial Finish Plan, Second Floor | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A11-31 | | Partial Finish Plan, Third Floor | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A11-32 | | Partial Finish Plan, Third Floor | 10/21/2005 | | 0 | | | Progress Print 1 | |
| A11-41 | | Partial Finish Plan, Fourth Floor | 10/21/2005 | | 0 | | | Progress Print 1 | |

R.P. Appx. 254



| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|-----------|--------|----------|--------------|----------|
| A11-42 | | Partial Finish Plan, Fourth Floor | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S1-01 | | General Notes | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S1-02 | | Typical Sections & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S1-03 | | Typical Sections & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S1-04 | | Typical Sections & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-01 | | Partial Pier Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-02 | | Partial Pier Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-11 | | Partial Foundation Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-12 | | Partial Foundation Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-21 | | Partial Second Floor Framing Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-22 | | Partial Second Floor Framing Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-31 | | Partial Third Floor Framing Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-32 | | Partial Third Floor Framing Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-41 | | Partial Fourth Floor Framing Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-42 | | Partial Fourth Floor Framing Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-51 | | Partial Roof Framing Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S2-52 | | Partial Roof Framing Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S3-01 | | Foundation Section and Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S3-02 | | Foundation Section and Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S4-01 | | Framing Section & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S4-02 | | Framing Section & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S4-03 | | Framing Section & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S4-04 | | Framing Section & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S5-01 | | Column Schedule & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| S6-01 | | Brace Elevation & Details | 10/21/2005 | | 0 | | | Progress Print 1 | |

R.P. Appx. 255



| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|-----------|--------|----------|---------------|----------|
| MEP1.00 | | Cover Sheet | 10/21/2005 | | 0 | | | Progress Print 1 | |
| MP1.01 | | Site Plan, Mechanical/Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M2.11 | | Partial First Floor Plan - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M2.12 | | Partial First Floor Plan - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M2.21 | | Partial Second Floor Plan - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M2.22 | | Partial Second Floor Plan - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M2.31 | | Partial Third Floor Plan - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M2.32 | | Partial Third Floor Plan - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M2.41 | | Partial Fourth Floor Plan - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M2.42 | | Partial Fourth Floor Plan - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| MEP2.51 | | Partial Roof Plan - Mechanical/Electrical/Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| MEP2.52 | | Partial Roof Plan - Mechanical/Electrical/Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M3.01 | | Partial Enlarged Plans - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M3.02 | | Partial Enlarged Second Floor Plans - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M3.03 | | Partial Enlarged Third Floor Plans - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M3.04 | | Partial Enlarged Fourth Floor Plans - Mechanical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M4.01 | | Mechanical Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M4.02 | | Mechanical Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| M5.01 | | Mechanical Schedules | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.01 | | Partial Underfloor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |

R.P. Appx. 256


| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|-----------|--------|----------|---------------|----------|
| P2.02 | | Partial Underfloor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.11 | | Partial First Floor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.12 | | Partial First Floor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.21 | | Partial Second Floor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.22 | | Partial Second Floor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.31 | | Partial Third Floor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.32 | | Partial Third Floor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.41 | | Partial Fourth Floor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P2.42 | | Partial Fourth Floor Plan - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P3.01 | | Partial Enlarged Plans - Plumbing | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P4.01 | | Plumbing Riser Diagrams | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P5.01 | | Plumbing Details and Schedules | 10/21/2005 | | 0 | | | Progress Print 1 | |
| P5.02 | | Plumbing Details | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E1.01 | | Site Plan Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E2.11 | | First Floor Plan Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E2.12 | | Partial First Floor Plan Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E2.21 | | Partial Second Floor Plan Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E2.22 | | Partial Second Floor Plan Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E2.31 | | Partial Third Floor Plan Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E2.32 | | Partial Third Floor Plan | 10/21/2005 | | 0 | | | Progress Print 1 | |

R.P. Appx. 257

**CLAYCO**

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|-----------|--------|----------|---------------|----------|
| | | Electrical | | | | | | | |
| E2.41 | | Partial Fourth Floor Plan Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E2.42 | | Partial Fourth Floor Plan Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E4.01 | | Single Line Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| E4.02 | | Details Electrical | 10/21/2005 | | 0 | | | Progress Print 1 | |
| EL2.11 | | Partial First Floor Plan Lighting | 10/21/2005 | | 0 | | | Progress Print 1 | |
| EL2.12 | | Partial First Floor Plan Lighting | 10/21/2005 | | 0 | | | Progress Print 1 | |
| EL2.21 | | Partial Second Floor Plan Lighting | 10/21/2005 | | 0 | | | Progress Print 1 | |
| EL2.22 | | Partial Second Floor Plan Lighting | 10/21/2005 | | 0 | | | Progress Print 1 | |
| EL2.31 | | Partial Third Floor Plan Lighting | 10/21/2005 | | 0 | | | Progress Print 1 | |
| EL2.32 | | Partial Third Floor Plan Lighting | 10/21/2005 | | 0 | | | Progress Print 1 | |
| EL2.41 | | Partial Fourth Floor Plan Lighting | 10/21/2005 | | 0 | | | Progress Print 1 | |
| EL2.42 | | Partial Fourth Floor Plan Lighting | 10/21/2005 | | 0 | | | Progress Print 1 | |
| 02466 | - | Drilled Piers | 10/21/2005 | | 0 | | | 9 Pages | |
| 03300 | 0 | Cast-In-Place Concrete | 10/21/2005 | | 0 | | | | |
| 03301 | - | Under Slab Vapor Barrier/Retarder | 10/21/2005 | | 0 | | | 2 Pages | |
| 03470 | - | Tilt-Up Concrete Construction | 10/21/2005 | | 0 | | | 6 Pages | |
| 03490 | - | Glass Fiber Reinforced Precast Concrete | 10/21/2005 | | 0 | | | 5 Pages | |
| 05120 | - | Structural Steel | 10/21/2005 | | 0 | | | 6 Pages | |
| 05210 | - | Steel Joists | 10/21/2005 | | 0 | | | 6 Pages | |
| 05310 | - | Steel Deck | 10/21/2005 | | 0 | | | 2 Pages | |
| 05500 | - | Metal Fabrications | 10/21/2005 | | 0 | | | 7 Pages | |
| 05511 | - | Metal Stairs | 10/21/2005 | | 0 | | | 8 Pages | |
| 05521 | - | Pipe and Tube Railing | 10/21/2005 | | 0 | | | 8 Pages | |

R.P. Appx. 258


| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|------------|--------|----------|---------------|----------|
| 05811 | - | Architectural Joint System | 10/21/2005 | | 0 | | | 6 Pages | |
| 06100 | - | Rough Carpentry | 10/21/2005 | | 0 | | | 5 Pages | |
| 06402 | - | Interior Architectural Woodwork | 10/21/2005 | | 0 | | | 5 Pages | |
| 07170 | - | Bentonite waterproofing | 10/21/2005 | | 0 | | | 5 Pages | |
| 07210 | - | Building Insulation | 10/21/2005 | | 0 | | | 7 Pages | |
| 07412 | - | Metal Wall Panels | 10/21/2005 | | 0 | | | 9 Pages | |
| 07540 | - | Thermoplastic Membrane Roofing | 10/21/2005 | | 0 | | | 6 Pages | |
| 07620 | - | Sheet Metal Flashing and Trim | 10/21/2005 | | 0 | | | 5 Pages | |
| 07720 | - | Roof Accessories | 10/21/2005 | | 0 | | | 3 Pages | |
| 07811 | - | Sprayed Fire- Resistive Materials | 10/21/2005 | | 0 | | | 5 Pages | |
| 07842 | - | Fire Resistive Joint Systems | 10/21/2005 | | 0 | | | 4 Pages | |
| 07920 | - | Joint Sealants | 10/21/2005 | | 0 | | | 7 Pages | |
| 08110 | - | Steel Doors and Frames | 10/21/2005 | | 0 | | | 5 Pages | |
| 08125 | - | Interior Aluminum Frames | 10/21/2005 | | 0 | | | 4 Pages | |
| 08211 | - | Flush Wood Doors | 10/21/2005 | | 0 | | | 4 Pages | |
| 08311 | - | Access Doors | 10/21/2005 | | 0 | | | 5 Pages | |
| 08331 | - | Overhead Coiling Doors | 10/21/2005 | | 0 | | | 4 Pages | |
| 08410 | - | Aluminum Entrances and Storefronts | 10/21/2005 | | 0 | | | 10 Pages | |
| 08470 | - | Revolving Entrance Doors | 10/21/2005 | | 0 | | | 7 Pages | |
| 08620 | - | Unit Skylights | 10/21/2005 | | 0 | | | 3 Pages | |
| 08711 | 0 | Door Schedule | 10/21/2005 | | 0 | | | | |
| 08800 | - | Glass & Glazing | 10/21/2005 | | 0 | | | 7 Pages | |
| 08830 | - | Mirrors | 10/21/2005 | | 0 | | | 5 Pages | |
| 08911 | - | Glazed Aluminum Curtain Wall | 10/21/2005 | | 0 | | | 9 Pages | |
| 09000 | 0 | Material Legend | 10/21/2005 | | 0 | | | 2 Pages | |
| 09253 | - | Gypsum Sheathing | 10/21/2005 | | 0 | | | 3 Pages | |

R.P. Appx. 259



| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|---|---|---|---|---|---|---|---|---|---|
| 09260 | - | Gypsum Board Assemblies | 10/21/2005 | | 0 | | | 14 Pages | |
| 09265 | - | Gypsum Board Shaft-Wall Assemblies | 10/21/2005 | | 0 | | | 5 Pages | |
| 09310 | - | Ceramic Tile | 10/21/2005 | | 0 | | | 7 Pages | |
| 09402 | - | Epoxy Terrazo | 10/21/2005 | | 0 | | | 5 Pages | |
| 09514 | - | Acoustical Pan Ceilings | 10/21/2005 | | 0 | | | 4 Pages | |
| 09653 | - | Resilient Wall Base | 10/21/2005 | | 0 | | | 4 Pages | |
| 09861 | - | Carpet Tile | 10/21/2005 | | 0 | | | 3 Pages | |
| 09912 | - | Painting | 10/21/2005 | | 0 | | | 9 Pages | |
| 09970 | - | Special Wall Surfaces (Fiberglass Reinforced Plastic Panels) | 10/21/2005 | | 0 | | | 4 Pages | |
| 09980 | 0 | Special Coatings for Concrete Surfaces | 10/21/2005 | | 0 | | | | |
| 10270 | - | Access Flooring | 10/21/2005 | | 0 | | | 6 Pages | |
| 10520 | - | Fire Protection Specialties | 10/21/2005 | | 0 | | | 5 Pages | |
| 10801 | - | Toilet Accessories | 10/21/2005 | | 0 | | | 3 Pages | |
| 11160 | - | Loading Dock Equipment | 10/21/2005 | | 0 | | | 5 Pages | |
| 12491 | - | Horizontal Blinds | 10/21/2005 | | 0 | | | 3 Pages | |
| 14240 | - | Hydraulic Elevators | 10/21/2005 | | 0 | | | 8 Pages | |
| 15010 | - | Basic Mechanical Requirements | 10/21/2005 | | 0 | | | 4 Pages | |
| 15071 | - | Mechanical Vibration Controls | 10/21/2005 | | 0 | | | 4 Pages | |
| 15081 | - | Duct Insulation | 10/21/2005 | | 0 | | | 8 Pages | |
| 15083 | - | Pipe Insulation | 10/21/2005 | | 0 | | | 10 Pages | |
| 15100 | - | Valves | 10/21/2005 | | 0 | | | 7 Pages | |
| 15135 | - | Meters and Gages | 10/21/2005 | | 0 | | | 4 Pages | |
| 15140 | - | Hangers and Supports | 10/21/2005 | | 0 | | | 4 Pages | |
| 15300 | - | Fire Suppression Piping | 10/21/2005 | | 0 | | | 14 Pages | |
| 15411 | - | Water Distribution Piping | 10/21/2005 | | 0 | | | 8 Pages | |

R.P. Appx. 260


| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|------------|--------|----------|---------------|----------|
| 15420 | - | Drainage and Vent Systems | 10/21/2005 | | 0 | | | 7 Pages | |
| 15440 | - | Plumbing Fixtures | 10/21/2005 | | 0 | | | 4 Pages | |
| 15453 | - | Plumbing Pumps | 10/21/2005 | | 0 | | | 4 Pages | |
| 15460 | - | Water Heaters | 10/21/2005 | | 0 | | | 3 Pages | |
| 15730 | - | Section Packaged Rooftop Air Conditioning Units | 10/21/2005 | | 0 | | | 10 Pages | |
| 15838 | - | Power Ventilators and Exhaust Fans | 10/21/2005 | | 0 | | | 7 Pages | |
| 15883 | - | Variable Frequency Drives | 10/21/2005 | | 0 | | | 5 Pages | |
| 15891 | - | Metal Ducts | 10/21/2005 | | 0 | | | 8 Pages | |
| 15910 | - | Duct Accessories | 10/21/2005 | | 0 | | | 6 Pages | |
| 15932 | - | Air Outlets and Inlets | 10/21/2005 | | 0 | | | 3 Pages | |
| 15933 | - | Air Terminals | 10/21/2005 | | 0 | | | 4 Pages | |
| 15990 | - | Testing, Adjusting, and Balancing | 10/21/2005 | | 0 | | | 7 Pages | |
| 15995 | - | Commissioning | 10/21/2005 | | 0 | | | 4 Pages | |
| 16010 | - | Basic Electrical Requirements | 10/21/2005 | | 0 | | | 4 Pages | |
| 16110 | - | Raceways | 10/21/2005 | | 0 | | | 5 Pages | |
| 16120 | - | Wires and Cables | 10/21/2005 | | 0 | | | 3 Pages | |
| 16135 | - | Cabinets, Boxes, and Fittings | 10/21/2005 | | 0 | | | 5 Pages | |
| 16143 | - | Wiring Devices | 10/21/2005 | | 0 | | | 4 Pages | |
| 16170 | - | Circuit and Motor Disconnect Switches | 10/21/2005 | | 0 | | | 2 Pages | |
| 16190 | - | Circuit and Motor Disconnect Switches | 10/21/2005 | | 0 | | | 4 Pages | |
| 16195 | - | Electrical Identification | 10/21/2005 | | 0 | | | 3 Pages | |
| 16420 | - | Service Entrance | 10/21/2005 | | 0 | | | 4 Pages | |
| 16425 | - | Switchboards | 10/21/2005 | | 0 | | | 6 Pages | |
| 16452 | - | Grounding | 10/21/2005 | | 0 | | | 5 Pages | |
| 16460 | - | Transformers | 10/21/2005 | | 0 | | | 3 Pages | |



R.P. Appx. 261


| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|---|---|---|---|---|---|---|---|---|---|
| 16470 | - | Panelboards | 10/21/2005 | | 0 | | | 5 Pages | |
| 16471 | - | Transient Voltage Surge Suppressors | 10/21/2005 | | 0 | | | 4 Pages | |
| 16475 | - | Overcurrent Protective Devices | 10/21/2005 | | 0 | | | 5 Pages | |
| 16481 | - | Motor Controllers | 10/21/2005 | | 0 | | | 3 Pages | |
| 16515 | - | Lighting | 10/21/2005 | | 0 | | | 6 Pages | |
| 16670 | - | Lightning Protection Systems | 10/21/2005 | | 0 | | | 3 Pages | |
| 16721 | - | Fire Alarm Systems | 10/21/2005 | | 0 | | | 7 Pages | |

R.P. Appx. 262

# INTELLICENTER
## Dallas, TX
## 211,637 SF  - 4 STORY  OFFICE  BLDG.
## KOLL DEVELOPMENT COMPANY
## February 20, 2006

PENGAD 800-631-6989

EXHIBIT

C

| EST. #: | | | TOTAL AREA: | 211,638 | Sf | 52,910 | 1st Flr | | | 5/19/2006 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE: | ######## | 3:52 PM | PERIMETER: | 1,226 | Lf | 158,728 | Upper Flrs | | | 3:52 PM | |
| BY: | SAM/TS | | CLEAR HT.: | | | | | | | | |
| SITE: | Dallas, TX | | SCHEDULE: | 9.00 | Mos | 211,638 | Total | 0.500% | INSURANCE | | |
| FILE: | | | | 39 | Wks | | | 4.00% | O.H. & PROFIT | | |

## 1.  SITE IMPROVEMENTS

| CODE | DESCRIPTION | | | QTY | U/M | Labor | Material | Sub Con | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | - | | |
| 02050 | Demolition  / Site Clearing | | | | | | | | - | | |
| | Curb Cuts | | | 3 | EA | | | 3,000.00 | 9,000 | | |
| | Site Clearing | | | 14.30 | ACR | | | 800.00 | 11,440 | | |
| | Tree/shrub  removal | | | - | LS | | | | - | | |
| | Sawcut existing island and entrance pavement | | | see above | | | | 3.00 | - | | |
| | Demo and fill for 2 entrance and island rework | | | 1 | LS | | | 7,000.00 | 7,000 | | |
| | Traffic control/barricades etc. | | | 1 | LS | | | 7,000.00 | 7,000 | 34,440 | |
| | Discount | | | 1 | LS | | | - | - | 0.18 | |
| 02200 | Earthwork | | | | | | discount | - | - | | |
| | Mob/Layout/surveying/dewatering | | | 1 | LS | | | 20,000.00 | 20,000 | | |
| | Cut/Fill on-site materials | | | 14,000 | CY | | | 3.50 | 49,000 | | |
| | Prep Building Pad | | | 5,555 | SY | | | 0.75 | 4,166 | | |
| | Cement Mix Clay Under Pavement Areas | Top 6" of subgrade | | SEE ALT | SY | | | 2.85 | - | | |
| | Lime at city Street Work | | | 1,604 | sy | | | 5.00 | 8,020 | | |
| | Moisture Conditioning of Slab On Grade areas | Top 2.5' below slab | | - | SY | | | 2.00 | - | | |
| | Spoils from utility work—Stockpiled On Site | | | 2,000 | CY | | | 2.00 | 4,000 | | |
| | Strip and stockpile topsoil | | | 4,500 | CY | | | 1.50 | 6,750 | | |
| | Respread topsoil | Based on 4" | | 3,000 | CY | | | 4.00 | 12,000 | | |
| | Topsoil—Stockpiled on Site | | | 1,500 | CY | | | 2.00 | 3,000 | | |
| | Fire Marshall Road (8" thickness) | | | 3,251 | Tons | | | 17.00 | 55,267 | | |
| | Temporary staging area | 8" Stone | | 10,000 | SF | | | 0.70 | 7,000 | | |
| | Maintain access road | w/access road | | 3 | MO | | | 3,500.00 | 10,500 | | |
| | Select fill material at City Road | | | 844 | Tons | | | 20.00 | 16,880 | 224,816 | |
| | Final Grade paved areas | | | 16,683 | sy | | | 1.00 | 16,683 | 1.06 | |
| | Build Mounds on site for excess utility spoils | | | 1,350 | cy | | | 3.00 | 4,050 | | |
| | Move  excess on site | | | 3,000 | CY | | | 2.50 | 7,500 | | |
| 02210 | Finish Grading / Backfill Footings | | | 1 | LS | | | 4,200.00 | 4,200 | 4,200 | |
| | | | | | | | | - | | 0.02 | |
| 02201 | Grading Contingincy | | | - | | | | - | - | | |
| | Undercut allowance | Excluded | By Koll | - | Allow | | | | - | - | |
| | | | | | | | | | - | - | |
| 02202 | Detention Pond | | | | | | | | - | | |
| | w/storm system | | | | | | | | - | - | |
| | | | | | | | | | - | - | |
| 02300 | Surface Water Control | | | | | | | | - | | |
| | Erosion control per plans | Allowance | | 1 | LS | | | 1,000.00 | 1,000 | | |
| | Silt fence | | | 1,800 | LF | | | 2.00 | 3,600 | | |
| | Temporary seed & mulch | | | 2 | AC | | | 1,200.00 | 2,400 | | |
| | Protect inlets | | | 10 | EA | | | 200.00 | 2,000 | 9,000 | |
| | | | | | | | | | - | 0.04 | |
| 02500 | Asphalt Paving and Striping | | | | | | | | - | | |
| | 3.5" + 2.0" asphalt paving | w/concrete paving | | - | | | | | - | | |
| | 3.0" + 1.5" asphalt paving | w/concrete paving | | - | | | | | - | | |
| | Roadway 2+81/2+4 | | | - | | | | | - | | |
| | Exterior Dock stairs/fndn wall | w/foundations | | - | | | | - | - | | |
| | Patch Drive After Construction | | | - | | | | | - | | |
| | Paving Fabric - Mirafi 500 | | | | | | | | - | | |
| | Stripe Parking Stalls - Cars | Need to count spaces | | 639 | EA | | | 5.00 | 3,195 | | |

6-30-05atlantaupdate

R.P. Appx. 263

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|---|---|---|---|---|---|---|---|---|---|
| | Stripe Parking Stalls - Trailers | | | | | | | - | |
| | Parking Blocks | | | | | | | - | 3,195 |
| | | | | | | | | - | 0.02 |
| 02510 | Concrete Paving & Curbs—TAS | | | | | | | - | |
| | 5 " Light duty paving | | 257,400 | sf | | | 2.20 | 566,280 | |
| | 6 " Medium duty paving | | 56,000 | sf | | | 2.50 | 140,000 | |
| | 6 " Islands and Decel lanes | | 14,450 | sf | | | 4.75 | 68,638 | |
| | Seal Joints w/ Hot Tar | | 327,850 | SF | - | | 0.07 | 22,950 | |
| | 4 " Sidewalk along the building | | 11,099 | SF | | | 3.25 | 36,072 | |
| | 4 " Sidewalk along main road | | 7,500 | SF | | | 4.00 | 30,000 | |
| | Transformer Pad | | 50 | SF | | | 8.00 | 400 | |
| | Light Pole Bases | | 36 | EA | | | 240.00 | 8,640 | 876,355 |
| | Pipe Bollards—install & pour | | 25 | ea | | | 135.00 | 3,375 | 4.14 |
| 02511 | Concrete Curbs | | | | | | | - | |
| | 6 " Extruded Curb | | 10,611 | LF | | | 3.00 | 31,833 | |
| | 24 " Curb & Gutter @ road | Existing | | | | | | - | |
| | discount | | 1 | LF | | | (27,000.00) | (27,000) | 4,833 |
| | | | | | | | | - | 0.02 |
| 02605 | Sanitary Sewer | | | | | | | - | |
| | Layout | | - | LS | | | 500.00 | - | |
| | 8 "Lateral Line | | 305 | LF | | | 22.00 | | |
| | Gravel bedding | | 75 | TON | | | 24.00 | | |
| | Sanitary Manhole (modify existing) | | 2 | EA | | | 750.00 | | |
| | Cleanouts | | - | | | | 875.00 | | |
| | Grinder Pump / Sewage Ejector | Not Included | - | | | | | | |
| | Street Bore | EXCLUDED | | | | | | | |
| | Tie-in to Existing Manhole | | 1 | EA | | | 1,500.00 | | 11,510 |
| | | | | | | | | - | 0.05 |
| 02606 | Sanitary Recoupment or Capacity Fees | EXCLUDED | | | | | | - | - |
| | | | | | | | | - | - |
| 02660 | Water Distribution | | | | | | | - | |
| | Meter Fees | | 1 | LS | | | 2,600.00 | | |
| | Meter Vault & Pit | | 1 | EA | | | 12,000.00 | | |
| | Combination Water Tap | 8" | 1 | EA | | | 5,000.00 | | |
| | Combination Water Tap | two @ 2" | 1 | EA | | | 2,000.00 | | |
| | 12 " Fire Line | | - | | | | 60.00 | | |
| | 8 " Fire Line | | 1,800 | LF | | | 20.00 | | |
| | 4 " Domestic Line | | 820 | LF | | | 16.00 | | |
| | Jack & bore | Not Required | - | LF | | | 275.00 | | |
| | 8" Detector check valve | | 1 | EA | | | 8,000.00 | | |
| | 2" Detector check valve | | 1 | EA | | | 2,500.00 | | |
| | Fire Hydrants | | 4 | EA | | | 2,700.00 | | |
| | Detector Check in Pyramid Box for Sprinklers | | 1 | EA | | | 2,500.00 | | 94,520 |
| | | | | | | | | - | 0.45 |
| 02680 | Gas Main to Building | EXCLUDED—BY KOLL | | | | | | - | - |
| | | | | | | | | - | - |
| 02700 | Storm Sewers | ALLOWANCE | | | | | | - | |
| | Layout | | - | LS | | | | - | |
| | Pumping | | 1 | LS | | | | - | |
| | Curb Inlets | | 5 | EA | | | 1,600.00 | | |
| | Drain Tile at Building Mud Slab | | 800 | LF | | | 16.00 | | |
| | Rip Rap around Flared Ends & Flumes | | 170 | TONS | | | 23.00 | | |
| | Manholes | | 3 | EA | | | 1,800.00 | | |
| | Roof drains | W/Storm Piping | - | LS | | | - | | |
| | Downspout Connections | | 12 | EA | | | 250.00 | | |
| | 6 " Storm Pipe | | 600 | LF | | | 24.00 | | |
| | 12 " Storm Pipe | | 964 | LF | | | 25.00 | | |
| | 15 " Storm Pipe | | - | | | | 38.00 | | |
| | 18 " Storm Pipe | | 175 | LF | | | 28.00 | | |
| | 21 " Storm Pipe | | | | | | 45.00 | | |
| | 24 " Storm Pipe | | 400 | LF | | | 32.00 | | |
| | 27 " Storm Pipe | | | | | | | - | |
| | 30 " Storm Pipe | | - | | | | | - | |
| | 36 " Storm Pipe | | | | | | | - | |
| | 42 " Storm Pipe | | - | | | | | - | |
| | 48 " Storm Pipe | | - | | | | | - | |
| | 54 " Storm Pipe | | | | | | | - | |

R.P. Appx. 264

6-30-05atlantaupdate

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|--|-----|-----|-------|----------|---------|-------|--|
| | 60 " Storm Pipe | | | | | | | - | |
| | Rock Excavation EXCLUDED | | - | ALL | | | - | - | 89,310 |
| | | | | | | | | - | 0.42 |
| 02780 | Landscape lighting conduit | | See Div 16 | LF | | | 9.50 | - | |
| 02781 | Underground Electric Conduit | Allowance | See Div 17 | | | | 32.00 | - | |
| 02782 | Underground Conduit & Circuit to Sign | | See Div 18 | | | | 11.00 | - | |
| 02783 | Underground Telephone Conduit--discount | | 800 | LF | | (12.50) | 12.50 | - | - |
| | | | | | | | | - | - |
| 02800 | Hardscape Allowance | ALLOWANCE | 1 | LS | | | 25,000.00 | 25,000 | |
| 02802 | Site Screen Walls | IN TILT-UP | | SF | | | | - | |
| 02805 | Trash Enclosure | IN TILT-UP | | SF | | | | - | |
| 02806 | Pavers | | - | SF | | | - | - | |
| 02806 | Fencing | EXCLUDED | | | | | 11.60 | - | |
| 02807 | Architectural Hardscape | | - | ALL | | - | - | - | |
| 02808 | Flag Poles | EXCLUDED | - | | 266.50 | 1,200.00 | 200.00 | - | 25,000 |
| | | | | | | | | - | 0.12 |
| 02900 | Landscaping Allowance | ALLOWANCE | 1 | LS | | | 225,000.00 | 225,000 | 225,000 |
| | | | | | | | | - | 1.06 |
| 02950 | Irrigation Allowance | ALLOWANCE | 1 | LS | | | 75,000.00 | 75,000 | 75,000 |
| | | | | | | | | - | 0.35 |
| | **SUBTOTAL SITE IMPROVEMENTS COSTS** | | | | | | | **1,677,179** | 1,677,179 |
| | | | | | | | | | 7.91 |
| | DIVISION 17 - MISCELLANEOUS | | | | | | | | |
| | EROSION CONTROL BOND | | | | | | | - | |
| | SITE IMPROVEMENT BOND | | | | | | | - | |
| | INSURANCE | | 0.500% | % | | | | 8,386 | |
| | OVERHEAD AND PROFIT | | 4.00% | | | | | 67,423 | |
| | **TOTAL SITE IMPROVEMENTS COSTS** | | **211,638** | **SF** | **8.28** | | | **1,752,988** | |

## 2. BUILDING SHELL

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|-----|-----|-------|----------|---------|-------|--|
| | **Division 1-GENERAL CONDITIONS** | | | | | | - | |
| | | | | | | | - | |
| 18010 | Project Manager--discount | 1.00 | Ls | | | | - | |
| | Project exec | | MO | | | 500.00 | - | |
| | Project Mgr (50% TIME) | 9.00 | MO | | | 6,800.00 | 61,200 | |
| | Project Engineer | 1.00 | MO | | | 3,800.00 | 3,800 | |
| | Mission control | 9.00 | MO | 700.00 | | | 6,300 | 71,300 |
| | General Supt | - | MO | 500.00 | | | - | 0.34 |
| 18020 | Field Superintendent (local wage only) | 41 | WK | | | 2,550.28 | 104,561 | |
| | Assistant Superintendent | | | | | | - | 104,561 |
| | | | | | | | - | 0.49 |
| 18025 | Travel Expenses--discount | | LS | | | | - | |
| | JobSite Superintendent - Per Diem Expenses--Bill Beck is Local | | days | | | | - | |
| | Housing Expense | - | | | | | - | |
| | PM Lodging (one per week) | 30 | Trips | | | 725.00 | 21,750 | |
| | Project Manager/Proj. Exec | 40 | trips | | | - | - | 21,750 |
| | Corporate Travel (1/2 TO Overhead) | 3 | EA | | | | - | 0.10 |
| 18030 | Drawing Reproduction & Progress Photos | | | | | | - | |
| | Reproduction Costs | 1 | LS | | 7,500.00 | | 7,500 | |
| | Progress Photos | 9.00 | MO | | 120.00 | | 1,080 | |
| | FedEx Charges | 9.00 | MO | | 125.00 | | 1,125 | 9,705 |
| | Web Cam | BY KOLL | | | | | - | 0.05 |
| 18040 | Field Engineering & Layout | | | | | | - | |
| | Topographic Survey | | | | | | - | |
| | Foundation Survey | | | | | | - | |
| | As-Built Survey | | | | | | - | |
| | Site Staking | 1 | LS | | | 13,000.00 | 13,000 | |
| | Layout | 1 | EA | | | 5,000.00 | 5,000 | 18,000 |
| | | | | | | | - | 0.09 |
| 18060 | Construction Cleaning & General Labor--discount | 1 | Ls | | | | - | |
| | General Labor | 200 | HR | 12.00 | | | 2,400 | |

R.P. Appx. 265

6-30-05atlantaupdate

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|---|---|---|---|---|---|---|---|---|---|
| | Clean Streets | | 80 | HR | 34.00 | | | 2,720 | |
| | Building Clean-up | | 211,638 | SF | 0.02 | 0.09 | | 23,280 | |
| | Final Clean-Up | | 211,638 | SF | | | 0.10 | 21,164 | |
| | Trash Hauling | | 20 | LDS | | | 300.00 | 6,000 | |
| | Dumpster Box Rental | Concrete | 3 | LDS | | | 500.00 | 1,500 | |
| | Dumpster Box Rental | Steel | 3 | LDS | | | 500.00 | 1,500 | |
| | Dumpster Box Rental | Wood | 3 | LDS | | | 300.00 | 900 | |
| | Dumpster Box Rental | Glass | 3 | LDS | | | 300.00 | 900 | |
| | Dumpster Box Rental | Plastic | 3 | LDS | | | 300.00 | 900 | |
| | Dumpster Box Rental | Drywall | 3 | LDS | | | 300.00 | 900 | |
| | Dumpster Box Rental | Insulation | 3 | LDS | | | 300.00 | 900 | |
| | Dumpster Box Rental | Misc. | 10 | LDS | | | 300.00 | 3,000 | 66,064 |
| | | | | | | | | - | 0.31 |
| 18100 | Equipment Rental & Small Tools | | | | | | | - | |
| | Job Trailers | | 9.00 | MO | | 200.00 | 325.00 | 4,725 | |
| | Tool Trailers | | 9.00 | MO | | | 350.00 | 3,150 | |
| | Superintendent Pick-up Truck | | 9.00 | MO | | 500.00 | | 4,500 | |
| | Fuel, Oil, & Repairs | | 9.00 | MO | | 145.00 | | 1,305 | |
| | Field Office Supplies | | 9.00 | MO | | 35.00 | | 315 | |
| | Small Tools | | 8.00 | MO | | | 600.00 | 4,800 | |
| | Hoisting Equipment | | | | | | | - | |
| | Barricades & Lights | | 9.00 | MO | - | - | | - | |
| | Scaffolding / Ladders | | 9.00 | MO | | 200.00 | | 1,800 | |
| | Jobsite Communications | | 9.00 | MO | | 200.00 | | 1,800 | 22,395 |
| | | | | | | | | - | 0.11 |
| 18200 | Miscellaneous G. C.'s & Safety | | | | | | | - | |
| | Miscellaneous Hauling | | 5.00 | MO | | | 400.00 | 2,000 | |
| | Job Signs | | 1 | EA | | 800.00 | 1,600.00 | 2,400 | |
| | Temporary Protection | | 1 | ls | | | 2,000.00 | 2,000 | |
| | Temporary Shoring | | | | | | | - | |
| | Ice, Cups & Water | | 40 | WK | 40.00 | 10.00 | | 2,000 | |
| | Protect Finish Work | | 1 | LS | 555.00 | 500.00 | | 1,055 | |
| | OSHA Handrails | | 2,200 | LF | 2.00 | 1.00 | 0.70 | 8,140 | |
| | Safety Supplies | | 9.00 | MO | | 200.00 | | 1,800 | |
| | First Aid Supplies | | 9.00 | MO | | 50.00 | | 450 | |
| | Security | | Excluded | | | | - | - | |
| | Site Fencing - Security | | Excluded | LF | | | 5.00 | - | |
| | Special Insurance | EXCLUDED | | | | | | - | 19,845 |
| | | | | | | | | - | 0.09 |
| 18210 | Winter Protection | EXCLUDED | - | | | | - | - | - |
| | | | | | | | | - | - |
| 18220 | Temporary Roads | w/earthwork | 1 | LS | | | 3,500.00 | 3,500 | 3,500 |
| | | | | | | | | - | 0.02 |
| 18240 | Performance Bond | EXCLUDED | | | | | | - | - |
| | | | | | | | | - | - |
| 18250 | Building Permit | | 211,000 | SF | | | 0.18 | 37,960 | 37,980 |
| | | | | | | | | - | 0.18 |
| 18255 | Builder's Risk Insurance | $.009/Hundred x Months + Soft Costs | 9 | MO | | | 1,650.00 | 14,850 | 14,850 |
| | | | | | | | | - | 0.07 |
| 18260 | Quality Control & Testing | BY KOLL | | | | | | - | |
| | Soils Testing Services | | | | | | | - | |
| | Concrete Testing Services | | | | | | | - | |
| | Asphalt Testing Services | | | | | | | - | |
| | Floor Flatness Testing | | | | | | | - | |
| | Steel Tests & Inspections | | | | | | | - | - |
| | | | | | | | | - | - |
| 18270 | Temporary Utilities | | | | | | | - | |
| | Telephone Setup & Connection | | 1 | LS | | | 1,000.00 | 1,000 | |
| | DSL Set Up | ALLOW | 1 | LS | | | 4,000.00 | 4,000 | |
| | Telephone | | 9.00 | MO | | | 600.00 | 5,400 | |
| | Temporary Electric Hookup | | 1 | LS | | | 2,500.00 | 2,500 | |
| | Temporary Electric | | 7.00 | MO | | | 750.00 | 5,250 | |
| | Permanent Electric | | 2.00 | MO | | | 4,000.00 | 6,000 | |
| | Temporary Water | | 9.00 | MO | | | 100.00 | 900 | |
| | Temporary Fire Protection | | 9.00 | MO | | | 75.00 | 675 | |
| | Temporary Toilets | | 9.00 | MO | | | 350.00 | 3,150 | 30,875 |
| | | | | | | | | - | 0.15 |

R.P. Appx. 266

6-30-05atlantaupdate

| CODE | DESCRIPTION | | | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|---|---|-----|-----|-------|----------|---------|-------|---|
| | | | GENERAL CONDITIONS TOTAL | | | | | | 420,825 | 420,825 |
| | | | | | | | | | | 2.00 |
| | **Division 2-EARTHWORK** | | | | | | | | - | |
| | | | | | | | | | - | |
| 02220 | Excavation and Backfill | | | | | | | - | - | |
| | Excavate Footings, Grade Beams, & Tie Beams | | | 60 | HR | 20.00 | | 70.00 | 5,400 | |
| | Pumping & Dewatering | | | 20 | HR | 20.00 | 10.00 | | 600 | |
| | Backfill Footings, Grade Beams, & Tie Beams | | See Div 2 | | | - | - | 6.25 | - | 6,000 |
| | | | | | | | | | - | 0.03 |
| 02370 | Drilled Piers | | | | LS | | | | - | |
| | Drilled piers | INCLUDED | | 119 | 91 EA | | | 2,950 | 268,450 | |
| | Drilling in Earth | | | | | | | | - | |
| | Drilling in Rock | | | | | | | | - | |
| | Auger Cast Piles | | | | | | | | - | |
| | Mobilization Charge | | | | | | | | - | |
| | Temporary Casing | | | | | | | | - | |
| | Layout of Piles | | | | | | | | - | |
| | Resteel in Piers | | | | | | | | - | 268,450 |
| | | | | | | | | | | 1.27 |
| | | | EARTHWORK TOTAL | | | | | | 274,450 | 274,450 |
| | | | | | | | | | | 1.30 |
| | **Division 3-CONCRETE** | | | | | | | | - | |
| | | | | | | | | | - | |
| 03210 | Reinforcing Steel | | | | | | | | - | |
| | Masonry | 0.4 #/SF x | #REF! | SF | | | | | | - | |
| | Pile Caps | 65 #/CY x | 74.0 | CY | | | | | | - | |
| | Exterior Pads | 60 #/CY x | #REF! | CY | | | | | | - | |
| | Cont. Footing | 65 #/CY x | 0.0 | CY | | | | | | - | |
| | Tie Beams | 65 #/CY x | 0.0 | CY | | | | | | - | |
| | Walls | 100 #/CY x | 3.0 | CY | | | | | | - | |
| | Grade Beams | 100 #/CY x | 1.0 | CY | | | | | | - | |
| | Miscellaneous Reinforcing | | | | | | | | - | |
| | | | Total | 50,000 | LBS | | | 0.60 | 30,000 | 30,000 |
| | | | | | | | | | - | 0.14 |
| 03300 | Cast-in-place Concrete | | | | | | | | - | |
| | Elevated beams  304 lf x 4 x 1.5 | | | 74 | CY | | | 950.00 | 70,300 | |
| | Continuous Perimeter Grade Beam | excluded w/piers | | - | LS | | | - | - | |
| | Premium to form elevated slab areas | w/flatwork | | - | Ls | | | - | - | |
| | Elevator Pits | | | 3 | EA | | | 6,000.00 | 18,000 | |
| | Install column isolation boxes | | | 1 | LS | | | 3,000.00 | 3,000 | |
| | Install cast-over @ diamonds & elevator pits | | | 1 | LS | | | 6,000.00 | 6,000 | |
| | Ducts below raised slab areas | | | 1 | EA | | | 3,500.00 | 3,500 | |
| | Slab Edge Forms & Column Blockouts | | | 1 | LS | | | 10,000.00 | 10,000 | 110,800 |
| | | | | | | | | | - | 0.52 |
| 03345 | Cement Flatwork | | | | | | | | - | |
| | 4 MUD SLAB | | | Excluded | | | | 2.50 | - | |
| | Concrete Fill Pan Stairs | | | 2,400 | SF | | | 6.00 | 14,400 | |
| | Rooftop Unit Sound Absorbing Slabs | | | 4,860 | SF | | | 5.00 | 24,300 | |
| | ## " Composite Office Slab On Mezzanine with mesh | | | 211,638 | SF | | | 3.00 | 634,914 | |
| | Vapor Barrier | | | - | | | | 0.14 | - | 704,970 |
| | Raised Slabs with Insulation (includes beam at expn joints) | | | 9,648 | sf | | | 3.25 | 31,356 | 3.33 |
| 03350 | Caulk Floor Joints w/ MM80 Sealer | | | - | | | | 1.90 | - | |
| 03355 | Concrete Sealer | | | - | | | | 0.09 | - | |
| 03346 | 4 " Granular Fill Under Slab | | | - | | | | 18.00 | - | |
| 03347 | W.W. Mesh - 6x6-10/10 | in above | | - | | | - | - | - | - |
| | | | | | | | | | - | - |
| 03400 | Architectural Concrete Wall Panels | | | | | | | | - | |
| | Tilt-up Panel Design | PART OF KOLL SCOPE | | | | | | | - | |
| | Casting beds for panels | | | 78,000 | SF | | | 1.65 | 128,700 | |
| | Loading dock area panels | | | 3,000 | SF | | | 7.00 | 21,000 | |
| | Joint chasing | | | 1 | LS | | | 7,500.00 | 7,500 | |
| | Perimeter Deadmen with removal | | | 272 | CY | | | 120.00 | 32,640 | |
| | Add for winter concrete | | | - | LS | | | 9,000.00 | - | |
| | Panel Erection w/ strongbacks | H&H STEEL | | | | | | | | |
| | Clayco Panel Supervision for Top Flight | | | | | | | | | |
| | Braces for tilt-up panels | | | included above | EA | | | 250.00 | - | |
| | 10 " Flat Slab TiltUp Panels @ Office | | | 72,000 | SF | | | 9.10 | 655,200 | 1,048,040 |

R.P. Appx. 267

6-30-05atlantaupdate

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|---|-----|-----|-------|----------|---------|-------|---|
| 3490 | GFRC Column Covers | | | | | | | | 4.95 |
| | Exterior Columns | | 2 | EA | | | 6,500.00 | 13,000 | |
| | | | | | | | | | 13,000 |
| | | | | | | | | - | 0.06 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | **CONCRETE TOTAL** | | | | | **1,906,810** | 1,906,810 |
| | | | | | | | | | 9.00 |
| | **Division 4-MASONRY** | | | | | | | - | |
| | | | | | | | | - | |
| 04210 | **Masonry** | | | | | | | - | |
| | Pilasters | | | | | | | - | |
| | Bond Beams | | | | | | | - | - |
| | | | | | | | | - | - |
| 04400 | **Stone or Granite** | | | | | | | - | - |
| | | | | | | | | - | - |
| | | | **MASONRY TOTAL** | | | | | - | - |
| | | | | | | | | | - |
| | **Division 5-METALS** | | | | | | | - | - |
| | | | | | | | | | |
| 05120 | **Structural Steel** | | | | | | | - | |
| | Structural Steel | | 1,520,000 | LBS | | 0.60 | | | |
| | Steel cantilever and column at 2 buik w/structural steel | | 2 | EA | | | 5,000.00 | | |
| | Less Galvanizing Roof Screen Steel | | 1 | Ls | | | (28,000.00) | | |
| | Roof screen framing | w/structural steel | - | LBS | | 0.85 | | | |
| | Mechanical Frames | w/structural steel | 8 | EA | | | 1,200.00 | | |
| | Dock Stair & Railing | | 1 | EA | | | 4,000.00 | | |
| | Pipe Bollards | | 5 | EA | 75.00 | 129.00 | 60.00 | | |
| | Stairs to Office | | 9 | EA | | | 8,900.00 | | |
| | Ships Ladder to Roof | | 1 | EA | | | 3,500.00 | | |
| | Misc. roof penetration framing | w/structural steel | - | Allow | | | 5,000.00 | | |
| | Misc. bracing & supports | | 20 | Tons | | | 1,800.00 | | |
| | Premium for lower level railing system at main stair | | - | LS | | | | | 1,040,520 |
| | Galvanizing Steel @ roof | | 1 | LS | | | 12,000.00 | | 4.92 |
| | | | | | | | | | |
| 05200 | **Miscellaneous for Tilt-Up** | | 1 | EA | | | 15,000.00 | | 15,000 |
| | | | | | | | | | 0.07 |
| 05210 | **Steel Joists** | | | | | | | | |
| | Roof Joists | 4.5#/SF | 65,000 | LB | | 0.55 | | | |
| | Truck Canopy Roof Joists | | - | | | 0.55 | | | |
| | Floor Joists | | - | | | | | | 35,750 |
| | | | | | | | | | 0.17 |
| 05300 | **Metal Decking** | | | | | | | | |
| | Roof Deck--1.5" | | 52,910 | SF | | 0.90 | | | |
| | Truck area canopy deck | | - | | | 0.90 | | | |
| | Floor Deck---3" | | 211,638 | SF | | 1.20 | | | 301,585 |
| | | | | | | | | | 1.43 |
| 05340 | **Structural Erection** | | | | | | | | |
| | Structural Steel & Joists | | 264,548 | SF | | | 1.75 | | |
| | Stair erection | w/structural steel | - | ea | | | | | |
| | Floor and Roof Deck | w/structural steel | - | | | | | | |
| | Div 5 Discount | w/structural steel | 1 | LS | | | (30,000.00) | | |
| | Tilt-Up erection | see div 3 | | SF | | | | | |
| | Braces for Tilt-Up panels | 6 per panel | 164 | LS | | | - | | 432,959 |
| | | | | | | | | | 2.05 |
| 05580 | **Sheet Metal Fabrications** | | | | | | | | |
| | Front entry high alucobond w/ framing (CMP-1) | | See Div 7 | SF | | | 22.75 | | |
| | Metal panel cladding - 10' per lf (MP-2) | | See Div 7 | | | | 12.25 | | |
| | Metal panel cladding - 9.2' per lf (MP-1) | | See Div 7 | | | | 12.25 | | |
| | Louver | | 1 | LS | | | 4,000.00 | | |
| | Roof gates | | 2 | LS | | | 350.00 | | |
| | Flashings & sheetmetal | | See Div 7 | LS | | | 32,000.00 | | |
| | Vents | | 10 | LS | | | 90.00 | | |
| | Adjustment for alternate manufacturer | | - | LS | | | | | |
| | Roof screen Steel | | 950 | Lf | | | 63.00 | | 65,450 |
| | | | | | | | | - | 0.31 |
| | | | **METALS TOTAL** | | | | | **1,891,264** | 1,891,264 |
| | | | | | | | | | 8.95 |

R.P. Appx. 268

6-30-05atlantaupdate

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|---|-----|-----|-------|----------|---------|-------|---|
| | **Division 6-WOOD AND FINISHES** | | | | | | | - | |
| | | | | | | | | - | |
| 06100 | **Rough Carpentry** | | | | | | | - | |
| | Treated Wood Blocking | | 1,226 | LF | 4.00 | 1.00 | | 6,130 | |
| | Expansion Joint Blocking | | 240 | LF | 4.00 | 1.00 | | 1,200 | |
| | Misc. wood blocking | | 400 | LF | 4.00 | 1.00 | | 2,000 | |
| | Fire Treated plywood at CW intersection | | 340 | LF | | | 11.00 | 3,740 | |
| | Window Sill Blocking | | 2,470 | LF | 2.05 | 1.00 | | 7,534 | |
| | Plywood At Parapet | | | | | | | - | |
| | Soffit Overhang Framing @ Entry | | 400 | SF | 3.00 | 2.00 | | 2,000 | 22,604 |
| | **Finish Carpentry** | | | | | | | - | 0.11 |
| | Cabinets @ Kitchen Area | | | | | | | - | |
| | Vanities @ Restrooms | MW2 | 144 | LF | 105.00 | 190.00 | | 42,480 | |
| | Window Sills | | 2,470 | LF | 5.00 | 8.60 | | 33,592 | |
| | Trim at main lobby/1st floor public area | ALLOWANCE | 1 | LS | | | 17,500.00 | 17,500 | |
| | Trim @ elevator Lobby | ALLOWANCE | 3 | EA | | | 5,000.00 | 15,000 | 108,572 |
| | | | | | | | | - | 0.51 |
| | **WOOD AND FINISHES  TOTAL** | | | | | | | **131,176** | 131,176 |
| | | | | | | | | | 0.62 |
| | **Division 7-THERMAL AND MOISTURE PROTECTION** | | | | | | | - | |
| | | | | | | | | - | |
| 07100 | **Waterproofing —elevator pits** | | 2 | ea | | | 3,500.00 | 7,000 | 7,000 |
| | | | | | | | | - | 0.03 |
| 07200 | **Insulation** | | | | | | | - | |
| | Foundation Insulation | | 2,452 | SF | 0.40 | 0.50 | | 2,207 | |
| | Insulation at CW Glass | | 630 | SF | | | 3.00 | 1,890 | 4,097 |
| | | | | | | | | - | 0.02 |
| 07300 | **Spray-On Fireproofing** at stairwells (9 locations) | | 1 | LS | | 4,500.00 | 12,500.00 | 17,000 | 17,000 |
| | | | | | | | | - | 0.08 |
| 07500 | **Roofing** | | | | | | | - | |
| | TPO Roofing w/R= 20 Insulation | | 52,910 | SF | | | 4.00 | 211,640 | |
| | Roofing Memberane W/out Insulation | | - | SF | | | 0.80 | - | |
| | 15 Year Extended Warranty excluded | | | | | | | | |
| | Walkway pads | | 2,100 | SF | | | 1.00 | 2,100 | |
| | Ballast Roofing at Lobby Area | | 290 | SF | | | 15.00 | 4,350 | |
| | Attic Vents | | 53 | ea | | | 50.00 | 2,650 | 225,540 |
| | Mech Unit Flashings | | 6 | ea | | | 800.00 | 4,800 | 1.07 |
| 07600 | **Flashing and Sheet Metal** | | | | | | | - | |
| | Decorative railing at 2 level atrium | | 32 | LF | | | 425.00 | 13,600 | |
| | Alucobond eye brow | | 11,600 | sf | | | 17.00 | 197,200 | |
| | Alucobond soffit @ entries | | 860 | sf | | | 23.00 | 19,780 | |
| | Metal Panel Cladding 10' per LF (MP2) | | 2,870 | sf | | | - | - | |
| | Roof Screen Morins X-12 | | 13,250 | sf | | | 11.00 | 145,750 | |
| | Cap Flashing / Gravel Stop | | 1,226 | LF | | | 8.00 | 9,808 | |
| | 22 g closer plate | | 510 | LF | | | 9.00 | 4,590 | |
| | CounterFlashings | | 716 | LF | 2.20 | | 8.00 | 7,303 | 411,531 |
| | Stainless Steel Railing at entry | | 30 | LF | | 450.00 | | 13,500 | 1.94 |
| 07700 | **Skylights & Roof Hatch** | | | | | | | - | |
| | Skylight | | 1 | EA | | | 4,500.00 | 4,500 | |
| | Roof Hatch | | 1 | EA | | | 1,000.00 | 1,000 | 5,500 |
| | | | | | | | | - | 0.03 |
| 07920 | **Sealants and Caulking** | | | | | | | - | |
| | Misc interior caulking | | 2,000 | LF | | | 2.00 | 4,000 | |
| | TiltUp  Walls - Outside Joints | | 72,000 | SF | | | 0.18 | 12,960 | |
| | TiltUp  Walls - Inside Joints | | 52,502 | SF | | | 0.15 | 7,875 | 24,835 |
| | | | | | | | | - | 0.12 |
| | **THERMAL & MOISTURE  TOTAL** | | | | | | | **695,503** | 695,503 |
| | | | | | | | | | 3.21 |
| | **Division 8-DOORS AND WINDOWS** | | | | | | | - | |
| | | | | | | | | - | |
| 08200 | Doors,Frames,and Hardware—discount | | 1 | Ls | | - | (8,500.00) | (8,500) | |
| | Hollow Metal Door Frames - Single | | - | | | | | - | |
| | Hollow Metal Door Frames - Double | | - | | | | | - | |
| | Aluminum Door Frames(includes 3 doubles) | | 100 | EA | 180.00 | 75.00 | 5.00 | 26,000 | |
| | Bathroom Louver doors | | 40 | EA | | | 800.00 | 32,000 | |
| | Solid Core Wood Doors | | 60 | EA | 280.00 | 75.00 | 5.00 | 21,600 | |

6-30-05atlantaupdate

R.P. Appx. 269

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total | |
|---|---|---|---|---|---|---|---|---|
| | HM doors | 3 | EA | 200.00 | 50.00 | 5.00 | 765 | |
| | Exterior Hollow Metal Door with frame & hardware | 1 | EA | | | 1,200.00 | 1,200 | |
| | A.D.A. Hardware | 100 | EA | 150.00 | 95.00 | 5.00 | 25,000 | |
| | Panic Devices / Automatic Closers | 12 | EA | - | - | 300.00 | 3,600 | 101,665 |
| | | | | | | | - | 0.48 |
| 08300 | Overhead Doors & Operators | | | | | | - | |
| | Dock / Rail Doors          9 ' X          10 ' | 1 | EA | | | 4,000.00 | 4,000 | |
| | Drive-in & Garage          12 ' X          14 ' | | | | | 1,400.00 | - | |
| | Electric Operator | 1 | EA | | | 550.00 | 550 | |
| | Overhead Coiling Doors @ main entry stair/lower level | - | | | | 4,500.00 | - | 4,550 |
| | | | | | | | - | 0.02 |
| 08800 | Glazing (based on National Agreement pricing)          PALS | | | | | | - | |
| | Aluminum Curtainwall (Vistawall) | 7,580 | sf | | | 42.00 | 318,360 | |
| | Glass & Glazing (Viracon) | 29,300 | sf | | | 26.50 | 776,450 | |
| | Revolving door | 1 | EA | | | 28,000.00 | 28,000 | |
| | Secondary Sealant          Excluded | | | | | | - | |
| | Aluminum Doors | 8 | EA | | | 1,950.00 | 15,600 | |
| | Mirrors @ Restrooms | 16 | EA | | | 500.00 | 8,000 | 1,158,560 |
| | Interior Glass--tempered only | 675 | SF | | | 18.00 | 12,150 | 5.47 |
| | **DOORS AND WINDOWS TOTAL** | | | | | 1,264,775 | 1,264,775 | |
| | | | | | | | | 5.98 |
| | **Division 9-FINISHES** | | | | | | - | |
| | | | | | | | - | |
| | | | | | | | - | |
| 09200 | Framing and Drywall | - | | | | - | - | |
| | Perimeter stud/insulation/vapor barrier/DRYWALL | 47,840 | SF | | | 4.40 | 210,496 | |
| | Perimeter insulation above ceiling | 14,352 | SF | | | 2.35 | 33,727 | |
| | Drywall ceiling at 2nd & 3rd level elevator lobby w/decorative s | | SF | | | 6.00 | - | |
| | drywall ceiling at 1st level main lobby--some coffers | | SF | | | 7.00 | - | |
| | Framing at 2 entries for vertical feature | 560 | SF | | | 7.00 | 3,920 | |
| | Framing for eyebrows | 11,920 | SF | | | 5.00 | 59,600 | |
| | 1st level corridor/lobby area--1 hour to deck | - | SF | | | 4.50 | - | |
| | Interior Wall Totals | | SF | | | 4.50 | - | |
| | Elevator room/Elec/Tech rooms | 5,960 | SF | | | 5.00 | 29,800 | |
| | Partitions at staging/fire room | - | SF | | | 6.00 | - | |
| | Mechanical shafts/elevator & stair shafts--1 hr | 26,800 | SF | | | 5.00 | 134,000 | |
| | Toilet Room Partition Walls | 16,000 | SF | | | 4.50 | 72,000 | |
| | Drywall columns | | SF | | | 4.50 | - | |
| | First Floor Lobby walls | 2,520 | SF | | | 5.00 | 12,600 | |
| | Gyp enclosure below stair | 135 | SF | | | 5.00 | 675 | |
| | Elevator Shaft Wall          sea above | - | | | | 4.75 | - | |
| | Drywall Ceiling Taped @ bathrooms--includeds vestibules | 5,340 | SF | | | 5.00 | 26,700 | |
| | Front Lobby bulkhead--radiused | 213 | SF | | | 10.00 | 2,130 | |
| | Lobby drywall ceilings 1-4 | 3,285 | SF | | | 6.00 | 19,710 | |
| | Stair 2 drywall soffits & fascias | 1,500 | SF | | | 5.50 | 8,250 | |
| | Premium for skylight framing & Drywall | 1 | LS | | | 1,500.00 | 1,500 | |
| | Soffit outside of main stair | 385 | sf | | | 5.00 | 1,925 | |
| | Expansion Joint materials--at floor level only, ceiling with TI | 294 | LF | | | 27.00 | 7,938 | |
| | Fascia/misc bulkheads | 150 | lf | | | 18.00 | 2,700 | |
| | Entry Soffit Taped | 600 | SF | | | 5.00 | 3,000 | |
| | Partially enclosed soffit @ truck dock area--studs/board/plaster | 1,375 | SF | | | 6.00 | 8,250 | |
| | Misc. Framing for sheet metal | 4,500 | SF | | | 6.00 | 27,000 | |
| | Framing for GFRC columns | 2 | EA | | | 1,400.00 | 2,800 | |
| | | | | | | | - | 668,721 |
| | | | | | | | - | 3.18 |
| 09250 | Lath & Plaster | | | | | | - | |
| | DryVit | | | | | | - | - |
| 9402 | Epoxy Terrrazzo | | | | | | | |
| | Lobby and Stair #2 Landings | 2,716 | SF | | | 14.00 | 38,024 | |
| | | | | | | | | 38,024 |
| 09500 | Ceiling | | | | | | - | 0.18 |
| | 2' x 2' @ Lobby Areas--METAL | 1,850 | SF | | | 15.25 | 28,213 | |
| | Standard 2' x 2'    second look--FURNISH ONLY | - | | | | | - | |
| | | - | | | | | - | |
| | Batt Laid Insulation Over Restrooms | - | | | | 0.65 | - | 28,213 |
| | | | | | | | - | 0.13 |
| 09650 | Ceramic Tile | | | | | | - | |
| | Ceramic tile in lobbies in lieu of terrazzo          Included as Terrazzo | - | | | | | - | |

R.P. Appx. 270

6-30-05atlantaupdate

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|---|-----|-----|-------|----------|---------|-------|---|
| | Ceramic Wall Tile @ Bathrooms | | 1,950 | SF | | | 14.00 | 27,300 | |
| | Ceramic Floor Tile @ Bathrooms | | 3,408 | SF | | | 12.00 | 40,896 | |
| | Porcelain tile at 1st floor main lobby areas with base | | - | sf | | | | - | |
| | Porcelain tile boarder at 2 lower level entry at perimeter of pedimat | | - | sf | | | | - | |
| | Porcelain tile boarder 2nd and 3rd fl elevator lobby areas | | - | sf | | | | - | 79,416 |
| | Pordelain Tile base at 2nd & 3rd fl elevator lobby areas | | 1,020 | LF | | | 11.00 | 11,220 | 0.38 |
| 09680 | Carpet & Resilient Flooring | IN FINISH ALLOW. | | | | | | - | |
| | Carpet @ elevator lobbies | | 200 | SY | | | 32.00 | 6,400 | |
| | Stair Carpet--main stair only | | - | | | | | - | |
| | VCT | | 1,900 | SF | | | 2.00 | 3,800 | |
| | Vinyl Base       B1&2 | | 4,536 | LF | | | 1.25 | 5,670 | 15,870 |
| | Vinyl flooring at 2 perimeter stairs | excluded | | | | | | - | 0.07 |
| 09900 | Painting | | | | | | | - | |
| | Exterior TiltUp Concrete Panels | | 68,000 | SF | | | 0.45 | 30,600 | |
| | Drywall---no painting the core areas | | 50,000 | SF | | | 0.35 | 17,500 | |
| | Plaster Soffits | | 600 | SF | | | 1.00 | 600 | |
| | Epoxy Floor at pump room | | 320 | SF | | | 3.00 | 960 | |
| | Stairs @ Loading Dock | | 1 | EA | | | 1,000.00 | 1,000 | |
| | Man Doors | | 45 | EA | | | 75.00 | 3,375 | |
| | Overhead Doors | | 1 | EA | | | 300.00 | 300 | |
| | Stairways | | 9 | FLIGHTS | | | 1,200.00 | 10,800 | 74,635 |
| | Paint Exterior Steel @ Roof Screen | | 1 | LS | | | 9,500.00 | 9,500 | 0.35 |
| 09950 | Wall Covering & Zolotone Allowance | | | | | | | - | |
| | Vinyl Wall Cover @ Restrooms (w-2) | | 7,200 | SF | | | 1.50 | 10,800 | |
| | Vinyl Wall Cover Lobby Areas (W-1) | | 3,932 | SF | | | 1.50 | 5,898 | |
| | | | | | | | | | 16,698 |
| | | | | | | | | | 0.08 |
| 9970 | Special Wall Surfaces (FRP) | | | | | | | | |
| | FRP | | 300 | SF | | | 5.00 | 1,500 | 1,500 |
| | | | | | | | | | |
| | | | | | | | | - | 0.01 |
| | FINISHES TOTAL | | | | | | | 923,077 | 923,077 |
| | | | | | | | | | 4.36 |

### Division 10-SPECIALTIES

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|---|-----|-----|-------|----------|---------|-------|---|
| | | | | | | | | - | |
| 10150 | Toilet Partitions and Acces. | | | | | | | - | |
| | Ceiling Mounted Painted Steel Partitions | | | | | | | - | |
| | Floor Mounted Painted Partitions | | - | | | | 600.00 | - | |
| | Wall Mounted Painted Metal Urinal Screens | | - | | | | 360.00 | - | |
| | Wall Mounted Stainless Urinal Screens | | | | | | | - | |
| | Toilet Room Accessories | | 12 | RMS | 560.00 | 985.00 | | 18,540 | 18,540 |
| | | | | | | | | - | 0.09 |
| 10550 | Metal Lockers | | | | | | | - | |
| | Full Lockers | | | | | | | - | |
| | Locker Room Benches | | | | | | | - | - |
| | | | | | | | | - | - |
| 10600 | Miscellaneous Specialties | | | | | | | - | |
| | Entry Mats | | 480 | SF | | | 25.00 | 12,000 | |
| | Fire Extinguisher Cabinets | | 10 | EA | 35.00 | 120.00 | | 1,550 | |
| | Wall Expansion Joints @ Interior | | 320 | LF | | | 6.00 | 1,920 | |
| | Floor Expansion Joints | | 460 | LF | | | 18.00 | 8,280 | |
| | Handicap Parking Signs | | 22 | EA | 80.00 | 60.00 | | 3,080 | 28,230 |
| | Exterior Expansion Joint (EJ1) | | 140 | LF | | | 10.00 | 1,400 | 0.13 |
| 10610 | Appliances | | | | | | | - | - |
| | | | | | | | | - | - |
| 10900 | Interior Signage & Directories | | | | | | | - | |
| | Building Directory | Excluded | | ALL | | | | - | |
| | Interior Signage Allowance | Excluded | | ALL | | | | - | - |
| | | | | | | | | - | - |
| 10950 | Exterior Signage Allowance | Excluded | | ALL | | | | - | - |
| | | | | | | | | - | - |
| | SPECIALTIES TOTAL | | | | | | | 46,770 | 46,770 |
| | | | | | | | | | 0.22 |

### Division 11-EQUIPMENT

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|-----|-----|-------|----------|---------|-------|---|
| | | | | | | | - | |
| 11161 | Dock Equipment | | LS | | | | - | |
| | Dock Bumpers | | - | | | | - | |

6-30-05atlantaupdate

R.P. Appx. 271

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|---|-----|-----|-------|----------|---------|-------|---|
| 11160 | Mechanical Dock Levelers - 35,000# Capacity | | 1 | LS | | | 2,045.00 | 2,045 | |
| 11161 | Dock Levelers - Self Leveling Pans | | | | | | | - | |
| 11162 | Dock Levelers - Form Pits | | - | | | | | | |
| 11163 | Dock Levelers - Dock Pit Angle | | - | | | | | - | |
| 11164 | Dock Locks | | - | | | | | - | |
| 11165 | Dock Seals | | - | | | | 650.00 | - | |
| 11166 | Dock Shelters | | | | | | | - | |
| 11167 | Dock Lights | | 1 | Ls | | | 300.00 | 300 | 2,345 |
| | | | | | | | | - | 0.01 |
| | **EQUIPMENT TOTAL** | | | | | | | **2,345** | 2,345 |
| | | | | | | | | | 0.01 |
| | **Division 12-FURNISHINGS** | | | | | | | - | |
| | | | | | | | | - | |
| 12510 | Horizontal Blinds - 1" | | 28,000 | SF | | | 2.10 | 58,800 | 58,800 |
| | | | | | | | | - | 0.28 |
| | **FURNISHINGS TOTAL** | | | | | | | **58,800** | 58,800 |
| | | | | | | | | | 0.28 |
| | **Division 13-SPECIAL CONSTRUCTION** | | | | | | | - | |
| | | | | | | | | - | |
| 13320 | Access Flooring | | | | | | | - | |
| | 14" Access Flooring--stockpile on floors, tech rooms installed | | 191,000 | SF | | | 3.77 | 720,070 | |
| | Computer Access Flooring - Ramp Grade Change | | | | | | | - | 720,070 |
| | | | | | | | | | 3.40 |
| | **SPECIAL CONSTRUCTION TOTAL** | | | | | | | **720,070** | 720,070 |
| | | | | | | | | | 3.40 |
| | **Division 14-CONVEYING SYSTEMS** | | | | | | | - | |
| | | | | | | | | - | |
| 14200 | Elevators | | | | | | | - | |
| | Hydraulic | | 3 | EA | | | 64,500.00 | 193,500 | |
| | Traction | | | | | | | - | |
| | Finish cab for flooring/1 wall panel | | 3 | EA | | | 3,500.00 | 10,500 | 204,000 |
| | | | | | | | | - | 0.96 |
| | **CONVEYING SYSTEMS TOTAL** | | | | | | | **204,000** | 204,000 |
| | | | | | | | | | 0.96 |
| | **Division 15-MECHANICAL** | | | | | | | - | |
| | | | | | | | | - | |
| 15300 | Fire Protection | | 211,638 | SF | | | 0.82 | 173,543 | |
| | Glass protection at 4 levels | | 30 | heads | | | 465.00 | 13,950 | |
| | Standpipe system | | 3 | Ea | | | 4,000.00 | 12,000 | |
| | Dry pipe system @ dock soffit area | | - | sf | | | 2.00 | - | |
| | Compressor for dry pipe system | | - | LS | | | 1,500.00 | - | 199,493 |
| | | | | | | | | - | 0.94 |
| 15310 | Booster Pumps--75 hp | | 1 | EA | | | 35,000.00 | 35,000 | |
| | In-Rack Sprinklers | | | | | | | - | 35,000 |
| | | | | | | | | - | 0.17 |
| 15400 | Plumbing--discount | | 1 | LS | | | (6,000.00) | (6,000) | |
| | Water Closet Fixtures (low usage) | | 34 | EA | | | 1,300.00 | 44,200 | |
| | Handicapped Water Closet Fixtures (low usage) | | 6 | EA | | | 1,300.00 | 7,800 | |
| | Urinals (low usage) | | 8 | EA | | | 800.00 | 6,400 | |
| | Drinking Fountains | | 8 | EA | | | 2,200.00 | 17,600 | |
| | Domestic Water in Building-includes 2 extra wet stacks | | 920 | LF | | | 25.00 | 23,000 | |
| | Sewer Line in Building--includes 2 extra wet stacks | | 920 | LF | | | 30.00 | 27,600 | |
| | Hose Bibbs | | 6 | EA | | | 270.00 | 1,620 | |
| | Interior Downspout Piping | | 1,800 | LF | | | 35.00 | 56,000 | |
| | Interior Downspout Roof Drains | | 16 | EA | | | 4,500.00 | 72,000 | |
| | Sinks or Rough-ins | | 32 | EA | | | 820.00 | 26,240 | |
| | Emergency Overflow Drains | | 16 | EA | | | 3,200.00 | 51,200 | |
| | Oilminder for elevator | | 1 | EA | | | 4,500.00 | 4,500 | |
| | Mop basins | | 8 | EA | | | 2,500.00 | 20,000 | |
| | Floor Drains | | 15 | EA | | | 700.00 | 10,500 | |
| | Grease / Oil Interceptor for Garage | | | | | | | - | |
| | Trench Drains | | | | | | | - | |
| | Hot Water Heaters | | 8 | EA | | | 1,600.00 | 12,800 | 375,460 |
| | | | | | | | | - | 1.77 |
| 15500 | HVAC | | | | | | | - | |
| | Trane rooftop units | Furnish only | 211,638 | SF | | | 5.96 | 1,261,362 | |
| | Nailor - underfloor HVAC | Furnish only | 1 | LS | | | | - | |

6-30-05atlantaupdate

R.P. Appx. 272

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|---|---|---|---|---|---|---|---|---|---|
| | HVAC core & shell | Excludes restrooms & lobby's | 1 | LS | | | | - | |
| | HVAC - restrooms & lobbies | | 1 | LS | | | | - | |
| | Prof. Liab. Insurance | | 1 | LS | | | | - | |
| | Control system | w/HVAC | | | | | | - | |
| | Compressed Air Piping | Excluded | | | | | | - | 1,261,362 |
| | | | | | | | | - | 5.96 |
| | | MECHANICAL TOTAL | | | | | 1,871,315 | 1,871,315 | |
| | | | | | | | | | 8.84 |

## Division 16-ELECTRICAL

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|---|---|---|---|---|---|---|---|---|---|
| 16050 | Electrical | | | | | | | | |
| | Main Building Service | | 4,000 | AMP | | | 61.00 | 244,000 | |
| | Service Feeder | | 150 | LF | | | 300.00 | 45,000 | |
| | Panel Boards for lighting | | 8 | EA | | | 3,000.00 | 24,000 | |
| | Panel boards for heating | | 3 | EA | | | 3,000.00 | 9,000 | |
| | Panel boards for receptacles | | 8 | EA | | | 3,000.00 | 24,000 | |
| | Panel for HVAC RTU (feeds to 4 RTU) | | 2,000 | amp | | | 25.00 | 50,000 | |
| | Transformer | | 8 | EA | | | 8,000.00 | 64,000 | |
| | Branch Circuits, raceways, supports | | 1 | LS | | | 6,000.00 | 6,000 | |
| | Can lighting for main lobby and elevator lobby | | 80 | EA | | | 225.00 | 18,000 | |
| | Fire pump hookup | | - | LS | | | 35,000.00 | - | |
| | Back of house ligl 2 x 4 Parabolics | | 118 | EA | | | 300.00 | 35,400 | |
| | Stairwell light fixtures | | 28 | EA | | | 300.00 | 8,400 | |
| | Stairwell light fixtures--main stair | | 14 | EA | | | 550.00 | 7,700 | |
| | Exit Fixtures | | 60 | EA | | | 270.00 | 16,200 | |
| | Restroom Downlights | | 72 | EA | | | 375.00 | 27,000 | |
| | Other Downlights | | 80 | EA | | | 375.00 | 30,000 | |
| | Strip lights | | 27 | EA | | | 530.00 | 14,310 | |
| | 250 W Metal Halide Exterior Flood Lights | | 8 | EA | | | 980.00 | 7,840 | |
| | Wall Sconces | | 66 | EA | | | 800.00 | 52,800 | |
| | Ground Fault Receptacle | | 12 | EA | | | 180.00 | 2,160 | |
| | Duplex recep for Water Cooler | | 6 | EA | | | 125.00 | 750 | |
| | Duplex for telephone | | 6 | EA | | | 200.00 | 1,200 | |
| | Four " PVC thru floors | | - | LS | | | 2,000.00 | - | |
| | Miscellaneous Outlets | | 60 | EA | | | 250.00 | 15,000 | |
| | Elevator Hookup | | 2 | EA | | | 5,000.00 | 10,000 | |
| | HVAC Hookup | | 4 | EA | | | 7,000.00 | 28,000 | |
| | Power to ERU units | | - | EA | | | 2,000.00 | - | |
| | Misc. HVAC | | 6 | EA | | | 750.00 | 4,500 | |
| | Sprinkler Hookup | | 1 | LS | | | 12,000.00 | 12,000 | |
| | Fire Alarm System | | 1 | LS | | | 75,000.00 | 75,000 | |
| | Telephone Board | | 7 | EA | 91.71 | 50.00 | | 992 | |
| | Security / Card Access System - EXCLUDED | | - | ALL | | | | - | |
| | Value engineering required to get to budget | | - | ALL | | | | - | |
| | Temporary Electric | | 1 | EA | | | 10,000.00 | 10,000 | 843,252 |
| | | | | | | | | - | 3.98 |
| 16100 | Site Lighting & Building Accent Lighting | | | | | | | - | |
| | Bid based upon 10/21 Drawings--this bid does anticipate about $50k VE savings (conductor & gear) with about $40k smoke damper Add | | | | | | | - | |
| | Ground mounted flood lighting | | - | EA | | | | - | |
| | Light Bollards, building accent well lights, specialty exter. Light ALLOWANCE | | 1 | LS | | | 15,000.00 | 15,000 | |
| | Fountain Lighting / Power | Excluded | - | EA | | | | - | |
| | Concrete bases for new sidewalk lighting | Excluded | - | Fixtures | | | | - | |
| | Added lighting along new sidewalk | Excluded | - | Fixtures | | | | - | |
| | Concrete Bases for Lights Bollards | ALLOWANCE | 32 | EA | | | 360.00 | 11,520 | |
| | Pole Lights @ Parking Lot | ALLOWANCE | 32 | EA | | | 3,200.00 | 102,400 | |
| | Wall Paks For Dock & Side Walls | | 5 | EA | | | 450.00 | 2,250 | 131,164 |
| | | | | | | | | - | 0.62 |
| | | ELECTRICAL TOTAL | | | | | 974,422 | 974,416 | |
| | | | | | | | | | 4.60 |
| | SUBTOTAL BUILDING SHELL COSTS | | | | | | 11,385,602 | 11,385,601 | |
| | | | | | | | | | 53.73 |

| | DIVISION 17 - MISCELLANEOUS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | COMMISSIONS | | | | | | | - | |
| | CONTINGENCY | | | | | | | - | |
| | INSURANCE | | 0.500% | % | | | | 56,928.01 | |
| | OVERHEAD AND PROFIT | | 4.00% | | | | | 457,701 | |

R.P. Appx. 273

6-30-05atlantaupdate

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|-----|-----|-------|----------|---------|-------|---|
| | TOTAL BUILDING SHELL COSTS | 211,638 | SF | 56.23 | | | 11,900,231 | |

## 3. TENANT FINISH ALLOWANCE

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|-----|-----|-------|----------|---------|-------|---|
| 06200 | Finish Carpentry Allowance | | | | | | - | |
| | LEED REQUIRED ISSUES--ALLOWANCE | 1 | LS | | | 20,000.00 | 20,000 | |
| | Sliding Closet Bi-Fold Doors | | | | | | - | |
| | Additional Shelving & Worktops | | | | | | - | 20,000 |
| | | | | | | | - | 0.09 |
| 08200 | Hollow Metal Doors & Frames | | | | | | - | |
| | Solid Core Wood Doors | | | | | | - | |
| | Lever Style Hardware | | | | | | - | |
| | Automatic Closers | | | | | | - | - |
| | | | | | | | - | - |
| 08800 | Glazing | | | | | | - | |
| | Interior Glass Doors | | | | | | - | |
| | Interior Glass Borrowlites in H.M. | | | | | | - | |
| | Mirrors | | | | | | - | - |
| | | | | | | | - | - |
| 09200 | Framing and Drywall | | | | | | - | |
| | Furred Columns Taped | | | | | | - | |
| | Taping | | | | | | - | - |
| | | | | | | | - | - |
| 09300 | Ceramic Tile | | | | | | - | |
| | Floors of Kitchen | | | | | | - | |
| | Wet Walls of Office Restrooms | | | | | | - | |
| | Quarry Tile @ Lobby | | | | | | - | - |
| | | | | | | | - | - |
| 09500 | Install Acoustical Tiles | | | | | | - | |
| | Std. 2 X 4        Second Look II System | | | | | | - | |
| | Install Pads | | | | | | - | |
| | Batt Laid Insulation | | | | | | - | - |
| | | | | | | | - | - |
| 09650 | Resilient Flooring | | | | | | - | |
| | Vinyl Base | | | | | | - | |
| | Vinyl Tile | | | | | | - | - |
| | | | | | | | - | - |
| 09680 | Carpet Allowance | | | | | | - | |
| | Office & Common Areas | | | | | | - | |
| | Stair Treads | | | | | | - | - |
| | | | | | | | - | - |
| 09900 | Painting | | | | | | - | |
| | VWC Allowance | | | | | | - | |
| | Paint New Doors & Frames | | | | | | - | - |
| | | | | | | | - | - |
| 10150 | Computer Flooring | | | | | | - | |
| | Computer Floor | | | | | | - | |
| | Ramp | | | | | | - | - |
| | | | | | | | - | - |
| 10990 | Miscellaneous Specialties | | | | | | - | |
| | Lockers | | | | | | - | |
| | Locker Room Benches | | | | | | - | - |
| | | | | | | | - | - |
| 12510 | Window Blinds or Drapes | | | | | | - | - |
| | | | | | | | - | - |
| 15300 | Fire Protection | | | | | | - | |
| | Office Sprinklers | | | | | | - | |
| | Recessed Heads | | | | | | - | |
| | Concealed Heads | | | | | | - | - |
| | | | | | | | - | - |
| 15400 | Plumbing | | | | | | - | |
| | Coffee Bar Areas | | | | | | - | |
| | Sinks or Rough-ins | | | | | | - | |

R.P. Appx. 274

6-30-05atlantaupdate

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | | |
|------|-------------|--|-----|-----|-------|----------|---------|-------|--|--|
| | Shower Doors | | | | | | | - | | - |
| | | | | | | | | - | | - |
| 15500 | HVAC | | | | | | | - | | |
| | Added VAV Boxes and Slot Diffusers | | | | | | | - | | |
| | Exhaust Fans @ Rest Room & Break Room | | | | | | | - | | |
| | Extended Warranty | | | | | | | - | | - |
| | | | | | | | | - | | - |
| 16050 | Electrical | | | | | | | - | | |
| | Distribution | | | | | | | - | | |
| | Plumbing Hookup | | | | | | | - | | |
| | Cable Tray System | | | | | | | - | | - |
| | | | | | | | | - | | - |
| 16150 | Security / Fire Alarm Systems Allowance | | | | | | | - | | |
| | Security System | | | | | | | - | | |
| | Fire Alarm System | | | | | | | - | | - |
| | | | | | | | | - | | - |
| 18001 | Space Planning & Design | | | | | | | - | | - |
| | | | | | | | | - | | - |
| | **SUBTOTAL TENANT FINISH COSTS** | | | | | | | **20,000** | | 20,000 |
| | | | | | | | | | | 0.09 |
| | DIVISION 17 - MISCELLANEOUS | | | | | | | | | |
| | INSURANCE | | 0.50% | % | | | | 100.00 | | |
| | OVERHEAD AND PROFIT | | 4.00% | | | | | 804 | | |
| | **TOTAL TENANT FINISH COSTS** | | 211,638 | SF | 0.10 | | | **20,904** | | |

## 4. ARCHITECTURAL & ENGINEERING SERVICES

| CODE | DESCRIPTION | | QTY | U/M | Labor | Material | Sub Con | Total | |
|------|-------------|--|-----|-----|-------|----------|---------|-------|--|
| | Preliminary Fees | | 1 | LS | | | - | - | - |
| | | | | | | | | | - |
| | Architectural Services | | 1 | LS | | | 340,000 | 340,000 | |
| | Interior Services / Space Planning | Part of TI | | | | | | - | |
| | Reimbursables | | 1 | LS | | | 25,950 | 25,950 | 365,950 |
| | | | | | | | | - | 1.73 |
| | Building Envelope | | 1 | LS | | | 3,500 | 3,500 | 3,500 |
| | | | | | | | | - | 0.02 |
| | Code Review | | 1 | LS | | | 3,000 | 3,000 | 3,000 |
| | | | | | | | | - | 0.01 |
| | Energy modeling | | | | | | 5,000 | - | - |
| | | | | | | | | - | - |
| | LEED certification | BY KOLL | | | | | - | - | - |
| | | | | | | | | - | - |
| | Structural Services | | 1 | LS | | | 110,000 | 110,000 | 110,000 |
| | | | | | | | | - | 0.52 |
| | MEP Services | | 1 | LS | | | 102,000 | 102,000 | 102,000 |
| | | | | | | | | - | 0.48 |
| | Plumbing Services | | | | | | w/HVAC | - | - |
| | | | | | | | | - | - |
| | Lighting Design | | 1 | LS | | | - | - | - |
| | | | | | | | | - | - |
| | Sprinkler Services | | | | | | w/HVAC | - | - |
| | | | | | | | | - | - |
| | Civil Services | | 1 | LS | | | 33,000 | 33,000 | |
| | Topographic Survey | BY KOLL | | | | | | - | |
| | Foundation Spot | BY KOLL | | | | | | - | |
| | As Built Survey | BY KOLL | | | | | | - | |
| | Site Staking | w/GC's | | | | | - | - | 33,000 |
| | | | | | | | | - | 0.16 |
| | Landscaping | | 1 | LS | | | 25,000 | 25,000 | 25,000 |
| | | | | | | | | - | 0.12 |
| | Subsurface Soil Report | BY KOLL | | | | | | - | - |
| | | | | | | | | - | - |
| | Roofing Inspections | | 1 | LS | | | 3,000 | 3,000 | 3,000 |

R.P. Appx. 275

6-30-05atlantaupdate

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | - | 0.01 |
| | Renderings | | | | | 2,000 | - | 5,000 |
| | Energy Model | 1 | LS | | | 5,000 | 5,000 | 0.02 |
| | Hardware, signage, acoustics & contingency | | | | | | - | - |
| | Models | | | | | | - | - |
| | SUBTOTAL ARCHITECTURAL COSTS | | | | | | 650,450 | 650,450 |
| | | | | | | | | 2.91 |
| | MISCELLANEOUS | | | | | | | |
| | INSURANCE | 0.500% | % | | | | 3,252 | |
| | OVERHEAD AND PROFIT | 4.00% | | | | | 26,148 | |
| | SUBTOTAL ARCHITECTURAL COSTS | 211,638 | SF | 3.21 | | | 679,850 | |

## PROJECT SUMMARY

| DESCRIPTION | PER /S.F. | TOTAL |
|---|---|---|
| 1. SITE IMPROVEMENTS | $7.92 | 1,677,179 |
| 2. BUILDING SHELL | $53.80 | 11,385,602 |
| 3. LEED CERTIFICATION ALLOWANCE | $0.09 | 20,000 |
| 4. ARCHITECTURAL & ENGINEERING SERVICES | $3.07 | 650,450 |
| MISCELLANEOUS | $0.32 | 68,666 |
| | $65.20 | 13,801,897 |
| Adjustment | | |
| OVERHEAD & PROFIT | $2.61 | 552,076 |

| TOTAL ESTIMATE =======> | $67.82 /SqFt | 14,353,973 |
|---|---|---|

### Dallas Intellicenter Exhibit C
### Dallas, TX
### 211,637 SF - 4 STORY OFFICE BLDG.
### KOLL DEVELOPMENT COMPANY
### February 20, 2006

| 02000 | SITE WORK | CONTROL BUDGET | COST PER/SF |
|---|---|---|---|
| 02050 | Demolition / Site Clearing | 34,440 | 0.16 |
| 02200 | Earthwork | 224,816 | 1.06 |
| 02210 | Finish Grading / Backfill Footings | 4,200 | 0.02 |
| 02300 | Surface Water Control | 9,000 | 0.04 |
| 02500 | Asphalt Paving and Striping | 3,195 | 0.02 |
| 02510 | Concrete Paving & Curbs—TAS | 881,188 | 4.16 |
| 02605 | Sanitary Sewer | 11,510 | 0.05 |
| 02660 | Water Distribution | 94,520 | 0.45 |
| 02680 | Gas Main to Building | 0 | 0.00 |
| 02700 | Storm Sewers | 89,310 | 0.42 |
| 02780 | Underground Electric Conduit | 0 | 0.00 |
| 02781 | Hardscape Allowance | 25,000 | 0.12 |
| 02850 | Landscaping Allowance | 225,000 | 1.06 |
| 02900 | Irrigation Allowance | 75,000 | 0.35 |

R.P. Appx. 276

6-30-05atlantaupdate

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|------|-------------|-----|-----|-------|----------|---------|-------|
| | SITE WORK TOTAL | 1,677,179 | 7.92 | | | | |
| **02000** | **EARTHWORK** | | | | | | |
| 02220 | Excavation and Backfill | 6,000 | 0.03 | | | | |
| 02370 | Drilled Piers | 268,450 | 1.27 | | | | |
| | EARTHWORK TOTAL | 274,450 | 1.30 | | | | |
| **03000** | **CONCRETE** | | | | | | |
| 03210 | Reinforcing Steel | 30,000 | 0.14 | | | | |
| 03300 | Cast-in-place Concrete | 110,800 | 0.52 | | | | |
| 03345 | Cement Flatwork | 704,970 | 3.33 | | | | |
| 03350 | Caulk Floor joints w/ MM80 Sealer | 0 | 0.00 | | | | |
| 03355 | Concrete Sealer | 0 | 0.00 | | | | |
| 03400 | Architectural Concrete Wall Panels | 1,061,040 | 5.01 | | | | |
| | CONCRETE TOTAL | 1,906,810 | 9.01 | | | | |
| **04000** | **MASONRY** | | | | | | |
| 04210 | Masonry | 0 | 0.00 | | | | |
| | MASONRY TOTAL | 0 | 0.00 | | | | |
| **05000** | **METALS** | | | | | | |
| 05120 | Structural Steel | 1,040,520 | 4.92 | | | | |
| 05200 | Miscellaneous for Tilt-Up | 15,000 | 0.07 | | | | |
| 05210 | Steel Joists | 35,750 | 0.17 | | | | |
| 05300 | Metal Decking | 301,585 | 1.43 | | | | |
| 05340 | Structural Erection | 432,959 | 2.05 | | | | |
| 05580 | Sheet Metal Fabrications | 65,450 | 0.31 | | | | |
| | METALS TOTAL | 1,891,264 | 8.94 | | | | |
| **06000** | **WOOD & PLASTICS** | | | | | | |
| 06100 | Rough Carpentry | 22,604 | 0.11 | | | | |
| #REF! | #REF! | 108,572 | 0.51 | | | | |
| | WOOD & PLASTICS TOTAL | 131,176 | 0.62 | | | | |

R.P. Appx. 277

6-30-05atlantaupdate

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|------|-------------|-----|-----|-------|----------|---------|-------|
| 07000 | THERMAL & MOISTURE PROTECTION | | | | | | |
| 07100 | Waterproofing --elevator pits | 7,000 | 0.03 | | | | |
| 07200 | Insulation | 21,097 | 0.10 | | | | |
| 07500 | Roofing | 225,540 | 1.07 | | | | |
| 07600 | Flashing and Sheet Metal | 411,531 | 1.94 | | | | |
| 07700 | Skylights & Roof Hatch | 5,500 | 0.03 | | | | |
| 07920 | Sealants and Caulking | 24,835 | 0.12 | | | | |
| | MOISTURE PROTECTION TOTAL | 695,503 | 3.29 | | | | |
| 08000 | DOORS & WINDOWS | | | | | | |
| 08200 | Doors,Frames,and Hardware--discount | 101,665 | 0.48 | | | | |
| 08300 | Overhead Doors & Operators | 4,550 | 0.02 | | | | |
| 08800 | Glazing (based on National Agreement pricing) | 1,158,560 | 5.47 | | | | |
| | DOORS & WINDOWS TOTAL | 1,264,775 | 5.98 | | | | |
| 09000 | FINISHES | | | | | | |
| 09200 | Framing and Drywall | 668,721 | 3.16 | | | | |
| 9402 | Epoxy Terrrazzo | 38,024 | 0.18 | | | | |
| 09500 | Ceiling | 28,213 | 0.13 | | | | |
| 09650 | Ceramic Tile | 79,416 | 0.38 | | | | |
| 09680 | Carpet & Resilient Flooring | 15,870 | 0.07 | | | | |
| 09900 | Painting | 74,635 | 0.35 | | | | |
| 09950 | Wall Covering & Zolotone Allowance | 16,698 | 0.08 | | | | |
| 9970 | Special Wall Surfaces (FRP) | 1,500 | 0.01 | | | | |
| | FINISHES TOTAL | 923,077 | 4.36 | | | | |
| 10000 | SPECIALTIES | | | | | | |
| 10150 | Toilet Partitions and Acces. | 18,540 | 0.09 | | | | |
| 10550 | Metal Lockers | 0 | 0.00 | | | | |
| 10600 | Miscellaneous Specialties | 28,230 | 0.13 | | | | |
| 10610 | Appliances | 0 | 0.00 | | | | |
| 10900 | Interior Signage & Directories | 0 | 0.00 | | | | |
| 10950 | Exterior Signage Allowance | 0 | 0.00 | | | | |
| | SPECIALTIES TOTAL | 46,770 | 0.22 | | | | |
| 11000 | EQUIPMENT | | | | | | |
| 11160 | Mechanical Dock Levelers - 35,000# Capacity | 2,045 | 0.01 | | | | |
| 11162 | Dock Levelers - Form Pits | 0 | 0.00 | | | | |
| 11164 | Dock Locks | 0 | 0.00 | | | | |
| 11165 | Dock Seals | 0 | 0.00 | | | | |
| 11166 | Dock Shelters | 0 | 0.00 | | | | |
| 11167 | Dock Lights | 300 | 0.00 | | | | |
| | EQUIPMENT TOTAL | 2,345 | 0.01 | | | | |
| 12000 | FURNISHINGS | | | | | | |
| 12510 | Horizontal Blinds - 1" | 58,800 | 0.28 | | | | |
| | FURNISHINGS TOTAL | 58,800 | 0.28 | | | | |
| 13000 | SPECIAL CONSTRUCTION | | | | | | |
| 13320 | Access Flooring | 720,070 | 3.40 | | | | |
| | SPECIAL CONSTRUCTION TOTAL | 720,070 | 3.40 | | | | |
| 14000 | CONVEYING SYSTEMS | | | | | | |
| 14200 | Elevators | 204,000 | 0.96 | | | | |

R.P. Appx. 278

6-30-05atlantaupdate

| CODE | DESCRIPTION | QTY | | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|---|
| | CONVEYING SYSTEMS TOTAL | 204,000 | 0.96 | | | | | |

**15000   MECHANICAL SYSTEMS**

| CODE | DESCRIPTION | QTY | | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|---|
| 15300 | Fire Protection | 199,493 | 0.94 | | | | | |
| 15310 | Booster Pumps—75 hp | 35,000 | 0.17 | | | | | |
| 15400 | Plumbing—discount | 375,460 | 1.77 | | | | | |
| 15500 | HVAC | 1,261,362 | 5.96 | | | | | |
| | MECHANICAL SYSTEMS TOTAL | 1,871,315 | 8.84 | | | | | |

R.P. Appx. 279

6-30-05atlantaupdate

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| **16000** | **ELECTRICAL** | | | | | | |
| | | | | | | | |
| 16050 | Electrical | 843,252 | 3.98 | | | | |
| 16100 | Site Lighting & Building Accent Lighting | 131,164 | 0.62 | | | | |
| | **ELECTRICAL  TOTAL** | **974,416** | **4.60** | | | | |
| | | | | | | | |
| **17000** | **CONSULTING SERVICES** | | | | | | |
| | | | | | | | |
| 17000 | Preliminary Fees | Incl | 0.00 | | | | |
| 17100 | Architectural Services | Incl | 0.00 | | | | |
| 17150 | Code Review | Incl | 0.00 | | | | |
| 17200 | Structural Services | Incl | 0.00 | | | | |
| 17300 | Mechanical-Electrical-Plumbing-Sprinklers | Incl | 0.00 | | | | |
| 17400 | Civil Services | Incl | 0.00 | | | | |
| 17470 | Subsurface Soil Report | Incl | 0.00 | | | | |
| 17600 | Roofing Inspections | Incl | 0.00 | | | | |
| 17600 | Rendering | Incl | 0.00 | | | | |
| 17900 | Reimbursables | Incl | 0.00 | | | | |
| | **CONSULTING SERVICES  TOTAL** | **650,450** | **3.07** | | | | |
| | | | | | | | |
| **18000** | **TENANT FINISH** | | | | | | |
| | | | | | | | |
| 06200 | Finish Carpentry Allowance | 20,000 | 0.09 | | | | |
| 08200 | Hollow Metal Doors & Frames | 0 | 0.00 | | | | |
| 08800 | Glazing | 0 | 0.00 | | | | |
| 09200 | Framing and Drywall | 0 | 0.00 | | | | |
| 09300 | Ceramic Tile | 0 | 0.00 | | | | |
| 09500 | Install Acoustical Tiles | 0 | 0.00 | | | | |
| 09650 | Resilient Flooring | 0 | 0.00 | | | | |
| 09680 | Carpet Allowance | 0 | 0.00 | | | | |
| 09900 | Painting | 0 | 0.00 | | | | |
| 10150 | Computer Flooring | 0 | 0.00 | | | | |
| 10990 | Miscellaneous Specialties | 0 | 0.00 | | | | |
| 12510 | Window Blinds or Drapes | 0 | 0.00 | | | | |
| 15300 | Fire Protection | 0 | 0.00 | | | | |
| 15400 | Plumbing | 0 | 0.00 | | | | |
| 15500 | HVAC | 0 | 0.00 | | | | |
| 16050 | Electrical | 0 | 0.00 | | | | |
| 16150 | Security / Fire Alarm Systems  Allowance | 0 | 0.00 | | | | |
| 18001 | Space Planning & Design | 0 | 0.00 | | | | |
| | **TENANT FINISH  TOTAL** | **20,000** | **0.09** | | | | |

R.P. Appx. 280

6-30-05atlantaupdate

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| 01000 | GENERAL CONDITIONS | | | | | | |
| 18010 | Project Manager--discount | 71,300 | 0.34 | | | | |
| 18020 | Field Superintendent (local wage only) | 104,561 | 0.49 | | | | |
| 18025 | Travel Expenses--discount | 21,750 | 0.10 | | | | |
| 18030 | Drawing Reproduction & Progress Photos | 9,705 | 0.05 | | | | |
| 18040 | Field Engineering & Layout | 18,000 | 0.09 | | | | |
| 18060 | Construction Cleaning & General Labor--discount | 66,064 | 0.31 | | | | |
| 18100 | Equipment Rental & Small Tools | 22,395 | 0.11 | | | | |
| 18200 | Miscellaneous G. C.'s & Safety | 19,845 | 0.09 | | | | |
| 18210 | Winter Protection | 0 | 0.00 | | | | |
| 18220 | Temporary Roads | 3,500 | 0.02 | | | | |
| 18240 | Performance Bond | 0 | 0.00 | | | | |
| 18250 | Building Permit | 37,980 | 0.18 | | | | |
| 18255 | Builder's Risk Insurance | 14,850 | 0.07 | | | | |
| 18260 | Quality Control & Testing | 0 | 0.00 | | | | |
| 18270 | Temporary Utilities | 30,875 | 0.15 | | | | |
| | GENERAL CONDITIONS  TOTAL | 420,825 | 1.99 | | | | |

| | SUMMARY | CONTROL BUDGET | COST PER/SF |
|---|---|---|---|
| 02000 | SITE WORK | 1,677,179 | 7.92 |
| 02000 | EARTHWORK | 274,450 | 1.30 |
| 03000 | CONCRETE | 1,906,810 | 9.01 |
| 04000 | MASONRY | 0 | 0.00 |
| 05000 | METALS | 1,891,264 | 8.94 |
| 06000 | WOOD & PLASTICS | 131,176 | 0.62 |
| 07000 | THERMAL & MOISTURE PROTECTION | 695,503 | 3.29 |
| 08000 | DOORS & WINDOWS | 1,264,775 | 5.98 |
| 09000 | FINISHES | 923,077 | 4.36 |
| 10000 | SPECIALTIES | 46,770 | 0.22 |
| 11000 | EQUIPMENT | 2,345 | 0.01 |
| 12000 | FURNISHINGS | 58,800 | 0.28 |
| 13000 | SPECIAL  CONSTRUCTION | 720,070 | 3.40 |
| 14000 | CONVEYING  SYSTEMS | 204,000 | 0.96 |
| 15000 | MECHANICAL  SYSTEMS | 1,871,315 | 8.84 |
| 16000 | ELECTRICAL | 974,416 | 4.60 |
| 18000 | TENANT  FINISH | 20,000 | 0.09 |
| 17000 | CONSULTING  SERVICES | 650,450 | 3.07 |
| 01000 | GENERAL  CONDITIONS | 420,825 | 1.99 |
| | MISCELLANEOUS | 68,672 | 0.32 |
| | OVERHEAD & PROFIT | 552,076 | 2.61 |
| | TOTAL ESTIMATE =========> | 14,353,973 | 67.81 |

1/21/06

| DESCRIPTION | QUANTITY | UNIT | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|
| ALT #1 - Add Mud slab | | | | | | |
| Slab--4" with Mesh | 52000 | sf | | | 2.20 | 114,400 |

6-30-05atlantaupdate

R.P. Appx. 281

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| | Misc | 1 | LS | | | 5,000.00 | 5,000 |
| | | | | | | | - |
| | | | | | | | 119,400 |
| Insurance | | 0.60% | | | | | 716 |
| Overhead & Profit | | 4.00% | | | | | 4,805 |
| | | | | | | | 124,921 |

ALT #2 - PROVIDE 20GAUGE VS. 18 GAUGE METAL PANELS MP-1 & MP-2

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| | Metal panels | 1 | LS | | | (10,900.00) | (10,900) |
| | | | | | | | - |
| | | | | | | | - |
| | | | | | | | (10,900) |
| Insurance | | 0.60% | | | | | (65) |
| Overhead & Profit | | 4.00% | | | | | (439) |
| | | | | | | | VOID |

ALT #3 - PROVIDE METAL PANELS MP-1 & MP-2 W/STANDARD BUTT JOINT CORNERS

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| | Metal panels | 1 | LS | | | (14,400.00) | (14,400) |
| | | | | | | | - |
| | | | | | | | - |
| | | | | | | | (14,400) |
| Insurance | | 0.60% | | | | | (86) |
| Overhead & Profit | | 4.00% | | | | | (579) |
| | | | | | | | VOID |

ALT#4 --DELETE GFRC PANEL AT LEVELS 2-4 AT 2 LOCATIONS

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| | Delete GFRC | 1 | LS | | | (8,500.00) | (8,500) |
| | Less Framing | 1 | Ls | | | (750.00) | (750) |
| | | | | | | | - |
| | | | | | | | (9,250) |
| Insurance | | 0.60% | | | | | (56) |
| Overhead & Profit | | 4.00% | | | | | (372) |
| | | | | | | | (9,678) |

ALT#5 - DELETE ROOF SCREEN WALL AND STEEL SUPPORTS

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| | Metal panels | 1 | LS | | | (50,000.00) | (50,000) |
| | Structural steel | 1 | LS | | | (100,000.00) | (100,000) |
| | Rough carpentry | 1 | LS | | | (1,000.00) | (1,000) |
| | Roofing & flashings | 1 | LS | | | 2,000.00 | 2,000 |
| | Drywall Framing | 1 | LS | | | (10,000.00) | (10,000) |
| | ADD FOR NEW SCREEN WALL | 675 | lf | | | 125.00 | 84,375 |
| | | | | | | | (74,625) |
| Insurance | | 0.60% | | | | | (448) |
| Overhead & Profit | | 4.00% | | | | | (3,003) |
| | | | | | | | VOID |

ALT #6 - DELETE CORNICE CMP-1 @ ROOF PERIMETER

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| | Metal panels | 1 | LS | | | (125,000.00) | (125,000) |
| | Roofing & flashings | 1 | LS | | | (10,000.00) | (10,000) |
| | Rough carpentry | 1 | LS | | | (75,000.00) | (75,000) |
| | | | | | | | (210,000) |
| Insurance | | 0.60% | | | | | (1,260) |
| Overhead & Profit | | 4.00% | | | | | (8,450) |
| | | | | | | | VOID |

ALT #7 - MECHANICALLY FASTENED ROOF SYSTEM IN LIEU OF FULLY ADHERED

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| | Roofing | 1 | LS | | | (7,000.00) | (7,000) |
| | | | | | | | - |
| | | | | | | | (7,000) |
| Insurance | | 0.60% | | | | | (42) |
| Overhead & Profit | | 4.00% | | | | | (282) |

6-30-05atlantaupdate

R.P. Appx. 282

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|------|-------------|-----|-----|-------|----------|---------|-------|
| | | | | | | | May use either system |
| | **ALT #8 - FURNISH 12"X12" POCELAIN TILE IN LIEU OF THE SPECIFIED 12"X24"** | | | | | | |
| | Ceramic tile | 1 | LS | | | (12,000.00) | (12,000) |
| | | | | | | | - |
| | | | | | | | (12,000) |
| Insurance | | 0.60% | | | | | (72) |
| Overhead & Profit | | 4.00% | | | | | (483) |
| | | | | | | | May use either system |
| | **ALT #9 - FLOOR JOISTS IN LIEU OF BEANS ON LEVELS 2 THRU 4** | | | | | | |
| | Concrete | 1 | LS | | | | - |
| | Structural steel | 1 | LS | | | | - |
| | | | | | | | - |
| Insurance | | 0.60% | | | | | - |
| Overhead & Profit | | 4.00% | | | | | - |
| | | | | | | | VOID |
| | **ALT#10 - DELETE STUMBLE LIGHTING IN TENANT AREAS (INCL. CONDUIT & WIRE)** | | | | | | |
| | Leave construction temp. lighting in place | | | | | | |
| | Electrical | 1 | LS | | | (15,000.00) | (15,000) |
| | | | | | | | - |
| | | | | | | | (15,000) |
| Insurance | | 0.60% | | | | | (90) |
| Overhead & Profit | | 4.00% | | | | | (604) |
| | | | | | | | (15,694) |
| | **ALT#11 - DELETE CURTAIN WALL SYSTEM ON COL. LINE 1 AND 16** | | | | | | |
| | Replace with tilt wall and storefront | | | | | | - |
| | Foundations | 1 | LS | | | (55,000.00) | (55,000) |
| | Flatwork concrete | 1 | LS | | | (2,000.00) | (2,000) |
| | Tilt-wall | 1,800 | SF | | | 10.00 | 18,000 |
| | Structural steel | 1 | LS | | | (10,000.00) | (10,000) |
| | Metal wall panels | 1 | LS | | | (15,000.00) | (15,000) |
| | Rough carpentry | 1 | LS | | | (2,000.00) | (2,000) |
| | Roofing | 1 | LS | | | (2,000.00) | (2,000) |
| | Curtainwall & storefront | 1 | LS | | | (85,000.00) | (85,000) |
| | Drywall | 1 | LS | | | - | - |
| | Painting | 1 | LS | | | (500.00) | (500) |
| | Access flooring | 1 | LS | | | (3,000.00) | (3,000) |
| | | | | | | | - |
| | | | | | | | (156,500) |
| Insurance | | 0.60% | | | | | (939) |
| Overhead & Profit | | 4.00% | | | | | (6,298) |
| | | | | | | | VOID |
| | **ALT #12 - DELETE STOREFRONT SUNSHADES LEVELS 1 AND 2** | | | | | | |
| | Storefront | 1 | LS | | | (25,000.00) | (25,000) |
| | | | | | | | - |
| | | | | | | | (25,000) |
| Insurance | | 0.60% | | | | | (150) |
| Overhead & Profit | | 4.00% | | | | | (1,006) |
| | | | | | | | VOID |
| | **ALT#13 - DELETE SUNSHADES AT CURTAINWALL AREAS** | | | | | | |
| | Curtainwall | 1 | LS | | | (50,000.00) | (50,000) |
| | | | | | | | - |
| | | | | | | | (50,000) |

6-30-05atlantaupdate

R.P. Appx. 283

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|------|-------------|-----|-----|-------|----------|---------|-------|
| | Insurance | 0.60% | | | | | (300) |
| | Overhead & Profit | 4.00% | | | | | (2,012) |
| | | | | | | | VOID |

**ALT #14 - DELETE INTERIOR GLASS @ STAIR 2 (LEVELS 1, 2,3 & 4)**

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|------|-------------|-----|-----|-------|----------|---------|-------|
| | Also delete terrazzo @ top landings | | | | | | - |
| | GL 7 | 1 | LS | | | (25,000.00) | (25,000) |
| | Drywall | 1 | LS | | | 5,000.00 | 5,000 |
| | Terrazzo | 1 | LS | | | (3,000.00) | (3,000) |
| | Fire protection | 1 | LS | | | (5,000.00) | (5,000) |
| | | | | | | | - |
| | | | | | | | (28,000) |
| | Insurance | 0.60% | | | | | (168) |
| | Overhead & Profit | 4.00% | | | | | (1,127) |
| | | | | | | | VOID |

**ALT #15 - REDUCE STEORFRONT PUNCHED OPENINGS**

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|------|-------------|-----|-----|-------|----------|---------|-------|
| | 8X6 ON LEVELS 1,2&3, 20X8 ON LEVEL 4, LESS MULLIONS | | | | | | |
| | Tilt panels | 1 | LS | | | 5,000.00 | 5,000 |
| | Curtainwall & storefront | 1 | LS | | | (218,750.00) | (218,750) |
| | Painting | 1 | LS | | | 5,000.00 | 5,000 |
| | | | | | | | - |
| | | | | | | | (208,750) |
| | Insurance | 0.60% | | | | | (1,253) |
| | Overhead & Profit | 4.00% | | | | | (8,400) |
| | | | | | | | VOID |

**ALT#16 - DELETE TRUCKING EXCESS SPOILS OFF SITE AND LEAVE ON SITE**

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|------|-------------|-----|-----|-------|----------|---------|-------|
| | | | | | | | - |
| | | | | | | | - |
| | Earthwork--keep cut & stockpile in number | 17,000 | CY | | | (5.00) | (85,000) |
| | | | | | | | - |
| | | | | | | | (85,000) |
| | Insurance | 0.60% | | | | | (510) |
| | Overhead & Profit | 4.00% | | | | | (3,420) |

**ALT#16a - DELETE TRUCKING EXCESS SPOILS (FROM EXTRA TOPSOIL AND UTILITY SPOILS)/LEAVE ON SITE**

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|------|-------------|-----|-----|-------|----------|---------|-------|
| | Earthwork--keeps excavating & stockpiling in number | 3,500 | CY | | | (5.00) | (17,500) |
| | | | | | | | - |
| | | | | | | | (17,500) |
| | Insurance | 0.60% | | | | | (105) |
| | Overhead & Profit | 4.00% | | | | | (704) |
| | | | | | | | leave on site |

**ALT #17 - DELETE LEED CERTIFICATION REQUIREMENTS**

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|------|-------------|-----|-----|-------|----------|---------|-------|
| | Design remains unchanged | | | | | | - |
| | Staff | 1 | LS | | | (10,000.00) | (10,000) |
| | Dumpsters | 1 | LS | | | (15,000.00) | (15,000) |
| | | | | | | | - |
| | | | | | | | - |
| | | | | | | | (25,000) |
| | Insurance | 0.60% | | | | | (150) |
| | Overhead & Profit | 4.00% | | | | | (1,006) |
| | | | | | | | VOID |

**ALT#18 - ADD GL-7 GLAZING AND DELETE 1/4" TEMPERED (Joel Berman Glass was not quoted to other GC's)**

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|------|-------------|-----|-----|-------|----------|---------|-------|
| | Glazing | 1 | LS | | | 43,000.00 | |

6-30-05atlantaupdate

R.P. Appx. 284

| CODE          DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|
| Insurance | 0.60% | | | | | |
| Overhead & Profit | 4.00% | | | | | |
| | | | | | | |
| **ALT#19 - ADD LIME STABILIZE BELOW PAVING AND CLOSE BLDG SW'S** | | | | | | |
| LIME WORK | 38,000 | SY | | | 3.75 | 142,500 |
| | | | | | | - |
| | | | | | | - |
| | | | | | | 142,500 |
| Insurance | 0.60% | | | | | 855 |
| Overhead & Profit | 4.00% | | | | | 5,734 |
| | | | | | | 149,089 |
| **ALT#20 -PROVIDE WINDOW WALL CONSULTANT** | | | | | | |
| CONSULTING & WATER TESTING | 1 | ls | | | 15,000.00 | 15,000 |
| | | | | | | - |
| | | | | | | - |
| | | | | | | 15,000 |
| Insurance | 0.60% | | | | | 90 |
| Overhead & Profit | 4.00% | | | | | 604 |
| | | | | | | 15,694 |
| | | | | | | |
| **ALT#21 -- MEPFP CLAYCO COORDINATION** | | | | | | |
| MEPFP | 1 | ls | | | 10,000.00 | 10,000 |
| | | | | | | - |
| | | | | | | - |
| | | | | | | 10,000 |
| Insurance | 0.60% | | | | | 60 |
| Overhead & Profit | 4.00% | | | | | 402 |
| | | | | | | 10,462 |
| **ALT#22 --CHANGE PANELS TO 15' WIDE, MODIFY TOP GLASS** | | | | | | |
| TILTUP PANEL ERECTION CREDIT | 1 | ls | | | (15,000.00) | (15,000) |
| GLASS CREDIT | 1 | LS | | | (100,000.00) | (100,000) |
| PIER & PANEL ADD PER TAS | 1 | LS | | | 75,000.00 | 75,000 |
| | | | | | | - |
| | | | | | | (40,000) |
| Insurance | 0.60% | | | | | (240) |
| Overhead & Profit | 4.00% | | | | | (1,610) |
| | | | | | | VOID |
| **ALT#23 --REMOVE SCOPE TO PROVIDE FIRE MARSHALL ACCESS** | | | | | | |
| WEIR AMOUNT | 1 | ls | | | (53,000.00) | (53,000) |
| | 1 | LS | | | - | - |
| | 1 | LS | | | - | - |
| | | | | | | (53,000) |
| Insurance | 0.60% | | | | | (318) |
| Overhead & Profit | 4.00% | | | | | (2,133) |
| | | | | | | VOID |
| | | | | | | |
| **ALT#24 --DELETE 2ND  PASSENGER ELEVATOR** | | | | | | |
| ELEVATOR CREDIT | 1 | ls | | | (56,000.00) | (56,000) |
| DEDUCT DRYWALL | 1,440 | SF | | | (4.00) | (5,760) |
| LESS ELECTRIC/F.ALARM | 1 | LS | | | (3,200.00) | (3,200) |
| | | | | | | - |
| | | | | | | (64,960) |
| Insurance | 0.60% | | | | | (390) |
| Overhead & Profit | 4.00% | | | | | (2,614) |
| | | | | | | VOID |
| | | | | | | |
| **ALT#25 --CHANGE HVAC TO O/H SYSTEM** | | | | | | |
| TD CREDIT | 1 | ls | | | (150,000.00) | (150,000) |
| DEDUCT DRYWALL | | SF | | | (5.00) | - |
| | 1 | LS | | | - | - |
| | | | | | | (150,000) |
| Insurance | 0.60% | | | | | (900) |
| Overhead & Profit | 4.00% | | | | | (6,036) |

6-30-05atlantaupdate

R.P. Appx. 285

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|---|---|---|---|---|---|---|---|
| | | | | | | | void |
| **ALT#26 -UTILIZE H&H STEEL** | | | | | | | |
| | CREDIT FROM ENNIS (WITH PANEL ERECTION) | 1 | ls | | | (2,318,000.00) | (2,318,000) |
| | Add for H&H | 1 | LS | | | 2,091,207.00 | 2,091,207 |
| | Contingency | 1 | LS | | | 40,000.00 | 40,000 |
| | | | | | | | - |
| | | | | | | | (186,793) |
| Insurance | | 0.60% | | | | | (1,121) |
| Overhead & Profit | | 4.00% | | | | | (7,517) |
| | | | | | | | void |
| **ALT#27 --ELECTRICAL VALUE ENGINEERING FROM DFW PLAN** | | | | | | | |
| | JMEG | 1 | ls | | | (60,000.00) | (60,000) |
| | | | SF | | | | - |
| | | 1 | LS | | | - | - |
| | | | | | | | - |
| | | | | | | | (60,000) |
| Insurance | | 0.60% | | | | | (360) |
| Overhead & Profit | | 4.00% | | | | | (2,414) |
| | | | | | | | void--offset Damper add |
| **ALT#28 --ADD TO DFW DRAWINGS FOR MISSING HVAC** | | | | | | | |
| Power & FA Connections to Fire Smoke Dampers per M3.01--currently being redesigned | | | | | | | - |
| | JMEG--Will be reduced | 1 | ls | | | 53,200.00 | 53,200 |
| | | | SF | | | | - |
| | | 1 | LS | | | - | - |
| | | | | | | | - |
| | | | | | | | 53,200 |
| Insurance | | 0.60% | | | | | 319 |
| Overhead & Profit | | 4.00% | | | | | 2,141 |
| | | | | | | | void--offset VE |
| **ALT#29 --ADD LIGHTING PER NEW 11/1/05 DOC'S NOT RECEIVED BY CLAYCO** | | | | | | | |
| Lighting Schedule provided to JMEG via Constructors | | | | | | | - |
| | JMEG | 1 | ls | | | 117,000.00 | 117,000 |
| | | | SF | | | | - |
| | | 1 | LS | | | - | - |
| | | | | | | | 117,000 |
| Insurance | | 0.60% | | | | | 702 |
| Overhead & Profit | | 4.00% | | | | | 4,708 |
| | | | | | | | 122,410 |
| **ALT#30 -Change roof screen Steel to Galvanized** | | | | | | | |
| - | | | | | | | - |
| | H&H | 1 | ls | | | 31,000.00 | 31,000 |
| | Painting | 1 | Ls | | | (5,000.00) | (5,000) |
| | | 1 | LS | | | - | - |
| | | | | | | | - |
| | | | | | | | 26,000 |
| Insurance | | 0.60% | | | | | 156 |
| Overhead & Profit | | 4.00% | | | | | 1,046 |
| | | | | | | | 27,202 |
| **ALT#31 --Caulk interior side of window frames** | | | | | | | |
| - | | | | | | | - |
| | Pals | 1 | ls | | | 11,500.00 | 11,500 |
| | | 1 | Ls | | | | - |
| | | 1 | LS | | | - | - |
| | | | | | | | - |
| | | | | | | | 11,500 |
| Insurance | | 0.60% | | | | | 69 |
| Overhead & Profit | | 4.00% | | | | | 463 |
| | | | | | | | 12,032 |

| | | | |
|---|---|---|---|
| ALT #1 - A ADD MUD SLAB | ADD | | 124,921 |
| ALT #2 - PROVIDE 20GAUGE VS. 18 GAUGE METAL PANELS MP-1 & MP-2 | DEDUCT | | VOID |
| ALT #3 - PROVIDE METAL PANELS MP-1 & MP-2 W/STANDARD BUTT JOINT CORNERS | DEDUCT | | VOID |
| ALT#4 --DELETE GFRC PANEL AT LEVELS 2-4 AT 2 LOCATIONS | DEDUCT | | (9,678) |
| ALT#5 - DELETE ROOF SCREEN WALL AND STEEL SUPPORTS | DEDUCT | | VOID |
| ALT #6 - DELETE CORNICE CMP-1 @ ROOF PERIMETER | DEDUCT | | VOID |

6-30-05atlantaupdate

R.P. Appx. 286

| CODE | DESCRIPTION | QTY | U/M | Labor | Material | Sub Con | Total |
|------|-------------|-----|-----|-------|----------|---------|-------|
| ALT #7 - MECHANICALLY FASTENED ROOF SYSTEM IN LIEU OF FULLY ADHERED | | | | | DEDUCT | Either System | |
| ALT #8 - FURNISH 12"X12" POCELAIN TILE IN LIEU OF THE SPECIFIED 12"X24" | | | | | DEDUCT | May use either system | |
| ALT #9 - FLOOR JOISTS IN LIEU OF BEANS ON LEVELS 2 THRU 4 | | | | | DEDUCT | VOID | |
| ALT#10 - DELETE STUMBLE LIGHTING IN TENANT AREAS (INCL. CONDUIT & WIRE) | | | | | DEDUCT | (15,694) | |
| ALT#11 - DELETE CURTAIN WALL SYSTEM ON COL. LINE 1 AND 16 | | | | | DEDUCT | VOID | |
| ALT #12 - DELETE STOREFRONT SUNSHADES LEVELS 1 AND 2 | | | | | DEDUCT | VOID | |
| ALT#13 - DELETE SUNSHADES AT CURTAINWALL AREAS | | | | | DEDUCT | VOID | |
| ALT #14 - DELETE INTERIOR GLASS @ STAIR 2 (LEVELS 1, 2,3 & 4) | | | | | DEDUCT | VOID | |
| ALT #15 - REDUCE STEORFRONT PUNCHED OPENINGS | | | | | DEDUCT | VOID | |
| ALT#16 - DELETE TRUCKING EXCESS SPOILS OFF SITE AND LEAVE ON SITE | | | | | DEDUCT | BALANCED SITE | |
| ALT#16a - DELETE TRUCKING EXCESS SPOILS (FROM EXTRA TOPSOIL AND UTILITY SPOILS)/LEAVE ON SI' | | | | | DEDUCT | BALANCED SITE | |
| ALT #17 - DELETE LEED CERTIFICATION REQUIREMENTS | | | | | DEDUCT | void | |
| ALT#18 - ADD GL-7 GLAZING AND DELETE 1/4" TEMPERED (Joel Berman Glass was not quoted to other GC' | | | | | ADD | 44,988 | |
| ALT#19 - ADD LIME STABILIZE BELOW PAVING AND CLOSE BLDG SW'S | | | | | ADD | 149,089 | |
| ALT#20 -PROVIDE WINDOW WALL CONSULTANT | | | | | ADD | 15,694 | |
| ALT#21 -- MEPFP CLAYCO COORDINATION | | | | | ADD | 10,462 | |
| ALT#22 --CHANGE PANELS TO 15' WIDE, MODIFY TOP GLASS | | | | | DEDUCT | void | |
| ALT#23 --REMOVE SCOPE TO PROVIDE FIRE MARSHALL ACCESS | | | | | DEDUCT | void | |
| ALT#24 --DELETE 2ND PASSENGER ELEVATOR | | | | | DEDUCT | void | |
| ALT#25 --CHANGE HVAC TO O/H SYSTEM | | | | | DEDUCT | void | |
| ALT#26 -UTILIZE H&H STEEL | | | | | DEDUCT | void | |
| ALT#27 --ELECTRICAL VALUE ENGINEERING FROM DFW PLAN | | | | | DEDUCT | void--offset Damper add | |
| ALT#28 --ADD TO DFW DRAWINGS FOR MISSING HVAC | | | | | ADD | void--offset VE | |
| ALT#29 --ADD LIGHTING PER NEW 11/1/05 DOC'S NOT RECEIVED BY CLAYCO | | | | | ADD | 122,410 | |
| ALT#30 -Change roof screen Steel to Galvanized | | | | | ADD | 27,202 | |
| ALT#31 --Caulk interior side of window frames | | | | | ADD | 12,032 | |

6-30-05atlantaupdate

R.P. Appx. 287

## Design Fee and Expense Summary

| Building Component | Gross SF Area | Est Cost per SF | Est Cost "Shell & Core" | | | Fee Basis $/SF | % | Design Fee | Fee Basis |
|---|---|---|---|---|---|---|---|---|---|
| **Intellicenter Dallas** | | | | | | | | | |
| | | (estimate) | | **Basic Design Fee** | | | | | |
| Building | 212,000 | $70 | $14,840,000 | Architectural | Forum | $1.60 | 2.3% | $340,000 | Lump Sum |
| | | | | | | | | | |
| Fee per sqft, before | | $2.95 | | **Consultants** | | | | | |
| expenses budget | | | | Structural | Alper | $0.52 | 0.7% | $110,000 | Lump Sum |
| | | | | MEP+FP | DFW | $0.48 | 0.7% | $102,000 | Lump Sum |
| | | | | Civil | Glenn | $0.16 | 0.2% | $33,000 | LS Fee, less Topo, ALTA, Storm Water |
| | | | | Landscape | TBG | $0.12 | 0.2% | $25,000 | Lump Sum |
| | | | | Energy Model | Coolshadow | $0.02 | 0.0% | $5,000 | Hourly NTE |
| | | | | Code/Life Safety | RJA | $0.01 | 0.0% | $3,000 | Hourly NTE |
| | | | | Roof Consulting | Maue | $0.01 | 0.0% | $3,000 | Hourly NTE |
| | | | | Bldg Envelope | Heitmann | $0.02 | 0.0% | $3,500 | Hourly NTE |

| | $/SF | % | Fee |
|---|---|---|---|
| **Total Basic and Consultant Fees** | $2.95 | 4.2% | **$624,500** |
| **Total "Estimated" Expenses Budget** | | | **$25,950** |
| **TOTAL FEES & ESTIMATED EXPENSES** | **$3.07** | **4.4%** | **$650,450** |

| "Estimated" Total Expenses | Consultant | SD | DD | CD | CA | Total Trips | Cost |
|---|---|---|---|---|---|---|---|
| | Forum | 1 | 1 | 1 | 15 | 18 | $17,100 |
| | Alper Audi | 0 | 0 | 0 | 3 | 3 | $2,850 |
| | DFW | 0 | 0 | 0 | 0 | 0 | $0 |
| | Total Travel | 1 | 1 | 1 | 18 | 21 | $19,950 |
| | | | | | | | |
| | ADA Accessology | | | | | | $3,000 |
| | Total Printing, Courier, etc. | | | | | | $3,000 |
| | **Total Expenses** | | | | | | **$25,950** Budget |

**"Estimated" Travel Expenses** (1 round trip to jobsite per person - 2 days & 1 night)

| | |
|---|---|
| Airfare | $500 |
| Rental Car | $125 |
| Hotel | $150 |
| Food | $100 |
| Parking & Mileage | $75 |
| Total Travel Cost/person | $950 |

Forum CA Phase Trips

| | |
|---|---|
| Months | 12 |
| Punchlist | 3 |
| Total | 15 |

Forum Studio, Inc.

1 of 1

R.P. Appx. 288

FORM OF CONSTRUCTION INDEMNITY AND
ASSIGNMENT AGREEMENT
(General Contractor)

THIS CONSTRUCTION INDEMNITY AND ASSIGNMENT AGREEMENT, dated as of the _____ day of _____, _____, from _____, a _____ (the "Contractor") to THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation ("Prudential"), _____ , a _____ - ("Developer") and _____, a _____ (the "Venture").

## RECITALS

A.     Prudential and Developer shall be partners in the Venture, pursuant to Acquire Joint Venture Interest, dated _____, _____ (the "Acquisition Agreement") and the Amended and Restated Limited Liability Partnership Agreement of the Venture, dated _____, _____ (the "JVA"). The Venture is the owner of the Project as more particularly described in the Acquisition Agreement. All capitalized terms used, but not defined herein, have the meanings given to such terms in the Acquisition Agreement.

B.     The     Venture     and     the     Contractor     have     entered     into     the _____, dated _____, _____ (the "Construction Contract"), whereby the Contractor agreed to construct the Improvements.

C.     The Contractor desires to enter into this Agreement to induce: (i) Prudential to make Prudential's Initial Contribution (as defined in the Acquisition Agreement) to the Venture; and (ii) acquire an interest in the Venture, in the manner contemplated by the Acquisition Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Contractor hereby agrees as follows:

1.     Guarantee.   The Contractor hereby guarantees all the work performed in connection with the construction of the Improvements and all materials furnished and installed, or either, under the Construction Contract including all change orders thereto, to be: (i) substantially in accordance with the Plans and Specifications attached to the Acquisition Agreement as Exhibit B and/or modifications thereof permitted pursuant to the Acquisition Agreement (including any and all replacements or corrections of work performed in connection with construction of the Improvements and materials that may be required pursuant thereto); (ii) substantially in accordance with all federal, State of _____, _____ County and City of _____ laws, ordinances, statutes, rules and regulations applicable to the construction of office buildings, including, without limitation, local building, environmental, land use and persons with disabilities requirements, in effect on the date of this Agreement (collectively, the "Legal Requirements"); and (iii) free from faulty, defective workmanship and materials. The Contractor agrees to repair, correct or replace, at their own cost and expense, all of the work performed in connection with construction of the Improvements and materials, or either, covered

under said Construction Contract, change orders, modifications or corrections pursuant thereto that may prove not to be substantially in accordance with the Plans and Specifications (and/or modifications thereof permitted pursuant to the Acquisition Agreement) or the Legal Requirements or not to be free from faulty, defective workmanship and/or materials, ordinary wear and tear excepted. The Contractor does further agree to pay the cost of repairing all damage to other property resulting from defects in the work, performed in connection with construction of the Improvements, and materials, or either, covered by this Agreement and to pay the cost and expenses of replacing other property which may be damaged or disturbed in making good any defects as provided herein.

This Agreement shall be for a period of 1 year commencing the date of substantial completion of the Project. This Agreement shall be for the entire work performed in connection with construction of the Improvements except as may be extended by other guarantees specified elsewhere in the Construction Contract or as required by applicable law, and materials under the Construction Contract, and is in no way to be construed as invalidating guarantees for longer periods where required by the Construction Contract. This Guarantee shall not broaden the scope of the guarantees specified in the Construction Contract.

All replacements and corrections to defective work performed in connection with construction of the Improvements and materials, or either, are to be done at the convenience of the Venture.

The obligation of Contractor under this Agreement shall survive both final payment for the work performed in connection with the construction of the Improvements or designated portion thereof and termination of the Construction Contract.

2. Indemnification. The Contractor shall indemnify, defend and hold harmless Prudential and the Venture, their officers, agents and employees for from and against any and all claims and demands, just or unjust, of third persons for death, for bodily injury, for personal injury, for property damage, direct or consequential, or for breach of contract arising or alleged to arise out of the construction of the Improvements and for all expenses incurred by them in the defense, settlement or satisfaction thereof except to the extent such claims and demands result from the intentional acts of Prudential or the Venture.

In any and all claims against Prudential or the Venture or any of their agents or employees by any employee of the Contractor, any subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, the indemnification obligation under this Agreement shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Contractor or any subcontractor under workers' or workmen's compensation acts, disability benefit acts or other employee benefit acts.

If so directed by Prudential or the Venture, the Contractor shall at its own expense defend any suit based upon any such claim or demand within the scope of the foregoing indemnity with counsel reasonably acceptable to Prudential or the Venture, as applicable (even if such suit, claim or demand is groundless, false or fraudulent).

3.    Assignment of Guarantees and Warranties. Contractor, as assignor, hereby conditionally assigns, transfers and sets over to the Venture, as assignee, all of its right, title and interest in and to all guarantees and warranties received by Contractor from subcontractors and suppliers in connection with the construction of the Improvements. This assignment shall be effective upon default by the Contractor under this Agreement or upon complete satisfaction of the obligations of Contractor hereunder. Contractor shall not and has not taken any action or done any thing which could limit the enforceability of such guarantees and warranties.

4.    Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of _____.

5.    No Assignment of Benefits Under this Agreement. Neither Prudential nor the Venture may assign this Agreement or its rights under this Agreement. This Agreement shall terminate as to both Prudential and the Venture upon any transfer by Prudential of its interest in the Venture to other than an affiliate of Prudential.

[CONTRACTOR]

By:_____
Name:_____
Its:_____

## EXHIBIT E

## FORM OF ARCHITECT'S CERTIFICATE

### [LETTERHEAD OF ARCHITECT FOR THE PROJECT]

[Dated no later than 5 days prior to the Closing date]

The Prudential Insurance Company
of America
Prudential Real Estate Investors

Re: _____

Gentlemen:

We understand that you intend to acquire an interest in _____ _____ (the "Venture"), which Venture acquired the real property in _____, more particularly described in Exhibit A attached hereto (the "Land"), and constructed an office building consisting of approximately _____ net rentable square feet, plus ____ parking spaces (collectively, the "Improvements"), pursuant to an Agreement To Acquire Joint Venture Interest, dated _____, 200___ (the "Commitment"). (The Land and Improvements shall be referred to herein collectively as the "Project".)

We understand that the receipt by you of certain written certifications from us is a condition precedent to your obligation to make a capital contribution to the Venture and to acquire an interest in the Venture. Accordingly, we hereby certify the following to the best of our knowledge, information and belief:

1. We prepared the working drawings, a true and complete copy of which is attached hereto as Exhibit B (the "Plans and Specifications"). The working drawings describe the Improvements completely and accurately.

2. The Project lies in a district designated _____ zoning under the applicable zoning ordinances of the _____. The Project, if built and used in conformity with the Plans and Specifications, is in full compliance with such zoning ordinances.

3. The Improvements contemplated by the Plans and Specifications are permitted by and in conformance with all applicable building codes and regulations and all other federal, state and local laws, rules and regulations relating to the physical aspects of improvements to land.

**R.P. Appx. 292**

~~1638252.2~~1638252.3

4.    Based on our observation of the Improvements during their construction and at the time all certificates of occupancy were issued, (a) the Improvements as actually built substantially conform to the Plans and Specifications, and comply with all Federal, state and local laws, rules, and regulations relating to the physical aspects of improvements to land, including, without limitation, those relating to zoning, building and fire codes, of which we have been made aware by the owner, and environmental laws, rules and regulations and (b) no amendment to the building permits were required subsequent to [_____].

5.    The Project complies in all respects with the Americans with Disabilities Act and all rules, regulations and guidelines promulgated in connection therewith.

6.    The specified materials for the Project do not contain asbestos or polychlorinated biphenyl (PCB) products or any other hazardous or toxic wastes or substances in violation of applicable environmental laws.

7.    The Project, if built in conformity with the Plans and Specifications, is in substantial compliance with all conditions and requirements specifically relating to construction and development of the Project contained in the following documents: [list of Private Development Covenants].

This letter is being delivered to you as a condition precedent to your making a capital contribution to the Venture and acquiring an interest in the Venture. We understand that you and the Venture are relying on this letter and that you or the Venture may pursue a claim against us in the event that you or the Venture has any loss or damage as a result of facts or circumstances that exist at the Project which make any of our certifications incorrect or inaccurate. This letter does not constitute, however, a guarantee of the work of the builder of the Improvements, and the builder and its subcontractors are solely responsible for all construction means, methods, techniques, sequences and procedures and compliance with the drawings, specifications and contract documents.

Very truly yours,

_____

By_____
Its_____

(Attachments)

R.P. Appx. 293

<u>EXHIBIT F</u>

<u>FORM OF ENGINEER'S CERTIFICATE</u>

[LETTERHEAD OF PROJECT'S ON-SITE ENGINEER]


[Dated no later than 5 days prior to Second Closing date]



The Prudential Insurance Company
of America
Prudential Real Estate Investors



Re: _____


Gentlemen:

We understand that you intend to acquire an interest in _____ _____ (the "Venture"), which Venture acquired the real property in _ _____, more particularly described in <u>Exhibit A</u> attached hereto (the "Land"), and constructed an office building consisting of approximately _____ net rentable square feet, plus ____ parking spaces (collectively, the "Improvements"), pursuant to an Agreement To Acquire Joint Venture Interest, dated _____, 200___ (the "Commitment"). (The Land and Improvements shall be referred to herein collectively as the "Project".)


We understand that the receipt by you of certain written certifications from us is a condition precedent to your obligation to make a capital contribution to the Venture and to acquire an interest in the Venture. Accordingly, we hereby certify the following:

1.     We are civil engineers licensed in the State of _____. We provided civil engineering design and construction observation services for the Improvements. Our involvement has included preparing civil engineering design plans dated [_____] (the "Plans"). In connection with rendering the Plans, we performed such research and made such investigations as we deemed appropriate in our professional judgment with respect to the Plans. Our firm provided construction observation services during site preparation and grading prior to beginning construction of buildings. In addition, we periodically observed the contractor's progress and procedures during the preparation of the site and full course of construction.

2.     We hereby represent to you that, in our professional opinion, based upon our services rendered, the Project has been designed by this office in compliance with applicable Federal, state and local approvals and design standards relating to the site improvements for the land.


R.P. Appx. 294

3. We hereby represent to you that the following utilities are connected to the Improvements and fully operational:_____. Such utilities comprise all of the utilities which were designed by this office.

4. We have concluded that on the basis of our observations that the contractor has completed the Project in substantial conformity with the "Plans and Specifications", attached hereto as Exhibit B. Further, the work we observed was completed in a manner compatible with the relevant aspects of the Land as we understood them at the time of design and in substantial compliance with our recommendations.

This letter is being delivered to you as a condition precedent to your making a capital contribution to the Venture and acquiring an interest in the Venture. We understand that you and the Venture are relying on this letter and that you or the Venture may pursue a claim against us in the event that you or the Venture has any loss or damage as a result of facts or circumstances that exist at the Project which make any of our certifications incorrect or inaccurate. This letter does not constitute, however, a guarantee of the work of the builder of the Improvements.

Very truly yours,

_____

By_____
Its_____

(Attachments)

## CONTRACTOR'S CONSENT AND AGREEMENT

The undersigned ("Contractor") acknowledges the assignment by Intellicenter Atlanta Investments, LLP, a Delaware limited liability partnership ("Owner"), to Bank of America, N.A., a national banking association, as administrative agent ("Administrative Agent") on behalf of the lenders ("Lenders") from time to time parties to the Loan Agreement (as herein defined), as additional security for the obligations of Owner under a Construction Loan Agreement ("Loan Agreement") between Owner (as Borrower), Administrative Agent and Lenders dated September 26, 2005, of Owner's rights (but not Owner's obligations) under the Construction Contract and any future modifications thereof or change orders ("Contract") between Owner and the Contractor pertaining to the project contemplated by the Loan Agreement, such project to be located upon certain real property described on Exhibit "A" attached hereto and made a part hereof (the "Property"). Contractor hereby consents to and agrees to be bound by such assignment. Contractor further represents and warrants to and agrees with Administrative Agent and Lenders as follows:

1.      The copy of the Contract attached hereto as Exhibit "B" is a true, correct and complete copy of the Contract, the Contract has not been changed or modified, and to Contractor's knowledge, the Contract is in full force and effect.

2.      If Owner defaults under the Loan Agreement or certain other Loan Documents (as defined in the Loan Agreement), Lenders may elect by a specific request in writing to (i) have Contractor continue performance under the Contract, in which case Contractor shall thereafter perform under the Contract pursuant to the remainder of this Paragraph 2, or (ii) have Contractor stop work on the project and vacate the Property, in which case Contractor shall promptly do so. If Lenders elect by specific request in writing to have Contractor continue or recommence to perform work under the Contract, Contractor shall continue or recommence performance on Lenders' behalf under the Contract in accordance with the terms thereof, and Contractor shall be reimbursed in accordance with the Contract for all work, labor and materials performed or furnished at Lender's request and prior to Lender's request; provided that, (i) with respect to reimbursement for work, labor or materials prior to Lender's request, Contractor has notified Administrative Agent in writing of the amounts owed Contractor and (ii) Lenders shall not be required to pay any amounts for work, labor or materials for which Lenders have already made an advance under the Loan Agreement . Contractor will look solely to the Owner for all sums owing under the Contract which Lenders are not required to advance pursuant to this paragraph. Contractor's agreement to act under the Contract for Lenders will not depend upon Contractor being paid any sums which Lenders are not required to advance hereunder nor on whether the Owner has otherwise defaulted under the Contract. Nor will Administrative Agent or Lenders be liable for any amounts owing Contractor if Administrative Agent (on behalf of Lenders) requests Contractor to stop work and vacate the Property pursuant to clause (ii) above. Neither Administrative Agent nor Lenders shall be liable for any damages Contractor may be entitled to recover from Owner or for change orders made by Contractor and not approved by Lenders pursuant to the Loan Agreement. In the event the Contract is terminated for any reason, Contractor shall notify Administrative Agent in writing within seven (7) days of such termination. After such termination, Contractor shall, at Lenders' option, enter into a new contract with Administrative Agent (on behalf of Lenders) upon substantially the same terms as the Contract. "Lenders" as used in this Paragraph includes Lenders' successors or assigns, any receiver in possession of the Property, any purchaser upon foreclosure of Lenders' security, or any corporation or other nominee formed by or on Lenders' behalf (collectively "Lenders' Successors"). This Paragraph 2 shall not affect the rights of Lenders or Lenders' Successors upon or following a foreclosure or transfer of title to the Property.

R.P. Appx. 296

3.    If Owner defaults in making any payment or in performing any other obligation under the Contract, Contractor shall promptly give Administrative Agent written notice thereof, specifying the default and the steps necessary to cure same; and if Contractor learns of any default in payment due any subcontractor or other person supplying labor or materials for the project, Contractor shall similarly advise the Administrative Agent thereof. Contractor will not exercise any remedy available under the Contract, at law, or in equity arising from such default by Owner until Lenders shall have had the same opportunity to cure such default to which Owner is entitled, but at least thirty (30) days in any event, if Lenders so elect to cure such default, and such longer period of time as may be necessary to obtain possession of, or title to, the Property, provided that Lenders shall have no obligation to cure any Owner default. Any curative act done by Lenders shall be as effective as if done by Owner.

4.    Contractor shall not perform work under any change order without first securing Administrative Agent's written consent to such change order unless:  (a) the Owner has certified to Contractor that Lenders' consent is not required for such change order; and (b) the cost of or reduction resulting from any single change or modification does not exceed $50,000, and the aggregate amount of all such changes and modifications does not exceed $500,000. In any such case, Contractor shall promptly provide Administrative Agent or its construction consultant with a copy of such change order or other modification. Administrative Agent's consent shall not constitute any assumption by Administrative Agent or Lenders of any obligation under the Contract. In addition, Contractor will not terminate, or in any material respect, modify or amend, the Contract without the prior written consent of Administrative Agent, provided that Contractor may terminate the Contract because of a default by Owner thereunder to the extent Contractor has such right in the Contract, provided Contractor has first complied with Paragraphs 2 and 3 above.

5.    Contractor acknowledges that the plans (the "Plans") described in the Schedule attached hereto were prepared by an architect on Contractor's staff or engaged by Contractor to prepare such Plans (the "Architect). Contractor represents and warrants to Administrative Agent and Lenders that such Architect is authorized to practice architecture under the laws of the State in which the Property is located and is familiar with the federal, state, and local laws and ordinances relevant to the construction of the improvements (the "Improvements") described in the Plans. Architect prepared all of the Plans, or such Plans were prepared under its supervision and direction, and Architect is responsible therefor. To the best of Contractor's knowledge, the Plans comply with all applicable laws, including all zoning, building, and other pertinent statutes, ordinances, rules and regulations. The Plans were prepared in accordance with customary professional standards of architectural practice for projects similar to the Improvements. The Plans are complete and adequate for the construction of the Improvements, and there have been no modifications thereof except as described on the attached Schedule. The Plans have been approved by all applicable governmental authorities. To the best of Contractor's knowledge: (a) the Improvements, if constructed in accordance with the Plans, will fully comply with all applicable laws, statutes, ordinances, codes, rules, regulations, decrees and orders (including but not limited to those relating to access and facilities for handicapped persons), applicable restrictive covenants and the site plan approved by Administrative Agent; and (b) the structural design of the Improvements, the proposed method of construction, the foundation plan, and the materials specified by the Plans for the project are adequate and appropriate for the contemplated Improvements and for the soil conditions of the construction site.

6.    Contractor hereby expressly subordinates all contractual, constitutional and statutory mechanics' and materialmen's liens to which Contractor may be or become entitled, to all liens and security interests securing the loan contemplated by the Loan Agreement (all indebtedness of Borrower, Administrative Agent and Lenders evidenced by the Loan Agreement and related loan documents are referred to herein as the "Secured Indebtedness") and expressly waives any right to remove any removable improvements from the Property. Contractor hereby expressly waives any equitable lien upon the loan funds to which Contractor might otherwise be entitled. Contractor acknowledges and agrees that,

R.P. Appx. 297

foreclosure of the liens and security interests securing the loan contemplated by the Loan Agreement shall be fully and automatically effective to cut off, terminate, and extinguish all of Contractor's liens and claims of any kind against the Property (provided, that, such termination shall not affect any rights that Contractor may have in any proceeds paid at any foreclosure of the Property in excess of the amount necessary to pay the Secured Indebtedness in full). Contractor shall require all material subcontracts and material purchase orders to contain a provision subordinating the subcontractors' and materialmen's liens to the liens and security interests securing the loan contemplated by the Loan Agreement and expressly waiving the right to remove removable improvements from the Property.

7.      As of the date hereof, Contractor has no counterclaim, right of set-off, defense or like right against Owner or Lenders, and to the best of Contractor's knowledge and belief, the Owner is not in default under the terms of the Contract. Contractor is not in default under the terms of the Contract.

8.      Nothing herein shall be construed to confer any present benefits on Contractor or to create any contractual arrangement between Contractor and Administrative Agent or Lenders or to impose upon Administrative Agent or Lenders any duty to see to the application of the proceeds of the loan contemplated by the Loan Agreement or to give any notice of any type to Contractor. Contractor acknowledges that Administrative Agent and Lenders are obligated under the Loan Agreement only to the Owner and to no other person or entity. Contractor is executing this Contractor's Consent and Agreement to induce Lenders to advance funds under the Loan Agreement, and Contractor understands that Lenders would not do so but for Contractor's execution and delivery of this Contractor's Consent and Agreement.

9.      Contractor shall provide Administrative Agent promptly in each case with (a) any information Contractor may have regarding defects in workmanship or materials incorporated into or provided for the project which come to Contractor's attention, (b) Contractor's estimate(s) of the stage(s) of completion of the project, (c) any deviations or variations in construction of the project from the plans and specifications used by Contractor, (d) any information Contractor may have regarding any defaults by Owner, or any other contractor or subcontractor under any construction contracts, and (e) any claims of non-payment by any person furnishing labor or material in connection with construction of the project.

10.      This Contractor's Consent and Agreement shall bind and benefit Contractor, Administrative Agent, Lenders and their respective successors and assigns, including Lenders' Successors, their successors and assigns.

11.      Any notice for purposes of this Contractor's Consent and Agreement shall be given in writing and shall be addressed or delivered to the respective addresses set forth below, or to such other address as may have been previously designated by the intended recipient by notice given in accordance with this Section and shall be delivered by personal delivery, by nationally recognized overnight courier service, by prepaid registered or certified United States mail (return receipt requested), or by facsimile. The notice shall be deemed effective when the receipt is signed or when the attempted initial delivery is refused or cannot be made because of a change of address of which the sending party has not been notified; and if transmitted by facsimile or personal delivery, the notice shall be effective when received. Until changed by notice given in accordance with this Section, the initial respective addresses for notices are the following:

To Administrative
Agent and Lender:          Bank of America, N.A.
                           901 Main Street, 21st Floor
                           Dallas, Texas 75202-3714
                           Attention: Real Estate Loan Administration
                           Fax No. 214.209.1832

R.P. Appx. 298

To Contractor: _____
_____
_____
_____
Attention: _____
Fax No. _____

12.     The provisions of this Contractor's Consent and Agreement cannot be waived, modified or amended unless such waiver, modification or amendment is in writing and is executed on behalf of each of Administrative Agent and Contractor.

13.     Prior to the date hereof, no work of any kind, including the destruction or removal of any existing improvements, site work, clearing, grubbing, draining or fencing of the Property, has been commenced or performed on the Property and no equipment or materials have been delivered to the Property for any purpose whatsoever.

14.     Neither the Contract, nor any memorandum, affidavit or notice thereof, has been recorded by or on behalf of Contractor in the county where the Property is located or in any other county. No affidavit of commencement of construction of any improvements, performance of labor, furnishing of materials, or providing of specially fabricated materials in connection with the construction contemplated by the Contract has been executed or filed by Contractor in the county where the Property is located or in any other county. Contractor will, however, join in the execution of such an affidavit once such work has commenced in form and substance satisfactory to Administrative Agent.

15.     Contractor will address to Administrative Agent, naming Administrative Agent as an additional named party or beneficiary, all certificates, statements, or representations regarding the completion of the project or any portion thereof.

16.     THIS CONTRACTOR'S CONSENT AND AGREEMENT AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION, SHALL BE GOVERNED BY TEXAS LAW (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES) AND APPLICABLE UNITED STATES FEDERAL LAW.

R.P. Appx. 299

EXECUTED this _____ day of _____, 2005.

"CONTRACTOR"

 

_____

By:_____

Name: _____

Title:_____

# EXHIBIT A

## LAND

# EXHIBIT B

## CONTRACT

`

## SCHEDULE OF PLANS AND SPECIFICATIONS

Project: _____

Location: _____

| Drawing No.<br>& Page Nos. | Description | Date |
|---|---|---|

4049692v.2

DC-15-02018

| | | |
|---|---|---|
| FORUM STUDIO, INC. and CLAYCO, INC., | § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | OF DALLAS COUNTY, TEXAS |
| INTELLICENTER DALLAS INVESTMENTS LLP, | § § § | |
| Defendants. | § § | 160TH JUDICIAL DISTRICT |

## ORDER ON PLAINTIFFS' APPLICATION TO STAY ARBITRATION

On this day, the Court considered the Application to Stay Arbitration ("Application") filed by Plaintiffs Forum Studio, Inc. and Clayco, Inc. ("Plaintiffs"). After reviewing the Application, the responses and replies thereto, if any, the Court is of the opinion that the Application should be DENIED. It is, therefore:

ORDERED that Plaintiffs' Application to Stay Arbitration is hereby DENIED.

SIGNED this _17_ day of _March_ , 2015.

_____
JUDGE PRESIDING

R.P. Appx. 304

DC-15-02018

| | | |
|---|---|---|
| FORUM STUDIO, INC. and CLAYCO, INC., | § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § § | |
| v. | § § | OF DALLAS COUNTY, TEXAS |
| INTELLICENTER DALLAS INVESTMENTS LLP, | § § § | |
| Defendants. | § § | 160TH JUDICIAL DISTRICT |

### ORDER DENYING PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER

On this day, the Court considered the Application for Temporary Restraining Order ("Application") filed by Plaintiffs Forum Studio, Inc. and Clayco, Inc. ("Plaintiffs"). After reviewing the Application, the responses and replies thereto, if any, the Court is of the opinion that the Application for Temporary Restraining Order should be DENIED. It is, therefore:

ORDERED that Plaintiffs' Application for Temporary Restraining Order is hereby DENIED.

SIGNED this 17 day of March, 2015.

_____
JUDGE PRESIDING

R.P. Appx. 305

DC-15-02018

| | | |
|---|---|---|
| FORUM STUDIO, INC. and | § | IN THE DISTRICT COURT |
| CLAYCO, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | OF DALLAS COUNTY, TEXAS |
| | § | |
| INTELLICENTER DALLAS | § | |
| INVESTMENTS LLP, | § | |
| | § | |
| Defendant. | § | 160TH JUDICIAL DISTRICT |

### DEFENDANT INTELLICENTER DALLAS INVESTMENT LLP'S
### MOTION TO COMPEL ARBITRATION

Defendant Intellicenter Dallas Investments LLP ("Intellicenter") files this Motion to

Compel Arbitration (the "Motion") and would show the Court as follows:

### I.
### INTRODUCTION AND FACTUAL SUMMARY

On or about May 19, 2006, Intellicenter contracted with Plaintiff Clayco, Inc. ("Clayco")

under a Design Build contract ("Contract") for the design and construction of a 4 story

speculative office building consisting of approximately 211,637 square feet located at 3701

Regent Boulevard, Irving Texas ("Project").[1] The Contract assigned Clayco as the general

contractor and Plaintiff Forum Studio, Inc. ("FS") as the Project's architect. The Contract

contains an arbitration provision stating that:

> **Any Claim arising out of or related to the Contract . . . <u>shall</u> be
> subject to binding arbitration. Prior to arbitration, the parties
> shall endeavor to resolve disputes my mediation . . . Claims not
> resolved by mediation shall be decided by <u>binding</u> arbitration
> which, unless the parties mutually agree otherwise, shall be in**

---

[1] *See* Standard Form Agreement Between Owner and Contract and General Conditions of the Contract for Construction, a true and correct copy of which is attached to Intellicenter's Amended Counterclaim as **Exhibit A**.

DEFENDANT INTELLICENTER DALLAS INVESTMENT LLP'S
MOTION TO COMPEL ARBITRATION

R.P. Appx. 306

**accordance with the Construction Industry Arbitration Rules
of the American Arbitration Association currently in effect.**[2]

On September 5, 2014, Intellicenter filed a demand for arbitration to recover the losses sustained as a result of Plaintiffs' breach of contract, breach of implied warranty, unjust enrichment, deficient design, fraud and/or negligent misrepresentation.[3] The Parties subsequently submitted the claims to mediation before Judge Glen M. Ashworth. Efforts to resolve the dispute in mediation failed. As required by the terms of the Contract, Intellicenter began preparing for arbitration before the AAA.

On February 20, 2015, Plaintiffs commenced this litigation with the filing of their Original Petition requesting a stay of the arbitration proceedings and seeking affirmative relief under the Declaratory Judgment Act as well as attorneys' fees.[4] The Court denied Plaintiffs' request for a stay on March 17, 2015.[5] Intellicenter now moves the Court to formally remove this matter to binding arbitration. The Parties' claims are indisputably related to the terms and obligations of the Contract and are, therefore, clearly subject to arbitration. Because all issues before the Court are properly subject to arbitration, the Court should grant this Motion and stay the current matter pending those proceedings. This Motion is filed to enforce the Court's March 17, 2015 Order denying Plaintiffs' application to stay arbitration.

---

[2] *See* Exhibit A, at 4.6.1-2 (emphasis added).

[3] *See* Intellicenter's Demand for Arbitration, a true and correct copy of which is attached to Defendant's Response to Plaintiffs' Application to Stay Arbitration as **Exhibit B**.

[4] *See* Plaintiff's Original Petition, at ¶¶ 26-35; Plaintiffs sought this same relief as well as a temporary restraining order against the American Arbitration Association in their First Amended Original Petition, ¶¶ 39 - 49.

[5] *See* March 17, 2015 Order Denying Plaintiffs' Application to Stay Arbitration.

R.P. Appx. 307

## II.
## MOTION TO COMPEL ARBITRATION

Both Texas and federal courts have long shown favor toward the enforcement of arbitration agreements.[6]  Because state and federal policies continue to favor arbitration, a presumption exists favoring agreements to arbitrate.[7]  In light of these strong state and federal policies, Texas and federal courts agree that any written agreement to submit a dispute to arbitration should be liberally construed, and any doubt as to the arbitrability – whether construction of the contract or any defense to arbitrability – should be resolved in favor of arbitration.[8]

For the court to compel arbitration, the moving party must show the claims at issue: (1) are subject to a valid arbitration agreement; and (2) fall within the scope of the agreement.[9]  The court must resolve any doubts about an agreement to arbitrate in favor of arbitration.[10]  Once the court determines the claims fall within the arbitration agreement, the trial court must compel arbitration and stay its own proceedings.[11]

---

[6] *See Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984); *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 268 (Tex. 1992).

[7] *United Offshore Company v. Southern Deepwater Pipeline Co.*, 899 F.2d 405, 408 (5th Cir.1990); *Colt Unconventional Resources, LLC v. Resolute Energy Corp.*, CA No. 3:13–CV–1324–K, 2013 WL 3789896, 3 (N.D. Tex. July 19, 2013); *In re First Merit Bank, N.A.*, 52 S.W.3d 749, 753 (Tex. 2001).

[8] *See Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983); *Rojas v. TK Commc'ns, Inc.*, 87 F.3d 745, 749 (5th Cir. 1996); *Austin Mun. Sec., Inc. v. Nat'l. Ass'n of Sec. Dealers, Inc.*, 757 F.2d 676, 696 (5th Cir. 1985); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

[9] *American Heritage v. Lang*, 321 F.3d 533, 537 (5th Cir. 2003); *Webb v. Investacorp,* 89 F.3d 252, 257 (5th Cir. 1996).

[10] *Fedmet Corp. v. M/V Buyalyk*, 194 F.3d 674 (5th Cir. 1999). *Colt Unconventional Resources, LLC v. Resolute Energy Corp.*, CA No. 3:13–CV–1324–K, 2013 WL 3789896, 3 (N.D. Tex. July 19, 2013).

[11] *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir.1992).

R.P. Appx. 308

In rejecting Plaintiffs' Application to Stay Arbitration, this Court determined that a valid arbitration agreement exists and that the Parties' claims fall within its scope.[12] An order compelling arbitration is now required. Under the very statute Plaintiffs invoked, "[i]f the Court finds for the party opposing the stay, the court **shall** order the parties to arbitrate."[13] To formally enforce this Court's prior Order, the Court should grant this Motion and stay the instant matter pending arbitration.

### III.
### CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant Intellicenter Dallas Investments LLP requests that the Court grant this Motion to Compel Arbitration and award all relief, in law and in equity, to which it may show itself justly entitled.

---

[12] *See* March 17, 2015 Order Denying Plaintiffs' Application to Stay Arbitration. As it did in its Response to Plaintiffs' Application to Stay Arbitration, Intellicenter notes that FS does not seek to avoid arbitration as a "non-signatory" to the Contract. But even had FS asserted this defense, it would ultimately fail. Non-signatories to a contract containing an arbitration clause may be required to arbitrate under principles of equity. *See In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 644 (Tex. 2009); *see also In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131 (Tex. 2005). To that end, Texas courts recognize the doctrine of direct benefits estoppel. "Under the doctrine of 'direct benefits equitable estoppel,' a person who has not agreed to arbitrate may nevertheless be compelled to do so when the person seeks to derive a direct benefit from the contract containing the arbitration provision." *In re Morgan Stanley & Co., Inc.*, 293 S.W.3d 182 (Tex. 2009). Direct benefits equitable estoppel also applies to a non-signatory who sues on a contract containing an arbitration clause. *Id*. Here, there can be no dispute that FS received direct, financial benefits from the Contract—the same agreement on which it has filed suit. As a result, claims arising out of or related to the services FS rendered are properly subject to binding arbitration.

[13] TEX. CIV. PRAC. & REM. CODE ANN. § 171.023(c) (emphasis added).

R.P. Appx. 309

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

/s/ Greg Noschese

Greg C. Noschese
State Bar No. 00797164
John Devin Wagner
State Bar No. 24090451
500 North Akard Street, Suite 3800
Dallas, Texas 75201-6659
(214)855-7500 (Telephone)
(214)855-7584 (Facsimile)
gnoschese@munsch.com
dwagner@munsch.com

**ATTORNEYS FOR DEFENDANT
INTELLICENTER DALLAS
INVESTMENTS LLP**

### CERTIFICATE OF CONFERENCE

I hereby certify that on March 27, 2015, the undersigned conferred with counsel for Plaintiffs in an attempt to resolve the issues discussed herein. Those efforts failed, necessitating the filing of this Motion.

/s/ Greg C. Noschese

Greg C. Noschese

R.P. Appx. 310

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of March, 2015, a true and correct copy of the foregoing instrument was served on the following by Eserve:

Kenneth B. Chaiken
**CHAIKEN & CHAIKEN, PC**
5801 Tennyson Pkwy, Suite 440
Plano, TX  75024
(214)265-0250
(214)265-1537 (fax)
Email:  kchaiken@chaikenlaw.com

R. Thomas Avery
**BLITZ, BARDGETT & DEUTSCH, LC**
120 South Central Avenue, Suite 1650
St. Louis, Missouri  63105
(314)863-1500
(314)863-1877 (Fax)
Email:  rtavery@bbdle.com

/s/ Greg C. Noschese
Greg C. Noschese

DC-15-02018

| | | |
|---|---|---|
| FORUM STUDIO, INC. and | § | IN THE DISTRICT COURT |
| CLAYCO, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | OF DALLAS COUNTY, TEXAS |
| | § | |
| INTELLICENTER DALLAS | § | |
| INVESTMENTS LLP, | § | |
| | § | |
| Defendants. | § | 160TH JUDICIAL DISTRICT |

## DEFENDANT INTELLICENTER DALLAS INVESTMENTS LLP's RESPONSE TO PLAINTIFF'S APPLICATION TO STAY ARBITRATION

Defendant Intellicenter Dallas Investments LLP ("Intellicenter") files its Response to Plaintiffs' Application to Stay Arbitration. In support thereof, Intellicenter would respectfully show as follows:

**I.**
**FACTUAL BACKGROUND AND INTRODUCTION**

On or about May 19, 2006, Intellicenter contracted with Plaintiff Clayco, Inc. ("Clayco") under a Design Build contract ("Contract") for the design and construction of a 4 story speculative office building consisting of approximately 211,637 square feet located at 3701 Regent Boulevard, Irving Texas ("Project").[1] The Contract assigned Clayco as the general contractor and Plaintiff Forum Studio, Inc. ("FS") as the Project's architect. Clayco and FS are collectively referred to as "Plaintiffs".[2]

---

[1] *See* Standard Form Agreement Between Owner and Contract and General Conditions of the Contract for Construction, a true and correct copy of which is attached hereto as **Exhibit A**.

[2] *See id*. at 1.

**Defendant's Response to Plaintiffs' Application to Stay Arbitration**          Page **1** of **12**

Pursuant to Section 4.6.1 of the Contract, the Parties agreed that "[a]ny Claim arising out of related to the Contract . . . <u>shall</u> be subject to binding arbitration." The clause further provides that "[p]rior to arbitration, the parties shall endeavor to resolve disputes by mediation." Section 4.6.2 of the Contract instructs that "[c]laims not resolved in mediation shall be decided by <u>binding</u> arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association."

On or about September 5, 2014, Intellicenter filed a demand for arbitration to recover the losses sustained as a result of Plaintiffs' breach of contract, breach of implied warranty, unjust enrichment, deficient design, fraud and/or negligent misrepresentation.[3] The Parties subsequently submitted the claims to mediation before Judge Glen M. Ashworth. Efforts to resolve the dispute in mediation failed. As expressly stipulated by the terms of the Contract, Intellicenter began preparing for arbitration before the AAA.

On February 20, 2015, Plaintiffs filed their Original Petition requesting a stay of the arbitration proceedings and related Motion for Dismiss and Request for Declaratory Judgment.[4] Arguing that Intellicenter failed to satisfy "a condition precedent" to its right to arbitrate, Plaintiffs contend the right has been waived.[5] Intellicenter filed its answer and counterclaims on March 2, 2015.

Intellicenter now files this Response to Plaintiffs' Application to Stay the Arbitration Case ("Response"). The plain terms of the Contract and binding precedent instruct that the arbitrability of this dispute be decided solely by the AAA. And Plaintiffs' grounds for avoiding

---

[3] *See* Intellicenter's Demand for Arbitration, a true and correct copy of which is attached hereto as **Exhibit B**.

[4] *See* Plaintiff's Original Petition, at ¶¶ 26-35.

[5] *Id*. at ¶ 27.

arbitration merely demonstrate why it is required. This Court should refuse to disturb the Parties' agreement and deny the application to stay arbitration.

## II.
## ARGUMENT AND AUTHORITIES

**1.** **THE ARBITRABILITY OF THIS DISPUTE IS A MATTER RESERVED FOR THE AAA.**

"An arbitrator's jurisdiction is defined by the parties' contract."[6] The arbitrator has the power to decide what matters are arbitrable where the arbitration clause "clearly and unmistakably" gives that power to the arbitrator.[7] Here, the Parties "clearly and unmistakably" gave that power to the AAA.

The Contract's arbitration clause is broad, covering "[a]ny claim arising out of or related to the Contract."[8] Federal and state courts agree that the broader the arbitration clause, the stronger the presumption of arbitrability.[9] In addition, "the express incorporation of rules that empower the arbitrator to determine arbitrability—such as the AAA Commercial Arbitration Rules—has been held to be *clear and unmistakable evidence of the parties' intent to allow the arbitrator to decide such issue*s."[10] The Parties elected to pursue arbitration "in accordance with

---

[6] *Am. Realty Trust, Inc. v. JDN Real Estate- McKinney, L.P.*, 74 S.W.3d 527, 531 (Tex. App.—Dallas 2002, pet. denied).

[7] *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83 (2002).

[8] *See* **Exhibit A**, at 4.6.1; *see also Ascendant Anesthesia PLLC v. Abazi*, 348 S.W.3d 454, 461 (Tex. App.—Dallas 2011, no pet.) (noting arbitration provision that assigns "any controversy, dispute, or claim" to arbitration is construed broadly and in favor of arbitration); *950 Corbindale, L.P. v. Kotts Capital Holdings Ltd. P'ship*, 316 S.W.3d 191, 195–96 (Tex.App.—Houston [14th Dist.] 2010, no pet.) ("presumption of arbitrability is particularly applicable when the clause is broad; that is, it provides for arbitration of 'any dispute arising between the parties'").

[9] *See, e.g.*, *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 650 (1986).

[10] *Schlumberger Tech. Corp. v. Baker Hughes Inc.*, 355 S.W.3d 791, 802 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see also Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1372–73 (Fed. Cir. 2006) (concluding that agreement's incorporation of AAA rules clearly and unmistakably showed parties' intent to delegate issue of determining arbitrability to arbitrator); *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332–33 (11th Cir. 2005) (holding that by incorporating AAA Rules into arbitration agreement, parties clearly and

**Defendant's Response to Plaintiffs' Application to Stay Arbitration** Page **3** of **12**

the Construction Industry Arbitration Rules of the American Arbitration Association." ("CIARAAA").[11] The CIARAAA recognize the arbitrator's authority "to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."[12] Thus, the breadth of the arbitration clause and specific language of the applicable rules mandate that issues of arbitrability remain with the AAA. Plaintiffs' application to stay the proceedings should thus be denied.

## 2. THE ARBITRATION CLAUSE COVERS THE PARTIES' DISPUTE.

Alternatively, if the Court finds it may properly decide arbitrability, the arbitration clause subsumes the Parties' dispute. Both Texas and federal courts have long shown favor toward the enforcement of arbitration agreements.[13] Because state and federal policies continue to favor arbitration, a presumption exists favoring agreements to arbitrate.[14] In light of these strong state and federal policies, Texas and federal courts agree that any written agreement to submit a dispute to arbitration should be liberally construed, and any doubt as to the arbitrability –

---

unmistakably agreed that arbitrator should decide whether arbitration clause was valid); *Contec Corp. v. Remote Solution, Co.*, 398 F.3d 205, 208 (2d Cir. 2005) ("[W]hen ... parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."); *Citifinancial, Inc. v. Newton*, 359 F.Supp.2d 545, 549–52 (S.D. Miss. 2005) (holding that by agreeing to be bound by procedural rules of AAA, including rule giving arbitrator power to rule on his or her own jurisdiction, defendant agreed to arbitrate questions of jurisdiction before arbitrator); *Sleeper Farms v. Agway, Inc.*, 211 F.Supp.2d 197, 200 (D. Me. 2002) (holding arbitration clause stating that arbitration shall proceed according to rules of AAA provides clear and unmistakable delegation of scope-determining authority to arbitrator).

[11] **Exhibit A,** at 4.6.2.

[12] CIARAAA R-9(a).

[13] *See Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984); *see also Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 268 (Tex. 1992).

[14] *United Offshore Company v. Southern Deepwater Pipeline Co.*, 899 F.2d 405, 408 (5th Cir. 1990); *Colt Unconventional Resources, LLC v. Resolute Energy Corp.*, CA No. 3:13–CV–1324–K, 2013 WL 3789896, 3 (N.D. Tex. July 19, 2013); *In re First Merit Bank, N.A.*, 52 S.W.3d 749, 753 (Tex. 2001).

whether construction of the contract or any defense to arbitrability – should be resolved in favor of arbitration.[15]

Generally, if the facts alleged "touch matters," have a "significant relationship" to, are "inextricably enmeshed" with, or are "factually intertwined" with the contract that is subject to the arbitration agreement, the matter is arbitrable.[16] However, if the facts alleged *are completely independent of the contract*, *and the claim could be maintained without reference to the contract, the claim is not subject to arbitration.*[17] The Federal Arbitration Act strongly favors arbitration and, as discussed above, any doubts as to whether a claim falls within the scope of an arbitration agreement must be resolved in favor of arbitration.[18] Thus, Plaintiffs' application to stay arbitration should be denied "unless it can be said with positive assurance that the arbitration clause is not susceptible to an interpretation which would cover the dispute at issue."[19]

The live pleadings clearly demonstrate the inextricably enmeshed nature of the terms of the Contract and the allegations at play. Plaintiffs' Original Petition concerns conditions to invoking the arbitration clause and the "contractual accrual date" of Intellicenter's claims and causes of action.[20] Similarly, Intellicenter's allegations turn on whether Plaintiffs designed and constructed the Project in accordance with their contractual obligations. It is self-evident that an adjudicator cannot resolve these disputes "without reference to the contract," as each are

---

[15] *See Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983); *Rojas v. TK Commc'ns, Inc.*, 87 F.3d 745, 749 (5th Cir. 1996); *Austin Mun. Sec., Inc. v. Nat'l. Ass'n of Sec. Dealers, Inc.*, 757 F.2d 676, 696 (5th Cir. 1985); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

[16] *Pennzoil Co. v. Arnold Oil Co., Inc.*, 30 S.W.3d 494, 498 (Tex. App.—San Antonio 2000, no pet.).

[17] *Id.* (citing *Fridl v. Cook*, 908 S.W.2d 507, 511 (Tex. App.—El Paso 1995, writ dism'd w.o.j.) (emphasis added).

[18] *Id.*

[19] *Id.* (internal quotation and citations omitted); *see also*, *AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650 (1986).

[20] *See* Plaintiffs' Original Petition, at ¶¶ 24, 27.

**Defendant's Response to Plaintiffs' Application to Stay Arbitration**                    Page **5** of **12**

R.P. Appx. 316                                                                                      5

factually intertwined with the very terms to which the Parties agreed. Because the allegations and Contract cannot be divorced, this Court cannot "with positive assurance" determine that arbitration should be stayed. Accordingly, Plaintiffs' application to stay the proceedings should be denied.[21]

### 3. PLAINTIFFS' POSITION MERELY PROVES WHY ARBITRATION IS REQUIRED.

Plaintiffs aver that Intellicenter's compliance with Section 150.002 of the Texas Civil Practices & Remedies Code represents a "condition precedent" to Intellicenter's right to arbitration.[22] Plaintiffs argue Intellicenter "waive[d]" that right because the "condition precedent cannot be satisfied."[23] The argument is unavailing, misguided and simply self-defeating.

Unlike issues of substantive arbitrability, "[p]rocedural arbitrability is the province of the arbitrator."[24] Procedural arbitrability entails "[i]ssues of notice, time limits, laches, and estoppel," or "generally any issue requiring the adjudicator to decide if a party has satisfied the prerequisites" of a right to arbitration.[25] "*[W]hether the issue is described as being a failure to*

---

[21] Intellicenter notes that FS does not seek to avoid arbitration as a "non-signatory" to the Contract. That issue is thus not properly before the Court. But even if FS had asserted this defense, it would ultimately fail. Non-signatories to a contract containing an arbitration clause may be required to arbitrate under principles of equity. *See In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 644 (Tex. 2009); *see also In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131 (Tex. 2005). To that end, Texas courts recognize the doctrine of direct benefits estoppel. "Under the doctrine of 'direct benefits equitable estoppel,' a person who has not agreed to arbitrate may nevertheless be compelled to do so when the person seeks to derive a direct benefit from the contract containing the arbitration provision." *In re Morgan Stanley & Co., Inc.*, 293 S.W.3d 182 (Tex. 2009). Direct benefits equitable estoppel also applies to a nonsignatory who sues on a contract containing an arbitration clause. *Id.* Here, there can be no dispute that FS received direct, financial benefits from the Contract—the same agreement on which it has filed suit. As a result, claims arising out of related to the services FS rendered are properly subject to binding arbitration.

[22] Plaintiff's Original Petition, at ¶ 27.

[23] *Id.*

[24] *In re Global Const. Co., L.L.C.*, 166 S.W.3d 795, 798 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (citing *Howsam*, 537 U.S. at 84-85).

[25] *Id.*

**Defendant's Response to Plaintiffs' Application to Stay Arbitration** Page **6** of **12**

*meet a condition precedent or is described as waiver . . . each one presents an issue of procedural arbitrabilit*y."[26]

Here, Plaintiffs seek to quash arbitration with defenses that are decidedly procedural.[27] But Plaintiffs' position only demonstrates why arbitration is required. Plaintiffs simply cannot avoid the well-established precept that "[t]rial court[s] [are] not authorized to address questions of procedural arbitrability such as the satisfaction of conditions precedent to a right of arbitration."[28] Intellicenter is unaware of any authority removing the "condition precedent" claimed here from the gamut of the rule. And given that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[,]" a strained analysis is not required.[29] Because Plaintiffs' challenges to arbitration are admittedly procedural, their request to stay the proceedings should be denied.

### 4. INTELLICENTER SATISFIED THE MUTUALLY AGREED CONDITIONS TO ARBITRATION.

Even if the Court could decide issues of procedural arbitrability—which it cannot— Intellicenter has satisfied all conditions for arbitrating this dispute. Section 4.6.1 of the Contract

---

[26] *Id.* (emphasis added); *see also Grand Homes 96, L.P. v. Loudermilk*, 208 S.W.3d 696, 703 (Tex. App.—Fort Worth 2006, pet. denied) (noting Texas courts hold that "matters of waiver and delay in requesting arbitration should be presented to the arbitrator for resolution"); *In re Weekley Homes*, 985 S.W.2d 111, 114 (Tex. App.—San Antonio 1998, no pet.) (holding plaintiffs' "contention that [defendant's] failure to perform a condition precedent released them from the arbitration provision is a procedural question the arbitrator should address"); *City of Lubbock v. Hancock*, 940 S.W.2d 123, 127 (Tex. App.—Amarillo 1996, no writ) (noting Section 171 of the Texas Civil Practices & Remedies Code "does not require or authorize a court to address questions of procedural arbitrability such as the satisfaction of conditions precedent to a right of arbitration").

[27] *See Howsam*, 537 U.S. at 84-85.

[28] *In re Gardner Zemke Co.*, 978 S.W.2d 624, 627 (Tex. App.—El Paso 1998, no pet.); *see also John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964) (holding that an arbitrator should decide whether the first two steps of a grievance procedure were completed, where these steps are prerequisites to arbitration).

[29] *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983); *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 753 (Tex. 2001) ("courts must resolve any doubts about an arbitration agreement's scope in favor of arbitration").

provides that "[p]rior to arbitration, the parties shall endeavor to resolve disputes by mediation . . ." The Parties completed that endeavor but resolution failed. As for any remaining prerequisites, the Parties expressly agreed that:

> Claims not resolved by mediation shall be decided by binding arbitration which, **unless the parties mutually agree otherwise**, **shall be in accordance with the Construction Industry Rules of the American Arbitration Association currently in effect**. The demand for arbitration shall be filed in writing with the other party to the Contract and with American Arbitration Association."[30]

The CIARAAA set forth the requirements to initiate a demand for arbitration.[31] Plaintiffs do not contest Intellicenter's compliance with these rules, and the Parties have not agreed to any further or additional conditions to arbitration.[32] Thus, Plaintiffs' procedural arbitrability arguments—had they been properly raised—still ultimately fail.

## 5. SECTION 150.002 HAS NO BEARING ON THIS CASE.

### A. *Section 150.002 Does Not Apply to the Pending Arbitration.*

While Intellicenter maintains that only the AAA may adjudicate this dispute, it offers a glimpse of why Plaintiffs' reliance on section 150.002 is misplaced. The plain language of the statute reveals it does not apply to the Parties' pending arbitration. The statute's certificate of

---

[30] **Exhibit A,** at 4.6.2 (emphasis added).

[31] Those prerequisites are found in CIAAA R-4:
 (i) The initiating party ("the claimant") shall, within the time period, if any, specified in the contract(s), file with the AAA a demand for arbitration, the administrative filing fee, and a copy of the applicable arbitration agreement from the parties' contract which provides for arbitration. Filing may be accomplished through use of AAA WebFile, located at www.adr.org, or by filing the demand with any AAA office.
 (ii) The claimant shall simultaneously provide a copy of the demand and the applicable arbitration agreement to the opposing party ("the respondent").
 (iii) The demand shall include:
  (a) The name of each party;
  (b) The address for each party, including, if known, telephone and fax numbers and email addresses;
  (c) If applicable, the names, addresses, telephone and fax numbers and, if known, email address of the known representative for each party;
  (d) A statement setting forth the nature of the claim including the relief sought and the amount involved;
  (e) The locale requested, if the arbitration agreement does not specify one.

**Defendant's Response to Plaintiffs' Application to Stay Arbitration**          Page **8** of **12**

merit requirements apply only to a "plaintiff."[33] But Intellicenter is not a "plaintiff" by definition; Intellicenter is a "claimant" in an arbitration proceeding.[34] Likewise, the statute only applies to "complaints."[35] Intellicenter did not file a "complaint," but rather a "demand for arbitration."[36]

If "plaintiff" was intended to include "claimant," as Plaintiffs may ultimately contend, the Texas Legislature would not consider amending the statute to change "plaintiff" to "claimant." But that is exactly what the Texas Legislature is currently considering.[37] Simply put, Intellicenter is not a "plaintiff," it did not file a "complaint" and the statute's procedural requirements do not apply. To hold otherwise ignores that courts are bound to interpret a statute in accordance with "the plain meaning of the provision's words and terms."[38]

### B.        Section 150.002 Does Not Apply to Plaintiffs.

Nor do Plaintiffs qualify for the shelter they seek. The statute's certificate of merit requirements apply only in actions "arising out of the provision of professional services by a *licensed or registered professional*."[39] Because neither FS nor Clayco satisfy the statutory definition of "licensed or registered professional," section 150.002 has no bearing on this case.

---

[33] Tex. Civ. Prac. & Rem. Code Ann. § 150.002(a).

[34] *See* **Exhibit B**.

[35] Tex. Civ. Prac. & Rem. Code Ann § 150.002(a).

[36] *See* **Exhibit B**.

[37] 2015 Tex. H.B. 1353, 84th Leg., R.S. (2015).

[38] *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865 (Tex. 1999).

[39] Tex. Civ. Prac. & Rem. Code Ann. § 150.002(a) (emphasis added).

**Defendant's Response to Plaintiffs' Application to Stay Arbitration**                    Page **9** of **12**

Texas Civil Practices & Remedies Code 150.001(1-a) defines "licensed or registered professional as a licensed architect, licensed professional engineer …or any firm in which such licensed or registered professional practices . . . ." The express terms of the Contract recognize that "[Clayco] is not a licensed architect or engineer[,]"[40] and Hans Hecker, FS's principal and the individual who signed the Architect's Certificate,[41] is not licensed by the Texas Board of Architectural Examiners.[42] The statute plainly provides that a firm qualifies as a "licensed or registered professional" *only* if its practicing architect does.[43] Because Hecker does not satisfy the statutory definition of licensed or registered professional, neither does FS. Plaintiffs' procedural posturing is fatally flawed, and their application to stay arbitration should be denied.

### III.
### CONCLUSION AND PRAYER

For these reasons, Defendant Intellicenter Dallas Investments LLP respectfully requests that the Court deny Plaintiffs' Application to Stay the Arbitration Case and further requests any such additional or other relief to which it may show itself justly entitled, whether in law or in equity.

---

[40] *See* **Exhibit A**, at Article 3.

[41] *See* Architect's Certificate executed by Hans Hecker as principal of Forum Studio, Inc., a true and correct copy of which is attached hereto as **Exhibit C**.

[42] Intellicenter requests the Court take judicial notice of Hecker's status by visiting: http://www.tbae.state.tx.us/publicinformation/finddesignprofessional.

[43] *See id.* § 150.001(1-a).

**Defendant's Response to Plaintiffs' Application to Stay Arbitration**

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

/s/ Greg Noschese

Greg C. Noschese
State Bar No. 00797164
John Devin Wagner
State Bar No. 24090451
500 North Akard Street, Suite 3800
Dallas, Texas 75201-6659
(214)855-7500 (Telephone)
(214)855-7584 (Facsimile)
gnoschese@munsch.com
dwagner@munsch.com

**ATTORNEYS FOR DEFENDANT
INTELLICENTER DALLAS
INVESTMENTS LLP**

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of March, 2015, a true and correct copy of the foregoing instrument was served on the following by Eserve:

Kenneth B. Chaiken
**CHAIKEN & CHAIKEN, PC**
5801 Tennyson Pkwy, Suite 440
Plano, TX  75024
(214)265-0250
(214)265-1537 (fax)
Email:  kchaiken@chaikenlaw.com

R. Thomas Avery
**BLITZ, BARDGETT & DEUTSCH, LC**
120 South Central Avenue, Suite 1650
St. Louis, Missouri  63105
(314)863-1500
(314)863-1877 (Fax)
Email:  rtavery@bbdle.com

/s/ Greg C. Noschese
Greg C. Noschese

# Exhibit A



# AIA® Document A111™ – 1997

## Standard Form of Agreement Between Owner and Contractor
where the basis for payment is the COST OF THE WORK PLUS A FEE with a negotiated
Guaranteed Maximum Price

**AGREEMENT** made as of the nineteenth day of May in the year two thousand six
*(In words, indicate day, month and year)*

**BETWEEN** the Owner:
*(Name, address and other information)*

Intellicenter Dallas Investments, LLP
8115 Preston Rd., Suite #700
Dallas, TX 75225
and the Contractor:
*(Name, address and other information)*

Clayco, Inc.
2199 Innerbelt Business Center Drive
St. Louis, Missouri 63114

The Project is:
*(Name and location)*

The design and construction of a 4-story speculative office building, consisting of
approximately 211,637 gross square feet, located at 3701 Regent Blvd., Irving, Texas.

The Architect is:
*(Name, address and other information)*
FS Architecture, PC
c/o Forum Studios, Inc.
2199 Innerbelt Business Center Drive
St. Louis, Missouri 63114

Structural, mechanical, electrical and civil engineering services and the consulting services
of other Design Professionals for the Project will be provided contractually through the
Architect except as follows: Topographic and boundary survey to be provided by Owner.

The Owner and Contractor agree as follows.

This document has important
legal consequences.
Consultation with an attorney
is encouraged with respect to
its completion or modification.

This document is not intended for
use in competitive bidding.

AIA Document A201-1997,
General Conditions of the
Contract for Construction, is
adopted in this document by
reference. Do not use with other
general conditions unless this
document is modified.

This document has been
approved and endorsed by the
Associated General Contractors
of America.

---

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects.
All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or
distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum
extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on
7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)                                                (2347931739)

1

R.P. Appx. 325                                                                                                    14

## ARTICLE 1 THE CONTRACT DOCUMENTS

The Contract Documents consist of this specifically modified Agreement, the specifically modified AIA Document A201-1997, General Conditions ~~of the Contract (General, Supplementary and other Conditions),~~ ("A201"), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the ~~Contract,~~ "Contract," and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 15. If anything in the other Contract Documents is inconsistent with this Agreement, this Agreement shall govern.

## ARTICLE 2 THE WORK OF THIS CONTRACT

The Contractor shall fully execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others.

## ARTICLE 3 RELATIONSHIP OF THE PARTIES

The Contractor accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect and exercise the Contractor's skill and judgment in furthering the interests of the Owner; to furnish efficient business administration and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Owner's interests. The Owner agrees to furnish and approve, in a timely manner, information required by the Contractor and to make payments to the Contractor in accordance with the requirements of the Contract Documents. The Contractor will enter into a direct contractual relationship with the Architect, engineers, design/build subcontractors and other design professionals (collectively, the "Design Professionals") to provide the design of the Project. The Owner acknowledges and agrees that the Contractor is not a licensed architect or engineer and is not agreeing to perform services which require such a license in the State in which the Project is located. Such services will be performed by licensed architects, engineers and design/build subcontractors under separate agreements. The fees and expenses of all such design professionals shall be included as part of the Cost of the Work. The Contractor shall cause the Architect to prepare and submit, as part of the Cost of the Work, the Construction Documents necessary for the construction of the Project. The contractual obligations of such the Architect, engineers and other design persons or entities are undertaken and performed in the interests of the Contractor. The agreements between the Contractor and the Architect, engineers and other design professionals shall be in writing and these arrangements, including financial arrangements with respect to the Project, shall be promptly and fully disclosed to the Owner upon request. The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, subcontractors and their agents and employees, and other persons, including the Architect, engineers and other Design Professionals, performing any portion of the Contractor's obligations under this Article 3 with respect to the design of the Project. The "Construction Documents" may include drawings, specifications, and other documents and electronic data setting forth the requirements for construction of the Work, and shall (i) be consistent with the intent of the Project as a whole, (ii) provide information for the use of those in the building trades; and (iii) include documents customarily required for regulatory agency approvals. The fees and expenses of all such Design Professionals shall be included as part of the Contract Sum.

## ARTICLE 4 DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

§ 4.1 The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.
*(Insert the date of commencement, if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

February 21, 2006.

If, prior to commencement of the Work, the Owner requires time to file mortgages, mechanic's liens and other security interests, the Owner's time requirement shall be as follows:

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)  (2347931739)

2

R.P. Appx. 326                                                                              15

**§ 4.2** The Contract Time shall be measured from the date of commencement.

**§ 4.3** The Contractor shall achieve Substantial Completion of the entire Work not later than ~~days from~~ December 26, 2006, subject to extensions for any delays contemplated in Paragraph 4.1 of this Agreement or Paragraph 8.3.1 of the form the General Conditions (AIA Document No. A201) attached hereto, such completion date ~~of commencement, or~~ being referred to herein as ~~follows:~~ the "**Substantial Completion Date**."

*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. Unless stated elsewhere in the Contract Documents, insert any requirements for earlier Substantial Completion of certain portions of the Work.)*

| ~~Portion of Work~~ | ~~Substantial Completion date~~ |
|---|---|

, subject to adjustments of this Contract Time as provided in the Contract Documents.

*(Insert provisions, if any, for liquidated damages relating to failure to complete on time, or for bonus payments for early completion of the ~~Work.)~~ Work.)* The initial construction schedule (the "**Project Schedule**") for the Project is attached hereto as **Exhibit "A**

## ARTICLE 5  BASIS FOR PAYMENT
### § 5.1 CONTRACT SUM
**§ 5.1.1** The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum is the Cost of the Work as defined in Article 7 plus the Contractor's Fee.

**§ 5.1.2** The Contractor's Fee is:
*(State a lump sum, percentage of Cost of the Work or other provision for determining the Contractor's Fee, and describe the method of adjustment of the Contractor's Fee for changes in the Work.)*

The "Contractor's Fee" shall be four percent (4%) of the Cost of the Work subject to an increase in the fee of four percent (4%) on all Change Orders, as defined in Paragraph 6.3 herein below, increasing the Cost of the Work, and subject to a decrease in the fee of four percent (4%) on all Change Orders decreasing the Cost of the Work.

### § 5.2 GUARANTEED MAXIMUM PRICE
**§ 5.2.1** The sum of the Cost of the Work and the Contractor's Fee is guaranteed by the Contractor not to exceed ~~($ ),~~ Fourteen Million Three Hundred Fifty-Three Thousand Nine Hundred Seventy-Three and 00/100 Dollars ($14,353,973.00), subject to additions and deductions by Change Order as provided in the Contract Documents. Such maximum sum is referred to in the Contract Documents as the Guaranteed Maximum Price (as the same may be adjusted from time to time by Change Order or otherwise, the "Guaranteed Maximum ~~Price.~~ Price"). Costs which would cause the Guaranteed Maximum Price to be exceeded shall be paid by the Contractor without reimbursement by the Owner If, upon Final Completion, the GMP exceeds Cost of the Work plus the Contractor's Fee, then the amount of such excess shall be referred to herein as the "savings"; and the savings shall be shared by the Owner and the Contractor as follows: sixty percent (60%) of the savings shall be retained by the Owner; and forty percent (40%) of the savings shall be paid to the Contractor as a fee in addition to the ~~Owner.~~ Contractor's Fee described in Paragraph 5.1.2 above.

*(Insert specific provisions if the Contractor is to participate in any savings.)*

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)

3

(2347931739)

R.P. Appx. 327                                                                 16

**§ 5.2.2** The Guaranteed Maximum Price is based on the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:
*(State the numbers or other identification of accepted alternates. If decisions on other alternates are to be made by the Owner subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when the amount expires.)*

See Outline Specification & Drawings (the "**Outline Specs**") attached to this Contract as **Exhibit "B"** (consisting of _____ pages).

**§ 5.2.3** Unit prices, if any, are as follows:

| ~~Description~~ | ~~Units~~ | ~~Price ($ 0.00)~~ |

See Outline Specs.

**§ 5.2.4** Allowances, if any, are as follows
*(Identify and state the amounts of any allowances, and state whether they include labor, materials, or both.)*

| ~~Allowance~~ | ~~Amount ($ 0.00)~~ | ~~Included items~~ |

See Outline Specs. If the Contract Documents provide for any allowances, then the parties agree that (i) the GMP shall be reduced by the amount, if any, by which the allowance exceeds the actual cost of the item for which such allowance was made, and (ii) the GMP shall be increased by the amount, if any, by which the actual cost of the item for which such allowance was made exceeds the allowance.

**§ 5.2.5** Assumptions, if any, on which the Guaranteed Maximum Price is based are as follows:

Contractor's general conditions as set forth in the Division 1 costs shall not exceed 125% of the amount set forth on the Clayco Control Budget attached as Exhibit "C".

See Outline Specs.

**§ 5.2.6** To the extent that the Drawings and Specifications are anticipated to require further development by the Architect, the Contractor has provided in the Guaranteed Maximum Price for such further development consistent with the Contract Documents and reasonably inferable therefrom. Such further development does not include such things as changes in scope, systems, kinds and quality of materials, finishes or equipment, all of which, if required, shall be incorporated by Change Order.

**ARTICLE 6   CHANGES IN THE WORK**
**§ 6.1** Adjustments to the Guaranteed Maximum Price on account of changes in the Work ~~may~~-shall be determined ~~by any of the methods listed in Section 7.3.3 of AIA Document A201-1997.~~ accordance with Paragraph 6.5 below.

**§ 6.. § 6.2** ~~In calculating adjustments to subcontracts (except those awarded with the Owner's prior consent on the basis of cost plus a fee), the terms "cost" and "fee" as used in Section 7.3.3.3 of AIA Document A201-1997 and the terms "costs" and "a reasonable allowance for overhead and profit" as used in Section 7.3.6 of AIA Document A201-1997 shall have the meanings assigned to them in AIA Document A201-1997 and shall not be modified by Articles 5, 7 and 8 of this Agreement. Adjustments to subcontracts awarded with the Owner's prior consent on the basis of cost plus a fee shall be calculated in accordance with the terms of those subcontracts.~~

**§ 6.3 § 6.2** In calculating adjustments to the Guaranteed Maximum ~~Price,~~ Price or the impact of any Change Order, the terms "cost" and "costs" as used in the above-referenced provisions of AIA Document A201-1997 shall mean the Cost of the Work as defined in Article 7 of this Agreement and the terms "fee" and "a reasonable allowance for overhead and profit" shall mean the percentage for the Contractor's Fee as ~~defined~~ indicated in Section 5.1.2 of this Agreement.

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)   (2347931739)

§ 6.4 ~~If no specific provision is made in Section 5.1 for adjustment of the Contractor's Fee in the case of changes in the Work, or if the extent of such changes is such, in the aggregate, that application of the adjustment provisions of Section 5.1 will cause substantial inequity to the Owner or Contractor, the Contractor's Fee shall be equitably adjusted on the basis of the Fee established for the original Work, and the Guaranteed Maximum Price shall be adjusted accordingly.~~

§ 6.3 If (a) the Owner requests a change in the Work or (b) the Contractor otherwise is entitled to a Change Order as provided in the Contract Documents, then the Contractor shall have the right to submit to the Owner a written change order request (a "**CO Request**"), which shall set forth such change to the Contract as shall be appropriate. Such CO Request shall be in writing and shall set forth the appropriate changes, if any, to the (i) Cost of the Work, (ii) the Contractor's Fee, (iii) the Guaranteed Maximum Price, (iv) the Contract Sum, (v) the schedule of values, (vi) the Substantial Completion Date, or (vii) any other provisions of the Contract. Each CO Request shall constitute an offer by the Contractor to amend the Contract. If the Owner accepts such offer in writing and without revision, then such offer and acceptance, together, shall constitute a "**Change Order**" which shall operate to amend the Contract. If the Owner accepts such offer subject to revisions not previously agreed to by the Contractor in writing, then such "acceptance" shall constitute a counteroffer by the Owner to the Contractor which the Contractor may either accept in writing or reject. If the Contractor accepts such counteroffer in writing, the same shall constitute a written Change Order. The Contractor shall have no obligation or right to perform any changes in the Work except pursuant to a Change Order made as provided herein.

## ARTICLE 7 COSTS TO BE REIMBURSED
### § 7.1 COST OF THE WORK
The term Cost of the Work shall mean costs necessarily incurred by the Contractor in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior written consent of the Owner. The Cost of the Work shall include only the items set forth in this Article 7.

### § 7.2 LABOR COSTS
§ 7.2.1 Wages of construction workers directly employed by the Contractor to perform the construction of the Work at the site or, with the Owner's approval, at off-site workshops.

§ 7.2.2 Wages or salaries of the Contractor's supervisory and administrative ~~personnel~~ personnel, based upon the time expended on the Project when stationed at the site with the Owner's ~~approval.~~ written approval. Time expended on the Project by the Contractor's Project Manager for the Project shall be included as a Cost of the Work, regardless of where the Project Manager is located.
*(If it is intended that the wages or salaries of certain personnel stationed at the Contractor's principal or other offices shall be included in the Cost of the Work, identify in Article 14 the personnel to be included and whether for all or only part of their time, and the rates at which their time will be charged to the Work.)*

§ 7.2.3 Wages and salaries of the Contractor's supervisory or administrative personnel engaged, at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

§ 7.2.4 Costs paid or incurred by the Contractor for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included in the Cost of the Work under Sections 7.2.1 through 7.2.3.

### § 7.3 SUBCONTRACT COSTS
§ 7.3.1 Payments made by the Contractor to Subcontractors (including, without limitation, the Contractor if the Contractor or a division of the Contractor is also a subcontractor but only if approved in writing in advance by Owner) in accordance with the requirements of the subcontracts.

### § 7.4 COSTS OF MATERIALS AND EQUIPMENT INCORPORATED IN THE COMPLETED CONSTRUCTION
§ 7.4.1 Costs, including transportation and storage, of materials and equipment incorporated or to be incorporated in the completed construction.

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)                                              (2347931739)

5

R.P. Appx. 329                                                                                              18

**§ 7.4.2** Costs of materials described in the preceding Section 7.4.1 in excess of those actually installed to allow for reasonable waste and spoilage. Unused excess materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by the Contractor. Any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

### § 7.5 COSTS OF OTHER MATERIALS AND EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS
**§ 7.5.1** Costs, including transportation and storage, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment, and hand tools not customarily owned by construction workers, that are provided by the Contractor at the site and fully consumed in the performance of the Work; and cost (less salvage value) of such items if not fully consumed, whether sold to others or retained by the Contractor. Cost for items previously used by the Contractor shall mean fair market value.

**§ 7.5.2** Rental charges for temporary facilities, machinery, equipment, and hand tools not customarily owned by construction workers that are provided by the Contractor at the site, whether rented from the Contractor or others, and costs of transportation, installation, minor repairs and replacements, dismantling and removal thereof. Rates and quantities of equipment rented <u>from the Contractor</u> shall <s>be subject to</s> <u>not exceed</u> the <s>Owner's prior approval.</s><u>fair market value thereof.</u>

**§ 7.5.3** Costs of removal of debris from the site.

**§ 7.5.4** Costs of document reproductions, facsimile transmissions and long-distance telephone calls, postage and parcel delivery charges, telephone service at the site and reasonable petty cash expenses of the site office.

**§ 7.5.5** That portion of the reasonable expenses of the Contractor's personnel incurred while traveling in discharge of duties connected with the Work.

**§ 7.5.6** Costs of materials and equipment suitably stored off the site at a mutually acceptable location, if approved in advance by the Owner.

### § 7.6 MISCELLANEOUS COSTS
**§ 7.6.1** That portion of insurance <s>and bond premiums</s> that can be directly attributed to this <u>Contract. The parties stipulate and agree that Contractor's cost for providing such insurance is six tenths of one percent (0.75%) of the Cost of the Work, excluding such cost of insurance.</u> <s>Contract.</s>

**§ 7.6.2** Sales, <u>consumer,</u> use or similar taxes imposed by a governmental authority that are related to the Work.

**§ 7.6.3** Fees and assessments for the building permit and for other permits, licenses and inspections for which the Contractor is required by the Contract Documents to pay.

**§ 7.6.4** Fees of laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work for which reimbursement is excluded by Section 13.5.3 of AIA Document A201-1997 or other provisions of the Contract Documents, and which do not fall within the scope of Section 7.7.3.

**§ 7.6.5** <s>Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement of the Contract Documents; and payments made in accordance with legal judgments against the Contractor resulting from such suits or claims and payments of settlements made with the Owner's consent. However, such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Contractor's Fee or subject to the Guaranteed Maximum Price. If such royalties, fees and costs are excluded by the last sentence of Section 3.17.1 of AIA Document A201-1997 or other provisions of the Contract Documents, then they shall not be included in the Cost of the Work.</s>
**§ 7.6.5** <u>Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents if such royalty and license fees are disclosed to Owner prior to Contractor commencing construction of the Project and Owner approves same in writing.</u>

**§ 7.6.6** Data processing costs related to the Work.

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)        (2347931739)

6

R.P. Appx. 330                                                          19

**§ 7.6.7** Deposits lost for causes other than the Contractor's negligence or failure to fulfill a specific responsibility to the Owner as set forth in the Contract Documents.

**§ 7.6.8** Legal, mediation and arbitration costs, including attorneys' fees, other than those arising from disputes between the Owner and Contractor, reasonably incurred by the Contractor in the performance of the Work and with the Owner's prior written approval; which approval shall not be unreasonably withheld.

**§ 7.6.9** Expenses incurred in accordance with the Contractor's standard personnel policy for relocation and temporary living allowances of personnel required for the Work, if approved by the Owner.

**§ 7.6.10 Payments by the Contractor into reserves established under the CCIP for the Project for providing Subcontractor insurance. The Contractor represents that the amount of such reserve payments shall not exceed the insurance premiums that reasonably would be incurred for the Project in the absence of the CCIP.**

**§ 7.6.11** Other direct reasonable expenses incurred by the Contractor in connection with the Project to the extent not described in this Section 7.6.

**§ 7.6.12 Design service fees payable to the Architect and any other design professionals engaged by Architect or the Contractor to provide the design for the Project.**

### § 7.7 OTHER COSTS AND EMERGENCIES
**§ 7.7.1** Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner.

**§ 7.7.2** Costs due to emergencies incurred in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property, as provided in Section 10.6 of AIA Document A201-1997.

**§ 7.7.3** Costs of repairing or correcting damaged ~~or nonconforming~~ Work executed by the Contractor, Subcontractors or suppliers, provided that such damaged ~~or nonconforming~~ Work was not caused by ~~negligence~~ NEGLIGENCE, intentional misconduct or failure to fulfill a specific responsibility of the Contractor and only to the extent that the cost of repair ~~or correction~~ is not ~~recoverable~~ recovered by the Contractor from insurance, sureties, Subcontractors or suppliers.

### ARTICLE 8  COSTS NOT TO BE REIMBURSED
§ 8.1 The Cost of the Work shall not include:

**§ 8.1.1** Salaries and other compensation of the Contractor's personnel stationed at the Contractor's principal office or offices other than the site office, except as specifically provided in Sections 7.2.2 and 7.2.3 or as may be provided in Article 14.

**§ 8.1.2** ~~Expenses~~ Except to the extent provided in Article 7, expenses of the Contractor's principal office and offices other than the site office.

**§ 8.1.3** Overhead and general expenses, except as may be expressly included in Article 7.

**§ 8.1.4** The Contractor's capital expenses, including interest on the Contractor's capital employed for the Work.

**§ 8.1.5** Rental costs of machinery and equipment, except as specifically provided in Section 7.5.2.

**§ 8.1.6** Except as provided in Section 7.7.3 of this Agreement, costs due to the negligence or failure to fulfill a specific responsibility of the Contractor, Subcontractors and suppliers or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable.

**§ 8.1.7** Any cost not specifically and expressly described in Article 7.

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)                                                    (2347931739)

7

R.P. Appx. 331                                                                                                  20

**§ 8.1.8** Costs, other than costs included in Change Orders approved by the Owner, that would cause the Guaranteed Maximum Price to be exceeded.

**§ 8.1.9** The release, or waiver or bonding, of any liens or claims which may be claimed, threatened or recorded so long as Owner paid Contractor all undisputed amounts under this Contract.

**§ 8.1.10**

Costs recovered by Contractor through insurance or otherwise.

### ARTICLE 9 DISCOUNTS, REBATES AND REFUNDS
**§ 9.1** Cash discounts obtained on payments made by the Contractor shall accrue to the Owner if (1) before making the payment, the Contractor included them in an Application for Payment and received payment therefor from the Owner, or (2) the Owner has deposited funds with the Contractor with which to make payments; otherwise, cash discounts shall accrue to the Contractor. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Contractor shall make provisions so that they can be secured.

**§ 9.2** Amounts that accrue to the Owner in accordance with the provisions of Section 9.1 shall be credited to the Owner as a deduction from the Cost of the Work.

### ARTICLE 10 SUBCONTRACTS AND OTHER AGREEMENTS
**§ 10.1** The Owner hereby agrees that portions of the Work may be subcontracted to the Contractor or any division of the Contractor if agreed to in writing in advance by Owner. Those portions of the Work that the Contractor does not ~~customarily~~ perform with the Contractor's own personnel (or which are not subcontracted to the Contractor or a division thereof as aforesaid) shall be performed under subcontracts or by other appropriate agreements with the Contractor. The Owner may designate specific persons or entities from whom the Contractor shall obtain bids. The Contractor shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work and shall deliver such bids to the ~~Architect.~~ Owner. The Owner shall then determine, with the advice of the ~~Contractor and the Architect,~~ Contractor, which bids will be accepted. The Contractor shall not be required to contract with anyone to whom the Contractor has reasonable objection. For each portion of the Work having an estimated cost in excess of $50,000, Contractor shall endeavor in good faith, using significant efforts, to obtain, and provide to Owner upon request, bids for said portion of the Work from at least 3 qualified subcontractors. If Contractor cannot obtain bids from 3 qualified bidders, Contractor shall inform Owner of this before entering into the relevant Subcontract. Contractor shall not subcontract performance of all or any portion of the Project under the Contract Documents pursuant to any subcontract in excess of $50,000 without first notifying Owner of the intended subcontracting and obtaining Owner's acceptance in writing of the subcontracting and the subcontractor, which acceptance or rejection shall be promptly given. If requested by Owner, Contractor shall furnish Owner a copy of the proposed subcontract for Owner's review of the terms and conditions thereof and shall not execute such subcontract until Owner has accepted such terms. Failure of Contractor to comply with this Section may be deemed to be a material breach of the Contract Documents. Contractor shall not remove any of the following major subcontractors and replace any of such major subcontractors with any other subcontractor without Owner's prior written approval, which shall not be unreasonably withheld or delayed, provided the proposed replacement subcontractor has the experience, financial backing and history of quality construction for projects of the nature and timing of the Project. The major subcontractors that can only be replaced in accordance with the foregoing procedures are as follows: any CSI Division 15 or 16 subcontractor and any subcontractor performing roofing or exterior glass or glazing work. Contractor shall not be relieved of obligations under the Contract Documents by virtue of Owner's approval of any subcontractors.

**§ 10.2** If a specific bidder among those whose bids are delivered by the Contractor to the ~~Architect~~ Owner (1) is recommended to the Owner by the Contractor; (2) is qualified to perform that portion of the Work; and (3) has submitted a bid that conforms to the requirements of the Contract Documents without reservations or exceptions, but the Owner requires that another bid be accepted, then the Contractor may require that a Change Order be issued to adjust the Guaranteed Maximum Price by the difference between the bid of the person or entity recommended to the

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)

8

(2347931739)

Owner by the Contractor and the amount of the subcontract or other agreement actually signed with the person or entity designated by the Owner.

§ 10.3 Subcontracts or other agreements shall conform to the applicable payment provisions of this Agreement, and shall be lump sum contracts and shall not be awarded on the basis of a fixed fee or cost plus a fee without the prior consent of the Owner.

§ 10.4 The Owner shall be invited to all subcontract bid and design review meetings.

§ 10.5 Contractor will, and will cause its subcontractors to, comply with the terms of the Contract Documents applicable to the portion of the Project performed by them. If any portion of the Project that has been subcontracted by Contractor is not prosecuted in accordance with the Contract Documents, on request of Owner the subcontractor shall be replaced and shall not be employed again on the Project.

§ 10.6 Contractor shall include a provision in the contract with each subcontractor authorizing assignment of such contract to Owner in the event of a termination by Owner of the Contract Documents with Contractor.

§ 10.7 As used in the Contract Documents, the term "subcontract" shall also include purchase orders and rental agreements for materials or equipment, and the term "subcontractor" shall also include vendors or suppliers of such material or equipment.

## ARTICLE 11  ACCOUNTING RECORDS
The Contractor shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management under this Contract, and the accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's accountants shall be afforded access to, and shall be permitted to audit and copy, the Contractor's records, books, correspondence, instructions, drawings, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Contract, and the Contractor shall preserve these for a period of three years after final payment, or for such longer period as may be required by law.

## ARTICLE 12  PAYMENTS
### § 12.1 PROGRESS PAYMENTS
§ 12.1.1 Based upon Applications for Payment submitted to the Architect Owner by the Contractor and Certificates for Payment issued by the Architect, Contractor, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

§ 12.1.2 The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

§ 12.1.3 Provided that an Application for Payment is received by the Architect Owner not later than the first (1st) day of a month, the Owner shall make payment to the Contractor not later than the twentieth (20th) day of the same month. If an Application for Payment is received by the Architect Owner after the application date fixed above, payment shall be made by the Owner not later than ( )twenty (20) days after the Architect Owner receives the Application for Payment.

§ 12.1.4 With each Application for Payment, the Contractor shall submit (a) payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner or Architect to demonstrate that cash disbursements already made by the Contractor on account of the Cost of the Work equal or exceed (1) progress payments already received by the Contractor; less (2) that portion of those payments attributable to the Contractor's Fee; plus (3) payrolls for the period covered by the present Application for Payment, (b) unconditional lien waivers in such form as Owner may reasonably require for the prior month's payment by Owner to Contractor, executed by Contractor and all first tier subcontractors, mechanics and materialmen on the Project, (c) conditional lien waivers in such form as Owner may reasonably require for Payment the current month's payment by Owner to Contractor, executed by Contractor and all first tier subcontractors, mechanics and materialmen on the Project, the only condition thereof being the receipt of payment from Owner (or Contractor, in the case of the subcontractors, mechanics and materialmen), (d) an affidavit executed by Owner indicating the names of all

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)                                         (2347931739)

R.P. Appx. 333                                                                                              22

subcontracts and materialmen that have worked on the Project since the date of the last Application for Payment, and (e) within 45 days after the foundation for the Project has been poured, a foundation survey showing the location of the foundation for the Project, along with the boundaries of the Land, the location of any flood plain and all easements and other title exceptions affecting the Land and any set back or other building restrictions as set forth on the most recent Survey.

§ 12.1.5 Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor and approved in writing by Owner in accordance with the Contract Documents. The schedule of values shall allocate the entire Guaranteed Maximum Price and the Contractor's current estimate of the Cost of the Work among the various portions of the Work, except that the Contractor's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Architect Owner may require. This schedule, unless objected to by the Architect, Owner, shall be used as a basis for reviewing the Contractor's Applications for Payment.

§ 12.1.6 Applications for Payment shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment. The percentage of completion shall be the lesser of (1) the percentage of that portion of the Work which has actually been completed; or (2) the percentage obtained by dividing (a) the expense that has actually been incurred by the Contractor on account of that portion of the Work for which the Contractor has made or intends to make actual payment prior to the next Application for Payment by (b) the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values.

§ 12.1.7 Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1    take that portion of the Guaranteed Maximum Price properly allocable to completed Work as determined by multiplying the percentage of completion of each portion of the Work by the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values. Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Section 7.3.8 of AIA Document A201 1997;the A201;

.2    add that portion of the Guaranteed Maximum Price properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work, or if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing;

.3    add the Contractor's Fee, less retainage of ( ).The ten percent (10%) of the first 50% of the Cost of the Work (using the Guaranteed Maximum Price as the Cost of the Work for this purpose) and zero percent (0%) retainage thereafter. The Contractor's Fee shall be computed upon the Cost of the Work described in the two preceding Clauses at the rate stated in Section 5.1.2 or, if the Contractor's Fee is stated as a fixed sum in that Subparagraph, shall be an amount that bears the same ratio to that fixed-sum fee as the Cost of the Work in the two preceding Clauses bears to a reasonable estimate of the probable Cost of the Work upon its completion;

.4    subtract the aggregate of previous payments made by the Owner;

.5    subtract the shortfall, if any, indicated by the Contractor in the documentation required by Section 12.1.4 to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner's accountants in such documentation;and

.6    subtract amounts, if any, for which the Architect Owner has withheld or nullified not approved a Certificate for Payment as provided in Section 9.5 of AIA Document A201 1997.A201-1997; and.

.7    Thirty (30) days after Substantial Completion of the Work, any retainage then held by the Owner shall be due and payable to the Contractor provided that such payment may be reduced by the cost of completing any incomplete Work or the disputed amount of any unsettled claims.

§ 12.1.8 Except with the Owner's prior approval, payments to Subcontractors shall be subject to retainage of not less than ( ) as set forth in Section 12.1.7.3 above. The Owner and the Contractor shall agree upon a mutually

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)    (2347931739)

acceptable procedure for review and approval of payments and retention for Subcontractors. Thirty days after any Subcontractor fully performs all of its obligations under its Subcontract and the Contractor has approved and the Owner has accepted such work,, upon request of the Contractor, the Owner shall release the full amount of the retainage for such Subcontractor to the Contractor for payment to the Subcontractor, provided that such Subcontractor has provided a final lien release applicable to such payment (as described in Section 12.1.4 above, conditional until payment clears, with an unconditional lien release to follow within 10 days after such payment clears).

§ 12.1.9 In taking action on the Contractor's Applications for Payment, the Architect shall be entitled to rely on the accuracy and completeness of the information furnished by the Contractor and shall not be deemed to represent that the Architect has made a detailed examination, audit or arithmetic verification of the documentation submitted in accordance with Section 12.1.4 or other supporting data; that the Architect has made exhaustive or continuous on-site inspections or that the Architect has made examinations to ascertain how or for what purposes the Contractor has used amounts previously paid on account of the Contract. Such examinations, audits and verifications, if required by the Owner, will be performed by the Owner's accountants acting in the sole interest of the Owner.
§ 12.1.9 As the Project reaches Substantial Completion, Contractor and Owner shall schedule and conduct a joint inspection of the Project and identify in writing all punch list items ("Punch List Items"). Contractor must complete all such Punch List Items prior to Owner making final payment to the Contractor. Owner may continue to retain one hundred ten percent (110%) of the estimated cost of completing the Punch List items until the completion of same. All Punch List Items shall be completed on or before the 45th day after Substantial Completion.
§ 12.1.10 Upon completion of 25%, 50% and 75% of the Work, Contractor shall provide to Owner a project cost report that includes an estimated cost to complete the Project, a listing of modifications and pending Change Orders, and other items reasonably requested by Owner. Upon completion of 25%, 50%, 75% and 100% of the Work, Contractor shall submit to Owner a written reconciliation report evidencing the difference, if any, between (a) the amounts Owner has paid to Contractor under the Schedule of Values plus the portion of the Contractor's Fee paid by Owner and (b) the actual Cost of the Work incurred to the applicable date plus the portion of the Contractor's Fee owed to the applicable date under this Agreement. If such written reconciliation report shows that Owner's payments pursuant to the Schedule of Values plus the Contractor's Fee has resulted in a payment to Contractor in excess of the actual Cost of the Work plus the Contractor's Fee then owed, the overpayment shall be credited to Owner, with the credit being spread over the remaining draws until the excess payments have been fully accounted for by Owner or, if no further draws are to be made, then promptly refunded to Owner.

### § 12.2 FINAL PAYMENT
§ 12.2.1 Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:

    .1    the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Section 12.2.2 of AIA Document A201-1997, and to satisfy other requirements, if any, which extend beyond final payment; andpayment.

    .2    a final Certificate for Payment has been issued by the Architect.
    .2    the other requirements of this Section 12.2 have been fully met.

§ 12.2.2 The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of Contractor has delivered the following to the Owner (but in no event earlier than the Architect's final Certificate for Payment, or as follows:date set forth in Section 12.2.3 hereof):

(i) executed final lien waivers from all first tier Subcontractors and the Contractor (which may be conditioned only upon receipt of Owner's final payment), and (ii) a copy of as-built plans and an as-built survey for the Project, (iii) evidence that all Punch List Items prepared at Substantial Completion of the Work have been completed. The Contractor agrees to obtain final and unconditional lien waivers from all first and second tier Subcontractors (or post an appropriate bond over such lien) and to provide a final unconditional lien waiver from the Contractor within thirty days after receipt of final payment.

§ 12.2.3 The Owner's accountants will review and report in writing on the Contractor's final accounting within 30 days after delivery of the final accounting to the Architect Owner by the Contractor. Based upon such Cost of the

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)

R.P. Appx. 335        24

Work as the Owner's accountants report to be substantiated by the Contractor's final accounting, and provided the other conditions of ~~Section~~ Sections 12.2.1 and 12.2.2 have been met, the ~~Architect~~ Owner will, within ~~seven~~ twenty (20) days ~~after receipt of~~ thereafter, either make the ~~written report of the Owner's accountants, either issue~~ final payment, or deliver to the ~~Owner~~ Contractor a ~~final Certificate for Payment with a~~ copy ~~to~~ of the ~~Contractor, or~~ Owner's accountant's report and notify the Contractor ~~and Owner~~ in writing of the ~~Architect's~~ Owner's reasons for withholding ~~a certificate~~ payment as provided in Section 9.5.1 of the AIA Document A201-1997. The time periods stated in this Section 12.2.3 supersede those stated in Section 9.4.1 of the AIA Document A201-1997.

§ 12.2.4 If the Owner's accountants report the Cost of the Work as substantiated by the Contractor's final accounting to be less than claimed by the Contractor, the Contractor shall be entitled to ~~demand arbitration of the disputed amount without~~ submit such matter as a ~~further decision~~ Claim under Section 4.3 of the ~~Architect.~~ A201. Such ~~demand for arbitration~~ Claim shall be made by the Contractor within 30 days after the Contractor's receipt ~~of a copy of the Architect's final Certificate for Payment;~~ Owner's accountants' report; failure to ~~demand arbitration~~ submit such Claim within this 30-day period shall result in the substantiated amount reported by the Owner's accountants becoming binding on the Contractor. Pending a final resolution ~~by arbitration,~~ of the Claim, the Owner shall pay the Contractor the amount certified in the ~~Architect's final Certificate for Payment.~~ Owner's accountants' report.

~~§ 12.2.5 If, subsequent to final payment and at the Owner's request, the Contractor incurs costs described in Article 7 and not excluded by Article 8 to correct defective or nonconforming Work, the Owner shall reimburse the Contractor such costs and the Contractor's Fee applicable thereto on the same basis as if such costs had been incurred prior to final payment, but not in excess of the Guaranteed Maximum Price. If the Contractor has participated in savings as provided in Section 5.2, the amount of such savings shall be recalculated and appropriate credit given to the Owner in determining the net amount to be paid by the Owner to the Contractor.~~

## ARTICLE 13 TERMINATION OR SUSPENSION

§ 13.1 The Contract may be terminated by the Contractor, or by the Owner for convenience, as provided in Article 14 of AIA Document A201-1997. However, the amount to be paid to the Contractor under Section 14.1.3 of AIA Document A201-1997 shall not ~~exceed~~ cause the ~~amount the Contractor would be entitled~~ Guaranteed Maximum Price to ~~receive under Section 13.2 below, except that the Contractor's Fee shall be calculated as if the Work had been fully completed by the Contractor, including a reasonable estimate of the Cost of the Work for Work not actually completed.~~ exceeded..

§ 13.2 The Contract may be terminated by the Owner for cause as provided in Article 14 of AIA Document A201-1997. The amount, if any, to be paid to the Contractor under Section 14.2.4 of AIA Document A201-1997 shall not cause the Guaranteed Maximum Price to be exceeded, nor shall it exceed an amount calculated as follows:

§ 13.2.1 Take the Cost of the Work incurred by the Contractor to the date of termination;

§ 13.2.2 Add the Contractor's Fee computed upon the Cost of the Work to the date of termination at the rate stated in Section 5.1.2 or, if the Contractor's Fee is stated as a fixed sum in that Section, an amount that bears the same ratio to that fixed-sum Fee as the Cost of the Work at the time of termination bears to a reasonable estimate of the probable Cost of the Work upon its completion; and

§ 13.2.3 Subtract the aggregate of previous payments made by the Owner.

§ 13.3 The Owner shall also pay the Contractor fair compensation, either by purchase or rental at the election of the Owner, for any equipment owned by the Contractor that the Owner elects to retain and that is not otherwise included in the Cost of the Work under Section 13.2.1. To the extent that the Owner elects to take legal assignment of subcontracts and purchase orders (including rental agreements), the Contractor shall, as a condition of receiving the payments referred to in this Article 13, execute and deliver all such papers and take all such steps, including the legal assignment of such subcontracts and other contractual rights of the Contractor, as the Owner may require for the purpose of fully vesting in the Owner the rights and benefits of the Contractor under such subcontracts or purchase orders.

§ 13.4 The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201-1997; in such case, the Guaranteed Maximum Price and Contract Time shall be increased as provided in Section 14.3.2 of AIA

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)       (2347931739)

Document A201-1997 except that the term "profit" shall be understood to mean the Contractor's Fee as described in Sections Section 5.1.2 and Section 6.4 of this Agreement.

## ARTICLE 14 MISCELLANEOUS PROVISIONS

§ 14.1 Where reference is made in this Agreement to a provision of AIA Document A201-1997 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

§ 14.2 Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

One percent (1%) over the "prime rate" as reported in The Wall Street Journal.

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Contractor's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

§ 14.3 The Owner's representative is:
*(Name, address and other information.)*

Mike Rosamond
8411 Preston Road, Suite 700
Dallas, Texas 75225

With copy of all notices to:
Wayne Angel
8411 Preston Road, Suite 700
Dallas, Texas 75225

§ 14.4 The Contractor's representative is:
*(Name, address and other information.)*

Attn:Tom Sieckhaus
Clayco, Inc.
2199 Innerbelt Business Center Drive
St. Louis, Missouri 63114

At all times during the course of the Project, Contractor shall provide at the job site a qualified, competent and responsible supervisor who shall be satisfactory to Owner. The supervisor shall be Doug Gellner. Any employee of Contractor reasonably deemed by Owner to be objectionable shall be removed from the job site promptly upon Owner request and shall be promptly replaced by Contractor at no extra expense to Owner. Contractor shall nevertheless retain all authority and control over its employees, including responsibility for all costs arising from providing reasonable accommodations for its employees.

§ 14.5 Neither the Owner's nor the Contractor's representative nor the supervisor shall be changed without ten days' written notice to the other party party and only with the other party's approval, which approval may not be unreasonably withheld or delayed.

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)        (2347931739)

13

**§ 14.6** Other provisions:

.1  If there is any conflict among the Contract Documents, then the following priority shall be given to the same: first, the provisions of any Change Orders, Change Directives or other modifications shall govern, with later modifications controlling over earlier modifications, second, this Agreement (A111) shall govern, third, the provisions of the General Conditions (A201), shall govern, fourth, the most recent version of the Drawings approved by Owner and Contractor in writing shall govern, and fifth, the Outline Specs shall govern (provided that as to design matters, the Outline Specs shall govern over A111 or A201).

.2  The Owner represents that it is the owner of fee simple title to the land on which the Project will be constructed (the "Land")

.3  The Owner is committed to providing a safe working environment on the jobsite. In endeavoring to achieve a safe workplace, the Owner requires that the Contractor implement a substance abuse policy covering all Contractor, Subcontractor, and Sub-subcontractor employees of any tier throughout the duration of this Project. Contractor agrees that such policy shall be in accordance with the Contractor's corporate substance abuse policy; provided that such policy shall meet or exceed the standards set forth by the St. Louis Construction Industry Substance Abuse Consortium.

## ARTICLE 15  ENUMERATION OF CONTRACT DOCUMENTS
**§ 15.1** The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:

**§ 15.1.1** The Agreement is this executed 1997 edition of the Standard Form of Agreement Between Owner and Contractor, AIA Document ~~A111-1997.~~A111-1997, as modified herein.

**§ 15.1.2** The General Conditions are the 1997 edition of the General Conditions of the Contract for Construction, AIA Document ~~A201-1997.~~A201-1997, as modified in the form attached to this Agreement.

**§ 15.1.3** The Supplementary and other Conditions of the Contract are those contained in the Project Manual dated , and are as follows:

| ~~Document~~ | ~~Title~~ | ~~Pages~~ |
|---|---|---|

**§ 15.1.4** The Specifications are those contained in the Project Manual dated as in Section 15.1.3, and are as follows:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

See Outline Specs.

| ~~Section~~ | ~~Title~~ | ~~Pages~~ |
|---|---|---|

**§ 15.1.5** The Drawings are as ~~follows, and are dated  unless a different date is shown below:~~follows:
*(Either list the Drawings here or refer to an exhibit attached to this Agreement.)*

See Outline Specs.

| ~~Number~~ | ~~Title~~ | ~~Date~~ |
|---|---|---|

**§ 15.1.6** The Addenda, if any, are as follows:

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)          (2347931739)

14

R.P. Appx. 338                                                                27

Number                    Date                    Pages

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 15.

§ 15.1.7 Other Documents, if any, forming part of the Contract Documents are as follows:
*(List here any additional documents, such as a list of alternates that are intended to form part of the Contract Documents. AIA Document A201-1997 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*

The Clayco Control Budget attached hereto as **Exhibit "C"**. The Clayco Control Budget is not attached for the purpose of (a) establishing a maximum cost of each such item, it being agreed that the Contractor's sole obligation with respect to the Cost of the Work is set forth in Paragraph 5.2.1 herein, or (b) defining the scope of the Work that the Contractor is obligated to provide under this Contract, it being agreed that the Outline Specs and the other Contract Documents (excluding such Control Budget) shall define the Contractor's scope of Work.

## ARTICLE 16  INSURANCE AND BONDS
*(List required limits of liability for insurance and bonds. AIA Document A201-1997 gives other specific requirements for insurance and bonds.)*

Type of insurance                    Limit of liability ($ 0.00)

The Contractor will obtain and maintain at all times Builder's Risk insurance for the Project and such insurance shall name the Owner, Owner's equity partner and Owner's construction lender as additional insureds. Current evidence of such insurance shall be furnished to Owner upon request. Contractor will maintain the following insurance coverage: (i) a policy of commercial general liability insurance (occurrence form) as described in paragraph 11.1 of the General Conditions (A201) with coverage limits of not less than $1,000,000 per occurrence and $2,000,000 in the aggregate, (ii) employer's liability coverage with limits of not less than $1,000,000, (iii) worker's compensation with limits of not less than $1,000,000 covering all persons employed by Contractor in the conduct of its operations at the Project (including the all states endorsement and, if applicable, the volunteers endorsement), (iv) automobile liability coverage of not less than $1,000,000, (v) umbrella policy of commercial general liability insurance with limits of not less than $10,000,000. Such insurance policies shall be issued by insurance companies with a rating of not less than A-Class VIII in the latest edition of Best's Insurance Guide. Owner and Prudential Insurance Company of America ("Prudential") shall be a named additional insured party on all such insurance policies, and Contractor shall deliver to Owner certified copies of such insurance policies, together with certificates evidencing the coverage of Owner and Prudential under all such insurance policies and a certified copy of the declarations page to each of the insurance policies, promptly upon issuance or renewal thereof.

Simultaneously with the execution hereof, Contractor shall enter into the Construction Indemnity and Assignment in the form attached hereto as **Exhibit "D"**.

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)                    (2347931739)

15

This Agreement is entered into as of the day and year first written above and is executed in at least three original copies, of which one is to be delivered to the Contractor, one to the Architect for use in the administration of the Contract, and the remainder to the Owner.

Exhibit "A" – Project Schedule
Exhibit "B" – Outline Specifications & Drawings
Exhibit "C" – Clayco Control Budget
Exhibit "D" – Construction Indemnity and Assignment
Exhibit "E" – Architect's Certificate
Exhibit "F" – Civil Engineer's Certificate
Exhibit "G" – Contractor's Consent and Agreement

## THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.

INTELLICENTER DALLAS INVESTMENTS, LLP    CLAYCO, INC.
   By: KDC-HPB Investments Dallas, LP,
     its partner
     By: KDC-HPB Investments Dallas GP, LLC,
      its general partner
      By: Koll Development Company I, L.P., Member
       By: SWV, LLC, Managing General Partner

By: _____    By: _____

**OWNER** *(Signature)*      **CONTRACTOR** *(Signature)*


_____    STEVEN R. SIECKHAUS
*(Printed name and title)*    *(Printed name and title)*
    VICE PRESIDENT OF OPERATIONS

AIA Document A111™ – 1997. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:11:31 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A111 - Koll - Intellicenter - Dallas v3 (5-19-06)    (2347931739)



# AIA® Document A201™ – 1997

## General Conditions of the Contract for Construction

**for the following PROJECT:**
*(Name and location or address):*

The design and construction of a 4-story speculative office building, consisting of approximately 211,637 gross square feet, located at 3701 Regent Blvd., Irving, Texas.

**THE OWNER:**
*(Name and address):*

Intellicenter Dallas Investments, LLP
8115 Preston Rd., Suite #700
Dallas, TX 75225

**THE ARCHITECT:**
*(Name and address):*

FS Architecture, PC
c/o Forum Studios, Inc.
2199 Innerbelt Business Center Drive
St. Louis, Missouri 63114

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

This document has been approved and endorsed by The Associated General Contractors of America

TABLE OF ARTICLES

1    GENERAL PROVISIONS

2    OWNER

3    CONTRACTOR

4    ADMINISTRATION OF THE CONTRACT

5    SUBCONTRACTORS

6    CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

7    CHANGES IN THE WORK

8    TIME

9    PAYMENTS AND COMPLETION

10   PROTECTION OF PERSONS AND PROPERTY

11   INSURANCE AND BONDS

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                    (986536188)

1



12    UNCOVERING AND CORRECTION OF WORK

13    MISCELLANEOUS PROVISIONS

14    TERMINATION OR SUSPENSION OF THE CONTRACT

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)        (986536188)

2

## INDEX

(Numbers and Topics in Bold are Section Headings)

**Acceptance of Nonconforming Work**
9.6.6, 9.9.3, **12.3**
Acceptance of Work
9.6.6, 9.8.2, 9.9.3, 9.10.1, 9.10.3, 12.3
**Access to Work**
**3.16, 6.2.1, 12.1**
Accident Prevention
4.2.3, 10
Acts and Omissions
3.2, 3.3.2, 3.12.8, 3.18, 4.2.3, 4.3.8, 4.4.1, 8.3.1,
9.5.1, 10.2.5, 13.4.2, 13.7, 14.1
Addenda
1.1.1, 3.11
Additional Costs, Claims for
4.3.4, 4.3.5, 4.3.6, 6.1.1, 10.3
Additional Inspections and Testing
9.8.3, 12.2.1, 13.5
Additional Time, Claims for
4.3.4, 4.3.7, 8.3.2
**ADMINISTRATION OF THE CONTRACT**
3.1.3, **4**, 9.4, 9.5
Advertisement or Invitation to Bid
1.1.1
Aesthetic Effect
4.2.13, 4.5.1
**Allowances**
**3.8**
All-risk Insurance
11.4.1.1
**Applications for Payment**
4.2.5, 7.3.8, 9.2, **9.3**, 9.4, 9.5.1, 9.6.3, 9.7.1, 9.8.5,
9.10, 11.1.3, 14.2.4, 14.4.3
Approvals
2.4, 3.1.3, 3.5, 3.10.2, 3.12, 4.2.7, 9.3.2, 13.4.2, 13.5
**Arbitration**
4.3.3, 4.4, 4.5.1, 4.5.2, **4.6**, 8.3.1, 9.7.1, 11.4.9,
11.4.10
**Architect**
**4.1**
Architect, Definition of
4.1.1
Architect, Extent of Authority
2.4, 3.12.7, 4.2, 4.3.6, 4.4, 5.2, 6.3, 7.1.2, 7.3.6, 7.4,
9.2, 9.3.1, 9.4, 9.5, 9.8.3, 9.10.1, 9.10.3, 12.1, 12.2.1,
13.5.1, 13.5.2, 14.2.2, 14.2.4
Architect, Limitations of Authority and
Responsibility
2.1.1, 3.3.3, 3.12.4, 3.12.8, 3.12.10, 4.1.2, 4.2.1,
4.2.2, 4.2.3, 4.2.6, 4.2.7, 4.2.10, 4.2.12, 4.2.13, 4.4,
5.2.1, 7.4, 9.4.2, 9.6.4, 9.6.6
Architect's Additional Services and Expenses
2.4, 11.4.1.1, 12.2.1, 13.5.2, 13.5.3, 14.2.4
**Architect's Administration of the Contract**

3.1.3, **4.2**, 4.3.4, 4.4, 9.4, 9.5
Architect's Approvals
2.4, 3.1.3, 3.5.1, 3.10.2, 4.2.7
Architect's Authority to Reject Work
3.5.1, 4.2.6, 12.1.2, 12.2.1
Architect's Copyright
1.6
Architect's Decisions
4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13, 4.3.4, 4.4.1, 4.4.5,
4.4.6, 4.5, 6.3, 7.3.6, 7.3.8, 8.1.3, 8.3.1, 9.2, 9.4,
9.5.1, 9.8.4, 9.9.1, 13.5.2, 14.2.2, 14.2.4
Architect's Inspections
4.2.2, 4.2.9, 4.3.4, 9.4.2, 9.8.3, 9.9.2, 9.10.1, 13.5
Architect's Instructions
3.2.3, 3.3.1, 4.2.6, 4.2.7, 4.2.8, 7.4.1, 12.1, 13.5.2
Architect's Interpretations
4.2.11, 4.2.12, 4.3.6
Architect's Project Representative
4.2.10
Architect's Relationship with Contractor
1.1.2, 1.6, 3.1.3, 3.2.1, 3.2.2, 3.2.3, 3.3.1, 3.4.2, 3.5.1,
3.7.3, 3.10, 3.11, 3.12, 3.16, 3.18, 4.1.2, 4.1.3, 4.2,
4.3.4, 4.4.1, 4.4.7, 5.2, 6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4,
9.5, 9.7, 9.8, 9.9, 10.2.6, 10.3, 11.3, 11.4.7, 12,
13.4.2, 13.5
Architect's Relationship with Subcontractors
1.1.2, 4.2.3, 4.2.4, 4.2.6, 9.6.3, 9.6.4, 11.4.7
Architect's Representations
9.4.2, 9.5.1, 9.10.1
Architect's Site Visits
4.2.2, 4.2.5, 4.2.9, 4.3.4, 9.4.2, 9.5.1, 9.9.2, 9.10.1,
13.5
Asbestos
10.3.1
Attorneys' Fees
3.18.1, 9.10.2, 10.3.3
Award of Separate Contracts
6.1.1, 6.1.2
**Award of Subcontracts and Other Contracts for**
**Portions of the Work**
**5.2**
**Basic Definitions**
**1.1**
Bidding Requirements
1.1.1, 1.1.7, 5.2.1, 11.5.1
**Boiler and Machinery Insurance**
11.4.2
Bonds, Lien
9.10.2
Bonds, Performance, and Payment
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, 11.5
Building Permit
3.7.1
**Capitalization**
**1.3**
Certificate of Substantial Completion

9.8.3, 9.8.4, 9.8.5
**Certificates for Payment**
4.2.5, 4.2.9, 9.3.3, **9.4**, 9.5, 9.6.1, 9.6.6, 9.7.1, 9.10.1, 9.10.3, 13.7, 14.1.1.3, 14.2.4
Certificates of Inspection, Testing or Approval
13.5.4
Certificates of Insurance
9.10.2, 11.1.3
**Change Orders**
1.1.1, 2.4.1, 3.4.2, 3.8.2.3, 3.11.1, 3.12.8, 4.2.8, 4.3.4, 4.3.9, 5.2.3, 7.1, **7.2**, 7.3, 8.3.1, 9.3.1.1, 9.10.3, 11.4.1.2, 11.4.4, 11.4.9, 12.1.2
Change Orders, Definition of
7.2.1
**CHANGES IN THE WORK**
3.11, 4.2.8, **7**, 8.3.1, 9.3.1.1, 11.4.9
Claim, **Definition** of
**4.3.1**
**Claims and Disputes**
3.2.3, **4.3**, 4.4, 4.5, 4.6, 6.1.1, 6.3, 7.3.8, 9.3.3, 9.10.4, 10.3.3
**Claims and Timely Assertion of Claims**
**4.6.5**
**Claims for Additional Cost**
3.2.3, 4.3.4, **4.3.5**, 4.3.6, 6.1.1, 7.3.8, 10.3.2
**Claims for Additional Time**
3.2.3, 4.3.4, **4.3.7**, 6.1.1, 8.3.2, 10.3.2
**Claims for Concealed or Unknown Conditions**
**4.3.4**
Claims for Damages
3.2.3, 3.18, 4.3.10, 6.1.1, 8.3.3, 9.5.1, 9.6.7, 10.3.3, 11.1.1, 11.4.5, 11.4.7, 14.1.3, 14.2.4
Claims Subject to Arbitration
4.4.1, 4.5.1, 4.6.1
**Cleaning Up**
**3.15, 6.3**
**Commencement of Statutory Limitation Period**
**13.7**
Commencement of the Work, Conditions Relating to
2.2.1, 3.2.1, 3.4.1, 3.7.1, 3.10.1, 3.12.6, 4.3.5, 5.2.1, 5.2.3, 6.2.2, 8.1.2, 8.2.2, 8.3.1, 11.1, 11.4.1, 11.4.6, 11.5.1
Commencement of the Work, Definition of
8.1.2
**Communications Facilitating Contract Administration**
3.9.1, **4.2.4**
Completion, Conditions Relating to
1.6.1, 3.4.1, 3.11, 3.15, 4.2.2, 4.2.9, 8.2, 9.4.2, 9.8, 9.9.1, 9.10, 12.2, 13.7, 14.1.2
**COMPLETION, PAYMENTS AND**
**9**
Completion, Substantial
4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, 9.8, 9.9.1, 9.10.3, 9.10.4.2, 12.2, 13.7
Compliance with Laws

1.6.1, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 4.4.8, 4.6.4, 4.6.6, 9.6.4, 10.2.2, 11.1, 11.4, 13.1, 13.4, 13.5.1, 13.5.2, 13.6, 14.1.1, 14.2.1.3
Concealed or Unknown Conditions
4.3.4, 8.3.1, 10.3
Conditions of the Contract
1.1.1, 1.1.7, 6.1.1, 6.1.4
Consent, Written
1.6, 3.4.2, 3.12.8, 3.14.2, 4.1.2, 4.3.4, 4.6.4, 9.3.2, 9.8.5, 9.9.1, 9.10.2, 9.10.3, 11.4.1, 13.2, 13.4.2
**CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS**
1.1.4, **6**
Construction Change Directive, Definition of
7.3.1
**Construction Change Directives**
1.1.1, 3.12.8, 4.2.8, 4.3.9, 7.1, **7.3**, 9.3.1.1
Construction Schedules, Contractor's
1.4.1.2, 3.10, 3.12.1, 3.12.2, 4.3.7.2, 6.1.3
**Contingent Assignment of Subcontracts**
**5.4, 14.2.2.2**
**Continuing Contract Performance**
**4.3.3**
Contract, Definition of
1.1.2
**CONTRACT, TERMINATION OR SUSPENSION OF THE**
5.4.1.1, 11.4.9, **14**
Contract Administration
3.1.3, 4, 9.4, 9.5
Contract Award and Execution, Conditions Relating to
3.7.1, 3.10, 5.2, 6.1, 11.1.3, 11.4.6, 11.5.1
**Contract Documents, The**
**1.1, 1.2**
Contract Documents, Copies Furnished and Use of
1.6, 2.2.5, 5.3
Contract Documents, Definition of
1.1.1
**Contract Sum**
3.8, 4.3.4, 4.3.5, 4.4.5, 5.2.3, 7.2, 7.3, 7.4, **9.1**, 9.4.2, 9.5.1.4, 9.6.7, 9.7, 10.3.2, 11.4.1, 14.2.4, 14.3.2
Contract Sum, Definition of
9.1
Contract Time
4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1.3, 7.3, 7.4, 8.1.1, 8.2, 8.3.1, 9.5.1, 9.7, 10.3.2, 12.1.1, 14.3.2
Contract Time, Definition of
8.1.1
**CONTRACTOR**
**3**
Contractor, Definition of
3.1, 6.1.2
**Contractor's Construction Schedules**
1.4.1.2, **3.10**, 3.12.1, 3.12.2, 4.3.7.2, 6.1.3
Contractor's Employees

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)          (986536188)

R.P. Appx. 344                                                33

3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6, 10.2, 10.3, 11.1.1, 11.4.7, 14.1, 14.2.1.1,

**Contractor's Liability Insurance**
**11.1**
Contractor's Relationship with Separate Contractors and Owner's Forces
3.12.5, 3.14.2, 4.2.4, 6, 11.4.7, 12.1.2, 12.2.4
Contractor's Relationship with Subcontractors
1.2.2, 3.3.2, 3.18.1, 3.18.2, 5, 9.6.2, 9.6.7, 9.10.2, 11.4.1.2, 11.4.7, 11.4.8
Contractor's Relationship with the Architect
1.1.2, 1.6, 3.1.3, 3.2.1, 3.2.2, 3.2.3, 3.3.1, 3.4.2, 3.5.1, 3.7.3, 3.10, 3.11, 3.12, 3.16, 3.18, 4.1.2, 4.1.3, 4.2, 4.3.4, 4.4.1, 4.4.7, 5.2, 6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4, 9.5, 9.7, 9.8, 9.9, 10.2.6, 10.3, 11.3, 11.4.7, 12, 13.4.2, 13.5
Contractor's Representations
1.5.2, 3.5.1, 3.12.6, 6.2.2, 8.2.1, 9.3.3, 9.8.2
Contractor's Responsibility for Those Performing the Work
3.3.2, 3.18, 4.2.3, 4.3.8, 5.3.1, 6.1.3, 6.2, 6.3, 9.5.1, 10
Contractor's Review of Contract Documents
1.5.2, 3.2, 3.7.3
Contractor's Right to Stop the Work
9.7
Contractor's Right to Terminate the Contract
4.3.10, 14.1
Contractor's Submittals
3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3, 7.3.6, 9.2, 9.3, 9.8.2, 9.8.3, 9.9.1, 9.10.2, 9.10.3, 11.1.3, 11.5.2
Contractor's Superintendent
3.9, 10.2.6
Contractor's Supervision and Construction Procedures
1.2.2, 3.3, 3.4, 3.12.10, 4.2.2, 4.2.7, 4.3.3, 6.1.3, 6.2.4, 7.1.3, 7.3.4, 7.3.6, 8.2, 10, 12, 14
Contractual Liability Insurance
11.1.1.8, 11.2, 11.3
Coordination and Correlation
1.2, 1.5.2, 3.3.1, 3.10, 3.12.6, 6.1.3, 6.2.1
Copies Furnished of Drawings and Specifications
1.6, 2.2.5, 3.11
Copyrights
1.6, 3.17
Correction of Work
2.3, 2.4, 3.7.4, 4.2.1, 9.4.2, 9.8.2, 9.8.3, 9.9.1, 12.1.2, 12.2, 13.7.1.3
**Correlation and Intent of the Contract Documents**
**1.2**
Cost, Definition of
7.3.6
Costs
2.4, 3.2.3, 3.7.4, 3.8.2, 3.15.2, 4.3, 5.4.2, 6.1.1, 6.2.3, 7.3.3.3, 7.3.6, 7.3.7, 7.3.8, 9.10.2, 10.3.2, 10.5, 11.3, 11.4, 12.1, 12.2.1, 12.2.4, 13.5, 14
**Cutting and Patching**

6.2.5, **3.14**
Damage to Construction of Owner or Separate Contractors
3.14.2, 6.2.4, 9.2.1.5, 10.2.1.2, 10.2.5, 10.6, 11.1, 11.4, 12.2.4
Damage to the Work
3.14.2, 9.9.1, 10.2.1.2, 10.2.5, 10.6, 11.4, 12.2.4
Damages, Claims for
3.2.3, 3.18, 4.3.10, 6.1.1, 8.3.3, 9.5.1, 9.6.7, 10.3.3, 11.1.1, 11.4.5, 11.4.7, 14.1.3, 14.2.4
Damages for Delay
6.1.1, 8.3.3, 9.5.1.6, 9.7, 10.3.2
Date of Commencement of the Work, Definition of
8.1.2
Date of Substantial Completion, Definition of
8.1.3
Day, Definition of
8.1.4
Decisions of the Architect
4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13, 4.3.4, 4.4.1, 4.4.5, 4.4.6, 4.5, 6.3, 7.3.6, 7.3.8, 8.1.3, 8.3.1, 9.2, 9.4, 9.5.1, 9.8.4, 9.9.1, 13.5.2, 14.2.2, 14.2.4
**Decisions to Withhold Certification**
9.4.1, **9.5**, 9.7, 14.1.1.3
Defective or Nonconforming Work, Acceptance, Rejection and Correction of
2.3, 2.4, 3.5.1, 4.2.6, 6.2.5, 9.5.1, 9.5.2, 9.6.6, 9.8.2, 9.9.3, 9.10.4, 12.2.1, 13.7.1.3
Defective Work, Definition of
3.5.1
Definitions
1.1, 2.1.1, 3.1, 3.5.1, 3.12.1, 3.12.2, 3.12.3, 4.1.1, 4.3.1, 5.1, 6.1.2, 7.2.1, 7.3.1, 7.3.6, 8.1, 9.1, 9.8.1
**Delays and Extensions of Time**
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1, 7.3.1, 7.4.1, **8.3**, 9.5.1, 9.7.1, 10.3.2, 10.6.1, 14.3.2
Disputes
4.1.4, 4.3, 4.4, 4.5, 4.6, 6.3, 7.3.8
**Documents and Samples at the Site**
**3.11**
Drawings, Definition of
1.1.5
Drawings and Specifications, Use and Ownership of
1.1.1, 1.3, 2.2.5, 3.11, 5.3
Effective Date of Insurance
8.2.2, 11.1.2
**Emergencies**
4.3.5, **10.6**, 14.1.1.2
Employees, Contractor's
3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6, 10.2, 10.3, 11.1.1, 11.4.7, 14.1, 14.2.1.1
Equipment, Labor, Materials and
1.1.3, 1.1.6, 3.4, 3.5.1, 3.8.2, 3.8.3, 3.12, 3.13, 3.15.1, 4.2.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6, 9.3.2, 9.3.3, 9.5.1.3, 9.10.2, 10.2.1, 10.2.4, 14.2.1.2
Execution and Progress of the Work

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved.** WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)

(986536188)

5

1.1.3, 1.2.1, 1.2.2, 2.2.3, 2.2.5, 3.1, 3.3, 3.4, 3.5, 3.7, 3.10, 3.12, 3.14, 4.2.2, 4.2.3, 4.3.3, 6.2.2, 7.1.3, 7.3.4, 8.2, 9.5, 9.9.1, 10.2, 10.3, 12.2, 14.2, 14.3

**Extensions of Time**
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1, 7.3, 7.4.1, 9.5.1, 9.7.1, 10.3.2, 10.6.1, 14.3.2

**Failure of Payment**
4.3.6, 9.5.1.3, **9.7**, 9.10.2, 14.1.1.3, 14.2.1.2, 13.6

Faulty Work
(*See* Defective or Nonconforming Work)

**Final Completion and Final Payment**
4.2.1, 4.2.9, 4.3.2, 9.8.2, **9.10**, 11.1.2, 11.1.3, 11.4.1, 11.4.5, 12.3.1, 13.7, 14.2.4, 14.4.3

Financial Arrangements, Owner's
2.2.1, 13.2.2, 14.1.1.5

Fire and Extended Coverage Insurance
11.4

**GENERAL PROVISIONS**
**1**

**Governing Law**
**13.1**

Guarantees (*See* Warranty)

Hazardous Materials
10.2.4, **10.3**, 10.5

Identification of Contract Documents
1.5.1

Identification of Subcontractors and Suppliers
5.2.1

**Indemnification**
3.17, **3.18**, 9.10.2, 10.3.3, 10.5, 11.4.1.2, 11.4.7

**Information and Services Required of the Owner**
2.1.2, **2.2**, 3.2.1, 3.12.4, 3.12.10, 4.2.7, 4.3.3, 6.1.3, 6.1.4, 6.2.5, 9.3.2, 9.6.1, 9.6.4, 9.9.2, 9.10.3, 10.3.3, 11.2, 11.4, 13.5.1, 13.5.2, 14.1.1.4, 14.1.4

**Injury or Damage to Person or Property**
**4.3.8, 10.2, 10.6**

Inspections
3.1.3, 3.3.3, 3.7.1, 4.2.2, 4.2.6, 4.2.9, 9.4.2, 9.8.2, 9.8.3, 9.9.2, 9.10.1, 12.2.1, 13.5

Instructions to Bidders
1.1.1

Instructions to the Contractor
3.2.3, 3.3.1, 3.8.1, 4.2.8, 5.2.1, 7, 12, 8.2.2, 13.5.2

Insurance
3.18.1, 6.1.1, 7.3.6, 8.2.1, 9.3.2, 9.8.4, 9.9.1, 9.10.2, 9.10.5, 11

**Insurance, Boiler and Machinery**
11.4.2

**Insurance, Contractor's Liability**
11.1

Insurance, Effective Date of
8.2.2, 11.1.2

**Insurance, Loss of Use**
11.4.3

**Insurance, Owner's Liability**
11.2

**Insurance, Project Management Protective Liability**
11.3

**Insurance, Property**
10.2.5, **11.4**

Insurance, Stored Materials
9.3.2, 11.4.1.4

**INSURANCE AND BONDS**
**11**

Insurance Companies, Consent to Partial Occupancy
9.9.1, 11.4.1.5

Insurance Companies, Settlement with
11.4.10

Intent of the Contract Documents
1.2.1, 4.2.7, 4.2.12, 4.2.13, 7.4

**Interest**
**13.6**

**Interpretation**
1.2.3, **1.4**, 4.1.1, 4.3.1, 5.1, 6.1.2, 8.1.4

Interpretations, Written
4.2.11, 4.2.12, 4.3.6

Joinder and Consolidation of Claims Required
4.6.4

**Judgment on Final Award**
**4.6.6**

**Labor and Materials, Equipment**
1.1.3, 1.1.6, **3.4**, 3.5.1, 3.8.2, 3.8.3, 3.12, 3.13, 3.15.1, 42.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6, 9.3.2, 9.3.3, 9.5.1.3, 9.10.2, 10.2.1, 10.2.4, 14.2.1.2

Labor Disputes
8.3.1

Laws and Regulations
1.6, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 4.4.8, 4.6, 9.6.4, 9.9.1, 10.2.2, 11.1, 11.4, 13.1, 13.4, 13.5.1, 13.5.2, 13.6, 14

Liens
2.1.2, 4.4.8, 8.2.2, 9.3.3, 9.10

**Limitation on Consolidation or Joinder**
**4.6.4**

Limitations, Statutes of
4.6.3, 12.2.6, 13.7

Limitations of Liability
2.3, 3.2.1, 3.5.1, 3.7.3, 3.12.8, 3.12.10, 3.17, 3.18, 4.2.6, 4.2.7, 4.2.12, 6.2.2, 9.4.2, 9.6.4, 9.6.7, 9.10.4, 10.3.3, 10.2.5, 11.1.2, 11.2.1, 11.4.7, 12.2.5, 13.4.2

Limitations of Time
2.1.2, 2.2, 2.4, 3.2.1, 3.7.3, 3.10, 3.11, 3.12.5, 3.15.1, 4.2.7, 4.3, 4.4, 4.5, 4.6, 5.2, 5.3, 5.4, 6.2.4, 7.3, 7.4, 8.2, 9.2, 9.3.1, 9.3.3, 9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9, 9.10, 11.1.3, 11.4.1.5, 11.4.6, 11.4.10, 12.2, 13.5, 13.7, 14

**Loss of Use Insurance**
**11.4.3**

Material Suppliers
1.6, 3.12.1, 4.2.4, 4.2.6, 5.2.1, 9.3, 9.4.2, 9.6, 9.10.5

Materials, Hazardous
10.2.4, 10.3, 10.5

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                    (986536188)

6

Materials, Labor, Equipment and
1.1.3, 1.1.6, 1.6.1, 3.4, 3.5.1, 3.8.2, 3.8.23, 3.12, 3.13, 3.15.1, 4.2.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6, 9.3.2, 9.3.3, 9.5.1.3, 9.10.2, 10.2.1, 10.2.4, 14.2.1.2

Means, Methods, Techniques, Sequences and Procedures of Construction
3.3.1, 3.12.10, 4.2.2, 4.2.7, 9.4.2

Mechanic's Lien
4.4.8

**Mediation**
4.4.1, 4.4.5, 4.4.6, 4.4.8, **4.5**, 4.6.1, 4.6.2, 8.3.1, 10.5

**Minor Changes in the Work**
1.1.1, 3.12.8, 4.2.8, 4.3.6, 7.1, **7.4**

**MISCELLANEOUS PROVISIONS**
13

Modifications, Definition of
1.1.1

Modifications to the Contract
1.1.1, 1.1.2, 3.7.3, 3.11, 4.1.2, 4.2.1, 5.2.3, 7, 8.3.1, 9.7, 10.3.2, 11.4.1

**Mutual Responsibility**
6.2

**Nonconforming Work, Acceptance of**
9.6.6, 9.9.3, **12.3**

Nonconforming Work, Rejection and Correction of
2.3, 2.4, 3.5.1, 4.2.6, 6.2.5, 9.5.1, 9.8.2, 9.9.3, 9.10.4, 12.2.1, 13.7.1.3

Notice
2.2.1, 2.3, 2.4, 3.2.3, 3.3.1, 3.7.2, 3.7.4, 3.12.9, 4.3, 4.4.8, 4.6.5, 5.2.1, 8.2.2, 9.7, 9.10, 10.2.2, 11.1.3, 11.4.6, 12.2.2, 12.2.4, 13.3, 13.5.1, 13.5.2, 14.1, 14.2

**Notice, Written**
2.3, 2.4, 3.3.1, 3.9, 3.12.9, 3.12.10, 4.3, 4.4.8, 4.6.5, 5.2.1, 8.2.2, 9.7, 9.10, 10.2.2, 10.3, 11.1.3, 11.4.6, 12.2.2, 12.2.4, **13.3**, 14

Notice of Testing and Inspections
13.5.1, 13.5.2

Notice to Proceed
8.2.2

**Notices, Permits, Fees and**
2.2.2, **3.7**, 3.13, 7.3.6.4, 10.2.2

Observations, Contractor's
1.5.2, 3.2, 3.7.3, 4.3.4

Occupancy
2.2.2, 9.6.6, 9.8, 11.4.1.5

Orders, Written
1.1.1, 2.3, 3.9, 4.3.6, 7, 8.2.2, 11.4.9, 12.1, 12.2, 13.5.2, 14.3.1

**OWNER**
2

Owner, Definition of
2.1

**Owner, Information and Services Required of the**
2.1.2, **2.2**, 3.2.1, 3.12.4, 3.12.10, 4.2.7, 4.3.3, 6.1.3, 6.1.4, 6.2.5, 9.3.2, 9.6.1, 9.6.4, 9.9.2, 9.10.3, 10.3.3, 11.2, 11.4, 13.5.1, 13.5.2, 14.1.1.4, 14.1.4

Owner's Authority

1.6, 2.1.1, 2.3, 2.4, 3.4.2, 3.8.1, 3.12.10, 3.14.2, 4.1.2, 4.1.3, 4.2.4, 4.2.9, 4.3.6, 4.4.7, 5.2.1, 5.2.4, 5.4.1, 6.1, 6.3, 7.2.1, 7.3.1, 8.2.2, 8.3.1, 9.3.1, 9.3.2, 9.5.1, 9.9.1, 9.10.2, 10.3.2, 11.1.3, 11.3.1, 11.4.3, 11.4.10, 12.2.2, 12.3.1, 13.2.2, 14.3, 14.4

Owner's Financial Capability
2.2.1, 13.2.2, 14.1.1.5

**Owner's Liability Insurance**
**11.2**

Owner's Loss of Use Insurance
11.4.3

Owner's Relationship with Subcontractors
1.1.2, 5.2, 5.3, 5.4, 9.6.4, 9.10.2, 14.2.2

**Owner's Right to Carry Out the Work**
**2.4, 12.2.4, 14.2.2.2**

**Owner's Right to Clean Up**
**6.3**

**Owner's Right to Perform Construction and to Award Separate Contracts**
**6.1**

**Owner's Right to Stop the Work**
**2.3**

Owner's Right to Suspend the Work
14.3

Owner's Right to Terminate the Contract
14.2

**Ownership and Use of Drawings, Specifications and Other Instruments of Service**
1.1.1, **1.6**, 2.2.5, 3.2.1, 3.11.1, 3.17.1, 4.2.12, 5.3

**Partial Occupancy or Use**
9.6.6, **9.9**, 11.4.1.5

**Patching, Cutting and**
**3.14, 6.2.5**

Patents
3.17

**Payment, Applications for**
4.2.5, 7.3.8, 9.2, **9.3**, 9.4, 9.5.1, 9.6.3, 9.7.1, 9.8.5, 9.10.1, 9.10.3, 9.10.5, 11.1.3, 14.2.4, 14.4.3

**Payment, Certificates for**
4.2.5, 4.2.9, 9.3.3, **9.4**, 9.5, 9.6.1, 9.6.6, 9.7.1, 9.10.1, 9.10.3, 13.7, 14.1.1.3, 14.2.4

**Payment, Failure of**
4.3.6, 9.5.1.3, **9.7**, 9.10.2, 14.1.1.3, 14.2.1.2, 13.6

Payment, Final
4.2.1, 4.2.9, 4.3.2, 9.8.2, 9.10, 11.1.2, 11.1.3, 11.4.1, 11.4.5, 12.3.1, 13.7, 14.2.4, 14.4.3

**Payment Bond, Performance Bond and**
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, **11.5**

Payments, Progress
4.3.3, 9.3, 9.6, 9.8.5, 9.10.3, 13.6, 14.2.3

**PAYMENTS AND COMPLETION**
9

Payments to Subcontractors
5.4.2, 9.5.1.3, 9.6.2, 9.6.3, 9.6.4, 9.6.7, 11.4.8, 14.2.1.2

PCB
10.3.1

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved.** WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)

(986536188)

R.P. Appx. 347                                    36

**Performance Bond and Payment Bond**
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, **11.5**
**Permits, Fees and Notices**
2.2.2, **3.7**, 3.13, 7.3.6.4, 10.2.2
PERSONS AND PROPERTY, PROTECTION
OF
10

Polychlorinated Biphenyl
10.3.1
Product Data, Definition of
3.12.2
**Product Data and Samples, Shop Drawings**
3.11, **3.12**, 4.2.7
**Progress and Completion**
4.2.2, 4.3.3, **8.2**, 9.8, 9.9.1, 14.1.4
**Progress Payments**
4.3.3, 9.3, **9.6**, 9.8.5, 9.10.3, 13.6, 14.2.3
Project, Definition of the
1.1.4
**Project Management Protective Liability
Insurance**
**11.3**
Project Manual, Definition of the
1.1.7
Project Manuals
2.2.5
Project Representatives
4.2.10
**Property Insurance**
10.2.5, **11.4**
PROTECTION OF PERSONS AND PROPERTY
10
Regulations and Laws
1.6, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 4.4.8, 4.6,
9.6.4, 9.9.1, 10.2.2, 11.1, 11.4, 13.1, 13.4, 13.5.1,
13.5.2, 13.6, 14
Rejection of Work
3.5.1, 4.2.6, 12.2.1
Releases and Waivers of Liens
9.10.2
Representations
1.5.2, 3.5.1, 3.12.6, 6.2.2, 8.2.1, 9.3.3, 9.4.2, 9.5.1,
9.8.2, 9.10.1
Representatives
2.1.1, 3.1.1, 3.9, 4.1.1, 4.2.1, 4.2.10, 5.1.1, 5.1.2,
13.2.1
**Resolution of Claims and Disputes**
**4.4, 4.5, 4.6**
Responsibility for Those Performing the Work
3.3.2, 3.18, 4.2.3, 4.3.8, 5.3.1, 6.1.3, 6.2, 6.3, 9.5.1,
10
Retainage
9.3.1, 9.6.2, 9.8.5, 9.9.1, 9.10.2, 9.10.3
**Review of Contract Documents and Field
Conditions by Contractor**
1.5.2, **3.2**, 3.7.3, 3.12.7, 6.1.3

Review of Contractor's Submittals by Owner and
Architect
3.10.1, 3.10.2, 3.11, 3.12, 4.2, 5.2, 6.1.3, 9.2, 9.8.2
Review of Shop Drawings, Product Data and
Samples by Contractor
3.12
**Rights and Remedies**
1.1.2, 2.3, 2.4, 3.5.1, 3.15.2, 4.2.6, 4.3.4, 4.5, 4.6, 5.3,
5.4, 6.1, 6.3, 7.3.1, 8.3, 9.5.1, 9.7, 10.2.5, 10.3,
12.2.2, 12.2.4, **13.4**, 14
**Royalties, Patents and Copyrights**
**3.17**
Rules and Notices for Arbitration
4.6.2
**Safety of Persons and Property**
**10.2, 10.6**
**Safety Precautions and Programs**
3.3.1, 4.2.2, 4.2.7, 5.3.1, **10.1**, 10.2, 10.6
Samples, Definition of
3.12.3
**Samples, Shop Drawings, Product Data and**
3.11, **3.12**, 4.2.7
**Samples at the Site, Documents and**
**3.11**
**Schedule of Values**
**9.2, 9.3.1**
Schedules,
1.4.1.2, 3.10, 3.Construction12.1, 3.12.2, 4.3.7.2,
6.1.3
Separate Contracts and Contractors
1.1.4, 3.12.5, 3.14.2, 4.2.4, 4.2.7, 4.6.4, 6, 8.3.1,
11.4.7, 12.1.2, 12.2.5
Shop Drawings, Definition of
3.12.1
**Shop Drawings, Product Data and Samples**
3.11, **3.12**, 4.2.7
**Site, Use of**
**3.13, 6.1.1, 6.2.1**
Site Inspections
1.2.2, 3.2.1, 3.3.3, 3.7.1, 4.2, 4.3.4, 9.4.2, 9.10.1, 13.5
Site Visits, Architect's
4.2.2, 4.2.9, 4.3.4, 9.4.2, 9.5.1, 9.9.2, 9.10.1, 13.5
Special Inspections and Testing
4.2.6, 12.2.1, 13.5
Specifications, Definition of the
1.1.6
**Specifications, The**
1.1.1, **1.1.6**, 1.1.7, 1.2.2, 1.6, 3.11, 3.12.10, 3.17
Statute of Limitations
4.6.3, 12.2.6, 13.7
Stopping the Work
2.3, 4.3.6, 9.7, 10.3, 14.1
Stored Materials
6.2.1, 9.3.2, 10.2.1.2, 10.2.4, 11.4.1.4
Subcontractor, Definition of
5.1.1
**SUBCONTRACTORS**

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)
(986536188)

R.P. Appx. 348                                          37

**5**

Subcontractors, Work by
1.2.2, 3.3.2, 3.12.1, 4.2.3, 5.2.3, 5.3, 5.4, 9.3.1.2, 9.6.7

**Subcontractual Relations**
**5.3, 5.4, 9.3.1.2, 9.6, 9.10 10.2.1, 11.4.7, 11.4.8, 14.1, 14.2.1, 14.3.2**

Submittals
1.6, 3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3, 7.3.6, 9.2, 9.3, 9.8, 9.9.1, 9.10.2, 9.10.3, 11.1.3

**Subrogation, Waivers of**
6.1.1, 11.4.5, **11.4.7**

**Substantial Completion**
4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, **9.8**, 9.9.1, 9.10.3, 9.10.4.2, 12.2, 13.7

Substantial Completion, Definition of
9.8.1

Substitution of Subcontractors
5.2.3, 5.2.4

Substitution of Architect
4.1.3

Substitutions of Materials
3.4.2, 3.5.1, 7.3.7

Sub-subcontractor, Definition of
5.1.2

Subsurface Conditions
4.3.4

**Successors and Assigns**
**13.2**

**Superintendent**
**3.9, 10.2.6**

**Supervision and Construction Procedures**
1.2.2, **3.3**, 3.4, 3.12.10, 4.2.2, 4.2.7, 4.3.3, 6.1.3, 6.2.4, 7.1.3, 7.3.6, 8.2, 8.3.1, 9.4.2, 10, 12, 14

Surety
4.4.7, 5.4.1.2, 9.8.5, 9.10.2, 9.10.3, 14.2.2

Surety, Consent of
9.10.2, 9.10.3

Surveys
2.2.3

**Suspension by the Owner for Convenience**
**14.4**

Suspension of the Work
5.4.2, 14.3

Suspension or Termination of the Contract
4.3.6, 5.4.1.1, 11.4.9, 14

Taxes
**3.6, 3.8.2.1, 7.3.6.4**

**Termination by the Contractor**
4.3.10, **14.1**

**Termination by the Owner for Cause**
4.3.10, 5.4.1.1, **14.2**

Termination of the Architect
4.1.3

Termination of the Contractor
14.2.2

**TERMINATION OR SUSPENSION OF THE CONTRACT**
**14**

**Tests and Inspections**
3.1.3, 3.3.3, 4.2.2, 4.2.6, 4.2.9, 9.4.2, 9.8.3, 9.9.2, 9.10.1, 10.3.2, 11.4.1.1, 12.2.1, **13.5**

**TIME**
**8**

**Time, Delays and Extensions of**
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1, 7.3.1, 7.4.1, **8.3**, 9.5.1, 9.7.1, 10.3.2, 10.6.1, 14.3.2

Time Limits
2.1.2, 2.2, 2.4, 3.2.1, 3.7.3, 3.10, 3.11, 3.12.5, 3.15.1, 4.2, 4.3, 4.4, 4.5, 4.6, 5.2, 5.3, 5.4, 6.2.4, 7.3, 7.4, 8.2, 9.2, 9.3.1, 9.3.3, 9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9, 9.10, 11.1.3, 11.4.1.5, 11.4.6, 11.4.10, 12.2, 13.5, 13.7, 14

**Time Limits on Claims**
**4.3.2, 4.3.4, 4.3.8, 4.4, 4.5, 4.6**

Title to Work
9.3.2, 9.3.3

**UNCOVERING AND CORRECTION OF WORK**
**12**

**Uncovering of Work**
**12.1**

Unforeseen Conditions
4.3.4, 8.3.1, 10.3

Unit Prices
4.3.9, 7.3.3.2

Use of Documents
1.1.1, 1.6, 2.2.5, 3.12.6, 5.3

**Use of Site**
**3.13, 6.1.1, 6.2.1**

**Values, Schedule of**
**9.2, 9.3.1**

Waiver of Claims by the Architect
13.4.2

Waiver of Claims by the Contractor
4.3.10, 9.10.5, 11.4.7, 13.4.2

Waiver of Claims by the Owner
4.3.10, 9.9.3, 9.10.3, 9.10.4, 11.4.3, 11.4.5, 11.4.7, 12.2.2.1, 13.4.2, 14.2.4

**Waiver of Consequential Damages**
**4.3.10, 14.2.4**

Waiver of Liens
9.10.2, 9.10.4

**Waivers of Subrogation**
6.1.1, 11.4.5, **11.4.7**

**Warranty**
**3.5, 4.2.9, 4.3.5.3, 9.3.3, 9.8.4, 9.9.1, 9.10.4, 12.2.2, 13.7.1.3**

Weather Delays
4.3.7.2

Work, Definition of
1.1.3

Written Consent

---

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved.** WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)

(986536188)



1.6, 3.4.2, 3.12.8, 3.14.2, 4.1.2, 4.3.4, 4.6.4, 9.3.2,
9.8.5, 9.9.1, 9.10.2, 9.10.3, 11.4.1, 13.2, 13.4.2
Written Interpretations
4.2.11, 4.2.12, 4.3.6
**Written Notice**

2.3, 2.4, 3.3.1, 3.9, 3.12.9, 3.12.10, 4.3, 4.4.8, 4.6.5,
5.2.1, 8.2.2, 9.7, 9.10, 10.2.2, 10.3, 11.1.3, 11.4.6,
12.2.2, 12.2.4, **13.3**, 14
Written Orders
1.1.1, 2.3, 3.9, 4.3.6, 7, 8.2.2, 11.4.9, 12.1, 12.2,
13.5.2, 14.3.1

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)
(986536188)

10

R.P. Appx. 350                                                                                                    39

## ARTICLE 1 GENERAL PROVISIONS
### § 1.1 BASIC DEFINITIONS
### § 1.1.1 THE CONTRACT DOCUMENTS

The Contract Documents consist of the ~~Agreement between Owner and Contractor (hereinafter the Agreement),~~ Agreement, this specifically modified AIA Document A201-1997, General Conditions ~~of the Contract (General, Supplementary and other Conditions),~~ ("A201"), Drawings, Specifications, Addenda issued prior to execution of the Contract, other documents listed in the Agreement and Modifications issued after execution of the Contract. A Modification is (1) a written amendment to the Contract signed by both parties, or (2) a Change ~~Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Architect.~~ Order. Unless specifically enumerated in the Agreement, the Contract Documents do not include other documents such as bidding requirements (advertisement or invitation to bid, Instructions to Bidders, sample forms, the Contractor's bid or portions of Addenda relating to bidding requirements). References herein to the "Agreement" shall mean and refer to the specifically modified Standard Form of Agreement Between Owner and Contractor, or Owner and Construction Manager, which may be an AIA Document A101, A111 or A121, whichever is applicable.

### § 1.1.2 THE CONTRACT

The Contract Documents form the Contract for Construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification. The Contract Documents shall not be construed to create a contractual relationship of any kind (1) between the Architect and Contractor, (2) between the Owner and a Subcontractor or Sub-subcontractor, (3) between the Owner and Architect or (4) between any persons or entities other than the Owner and Contractor. ~~The Architect shall, however, be entitled to performance and enforcement of obligations under the Contract intended to facilitate performance of the Architect's duties.~~

### § 1.1.3 THE WORK

The term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

### § 1.1.4 THE PROJECT

The Project is the total construction of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Owner or by separate contractors.

### § 1.1.5 THE DRAWINGS

The Drawings are the graphic and pictorial portions of the Contract Documents showing the design, location and dimensions of the Work, generally including plans, elevations, sections, details, schedules and diagrams.

### § 1.1.6 THE SPECIFICATIONS

The Specifications are that portion of the Contract Documents consisting of the written requirements for materials, equipment, systems, standards and workmanship for the Work, and performance of related services.

### § 1.1.7 THE PROJECT MANUAL

The Project Manual is a volume assembled for the Work which may include the bidding requirements, sample forms, Conditions of the Contract and Specifications.

### § 1.2 CORRELATION AND INTENT OF THE CONTRACT DOCUMENTS

§ 1.2.1 The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required only to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results.

§ 1.2.2 Organization of the Specifications into divisions, sections and articles, and arrangement of Drawings shall not control the Contractor in dividing the Work among Subcontractors or in establishing the extent of Work to be performed by any trade.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved.** WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)          (986536188)

**§ 1.2.3** Unless otherwise stated in the Contract Documents, words which have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

**§ 1.3 CAPITALIZATION**

**§ 1.3.1** Terms capitalized in these General Conditions include those which are (1) specifically defined, (2) the titles of numbered articles or (3) the titles of other documents published by the American Institute of Architects.

**§ 1.4 INTERPRETATION**

**§ 1.4.1** In the interest of brevity the Contract Documents frequently omit modifying words such as "all" and "any" and articles such as "the" and "an," but the fact that a modifier or an article is absent from one statement and appears in another is not intended to affect the interpretation of either statement.

**§ 1.5 EXECUTION OF CONTRACT DOCUMENTS**

**§ 1.5.1** The Contract Documents shall be signed by the Owner and Contractor. ~~If either the Owner or Contractor or both do not sign all the Contract Documents, the Architect shall identify such unsigned Documents upon request.~~

**§ 1.5.2** Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become generally familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents.

**§ 1.6 OWNERSHIP AND USE OF DRAWINGS, SPECIFICATIONS AND OTHER INSTRUMENTS OF SERVICE**

**§ 1.6.1** ~~The Drawings, Specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service through which the Work to be executed by the Contractor is described. The Contractor may retain one record set. Neither the Contractor nor any Subcontractor, Sub-subcontractor or material or equipment supplier shall own or claim a copyright in the Drawings, Specifications and other documents prepared by the Architect or the Architect's consultants, and unless otherwise indicated the Architect and the Architect's consultants shall be deemed the authors of them and will retain all common law, statutory and other reserved rights, in addition to the copyrights. All copies of Instruments of Service, except the Contractor's record set, shall be returned or suitably accounted for to the Architect, on request, upon completion of the Work. The Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants, and copies thereof furnished to the Contractor, are for use solely with respect to this Project. They are not to be used by the Contractor or any Subcontractor, Sub-subcontractor or material or equipment supplier on other projects or for additions to this Project outside the scope of the Work without the specific written consent of the Owner, Architect and the Architect's consultants. The Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers are authorized to use and reproduce applicable portions of the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants appropriate to and for use in the execution of their Work under the Contract Documents. All copies made under this authorization shall bear the statutory copyright notice, if any, shown on the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants. Submittal or distribution to meet official regulatory requirements or for other purposes in connection with this Project is not to be construed as publication in derogation of the Architect's or Architect's consultants' copyrights or other reserved rights.~~

**§ 1.6.1** The Drawings, Specifications and other documents prepared by the Architect or by any engineer or other design consultant working under the Architect or the Contractor (the "Other Design Consultants") for this Project (the "Design Documents") are instruments of the Architect's and Other Design Consultants' service through which the Work to be executed by the Contractor is described and, unless otherwise provided, the Architect and Other Design Consultants shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright until such time as the Owner has provided full and final payment to the Contractor for all services provided by the Architect and Other Design Consultants under this Agreement. Until final payment has been made by Owner, the Contractor shall cause the Architect and Other Design Consultants to grant in writing, upon execution of this Agreement, to the Owner a full and exclusive license for all copyright rights and privileges held by the Architect and Other Design Consultants with respect to the Design Documents. Such written agreement by the Architect and Other Design Consultants shall also provide that, upon full and final payment for Architect's and the Other Design Consultants' services, all rights reserved for the Architect and the Other Design Consultants with respect to the Design Documents shall pass to the Owner. The Architect and Other Design Consultants shall be permitted to retain copies, including reproducible and electronic copies, of the Design Documents for information and for use in the marketing of the Architect's and Other Design Consultants' services.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                    (986536188)

R.P. Appx. 352                                                                 41

Architect and the Other Design Consultants shall also be permitted to use any standard details from the Design Documents for other projects by the Architect or Other Design Consultants.

Any use of the copyright license or use or distribution of the Design Documents by the Owner, other than for this specific project, shall be at the Owner's sole risk. The Owner waives any right to make claims and waives, to the fullest extent permitted by law, any claim or cause of action against the Architect, the Other Design Consultants, their employees, agents or subconsultants, which may arise out of the Owner's use of this copyright license or its use or distribution of the Design Documents for other than this specific project without the concurrent and associated use of the Architect's or Other Design Consultants' services. The Owner hereby agrees to defend, indemnify and hold harmless the Contractor, Architect and Architect's consultants from any and all claims, damages, liabilities, losses and expenses, including reasonable attorney's fees, arising out of or resulting from the use of the "instruments of service." This does not relieve the Architect or Other Design Consultants from their responsibility to properly design this project for future renovations or expansions to the extent the criteria for such are specifically identified by the Owner and documented in the programming of this project.

The Architect and Other Design Consultants shall deliver to the Owner a complete set of the Design Documents prepared by the Architect, Other Design Consultants or their subconsultants in the form of electronic files within thirty (30) days of the Substantial Completion date or the date of the last Owner-initiated revision, whichever is latest. Architect and the Other Design Consultants shall also maintain an electronic copy of the Design Documents for a period of three (3) years from the date of Substantial Completion of the Project.

## ARTICLE 2 OWNER
### § 2.1 GENERAL
§ 2.1.1 The Owner is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The Owner shall designate in writing a representative who shall have express authority to bind the Owner with respect to all matters requiring the Owner's approval or authorization. Except as otherwise provided in Section 4.2.1, the Architect does not have such authority. The term "Owner" means the Owner or the Owner's authorized representative.

§ 2.1.2 The Owner shall furnish to the Contractor within fifteen days after receipt of a written request, information necessary and relevant for the Contractor to evaluate, give notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property on which the Project is located, usually referred to as the site, and the Owner's interest therein.

### § 2.2 INFORMATION AND SERVICES REQUIRED OF THE OWNER
§ 2.2.1 The Owner shall, at the written request of the Contractor, prior to commencement of the Work and thereafter, furnish to the Contractor reasonable evidence that financial arrangements have been made to fulfill the Owner's obligations under the Contract. Furnishing of such evidence shall be a condition precedent to commencement or continuation of the Work. After such evidence has been furnished, the Owner shall not materially vary such financial arrangements without prior notice to the Contractor.

§ 2.2.2 Except for permits and fees, including those required under Section 3.7.1, which are the responsibility of the Contractor under the Contract Documents, the Owner shall secure and pay for necessary approvals, easements, assessments and charges required for construction, use or occupancy of permanent structures or for permanent changes in existing facilities.

§ 2.2.3 The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, Project (the "**Surveys**"), and a legal description of the site. The Contractor shall be entitled to rely on the accuracy of information furnished by the Owner but shall exercise proper precautions relating to the safe performance of the Work. The Owner shall disclose, to the extent known to the Owner, the results and reports of studies, prior tests, inspections or investigations conducted for the Project (collectively, the "**Project Information**") involving: structural or mechanical systems; chemical, air and water pollution; hazardous materials; geotechnical conditions; Surveys; studies and plans or other environmental, subsurface or concealed conditions. The Owner shall disclose all information known to the Owner regarding the presence of hazardous materials, pollutants or contaminants at the Project's site. The Contractor shall review all such Project Information and shall cause the Architect, the structural engineer and other Design Professionals hired by Contractor and/or Architect to design, and

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)       (986536188)

R.P. Appx. 353       42

Contractor shall construct, the Project in accordance with the recommendations and findings set forth in such Project Information.

§ 2.2.4 Information or services required of the Owner by the Contract Documents shall be furnished by the Owner with reasonable promptness. Any other information or services relevant to the Contractor's performance of the Work under the Owner's control shall be furnished by the Owner after receipt from the Contractor of a written request for such information or services.

§ 2.2.5 Unless otherwise provided in the Contract Documents, the Contractor will be furnished, free of charge, such copies of Drawings and Project Manuals as are reasonably necessary for execution of the Work.

## § 2.3 OWNER'S RIGHT TO STOP THE WORK
§ 2.3.1 If the Contractor fails to correct Work which is not in accordance with the requirements of the Contract Documents as required by Section 12.2 or persistently fails to carry out Work in accordance with the Contract Documents, the Owner may issue a written order to the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Contractor or any other person or entity, except to the extent required by Section 6.1.3. No part of the time lost due to any such stop work orders shall be made the subject of a claim for extension of time or for increased costs or damages by Contractor.

## § 2.4 OWNER'S RIGHT TO CARRY OUT THE WORK
§ 2.4.1 If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within a seven-day period after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may after such seven-day period give the Contractor a second written notice to correct such deficiencies within a three-day period. If the Contractor within such three-day period after receipt of such second notice fails to commence and continue to correct any deficiencies, the Owner may, without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Contractor the reasonable cost of correcting such deficiencies, including Owner's expenses and compensation for the Architect's additional services made necessary by such default, neglect or failure. Such action by the Owner and amounts charged to the Contractor are both subject to prior approval of the Architect. If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor shall pay the difference to the Owner. If the Contractor defaults in the Contractor's obligations to the Owner, the Architect shall grant a license to the Owner to use the drawings, specifications, and other documents and electronic data furnished by the Architect to the Contractor for the completion of the Project.

## ARTICLE 3  CONTRACTOR
### § 3.1 GENERAL
§ 3.1.1 The Contractor is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Contractor" means the Contractor or the Contractor's authorized representative.

§ 3.1.2 The Contractor shall perform the Work in accordance with the Contract Documents.

§ 3.1.3 The Contractor shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the Architect in the Architect's administration of the Contract, or by tests, inspections or approvals required or performed by persons other than the Contractor.

### § 3.2 REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY CONTRACTOR
§ 3.2.1 Since the Contract Documents are complementary, before starting each portion of the Work, the Contractor shall carefully study and compare the various Drawings and other Contract Documents relative to that portion of the Work, as well as the information furnished by the Owner pursuant to Section 2.2.3, shall take field measurements of any existing conditions related to that portion of the Work and shall observe any conditions at the site affecting it. These obligations are for the purpose of facilitating construction by the Contractor and are not for the purpose of discovering errors, omissions, or inconsistencies in the Contract Documents; however, any errors, inconsistencies or omissions discovered by the Contractor shall be reported promptly to the Architect Owner as a request for information in such form as the Architect Owner may reasonably require.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)       (986536188)

14

R.P. Appx. 354                                                                 43

§ 3.2.2 Any design errors or omissions noted by the Contractor during this review shall be reported promptly to the ~~Architect,~~ Owner, but it is recognized that the Contractor's review is made in the Contractor's capacity as a contractor and not as a licensed design ~~professional unless otherwise specifically provided in the Contract Documents.~~ professional. The Contractor ~~is not required~~ shall cause the Architect and other design professionals to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations, including, without limitation, the Americans with Disabilities Act, but any nonconformity discovered by or ~~made~~ make known to the Contractor shall be promptly reported ~~promptly~~ to the ~~Architect.~~ Owner.

§ 3.2.3 If the Contractor believes that additional cost or time is involved because of clarifications or instructions issued by the ~~Architect~~ Owner in response to the Contractor's notices or requests for information pursuant to Sections 3.2.1 and 3.2.2, the Contractor shall make Claims as provided in Sections 4.3.6 and 4.3.7. If the Contractor fails to perform the obligations of Sections 3.2.1 and 3.2.2, the Contractor shall pay such costs and damages to the Owner as would have been avoided if the Contractor had performed such obligations. ~~The Contractor shall not be liable to the Owner or Architect for damages resulting from errors, inconsistencies or omissions in the Contract Documents or for differences between field measurements or conditions and the Contract Documents unless the Contractor recognized such error, inconsistency, omission or difference and knowingly failed to report it to the Architect.~~

### § 3.3 SUPERVISION AND CONSTRUCTION PROCEDURES
§ 3.3.1 The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, the Contractor shall evaluate the jobsite safety thereof and, except as stated below, shall be fully and solely responsible for the jobsite safety of such means, methods, techniques, sequences or procedures. If the Contractor determines that such means, methods, techniques, sequences or procedures may not be safe, the Contractor shall give timely written notice to the Owner and ~~Architect and~~ shall not proceed with that portion of the Work without further written instructions from the ~~Architect.~~ Owner. If the Contractor is then instructed to proceed with the required means, methods, techniques, sequences or procedures without acceptance of changes proposed by the Contractor, the Owner shall be solely responsible for any resulting loss or damage.

§ 3.3.2 The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors.

§ 3.3.3 The Contractor shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work.

### § 3.4 LABOR AND MATERIALS
§ 3.4.1 Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

§ 3.4.2 The Contractor may make substitutions only with the consent of the Owner, after evaluation by the Architect and in accordance with a Change Order.

§ 3.4.3 The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Contract. The Contractor shall not permit employment of unfit persons or persons not skilled in tasks assigned to them.

§ 3.4.4 The Contractor shall inspect all materials, supplies and equipment that are to be incorporated into the Project. In addition, Contractor shall be responsible for construction quality control for all Work. Contractor's quality control program and inspection procedures for the foregoing shall be submitted in writing to Owner for review and approval, in sufficient detail to delineate those items to be inspected and the manner in which they are to be

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)  (986536188)

15

R.P. Appx. 355                                                         44

inspected, and shall adequately describe all construction quality control activities contemplated, including provision for adequate documentation of Contractor's performance of such quality control and inspection.

§ 3.4.5 Contractor shall, during the course of performance of the Project hereunder, without additional compensation, make or cause to be made all inspections required by the Contract Documents. Owner may require at Owner's expense additional inspections. Contractor shall furnish Owner with satisfactory documentation of the results of all inspections. Owner shall be given not less than three (3) working days notice of any inspections to be made by Contractor or Contractor's subcontractors in order that Owner may witness any such inspections.

§ 3.4.6 Owner and its representatives, and others as may be required by applicable laws, ordinances and regulations, shall have the right at all reasonable times to inspect the Project and all material and equipment for the Project at the job site and at Contractor's and its subcontractors' shops for conformance with the Contract Documents. Contractor shall provide, or cause to be provided access and sufficient, safe and proper facilities for such inspections.

§ 3.4.7 Neither the failure by Owner to make any inspection under the Contract Documents nor to discover defective workmanship, materials or equipment, nor approval of any Work or payment to Contractor for such Work shall constitute Contractor's satisfaction of its obligations under the Contract Documents, nor shall any such inspections or approvals prejudice the rights of Owner.

### § 3.5 WARRANTY

§ 3.5.1 The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Contractor, improper or insufficient maintenance, improper operation, or normal wear and tear and normal usage. If required by the Architect, Owner, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment. All warranties under this Paragraph shall commence as of the date of Substantial Completion of the Work, and shall continue for a period of one (1) year, except as otherwise noted in the Outline Specs (as such term is defined in the Agreement). **THE CONTRACTOR HEREBY DISCLAIMS ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION, ANY WARRANTIES OF FITNESS FOR ANY PARTICULAR PURPOSE, EXCEPT AS EXPRESSLY WARRANTED HEREIN. THERE ARE NO WARRANTIES BEYOND THE DESCRIPTION ON THE FACE HEREOF.** All subcontractor's and manufacturer's warranties shall be deemed furnished and assigned to the Owner pursuant to this Contract without further action by the Contractor upon Final Payment by the Owner as required under this Contract.

### § 3.6 TAXES

§ 3.6.1 The Contractor shall pay sales, consumer, use and similar taxes for the Work provided by the Contractor which are legally enacted when bids are received or negotiations concluded, whether or not yet effective or merely scheduled to go into effect.

### § 3.7 PERMITS, FEES AND NOTICES

§ 3.7.1 Unless otherwise provided in the Contract Documents, the Contractor shall secure and pay for the building permit and other permits and governmental fees, licenses , waivers, consents, approvals and authorizations and make all material registrations, qualifications, designations and filings required and shall secure and pay for all inspections necessary for proper execution and completion of the Work which are customarily secured after execution of the Contract and which are legally required when bids are received or negotiations concluded.

§ 3.7.2 The Contractor shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities applicable to performance of the Work.

§ 3.7.3 It is not Contractor shall cause the Contractor's responsibility Architect and other design professionals to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations. However, if the Contractor observes that portions of the Contract Documents are at variance therewith, the Contractor shall promptly notify the Architect and Owner in writing, and necessary changes shall be accomplished by appropriate Modification.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)          (986536188)

16

**§ 3.7.4** If the Contractor performs Work knowing it to be contrary to laws, statutes, ordinances, building codes, and rules and regulations without such notice to the ~~Architect and~~ Owner, the Contractor shall assume appropriate responsibility for such Work and shall bear the costs attributable to correction.

## § 3.8 ALLOWANCES

**§ 3.8.1** The Contractor shall include in the Contract Sum all allowances stated in the Contract Documents. Items covered by allowances shall be supplied for such amounts and by such persons or entities as the Owner may direct, but the Contractor shall not be required to employ persons or entities to whom the Contractor has reasonable objection.

**§ 3.8.2** Unless otherwise provided in the Contract Documents:

.1   allowances shall cover the cost to the Contractor of materials and equipment delivered at the site and all required taxes, less applicable trade discounts;

.2   Contractor's costs for unloading and handling at the site, labor, installation costs, ~~overhead, profit~~ Contractor's Fee based on the percentage set forth in Section 5.1.2 of the Agreement and other expenses contemplated for stated allowance amounts shall be included in the Contract Sum but not in the allowances;

.3   whenever costs are more than or less than allowances, the Contract Sum shall be adjusted accordingly by Change Order. The amount of the Change Order shall reflect (1) the difference between actual costs and the allowances under Section 3.8.2.1 and (2) changes in Contractor's ~~costs~~ costs, Contractor's Fee based on the percentage set forth in Section 5.1.2 of the Agreement and other expenses under Section 3.8.2.2.

**§ 3.8.3** Materials and equipment under an allowance shall be selected by the Owner in sufficient time to avoid delay in the Work.

## § 3.9 SUPERINTENDENT

**§ 3.9.1** The Contractor shall employ a competent superintendent and necessary assistants who shall be in attendance at the Project site during performance of the Work. The superintendent shall represent the Contractor, and communications given to the superintendent shall be as binding as if given to the Contractor. Important communications (including but not limited to any communication that may affect the items in subparagraphs (i) through (vii) of Section 6.5 of the Agreement) shall be confirmed in writing. Other communications shall be similarly confirmed on written request in each case.

## § 3.10 CONTRACTOR'S CONSTRUCTION SCHEDULES

**§ 3.10.1** The Contractor, promptly after being awarded the Contract, shall prepare and submit for the Owner's ~~and Architect's~~ information a Contractor's construction schedule for the Work. The schedule shall not exceed time limits current under the Contract Documents, shall be revised at appropriate intervals as required by the conditions of the Work and Project, shall be related to the entire Project to the extent required by the Contract Documents, and shall provide for expeditious and practicable execution of the Work.

**§ 3.10.2** The Contractor shall prepare and keep current, for the ~~Architect's~~ Owner's approval, a schedule of submittals which is coordinated with the Contractor's construction schedule and allows the ~~Architect~~ Owner reasonable time to review submittals.

**§ 3.10.3** The Contractor shall perform the Work in general accordance with the most recent schedules submitted to the ~~Owner and Architect.~~ Owner.

## § 3.11 DOCUMENTS AND SAMPLES AT THE SITE

**§ 3.11.1** The Contractor shall maintain at the site for the Owner one record copy of the Drawings, Specifications, Addenda, Change Orders and other Modifications, in good order and marked currently to record field changes and selections made during construction, and one record copy of approved Shop Drawings, Product Data, Samples and similar required submittals. These shall be available to the ~~Architect~~ Owner and shall be delivered ~~to the Architect for submittal~~ to the Owner upon completion of the Work.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06) (986536188)

## § 3.12 SHOP DRAWINGS, PRODUCT DATA AND SAMPLES

**§ 3.12.1** Shop Drawings are drawings, diagrams, schedules and other data specially prepared for the Work by the Contractor or a Subcontractor, Sub-subcontractor, manufacturer, supplier or distributor to illustrate some portion of the Work.

**§ 3.12.2** Product Data are illustrations, standard schedules, performance charts, instructions, brochures, diagrams and other information furnished by the Contractor to illustrate materials or equipment for some portion of the Work.

**§ 3.12.3** Samples are physical examples which illustrate materials, equipment or workmanship and establish standards by which the Work will be judged.

**§ 3.12.4** Shop Drawings, Product Data, Samples and similar submittals are not Contract Documents. The purpose of their submittal is to demonstrate for those portions of the Work for which submittals are required by the Contract Documents the way by which the Contractor proposes to conform to the information given and the design concept expressed in the Contract Documents. Review by the ~~Architect~~ Owner is subject to the limitations of ~~Section~~ section 4.2.7. Informational submittals upon which the ~~Architect~~ Owner is not expected to take responsive action may be so identified in the Contract Documents. Submittals ~~which~~ that are not required by the Contract Documents may be returned by the ~~Architect~~ Owner without action.

**§ 3.12.5** The Contractor shall review for compliance with the Contract Documents, ~~approve~~ and ~~submit~~ direct the Owner to review the ~~Architect~~ Shop Drawings, Product Data, Samples and similar submittals required by the Contract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Owner or of separate contractors. ~~Submittals which are not marked as reviewed for compliance with the Contract Documents and approved by the Contractor may be returned by the Architect without action.~~

**§ 3.12.6** By approving and submitting Shop Drawings, Product Data, Samples and similar submittals, the Contractor represents that the Contractor has determined and verified materials, field measurements and field construction criteria related thereto, or will do so, and has checked and coordinated the information contained within such submittals with the requirements of the Work and of the Contract Documents.

**§ 3.12.7** The Contractor shall perform no portion of the Work for which the Contract Documents require submittal and review by the Owner of Shop Drawings, Product Data, Samples or similar submittals until the respective submittal has been approved by the ~~Architect.~~ Owner.

**§ 3.12.8** The Work shall be in accordance with approved submittals except that the Contractor shall not be relieved of responsibility for deviations from requirements of the Contract Documents by the ~~Architect's~~ Owner's approval of Shop Drawings, Product Data, Samples or similar submittals unless the Contractor has specifically informed the ~~Architect~~ Owner in writing of such deviation at the time of submittal and (1) the ~~Architect~~ Owner has given written approval to the specific deviation as a minor change in the Work, or (2) a Change Order ~~or Construction Change Directive~~ has been issued authorizing the deviation. The Contractor shall not be relieved of responsibility for errors or omissions in Shop Drawings, Product Data, Samples or similar submittals by the ~~Architect's~~ Owner's approval thereof.

**§ 3.12.9** The Contractor shall direct specific attention, in writing or on resubmitted Shop Drawings, Product Data, Samples or similar submittals, to revisions other than those requested by the ~~Architect~~ Owner on previous submittals. In the absence of such written notice the ~~Architect's~~ Owner's approval of a resubmission shall not apply to such revisions.

**§ 3.12.10** The Contractor shall not be required to provide professional services which constitute the practice of architecture or engineering unless such services are specifically required by the Contract Documents for a portion of the Work or unless the Contractor needs to provide such services in order to carry out the Contractor's responsibilities for construction means, methods, techniques, sequences and procedures. The Contractor shall not be required to provide professional services in violation of applicable law. If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Owner ~~and the Architect~~ will specify all performance and design criteria that such services must satisfy. The Contractor shall cause such services or certifications to be provided by a properly licensed design professional, whose signature and seal shall appear on all drawings, calculations,

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)  (986536188)

R.P. Appx. 358                                                                                          47

specifications, certifications, Shop Drawings and other submittals prepared by such professional. Shop Drawings and other submittals related to the Work designed or certified by such professional, if prepared by others, shall bear such professional's written approval when submitted to the ~~Architect.~~ Owner. The Owner ~~and the Architect~~ shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals, provided the Owner ~~and Architect have~~ has specified to the Contractor all performance and design criteria that such services must satisfy. Pursuant to this Section 3.12.10, the ~~Architect~~ Owner will review, approve or take other appropriate action on submittals only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Contractor shall not be responsible for the adequacy of the performance or design criteria required by the Contract Documents.

### § 3.13 USE OF SITE
**§ 3.13.1** The Contractor shall confine operations at the site to areas permitted by law, ordinances, permits and the Contract Documents and shall not unreasonably encumber the site with materials or equipment.

### § 3.14 CUTTING AND PATCHING
**§ 3.14.1** The Contractor shall be responsible for cutting, fitting or patching required to complete the Work or to make its parts fit together properly.

**§ 3.14.2** The Contractor shall not damage or endanger a portion of the Work or fully or partially completed construction of the Owner or separate contractors by cutting, patching or otherwise altering such construction, or by excavation. The Contractor shall not cut or otherwise alter such construction by the Owner or a separate contractor except with written consent of the Owner and of such separate contractor; such consent shall not be unreasonably withheld. The Contractor shall not unreasonably withhold from the Owner or a separate contractor the Contractor's consent to cutting or otherwise altering the Work.

### § 3.15 CLEANING UP
**§ 3.15.1** The Contractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Contract. At completion of the Work, the Contractor shall remove from and about the Project waste materials, rubbish, the Contractor's tools, construction equipment, machinery and surplus materials.

**§ 3.15.2** If the Contractor fails to clean up as provided in the Contract Documents, the Owner may do so and the cost thereof shall be charged to the Contractor.

### § 3.16 ACCESS TO WORK
**§ 3.16.1** The Contractor shall provide the Owner and Architect access to the Work in preparation and progress wherever located.

### § 3.17 ROYALTIES, PATENTS AND COPYRIGHTS
**§ 3.17.1** The Contractor shall pay all royalties and license fees. The Contractor shall defend suits or claims for infringement of copyrights and patent rights and shall hold the Owner ~~and Architect~~ harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Contract Documents or where the copyright violations are contained in Drawings, Specifications or other documents prepared by the ~~Owner or Architect.~~ Owner. However, if the Contractor has reason to believe that the required design, process or product is an infringement of a copyright or a patent, the Contractor shall be responsible for such loss unless such information is promptly furnished to the ~~Architect.~~ Owner.

### § 3.18 INDEMNIFICATION
**§ 3.18.1** To the fullest extent permitted by law and to the extent claims, damages, losses or expenses are not covered by (a) Project Management Protective Liability insurance purchased by the Contractor in accordance with Section ~~11.3,~~ 11.3 or (b) builder's risk or property insurance maintained with respect to the Project, the Contractor shall indemnify and hold harmless the Owner, ~~Architect, Architect's consultants, and agents and employees of any of them~~ from and against claims, damages, losses and expenses, including but not limited to reasonable attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the ~~negligent~~ acts or omissions of the Contractor, a Subcontractor,

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)   (986536188)

anyone directly or indirectly employed by them or anyone for whose acts they may be liable, ~~regardless~~ but only to the extent that such claim, damage, loss or expense is not caused by breach, or acts of omissions of the Owner. To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, its Subcontractors, and the agents and employees of any of ~~whether or~~ them from and against claims, damages, losses and expenses, including but not limited to reasonable attorneys' fees, arising out of the Project, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property, but only to the extent caused by the Owner's breach of this Contract, or the acts or omissions of the Owner, the Owner's separate contractors (as provided in ~~part~~ subparagraph 6.1.4), anyone directly or indirectly employed by them or anyone for whose acts they may be liable (other than the Contractor and its Subcontractors), and only to the extent that such claim, damage, loss or expense is not caused by ~~a~~ breach, or acts or omissions of the party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 3.18. The obligations of the Contractor and the Owner herein are subject to the provisions of Subparagraphs 4.3.10 and 11.4.7.

§ 3.18.2 In claims against any person or entity indemnified under this Section 3.18 by an employee of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Section 3.18.1 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or a Subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

## ARTICLE 4  ADMINISTRATION OF THE CONTRACT
### § 4.1 ARCHITECT
§ 4.1.1 The Architect is the person lawfully licensed to practice architecture or an entity lawfully practicing architecture identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Architect" means the Architect or the Architect's authorized representative.

§ 4.1.2 Duties, responsibilities and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the ~~Owner, Contractor~~ Owner and ~~Architect.~~ the Contractor. Consent shall not be unreasonably withheld.

§ 4.1.3 If the employment of the Architect is terminated, the ~~Owner~~ Contractor shall employ a new Architect against whom the ~~Contractor~~ Owner has no reasonable objection ~~and~~ whose status under the Contract Documents shall be that of the former Architect.

### § 4.2 ARCHITECT'S ADMINISTRATION OF THE CONTRACT
~~§ 4.2.1 The Architect will provide administration of the Contract as described in the Contract Documents, and will be an Owner's representative (1) during construction, (2) until final payment is due and (3) with the Owner's concurrence, from time to time during the one-year period for correction of Work described in Section 12.2. The Architect will have authority to act on behalf of the Owner only to the extent provided in the Contract Documents, unless otherwise modified in writing in accordance with other provisions of the Contract.~~
§ 4.2.1 The Contractor shall keep the Owner informed of the progress and quality of the Work. Within thirty (30) calendar days after full execution and delivery of the Contract Documents and before submittal of the first progress payment invoice, and at each construction progress meeting on site, Contractor shall submit to Owner for Owner's reasonable approval (i) a revised Project Schedule (the most recent schedule so approved in writing by Owner becoming the revised Project Schedule for all purposes of the Contract Documents) showing changes from the prior Project Schedule, the sequence in which Contractor proposes to perform the Project, the start and completion dates of all separable portions of the Project in sufficient detail, manpower forecasts (incremental and cumulative percent complete), materials procurement and delivery plans, the anticipated Substantial Completion Date and the anticipated date that Contractor will tender possession of the Project and any other information reasonably specified by Owner pertaining to the construction schedule, along with (ii) a proforma Project Schedule that "looks ahead" two weeks containing the same details as set forth in subpart (i) above. Contractor agrees to adhere to the Project Schedule and attend and participate in scheduled progress and coordination meetings called by Owner. Within thirty (30) calendar days after full execution and delivery of the Contract Documents and before submittal of the first progress payment invoice, and at each construction progress meeting on site, Contractor shall also submit to Owner a revised budget for the Project, in form and content reasonably approved by Owner, including all hard and soft construction costs (the "**Budget**"), along with a construction cost report in form and content reasonably acceptable to Owner. Contractor shall use commercially reasonable efforts to keep the Budget as accurate as possible.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved.** WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                    (986536188)

Contractor shall provide Owner with monthly reports no later than the tenth (10th) day of each month, which shall, at the minimum, include the most current Project Schedule and a Project Change Order log update (with pricing information).

§ 4.2.2 In the event Contractor's performance of the Project is not in compliance with the Project Schedule, Owner may, in writing, require the Contractor to submit its plan for schedule recovery, or specify in writing the steps to be taken to achieve compliance with such Project Schedule, and/or exercise any other remedies under the Contract Documents. Contractor shall thereupon take such commercially reasonable steps as may be directed by Owner or otherwise necessary to improve its progress.

§ 4.2.2 The Architect, as a representative of the Owner, will visit the site at intervals appropriate to the stage of the Contractor's operations (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect will neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents, except as provided in Section 3.3.1.

§ 4.2.3 Contractor acknowledges and agrees Prudential Insurance Company of America ("**Prudential**") shall employ one or more construction consultants or engineers (collectively, the "**Prudential Construction Consultant**") to advise Prudential with respect to the progress of construction and compliance of construction with the construction plans and specifications for the Project, applicable legal requirements and good construction practices. Contractor shall inform the Prudential Construction Consultant of the usual location, date and time of periodic construction meetings for the Project. The Prudential Construction Consultant shall be permitted to attend all such construction meetings. Contractor shall provide the Owner and Prudential Construction Consultant with at least three (3) business days' prior notice of any change in the date, time or location of a periodic construction meeting. Contractor shall permit Owner and the Prudential Construction Consultant to have access to the Project during the period of construction to enable the Owner and Prudential Construction Consultant to examine all aspects of such construction and all matters related thereto. Contractor shall provide Owner and the Prudential Construction Consultant with at least three (3) business days' prior written notice of each of the following trades commencing construction at the Project: mechanical, electrical, plumbing, framing, paving, curtain wall installation and foundations. Contractor shall provide to Owner and the Prudential Construction Consultant reasonable access during normal business hours to all books, records, shop drawings, and engineering and other reports and tests related to the Project as may be requested by Owner or the Prudential Construction Consultant. The Owner and the Prudential Construction Consultant shall have the right to make copies of all such materials. Contractor shall provide to Owner and the Prudential Construction Consultant a reasonable working space and access to telephone and other such facilities as may be reasonably requested by Owner or the Prudential Construction Consultant. Upon execution of this Agreement, Contractor shall deliver to Owner and the Prudential Construction Consultant a list of all current and potential bidders who may perform work at or supply materials to the Project together with a list of all bid packages which were sent to any of such bidders and all bids which were received from such bidders. Such bidding information shall be updated by Contractor on a monthly basis by delivering revised lists to Owner and the Prudential Construction Consultant. The Owner and the Prudential Construction Consultant shall have the right to review any bid packages or any bids received upon request.

§ 4.2.3 The Architect will not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect will not have control over or charge of and will not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or any other persons or entities performing portions of the Work.

§ 4.2.4 If requested by Owner, Contractor shall furnish it with the names of the subcontractors who have performed or are performing the Work hereunder.

§ 4.2.4 § 4.2.5 Communications Facilitating Contract Administration. Except as otherwise provided in the Contract Documents or when direct communications have been specially authorized, the Owner and Contractor shall endeavor to communicate with each other through the Architect about matters arising out of or relating to the Contract. Communications by and with the Architect's consultants shall be through the Architect. Communications

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved.** WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)

by and with Subcontractors and material suppliers shall be through the Contractor. Communications by and with separate contractors shall be through the Owner.

§ 4.2.5 ~~Based on the Architect's evaluations of the Contractor's Applications for Payment, the Architect will review and certify the amounts due the Contractor and will issue Certificates for Payment in such amounts.~~
§ 4.2.6 Upon request of Owner, Contractor will furnish it with a certificate satisfactory in form to Owner that goods furnished by Contractor in performance of the Contract Documents were produced in full compliance with the requirements of Sections 6, 7, and 12 of the Fair Labor Standards Act of 1938, as amended, and the regulations and orders of the U.S. Department of Labor issued under Section 14 thereof.

~~§ 4.2.6~~ § 4.2.7 The ~~Architect~~ Owner will have authority to reject Work that does not conform to the Contract Documents. Whenever the ~~Architect~~ Owner considers it necessary or advisable, the ~~Architect~~ Owner will have authority to require inspection or testing of the Work in accordance with Sections 13.5.2 and 13.5.3, whether or not such Work is fabricated, installed or completed. However, neither this authority of the ~~Architect~~ Owner nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the ~~Architect~~ Owner to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees, or other persons or entities performing portions of the Work.

~~§ 4.2.7~~ § 4.2.8 As set forth in paragraph 3.12 above, the Owner will review submittals such as Shop Drawings, Product Data and Samples. The ~~Architect~~ Owner will review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The ~~Architect's~~ Owner's action will be taken with such reasonable promptness as to cause no delay in the Work or in the activities of the ~~Owner,~~ Contractor or separate contractors, while allowing ~~sufficient~~ time ~~in the Architect's professional judgment~~ to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The ~~Architect's~~ Owner's review of the Contractor's submittals shall not relieve the Contractor of the obligations under Sections 3.3, 3.5 and 3.12. The ~~Architect's~~ Owner's review shall not constitute approval of safety precautions ~~or, unless otherwise specifically stated by the Architect,~~ or of any construction means, methods, techniques, sequences or procedures. The ~~Architect's~~ Owner's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

~~§ 4.2.8 The Architect will prepare Change Orders and Construction Change Directives, and may authorize minor changes in the Work as provided in Section 7.4.~~
§ 4.2.9 The Owner will submit CO Requests as provided in Section 6.5 of the Agreement.

~~§ 4.2.9~~ § 4.2.10 The ~~Architect~~ Owner will conduct inspections to determine the date or dates of Substantial Completion and the date of final ~~completion, will receive and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract and assembled by the Contractor, and will issue a final Certificate for Payment upon compliance with the requirements of the Contract Documents.~~ completion.

~~§ 4.2.10 If the Owner and Architect agree, the Architect will provide one or more project representatives to assist in carrying out the Architect's responsibilities at the site. The duties, responsibilities and limitations of authority of such project representatives shall be as set forth in an exhibit to be incorporated in the Contract Documents.~~
§ 4.2.11 Contractor represents and warrants it is an independent contractor and an employer subject to all applicable unemployment compensation, occupational safety and health, workers' compensation, or similar statutes so as to relieve Owner of any responsibility or liability for treating Contractor's employees as employees of Owner for the purpose of their safety or of keeping records, making reports or paying of any payroll taxes or contribution. Contractor agrees to defend, indemnify and hold Owner harmless and reimburse them for any expense or liability incurred under said statutes in connection with employees of Contractor, including a sum equal to any unemployment benefits paid to those who were Contractor's employees, where such benefit payments are charged to Owner under any merit plan or to Owner reserve accounts pursuant to any statute. Nothing contained in the Contract Documents or any subcontract awarded by Contractor shall create any contractual relationship between any subcontractor and Owner.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)

22

(986536188)

§ 4.2.11 ~~The Architect will interpret and decide matters concerning performance under and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests will be made in writing within any time limits agreed upon or otherwise with reasonable promptness. If no agreement is made concerning the time within which interpretations required of the Architect shall be furnished in compliance with this Section 4.2, then delay shall not be recognized on account of failure by the Architect to furnish such interpretations until 15 days after written request is made for them.~~

§ 4.2.12 Contractor represents and warrants that it will keep and have available all necessary records and make all payments, reports, collections and deductions and otherwise do any and all things so as to fully comply with all federal, state and local laws, ordinances and regulations as they affect performance of the Contract Documents, so as to fully relieve and protect Owner from any and all responsibility or liability therefore or in regard thereto: (1) the production, purchase and sale, furnishing and delivering, pricing, and use or consumption of materials, supplies and equipment; (2) the hire, tenure or conditions of employment of employees and their hours of work and rates of the payment of their Work, and (3) the keeping of records, making of reports, and the payment, collection and/or deduction of federal, state, commonwealth and local taxes, contributions, pension funds, welfare funds, or similar assessments.

§ 4.2.12 ~~Interpretations and decisions of the Architect will be consistent with the intent of and reasonably inferable from the Contract Documents and will be in writing or in the form of drawings. When making such interpretations and initial decisions, the Architect will endeavor to secure faithful performance by both Owner and Contractor, will not show partiality to either and will not be liable for results of interpretations or decisions so rendered in good faith.~~

§ 4.2.13 ~~The Architect's decisions on matters relating to aesthetic effect will be final if consistent with the intent expressed in the Contract Documents.~~

§ 4.2.13 Nothing in the Contract Documents shall be deemed to represent that Contractor, or any of Contractor's employees or agents, are the agents, representatives or employees of Owner. Contractor shall be an independent contractor and shall have responsibility for and control over the details and means for performing the Project. Anything in the Contract Documents that may appear to give Owner the right to direct Contractor as to the details of the performance of the Project or to exercise a measure of control over Contractor shall mean that Contractor shall follow the desires of Owner only as to the intended results of the Project.

## § 4.3 CLAIMS AND DISPUTES

§ 4.3.1 Definition. A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract. Claims must be initiated by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim.

§ 4.3.2 Time Limits on Claims. Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. Claims must be initiated by written notice to the ~~Architect and the~~ other party.

§ 4.3.3 Continuing Contract Performance. Pending final resolution of a Claim except as otherwise agreed in writing or as provided in Section 9.7.1 and Article 14, the Contractor shall proceed diligently with performance of the Contract and the Owner shall continue to make payments in accordance with the Contract Documents.

§ 4.3.4 Claims for Concealed or Unknown Conditions. If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, then notice by the observing party shall be given to the other party promptly before conditions are disturbed and in no event later than 21 days after first observance of the conditions. ~~The Architect will promptly investigate such conditions and, if they differ materially and cause an increase or decrease in the Contractor's cost of, or time required for, performance of any part of the Work, will recommend an equitable adjustment in the Contract Sum or Contract Time, or both. If the Architect determines that the conditions at the site are not materially different from those indicated in the Contract Documents and that no change in the terms of the Contract is justified, the Architect shall so notify the Owner and Contractor in writing, stating the reasons. Claims by either party in opposition to such determination must be made within 21 days after the Architect has given notice of the decision. If~~

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)     (986536188)

the conditions encountered are materially different, the Contract Sum and Contract Time shall be equitably adjusted, but if the Owner and Contractor cannot agree on an adjustment in the Contract Sum or Contract Time, the ~~adjustment~~ matter shall be ~~referred to the Architect for initial determination, subject to further proceedings pursuant to Section 4.4.~~ considered a Claim and be resolved in accordance with Sections 4.4-4.6 below.

§ 4.3.5 Claims for Additional Cost. If the Contractor wishes to make Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the Work. Prior notice is not required for Claims relating to an emergency endangering life or property arising under Section 10.6.

§ 4.3.6 If the Contractor believes additional cost is involved for reasons including but not limited to (1) a written interpretation from the ~~Architect,~~ Owner, (2) an order by the Owner to stop the Work where the Contractor was not at fault, (3) a written order for a minor change in the Work issued by the ~~Architect,~~ Owner, (4) failure of payment by the Owner, (5) termination of the Contract by the Owner, (6) Owner's suspension or (7) other reasonable grounds, Claim shall be filed in accordance with this Section 4.3.

§ 4.3.7 Claims for Additional Time
§ 4.3.7.1 If the Contractor wishes to make Claim for an increase in the Contract Time, written notice as provided herein shall be given. The Contractor's Claim shall include an estimate of cost and of probable effect of delay on progress of the Work. In the case of a continuing delay only one Claim is necessary.

§ 4.3.7.2 ~~If adverse weather conditions are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that weather conditions were abnormal for the period of time, could not have been reasonably anticipated and had an adverse effect on the scheduled construction.~~
§ 4.3.7.2 Adverse weather conditions or adverse site conditions caused by adverse weather may be the basis for a Claim for additional time to the extent that the days lost during a particular calendar month due to such inclement weather exceeds three (3) days of lost time (in work days) for the calendar month. If adverse weather conditions or adverse site conditions caused by adverse weather are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that either (i) weather conditions had an adverse effect on the scheduled construction, or (ii) weather conditions prevented the type of Work then scheduled, or (iii) adverse site conditions caused by adverse weather prevented the type of Work then scheduled.

§ 4.3.8 Injury or Damage to Person or Property. If either party to the Contract suffers injury or damage to person or property because of an act or omission of the other party, or of others for whose acts such party is legally responsible, written notice of such injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after discovery. The notice shall provide sufficient detail to enable the other party to investigate the matter.

§ 4.3.9 If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are materially changed in a proposed Change Order ~~or Construction Change Directive~~ so that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or Contractor, the applicable unit prices shall be equitably adjusted.

§ 4.3.10 Claims for Consequential Damages. The Contractor and Owner waive Claims against each other for consequential damages arising out of or relating to this Contract. This mutual waiver includes:

.1 damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

.2 damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work.

This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 14. Nothing contained in this Section 4.3.10 shall be deemed to preclude an award of liquidated direct damages, when applicable, in accordance with the requirements of the Contract Documents.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)     (986536188)

24

R.P. Appx. 364                                                              53

## § 4.4 INDEMNITY & RESOLUTION OF CLAIMS AND DISPUTES

§ 4.4.1 ~~Decision of Architect. Claims, including those alleging an error or omission by the Architect but excluding those arising under Sections 10.3 through 10.5, shall be referred initially to the Architect for decision. An initial decision by the Architect shall be required as a condition precedent to mediation, arbitration or litigation of all Claims between the Contractor and Owner arising prior to the date final payment is due, unless 30 days have passed after the Claim has been referred to the Architect with no decision having been rendered by the Architect. The Architect will not decide disputes between the Contractor and persons or entities other than the Owner.~~

§ 4.4.1 Contractor agrees to defend, indemnify and hold Owner, the affiliated companies of Owner, and all of their directors, officers, employees, agents and representatives, harmless from and against any claim, demand, cause of action, liability, loss or expense arising:

.1 By reason of Contractor's actual or asserted failure to comply with any law, ordinance, regulation, rule or order, or with the Contract Documents. This Section 4.4.1.1 includes, but is not limited to, fines or penalties by government authorities and claims arising from Contractor's actual or asserted failure to pay taxes.

.2 From actual or asserted violation or infringement of rights in any patent, copyright, proprietary information, trade secret or other property right caused or alleged to be caused by the use or sale of goods, materials, methods, processes, designs or information, including construction methods, construction equipment and temporary construction facilities, furnished by Contractor or its subcontractors in performance of the Project. Should any goods or services provided by Contractor become, or appear likely to become, the subject of a claim of infringement of a patent, copyright or other property right, Contractor shall, at Owner's option, either procure for Owner the right to continue using such goods or services, replace same with equivalent, non-infringing goods or services, or modify the goods or services so that the use thereof becomes non-infringing, provided that any such modification or replacement is of equal quality and provides equal performance to the infringing goods or services.

.3 From actual or alleged contamination, pollution, or public or private nuisance, directly caused by any negligence or intentional misconduct of the Contractor or its subcontractors.

§ 4.4.2 ~~The Architect will review Claims and within ten days of the receipt of the Claim take one or more of the following actions: (1) request additional supporting data from the claimant or a response with supporting data from the other party, (2) reject the Claim in whole or in part, (3) approve the Claim, (4) suggest a compromise, or (5) advise the parties that the Architect is unable to resolve the Claim if the Architect lacks sufficient information to evaluate the merits of the Claim or if the Architect concludes that, in the Architect's sole discretion, it would be inappropriate for the Architect to resolve the Claim.~~

**§ 4.4.2 Contractor's indemnity obligations in this Subparagraph 4.4 are subject to the provisions of Subparagraphs 4.3.10 and 11.4.7 and Article 10, and shall apply to the extent that the amount to be indemnified was not caused by the negligence or willful misconduct of, or by defects in design furnished by, the party to be indemnified. Contractor's defense and indemnity obligations shall include the duty to reimburse any attorneys' fees and expenses reasonably incurred by Owner for legal action to enforce Contractor's indemnity obligations.**

§ 4.4.3 ~~In evaluating Claims, the Architect may, but shall not be obligated to, consult with or seek information from either party or from persons with special knowledge or expertise who may assist the Architect in rendering a decision. The Architect may request the Owner to authorize retention of such persons at the Owner's expense.~~

§ 4.4.3 In the event that the indemnity provisions in the Contract Documents are contrary to the law governing the Contract Documents, then the indemnity obligations applicable hereunder shall be construed to be to the fullest extent allowed by applicable law.

§ 4.4.4 ~~If the Architect requests a party to provide a response to a Claim or to furnish additional supporting data, such party shall respond, within ten days after receipt of such request, and shall either provide a response on the requested supporting data, advise the Architect when the response or supporting data will be furnished or advise the Architect that no supporting data will be furnished. Upon receipt of the response or supporting data, if any, the Architect will either reject or approve the Claim in whole or in part.~~

§ 4.4.4 With respect to claims by employees of Contractor or its subcontractors, the indemnity obligations created under this Section 4.4 shall not be limited by the fact of, amount, or type of benefits or compensation payable by or for Contractor, its subcontractors or suppliers under any workers' compensation, disability benefits, or other employee benefits acts or regulations, and Contractor waives any limitation of liability or immunity arising from workers' compensation or such other acts or regulations.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                    (986536188)

§ 4.4.5 ~~The Architect will approve or reject Claims by written decision, which shall state the reasons therefor and which shall notify the parties of any change in the Contract Sum or Contract Time or both. The approval or rejection of a Claim by the Architect shall be final and binding on the parties but subject to mediation and arbitration.~~

§ 4.4.5 Unless Contractor has provided Owner with a bond or other form of security in form and amount reasonably acceptable to Owner, amounts may be retained from payments otherwise due Contractor as shall reasonably be considered necessary to satisfy any mechanics' or materialmen's liens for damages that fall within Contractor's indemnity obligations under this Section 4.4 until such claims suits or liens have been settled and satisfactory evidence to that effect has been furnished to Owner. Notwithstanding anything to the contrary in the foregoing, if the Contractor provides the Owner with a lien bond or other form of security sufficient to cover mechanics' liens filed by the Contractor or any Subcontractor, the Owner shall not withhold payment as set forth in this Section or in Section 9.5.1 herein. The Contractor will diligently pursue the removal of any lien filed by a Subcontractor, and, regardless of whether a lien bond is provided as set forth above, during such time the Owner shall not satisfy or pay off the lien or otherwise settle or compromise the Contractor's claim; provided, however, that promptly after a final, non-appealable judgment is rendered directing that the property be sold to satisfy the lien, and in any event prior to the date of such sale, the Contractor will satisfy the lien and pay the Contractor all amounts owing.

§ 4.4.6 ~~When a written decision of the Architect states that (1) the decision is final but subject to mediation and arbitration and (2) a demand for arbitration of a Claim covered by such decision must be made within 30 days after the date on which the party making the demand receives the final written decision, then failure to demand arbitration within said 30 days' period shall result in the Architect's decision becoming final and binding upon the Owner and Contractor. If the Architect renders a decision after arbitration proceedings have been initiated, such decision may be entered as evidence, but shall not supersede arbitration proceedings unless the decision is acceptable to all parties concerned.~~

§ 4.4.6 Notwithstanding any provision in the Contract Documents to the contrary, Owner and Contractor mutually waive any and all claims against the other for special, consequential or punitive damages arising out of or relating to the Contract Documents. This waiver includes but is not limited to damages incurred for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons.

§ 4.4.7 Upon receipt of a Claim against the Contractor or at any time thereafter, the ~~Architect or the~~ Owner may, but is not obligated to, notify the surety, if any, of the nature and amount of the Claim. If the Claim relates to a possibility of a Contractor's default, ~~the Architect or~~ the Owner may, but is not obligated to, notify the surety and request the surety's assistance in resolving the controversy.

§ 4.4.8 If a Claim relates to or is the subject of a mechanic's lien, the party asserting such Claim may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the ~~Claim by the Architect,~~ Claim, by mediation or by arbitration.

## § 4.5 MEDIATION

§ 4.5.1 Any Claim arising out of or related to the Contract, except ~~Claims relating to aesthetic effect and except~~ those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5 shall, ~~after initial decision by the Architect or 30 days after submission of the Claim to the Architect,~~ be subject to mediation as a condition precedent to ~~arbitration or~~ binding arbitration. Except with the Owner's prior written consent, neither the assertion of a Claim nor the ~~institution~~ prosecution of ~~legal~~ mediation or ~~equitable proceedings by either party.~~ arbitration hereunder shall cause any Work to be halted pending resolution of same.

§ 4.5.2 The parties shall endeavor to resolve their Claims by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to the Contract and with the American Arbitration Association. The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06) (986536188)

26

R.P. Appx. 366    55

**§ 4.5.3** The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

### § 4.6 ARBITRATION

**§ 4.6.1** Any Claim arising out of or related to the Contract, except ~~Claims relating to aesthetic effect and except~~ those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5, ~~shall, after decision by the Architect or 30 days after submission of the Claim to the Architect,~~ shall be subject to binding arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with the provisions of Section 4.5.

**§ 4.6.2** Claims not resolved by mediation shall be decided by binding arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to the Contract and with the American Arbitration ~~Association, and a copy shall be filed with the Architect.~~ Association. BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL.

Owner Initials _____ Contractor Initials

**§ 4.6.3** A demand for arbitration shall be made within ~~the time limits specified in Sections 4.4.6 and 4.6.1 as applicable, and in other cases within~~ a reasonable time after the Claim has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such Claim would be barred by the applicable statute of limitations as determined pursuant to Section 13.7.

**§ 4.6.4** Limitation on Consolidation or Joinder. ~~No arbitration arising out of or relating to the Contract shall include, by consolidation or joinder or in any other manner, the Architect, the Architect's employees or consultants, except by written consent containing specific reference to the Agreement and signed by the Architect, Owner, Contractor and any other person or entity sought to be joined. No arbitration shall include, by consolidation or joinder or in any other manner, parties other than the Owner, Contractor, a separate contractor as described in Article 6 and other persons substantially involved in a common question of fact or law whose presence is required if complete relief is to be accorded in arbitration. No person or entity other than the Owner, Contractor or a separate contractor as described in Article 6 shall be included as an original third party or additional third party to an arbitration whose interest or responsibility is insubstantial. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of a Claim not described therein or with a person or entity not named or described therein.~~ The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to the Agreement shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

**§ 4.6.5** Claims and Timely Assertion of Claims. The party filing a notice of demand for arbitration must assert in the demand all Claims then known to that party on which arbitration is permitted to be demanded.

**§ 4.6.6** Judgment on Final Award. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

### ARTICLE 5  SUBCONTRACTORS
### § 5.1 DEFINITIONS

**§ 5.1.1** A Subcontractor is a person or entity who has a direct contract with the Contractor to perform a portion of the Work at the site. The term "Subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Subcontractor or an authorized representative of the Subcontractor. The term "Subcontractor" does not include a separate contractor or subcontractors of a separate contractor.

**§ 5.1.2** A Sub-subcontractor is a person or entity who has a direct or indirect contract with a Subcontractor to perform a portion of the Work at the site. The term "Sub-subcontractor" is referred to throughout the Contract

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)          (986536188)

Documents as if singular in number and means a Sub-subcontractor or an authorized representative of the Sub-subcontractor.

## § 5.2 AWARD OF SUBCONTRACTS AND OTHER CONTRACTS FOR PORTIONS OF THE WORK

§ 5.2.1 Unless otherwise stated in the Contract Documents or the bidding requirements, the Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner ~~through the Architect~~ the names of persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for each principal portion of the ~~Work.~~ Work and will, upon request therefor by Owner, update such list during construction of the Project. The ~~Architect~~ Owner will promptly reply to the Contractor in writing stating whether or not the ~~Owner or the Architect,~~ Owner, after due investigation, has reasonable objection to any such proposed person or entity. Failure of the Owner ~~or Architect~~ to reply promptly shall constitute notice of no reasonable objection. Notwithstanding anything herein to the contrary, the Contractor may subcontract portions of the Work to the Contractor or divisions of the Contractor pursuant to a subcontract agreement, and the subcontract sum thereof shall constitute a Cost of the Work, but only if such subcontract agreement is approved in writing in advance by Owner.

§ 5.2.2 The Contractor shall not contract with a proposed person or entity to whom the Owner ~~or Architect~~ has made reasonable and timely objection. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

§ 5.2.3 If the Owner ~~or Architect~~ has reasonable objection to a person or entity proposed by the Contractor, the Contractor shall propose another to whom the Owner ~~or Architect~~ has no reasonable objection. If the proposed but rejected Subcontractor was reasonably capable of performing the Work, the Contract Sum and Contract Time shall be increased or decreased by the difference, if any, occasioned by such change, and an appropriate Change Order shall be issued before commencement of the substitute Subcontractor's Work. However, no increase in the Contract Sum or Contract Time shall be allowed for such change unless the Contractor has acted promptly and responsively in submitting names as required.

§ 5.2.4 The Contractor shall not change a Subcontractor, person or entity previously selected if the Owner ~~or Architect~~ makes reasonable objection to such substitute.

## § 5.3 SUBCONTRACTUAL RELATIONS

§ 5.3.1 By appropriate agreement, written where legally required for validity, the Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work, which the Contractor, by these Documents, assumes toward the ~~Owner and Architect.~~ Owner. Each subcontract agreement shall preserve and protect the rights of the Owner ~~and Architect~~ under the Contract Documents with respect to the Work to be performed by the Subcontractor so that subcontracting thereof will not prejudice such rights, and shall allow to the Subcontractor, unless specifically provided otherwise in the subcontract agreement, the benefit of all rights, remedies and redress against the Contractor that the Contractor, by the Contract Documents, has against the Owner. Where appropriate, the Contractor shall require each Subcontractor to enter into similar agreements with Sub-subcontractors. The Contractor shall make available to each proposed Subcontractor, prior to the execution of the subcontract agreement, copies of the Contract Documents to which the Subcontractor will be bound, and, upon written request of the Subcontractor, identify to the Subcontractor terms and conditions of the proposed subcontract agreement which may be at variance with the Contract Documents. Subcontractors will similarly make copies of applicable portions of such documents available to their respective proposed Sub-subcontractors.

## § 5.4 CONTINGENT ASSIGNMENT OF SUBCONTRACTS

§ 5.4.1 Each subcontract agreement for a portion of the Work is assigned by the Contractor to the Owner provided that:

.1 assignment is effective only after termination of the Contract by the Owner for cause pursuant to Section 14.2 and only for those subcontract agreements which the Owner accepts by notifying the Subcontractor and Contractor in writing; and

.2 assignment is subject to the prior rights of the surety, if any, obligated under bond relating to the Contract.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06) (986536188)

28

**§ 5.4.2** Upon such assignment, if the Work has been suspended for more than 30 days, the Subcontractor's compensation shall be equitably adjusted for increases in cost resulting from the suspension.

## ARTICLE 6 CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS
### § 6.1 OWNER'S RIGHT TO PERFORM CONSTRUCTION AND TO AWARD SEPARATE CONTRACTS
**§ 6.1.1** The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and to award separate contracts in connection with other portions of the Project or other construction or operations on the site under Conditions of the Contract identical or substantially similar to these including those portions related to insurance and waiver of subrogation. If the Contractor claims that delay or additional cost is involved because of such action by the Owner, the Contractor shall make such Claim as provided in Section 4.3.

**§ 6.1.2** When separate contracts are awarded for different portions of the Project or other construction or operations on the site, the term "Contractor" in the Contract Documents in each case shall mean the Contractor who executes each separate Owner-Contractor Agreement.

**§ 6.1.3** The Owner shall provide for coordination of the activities of the Owner's own forces and of each separate contractor with the Work of the Contractor, who shall cooperate with them. The Contractor shall participate with other separate contractors and the Owner in reviewing their construction schedules when directed to do so. The Contractor shall make any revisions to the construction schedule deemed necessary after a joint review and mutual agreement. The construction schedules shall then constitute the schedules to be used by the Contractor, separate contractors and the Owner until subsequently revised.

**§ 6.1.4** Unless otherwise provided in the Contract Documents, when the Owner performs construction or operations related to the Project with the Owner's own ~~forces,~~ forces or pursuant to separate contracts with other contractors, the Owner shall be deemed to be subject to the same obligations and to have the same rights which apply to the Contractor under the Conditions of the Contract, including, without excluding others, those stated in Article 3, this Article 6 and Articles 10, 11 and 12. Without limiting the generality of the foregoing, if the Owner awards separate contracts with any other contractors for any work at the Project site during the performance of the Work, then the Owner shall cause each and every such other contractor (and their subcontractors of any tier) to name the Contractor as an additional insured on all liability insurance policies maintained by such other contractor (and their subcontractors of any tier) to the extent such policies cover liabilities relating to the Project or other work being performed at the Project site. The Owner shall furnish to the Contractor written evidence that such insurance is in effect and that the Contractor has been named an additional insured as aforesaid upon the first to occur of the award or execution of any such separate contract.

### § 6.2 MUTUAL RESPONSIBILITY
**§ 6.2.1** The Contractor shall afford the Owner and separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities, and shall connect and coordinate the Contractor's construction and operations with theirs as required by the Contract Documents.

**§ 6.2.2** If part of the Contractor's Work depends for proper execution or results upon construction or operations by the Owner or a separate contractor, the Contractor shall, prior to proceeding with that portion of the Work, promptly report to the ~~Architect~~ Owner apparent discrepancies or defects in such other construction that would render it unsuitable for such proper execution and results. Failure of the Contractor so to report shall constitute an acknowledgment that the Owner's or separate contractor's completed or partially completed construction is fit and proper to receive the Contractor's Work, except as to defects not then reasonably discoverable.

**§ 6.2.3** The Owner shall be reimbursed by the Contractor for costs incurred by the Owner which are payable to a separate contractor because of delays, improperly timed activities or defective construction of the Contractor. The Owner shall be responsible to the Contractor for costs incurred by the Contractor because of delays, improperly timed activities, damage to the Work or defective construction of a separate contractor.

**§ 6.2.4** The Contractor shall promptly remedy damage wrongfully caused by the Contractor to completed or partially completed construction or to property of the Owner or separate contractors as provided in Section 10.2.5.

**§ 6.2.5** The Owner and each separate contractor shall have the same responsibilities for cutting and patching as are described for the Contractor in Section 3.14.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)   (986536188)

## § 6.3 OWNER'S RIGHT TO CLEAN UP

§ 6.3.1 If a dispute arises among the Contractor, separate contractors and the Owner as to the responsibility under their respective contracts for maintaining the premises and surrounding area free from waste materials and rubbish, the Owner may clean up and the ~~Architect will allocate the~~ cost among those ~~responsible.~~responsible shall be equitably allocated.

## ARTICLE 7   CHANGES IN THE WORK
### § 7.1 GENERAL

§ 7.1.1 Changes in the Work may be accomplished after execution of the Contract, and without invalidating the Contract, by Change Order, ~~Construction Change Directive or order for a minor change in the Work,~~ subject to the limitations stated in this Article 7 and elsewhere in the Contract Documents.

~~§ 7.1.2 A Change Order shall be based upon agreement among the Owner, Contractor and Architect; a Construction Change Directive requires agreement by the Owner and Architect and may or may not be agreed to by the Contractor; an order for a minor change in the Work may be issued by the Architect alone.~~
§ 7.1.2 A Change Order shall be based upon agreement between the Owner and the Contractor as provided in Section 6.5 of the Agreement.

§ 7.1.3 Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Contractor shall proceed promptly, unless otherwise provided in the Change ~~Order, Construction Change Directive or order for a minor change in the Work.~~Order.

### § 7.2 CHANGE ORDERS

~~§ 7.2.1 A Change Order is a written instrument prepared by the Architect and signed by the Owner, Contractor and Architect, stating their agreement upon all of the following:~~
> ~~.1    change in the Work;~~
> ~~.2    the amount of the adjustment, if any, in the Contract Sum; and~~
> ~~.3    the extent of the adjustment, if any, in the Contract Time.~~
>> § 7.2.1 If the other provisions of the Contract require that a Change Order be issued and the Owner and the Contractor are unable to agree upon the terms thereof as provided in  Section 6.5 of the Agreement within ten days of a written demand given by either party to the other party to so agree, then the dispute shall be resolved as provided in Article 4 herein.  In any such dispute resolution proceedings the parties agree that the terms of the Change Order set forth in subparagraphs (i)-(vii) of Section 6.5 of the Agreement shall be determined.

§ 7.2.2 ~~Methods~~In any dispute resolution proceeding over a Change Order, the methods used in determining adjustments to the Contract Sum may include those listed in Section ~~7.3.3.~~7.33.

§ 7.2.3 Contractor shall not suspend performance of the Contract Documents during the review and negotiation of any Change Order.

### § 7.3 CONSTRUCTION CHANGE DIRECTIVES

~~§ 7.3.1 A Construction Change Directive is a written order prepared by the Architect and signed by the Owner and Architect, directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or Contract Time, or both. The Owner may by Construction Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly.~~
§ 7.3.1 [Intentionally Omitted].

~~§ 7.3.2 A Construction Change Directive shall be used in the absence of total agreement on the terms of a Change Order.~~
§ 7.3.2 [Intentionally Omitted].

§ 7.3.3 If the ~~Construction~~Change ~~Directive~~Order provides for an adjustment ~~to~~in the Contract Sum, the adjustment ~~shall~~may be based on one of the following methods:

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.  This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                   (986536188)

    .1     mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;

    .2     unit prices stated in the Contract Documents or subsequently agreed upon;

    .3     cost to be determined in a manner agreed upon by the parties and a ~~mutually acceptable fixed or~~ Contractor Fee based on the percentage ~~fee;~~ set forth in Section 5.1.2 of the Agreement; or

    .4     as provided in Section 7.3.6.

**§ 7.3.4** ~~Upon receipt of a Construction Change Directive, the Contractor shall promptly proceed with the change in the Work involved and advise the Architect of the Contractor's agreement or disagreement with the method, if any, provided in the Construction Change Directive for determining the proposed adjustment in the Contract Sum or Contract Time.~~
**§ 7.3.4** [Intentionally Omitted].

**§ 7.3.5** [Intentionally Omitted].
**§ 7.3.5** ~~A Construction Change Directive signed by the Contractor indicates the agreement of the Contractor therewith, including adjustment in Contract Sum and Contract Time or the method for determining them. Such agreement shall be effective immediately and shall be recorded as a Change Order.~~

**§ 7.3.6** ~~If~~ In any dispute between the Contractor ~~does not respond promptly or disagrees with~~ and the Owner over the method for adjustment in the Contract ~~Sum,~~ Sum in connection with any Change Order or in connection with any other adjustment in the Contract Sum to which the Contractor is entitled under the Contract Documents, then the method and the adjustment shall be determined ~~by the Architect~~ on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in case of an increase in the Contract Sum, a ~~reasonable allowance for overhead and profit.~~ Contractor's Fee based on the percentage set forth in Section 5.1.2 of the Agreement. In such case, ~~and also under Section 7.3.3.3,~~ the Contractor shall keep and present, in such form as the ~~Architect~~ Owner may reasonably prescribe, ~~an~~ a reasonably itemized accounting together with appropriate supporting data. Unless otherwise provided in the Contract Documents, costs for the purposes of this Section 7.3.6 shall be limited to the following:

    .1     costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance;

    .2     costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

    .3     rental costs of machinery and equipment, exclusive of hand tools, whether rented from the Contractor or others;

    .4     costs of premiums for all bonds and insurance, permit fees, and sales, use or similar taxes related to the Work;~~and~~

    .5     additional costs of supervision and field office personnel directly attributable to the ~~change.~~change; and

    .6     if the Agreement is an AIA Document A111 or A121, all other costs which would be considered to be Costs of the Work under the Agreement.

**§ 7.3.7** The amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a net decrease in the Contract Sum shall be actual net ~~cost as confirmed by the Architect.~~ cost. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change.

**§ 7.3.8** Pending final determination of the total cost of a ~~Construction~~ Change ~~Directive to the Owner,~~ Order, amounts not in dispute for such changes in the Work shall be included in Applications for Payment accompanied by a Change Order indicating the parties' agreement with part or all of such ~~costs. For any portion of~~costs and the Owner shall be obligated to pay such ~~cost that remains~~costs together with a Contractor's Fee based on the percentage set forth in ~~dispute, the Architect will make an interim determination for purposes of monthly certification for payment for those costs. That determination~~ Section 5.1.2 ~~of cost shall adjust the Contract Sum on the same basis as a Change Order, subject~~ Agreement ~~to the right of either party to disagree and assert a claim in accordance with Article 4.~~Contractor.

**§ 7.3.9** When the Owner and Contractor agree ~~with the determination made by the Architect~~ concerning ~~the~~ any adjustments in any one or more of the Work, the Contract Sum ~~and~~ or the Contract Time, or otherwise reach

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)        (986536188)

agreement upon the ~~adjustments,~~ adjustments in the items set forth in subparagraphs (i)-(vii) of Section 6.5 of the Agreement, such agreement shall be effective immediately and shall be recorded by preparation and execution of an appropriate Change Order.

## § 7.4 MINOR CHANGES IN THE WORK

§ 7.4.1 The ~~Architect~~ Owner will have authority to ~~order~~ make minor changes in the Work not involving adjustment in the Contract Sum or extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes shall be effected by written order and shall be binding on the ~~Owner and~~ Contractor. The Contractor shall carry out such written orders promptly.

## ARTICLE 8 TIME
## § 8.1 DEFINITIONS

§ 8.1.1 Unless otherwise provided, Contract Time is the period of time, including authorized adjustments, allotted in the Contract Documents for Substantial Completion of the Work.

§ 8.1.2 The date of commencement of the Work is the date established in the Agreement.

§ 8.1.3 The date of Substantial Completion is the date ~~certified by the Architect~~ when Substantial Completion is actually achieved in accordance with Section 9.8.

§ 8.1.4 The term "day" as used in the Contract Documents shall mean calendar day unless otherwise specifically defined.

## § 8.2 PROGRESS AND COMPLETION

§ 8.2.1 Time limits stated in the Contract Documents are of the essence of the Contract. By executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work.

§ 8.2.2 The Contractor shall not knowingly, except by agreement or instruction of the Owner in writing, prematurely commence operations on the site or elsewhere prior to the effective date of insurance required by Article 11 to be furnished by the Contractor and Owner. The date of commencement of the Work shall not be changed by the effective date of such insurance. Unless the date of commencement is established by the Contract Documents or a notice to proceed given by the Owner, the Contractor shall notify the Owner in writing not less than five days or other agreed period before commencing the Work to permit the timely filing of mortgages, mechanic's liens and other security interests.

§ 8.2.3 The Contractor shall proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time.

## § 8.3 DELAYS AND EXTENSIONS OF TIME

§ 8.3.1 ~~If the Contractor is delayed at any time in the commencement or progress of the Work by an act or neglect of the Owner or Architect, or of an employee of either, or of a separate contractor employed by the Owner, or by changes ordered in the Work, or by labor disputes, fire, unusual delay in deliveries, unavoidable casualties or other causes beyond the Contractor's control, or by delay authorized by the Owner pending mediation and arbitration, or by other causes which the Architect determines may justify delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine.~~

§ 8.3.1 If the Contractor is delayed at any time in the commencement or progress of the Work that adversely affect the sequencing of the Work resulting in a delay in Substantial Completion by (i) an act or neglect of the Owner, or of an employee of Owner, or of a separate contractor employed by the Owner, or (ii) changes ordered in the Work, or (iii) labor disputes, or (iv) fire, or (v) unusual delay in deliveries, or (vi) the imposition after the date of the Agreement of quotas or other restrictions on the ability of the Contractor to obtain material or equipment, or (vii) unavoidable casualties or (viii) other causes not reasonably foreseeable on the date the Work commenced or which are beyond the Contractor's control, or (ix) adverse weather conditions or adverse site conditions as set forth in Section 4.3.7.2, or (x) delays caused by governmental authorities (not caused as a result of fault on the part of the Contractor) or (xi) delay authorized by the Owner pending mediation and arbitration (provided that no such event has been caused by the delay or negligent or other wrongful act or omission of the Contractor or any of its employees or agents), and provided that Contractor has delivered to Owner written notice of the occurrence of such event within ten (10) business days after the occurrence thereof, then the Contract Time shall be extended by

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)

R.P. Appx. 372                                                                                    61

Change Order for a reasonable time and the Contract Sum shall be adjusted to the extent reasonably necessary to compensate the Contractor for any increases in the Cost of the Work caused by such delay.

§ 8.3.2 Claims relating to time shall be made in accordance with applicable provisions of Section 4.3.

§ 8.3.3 This Section 8.3 does not preclude recovery of damages for delay by either party under other provisions of the Contract Documents.

## ARTICLE 9  PAYMENTS AND COMPLETION
### § 9.1 CONTRACT SUM
§ 9.1.1 The Contract Sum is stated in the Agreement and, including authorized adjustments, is the total amount payable by the Owner to the Contractor for performance of the Work under the Contract Documents.

### § 9.2 SCHEDULE OF VALUES
§ 9.2.1 Before the first Application for Payment, the Contractor shall submit to the ~~Architect~~ Owner a schedule of values allocated to various portions of the Work, prepared in such form and supported by such data to substantiate its accuracy as the ~~Architect~~ Owner may require. This schedule, unless objected to by the ~~Architect,~~ Owner, shall be used as a basis for reviewing the Contractor's Applications for Payment.

### § 9.3 APPLICATIONS FOR PAYMENT
§ 9.3.1 At least ~~ten~~ twenty days before the date established for each progress payment, the Contractor shall submit to the ~~Architect~~ Owner an itemized Application for Payment for operations completed in accordance with the schedule of values. Such application shall be notarized, if required, and supported by such data substantiating the Contractor's right to payment as the Owner ~~or Architect~~ may reasonably require, such as copies of requisitions from Subcontractors and material suppliers, and reflecting retainage if provided for in the Contract Documents. See the Agreement for additional provisions relating to Applications for Payment.

§ 9.3.1.1 ~~As provided in Section 7.3.8, such applications may include requests for payment on account of changes in the Work which have been properly authorized by Construction Change Directives, or by interim determinations of the Architect, but not yet included in Change Orders.~~[Intentionally Omitted].

§ 9.3.1.2 Such applications may not include requests for payment for portions of the Work for which the Contractor does not intend to pay to a Subcontractor or material supplier, unless such Work has been performed by others whom the Contractor intends to pay.

§ 9.3.2 Unless otherwise provided in the Contract Documents, payments shall be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. If approved in advance by the Owner, payment may similarly be made for materials and equipment suitably stored off the site at a location agreed upon in writing. Payment for materials and equipment stored on or off the site shall be conditioned upon compliance by the Contractor with procedures satisfactory to the Owner to establish the Owner's title to such materials and equipment or otherwise protect the Owner's interest, and shall include the costs of applicable insurance, storage and transportation to the site for such materials and equipment stored off the site.

§ 9.3.3 The Contractor warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment. The Contractor further warrants that upon submittal of an Application for Payment all Work for which ~~Certificates for Payment~~ payments have been ~~previously issued and payments~~ received from the Owner ~~shall, to the best of the Contractor's knowledge, information and belief,~~ shall be free and clear of liens, claims, security interests or encumbrances in favor of the Contractor, Subcontractors, material suppliers, or other persons or entities making a claim by reason of having provided labor, materials and equipment relating to the Work. To the extent permitted by applicable law, good and clear title to all materials furnished by Contractor under the Contract Documents for the Project shall pass to Owner upon incorporation into the Project. Contractor shall ensure that subcontractors from whom Contractor obtains materials do not retain or reserve title to such items, and Contractor shall defend, indemnify and hold Owner harmless from any such claims by Contractor's subcontractors. Notwithstanding the foregoing, the care, custody and control of Contractor's Work incorporated into the Project shall remain with Contractor until such Work has been accepted in writing by Owner and shall thereon pass to Owner unless Owner notifies Contractor in writing that such care, custody and control is assumed by Owner at a earlier date.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                  (986536188)

R.P. Appx. 373                                                                                      62

## § 9.4 CERTIFICATES FOR PAYMENT

§ 9.4.1 The ~~Architect~~ Owner will, within ~~seven~~ twenty days after receipt of the Contractor's Application for Payment, either ~~issue to~~ pay the ~~Owner a Certificate~~ amount of such Application for ~~Payment, with a copy~~ Payment to the Contractor, ~~for such amount as the Architect determines is properly due,~~ or notify the Contractor ~~and Owner~~ in writing of the ~~Architect's~~ Owner's reasons for withholding ~~certification~~ payment in whole or in part as provided in Section 9.5.1.

§ 9.4.2 ~~The issuance of a Certificate for Payment will constitute a representation by the Architect to the Owner, based on the Architect's evaluation of the Work and the data comprising the Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to correction of minor deviations from the Contract Documents prior to completion and to specific qualifications expressed by the Architect. The issuance of a Certificate for Payment will further constitute a representation that the Contractor is entitled to payment in the amount certified. However, the issuance of a Certificate for Payment will not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) made examination to ascertain how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.~~ [Intentionally Omitted].

## § 9.5 DECISIONS TO WITHHOLD CERTIFICATION

§ 9.5.1 ~~The Architect may withhold a Certificate for Payment in whole or in part, to~~ If the extent ~~reasonably necessary to protect the Owner, if in the Architect's opinion the representations to the~~ Owner ~~required by Section 9.4.2 cannot be made. If the Architect is unable to certify~~ withholds a payment ~~in the amount~~ of all or any portion of an Application for Payment, then the ~~Application, the Architect~~ Owner will notify the Contractor ~~and Owner~~ as provided in Section 9.4.1. If the Contractor and ~~Architect~~ the Owner cannot agree on a revised amount, the ~~Architect~~ Owner will promptly ~~issue a Certificate for Payment for~~ pay the amount ~~for~~ which ~~the Architect~~ is ~~able to make such representations to the Owner.~~ not in dispute. The ~~Architect~~ Owner may ~~also~~ withhold a ~~Certificate for Payment~~ payment or, because of subsequently discovered evidence, may ~~nullify~~ request a refund of the whole or a part of a ~~Certificate for Payment~~ payment previously ~~issued,~~ made to such extent as may be reasonably necessary ~~in the Architect's opinion~~ to protect the Owner from loss for which the Contractor is responsible, ~~including loss~~ resulting from acts and omissions described in Section 3.3.2, because of:

   .1     defective Work not remedied;

   .2     third party claims filed or reasonable evidence indicating probable filing of such claims against Owner, the Land or the Project or reasonable evidence indicating the probable filing of such claims, unless security acceptable to the Owner is provided by the Contractor to protect Owner against such claims (such security may include, without limitation, Contractor's compliance with its indemnification or bonding obligations under the ~~Contractor;~~ Contract);

   .3     failure of the Contractor to make payments properly to Subcontractors or for labor, materials or equipment;

   .4     reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum;

   .5     damage to the Owner or another contractor;

   .6     reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay; ~~or~~

   .7     persistent failure to carry out the Work in accordance with the Contract Documents; or

   .8     without limiting the generality of the above, any other reason for which Owner is entitled to withhold or deduct payment under the express provisions of the Contract Documents.

§ 9.5.2 When the above reasons for withholding ~~certification~~ payment are removed, ~~certification~~ payment will be made for amounts previously withheld.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)      (986536188)

34

### § 9.6 PROGRESS PAYMENTS

**§ 9.6.1** After the ~~Architect~~ Owner has ~~issued a Certificate~~ received an Application for ~~Payment,~~ Payment which complies with the requirements of the Contract Documents, the Owner shall make payment in the manner and within the time provided in the Contract ~~Documents, and shall so notify the Architect.~~ Documents.

**§ 9.6.2** The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor on account of such Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to Sub-subcontractors in a similar manner.

**§ 9.6.3** The ~~Architect~~ Owner will, on request, furnish to a Subcontractor, if practicable, information regarding percentages of completion or amounts applied for by the Contractor and action taken thereon by the ~~Architect and~~ Owner on account of portions of the Work done by such Subcontractor.

**§ 9.6.4** ~~Neither~~ Contractor shall use the sums advanced to it pursuant to the Contract documents solely for the purpose of the performance of the Work. The Owner ~~nor Architect~~ shall not have an obligation to pay or to see to the payment of money to a Subcontractor except as may otherwise be required by law.

**§ 9.6.5** Payment to material suppliers shall be treated in a manner similar to that provided in Sections 9.6.2, 9.6.3 and 9.6.4.

**§ 9.6.6** A ~~Certificate for Payment, a~~ progress payment, or partial or entire use or occupancy of the Project by the Owner shall not constitute acceptance of Work not in accordance with the Contract ~~Documents.~~ Documents and shall not relieve Contractor of its obligations under the Contract Documents with respect thereto.

**§ 9.6.7** Unless the Contractor provides the Owner with a payment bond in the full penal sum of the Contract Sum, payments received by the Contractor for Work properly performed by Subcontractors and suppliers shall be held by the Contractor for those Subcontractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor for which payment was made by the Owner. Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Contractor, shall create any fiduciary liability or tort liability on the part of the Contractor for breach of trust or shall entitle any person or entity to an award of punitive damages against the Contractor for breach of the requirements of this provision.

### § 9.7 FAILURE OF PAYMENT

**§ 9.7.1** If the ~~Architect~~ Owner does not ~~issue~~ make a ~~Certificate for~~ Payment, through no fault of the Contractor, within ~~seven~~ twenty days after receipt of the Contractor's Application for Payment, or if the Owner does not pay the Contractor within seven days after the date established in the Contract Documents the amount ~~certified by~~ due to the ~~Architect~~ Contractor hereunder or awarded by arbitration, then the Contractor ~~may, upon seven additional days' written notice to the Owner and Architect,~~ may stop the Work until payment of the amount owing has been received. The Contract Time shall be extended appropriately and the Contract Sum shall be increased by the amount of the Contractor's reasonable costs of shut-down, delay and start-up, plus interest as provided for in the Contract Documents.

### § 9.8 SUBSTANTIAL COMPLETION

**§ 9.8.1** Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use.

**§ 9.8.2** When the Contractor considers that the Work, or a portion thereof which the Owner agrees to accept separately, is substantially complete, the Contractor shall prepare and submit to the ~~Architect~~ Owner a comprehensive list of items to be completed or corrected prior to final payment. Failure to include an item on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents.

**§ 9.8.3** Upon receipt of the Contractor's list, the ~~Architect~~ Owner will make an inspection to determine whether the Work or designated portion thereof is substantially complete. If the ~~Architect's~~ Owner's inspection discloses any

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)  (986536188)

R.P. Appx. 375                                                                 64

item, whether or not included on the Contractor's list, which is not sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work or designated portion thereof for its intended use, the Contractor shall, before issuance of the Certificate of Substantial Completion, complete or correct such item upon notification by the ~~Architect.~~ Owner. In such case, the Contractor shall then submit a request for another inspection by the ~~Architect~~ Owner to determine Substantial Completion.

§ 9.8.4 When the Work or designated portion thereof is substantially complete, the ~~Architect~~ Owner will prepare a Certificate of Substantial Completion which shall establish the date of Substantial Completion, shall establish responsibilities of the Owner and Contractor for security, maintenance, heat, utilities, damage to the Work and insurance, and shall fix the time within which the Contractor shall finish all items on the list accompanying the Certificate. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion. Upon the Owner providing such Certificate of Substantial Completion, Contractor shall cause (a) the Architect to sign and deliver to Owner and Prudential a certificate in the form of **Exhibit "E"** attached hereto, and (b) the civil engineer for the Project to sign and deliver to Owner and Prudential a certificate in the form of **Exhibit "F"** attached hereto.

§ 9.8.5 The Certificate of Substantial Completion shall be submitted to the Owner and Contractor for their written acceptance of responsibilities assigned to them in such Certificate. Upon such acceptance and consent of surety, if any, the Owner shall make payment of retainage applying to such Work or designated portion thereof. Such payment shall be adjusted for Work that is incomplete or not in accordance with the requirements of the Contract Documents.

## § 9.9 PARTIAL OCCUPANCY OR USE

§ 9.9.1 The Owner may occupy or use any completed or partially completed portion of the Work at any stage when such portion is designated by separate agreement with the Contractor, provided such occupancy or use is consented to by the insurer as required under Section 11.4.1.5 and authorized by public authorities having jurisdiction over the Work. Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the Owner and Contractor have accepted in writing the responsibilities assigned to each of them for payments, retainage, if any, security, maintenance, heat, utilities, damage to the Work and insurance, and have agreed in writing concerning the period for correction of the Work and commencement of warranties required by the Contract Documents. When the Contractor considers a portion substantially complete, the Contractor shall prepare and submit a list to the ~~Architect~~ Owner as provided under Section 9.8.2. Consent of the Contractor to partial occupancy or use shall not be unreasonably withheld. The stage of the progress of the Work shall be determined by written agreement between the Owner and ~~Contractor or, if no agreement is reached, by decision of the Architect.~~ Contractor.

§ 9.9.2 Immediately prior to such partial occupancy or use, the ~~Owner,~~ Owner and the Contractor ~~and Architect~~ shall jointly inspect the area to be occupied or portion of the Work to be used in order to determine and record the condition of the Work.

§ 9.9.3 Unless otherwise agreed upon, partial occupancy or use of a portion or portions of the Work shall not constitute acceptance of Work not complying with the requirements of the Contract Documents.

## § 9.10 FINAL COMPLETION AND FINAL PAYMENT

§ 9.10.1 Upon receipt of written notice from Contractor to Owner that all Punch List Items have been completed and that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the ~~Architect~~ Owner will promptly make such inspection and, when ~~the Architect finds~~ the Work ~~acceptable under~~ has been finally completed in accordance with the Contract Documents and the Contract fully performed, the ~~Architect~~ Owner will promptly ~~issue a~~ make final ~~Certificate for Payment stating that to the best~~ payment of ~~the Architect's knowledge, information~~ all amounts due ~~and belief, and on the basis of the Architect's on-site visits and inspections, the Work has been completed in accordance with terms and conditions of the Contract Documents and that the entire balance found~~ owing to ~~be due~~ the Contractor ~~and noted in~~ under the final ~~Certificate~~ is due and payable. ~~The Architect's final Certificate for Payment will constitute a further representation that conditions listed in Section 9.10.2 as precedent to the Contractor's being entitled to final payment have been fulfilled.~~ Contract Documents.

§ 9.10.2 Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the ~~Architect~~ Owner (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved.** WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)

(986536188)

connected with the Work for which the Owner or the Owner's property might be responsible or encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied, (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner, (3) a written statement that the Contractor knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents, (4) consent of surety, if any, to final ~~payment~~ payment, (5) a certificate stating that to the best of Contractor's knowledge, the Project is in compliance with all applicable laws, statutes, ordinances, rules and regulations with respect to the Project, and that there is no action or proceeding pending or threatened before any court or administrative agency with respect to the validity of the certificates, permits, licenses, waivers, consents, approvals, authorizations, registrations, qualifications, designations, declarations and filings required or compliance with any laws, statutes, ordinances, rules and regulations and Contractor has not received any notice to the contrary, (6) evidence satisfactory to Owner that all utilities necessary or appropriate for the operation of the Project have been installed and are fully operational and are actually operating to the satisfaction of the governmental authorities or utility companies responsible for the operation thereof and that all costs in connection with such installation and operation (including but not limited to impact fees, development fees, tap-on fees and recapture costs) have been paid in full and ~~(5),~~ (7), if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. If a Subcontractor refuses to furnish a release or waiver required by the Owner, the Contractor may furnish a bond satisfactory to the Owner to indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made, the Contractor shall refund to the Owner all money that the Owner may be compelled to pay in discharging such lien, including all costs and reasonable attorneys' fees.

§ 9.10.3 If, after Substantial Completion of the Work, final completion thereof is materially delayed through no fault of the Contractor or by issuance of Change Orders affecting final completion, ~~and the Architect so confirms,~~ the Owner shall, upon application by the ~~Contractor and certification by the Architect,~~ Contractor, and without terminating the Contract, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance for Work not fully completed or corrected is less than retainage stipulated in the Contract Documents, and if bonds have been furnished, the written consent of surety to payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by the Contractor to the ~~Architect prior to certification of such payment.~~ Owner. Such payment shall be made under terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

§ 9.10.4 The making of final payment shall constitute a waiver of Claims by the Owner except those arising from:

   .1    liens, Claims, security interests or encumbrances arising out of the Contract and unsettled;

   .2    failure of the Work to comply with the requirements of the Contract Documents; or

   .3    terms of special warranties required by the Contract Documents.

§ 9.10.5 Acceptance of final payment by the Contractor, a Subcontractor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment.

## ARTICLE 10   PROTECTION OF PERSONS AND PROPERTY
### § 10.1 SAFETY PRECAUTIONS AND PROGRAMS
§ 10.1.1 The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract.

### § 10.2 SAFETY OF PERSONS AND PROPERTY
§ 10.2.1 The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to:

   .1    employees on the Work and other persons who may be affected thereby;

   .2    the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of the Contractor or the Contractor's Subcontractors or Sub-subcontractors; and

   .3    other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)    (986536188)

37

Contractor shall comply strictly with local, municipal, provincial, state and national laws, orders, and regulations pertaining to health or safety which are applicable to Contractor or to the Project, including without limitation the Occupational Safety and Health Act of 1970 (84 U.S. Statutes 1590), as amended and any state plans approved thereunder, and regulations thereunder, to the extent applicable, and Contractor warrants the materials, equipment and facilities, whether temporary or permanent, furnished by Contractor in connection with the performance of the Project shall comply therewith. At all times while any of Contractor's employees, agents or subcontractors are on Project, Contractor shall provide them with a safe place of employment, and Contractor shall inspect the places where its employees, agents or subcontractors are or may be present on the Project and shall promptly take action to correct conditions which are or may become an unsafe place of employment for them.

Contractor shall incorporate necessary safety precautions and programs in a written safety program manual. Contractor shall provide Owner with a copy of such safety program manual.

Contractor shall take reasonable steps to erect and maintain safeguards for the protection of workers and the public and eliminate or abate safety hazards created by or otherwise resulting from the performance of the Work. Contractor shall take all precautions reasonably necessary for the safety and health of, and shall provide all reasonable protection to prevent damage, injury or loss to: (i) persons working at the job site employed by Contractor or its subcontractors in connection with the Work, (ii) all materials and equipment to be incorporated into the Project, whether in storage on or off the job site and (iii) other property at the job site.

Written reports of any accidents, injuries and illnesses at the Project requiring medical attention other than first aid, damage to property of Owner or Contractor, and fires shall be orally reported to Owner at the time of the incident. Written reports, reasonably satisfactory in form and content to Owner, shall be submitted by Contractor within forty-eight (48) hours after each incident.

Contractor shall maintain in form and content approved by Owner, job site accident, injury and illness statistics that shall be available for inspection by and submitted to Owner upon their written request.

In the event of any emergency endangering life or property, Contractor shall take such action as may be reasonable and necessary to prevent, avoid or mitigate injury or damage and shall, as soon as possible, report to Owner's representatives any such incidents, including Contractor's response thereto. If Contractor fails to take sufficient precautions for the safety of the public or the protection of the Work or of structures or property on or adjacent to the job site, creating an emergency requiring immediate action, the Owner may cause such sufficient precautions to be taken or provide such protection.

Construction equipment obtained or furnished by Contractor or its subcontractors that is to be used on the job site shall be in operating condition, safe, fit for the uses for which intended, and suitable for the safe, legal and efficient performance of the Project.

§ 10.2.2 The Contractor shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on safety of persons or property or their protection from damage, injury or loss.

§ 10.2.3 The Contractor shall erect and maintain, as required by existing conditions and performance of the Contract, reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent sites and utilities.

§ 10.2.4 The Contractor will not use, store or keep at the Project any hazardous materials, except those customarily and prudently used in construction of projects similar to the Project and in compliance with all environmental laws. When use or storage of explosives or other hazardous materials or equipment or unusual methods are necessary for execution of the Work, the Contractor shall exercise utmost care and carry on such activities under supervision of properly qualified personnel.

§ 10.2.5 The Contractor shall promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Contract Documents) to property referred to in Sections 10.2.1.2 and 10.2.1.3 caused in whole or in part by the Contractor, a Subcontractor, a Sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Contractor is responsible under

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)      (986536188)

Sections 10.2.1.2 and 10.2.1.3, except damage or loss attributable to acts or omissions of the Owner or ~~Architect or~~ anyone directly or indirectly employed by ~~either of them,~~ the Owner, or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under Section 3.18.

§ 10.2.6 The Contractor shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents. This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the ~~Owner and Architect.~~Owner.

§ 10.2.7 The Contractor shall not load or permit any part of the construction or site to be loaded so as to endanger its safety.

## § 10.3 HAZARDOUS MATERIALS
§ 10.3.1 If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner ~~and Architect~~ in writing.

§ 10.3.2 The Owner shall obtain the services of a licensed laboratory to verify the presence or absence of the material or substance reported by the Contractor and, in the event such material or substance is found to be present, to verify that it has been rendered harmless. Unless otherwise required by the Contract Documents, the Owner shall furnish in writing to the Contractor ~~and Architect~~ the names and qualifications of persons or entities who are to perform tests verifying the presence or absence of such material or substance or who are to perform the task of removal or safe containment of such material or substance. The Contractor ~~and the Architect~~ will promptly reply to the Owner in writing stating whether or not ~~either~~ the Contractor has reasonable objection to the persons or entities proposed by the Owner. If ~~either~~ the Contractor ~~or Architect~~ has an objection to a person or entity proposed by the Owner, the Owner shall propose another to whom the Contractor ~~and the Architect have~~ has no reasonable objection. When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Contractor. The Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Contractor's reasonable additional costs of shut-down, delay and start-up, which adjustments shall be accomplished as provided in Article 7.

§ 10.3.3 To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, Subcontractors, Architect, Architect's consultants and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in Section 10.3.1 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) and provided that such damage, loss or expense is not due to the sole negligence of a party seeking indemnity.

§ 10.4 The Owner shall not be responsible under Section 10.3 for materials and substances brought to the site by the Contractor unless such materials or substances were required by the Contract Documents.

§ 10.5 If, without negligence on the part of the Contractor, the Contractor is held liable for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by the Contract Documents, the Owner shall indemnify the Contractor for all cost and expense thereby incurred.

## § 10.6 EMERGENCIES
§ 10.6.1 In an emergency affecting safety of persons or property, the Contractor shall act, at the Contractor's discretion, to prevent threatened damage, injury or loss. Additional compensation or extension of time claimed by the Contractor on account of an emergency shall be determined as provided in Section 4.3 and Article 7.

## ARTICLE 11 INSURANCE AND BONDS
## § 11.1 CONTRACTOR'S LIABILITY INSURANCE
§ 11.1.1 The Contractor shall purchase from and maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located such insurance as will protect the Contractor from claims

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)       (986536188)

set forth below which may arise out of or result from the Contractor's operations under the Contract and for which the Contractor may be legally liable, whether such operations be by the Contractor or by a Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

.1 claims under workers' compensation, disability benefit and other similar employee benefit acts which are applicable to the Work to be performed;

.2 claims for damages because of bodily injury, occupational sickness or disease, or death of the Contractor's employees;

.3 claims for damages because of bodily injury, sickness or disease, or death of any person other than the Contractor's employees;

.4 claims for damages insured by usual personal injury liability coverage;

.5 claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;

.6 claims for damages because of bodily injury, death of a person or property damage arising out of ownership, maintenance or use of a motor vehicle;

.7 claims for bodily injury or property damage arising out of completed operations; and

.8 claims involving contractual liability insurance applicable to the Contractor's obligations under Section 3.18.

§ 11.1.2 The insurance required by Section 11.1.1 shall be written for not less than limits of liability specified in the Contract Documents or required by law, whichever coverage is greater. Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of the Work until date of final payment and termination of any coverage required to be maintained after final payment.

§ 11.1.3 Certificates of insurance acceptable to the Owner shall be filed with the Owner prior to commencement of the Work. These certificates and the insurance policies required by this Section 11.1 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner. If any of the foregoing insurance coverages are required to remain in force after final payment and are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the final Application for Payment as required by Section 9.10.2. Information concerning reduction of coverage on account of revised limits or claims paid under the General Aggregate, or both, shall be furnished by the Contractor with reasonable promptness in accordance with the Contractor's information and belief.

§ 11.1.4 Contractor shall cause all architects, engineers and other Design Professionals performing design work for the Project to maintain Professional Liability Insurance having minimum limits of One Million Dollars ($1,000,000) per claim and in the aggregate (including excess coverage) (claims made basis). Such Professional Liability Insurance policies shall (i) provide coverage for claims arising out of any act, error or omission with respect to the rendering of or failure to render design, engineering, professional or architectural services by architects, engineers or other Design Professionals (and their respective officers, directors, employees or agents) who may be employed, engaged or otherwise utilized by Contractor to perform Contractor's design, engineering, architectural and professional duties, obligations and responsibilities under the Contract Documents, (ii) include Owner, and its partners, members, officers, directors, employees, agents, successors and assigns as "additional insureds," (iii) be written on an occurrence basis and not on a claims-made basis, (iv) waive any rights of subrogation against Owner and its partners, members, officers, directors, employees, agents, successors and assigns, and (v) be written by an insurance company or companies with a current A.M. Best Company rating of A-/IX or better and be admitted to do business in the State where the Land is located.

### § 11.2 OWNER'S LIABILITY INSURANCE
§ 11.2.1 The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance.

### § 11.3 PROJECT MANAGEMENT PROTECTIVE LIABILITY INSURANCE
§ 11.3.1 Optionally, the Owner may require the Contractor to purchase and maintain Project Management Protective Liability insurance from the Contractor's usual sources as primary coverage for the Owner's, Contractor's and Architect's vicarious liability for construction operations under the Contract. Unless otherwise required by the Contract Documents, the Owner shall reimburse the Contractor by increasing the Contract Sum to pay the cost of purchasing and maintaining such optional insurance coverage, and the Contractor shall not be responsible for purchasing any other liability insurance on behalf of the Owner. The minimum limits of liability purchased with

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)    (986536188)

40

such coverage shall be equal to the aggregate of the limits required for Contractor's Liability Insurance under Sections 11.1.1.2 through 11.1.1.5.

§ 11.3.2 To the extent damages are covered by Project Management Protective Liability insurance, the Owner, Contractor and Architect waive all rights against each other for damages, except such rights as they may have to the proceeds of such insurance. The policy shall provide for such waivers of subrogation by endorsement or otherwise.

§ 11.3.3 The Owner shall not require the Contractor to include the Owner, Architect or other persons or entities as additional insureds on the Contractor's Liability Insurance coverage under Section 11.1.

### § 11.4 PROPERTY INSURANCE

§ 11.4.1 ~~Unless otherwise provided, the Owner~~ Contractor shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance written on a builder's risk "all-risk" or equivalent policy form in the amount of the initial Contract Sum, plus value of subsequent Contract modifications and cost of materials supplied or installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made as provided in Section 9.10 or until no person or entity other than the Owner has an insurable interest in the property required by this Section 11.4 to be covered, whichever is later. This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Project.

§ 11.4.1.1 Property insurance shall be on an "all-risk" or equivalent policy form and shall include, without limitation, insurance against the perils of fire (with extended coverage) and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and startup, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Architect's and Contractor's services and expenses required as a result of such insured loss.

§ 11.4.1.2 ~~If the Owner does not intend to purchase such property insurance required by the Contract and with all of the coverages in the amount described above, the Owner shall so inform the Contractor in writing prior to commencement of the Work. The Contractor may then effect insurance which will protect the interests of the Contractor, Subcontractors and Sub-subcontractors in the Work, and by appropriate Change Order the cost thereof shall be charged to the Owner. If the Contractor is damaged by the failure or neglect of the Owner to purchase or maintain insurance as described above, without so notifying the Contractor in writing, then the Owner shall bear all reasonable costs properly attributable thereto.~~[Intentionally Omitted].

§ 11.4.1.3 If the property insurance requires deductibles, the Owner shall pay as a Cost of the Work costs not covered because of such ~~deductibles.~~deductibles; provided, however, that except for claims arising from flood or earthquake damage, the cost of such deductibles shall not exceed $10,000 per occurrence.

§ 11.4.1.4 This property insurance shall cover portions of the Work stored off the site, and also portions of the Work in transit.

§ 11.4.1.5 Partial occupancy or use in accordance with Section 9.9 shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise. The Owner and the Contractor shall take reasonable steps to obtain consent of the insurance company or companies and shall, without mutual written consent, take no action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of insurance.

§ 11.4.2 Boiler and Machinery Insurance. ~~The Owner~~ Contractor shall purchase and maintain boiler and machinery insurance required by the Contract Documents or by law, which shall specifically cover such insured objects during installation and until final acceptance by the Owner; this insurance shall include interests of the Owner, Contractor, Subcontractors and Sub-subcontractors in the Work, and the Owner and Contractor shall be named insureds.

§ 11.4.3 Loss of Use Insurance. ~~The Owner, at the Owner's option, may~~ Contractor shall purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other hazards, however

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)          (986536188)

41

caused. ~~The Owner~~ Contractor waives all rights ~~of action~~ against ~~the Contractor~~ Owner for ~~loss of use of the Owner's property, including consequential losses due to~~ damages caused by fire or other ~~hazards however caused.~~ perils to the extent covered by property insurance obtained pursuant to the terms of this Section 11.4.

§ 11.4.4 [Intentionally Omitted].
~~§ 11.4.4 If the Contractor requests in writing that insurance for risks other than those described herein or other special causes of loss be included in the property insurance policy, the Owner shall, if possible, include such insurance, and the cost thereof shall be charged to the Contractor by appropriate Change Order.~~

§ 11.4.5 If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project, or if after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, the Owner shall waive all rights in accordance with the terms of Section 11.4.7 for damages caused by fire or other causes of loss covered by this separate property insurance. All separate policies shall provide this waiver of subrogation by endorsement or otherwise.

§ 11.4.6 Before an exposure to loss may occur, the ~~Owner~~ Contractor shall file with the ~~Contractor~~ Owner a copy of each policy that includes insurance coverages required by this Section 11.4. Each policy shall contain all generally applicable conditions, definitions, exclusions and endorsements related to this Project. Each policy shall contain a provision that the policy will not be canceled or allowed to expire, and that its limits will not be reduced, until at least 30 days' prior written notice has been given to the Contractor.

§ 11.4.7 Waivers of Subrogation. The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the ~~Architect, Architect's consultants,~~ separate contractors described in Article 6, if any, and any of their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.4 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. The Owner or Contractor, as appropriate, shall require of the ~~Architect, Architect's consultants,~~ separate contractors described in Article 6, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

§ 11.4.8 A loss insured under Owner's property insurance shall be adjusted by the Owner as fiduciary and made payable to the Owner as fiduciary for the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause and of Section 11.4.10. The Contractor shall pay Subcontractors their just shares of insurance proceeds received by the Contractor, and by appropriate agreements, written where legally required for validity, shall require Subcontractors to make payments to their Sub-subcontractors in similar manner.

§ 11.4.9 If required in writing by a party in interest, the Owner as fiduciary shall, upon occurrence of an insured loss, give bond for proper performance of the Owner's duties. The cost of required bonds shall be charged against proceeds received as fiduciary. The Owner shall deposit in a separate account proceeds so received, which the Owner shall distribute in accordance with such agreement as the parties in interest may reach, or in accordance with an arbitration award in which case the procedure shall be as provided in Section 4.6. If after such loss no other special agreement is made and unless the Owner terminates the Contract for convenience, replacement of damaged property shall be performed by the Contractor after notification of a Change in the Work in accordance with Article 7.

§ 11.4.10 The Owner as fiduciary shall have power to adjust and settle a loss with insurers unless one of the parties in interest shall object in writing within five days after occurrence of loss to the Owner's exercise of this power; if such objection is made, the dispute shall be resolved as provided in Sections 4.5 and 4.6. The Owner as fiduciary shall, in the case of arbitration, make settlement with insurers in accordance with directions of the arbitrators. If distribution of insurance proceeds by arbitration is required, the arbitrators will direct such distribution.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)
42
(986536188)

R.P. Appx. 382                                                                 71

## § 11.5 PERFORMANCE BOND AND PAYMENT BOND

**§ 11.5.1** The Owner shall have the right to require the Contractor to furnish bonds covering faithful performance of the Contract and payment of obligations arising thereunder as stipulated in bidding requirements or specifically required in the Contract Documents on the date of execution of the Contract.

**§ 11.5.2** Upon the request of any person or entity appearing to be a potential beneficiary of bonds covering payment of obligations arising under the Contract, the Contractor shall promptly furnish a copy of the bonds or shall permit a copy to be made.

## ARTICLE 12 UNCOVERING AND CORRECTION OF WORK
### § 12.1 UNCOVERING OF WORK

**§ 12.1.1** If a portion of the Work is covered contrary to the ~~Architect's request or to~~ requirements specifically expressed in the Contract Documents, <u>any written inspection schedule agreed to by Contractor, or as previously requested in writing by Owner,</u> it must, if required in writing by the ~~Architect,~~ <u>Owner,</u> be uncovered for the ~~Architect's~~ <u>Owner's</u> examination and be replaced at the Contractor's expense without change in the Contract Time.

**§ 12.1.2** If a portion of the Work has been covered which the ~~Architect~~ <u>Owner</u> has not specifically requested to examine prior to its being covered, the ~~Architect~~ <u>Owner</u> may request to see such Work and it shall be uncovered by the Contractor. If such Work is in accordance with the Contract Documents, costs of uncovering and replacement shall, by appropriate Change Order, be at the Owner's expense. If such Work is not in accordance with the Contract Documents, correction shall be at the Contractor's expense unless the condition was caused by the Owner or a separate contractor in which event the Owner shall be responsible for payment of such costs.

### § 12.2 CORRECTION OF WORK
#### § 12.2.1 BEFORE OR AFTER SUBSTANTIAL COMPLETION

**§ 12.2.1.1** The Contractor shall promptly correct Work ~~rejected by the Architect or~~ failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspections and compensation for the ~~Architect's services and~~ expenses made necessary thereby, shall be at the Contractor's expense.

#### § 12.2.2 AFTER SUBSTANTIAL COMPLETION

**§ 12.2.2.1** In addition to the Contractor's obligations under Section 3.5, if, within one year after the date of Substantial Completion of the Work or designated portion thereof or after the date for commencement of warranties established under Section 9.9.1, or by terms of an applicable special warranty required by the Contract Documents, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so unless the Owner has previously given the Contractor a written acceptance of such condition. The Owner shall give such notice promptly after discovery of the condition. During the one-year period for correction of Work, if the Owner fails to notify the Contractor and give the Contractor an opportunity to make the correction, the Owner waives the rights to require correction by the Contractor and to make a claim for breach of warranty. If the Contractor fails to correct nonconforming Work within a reasonable time during that period after receipt of notice from the ~~Owner or Architect,~~ <u>Owner,</u> the Owner may correct it in accordance with Section 2.4.

**§ 12.2.2.2** The one-year period for correction of Work shall be extended with respect to portions of Work first performed after Substantial Completion by the period of time between Substantial Completion and the actual performance of the Work.

**§ 12.2.2.3** The one-year period for correction of Work shall not be extended by corrective Work performed by the Contractor pursuant to this Section 12.2.

**§ 12.2.3** The Contractor shall remove from the site portions of the Work which are not in accordance with the requirements of the Contract Documents and are neither corrected by the Contractor nor accepted by the Owner.

**§ 12.2.4** The Contractor shall bear the cost of correcting destroyed or damaged construction, whether completed or partially completed, of the Owner or separate contractors caused by the Contractor's correction or removal of Work which is not in accordance with the requirements of the Contract Documents.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)                                        (986536188)

43

R.P. Appx. 383                                                                                        72

**§ 12.2.5** Nothing contained in this Section 12.2 shall be construed to establish a period of limitation with respect to other obligations which the Contractor might have under the Contract Documents. Establishment of the one-year period for correction of Work as described in Section 12.2.2 relates only to the specific obligation of the Contractor to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Contractor's liability with respect to the Contractor's obligations other than specifically to correct the Work.

### § 12.3 ACCEPTANCE OF NONCONFORMING WORK

**§ 12.3.1** If the Owner prefers to accept Work which is not in accordance with the requirements of the Contract Documents, the Owner may do so instead of requiring its removal and correction, in which case the Contract Sum will be reduced as appropriate and equitable. Such adjustment shall be effected whether or not final payment has been made.

### ARTICLE 13   MISCELLANEOUS PROVISIONS
### § 13.1 GOVERNING LAW

**§ 13.1.1** The Contract shall be governed by the law of the place where the Project is located.

### § 13.2 SUCCESSORS AND ASSIGNS

**§ 13.2.1** The Owner and Contractor respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto and to partners, successors, assigns and legal representatives of such other party in respect to covenants, agreements and obligations contained in the Contract Documents. Except as provided in Section 13.2.2, neither party to the Contract shall assign the Contract as a whole without written consent of the other. If either party attempts to make such an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract. Notwithstanding the foregoing, Owner may assign the Contract Documents to Prudential or any entity controlled by Prudential.

**§ 13.2.2** The Owner may, without consent of the Contractor, assign the Contract to an institutional lender providing construction financing for the Project. In such event, the lender shall assume the Owner's rights and obligations under the Contract Documents. The Contractor shall execute all consents reasonably required to facilitate such assignment. Contractor hereby subordinates any mechanics'' and materialmen's liens or other claims or encumbrances that may be brought by Contractor against any or all of the Work, the Land or the Project to any liens granted in favor of Owner's lender(s), whether such lien in favor of Owner's lender(s) is created, attached or perfected prior to or after any such liens, claims or encumbrances, and shall require by subcontract its Subcontractors, and Sub-subcontractors to the extent required by Owner's lender(s), to similarly subordinate their lien, claim and encumbrance rights. Contractor agrees to comply with reasonable request of Owner for supporting documentation required by Owner's lender(s), including any necessary lien subordination agreements, affidavits or other documents that may be required to demonstrate that Owner's property and premises are free from liens, claims and encumbrances arising out of the furnishing of Work under the Contract. This subordination of lien is made in consideration of and as an inducement to the execution and delivery of this agreement, and shall be applicable despite any dispute between the parties hereto or any others, or any default by Owner under the Contract Documents or otherwise. Owner's lenders may require periodic inspections and certifications by an inspector or inspecting architect, and Contractor will make the Project available at all times for such inspections.

### § 13.3 WRITTEN NOTICE

**§ 13.3.1** Written notice shall be deemed to have been duly served if delivered in person to the individual or a member of the firm or entity or to an officer of the corporation for which it was intended, or if delivered at or sent by registered or certified mail to the last business address known to the party giving notice.

### § 13.4 RIGHTS AND REMEDIES

**§ 13.4.1** Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law.

**§ 13.4.2** No action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)          (986536188)

**44**

§ 13.4.3 If any mediation or arbitration is commenced by either party hereunder to enforce the obligations of the other party, then (a) the identity of the prevailing party in any such proceeding shall be determined by the mediator or arbitrator (whichever is applicable), (b) such prevailing party shall be reimbursed by the nonprevailing party for all of the prevailing party's reasonable out-of-pocket expenses incurred in connection therewith, including without limitation reasonable attorneys' fees and (c) the mediator or arbitrator (whichever is applicable) shall be authorized to make an award of such expense in any such proceeding.

### § 13.5 TESTS AND INSPECTIONS

§ 13.5.1 Tests, inspections and approvals of portions of the Work required by the Contract Documents or by laws, ordinances, rules, regulations or orders of public authorities having jurisdiction shall be made at an appropriate time. Unless otherwise provided, the Contractor shall make arrangements for such tests, inspections and approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority, and shall bear all related costs of tests, inspections and approvals. The Contractor shall give the ~~Architect~~ Owner timely notice of when and where tests and inspections are to be made so that the ~~Architect~~ Owner may be present for such procedures. The Owner shall bear costs of tests, inspections or approvals which do not become requirements until after bids are received or negotiations concluded.

§ 13.5.2 If the ~~Architect,~~ Owner or public authorities having jurisdiction determine that portions of the Work require additional testing, inspection or approval not included under Section 13.5.1, the ~~Architect will, upon written authorization from the Owner,~~ Owner will instruct the Contractor to make arrangements for such additional testing, inspection or approval by an entity acceptable to the Owner, and the Contractor shall give timely notice to the ~~Architect~~ Owner of when and where tests and inspections are to be made so that the ~~Architect~~ Owner may be present for such procedures. Such costs, except as provided in Section 13.5.3, shall be at the Owner's expense.

§ 13.5.3 If such procedures for testing, inspection or approval under Sections 13.5.1 and 13.5.2 reveal failure of the portions of the Work to comply with requirements established by the Contract Documents, all costs made necessary by such failure including those of repeated procedures ~~and compensation for the Architect's services and expenses~~ shall be at the Contractor's expense.

§ 13.5.4 Required certificates of testing, inspection or approval shall, unless otherwise required by the Contract Documents, be secured by the Contractor and promptly delivered to the ~~Architect.~~ Owner.

§ 13.5.5 If the ~~Architect~~ Owner is to observe tests, inspections or approvals required by the Contract Documents, the ~~Architect~~ Owner will do so promptly and, where practicable, at the normal place of testing.

§ 13.5.6 Tests or inspections conducted pursuant to the Contract Documents shall be made promptly to avoid unreasonable delay in the Work.

### § 13.6 INTEREST

§ 13.6.1 Payments due and unpaid under the Contract Documents shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.

### § 13.7 COMMENCEMENT OF STATUTORY LIMITATION PERIOD

§ 13.7.1 As between the Owner and Contractor:

.1 Before Substantial Completion. As to acts or failures to act occurring prior to the relevant date of Substantial Completion, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than such date of Substantial Completion;

.2 Between Substantial Completion and Final Certificate for Payment. As to acts or failures to act occurring subsequent to the relevant date of Substantial Completion and prior to issuance of the final Certificate for Payment, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date ~~of issuance of~~ Owner is required to make the final ~~Certificate for Payment;~~ payment hereunder; and

.3 After Final Certificate for Payment. As to acts or failures to act occurring after the ~~relevant~~ date ~~of issuance of the~~ final ~~Certificate for Payment,~~ payment, any applicable statute of limitations shall

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)

(986536188)

commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of any act or failure to act by the Contractor pursuant to any Warranty provided under Section 3.5, the date of any correction of the Work or failure to correct the Work by the Contractor under Section 12.2, or the date of actual commission of any other act or failure to perform any duty or obligation by the Contractor or Owner, whichever occurs last.

## ARTICLE 14 TERMINATION OR SUSPENSION OF THE CONTRACT
### § 14.1 TERMINATION BY THE CONTRACTOR

§ 14.1.1 The Contractor may terminate the Contract if the Work is stopped for a period of 30 consecutive days through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, for any of the following reasons:

.1    issuance of an order of a court or other public authority having jurisdiction which requires all Work to be stopped;

.2    an act of government, such as a declaration of national emergency which requires all Work to be stopped;

.3    because the ~~Architect~~ Owner has not issued a ~~Certificate for Payment~~ payment and has not notified the Contractor of the reason for withholding ~~certification~~ payment as provided in Section 9.4.1, or because the Owner has not made payment ~~on a Certificate for Payment~~ within the time stated in the Contract Documents; or

.4    the Owner has failed to furnish to the Contractor promptly, upon the Contractor's request, reasonable evidence as required by Section 2.2.1.

§ 14.1.2 The Contractor may terminate the Contract if, through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, repeated suspensions, delays or interruptions of the entire Work by the Owner as described in Section 14.3 constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less.

§ 14.1.3 If one of the reasons described in Section 14.1.1 or 14.1.2 exists, the Contractor may, upon ~~seven days'~~ written notice to the ~~Owner and Architect,~~ Owner, terminate the Contract and recover from the Owner payment for Work executed and for proven loss with respect to materials, equipment, tools, and construction equipment and machinery, including ~~reasonable overhead, profit and damages.~~ Contractor's Fee based on the percentage set forth in Section 5.1.2 of the Agreement on Work completed to date.

§ 14.1.4 If the Work is stopped for a period of 60 consecutive days through no act or fault of the Contractor or a Subcontractor or their agents or employees or any other persons performing portions of the Work under contract with the Contractor because the Owner has persistently failed to fulfill the Owner's obligations under the Contract Documents with respect to matters important to the progress of the Work, the Contractor may, upon ~~seven additional days'~~ written notice to the ~~Owner and the Architect,~~ Owner, terminate the Contract and recover from the Owner as provided in Section 14.1.3.

### § 14.2 TERMINATION BY THE OWNER FOR CAUSE

§ 14.2.1 The Owner may terminate the Contract if ~~the Contractor:~~:

.1    the Contractor persistently or repeatedly refuses or fails to supply enough properly skilled workers or proper materials;

.2    the Contractor fails to make payment to Subcontractors for materials or labor in accordance with the respective agreements between the Contractor and the Subcontractors;

.3    the Contractor persistently disregards laws, ordinances, or rules, regulations or orders of a public authority having jurisdiction;

.4    a mechanic's or materialmen's lien, stop notice or other encumbrance is filed or served by a Subcontractor, Sub-subcontractor or any person or entity claiming by, through or under Contractor against the Land or the Project or any funds due Contractor, or any part thereof, and the lien, stop notice or encumbrance is not discharged, insured over, or bonded off within 45 days after filing or service, or

.4    otherwise is guilty of substantial breach of a provision of the Contract Documents.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)      (986536188)

Without limiting the foregoing, Contractor shall be in default (a "**Contractor Default**") allowing Owner to terminate the Contract if Contractor fails to perform any obligation under the Contract Documents and does not correct such failure within five (5) working days following written notice thereof from Owner; provided, however, no Contractor Default shall occur if the matter is not subject to being cured within such five (5) day period, but Contractor has promptly begun the correction thereof and diligently proceeds to the correction thereof within thirty (30) working days. In the event of Contractor's Default, Owner may, without prejudice to any other rights or remedies Owner may have, hold in abeyance further payments to Contractor to the extent reasonably deemed necessary by Owner to correct any Contractor Default and/or terminate Contractor's right to continue performance of the Contract Documents by written notice to Contractor specifying the date of termination. In the event of such termination, Owner may take possession of the Work at the job site and any or all materials and equipment (whether delivered to the job site or on order therefore by Contractor), tools and construction equipment at the job site and finish the Work by whatever method Owner may deem expedient.

In the event of termination by Owner, Contractor shall, upon request by Owner, promptly advise it of all outstanding subcontracts, rental agreements and purchase orders which Contractor has with others pertaining to performance of the Project and furnish Owner with complete copies thereof. Upon request by Owner, Contractor shall assign to Owner, in form and content reasonably satisfactory to Owner, Contractor's title to materials and equipment for the Project and those subcontracts designated by Owner.

In the event of termination by Owner, Contractor shall not be entitled to receive any further payment until the Project is completed. Upon completion and final acceptance of the Project, Owner will determine the total cost incurred in completing the Project including, without limitation, additional overhead, legal and other costs incurred by Owner to effect such termination and to complete the Project. If the total costs noted above exceed the balance of the Contract Sum unpaid at the time of the termination, Contractor shall, promptly after receipt of an invoice, pay to Owner the amount of such excess. Owner shall have the right and is authorized to set-off against and deduct from any excess payable to Contractor any other damages suffered by Owner due to said default or event giving rise to the termination or due to other defaults of Contractor in complying with the terms of the Contract Documents. Contractor shall continue to be fully liable for all such other damages to Owner. A waiver by Owner of one default by Contractor shall not be considered to be a waiver of any subsequent default by Contractor, nor be deemed to amend or modify the terms of the Contract Documents. Contractor expressly waives any formal notice by Owner of Contractor's failure to perform, or passive breach of, Contractor's express obligations under the Contract Documents.

Contractor agrees that upon commencement of a case, receivership, civil action or other proceeding by or against Contractor under state, federal or other applicable insolvency law and if such case is not dismissed within thirty (30) days thereafter, or upon any general assignment by Contractor for the benefit of its creditors, Owner may, in its sole discretion, treat Contractor as in default and may exercise any of the remedies of this Section 14.2.1. In the event Owner's remedies are limited by the commencement by or against the Contractor of a case under any chapter of the United States Bankruptcy Code, Contractor stipulates, acknowledges and agrees that time is of the essence in determination of whether the Contract Documents should be "assumed" or "rejected," within the meaning of 11 U.S.C. § 365; and Contractor therefore further stipulates and agrees that subject only to calendaring constraints of the Bankruptcy Court having jurisdiction, it will take all necessary action to cause the assumption or rejection of the Contract Documents on or before the thirtieth day following the filing of the Petition commencing any such case. In such event, if Contractor seeks to "assume" the Contract Documents, Contractor expressly stipulates, acknowledges and agrees that "adequate assurance of future performance" within the meaning of 11 U.S.C. § 365 (b)(1)(C) means a determination that there is no foreseeable likelihood that there will be any further interruption of Contractor's performance under the Contract Documents following its assumption.

In the event Owner determines, in its reasonable discretion, that Contractor has become insolvent or is in danger of becoming insolvent, then Owner is authorized, but not required, to make direct payment to Contractor's subcontractors with respect to any current or past-due invoices then outstanding. Alternatively, Owner may, in its sole discretion, require that agreements between Contractor and any such subcontractor be assigned to Owner, and Contractor hereby authorizes and consents to any such assignment. Owner shall be entitled to full credit against any obligations to Contractor for any payments made to any subcontractor under this Section, whether made pursuant to assigned subcontracts or

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)          (986536188)

**47**

otherwise. Title to any materials or equipment for which such direct payment is made shall pass directly from such subcontractor to Owner.

§ 14.2.2 When any of the above reasons exist, the ~~Owner, upon certification by the Architect that~~ Owner may, if sufficient cause exists to justify such action, ~~may~~ without prejudice to any other rights or remedies of the Owner and after giving the Contractor and the Contractor's surety, if any, seven days' written notice, terminate employment of the Contractor and may, subject to any prior rights of the surety:

.1 take possession of the site and of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor;

.2 accept assignment of subcontracts pursuant to Section 5.4; and

.3 finish the Work by whatever reasonable method the Owner may deem expedient. Upon request of the Contractor, the Owner shall furnish to the Contractor a detailed accounting of the costs incurred by the Owner in finishing the Work.

§ 14.2.3 When the Owner terminates the Contract for one of the reasons stated in Section 14.2.1, the Contractor shall not be entitled to receive further payment until the Work is finished.

§ 14.2.4 If the unpaid balance of the Contract Sum exceeds costs of finishing the Work, ~~including compensation for the Architect's services and expenses made necessary thereby,~~ and other damages incurred by the Owner and not expressly waived, such excess shall be paid to the Contractor. If such costs and damages exceed the unpaid balance, the Contractor shall pay the difference to the Owner. ~~The amount to be paid to the Contractor or Owner, as the case may be, shall be certified by the Architect, upon application, and this~~ This obligation for payment shall survive termination of the ~~Contract.~~ Contract Documents.

## § 14.3 SUSPENSION BY THE OWNER FOR CONVENIENCE

§ 14.3.1 The Owner may, without cause, order the Contractor in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as the Owner may determine. Upon receiving any such notice of suspension, Contractor shall promptly suspend further performance of the Project to the extent specified, and during the period of such suspension shall properly care for and protect all Work in progress and materials, supplies, and equipment Contractor has on hand for performance of the Project. Upon the request of Owner, Contractor shall promptly deliver to Owner copies of outstanding subcontracts of Contractor, and shall take such action relative to such subcontracts as may reasonably be directed by Owner. Contractor shall use its best efforts to utilize its material, labor and equipment in such a manner as to mitigate costs associated with suspension. Owner may at any time withdraw the suspension of performance of the Project as to all or part of the suspended Project by written notice to Contractor specifying the effective date and scope of withdrawal, and Contractor shall resume diligent performance of the Project for which the suspension is withdrawn on the specified effective date of withdrawal.

§ 14.3.2 The Contract Sum and Contract Time shall be adjusted for increases in the cost and time caused by suspension, delay or interruption as described in Section 14.3.1. Adjustment of the Contract Sum shall include profit. No adjustment shall be made to the extent:

.1 that performance is, was or would have been so suspended, delayed or interrupted by another cause for which the Contractor is responsible; or

.2 that an equitable adjustment is made or denied under another provision of the Contract.

## § 14.4 TERMINATION BY THE OWNER FOR CONVENIENCE

§ 14.4.1 The Owner may, at any time, terminate the Contract for the Owner's convenience and without cause.

§ 14.4.2 Upon receipt of written notice from the Owner of such termination for the Owner's convenience, the Contractor shall:

.1 cease operations as directed by the Owner in the notice;

.2 take actions necessary, or that the Owner may direct, for the protection and preservation of the Work; and

.3 except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing subcontracts and purchase orders and enter into no further subcontracts and purchase orders.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
User Notes: Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)

(986536188)

R.P. Appx. 388                                                                77



Upon receipt of said notice, Contractor shall advise Owner of its outstanding subcontracts pertaining to performance of the terminated Work and, upon request, furnish Owner with complete copies. Contractor shall place no further subcontracts except as may be necessary for completion of such portion of the Project as is not terminated. Contractor shall promptly make every reasonable effort to procure cancellation, upon terms satisfactory to Owner, of all subcontracts to the extent they relate to the performance of Work terminated or, as directed by Owner, shall assign to Owner in form satisfactory to Owner such of its subcontracts as are designated by Owner, or shall take such other action relative to such subcontracts as may be directed by Owner.

§ 14.4.3 In case of such termination for the Owner's convenience, the Contractor shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with ~~reasonable overhead and profit~~ Contractor's Fee based on the percentage set forth in Section 5.1.2 of the Agreement for Work completed to date. Contractor shall not ~~executed.~~ be entitled to any prospective profits or any damages from any termination, suspension or otherwise, whether caused by Owner's fault, negligence or otherwise.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)   (986536188)

## Certification of Document's Authenticity

*AIA® Document D401™ – 2003*

I, , hereby certify, to the best of my knowledge, information and belief, that I created the attached final document simultaneously with this certification at 14:42:43 on 05/19/2006 under Order No. 1000182995_1 from AIA Contract Documents software and that in preparing the attached final document I made no changes to the original text of AIA® Document A201™ – 1997 - General Conditions of the Contract for Construction, as published by the AIA in its software, other than changes shown in the attached final document by underscoring added text and striking over deleted text.

_____
*(Signed)*

_____
*(Title)*

_____
*(Dated)*

**AIA Document D401™ – 2003. Copyright © 1992 and 2003** by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:43 on 05/19/2006 under Order No.1000182995_1 which expires on 7/23/2006, and is not for resale.
**User Notes:** Clayco A201 - Koll - Intellicenter - Dallas v2 (5-19-06)

1

(986536188)

# Exhibit B

# AMERICAN ARBITRATION ASSOCIATION
# ONLINE FILING ACKNOWLEDGEMENT

**This confirmation serves as the Demand for Arbitration or Request for Mediation for this filing.**
**To institute proceedings, please send a copy of this form and the parties' dispute resolution agreement to the opposing party.**
**Case # : 01-14-0001-0249**

This will acknowledge receipt of a request for dispute resolution services for the claim and parties detailed below.

| | |
|---|---|
| This claim has been filed for | Arbitration |
| This matter has been filed in accordance with | Construction Industry Arbitration Rules |
| The fee paid at the time of filing was | $8,200.00 |
| This request was received by the AAA on | 05-Sep-2014 |

---

**Claim Description**

On or about May 19, 2006, Intellicenter Dallas Investments, LP ("Intellicenter") contracted with Clayco Inc ("Contractor") under a Design Build contract ("Design Build Contract") for the design and construction of a 4 story speculative office building consisting of approximately 211,637 square feet located at 3701 Regent Boulevard, Irving Texas ("Project"). The Design Build Contract provided that the Contractor shall be responsible to Intellicenter for acts and omissions of the Contractor's employees, subcontractors and their agents and employees, and other persons, including the Architect, engineers and other Design Professionals, performing any portion of the Contractor's obligations under Article 3 with respect to the design of the Project.

The Design Build Contract Documents included a specification manual which required the elevated floor slabs to be designed for a 100lb live load with Code allowance reductions. The Contractor completed construction on March 6, 2007 as indicated in the architect's certification under the Certificate of Substantial Completion. In September 2007, six months after Substantial Completion, the architect, Forum Studio Inc. ("FS")., represented to Intellicenter that the Project was built in accordance with the plans and specifications. Further, FS indicated that it understood Intellicenter was relying upon the architect's representation and that Intellicenter may pursue a claim in the event that Intellicenter has any loss or damage as a result of the facts and circumstances that exist at the Project which made any of the FS's certifications incorrect or inaccurate.

Last year, as Intellicenter was preparing the building for sale, a broker noted some cracking in the exterior tilt panels. After evaluating the cracks, the design, and the building, Intellicenter learned that the cracks, some of which appeared to have been intentionally concealed by repair at the time of initial construction, were the result

R.P. Appx. 392                                                                 81

of inadequate structural design in portions of the perimeter concrete wall panels and a portion of the steel beam to wall panel connections in such a way that some, if not all, failed to meet applicable building code based upon contract specified live load on design drawings. Upon its first discovery of the cracks, Intellicenter wrote Contractor and requested that Contractor correct the deficient design and/or construction. Intellicenter even met with Contractor in person and requested more information. Despite the request to repair the deficiency, Contractor has refused to correct the design and construction deficiencies. Because of Contractor's refusal, Intellicenter has sought bids and contracted for the Project to be repaired to correct the defects. Until undertaking these repairs, Intellicenter had not made any repairs to the outside of the Project.

Intellicenter files this demand for arbitration to recover the losses it has sustained as a result of Contractor's and/or FS's breach of contract, breach of implied warranty, unjust enrichment, deficient design, fraud and/or negligent misrepresentation. Intellicenter also seeks to recover its attorney's fees, and all reasonable and necessary costs and expenses recoverable under the Design Build Contract and/or applicable law and further seeks all other relief permitted by law.

| | |
|---|---|
| Claim Amount | $1,500,000.00 |
| Do you have a Non-monetary aspect to your claim? | N |

Additional Damages

| | Amount |
|---|---|
| Attorney fees | |
| Interest | |
| Other | |

| | |
|---|---|
| **Fee Schedule Option** | Standard |
| **ADR Agreement** | Contained in AIA Document. |

---

**Parties and Representatives**

**Party 1**

| | |
|---|---|
| Category | Owner |
| Name | |
| Company Name | Intellicenter Dallas Investments LP |
| Address | 8115 Preston Road |
| | Suite 700 |
| | Dallas, TX 75225 |
| Phone | |
| Fax | |
| Email | |
| The Party is the | Company |

**Representative 1**

| | |
|---|---|
| Name | Gregory C. Noschese |
| Firm Name | Munsch Hardt Kopf Harr |

| | |
|---|---|
| Address | 500 North Akard |
| | Suite 3800 |
| | Dallas, TX 75201 |
| Phone | |
| Fax | |
| Email | gnoschese@munsch.com |

**Party 2**

| | |
|---|---|
| Category | Design / Builder |
| Name | |
| Company Name | Clayco Inc. |
| Address | 2199 Innerbelt Business Drive |
| | St. Louis, MO 63114 |
| Phone | |
| Fax | |
| Email | |
| The Party is the | Company |

**Representative 2**

| | |
|---|---|
| Name | Thomas  Avery |
| Firm Name | |
| Address | 120 South Central Avenue |
| | Suite 1650 |
| | St. Louis , MO 63105 |
| Phone | |
| Fax | |
| Email | |

**Party 3**

| | |
|---|---|
| Category | Architect |
| Name | |
| Company Name | FS Architecture, PC |
| Address | c/o Forum Studios, Inc. |
| | 2199 Innerbelt Business Ctr. Dr. |
| | St. Louis, MO 63114 |
| Phone | |
| Fax | |
| Email | |
| The Party is the | Company |

**Representative 3**

| | |
|---|---|
| Name | Registered   Agent |
| Firm Name | FS Architecture, PC |
| Address | c/o Forum Studios, Inc. |
| | 2199 Innerbelt Business Ctr. Dr. |
| | St. Louis, MO 63114 |
| Phone | |
| Fax | |
| Email | |

# EXHIBIT C

# FORM OF ARCHITECT'S CERTIFICATE

The Prudential Insurance Company of America

Prudential Real Estate Investors

Two Ravina Drive, Suite 400

Atlanta, GA 30346

Attn: Mark W. Seedorff

Re: 3701 Regent Blvd., Irving TX

Gentlemen:

We understand that you intend to acquire an interest in Intellicenter Dallas Investments, LLP, a Delaware limited liability partnership (the "Venture"), which Venture acquired the real property in Irving, Texas, more particularly described in Exhibit A attached hereto (the "Land"), and constructed an office building consisting of approximately 199,276 net rentable square feet, plus 850 parking spaces (collectively, the "Improvements"), pursuant to an Agreement To Acquire Interest, dated January 5, 2006 (the "Commitment"). (The Land and Improvements shall be referred to herein collectively as the "Project".)

We understand that the receipt by you of certain written certifications from us is a condition precedent to your obligation to make a capital contribution to the Venture and to acquire an interest in the Venture. Accordingly, we hereby certify the following:

## ARCHITECTURE

1.      We prepared the working drawings, a true and complete copy of which is attached hereto as Exhibit B (the "Plans and Specifications"). The working drawings describe the Improvements completely and accurately.

2.      The Project lies in a district designated FWY (Freeway) zoning under the applicable zoning ordinance No. 4681, City of Irving Planning and Development Department. The Project, if built and used in conformity with the Plans and Specifications, is in full compliance with such zoning ordinances.

3.      All Improvements contemplated by the Plans and Specifications are permitted by and in conformance with all applicable building codes and regulations and all other federal, state and local laws, rules and regulations relating to the physical aspects of improvements to land.

4.      Based on our observation of the Improvements during their construction and at the time all certificates of occupancy were issued, (a) the Improvements as actually built substantially conform to the Plans and Specifications, and comply with all Federal, state and local laws, rules, and regulations relating to the physical aspects of improvements to land, including, without limitation, those relating to zoning, building and fire codes, of which we have been made aware

1855559.2

by the owner, and environmental laws, rules and regulations and (b) no amendment to the building permits were required subsequent to April 26, 2006.

5. The Project complies in all respects with the Americans with Disabilities Act and all rules, regulations and guidelines promulgated in connection therewith.

6. Intentionally deleted.

7. The specified materials for the Project do not contain asbestos or polychlorinated biphenyl (PCB) products or any other hazardous or toxic wastes or substances in violation of applicable environmental laws.

8. The Project, if built in conformity with the Plans and Specifications, is in substantial compliance with all conditions and requirements specifically relating to construction and development of the Project contained in the following documents:
[None]

## LANDSCAPE ARCHITECTURE

1. The landscape architects are licensed in the State of Texas. They provided landscape architecture design and construction observation services for the site improvements for the Project. Their involvement included preparing landscape design plans, as noted on Exhibit B. In connection with rendering such plans, they performed such research and made such investigations as they deemed appropriate in their professional judgment with respect to such plans. They provided limited construction observation services pursuant to our contract. In addition, they periodically observed the contractor's progress and procedures during the preparation of the site and full course of construction.

2. In our professional opinion and based upon our services rendered, the Project's landscape improvements (the "Site Improvements") have been designed in compliance with applicable federal, state and local approvals and design standards relating to the Site Improvements.

3. Further, the work was completed in a manner compatible with the relevant aspects of the Land as understood by the landscape architects at the time of design and in substantial compliance with their recommendations.

## ENGINEERING

1. The civil engineers are licensed in the State of Texas. They provided civil engineering design and construction observation services for the Improvements. Their involvement has included preparing civil engineering design plans noted on Exhibit B. In connection with rendering the Plans, they performed such research and made such investigations as deemed appropriate in their professional judgment with respect to the Plans. They provided construction observation services during site preparation and grading prior to beginning construction of buildings. In addition, they periodically observed the contractor's progress and procedures during the preparation of the site and full course of construction.

2. We hereby represent to you that, in our professional opinion, based upon our services rendered, the Project has been designed with respect to the civil engineering aspects in

1855559.2

compliance with applicable Federal, state and local approvals and design standards relating to the site improvements for the land.

3.      We hereby represent to you that the following utilities are connected to the Improvements and fully operational: water, electric, sanitary/sewer and telephone. Such utilities comprise all of the utilities which were designed by the civil engineers.

4.      We have concluded that on the basis of our observations that the contractor has completed the Project in substantial conformity with the Plans. Further, the work was completed in a manner compatible with the relevant aspects of the Land as understood by the civil engineers at the time of design and in substantial compliance with their recommendations.

This letter is being delivered to you as a condition precedent to your making a capital contribution to the Venture and acquiring an interest in the Venture. We understand that you and the Venture are relying on this letter and that you or the Venture may pursue a claim against us in the event that you or the Venture has any loss or damage as a result of facts or circumstances that exist at the Project which make any of our certifications incorrect or inaccurate. This letter does not constitute, however, a guarantee of the work of the builder of the Improvements, and the builder and its subcontractors are solely responsible for all construction means, methods, techniques, sequences and procedures and compliance with the drawings, specifications and contract documents.

Very truly yours,

Forum Studio, Inc.

By _Haushecker_

Its _Principal_

(Attachments)

EXHIBIT A
Land

EXHIBIT B
Plans and Specifications

1855559.2

R.P. Appx. 398

87

## EXHIBIT A
## LEGAL DESCRIPTION OF THE LAND

BEING a 14.84 acre tract of land situated in the Jefferson Tilley Survey, Abstract No. 1474, City of Irving, Dallas County, Texas, and being part of a tract of land conveyed to The Travelers Insurance Company by deed as recorded in Volume 91244, Page 4044 of the Deed Records, Dallas County, Texas, and being more particularly described by metes and bounds as follows:

COMMENCING at a 1/2 inch iron rod found at the new West line of Beltline Road, said point being the Northwest corner of a tract of land conveyed to the County of Dallas by deed recorded in Volume 91189, Page 2171, of the Deed Records of Dallas County, Texas, said point also being in the southerly line of Interstate Highway No. 635 (LBJ Freeway, a variable width right-of-way);

THENCE North 71 degrees 07 minutes 55 seconds West, along the southerly line of said Interstate Highway No. 635 (LBJ Freeway), a distance of 518.07 feet to a 1/2 inch iron rod found for corner;

THENCE North 61 degrees 27 minutes 23 seconds West, continuing along the southerly line of said Interstate Highway No. 635 (LBJ Freeway) , a distance of 26.87 feet to a 1/2 inch iron rod found for corner, said point being the POINT OF BEGINNING, same point being the Northwest corner of a tract of land conveyed to SMPD-TEXAS-IRVING-203, LLC by deed as recorded in Volume 2003066, Page 01481, Deed Records, Dallas County, Texas, said point also being the Northeast corner of said 14.83 acre tract of land being described;

THENCE South 28 degrees 32 minutes 37 seconds West, departing the southerly line of said Interstate Highway No. 635 (LBJ Freeway) and along the common line of said SMPD-TEXAS-IRVING-203, LLC tract and said 14.83 acre tract of land being described, a distance of 775.69 feet to a 1/2 inch iron rod set for corner, said point being in the northeasterly line of Regent Boulevard (a variable width right-of-way) according to the plat thereof recorded in Volume 85244, Page 3298, Map Records, Dallas County, Texas, said point being the Southeast corner of said 14.83 acre tract of land being described, said point also being the Southwest corner of a tract of land conveyed to SECOND CENTURY INVESTMENTS by deed as recorded in Volume 2003066, Page 01466, Deed Records, Dallas County, Texas, same point being the beginning of a curve to the right having a radius of 900.00 feet a delta angle of 22 degrees 59 minutes 22 seconds, and a chord bearing and distance of North 56 degrees 37 minutes 34 seconds West, 358.70 feet;

THENCE in a northwesterly direction continuing along the said curve to the right an arc distance of 361.12 feet and to a 1/2 inch iron rod found for corner;

THENCE North 45 degrees 07 minutes 53 seconds West, continuing along the northeasterly line of said Regent Boulevard, a distance of 119.07 feet to a 1/2 inch iron

rod found for corner, said point being the beginning of a curve to the right having a radius of 607.74 feet a delta angle of 40 degrees 07 minutes 46 seconds, and a chord bearing and distance of North 25 degrees 04 minutes 00 seconds West, 417.01 feet;

THENCE in a northwesterly direction continuing along the said curve to the right an arc distance of 425.66 feet and to a 1/2 inch iron rod found for corner;

THENCE North 05 degrees 00 minutes 07 seconds West, continuing along the northeasterly line of said Regent Boulevard, a distance of 337.64 feet to a 1/2 inch iron rod found for corner, said point being the beginning of a curve to the left having a radius of 708.50 feet a delta angle of 34 degrees 03 minutes 09 seconds, and a chord bearing and distance of North 21 degrees 57 minutes 59 seconds West, 414.91 feet;

THENCE in a northwesterly direction continuing along the said curve to the right an arc distance of 421.08 feet and to a 1/2 inch iron rod found for corner, said point being the Northwest corner of said 14.83 acre tract of land being described and being in the southerly line of said Interstate Highway No. 635 (LBJ Freeway);

THENCE South 45 degrees 07 minutes 23 seconds East, along the southerly line of said Interstate Highway No. 635 (LBJ Freeway), a distance of 286.79 feet to a 1/2 inch iron rod found for corner;

THENCE South 61 degrees 27 minutes 23 seconds East, continuing along the southerly line of said Interstate Highway No. 635 (LBJ Freeway), a distance of 1038.95 feet to the POINT OF BEGINNING and containing 646,585 square feet or 14.84 acres of computed land.

# EXHIBIT B - DALLAS

# Drawing List

**Intellicenter - Dallas**
3701 Regent Blvd.
Irving, Texas 75063

**Number**

**Drawing**

| Civil | Title | Rev Date |
|-------|-------|----------|
| C1 | Cover Sheet | 3/26/2007 |
| C2 | Grading Plan | 3/26/2007 |
| C3 | Underfloor Grading Plan | 3/26/2007 |
| C4 | Drainage Area Map | 3/26/2007 |
| C5 | Storm Sewer Plan | 3/26/2007 |
| C6 | Storm Sewer Profiles | 3/26/2007 |
| C7 | Utility Plan | 3/26/2007 |
| C8 | Paving Plan | 3/26/2007 |
| C9 | Turn Lane Plan | 3/26/2007 |
| C10 | Turn Lane Plan and Details | 3/26/2007 |
| C11 | Paving Details | 3/26/2007 |
| C12 | Erosion Control Plan | 3/26/2007 |
| C13 | Erosion Control Details | 3/26/2007 |
| C14 | City of Irving Storm Water Pollution Prevention Methods | 5/8/2006 |
| C15 | City of Irving Storm Water Pollution Prevention Details | 5/8/2006 |
| C16 | City of Irving Storm Sewer Details | 3/26/2007 |
| C17 | City of Irving Inlet Details | 3/26/2007 |
| C18 | City of Irving Trench Embedment, Backfill, and Pavement Repair Details | 3/26/2007 |
| C19 | City of Irving Details for Trench Sheeting, Shoring, Sloping for Trenches over 5' Deep | 3/26/2007 |
| C20 | City of Irving Water and Sanitary Sewer Details | 3/26/2007 |
| C21 | City of Irving Sanitary Sewer Details | 3/26/2007 |

## Architectural

| | Cover | 3/26/2007 |
|---|-------|-----------|
| Cover | Cover | 3/26/2007 |
| A0-00 | Project Information | 3/26/2007 |
| INDEX | Drawing Index | 3/26/2007 |
| A0-01 | Life Safety Plans & Code Data | 3/26/2007 |
| A0-02 | Rated Structure Plans | 3/26/2007 |

1

R.P. Appx. 401                                                   90

| | | |
|---|---|---|
| A0-03 | UL Assemblies | 3/26/2007 |
| A1-01 | Architectural Site Plan | 3/26/2007 |
| A1-02 | Enlarged Site Plans and Details | 3/26/2007 |
| A2-01 | Overall Crawl Space and First Floor Plans | 3/26/2007 |
| A2-02 | Overall Second and Third Floor Plans | 3/26/2007 |
| A2-03 | Overall Fourth Floor and Roof Plans | 3/26/2007 |
| A2-11 | Partial First Floor Plan | 3/26/2007 |
| A2-12 | Partial First Floor Plan | 3/26/2007 |
| A2-21 | Partial Second Floor Plan | 3/26/2007 |
| A2-22 | Partial Second Floor Plan | 3/26/2007 |
| A2-31 | Partial Third Floor Plan | 3/26/2007 |
| A2-32 | Partial Third Floor Plan | 3/26/2007 |
| A2-41 | Partial Fourth Floor Plan | 3/26/2007 |
| A2-42 | Partial Fourth Floor Plan | 3/26/2007 |
| A2-51 | Partial Roof Plan | 3/26/2007 |
| A2-52 | Partial Roof Plan | 3/26/2007 |
| A2-53 | Roof Details | 3/26/2007 |
| A2-54 | Roof Details | 3/26/2007 |
| A3-01 | Overall Elevations | 3/26/2007 |
| A3-02 | Enlarged Elevations | 3/26/2007 |
| A3-03 | Enlarged Elevations | 3/26/2007 |
| A3-04 | Enlarged Elevations | 3/26/2007 |
| A3-05 | Enlarged Elevations | 3/26/2007 |
| A3-10 | Building Sections | 3/26/2007 |
| A3-11 | Building Sections | 3/26/2007 |
| A4-01 | Enlarged Plans, Toilet Rooms & Lobby | 3/26/2007 |
| A5-00 | Interior Elevations, Typical Information | 3/26/2007 |
| A5-01 | Interior Elevations, Lobby | 3/26/2007 |
| A5-02 | Interior Elevations, Toilet Rooms | 3/26/2007 |
| A5-03 | Interior Elevations Elevator Cabs | 3/26/2007 |
| A6-11 | Partial First Floor Ceiling Plan | 3/26/2007 |
| A6-12 | Partial First Floor Ceiling Plan | 3/26/2007 |
| A6-21 | Partial Second Floor Ceiling Plan | 3/26/2007 |
| A6-22 | Partial Second Floor Ceiling Plan | 3/26/2007 |
| A6-31 | Partial Third Floor Ceiling Plan | 3/26/2007 |
| A6-32 | Partial Third Floor Ceiling Plan | 3/26/2007 |
| A6-41 | Partial Fourth Floor Ceiling Plan | 3/26/2007 |

R.P. Appx. 402

91

| A6-42 | Partial Fourth Floor Ceiling Plan | 3/26/2007 |
| A7-01 | Elevator Plans & Sections | 3/26/2007 |
| A7-02 | Elevator Sections | 3/26/2007 |
| A7-03 | Elevator Details | 3/26/2007 |
| A7-11 | Stair 1 Sections & Plans | 3/26/2007 |
| A7-11A | Stair 3 Section & Plans | 3/26/2007 |
| A7-12 | Stair 2 Sections & Plans | 3/26/2007 |
| A7-13 | Stair Details | 3/26/2007 |
| A8-01 | Wall Sections | 3/26/2007 |
| A8-02 | Wall Sections | 3/26/2007 |
| A8-03 | Wall Sections | 3/26/2007 |
| A8-04 | Wall Sections | 3/26/2007 |
| A9-01 | Partition Types and Details, Door & Frame Types & Details | 3/26/2007 |
| A9-02 | TYP Window Details | 3/26/2007 |
| A9-03 | Window Frame Types | 3/26/2007 |
| A9-10 | Plan Details | 3/26/2007 |
| A9-11 | Plan Details | 3/26/2007 |
| A9-20 | Exterior Details | 3/26/2007 |
| A9-21 | Exterior Details | 3/26/2007 |
| A9-22 | Exterior Details | 3/26/2007 |
| A10-01 | Interior Details, Toilet Rooms | 3/26/2007 |
| A10-02 | Interior Details, 1st Level Lobby | 3/26/2007 |
| A10-03 | Interior Details, 2nd Level Lobby | 3/26/2007 |
| A11-11 | Partial Finish Plans, First Floor | 3/26/2007 |
| A11-12 | Partial Finish Plans, First Floor | 3/26/2007 |
| A11-21 | Partial Finish Plan, Second Floor | 3/26/2007 |
| A11-22 | Partial Finish Plan, Second Floor | 3/26/2007 |
| A11-31 | Partial Finish Plan, Third Floor | 3/26/2007 |
| A11-32 | Partial Finish Plan, Third Floor | 3/26/2007 |
| A11-41 | Partial Finish Plan, Fourth Floor | 3/26/2007 |
| A11-42 | Partial Finish Plan, Fourth Floor | 3/26/2007 |

## Structural

| S1-01 | General Notes | 3/26/2007 |
| S1-02 | Typical Sections & Details | 3/26/2007 |
| S1-03 | Typical Sections & Details | 3/26/2007 |
| S1-04 | Typical Sections & Details | 3/26/2007 |
| S2-01 | Partial Pier Plan | 3/26/2007 |

R.P. Appx. 403

| | | |
|---|---|---|
| S2-02 | Partial Pier Plan | 3/26/2007 |
| S2-03 | Dock Plan | 3/26/2007 |
| S2-11 | Partial Foundation Plan | 3/26/2007 |
| S2-12 | Partial Foundation Plan | 3/26/2007 |
| S2-21 | Partial Second Floor Framing Plan | 3/26/2007 |
| S2-22 | Partial Second Floor Framing Plan | 3/26/2007 |
| S2-31 | Partial Third Floor Framing Plan | 3/26/2007 |
| S2-32 | Partial Third Floor Framing Plan | 3/26/2007 |
| S2-41 | Partial Fourth Floor Framing Plan | 3/26/2007 |
| S2-42 | Partial Fourth Floor Framing Plan | 3/26/2007 |
| S2-51 | Partial Roof Framing Plan | 3/26/2007 |
| S2-52 | Partial Roof Framing Plan | 3/26/2007 |
| S3-01 | Foundation Section and Details | 3/26/2007 |
| S3-02 | Foundation Section and Details | 3/26/2007 |
| S3-03 | Foundation Section & Details | 3/26/2007 |
| S4-01 | Framing Section & Details | 3/26/2007 |
| S4-02 | Framing Section & Details | 3/26/2007 |
| S4-03 | Framing Section & Details | 3/26/2007 |
| S4-04 | Framing Section & Details | 3/26/2007 |
| S5-01 | Column Schedule & Details | 3/26/2007 |
| S6-01 | Brace Elevation & Details | 3/26/2007 |

## Tilt Up

| | | |
|---|---|---|
| T1-11 | Partial Panel Layout Plan | 3/26/2007 |
| T1-12 | Partial Panel Layout Plan | 3/26/2007 |
| T2-11 | Typical Sections & Details | 3/26/2007 |
| T3-11 | Tilt-Up Wall Elevations | 3/26/2007 |
| T3-12 | Tilt-Up Wall Elevations | 3/26/2007 |
| T3-13 | Tilt-Up Wall Elevations | 3/26/2007 |
| T3-14 | Tilt-Up Wall Elevations | 3/26/2007 |
| T4-11 | Reinforcing Details | 3/26/2007 |
| T4-12 | Reinforcing Details | 3/26/2007 |

## Fire Protection

| | | |
|---|---|---|
| Sheet 1 of 10 | Site Plan | 3/13/2007 |
| Sheet 2 of 10 | Level 1 - East Wing | 3/13/2007 |
| Sheet 3 of 10 | Level 1 - West Wing | 3/13/2007 |
| Sheet 4 of 10 | Level 2 - East Wing | 3/13/2007 |

4

| | | |
|---|---|---|
| Sheet 5 of 10 | Level 2 - West Wing | 3/13/2007 |
| Sheet 6 of 10 | Level 3 - East Wing | 3/13/2007 |
| Sheet 7 of 10 | Level 3 - West Wing | 3/13/2007 |
| Sheet 8 of 10 | Level 4 - East Wing | 3/13/2007 |
| Sheet 9 of 10 | Level 4 - West Wing | 3/13/2007 |
| Sheet 10 of 10 | Details | 3/13/2007 |

## Mechanical

| | | |
|---|---|---|
| M2.11 | Partial First Floor Plan - Mechanical | 1/26/2007 |
| M2.12 | Partial First Floor Plan - Mechanical | 1/26/2007 |
| M2.21 | Partial Second Floor Plan - Mechanical | 1/26/2007 |
| M2.22 | Partial Second Floor Plan - Mechanical | 1/26/2007 |
| M2.31 | Partial Third Floor Plan - Mechanical | 1/26/2007 |
| M2.32 | Partial Third Floor Plan - Mechanical | 1/26/2007 |
| M2.41 | Partial Fourth Floor Plan - Mechanical | 1/26/2007 |
| M2.42 | Partial Fourth Floor Plan - Mechanical | 1/26/2007 |
| MEP2.51 | Partial Roof Plan - Mechanical/Electrical/Plumbing | 1/26/2007 |
| MEP2.52 | Partial Roof Plan - Mechanical/Electrical/Plumbing | 1/26/2007 |
| M3.01 | Partial Floor Plans - Mechanical | 1/26/2007 |
| M3.02 | Partial Second Floor Plans - Mechanical | 1/26/2007 |
| M3.03 | Partial Third Floor Plans - Mechanical | 1/26/2007 |
| M3.04 | Partial Fourth Floor Plans - Mechanical | 1/26/2007 |
| M4.02 | Mechanical Details | 1/26/2007 |

## Plumbing

| | | |
|---|---|---|
| P2.01 | Partial Underfloor Plan - Plumbing | 1/26/2007 |
| P2.02 | Partial Underfloor Plan - Plumbing | 1/26/2007 |
| P2.11 | Partial First Floor Plan - Plumbing | 1/26/2007 |
| P2.12 | Partial First Floor Plan - Plumbing | 1/26/2007 |
| P2.21 | Partial Second Floor Plan - Plumbing | 1/26/2007 |
| P2.22 | Partial Second Floor Plan - Plumbing | 1/26/2007 |
| P2.31 | Partial Third Floor Plan - Plumbing | 1/26/2007 |
| P2.32 | Partial Third Floor Plan - Plumbing | 1/26/2007 |
| P2.41 | Partial Fourth Floor Plan - Plumbing | 1/26/2007 |
| P2.42 | Partial Fourth Floor Plan - Plumbing | 1/26/2007 |
| P3.01 | Partial Enlarged Plans - Plumbing | 1/26/2007 |
| P3.02 | Partial Enlarged Plans - Plumbing | 1/26/2007 |
| P4.01 | Plumbing Riser Diagrams | 1/26/2007 |

## Electrical

| | | |
|---|---|---|
| E1.01 | Site Plan Electrical | 3/9/2007 |
| E2.11 | First Floor Plan Electrical | 3/9/2007 |
| E2.12 | Partial First Floor Plan Electrical | 3/9/2007 |
| E2.21 | Partial Second Floor Plan Electrical | 3/9/2007 |
| E2.22 | Partial Second Floor Plan Electrical | 3/9/2007 |
| E2.31 | Partial Third Floor Plan Electrical | 3/9/2007 |
| E2.32 | Partial Third Floor Plan Electrical | 3/9/2007 |
| E2.41 | Partial Fourth Floor Plan Electrical | 3/9/2007 |
| E2.42 | Partial Fourth Floor Plan Electrical | 3/9/2007 |
| E4.01 | Single Line Electrical | 3/9/2007 |
| E4.02 | Details Electrical | 3/9/2007 |
| E4.03 | Details Electrical | 3/9/2007 |
| E5.01 | Electrical Schedules | 3/9/2007 |
| E5.02 | Electrical Schedules | 3/9/2007 |
| E5.03 | Electrical Schedules | 3/9/2007 |
| E5.04 | Electrical Schedules | 3/9/2007 |
| E5.05 | Electrical Schedules | 3/9/2007 |
| E5.06 | Lighting Fixture Schedule | 3/9/2007 |
| EL2.11 | Partial First Floor Plan Lighting | 3/9/2007 |
| EL2.12 | Partial First Floor Plan Lighting | 3/9/2007 |
| EL2.21 | Partial Second Floor Plan Lighting | 3/9/2007 |
| EL2.22 | Partial Second Floor Plan Lighting | 3/9/2007 |
| EL2.31 | Partial Third Floor Plan Lighting | 3/9/2007 |
| EL2.32 | Partial Third Floor Plan Lighting | 3/9/2007 |
| EL2.41 | Partial Fourth Floor Plan Lighting | 3/9/2007 |
| EL2.42 | Partial Fourth Floor Plan Lighting | 3/9/2007 |

## Landscape & Irrigation

| | | |
|---|---|---|
| LC 1.1 | General Notes & Materials Schedule | 4/18/06 |
| LS 1.1 | Overall Landscape Sitework Plan | 4/18/06 |
| LS 1.2 | Sitework & Paving Enlargements | 4/18/06 |
| LS 2.1 | Sitework Details | 4/18/06 |
| LP 1.1 | Planting Plan | 4/18/06 |
| LP 1.2 | Planting Entry Enlargement | 4/18/06 |
| LP 1.3 | Planting Entry Enlargement | 4/18/06 |
| LP 2.1 | Planting Details | 4/18/06 |
| LI 1.1 | Overall Landscape Irrigation Plan | 4/18/06 |

6

| LI 1.3 | Landscape Irrigation Building Enlargement | 4/18/06 | |
| LI 1.2 | Landscape Irrigation Building Enlargement | 4/18/06 | |
| LI 2.1 | Landscape Irrigation Detials | 4/18/06 | |

## Specification

| 00010 | Table of Contents | 9/1/2006 | 4 Pages |
| 02110 | Site Clearing | 1/19/2006 | 2 Pages |
| 02122 | Tree Protection and Trimming | 1/19/2006 | 3 Pages |
| 02200 | Site Earthwork | 1/19/2006 | 8 Pages |
| 02201 | Trenching, Embedment and Backfilling | 1/19/2006 | 2 Pages |
| 02244 | Lime Soil Stabilization | 1/19/2006 | 4 Pages |
| 02400 | Trench Safety Sheeting and Shoring | 1/19/2006 | 8 Pages |
| 02466 | Drilled Piers | 10/21/2005 | 9 Pages |
| 02520 | Portland Cement Concrete Paving | 1/19/2006 | 4 Pages |
| 02624 | Concrete Curb and Gutter | 1/19/2006 | 2 Pages |
| 02660 | Water and Pipe Fittings | 1/19/2006 | 5 Pages |
| 02661 | Gate Valves and Butterfly Valves | 1/19/2006 | 6 Pages |
| 02662 | Fire Hydrants | 1/19/2006 | 1 Pages |
| 02663 | Wet Connection | 1/19/2006 | 1 Pages |
| 02665 | Water Pipe Test | 1/19/2006 | 3 Pages |
| 02666 | Water Dechlorination | 1/19/2006 | 1 Pages |
| 02667 | Cutting, Plugging and Blocking off Existing Water Mains | 1/19/2006 | 1 Pages |
| 02720 | Reinforced Concrete Pipe Culverts | 1/19/2006 | 1 Pages |
| 02721 | Drainage Structures | 1/19/2006 | 1 Pages |
| 02722 | Corrugated Polyathylene Pipe | 1/19/2006 | 3 Pages |
| 02730 | Sanitary Sewer Mains | 1/19/2006 | 2 Pages |
| 02731 | Sanitary Sewer Manholes | 1/19/2006 | 2 Pages |
| 02732 | Sanitary Sewer Testing | 1/19/2006 | 1 Pages |
| 03300 | Cast-In-Place Concrete | 10/25/2005 | 13 Pages |
| 03301 | Under Slab Vapor Barrier/Retarder | 10/21/2005 | 2 Pages |
| 03305 | Concrete Curing, Sealing and Hardening | 11/7/2005 | 3 Pages |
| 03470 | Tilt-Up Concrete Construction | 10/21/2005 | 6 Pages |
| 03490 | Glass Fiber Reinforced Precast Concrete | 10/21/2005 | 5 Pages |
| 05120 | Structural Steel | 10/21/2005 | 6 Pages |

7

| 05210 | Steel Joists | 10/21/2005 | 6 Pages |
|-------|--------------|------------|---------|
| 05310 | Steel Deck | 10/21/2005 | 2 Pages |
| 05500 | Metal Fabrications | 10/21/2005 | 7 Pages |
| 05511 | Metal Stairs | 10/21/2005 | 8 Pages |
| 05521 | Pipe and Tube Railing | 10/21/2005 | 8 Pages |
| 05811 | Architectural Joint System | 10/21/2005 | 6 Pages |
| 06100 | Rough Carpentry | 10/21/2005 | 5 Pages |
| 06402 | Interior Architectural Woodwork | 10/21/2005 | 5 Pages |
| 07170 | Bentonite waterproofing | 10/21/2005 | 5 Pages |
| 07210 | Building Insulation | 10/21/2005 | 7 Pages |
| 07412 | Metal Wall Panels | 10/21/2005 | 9 Pages |
| 07540 | Thermoplastic Membrane Roofing | 10/21/2005 | 6 Pages |
| 07620 | Sheet Metal Flashing and Trim | 10/21/2005 | 5 Pages |
| 07720 | Roof Accessories | 6/22/2006 | 3 Pages |
| 07811 | Sprayed Fire- Resistive Materials | 10/21/2005 | 5 Pages |
| 07842 | Fire Resistive Joint Systems | 10/21/2005 | 4 Pages |
| 07920 | Joint Sealants | 2/27/2006 | 7 Pages |
| 08110 | Steel Doors and Frames | 10/21/2005 | 5 Pages |
| 08125 | Interior Aluminum Frames | 10/21/2005 | 4 Pages |
| 08211 | Flush Wood Doors | 10/21/2005 | 4 Pages |
| 08311 | Access Doors | 10/21/2005 | 5 Pages |
| 08331 | Overhead Coiling Doors | 10/21/2005 | 4 Pages |
| 08410 | Aluminum Entrances and Storefronts | 10/21/2005 | 10 Pages |
| 08470 | Revolving Entrance Doors | 10/21/2005 | 7 Pages |
| 08620 | Unit Skylights | 10/21/2005 | 3 Pages |
| 08710 | Door Hardware | 6/12/2006 | 18 Pages |
| 08711 | Door Schedule | 6/22/2006 | 7 Pages |
| 08800 | Glass & Glazing | 10/21/2005 | 7 Pages |
| 08830 | Mirrors | 10/21/2005 | 5 Pages |
| 08911 | Glazed Aluminum Curtain Wall | 10/21/2005 | 9 Pages |
| 09000 | Material Legend | 6/22/2006 | 2 Pages |
| 09253 | Gypsum Sheathing | 10/21/2005 | 3 Pages |
| 09260 | Gypsum Board Assemblies | 10/21/2005 | 14 Pages |

8

R.P. Appx. 408                                   97

| 09265 | Gypsum Board Shaft-Wall Assemblies | 10/21/2005 | 5 Pages |
|---|---|---|---|
| 09310 | Ceramic Tile | 10/21/2005 | 7 Pages |
| 09402 | Epoxy Terrazo | 10/21/2005 | 5 Pages |
| 09514 | Acoustical Pan Ceilings | 10/21/2005 | 4 Pages |
| 09653 | Resilient Wall Base | 10/21/2005 | 4 Pages |
| 09671 | Resinous Flooring | 10/27/2005 | 6 Pages |
| 09861 | Carpet Tile | 10/21/2005 | 3 Pages |
| 09912 | Painting | 10/21/2005 | 9 Pages |
| 09950 | Wall Covering | 9/1/2006 | 2 Pages |
| 09970 | Special Wall Surfaces(Fiberglass Reinforced Plastic Panels) | 10/21/2005 | 4 Pages |
| 09980 | Special Coatings for Concrete Surfaces | 6/22/2006 | 6 Pages |
| 10155 | Toilet Compartments | 7/28/2006 | 2 Pages |
| 10270 | Access Flooring | 10/21/2005 | 6 Pages |
| 10520 | Fire Protection Specialties | 10/21/2005 | 5 Pages |
| 10801 | Toilet and Bath Accessories | 6/22/2006 | 2 Pages |
| 11160 | Loading Dock Equipment | 10/21/2005 | 5 Pages |
| 12491 | Horizontal Blinds | 10/21/2005 | 3 Pages |
| 14240 | Hydraulic Elevators | 2/27/2006 | 8 Pages |
| 15010 | Basic Mechanical Requirements | 1/19/2006 | 4 Pages |
| 15071 | Mechanical Vibration Controls | 1/19/2006 | 4 Pages |
| 15075 | Mechanical Identification | 1/19/2006 | 4 Pages |
| 15081 | Duct Insulation | 1/10/2006 | 8 Pages |
| 15083 | Pipe Insulation | 1/19/2006 | 10 Pages |
| 15100 | Valves | 1/19/2006 | 8 Pages |
| 15135 | Meters and Gages | 1/19/2006 | 4 Pages |
| 15140 | Hangers and Supports | 1/19/2006 | 4 Pages |
| 15300 | Fire Suppression Piping | 1/19/2006 | 14 Pages |
| 15411 | Water Distribution Piping | 1/19/2006 | 8 Pages |
| 15420 | Drainage and Vent Systems | 1/19/2006 | 7 Pages |
| 15440 | Plumbing Fixtures | 1/19/2006 | 4 Pages |
| 15453 | Plumbing Pumps | 1/19/2006 | 4 Pages |
| 15460 | Water Heaters | 1/19/2006 | 3 Pages |

R.P. Appx. 409

98

| 15730 | Section Packaged Rooftop Air Conditioning Units | 1/19/2006 | 10 Pages |
|---|---|---|---|
| 15838 | Power Ventilators and Exhaust Fans | 1/19/2006 | 7 Pages |
| 15883 | Variable Frequency Drives | 1/19/2006 | 5 Pages |
| 15891 | Metal Ducts | 1/19/2006 | 8 Pages |
| 15910 | Duct Accessories | 1/19/2006 | 6 Pages |
| 15932 | Air Outlets and Inlets | 1/19/2006 | 3 Pages |
| 15933 | Air Terminals | 1/19/2006 | 4 Pages |
| 15970 | Automatic Controls | 6/7/2006 | 32 Pages |
| 15990 | Testing, Adjusting, and Balancing | 1/19/2006 | 7 Pages |
| 15995 | Commissioning | 1/19/2006 | 5 Pages |
| 16010 | Basic Electrical Requirements | 1/19/2006 | 4 Pages |
| 16110 | Raceways | 1/19/2006 | 5 Pages |
| 16120 | Wires and Cables | 1/19/2006 | 3 Pages |
| 16135 | Cabinets, Boxes, and Fittings | 1/19/2006 | 5 Pages |
| 16143 | Wiring Devices | 1/19/2006 | 4 Pages |
| 16170 | Circuit and Motor Disconnect Switches | 1/19/2006 | 2 Pages |
| 16190 | Circuit and Motor Disconnect Switches | 1/19/2006 | 4 Pages |
| 16195 | Electrical Identification | 1/19/2006 | 3 Pages |
| 16420 | Service Entrance | 1/19/2006 | 4 Pages |
| 16425 | Switchboards | 1/19/2006 | 6 Pages |
| 16452 | Grounding | 1/19/2006 | 5 Pages |
| 16460 | Transformers | 1/19/2006 | 3 Pages |
| 16470 | Panelboards | 1/19/2006 | 4 Pages |
| 16471 | Transient Voltage Surge Suppressors | 1/19/2006 | 4 Pages |
| 16475 | Overcurrent Protective Devices | 1/19/2006 | 5 Pages |
| 16481 | Motor Controllers | 1/19/2006 | 4 Pages |
| 16515 | Lighting | 1/19/2006 | 6 Pages |
| 16670 | Lightning Protection Systems | 1/19/2006 | 3 Pages |
| 16721 | Fire Alarm Systems | 1/19/2006 | 7 Pages |

R.P. Appx. 410



R.P. Appx. 411

# Business Search

Note: It appears that some browsers, including Microsoft Internet Explorer Version 11, may display information improperly. TBAE staff are working on a solution to this problem, and meanwhile encourage users to view this page using Firefox, Chrome, Safari, or an earlier version of Internet Explorer if necessary while we work on the solution. Instructions to view results in Microsoft Internet Explorer 11.

### Enter your search criteria

Reg #: BR [ ]  Firm Name: Clayco  City: Saint Louis  State: MO  Zip: 63114

Select Profession  [Search]

There Is No Result Based On Your Search Criteria.

R.P. Appx. 412

# Business Search

Note: It appears that some browsers, including Microsoft Internet Explorer Version 11, may display information improperly. TBAE staff are working on a solution to this problem, and meanwhile encourage users to view this page using Firefox, Chrome, Safari, or an earlier version of Internet Explorer if necessary while we work on the solution. Instructions to view results in Microsoft Internet Explorer 11.

### Enter your search criteria

Reg #: BR [_____] Firm Name: Clayco [_____] City: St. Louis [_____] State: MO Zip: 63114

[ Select Profession ] [ Search ]

There Is No Result Based On Your Search Criteria.

R.P. Appx. 413